UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 Case |
|  | ) |  |
| Adelphia Communications Corporation, et al., | ) | Case No. 02-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |

_____

**DEBTORS' MOTION FOR ENTRY OF AN ORDER:
(a) AUTHORIZING EMPLOYMENT AND RETENTION
COVINGTON & BURLING ("COVINGTON") AS SPECIAL
COUNSEL TO THE SPECIAL COMMITTEE OF THE
BOARD OF DIRECTORS OF DEBTOR ADELPHIA
COMMUNICATIONS CORPORATION; (b) AUTHORIZING
COVINGTON TO EMPLOY CERTAIN PROFESSIONALS
AND ESTABLISHING PROCEDURES FOR THE
EMPLOYMENT AND COMPENSATION OF SUCH
PROFESSIONALS; AND (c) GRANTING RELATED RELIEF**

TO:  THE HONORABLE JUDGES OF THE
      UNITED STATES BANKRUPTCY COURT FOR
      THE SOUTHERN DISTRICT OF NEW YORK:

The above-captioned debtors and debtors in possession the cases (collectively, the "Debtors"), by their attorneys, Willkie Farr & Gallagher, respectfully represent:

**BACKGROUND**

1.      On June 25, 2002 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors simultaneously filed a motion

(the "Joint Administration Motion") seeking to have their chapter 11 cases consolidated for procedural purposes and jointly administered.[1]

2.       Adelphia Communications Corporation ("ACC" or "Parent"), a Delaware corporation and the ultimate parent Debtor, owns all of the issued and outstanding shares of ACC Investment Holdings, Inc., a Delaware corporation, and ACC Operations, Inc. ("HoldCo"), a Delaware corporation.  HoldCo, in turn, directly or indirectly owns, controls or holds interests in virtually all of the remaining Debtors.

3.       Until January 11, 2002, ACC owned approximately 78.4% of the outstanding stock of Adelphia Business Solutions, Inc. ("ABIZ") and held approximately 95.9% of the total voting power.  On January 11, 2002, ACC distributed, in the form of a dividend, all of the shares of ABIZ common stock owned by ACC to holders of ACC's Class A and Class B common stock (the "Spin-off").[2]  Subsequent to the Spin-off, Adelphia has continued a business relationship with ABIZ, such that ABIZ has borrowed funds from Adelphia, certain of ABIZ's subsidiaries manage certain facilities-based integrated communication networks which Adelphia previously purchased from ABIZ, and the companies provide other management and services to each other.  On March 27, 2002, ABIZ and certain of its subsidiaries (the "ABIZ Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court (the "March 27 ABIZ Filings").  In addition, on June 18, 2002, eleven additional subsidiaries of

---

[1]       On June 10, 2002, Century Communications Corporation ("CCC"), a wholly-owned subsidiary of Arahova Communications, Inc., a Debtor herein, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "CCC Bankruptcy Case").  CCC has continued in possession of its property and the management of its business as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  Pursuant to the Joint Administration Motion, the Debtors are seeking to consolidate the CCC Bankruptcy Case with the instant chapter 11 cases for procedural and joint administration purposes.

[2]       Following the Spin-off, ABIZ continued to be an affiliate of ACC by virtue of the fact that the Rigas Family, directly or indirectly, owns approximately 9.4% of the common stock of ABIZ and approximately 53.4% of the voting interests in ABIZ.

ABIZ also commenced voluntary chapter 11 cases with this Court (together with the March 27

ABIZ Filings, the "ABIZ Bankruptcy Cases").  The ABIZ Bankruptcy Cases are being

administered separately from these chapter 11 cases.

4.    Together with its direct and indirect subsidiaries (collectively,

"Adelphia"), Adelphia is the sixth largest operator of cable television systems in the United

States.  The Debtors' cable systems are located in 29 states and Puerto Rico and are organized

into six strategic clusters: Los Angeles; "PONY" (Western Pennsylvania, Ohio and Western

New York); New England; Florida; Virginia; and Colorado Springs.  Such cable systems are

located primarily in suburban areas of large and medium-sized cities within the 50 largest

television markets.  As of June 1, 2002, the broadband networks for the Debtors' cable systems

passed in front of approximately 9.0 million homes and approximately 5.8 million basic

subscribers.  Adelphia's corporate headquarters are located at One North Main Street,

Coudersport, Pennsylvania 16915-1141.

