UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Case No. 02-41729 (REG) |
| **ADELPHIA COMMUNICATIONS CORPORATION, et al.,** | Chapter 11 Jointly Administered |
| Debtors. | Hon. Robert E. Gerber |

## DEBTORS' MOTION FOR ORDER
## AUTHORIZING AND APPROVING MODIFICATION OF THE BORROWING LIMITS
## OF THE CENTURY–TCI AND PARNASSOS BORROWER GROUPS
## PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364

TO: THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases

(collectively, the "Debtors"), by their attorneys, respectfully represent:

1078709.2

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................. 2

    A.    Relief Requested by this Motion............................................ 2

    B.    The Previous DIP Facility ....................................................... 3

    C.    The Extended DIP Facility ...................................................... 4

    D.    The Comcast JV Partner's Consent Rights ................................ 5

    E.    Century-TCI's Present Need To Increase Its Borrowing Limit ................. 5

    F.    Parnassos' Present Need to Decrease Its Borrowing Limit ..................... 7

    G.    The Comcast JV Partner's Concerns ........................................ 7

    H.    Sale and Plan Developments .................................................. 10

II.    JURISDICTION ............................................................................. 11

III.    RELIEF REQUESTED ................................................................... 11

IV.    LEGAL AUTHORITY FOR RELIEF REQUESTED............................. 12

V.    PROCEDURE ................................................................................ 16

VI.    CONCLUSION............................................................................... 17

# TABLE OF AUTHORITIES

Page

## Cases

Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),
  722 F.2d 1063 (2d Cir. 1983)............................................................................. 12, 14

In re Adelphia Communications Corp.,
  No. 02-41729 (REG)
  (Bankr. S.D.N.Y. Mar 4, 2003) (Docket No. 1475) ................................................ 12

In re Bush Terminal Co.,
  78 F.2d 662 (2d Cir. 1935)...................................................................................... 13

In re Cardinal Industries, Inc.,
  116 B.R. 964 (Bankr. S.D. Ohio 1990)................................................................... 13

In re Global Crossing Ltd.,
  295 B.R. 726 (Bankr. S.D.N.Y. 2003)..................................................................... 12

In re Ionosphere Clubs, Inc.,
  100 B.R. 670 (Bankr. S.D.N.Y. 1989)..................................................................... 12

In re Johns-Manville Corp.,
  801 F.2d 60 (2d Cir. 1986)...................................................................................... 13

In re MAP 1978 Drilling Partnership,
  95 B.R. 432 (Bankr. N.D. Tex. 1989)...................................................................... 13

In re Paolo Gucci,
  126 F.3d 380 (2d Cir. 1997)................................................................................... 12

In re Potter Instrument Co.,
  593 F.2d 470 (2d Cir. 1979).................................................................................... 13

In re Public Service Holding Corp.,
  141 F.2d 425 (2d Cir. 1944).................................................................................... 13

Matter of Dutch Inn of Orlando, Ltd.,
  614 F.2d 506 (5th Cir. 1980) .................................................................................. 13

Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.
  (In re Integrated Res., Inc.),
  147 B.R. 650 (S.D.N.Y. 1992)................................................................................ 14
Official Committee of Unsecured Creditors of LTV Aerospace and Defense Co.
  (In re Chateaugay Corp.),
  973 F.2d 141 (2d Cir. 1992).................................................................................... 12

# TABLE OF AUTHORITIES

**Page**

*Summit Investment and Development Corp. v. Leroux,*
69 F.3d 608 (1st Cir. 1995) .................................................................................... 13

## Statutes

11 U.S.C. § 105 ......................................................................................... 1, 11, 13
11 U.S.C. § 361 ............................................................................................. 1, 11
11 U.S.C. § 362 ............................................................................................. 1, 11
11 U.S.C. § 363 ...................................................................................... 1, 11, 12, ii
11 U.S.C. § 364 ............................................................................................. 1, 11
28 U.S.C. § 1334 .............................................................................................. 11
28 U.S.C. § 1408 .............................................................................................. 11
28 U.S.C. § 1409 .............................................................................................. 11

## INTRODUCTION

### A.     Relief Requested by this Motion

1.     By this motion (the "Motion"), the Debtors seek the entry of an order authorizing and approving the modification of the Borrowing Limits of the Century-TCI and Parnassos Borrower Groups pursuant to the Debtors' Extended DIP Facility (discussed below).  Specifically, the Debtors seek (a) to increase the Borrowing Limit of the Century-TCI Borrower Group to $ 315.0 million from its present level of $ 235.0 million, which would provide Century-TCI the ability to continue to operate as budgeted and a borrowing cushion over its anticipated borrowing needs, and (b) to decrease the Borrowing Limit of the Parnassos Borrower Group to $15.0 million from its present level of $40.0 million, which would save the Debtors a significant amount of fees and costs on funds that the Parnassos Borrower Group no longer needs to borrow.