5.    As of June 1, 2002, the Debtors employed approximately 15,444 full and

part-time employees, of which approximately 632 employees were covered by collective

bargaining agreements.

6.    In addition to operation of their cable television systems, the Debtors

operate and/or hold interests in six (6) non-cable businesses, including: (i) wireless messaging

and paging services ("Paging"); (ii) mobile telephone reseller services ("Mobile"); (iii) long

distance telephone reseller services ("Long Distance"); (iv) advertising in connection with

Adelphia's cable business ("Advertising"); (v) home security ("Security"); and (vi) a CLEC

business managed by ABIZ on ACC's behalf ("CLEC" and together with Paging, Mobile, Long

Distance, Advertising and Security, the "Non-Cable Businesses").

7.      The predecessor cable companies to Adelphia were founded in 1952 by John J. Rigas.  ACC was incorporated in 1986 by Mr. Rigas.  Mr. Rigas and members of his immediate family (collectively, the "Rigas Family") own or control certain non-Debtor partnerships, corporations and limited liability companies which are engaged in the ownership and operation of cable television systems and other related and unrelated businesses (collectively, the "Rigas Entities").  In addition to their own business operations, the Debtors manage and maintain virtually every aspect of those Rigas Entities that own and operate cable television systems (collectively, the "Managed Rigas Entities"), including, but not limited to, (i) administrative functions such as cash management, billing, accounting, human resources and payroll and (ii) operational functions such as programming, advertising, sales, customer service, engineering and maintenance.  As the revenues of the Managed Rigas Entities are regularly deposited into Adelphia's cash management system, the Debtors are largely reimbursed for the expenditures made on the Managed Rigas Entities' behalf.  In addition, in exchange for these management services, the Debtors charge the Managed Rigas Entities a management fee based upon the revenue of such entities.

8.      As of June 1, 2002, various Debtors owed approximately $6.8 billion in principal amount (excluding outstanding letters of credit, accrued and unpaid interest and applicable fees and expenses) under six different credit facilities (collectively, the "Credit Facilities").[3]  The lenders under each of the Credit Facilities are syndicates of banks and other secured lenders (the "Prepetition Lenders").  The Debtors' obligations under the Credit Facilities

---

[3]      Three of the Credit Facilities are co-borrowing credit facilities (collectively, the "Co-Borrowing Facilities") under which certain of the Debtors are co-borrowers with various Rigas Entities.  Under the terms and conditions of the Co-Borrowing Facilities, each co-borrower may borrow up to the entire amount of available credit under the respective Co-Borrowing Facility, and each co-borrower is jointly and severally liable for the entire amount of the indebtedness under the applicable Co-Borrowing Facility regardless of whether the particular co-borrower actually borrowed the total indebtedness under the respective Co-Borrowing Facility.

are secured by certain pledges of capital stock in various operating subsidiaries, and with respect to one of the Credit Facilities, other asset-based collateral.

9.      In addition, as of June 1, 2002, ACC owed approximately (i) $4.9 billion in principal amount (excluding accrued and unpaid interest) under fourteen series of unsecured senior notes issued pursuant to nine indentures (collectively, the "ACC Senior Notes") and (ii) $2.0 billion in principal amount (excluding accrued and unpaid interest) under two series of unsecured convertible subordinated notes issued pursuant to a single indenture[4] (collectively, the "ACC Subordinated Notes" and together with the ACC Senior Notes, the "ACC Notes").

10.      In addition to the ACC Notes, ACC has issued approximately $1.6 billion of cumulative exchangeable, mandatory and/or mandatory convertible preferred stock (the "ACC Preferred Stock").  Four series of ACC Preferred Stock are currently outstanding: (i) $150 million of 13% Series B Cumulative Exchangeable Preferred Stock with a maturity of July 15, 2009; (ii) $575 million of 5.5% Series D Convertible Preferred Stock; (iii) $345 million of 7.5% Series E Mandatory Convertible Preferred Stock with a maturity of November 15, 2004; and (iv) $575 million of 7.5% Series F Mandatory Convertible Preferred Stock with a maturity of February 1, 2005.  All series of Preferred Stock are registered and approximately 1.5 million shares of Series B, 2.875 million shares of Series D, 13.8 million shares of Series E and 23 million shares of Series F Preferred Stock were outstanding as of June 1, 2002.