2.     By order dated February 22, 2005, a copy of which is attached hereto as Exhibit "A," the Court authorized and approved the modification of the Borrowing Limits for each of the Debtors' Borrower Groups in connection with its approval of the Extended DIP Facility; however, with respect to the Century-TCI Borrower Group, such increase is not effective without (a) the consent of TCI California Holdings, LLC ("Comcast JV Partner"), a limited partner of Century-TCI (and an affiliate of Comcast Corporation), or (b) further order of this Court.  Exhibits "B," "C" and "D" contain copies of the Amended Credit Agreement, Commitment Letter and Schedule of Borrowing Limits.  As to the Parnassos Borrower Group, the Extended DIP Facility proposes to reduce the Borrowing Limit; however, such reduction also requires the consent of a

Comcast affiliate, TCI Adelphia Holdings, LLC (also referred to herein as the Comcast JV Partner for ease of reference).

3.     The Comcast JV Partner has not yet consented to increase the Borrowing Limit of the Century-TCI Borrower Group or to decrease the Borrowing Limit of the Parnassos Borrower Group, thus necessitating this Motion.  Negotiations to obtain those consents continue.  Time, however, is of the essence because a potential cash crunch at Century-TCI this summer will necessitate a reduction in spending and budgeted capital expenditures in the near future, which would adversely affect the value of the Century-TCI Borrower Group if the Debtors do not obtain the consent of the Comcast JV Partner or an order of this Court  by middle to late March.  A reduction in the Parnassos Group's Borrowing Limit, meanwhile, would immediately save the Debtors a substantial amount of fees and costs.

## B.     The Previous DIP Facility

4.     On June 25, 2002 (the "Petition Date"), the Debtors filed a motion seeking approval of the original debtor in possession credit facility (the "Original DIP Facility"). On June 28, 2002, the Court approved the Original DIP Facility on an interim basis and, on August 23, 2002, the Court entered an order approving the Original DIP Facility on a final basis (as amended, the "DIP Order").

5.     On April 21, 2004, the Debtors filed a motion seeking to extend and amend the Original DIP Facility on the terms reflected in the Previous DIP Facility and, on May 6, 2004, the Court entered an order (the "First DIP Extension Order") approving the Previous DIP Facility.

6.    The previous DIP Facility, which had a maturity date of March 31, 2005, consisted of a $800.0 million revolving credit facility (the "Tranche A Loan") and a $200.0 million loan (the "Tranche B Loan"), and established a Borrowing Limit for each Borrower Group.[1] The Borrowing Limit for the Century-TCI Borrower Group was $235.0 million; the Borrowing Limit for the Parnassos Borrower Group was $40.0 million.

## C.    The Extended DIP Facility

7.    On February 22, 2005, this Court approved and authorized the Debtors to enter into the Extended DIP Facility. The Extended DIP Facility (a) extends the maturity date of the previous DIP Facility from March 31, 2005 to March 31, 2006, (b) increases the DIP Lenders' aggregate commitment from $1 billion to $1.3 billion, (c) decreases the borrowing margins on Loans extended by the DIP Lenders, (d) reduces the unused commitment fee rate in respect of the Tranche A Loan and (e) changes the Borrowing Limits and extends the financial covenant levels of each Borrower Group through the new maturity date.

8.    Although the Extended DIP Facility increases the Borrowing Limits of each of the Debtors' Borrower Groups (other than the Parnassos Borrower Group), the Century-TCI Borrower Group cannot avail itself of the increased Borrowing Limit absent either (a) consent of the Comcast JV Partner or (b) a further order of this Court (which the Debtors seek by this Motion). Likewise, the Parnassos Borrower Group cannot formally lower its Borrowing Limit without the consent of the Comcast JV Partner.