11.      Certain Debtor-subsidiaries of HoldCo including, Olympus Communications, L.P., FrontierVision Operating Partners, L.P., FrontierVision Holdings, L.P. and Arahova Communications, Inc. (f/k/a Century Communications Corp.), have also issued

---

[4]      These totals include approximately $567 million of convertible subordinated notes held by certain of the Rigas Entities issued pursuant to two separate series that mirror the terms and conditions of the ACC Subordinated Notes.

several series of senior and subordinated notes (the "Subsidiary Notes" and together with the

ACC Notes, the "Notes").  As of June 1, 2002, these HoldCo subsidiaries owed approximately

$2.6 billion in principal amount (excluding accrued and unpaid interest) pursuant to the

Subsidiary Notes.

12.    Prior to being delisted on June 3, 2002, ACC's Class A common stock

was publicly traded on NASDAQ under the symbol ADLAE.  As of June 1, 2002, there were

approximately (i) 228.6 million shares of ACC's Class A common stock outstanding and (ii)

25.1 million shares of ACC's Class B common stock outstanding.  ACC's Class A common

stock is currently traded on the NASDAQ OTC under the symbol ADELA.

13.    An informal committee (the "Informal Committee") of holders of the ACC

Notes has been formed and is active.  No official committee, trustee or examiner has been

appointed in these cases.

14.    Due to its valuable assets and strong core business, Adelphia has been and

remains a viable business enterprise that generates substantial cash flow from operations.  In

order to sustain its business and ensure the future development and growth of its cable systems,

infrastructure and broadband network, Adelphia must continuously expend capital on

construction, modernization, expansion, and maintenance.  Until recently, Adelphia largely

financed such expenditures -- and its working capital needs -- by borrowings under its Credit

Facilities and raising money through issuance of the Notes.  However, a series of recent events

have precluded Adelphia from borrowing under its Credit Facilities and limited Adelphia's

access to capital markets, thus precipitating a severe liquidity crisis.

15.    Specifically, on May 14, 2002, Deloitte & Touche LLP, Adelphia's former

auditor, suspended its auditing work on Adelphia's financial statements for the year ended

December 31, 2001.  Consequently, Adelphia was unable to: (i) deliver audited financial

statements as required under the Credit Facilities; (ii) comply with certain information delivery

and other requests made pursuant to the Credit Facilities and the Notes; and (iii) file its Form 10-

K for the year ended December 31, 2001.  The failure to produce these items gave rise to

defaults, and ultimately to Events of Default, as defined in certain of the Credit Facilities and the

Notes.  Subsequently, on May 15, 2002, Adelphia failed to make interest payments totaling

approximately $38.3 million under certain of the Notes and an approximately $6.5 million

dividend payment on its Series E Mandatory Convertible Preferred Stock.  These payment

defaults in turn triggered cross-defaults among certain of the Credit Facilities and the Notes.  In

addition, the delisting of ACC's Class A common stock by the NASDAQ National Market on

June 3, 2002, triggered obligations to repurchase certain ACC Notes at 100% of their principal

amount plus accrued and unpaid interest.  On June 15, 2002, Adelphia failed to make interest

payments totaling approximately $55.4 million under certain of the Notes.

      16.     The events, developments and matters described above transpired in the

broader context of certain announcements and disclosures contained in certain Securities and

Exchange Commission ("SEC") filings and press releases by ACC since March 27, 2002

(collectively "the SEC Filings and Press Releases") that have raised serious concerns in the

financial marketplace.[5]  On April 3, 2002, ACC announced that the SEC was conducting an

informal inquiry into the Co-Borrowing Facilities and asked Adelphia to provide clarification

and documentation related thereto.  On April 17, 2002, ACC announced that it had been

informed that the SEC had issued a formal order of investigation in connection with the Co-

---

[5]    The descriptions of the events, developments and matters below are not intended to be complete summaries
and are qualified in their entirety by reference to the SEC Filings and Press Releases, which are hereby
incorporated by reference.