---

[1]    Capitalized terms not otherwise defined herein have the meanings given to them in the Extended DIP Facility and the DIP Order previously entered by the Court.

9.      The Comcast JV Partner has not yet consented to the increased Borrowing Limit for the Century-TCI Borrower Group or to the decreased Borrowing Limit for the Parnassos Borrower Group.

**D.      The Comcast JV Partner's Consent Rights**

10.     The Comcast JV Partner's consent right arises from an amendment to the Century-TCI Limited Partnership Agreement and the Parnassos Limited Partnership Agreement.  Specifically, the Debtors and the Comcast JV Partner entered into the Consent Agreement pursuant to which, among other things, the Comcast JV Partner consented to the voluntary bankruptcy petitions of Century-TCI and Parnassos.  Exhibit "E" contains a copy of the Consent Agreement.

11.     In connection therewith, the parties also amended their limited partnership agreement.  Among other things, the amendments authorized Century-TCI and Parnassos to enter into a DIP financing arrangement but required the Comcast JV Partner to consent to any cumulative increase or decrease in each partnership's Initial Borrowing Limit (initially set at $150.0 million for the Century-TCI Borrower Group; $50.0 million for the Parnassos Borrower Group) of more than 20%.  Exhibit "E" contains the amendments to the limited partnership agreements as well.  The Comcast JV Partner subsequently consented to increase the Borrowing Limit of the Century-TCI Borrower Group to $235.0 million.

**E.      Century-TCI's Present Need To Increase Its Borrowing Limit**

12.     As part of its management of Century-TCI, the Debtors regularly prepare budgets of cash needs based on anticipated revenues, costs, debt financing and capital

expenditures. These budgets consider historical trends, actual performance, and anticipated operations and require the input of a number of local and regional personnel.

13.    The recent budget indicates that, if operations proceed as expected, Century-TCI will run out of funds this summer, probably in late June or early July. Consequently, Century-TCI needs access to the additional funds provided by the Extended DIP Facility as previously agreed to by the DIP Lenders. In addition, the Debtors, in their business judgment, believe it would be appropriate to establish a borrowing cushion to permit Century-TCI to address unanticipated events. Specifically,

a.    The Debtors anticipate that (i) Century-TCI will run out of funds at budgeted spending levels in late June or July and (ii) total borrowing needs as of March 31, 2006 will be approximately $ 247.0 million, or approximately $12.0 million more than the current Borrowing Limit.

b.    The Debtors also seek to establish a borrowing "cushion," access to funds in excess of anticipated need, of approximately $ 68.0 million to address unanticipated events. (The cushion would equal approximately 28% of the Century-TCI Borrower Group's anticipated borrowings, consistent with the borrowing cushion for the entire Extended DIP Facility.)

14.    Moreover, Century-TCI needs to know *now* that it will have access to additional funds when needed this summer; otherwise, Century-TCI must curtail capital expenditures immediately. Quite simply, Century-TCI cannot make commitments to vendors that it might not be able to honor later and/or engage on a path of capital improvements that it cannot complete. Moreover, it would be detrimental to the

customers of Century-TCI, and thus the value of Century-TCI, if Century-TCI does not complete the projects it intends to undertake due to a lack of funds.

15.    At present, until the consent of the Comcast JV Partner or order of this Court is obtained, the Borrowing Limit of the Century-TCI Borrower Group is $235.0 million. Under the Extended DIP Facility, that sum may grow to $315.0 million, of which approximately $68.0 million would provide the borrowing cushion mentioned above. The Comcast JV Partner had at one time approved an increase of the Borrowing Limit to $265.0 million (enough to meet the presently anticipated operating shortfall, but not enough to provide a sufficient borrowing cushion), but that sum was reduced by the Debtors to $235.0 million under the previous DIP Facility.

**F.    Parnassos' Present Need to Decrease Its Borrowing Limit**

16.    Under the Extended DIP Facility, Parnassos (like all Borrower Groups) pays a fee on its borrowing availability (in addition to fees and costs for actual borrowing).

17.    The Debtors' budget for Parnassos indicates that Parnassos will require less DIP Loan proceeds than previously made available.

18.    Accordingly, Parnassos can reduce its fees and costs under the Extended DIP Facility by reducing the Borrowing Limit for the Parnassos Borrower Group.