Borrowing Facilities.  On April 18, 2002, ACC announced that it had received a NASDAQ Staff

Determination Letter indicating that it was not in compliance with Marketplace Rule 4310(c)(14)

for failing to timely file with the SEC its Annual Report on Form 10-K for the year ended

December 31, 2001 and consequently, its securities were subject to delisting from the NASDAQ

National Market.  On May 16, 2002, ACC announced that the Special Committee of the Board of

Directors (the "Special Committee") consisting of three independent directors would expand its

ongoing investigation into a number of issues, including transactions between the Debtors and

the Rigas Entities.

       17.     On May 23, 2002, ACC announced that as a result of discussions with the

SEC, it had tentatively concluded that it should increase to approximately $2.5 billion, from the

$1.6 billion previously reported, the amount of indebtedness to be included in its financial

statements as of December 31, 2001, to reflect the full amount of principal borrowings and

interest expense incurred by the Rigas Entities.  ACC also announced that as of April 30, 2002, it

estimated the total amount of co-borrowings by Rigas Entities for which Adelphia is jointly and

severally liable was approximately $3.1 billion.

       18.     On May 23, 2002, ACC further announced that an agreement had been

reached with the Rigas Family (the "Rigas Agreement") pursuant to which the Rigas Family

agreed to take certain actions to relinquish control of Adelphia and to transfer certain assets to

Adelphia.  In connection with execution of the Rigas Agreement, all Rigas Family members still

serving as officers and/or directors of Adelphia resigned their positions.  The Rigas Agreement,

which contemplates the execution of definitive documentation subject to Bankruptcy Court

approval, also provides that, among other things: (i) cash flow from cable properties owned by

the Managed Rigas Entities will be used to support the Rigas Family's obligations under the Co-

Borrowing Facilities; (ii) Adelphia debt held by the Rigas Family, amounting to approximately $567 million, would be transferred to Adelphia in exchange for satisfaction of the Rigas Family obligations under a certain $202 million stock purchase agreement and a transfer to Adelphia of primary liability for approximately $365 million under the Co-Borrowing Facilities; (iii) those cable properties owned by the Managed Rigas Entities that Adelphia chooses to have transferred to Adelphia will be transferred to Adelphia or to a third party of Adelphia's choosing at their appraised value; (iv) all ACC stock owned by the Rigas Family will be placed in a voting trust until all obligations of the Rigas Family to Adelphia for loans, advances, or borrowings under the Co-Borrowing Facilities or otherwise are satisfied; and (v) all ACC common and preferred stock held by the Rigas Family will be pledged to Adelphia as security for the balance of the Rigas Family's obligations.

19.    On May 24, 2002, ACC announced that it had filed a current report on Form 8-K, disclosing and outlining, among other things, various transactions with the Rigas Entities and the Co-Borrowing Facilities.  On June 10, 2002, ACC disclosed that certain material financial information, including revenue estimates, for the years ended December 31, 2000 and 2001 was overstated and would need to be revised.  In addition, ACC announced that it would reduce its reported subscriber count by 47,000.

20.    As a cumulative result of the foregoing announcements, disclosures and events of default, the Debtors had no borrowing availability under their various Credit Facilities and no access to traditional sources of liquidity in the capital markets.  In addition, Adelphia's efforts to generate liquidity through the sale of certain of its assets have been unsuccessful. Consequently, Adelphia determined that the continued viability of its businesses required immediate access to debtor in possession financing and a breathing spell from creditors to

resolve its financial reporting and related issues and restructure its highly leveraged capital structure.

21.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges," dated July 10, 1984, issued by District Court Judge Robert T. Ward.  Venue of these cases and the within motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 327(e), 328 and 1107(b) of the Bankruptcy Code, as supplemented by Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## RELIEF REQUESTED

22.     By this motion (the "Motion") and pursuant to section 327(e), as modified by section 1107(b) and section 328 of the Bankruptcy Code, the Debtors seek to employ the firm of Covington & Burling ("Covington") as special counsel to the Special Committee of the Board of Directors of Adelphia Communications Corporation (the "Special Committee") under a general retainer to perform the legal services summarized in paragraph 27 below.  The Debtors believe Covington is well qualified to act as special securities counsel on behalf of the Debtors in these cases.