**G.    The Comcast JV Partner's Concerns**

19.    The Comcast JV Partner has not yet consented to the increased Borrowing Limit for the Century-TCI Borrower Group or the decreased Borrowing Limit

for the Parnassos Borrower Group, and the Debtors have no assurance that the consents are forthcoming.

20. The Comcast JV Partner has not offered any business justification for failing to provide consent for the increased or the decreased Borrowing Limit as the case may be. However, as to Century-TCI, it is expected that the Comcast JV Partner will argue that Century-TCI does not need access to additional DIP Loan proceeds if certain costs incurred by the Debtors are not allocated to Century-TCI but, instead, are borne by the other Borrower Groups. The Debtors cannot accede to this request because the Debtors believe that such costs are properly allocable to Century–TCI. As such, the Cash Management Protocol previously approved by the Court and the Extended DIP Facility (like the Previous DIP Facility), require that Century-TCI bear such costs. Exhibit "F" contains a copy of the Cash Management Protocol. Indeed, if such costs are not properly allocated and effectively paid each month, Century-TCI would be in default of both the Extended DIP Facility and the Cash Management Order, thus cutting off its right to borrow any more funds at all.

a. Among other things, the Comcast JV Partner has raised concerns about the allocation of a portion of the Debtors' reorganization costs to Century-TCI (some of which the Debtors have already addressed). Moreover, the Comcast JV Partner wants to audit certain other expenses allocated to Century-TCI to ensure that the Debtors properly allocated such costs. While these concerns are understandable, and inevitably will be addressed,[2] they do not presently justify starving Century-TCI's anticipated need for funds at this critical juncture of the bankruptcy case.

---

[2] The Debtors and Comcast are attempting to develop a protocol for addressing and ultimately resolving Comcast's questions about business and reorganization costs allocated to

b. The Debtors believe that they have properly allocated the reorganization costs to Century-TCI:

(i) Century-TCI is properly a debtor. The Comcast JV Partner consented to Century-TCI's filing bankruptcy and with good reason. Century-TCI was highly leveraged, had negative cash flow and needed additional funds for operations. In addition, Century-TCI required significant funds to upgrade the company's facilities to permit it to offer advanced services.

(ii) In addition, Century-TCI has availed itself of the benefits of the bankruptcy process. Most notably, Century-TCI has borrowed approximately $178.5 million of the DIP Loan proceeds as of February 28, 2005. Likewise, Century-TCI is necessarily a party to the investigation of prior accounting, intercompany transfers, cross collateralization and the like — all of which give rise to allocable reorganization costs.

(iii) The Debtors also believe that they have properly allocated all other costs to Century-TCI based on a valid methodology, consistent with historical practices (subject to justified and articulated modifications).

21. In any event, the allocation issue is necessarily an issue for another day. The Comcast JV Partner previously reserved its right to challenge the allocation of costs to Century-TCI and, at the appropriate time, the Comcast JV Partner can formally challenge the allocation. Should the Comcast JV Partner prevail in such a challenge, moreover, the Debtors would true up the allocation of costs and satisfy the resulting

---

Century-TCI. Unfortunately, the process is very labor-intensive and cannot be addressed as quickly or easily as one would hope. Also, the allocation of costs necessarily affects other constituents and, therefore, the process will need to include discussions with other parties as well.

intercompany receivable immediately as they are required to do. To hold back further allocation of reorganization costs pending final resolution of this issue (in effect reversing the reservation of rights) as the Comcast JV Partner would prefer, however, would unduly interfere with the administration of these bankruptcy estates by imposing additional costs on the other silos at this time without any justification therefor (or starving Century-TCI of the funds it needs). Again, the Debtors believe that the allocations have been and continue to be appropriate and justified.

## H.    Sale and Plan Developments

22.     As indicated in the Debtors' previous motion for Court authority and approval to enter into the Extended DIP Facility, these bankruptcy cases are at a critical juncture. The Debtors have embarked on a dual-track process, soliciting offers to sell their assets while also proceeding to formulate a viable stand-alone plan of reorganization. Negotiations with various bidders are proceeding and an amended plan of reorganization was filed on February 4, 2005. In order to provide the Debtors with the financing necessary for them to continue to run and operate their businesses as they complete the dual-track process, it was imperative that the maturity date of the Existing DIP Facility be extended and that the Borrowing Limits be increased generally — all as previously approved by the Court. As for Century-TCI, in particular, the failure to obtain access to additional DIP Loan proceeds would be most detrimental (as noted above), preventing Century-TCI from operating as planned.