## DESCRIPTION OF COVINGTON SERVICES

23.     Upon its formation, the Special Committee recognized that it needed sophisticated legal assistance to investigate the numerous transactions among the Debtors and the Rigas Entities and analyze the myriad legal issues raised by such an investigation.  The Special Committee selected Covington to represent it because of Covington's expertise in such matters.

24.     Founded more than 80 years ago, Covington is a leading international law firm, with over 500 lawyers practicing in Washington, New York, San Francisco, London, and

Brussels.  Covington's major practice areas include mergers and acquisitions, finance and

taxation, antitrust and regulatory law, technology and intellectual property law, white collar

defense as well as virtually all types of litigation and alternative dispute resolution proceedings.

   25. Two of Covington's specialties are in the areas of "white collar" defense

work and corporate governance.  Covington represents clients in all areas of white collar

representation and civil cases involving potential allegations of criminal conduct by providing

services that include:  defending individuals and corporations in criminal and parallel civil

proceedings before federal and state courts, the U.S. Department of Justice, the Securities and

Exchange Commission, and other federal and state agencies; and representing clients in

congressional, inspector general, and independent counsel investigations.  Also Covington will

conduct internal investigations for corporate clients and other entities, help design corporate

compliance programs, and advise public companies and new issuers on disclosure and related

issues in connection with public offerings.

   26. Covington has represented the Special Committee since March 2002.  In

particular, Covington has represented the Special Committee in the investigation of:  (a) certain

accounting and disclosure issues relating to Adelphia; and (b) material relationships and

transactions involving Adelphia and certain of its subsidiaries, on the one hand, and the Rigas

Entities, on the other hand.  As of the Petition Date, a number of matters being handled by

Covington & Burling were pending.

   27. During these cases, in connection with its proposed retention, the

professional services that Covington & Burling will render to the Special Committee are

expected to include, but not necessarily be limited to, the following:

    (a) investigate the nature and propriety of certain transactions between the
       Debtors and the Rigas Entities;

(b)    investigate the integrity of the Debtors' books and records, including the accuracy and completeness of the Debtors' financial accounting;

(c)    report to the Special Committee on the findings of the investigation;

(d)    advise and counsel the Special Committee with respect to the Debtors' compliance with obligations under certain credit agreements and other debt instruments;

(e)    coordinate with other professionals retained by the Debtors; and

(f)    perform other appropriate legal services for the Special Committee related to corporate governance.

28.    Based on Covington's overall expertise and the services performed to date, the Special Committee believes Covington is well-qualified to serve as special counsel and therefore, Covington's retention is in the best interests of the estates.

29.    In addition, the Special Committee recognized that Covington could not perform all the necessary services by itself to investigate thoroughly the Debtors' transactions and relationships with, among others, the Rigas Entities --  an investigation which would necessitate a review of the Debtors' financial reporting and accounting.  Accordingly, the Special Committee authorized Covington to employ the accounting firm of Urbach Kahn & Welin Advisors, Inc. ("Urbach") to perform forensic accounting services to assist Covington in its investigation.  In addition to seeking approval of Covington's retention, this Motion also seeks to authorize the implementation of procedures pursuant to which Covington may employ one or more "Special Professionals" (as defined below), including Urbach, and provide for their compensation .

## APPLICABLE LEGAL AUTHORITY

A.    *Employment of special counsel pursuant to 11 U.S.C. § 327(e).*

30.    The Debtors submit that the retention of Covington under the terms described herein is appropriate under sections 327(e), 328 and 1107 of the Bankruptcy Code.

With the court's approval, a debtor in possession has the power to employ attorneys as special

counsel pursuant to section 327(e) of the Bankruptcy Code, which provides:

> e. The [debtor], with the Court's approval, to retain "for a specified special
> purpose, other than in conducting the [Debtors' cases], an attorney that has
> represented the [Debtors], if in the best interests of [the estates], and if such
> attorney does not represent or hold any interest adverse to the [Debtors] or
> [their estates] with respect to the matter on which such attorney is to be
> employed.

11 U.S.C. § 327(e).  See, e.g., DeVlieg-Bullard, Inc. v. Natale (In re DeVlieg, Inc.), 174 B.R.

497 (N.D. Ill. 1994);  Meespierson Inc. v. Strategic Telecom, Inc., 202 B.R. 845, 847-48 (Bankr.