## II.

## JURISDICTION

23.     This Court has jurisdiction of the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges," dated July 10, 1984, issued by District Court Judge Robert J. Ward.  Venue of this proceeding and the within Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are §§ 105, 361**Error! Bookmark not defined.**, 362, 363 and 364 of the Bankruptcy Code.

## III.

## RELIEF REQUESTED

24.     The Debtors seek authority to increase the Borrowing Limit of the Century-TCI Borrower Group because Century-TCI needs additional funds to operate as planned.  Without an increase in the Borrowing Limit, already agreed to by the DIP Lenders, Century-TCI will need to cut back its planned capital expenditures dramatically and also may have to curtail other spending (such as marketing and customer support), thus impeding the services it can provide its customers and threatening the value of the enterprise.

25.     In addition, the Debtors seek to reduce the Borrowing Limits of the Parnassos Borrower Group in order to reduce its fees and costs for funds Parnassos is not expected to require for its continuing operations.

## IV.

## LEGAL AUTHORITY FOR RELIEF REQUESTED

26.    Section 363(b) of the Bankruptcy Code provides in pertinent part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Courts within this Circuit interpreting § 363(b) have held that transactions should be approved pursuant to this provision when, as here, they are supported by management's sound business judgment. *See, e.g., Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983) (outlining requirements for sale of assets pursuant to section 363); *In re Paolo Gucci,* 126 F.3d 380, 387 (2d Cir. 1997); *Official Committee of Unsecured Creditors of LTV Aerospace and Defense Co. (In re Chateaugay Corp.),* 973 F.2d 141 (2d Cir. 1992); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Adelphia Communications Corp.,* No. 02-41729 (REG) (Bankr. S.D.N.Y. Mar 4, 2003) (Docket No. 1475).

27.    Moreover, under § 105(a) of the Bankruptcy Code, a bankruptcy court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." *See* 11 U.S.C. § 105(a). Pursuant to such statute, courts have suspended or cast aside provisions of shareholder and partnership agreements that are intended to protect equity interests when such protections would otherwise interfere with the administration of a bankruptcy estate. For example, courts have long held that it may be appropriate to enjoin a shareholder meeting during the pendency of bankruptcy cases when such meeting is called to elect a new board of

directors, thus interfering with the administration of the bankruptcy estate. *See, for example, In re Johns-Manville Corp.,* 801 F.2d 60 (2d Cir. 1986) (affirming lower court's decision to enjoin shareholders meeting based on the court's equitable power under Bankruptcy Code § 105(a). *See also In re Public Service Holding Corp.,* 141 F.2d 425 (2d Cir. 1944) (holding that the shareholders' right to hold an annual meeting is not absolute and equity might require that it be suspended); *In re Bush Terminal Co.,* 78 F.2d 662 (2d Cir. 1935); and, *In re Potter Instrument Co.,* 593 F.2d 470 (2d Cir. 1979) (the court enjoins a shareholders' meeting, finding that the meeting might result in unsatisfactory management that would jeopardize the debtor's rehabilitation). Similarly, courts have permitted the sale of assets of a limited partnership in contravention of the limited partners' ability to object to such sales where the limited partners were not materially adversely affected by such sale. *See, for example, Matter of Dutch Inn of Orlando, Ltd.,* 614 F.2d 506 (5th Cir. 1980). *See also In re MAP 1978 Drilling Partnership,* 95 B.R. 432 (Bankr. N.D. Tex. 1989) (holding a partnership agreement that required an absolute majority vote by limited partners for a sale of assets outside the ordinary course of business would not be followed). Likewise, clauses which would strip a general partner of its ability to operate the limited partnership, in favor of the limited partners, have often been invalidated as well. *See, Summit Investment and Development Corp. v. Leroux,* 69 F.3d 608, 610-614 (1st Cir. 1995). *See also In re Cardinal Industries, Inc.,* 116 B.R. 964 (Bankr. S.D. Ohio 1990).[3]

---

[3]    Of course, as general partner of Century-TCI, the Debtors owe a fiduciary duty to the estate. In the discharge of this duty, the Debtors believe it is appropriate to increase the Borrowing Limit of the Century-TCI Borrower Group to permit operations to proceed as planned.