D. Del. 1996);  In re Leisure Dynamics, 32 B.R. 753, 754 n.2 (Bankr. D. Minn.), aff'd, 33 B.R.

121 (D. Minn. 1983) (noting that court had approved debtor's retention of corporate counsel

under section 327(e)).  Section 1107(b) provides that "a person is not disqualified for

employment under section 327 of this title by a debtor in possession solely because of such

person's employment by or representation of the debtor before the commencement of the case."

11 U.S.C. § 1107(b).

31.     Simply put, section 327(e) authorizes the retention of an attorney who

previously represented a debtor prepetition, provided that:  (a) such retention is for a special

purpose; (b) the purpose of the retention is not to conduct the cases; (c) the retention is in the

best interests of the estates; and (d) the attorney does not hold any interest adverse to the debtor

respecting the subject of its retention.  As detailed below, the Debtors' proposed retention of

Covington as special corporate counsel falls squarely within the scope of and purpose for which

Congress enacted section 327(e).

(i)     Special Purpose

32.     Covington's proposed retention pursuant to section 327(e) of the

Bankruptcy Code is for the limited purpose of representing the Special Committee.  Prior to the

Petition Date, Covington rendered specific services in connection with the investigation of certain corporate governance and accounting matters, as described above, to the Special Committee.  The Special Committee expects that Covington will continue to provide those services as well as such other matters that may designated by the Special Committee.  None of the matters for which Covington is responsible is central to the Debtors' reorganization.

33.   The Debtors have filed an application seeking to retain Boies, Schiller & Flexner LLP ("BS&F"), as special counsel, to represent the Debtors in connection with certain lawsuits and investigations by federal authorities.  The services of the two firms will not overlap.

(ii)   Conduct of the Cases

34.   Covington's proposed retention is for the discrete matters referenced above, and Covington will not be rendering services typically performed by a debtors' bankruptcy counsel.  Among other things, Covington ordinarily will not be involved in interfacing with this Court or be primarily responsible for the Debtors' general restructuring efforts.  By delineating Covington's limited role, the Debtors have ensured there will be no duplication of services.

(iii)   Best Interests of the Estates

35.   Covington's retention also is in the best interests of the Debtors, their estates and creditors.  The Special Committee selected Covington prepetition because, among other things, its attorneys have extensive experience and knowledge in the fields of corporate governance and white collar defense.  Covington has developed a particular understanding of the legal issues confronting the Debtors.  This information leaves Covington uniquely situated to assist the Debtors in providing the services described above.

36.   Accordingly, Covington's familiarity with the Debtors could not be replicated with new counsel without the additional and unnecessary expenditure of both time and

money.  Courts have recognized the benefits of retaining special counsel under such conditions.

See In re Sharon Steel Corp., 156 B.R. 14, 16 (W.D. Pa. 1993) (noting that appointment of

special counsel will "eliminate the possibility of derailing reorganization because the expertise

and knowledge of pre-petition counsel in the areas of their prior service will be maintained" and

"result in significant cost savings").  Covington is best suited to serve as special counsel to the

Special Committee and to ensure that the Debtors' interests are protected and these cases proceed

in an efficient and successful manner.  As such, Covington's retention is warranted.

        (iv)    <u>Adverse Interest</u>

        37.    To the best of the Debtors' knowledge, the members and associates of

Covington do not have any connection with the Debtors, their creditors or any other party in

interest, or their respective attorneys, except to the extent set forth in the affidavit of Leonard

Chazen, a member of Covington, which is annexed hereto as Exhibit "A."  Covington has

informed the Debtors that it represents no interest adverse to the Debtors' estates respecting the

matters on which it is to be retained.

        38.    Where, as here, there is no conflict concerning the subject matter of the

proposed special engagement, a motion to employ special counsel should be granted.  As

recognized in In re Carla Leather, Inc., 44 B.R. 457, 474 (Bankr. S.D.N.Y. 1984), aff'd, 50 B.R.

764 (S.D.N.Y. 1985), "[section] 327(e) bars engagement of special counsel only in the presence

of an actual conflict of interest concerning the subject matter of the engagement." (citations

omitted).