28.     The situation here is no different.  The Lenders under the Extended DIP Facility will not increase the Borrowing Limit for the Century-TCI Borrower Group unless they either receive the consent of the Comcast JV Partner or an Order of this Court. The Comcast JV Partner's refusal to consent thus threatens to irreparably harm Century-TCI — thus interfering with the restructuring/sale effort — without any articulated business justification or benefit for the Comcast JV Partner or any other party in interest.  As such, the Court should supercede the Comcast JV Partner's consent right, much as it would suspend the right of shareholders to conduct a meeting to elect new management that would interfere with the reorganization effort.  Likewise, the Court should supercede the Comcast JV Partner's consent right to permit the Parnassos Borrower Group to reduce its Borrowing Limit, thus saving significant fees and costs.

29.     Courts in this district and elsewhere consistently and appropriately have been unwilling to interfere with the decisions of a debtor's management absent a showing of bad faith, self-interest, or gross negligence, and will uphold a board's decisions as long as they are attributable to any "rational business purpose." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992).  Whether or not there are sufficient business reasons to justify the use of assets of the estates depends upon the facts and circumstances of each case.  *Lionel,* 722 F.2d at 1071.  The Debtors believe that modifying the Borrowing Limits of the Century-TCI and Parnassos Borrower Groups is without question supported by sound business reasons and in the best interest of the estate.

30.     Since the commencement of the case, the Debtors have, among other things, (a) completed the audit of ACC's consolidated financial statements for the fiscal years ended December 31, 2003, 2002 and 2001, (b) filed with the SEC the ACC's Annual Report on Form 10-K for the fiscal year ended December 31, 2003, (c) continued to perform a review of their historical books and records, accounting policies and practices and financial statements and have made significant progress in that regard, (d) continued the difficult task of simultaneously pursuing a dual-track emergence strategy, (e) begun the process of reviewing, analyzing and reconciling the more than $3 trillion of claims asserted against the Debtors in these cases, and (f) continued to restructure their businesses to fix the operational problems associated with prior management.  However, given the extremely complicated nature of these cases, the Debtors simply will not be able to complete their restructuring efforts prior to this summer, at which time they project that Century-TCI will run out of funds if expenditures are not dramatically (and detrimentally) cut at the present time.

31.     In the exercise of their business judgment, therefore, the Debtors believe that increasing the Borrowing Limit of the Century-TCI Borrower Group, and decreasing the Borrowing Limit of the Parnassos Borrower Group, is reasonable and appropriate under the circumstances.  As stated above, access to additional funds is necessary for Century-TCI to continue to operate as budgeted in a manner that is beneficial to the company's customers and its value to these bankruptcy estates; reducing the Borrowing Limit of the Parnassos Borrower Group, meanwhile, will save the estate significant fees and costs.

# V.

## PROCEDURE

32.     The Debtors will provide notice of this Motion to: (i) the United States
Trustee for the Southern District of New York; (ii) counsel to the agents for the DIP
Lenders and the Prepetition Lenders; (iv) counsel to the Creditors' Committee; (v)
counsel to the Equity Committee; (vi) the SEC; (vii) counsel to the Comcast JV Partner;
and (viii) all parties who have filed a request for service of all pleadings pursuant to
Bankruptcy Rule 2002 as of the day prior to the service hereof.

33.     The authorities relied upon herein are set forth above. Accordingly, the
Debtors request that the Court dispense with the requirement of Local Bankruptcy Rule
9013-1(b) that a separate memorandum of law be submitted herewith.

34.     No previous request for the relief sought in this Motion has been made to
this or any other court.

# VI.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form annexed hereto as Exhibit "G," granting the relief requested herein and such other and further relief as this Court may deem just or proper.

Dated: March 2, 2005

MUNGER, TOLLES & OLSON LLP
Special Conflict Attorneys for Debtors
and Debtors in Possession

By: _____

Mark Shinderman (CA Bar 136644)
*Admitted Pro Hac Vice*

355 South Grand Avenue, Suite 3500
Los Angeles, California 90071-1560
Tel: 213-683-9201
Fax: 213-683-4010

1078709.2

- 17 -

[Pages 18 & 19 Intentionally Omitted]

1078709.2