        39.    Section 328(a) of the Bankruptcy Code authorizes the employment of a

professional person "on any reasonable terms and conditions of employment, including a

retainer." 11 U.S.C. § 328(a).  As Covington is likely to render extensive legal services as special

counsel to the Special Committee, the cost of which cannot be estimated with certainty, it is

necessary and essential that the Debtors, as debtors in possession, employ that firm under a general retainer to render the services described herein.

40.     Subject to Court approval in accordance with sections 330 and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules, the Administrative Order Re: Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases and any administrative order entered by this Court governing compensation in these cases, compensation will be payable to Covington on an hourly basis, plus reimbursement of actual and necessary expenses incurred by Covington.

B.     *Employment of "Special Professionals".*

41.     In addition to employing Covington as special counsel, the Debtors seek to implement procedures that will permit Covington to retain certain third parties ("Special Professionals") whose employment Covington may require to assist it in performing its services for the Special Committee.  Such professionals would be hired directly by Covington, but would be paid by the Debtors.  Although the Debtors would not be retaining such Special Professionals, they would still be subject to the material adverse interest disclosures that other retained professionals must make as well as subject to the compensation process in place for other retained professionals.  As of this date, Covington has advised the Debtors that the employment of Urbach Kahn & Swerling ("Urbach") is required.  Urbach is an accounting firm which Covington employed prepetition to provide forensic accounting services.[6]

---

[6]     In accordance with the procedures proposed herein, Urbach will submit to this Court and other interested parties an affidavit that, among other things, discloses its connections with potential parties in interest.

42.     In the typical bankruptcy case, a debtor may retain "Professional

Persons"[7] pursuant to section 327(a) and "Ordinary Course Professionals" pursuant to section

327(e)[8].  In this instance, the Debtors seek authority to permit Covington to employ Special

Professionals on an as needed basis, subject to the procedures set forth below.  The Debtors

distinguish these Special Professionals from the other two groups because:  (i) the Debtors are

not retaining such Special Professionals -- they are being selected and employed by special

counsel; (ii) the amount of the monthly fees incurred by such Special Professional likely would

exceed the ceiling established in the Debtors' proposed procedures for compensating Ordinary

Course Professionals, thus necessitating the Special Professionals to file interim fee applications;

and (iii) in the interest of full disclosure, the Debtors want to ensure that the Court, the U.S.

Trustee and all parties in interest are apprised of the employment of these Special Professionals,

who ordinarily would be professionals for purposes of section 327(a), but who are being

employed by special counsel on behalf of the Debtors to perform discrete services analogous to

those rendered by expert witnesses.

i.     Procedures for Employment and Compensation

43.     To the extent that Covington seeks to employ a Special Professional, the

Debtors propose that the Special Professional prepare an affidavit, in substantially the form as

that submitted by retained professionals, providing disclosure of any conflicts and connections

with the Debtors, their creditors and parties in interest).  In connection with such employment,

the Debtors propose that a procedure be established similar to the procedure for the employment

---

[7]     In interpreting section 327, the term "professional persons" is "a term of art reserved for the those persons who play an intimate role in the reorganization of a debtor's case."  In re Johns-Manville Corp., 60 B.R. 612, 619 (Bankr. S.D.N.Y. 1986).

[8]     Included among its "first-day" motions and applications, the Debtors have filed a motion for authority to retain and compensate Ordinary Course Professionals.

of an Ordinary Course Professional.  Specifically, the Debtors propose to serve a notice of the

proposed employment and the affidavit upon:  (a) the Office of the United States Trustee;

(b) counsel for the agents to the Prepetition Lenders under the Debtors' Credit Facilities; (c)

counsel for the agents to the DIP Lenders; (d) counsel to the official committee of unsecured

creditors, or if one has not yet been appointed, to the Debtors' fifty (50) largest unsecured

creditors on a consolidated basis and counsel to the Informal Committee; and (e) all other parties

that have filed a notice of appearance in these cases.  The Debtors further propose that if no

objection to the proposed retention of a Special Professional is filed within fifteen (15) days after

service, then the retention would be deemed approved by the Court without the need for a

hearing or further order.

        44.    Approved Special Professionals would be compensated as if each has been

retained as a retained professional.  Thus, their fees and expenses would be subject to Court

approval in accordance with sections 330 and 331 of the Bankruptcy Code, the Federal Rules of

Bankruptcy Procedure, the Local Bankruptcy Rules, the Administrative Order Re: Guidelines for

Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases

and any administrative order entered by this Court governing compensation in these cases.

        45.    The type of relief requested herein, while perhaps somewhat unique, is not

unprecedented.  For example, in the typical debtor-in-possession financing arrangement, the

debtor-borrower is usually required to reimburse the legal fees and expenses of professionals

retained by the debtor's lender, including attorneys, accountants and other financial advisors.

These professionals are not required to make any disclosures to the Court or any other parties

regarding their conflicts, and the reasonableness of their fees are rarely subject to Court scrutiny.

46. Also, in a number of cases, a debtor's special counsel has been authorized to employ parties to provide services to the special counsel in furtherance of its service to the debtor. Typically, the special counsel retains a party, who, ordinarily would be treated as a professional, but due to the nature of the services rendered, is treated as an expert witness and relieved from meeting section 327(a) standards. See, e.g., In re First American Health Care of Georgia, Inc., 208 B.R. 996 (Bankr. S.D. Ga. 1996); In re That's Entertainment Marketing Group, Inc., 168 B.R. 226 (C.D. Cal 1994); and In re Napoleon, 233 B.R. 910 (Bankr. D.N.J. 1999).

47. In First American Health Care of Georgia, the Debtor's criminal defense counsel sought to retain an accounting firm to help prepare evidence as an expert witness. In response to the U.S. Trustee's objection that the accountant should be held to a section 327(a) analysis, the court found that the accountant activities were more in the nature of those required of an expert witness than a section 327(a) professional. Significant to the Court was its finding that the firm was "accumulating, gathering, analyzing, and presenting accounting information generated internally or by the company's outside accounting firms as an aid to the defendant corporation's criminal defense counsel, first, in defense of the federal indictments and now as an element of the defendant corporation's defense strategy in the sentencing phase of the criminal proceeding" and not providing day-today accounting services for the debtor. Thus, the court held that section 327(a) did not apply to the employment. Id. at 998. See also, That's Entertainment Marketing, 168 B.R. at 230 n.3 (although accountants are commonly considered professionals, it is their **role** in the bankruptcy case, rather than their **status** as accountants which controls. (emphasis added)). Based on the foregoing, the Debtors submit that the relief

requested in the Motion is reasonable and beneficial to the Debtors, their estates and the interest of creditors.

## NOTICE AND PROCEDURE

48.    The Debtors have provided notice of this Motion to:  (a) the United States Trustee for the Southern District of New York; (b) counsel for the agents to the Prepetition Lenders under the Debtors' Credit Facilities; (c) counsel for the agents to the DIP Lenders; (d) the Debtors' fifty (50) largest unsecured creditors (on a consolidated basis); and (e) counsel to the Informal Committee.  The Debtors submit that, under the circumstances, no other or further notice is required.

49.    As this Motion presents no novel issues of law and the legal authorities for the relief requested are cited herein, the Debtors request that the Court dispense with the requirement of Local Bankruptcy Rule 9013-1(b) that a memorandum of law be submitted herewith.

50.    No previous motion for the relief sought herein has been made to this or any other court.

## CONCLUSION

**WHEREFORE,** the Debtors respectfully request that the Court enter an Order,

substantially in the form annexed hereto, granting the relief requested hereby and such other and

further relief as the Court deems just.

Dated:    June 25, 2002

                                              **Adelphia Communications Corporation, et al.,**
                                              Debtors and Debtors in Possession


                                              By:   /s/ Randall D. Fisher
                                                          Authorized Signatory


**WILLKIE FARR & GALLAGHER**
Attorneys for Debtors and
   Debtors in Possession


By:   /s/ Shelley C. Chapman
            Myron Trepper (MT-2636)
               (A Member of the Firm)
            Marc Abrams (MA-0735)
               (A Member of the Firm)
            Shelley C. Chapman (SC-4691)
               (A Member of the Firm)

787 Seventh Avenue
New York, New York  10019
                              (212) 728-8000