UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————————

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Adelphia Communications Corp., *et al.*, | ) | Case No. 02-41729 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

———————————————————————————

BENCH DECISION ON MOTION TO APPROVE
SETTLEMENT AGREEMENTS


APPEARANCES:

WILLKIE FARR & GALLAGHER LLP
Counsel for Debtors and Debtors in Possession
787 Seventh Avenue
New York, NY 10019-6099
By:     Marc Abrams, Esq. (argued)
        Paul V. Shalhoub, Esq.
        Brian E. O'Connor, Esq.
        Terence K. McLaughlin, Esq.
        Rachel C. Strickland, Esq.
        Morris J. Massel, Esq.
        Jamie M. Ketten, Esq.

BOIES, SCHILLER & FLEXNER LLP
Counsel for Debtors and Debtors in Possession
333 Main Street
Armonk, NY 10504
By:     Philip C. Korologos, Esq. (argued)
        George Carpinello, Esq.
        Eric Brenner, Esq.

COVINGTON & BURLING
Counsel for Debtors and Debtors in Possession
1330 Avenue of the Americas
New York, NY 10019
By:     Alan Vinegrad, Esq.

FOLEY & LARDNER LLP
Counsel for Debtors and Debtors in Possession
3000 K Street, N.W., Suite 500
Washington, D.C. 20007
By:     Gregory S. Bruch, Esq.

DAVID N. KELLEY
United States Attorney
One Saint Andrew's Plaza
New York, NY 10007
By:     Richard D. Owens, Assistant United States Attorney
        Christopher J. Clark, Assistant United States Attorney (argued)
        Judd C. Lawler, Assistant United States Attorney

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
233 Broadway
New York, NY 10279
By:     Alistaire Bambach, Esq.

DILWORTH PAXSON LLP
Counsel for the Rigases
1735 Market Street
3200 Mellon Bank Center
Philadelphia, PA 19103
By:     Lawrence G. McMichael, Esq. (argued)
        Martin J. Weis, Esq.

BROWN RAYSMAN MILLSTEIN FELDER & STEINER LLP
Counsel for the Rigases
900 Third Avenue
New York, NY 10022-4728
By:     Gerard S. Catalanello, Esq.
        Shannon R. Wing, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for the Official Committee of Unsecured Creditors
1633 Broadway
New York, NY  10019
By:     David M. Friedman, Esq. (argued)
        Adam L. Shiff, Esq.
        Jonathan E. Minsker, Esq.

BRAGAR WEXLER EAGEL & MORGENSTERN, P.C.
Counsel for the Official Committee of Equity Security Holders
885 Third Avenue, Suite 3040
New York, NY 10022
By:     Peter D. Morgenstern, Esq. (argued)
        Gregory A. Blue, Esq.
        Eric B. Fisher, Esq.
        Andrew Buck, Esq.

HENNIGAN, BENNETT & DORMAN LLP
Counsel for the Ad Hoc Committee of ACC Senior Noteholders
601 South Figueroa Street, Suite 3300
Los Angeles, CA 90017
By:     Bruce Bennett, Esq. (argued)
        James O. Johnston, Esq.

245 Park Avenue, Suite 3962
New York, NY 10167
By:     A. Brent Truitt, Esq.

SEWARD & KISSEL LLP
Counsel for Law Debenture Trust Company of New York, as ACC Senior Notes Trustee
One Battery Park Plaza
New York, NY 10004
By:     Arlene R. Alves, Esq.

BROWN RUDNICK BERLACK ISRAELS LLP
Counsel for the Ad Hoc Adelphia Trade Claims Committee
120 West 45th Street
New York, NY 10036
By:     Edward S. Weisfelner, Esq.

One Financial Center
Boston, MA 02111
By:     Steven D. Pohl, Esq. (argued)

WHITE & CASE LLP
Counsel for the Ad Hoc Committee of Arahova Noteholders
1155 Avenue of the Americas
New York, NY 10036-2787
By:     J. Christopher Shore, Esq. (argued)
        Douglas P. Baumstein, Esq.

Wachovia Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
By:     Thomas E. Lauria, Esq.
        John K. Cunningham, Esq.
        Gerard Uzzi, Esq.

ANDREWS KURTH LLP
Counsel for the Ad Hoc Committee of Senior Preferred Shareholders
450 Lexington Avenue
New York, NY 10017
By:     Peter S. Goodman, Esq. (argued)
        Justin R. Wyatt, Esq.

600 Travis, Suite 4200
Houston, TX 77002
By:     Hugh M. Ray, Esq.

FRIED FRANK HARRIS SHRIVER & JACOBSON LLP
Counsel for W.R. Huff Asset Management Co., L.L.C.
One New York Plaza
New York, NY 10004-1980
By:     Gregg L. Weiner, Esq.
        Gary Kaplan, Esq. (argued)
        Craig M. Price, Esq.

SHEPPARD MULLIN RICHTER & HAMPTON LLP
Counsel for U.S. Bank National Association, as Indenture Trustee in Respect of the
Arahova Notes and the FrontierVision Notes
333 South Hope Street, 48th Floor
Los Angeles, CA 90071
By:     David McCarty, Esq.

CHAPMAN AND CUTLER LLP
Counsel for the Certain FrontierVision Noteholders
111 West Monroe Street
Chicago, IL 60603
By:     James E. Spiotto, Esq.
        Ann Acker, Esq.

EMMET, MARVIN & MARTIN, LLP
Counsel for The Bank of New York, as Indenture Trustee
120 Broadway, 32nd Floor
New York, NY 10271
By:     Edward P. Zujkowski, Esq.
        Martin Eisenberg, Esq.

HAYNES AND BOONE, LLP
Counsel for Bank of America, N.A.
399 Park Avenue, 23rd Floor
New York, NY 10022
By:     Judith Elkin, Esq.

901 Main Street, Suite 3100
Dallas, TX 75202
By:     Thomas E. Kurth, Esq.
        Robin E. Phelan, Esq. (argued)
        Richard Anigian, Esq.

1155 Avenue of the Americas
New York, NY 10036
By:     Glenn M. Kurtz, Esq.
        Karen M. Asner, Esq.

MAYER, BROWN, ROWE & MAW LLP
Counsel for Bank of Montreal, as Administrative Agent for the Olympus Lenders
1675 Broadway
New York, NY 10019
By:     J. Robert Stoll, Esq.
        Robert J. Ward, Esq.
        Kenneth E. Noble, Esq. (argued)

SIMPSON THACHER & BARTLETT LLP
Counsel for Wachovia Bank, N.A., as Administrative Agent for the UCA Lenders
425 Lexington Avenue
New York, NY 10017
By:     Peter Pantaleo, Esq. (argued)
        William T. Russell, Jr., Esq. (argued)

MILBANK, TWEED, HADLEY & MCCLOY LLP
Counsel for Citibank, N.A., as Administrative Agent for the Century-TCI Lenders
One Chase Manhattan Plaza
New York, NY 10005-1413
By:     Luc A. Despins, Esq.

MILBANK, TWEED, HADLEY & MCCLOY LLP
Counsel for JPMorgan Chase Bank, as Administrative Agent for the FrontierVision
Lenders
One Chase Manhattan Plaza
New York, NY 10005-1413
By:     James C. Tecce, Esq.

LUSKIN, STERN & EISLER LLP
Counsel for The Bank of Nova Scotia
330 Madison Avenue
New York, NY 10017
By:     Michael Luskin, Esq.
        Trevor Hoffmann, Esq.

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Counsel for 13 Investment Banks
One Liberty Plaza
New York, NY 10006
By:     Mitchell A. Lowenthal, Esq. (argued)

CHADBOURNE & PARKE LLP
Counsel for Credit Lyonnais New York Branch, Credit Lyonnais Securities (USA) Inc.,
and LCM I Limited Partnership
30 Rockefeller Plaza
New York, NY 10112
By:     Andrew P. Brozman, Esq.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
Counsel for Comcast
1735 Market Street, 51st Floor
Philadelphia, PA 19103
By:     William Slaughter, Esq. (argued)

MORGAN, LEWIS & BOCKIUS LLP
Counsel for Century/ML Cable Venture
101 Park Avenue
New York, NY 10178
By:     Richard S. Toder, Esq. (argued)
        Neil E. Herman, Esq.

PROSKAUER ROSE LLP
Counsel for ML Media Partners, L.P.
1585 Broadway
New York, NY 10036
By:     Bradley I. Ruskin, Esq. (argued)
        Jeffrey Levitan, Esq.
        Scott A. Eggers, Esq.
        Karen Coombs, Esq.

ANGEL & FRANKEL, P.C.
Counsel for Consolidated Class Action Plaintiffs
460 Park Avenue
New York, NY 10022-1906
By:     Joshua J. Angel, Esq.
        Laurence May, Esq. (argued)
        John H. Drucker, Esq. (argued)
        Leonard H. Gerson, Esq.

KIRBY MCINERNEY & SQUIRE LLP
Co-Counsel for Consolidated Class Action Plaintiffs
830 Third Avenue
New York, NY 10022-3903
By:     Richard L. Stone, Esq.
        Mark A. Strauss, Esq.

ABBEY GARDY, LLP
Co-Counsel for Consolidated Class Action Plaintiffs
212 East 39th Street
New York, NY 10016
By:     Arthur N. Abbey, Esq.
        Judith L. Spanier, Esq.
        Stephen T. Rodd, Esq.
        Richard B. Margolies, Esq.

RUTAN & TUCKER, LLP
Counsel for the County of San Diego, California
611 Anton Boulevard, Suite 1400
Costa Mesa, CA 92626
By:     William M. Marticorena, Esq.

MILLER & VAN EATON, LLP
Counsel for the City of Carlsbad, California
400 Montgomery Street, #501
San Francisco, CA 94104-1215
By:     Kenneth A. Brunetti, Esq.

MILLER & VAN EATON, PLLC
Counsel for the City of Carlsbad, California
1155 Connecticut Avenue, #1000
Washington, D.C. 20036-4320
By:      William Malone, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
33 Whitehall Street, 21st Floor
New York, NY 10004
By:      Tracy Hope Davis, Esq.


BEFORE:        ROBERT E. GERBER
               UNITED STATES BANKRUPTCY JUDGE


In this contested matter in the jointly administered chapter 11 cases of Adelphia

Communications Corporation and its subsidiaries (the "Debtors"), Adelphia moves for

authorization to enter into three related agreements, collectively embodying a four-way

settlement with the United States Department of Justice, the Securities and Exchange

Commission, and members of the family of John Rigas, Adelphia's founder and former

CEO.  The settlement addresses, among other things, the DoJ's ability to indict Adelphia

itself, the SEC's action and proof of claim against Adelphia, and Adelphia's presently

pending adversary proceeding against the Rigases.  The motion has engendered a

considerable number of objections, principally by unsecured creditors, who express the

concern, probably with some justification, that a victims restitution fund that the DoJ and

SEC will establish with settlement proceeds will go in major part to equity holder victims

of Adelphia fraud, whose recoveries in this Court would be subordinate to creditors under

normal bankruptcy priorities.

The motion requires the Court to consider whether the settlement is in the best

interests of the estate and is fair and equitable.  It also requires the Court to consider

whether the settlement inappropriately prejudices the substantive rights of any

stakeholder.

After considering the parties' written and oral arguments, and the evidence at an

evidentiary hearing, I conclude that the settlement is in the best interests of the estate and

fair and equitable.  I further conclude that while the estate's contractual arrangements

with the counterparties to its settlement agreements should be approved (and without any

change), certain internal measures, within these chapter 11 cases, are appropriate to avoid

undue prejudice to creditors as a consequence of the settlement, which I should establish

within the approval order.

Accordingly, the settlement is approved, with certain additional measures being

included within my approval order to protect rights following the implementation of the

settlement.  The following are my Findings of Fact, Conclusions of Law, and bases for

the exercise of my discretion in connection with this decision.

<u>Findings of Fact</u>

Under my Case Management Order #3, factual assertions in motions in contested

matters are taken as true unless controverted.  Under that order as well, direct testimony

is taken by affidavit, and cross-examination and any subsequent testimony is taken live.

After reviewing the direct testimony affidavits and designated deposition testimony

(cross-examination having been waived) of Adelphia's witnesses, Lead Director Anthony

Kronman and Covington & Burling lawyer Alan Vinegrad, I find their testimony—by

affidavit and in their depositions —wholly credible, and I accept it in full.  Without

getting into all of the detail that characterizes the record on this motion, I summarize my

factual findings, and my conclusions based upon them, below.

*A. Background*

Just as Adelphia owns numerous cable companies, so do the Rigases personally,

through business entities ( "Rigas Family Entities")—corporations, general partnerships,

limited partnerships, and limited liability companies—that own cable properties that

generate substantial revenues, and are not debtors before this or any other court.  About

16 of the Rigas Family Entities, operating 11 cable systems, are currently managed by

Adelphia on a day-to-day basis; they are referred to as the "Managed Entities."

In March 2002, Adelphia disclosed that it was jointly and severally liable for

more than $2 billion of borrowings attributed to certain of the Managed Entities under

credit facilities (the "Co-Borrowing Facilities") that were not reflected as debt on

Adelphia's consolidated financial statements.  It also appeared that a portion of the

borrowings for which Adelphia entities were jointly and severally liable had been

advanced to various Rigas Family Entities to finance purchases of Adelphia securities.

In the aftermath of this disclosure, the stock of ACC was delisted from the

NASDAQ National Market; Deloitte & Touche LLP ("Deloitte"), the Debtors'

independent auditor at that time, suspended its auditing work on Adelphia's consolidated

financial statements for the year ended December 31, 2001 and withdrew its opinion for

prior consolidated financial statements; and Adelphia and its subsidiaries ultimately

defaulted under various credit facilities, notes and preferred stock.

In addition, a special committee of ACC's Board of Directors (the "Board"),

composed solely of three members of the Board who were not members of the Rigas

Family, commenced a formal investigation into related party transactions between

Adelphia entities and members and Rigas Family Entities.  This investigation led to the

public disclosure of previously undisclosed information about the Rigas Family's co-

-10-

borrowing activities, related party transactions, and involvement in accounting

irregularities.  In May 2002, the Rigases resigned their positions as officers and directors

of Adelphia.

With no access to traditional sources of liquidity in the capital markets, pending

governmental agency investigations, mounting litigation, default notifications under

various credit instruments, and the resulting risk of collection and foreclosure actions by

creditors, the Debtors filed for chapter 11 protection in June 2002.

*B. Government Actions*

After the disclosure of the improprieties, the DoJ and the SEC (collectively, the

"Government") also initiated significant actions against, or investigations of, the Rigases,

Adelphia as an entity, and others.  This included criminal prosecutions and related

forfeiture proceedings in the district court, initiated by the DoJ, and a civil action in the

district court and proof of claim in this Court by the SEC.

*(1) The Criminal Prosecutions*

Following Government investigation of the matters described in part above, John,

Timothy and Michael Rigas were indicted for numerous alleged violations of federal law.

Although none of the Debtors were indicted, at no point did the DoJ rule out such a

possibility—although the Debtors requested as early as the Summer of 2002 that the DoJ

agree not to pursue an indictment of Adelphia.  After a jury trial in the district court

(Hon. Leonard Sand, U.S.D.J.), John and Timothy Rigas were convicted of conspiracy to

commit fraud and several counts of mail fraud and bank fraud.  The jury acquitted

Michael Rigas of some of the charges, but could not reach agreement with respect to

others.

Since the time the Rigases themselves were indicted, the DoJ has considered

whether, in addition to having indicted John, Timothy and Michael Rigas, it would indict

Adelphia itself.  In addition, the DoJ has advised Adelphia's counsel on several occasions

that there is a "real risk" of an indictment of Adelphia.  For example, when the Creditors'

Committee announced its plan of reorganization term sheet in November 2004, which

contained terms inconsistent with the Government's expectations, only the extensive

efforts and assurances of the Debtors and their advisors avoided a possible indictment.

More recently, the Debtors were threatened with indictment if they were unable to reach

agreement on settlement terms with the DoJ and the Rigas Family by the previously

scheduled sentencing date of April 18, 2005 for John and Timothy Rigas.

That was so even though Adelphia and its counsel provided the Government with

very substantial cooperation in its investigation and prosecution of the Rigases.

Additionally, the DoJ has initiated proceedings to secure the criminal forfeiture of

the Managed Entities, and has threatened Adelphia with the possibility of indicting such

Managed Entities—matters of considerable concern to Adelphia, given Adelphia's own

litigation against the Rigases, and Adelphia's own efforts to recover the Managed Entities

in partial satisfaction of the losses Adelphia itself suffered under the Rigases' watch.

*(2) The SEC Action*

On July 24, 2002, the SEC filed a civil enforcement action (the "SEC Action")

against ACC, certain members of the Rigas Family and others, alleging securities fraud

and improper books and records claims.  On December 3, 2003, the SEC filed a proof of

claim in this Court for, among other things, penalties, disgorgement and prejudgment

interest in an unspecified amount based on the allegations in the SEC Action.  The SEC

-12-

staff has indicated that its asserted claims could amount to several billions of dollars of liabilities.

The SEC has informed Adelphia's advisors that, in the absence of a settlement, the SEC would seek hundreds of millions of dollars of civil penalties and the disgorgement from the Debtors of all funds raised through public offerings during the period that the Debtors' financial statements contained material misstatements and omissions. The amount of such funds (excluding the securities placed with the Rigases) is between approximately $5 billion and $6 billion.

In July 2004, the Creditors' Committee initiated an adversary proceeding against the SEC related to the SEC's proof of claim—seeking, among other things, to subordinate the SEC's claim to all of the claims and interests that are senior or equal to the claims and interests on whose behalf the SEC claim has been asserted. In that adversary proceeding, the Creditors' Committee made contentions very similar to those it makes here—that under bankruptcy law, claims of creditors must be satisfied before distributions to equity can be made, and that the SEC's claim must be subordinated under Bankruptcy Code section 510(b). I granted motions by the Equity Committee and the Unofficial Committee of Trade Claims holders to intervene. The SEC thereafter moved to dismiss the adversary proceeding on an asserted absence of a justiciable case or controversy, and the Creditors' Committee cross-moved for summary judgment. The briefing as to those motions is still underway.

### C. The Adelphia-Rigas Action

In July 2002, Adelphia commenced an adversary proceeding in this Court (the "Adelphia-Rigas Action") against the Rigases, other former Adelphia employees, and several Rigas Family Entities. Adelphia's adversary complaint generally alleged that the

-13-

Rigases misappropriated billions of dollars from Adelphia in violation of their fiduciary duties. In November 2002, Adelphia filed an amended complaint against the defendants, expanding upon the facts alleged in its original complaint, and alleging state law claims for breach of fiduciary duty, fraudulent concealment, fraudulent misrepresentation, conversion, waste of corporate assets, breach of contract, unjust enrichment, fraudulent conveyance, constructive trust, inducing breach of fiduciary duty, and a request for an accounting, and federal claims under RICO and the Securities Exchange Act of 1934.

The Rigases moved to dismiss the amended complaint. I denied that motion insofar as it covered the common law claims, and took the portion of that motion that dealt with the RICO and '34 Act claims under advisement. With the agreement of the parties, that aspect of the decision was held in abeyance.

In August 2004, after John and Timothy Rigas were convicted, Adelphia moved for partial summary judgment against John, Timothy, Michael and James Rigas, and several Rigas Family Entities on the unjust enrichment and constructive trust counts of the amended complaint—seeking, among other relief, judgment in the amount of approximately $3.2 billion. That motion was fully briefed but oral argument on it was deferred in light of the proposed settlement.

*D. Negotiation of the Settlement Agreements*

Given the extraordinary challenges posed by the DoJ's indictment threats and the SEC claims, the Adelphia Board acted to ensure that Adelphia had retained outside counsel with preeminent experience to represent Adelphia's interests. Thus, in addition to Adelphia's existing litigation counsel, Boies, Schiller & Flexner, and its regular bankruptcy and corporate counsel, Willkie Farr & Gallagher, Adelphia also retained Alan Vinegrad of Covington & Burling ("C&B") as its principal white-collar defense counsel,

and Gregory S. Bruch of Foley & Lardner as its principal SEC counsel.  Mr. Vinegrad

served as the United States Attorney for the Eastern District of New York and the Chief

Assistant U.S. Attorney, Chief of the Criminal Division, Deputy Chief of the Criminal

Division, Chief of Civil Rights Litigation, and Chief of General Crimes.  Mr. Bruch spent

12 years with the SEC Division of Enforcement, where he served as assistant director.

Adelphia and the Board were also advised by Adelphia's General Counsel, Brad

Sonnenberg, who joined Adelphia in July 2003.  Mr. Sonnenberg served as an Assistant

U.S. Attorney for the Department of Justice, where he prosecuted white collar crimes,

and therefore also had substantial experience in these types of matters.

From the time the SEC Action was filed in July 2002, Adelphia's advisors

engaged in ongoing discussions with the SEC and the DoJ about how Adelphia's issues

with the Government might be resolved.  I am intentionally not setting forth the specifics

of Adelphia settlement proposals, or the substantial legal advice Adelphia obtained with

respect to the settlement negotiations, but am including enough of the detail to document

the substantial effort Adelphia made to negotiate the best settlement possible, and the

considerable care with which it engaged in the settlement process.

In these discussions, the SEC had proposed that the Debtors settle the SEC Action

and resolve all outstanding issues with the DoJ for $1 billion, which the SEC said was

20% of its disgorgement claim.  The Board was also informed that the DoJ—which was

still in the midst of its criminal case against John, Timothy, and Michael Rigas—had not

had a chance to formulate a view of the "right" settlement number.

Because any settlement necessarily would have to be a comprehensive one that

included the DoJ, and because the DoJ indicated that it needed to complete its criminal

-15-

trial of the Rigases before being able to evaluate, let alone negotiate, its position on a

consensual resolution of Adelphia's criminal issues, formal settlement negotiations to

resolve the Government Claims were not pursued while the DoJ's criminal case against

the Rigases proceeded to trial.  Nonetheless, as the criminal trial moved closer to

completion, the Board, together with its advisors, discussed how to respond to the SEC's

$1 billion settlement demand.  In the meantime, Adelphia and its lawyers continued to

provide extensive assistance to the DoJ in connection with the ongoing criminal trial.

In connection with a June 1, 2004 Board Meeting, the Board received information

concerning selected recent SEC settlements in financial fraud and related cases and was

advised of each case's relevance to the SEC's claims against Adelphia.  The Board was

also provided with a copy of an April 29, 2004 speech by Steve Cutler, the SEC's

Director of Enforcement, which provided a structure for considering the appropriate

measure of a civil penalty against Adelphia.

The Board was also provided with a quantitative analysis by Adelphia's financial

advisors, Lazard Freres, which compared the settlement in the *WorldCom* case, which

had provided the SEC with $750 million in value as the distribution on an allowed claim

of a face value of $2.25 billion, with the $1 billion dollar settlement figure mentioned by

the SEC to Adelphia's advisors.  The Board understood that the *WorldCom* settlement

was likely to be a viewed as a benchmark for any Adelphia settlement.  Thus, the Lazard

analysis sought to calculate a variety of possible Adelphia settlements based on a

comparison of Adelphia to WorldCom using a number of potentially relevant metrics,

such as market value, total distributable value, sales, and EBITDA.

Because the Lazard analysis showed that Adelphia, compared to WorldCom, had raised far more capital in the public markets during the alleged period of the fraud, this metric suggested that the $1 billion settlement demand was reasonable. But according to most of the metrics used in the Lazard analysis, a $1 billion settlement of the SEC Action seemed disproportionate to the $750 million settlement of the SEC's claims against WorldCom.

Accordingly, after considerable analysis and discussion, Adelphia's Board authorized the first of its several settlement proposals—a meaningful amount, but much less than the amount of the proposed settlement amount now. But after considering comments from Adelphia's Creditors' Committee, Adelphia changed, adversely to the Government, the size and currency of its settlement proposal, and Adelphia instead made a proposal in a lesser amount, and in the currency not of cash, but rather of common stock of a reorganized Adelphia.

But the SEC rejected this offer. After the conclusion of the Rigas criminal trial in early July 2004, the DoJ joined in supporting the $1 billion settlement figure proposed by the SEC, though it stated that such a settlement would resolve both the DoJ's and SEC's claims. The Adelphia Board, now caught in a crossfire between the DoJ and the SEC, was informed that the Government indicated that it had two powerful weapons at its disposal—indictment and forfeiture—and that the Government would consider using them if Adelphia was unwilling to pay $1 billion towards compensation for the victims of the crimes committed by convicted members of the Rigas management. In support of its $1 billion demand, the Government cited, among other things, its view that $1 billion was the approximate value of the Managed Entities that the Government intended to seize in

-17-

full or partial satisfaction of the approximately $2.5 billion forfeiture obligations of John and Timothy Rigas.

Adelphia and its Board faced these challenges even though C&B had made a presentation to the Government in November 2004 regarding the so called "Thompson" factors—factors federal prosecutors are to consider following in deciding whether to seek criminal charges against a corporation. These factors, which are publicly available, were argued by C&B, as they are argued by objectors here, to tilt—materially—in favor of a decision *not* to indict.

But the Government expressed a different view. It asserted that the "Thompson" factors, as applied to Adelphia, were essentially in equipoise and that, in the Government's view, the amount of restitution to be paid to victims was the "swing" issue that would decide whether the balance would tip in favor of, or against, indictment. The Government expressed the view that Adelphia's initial offer was inadequate to tip the balance against indictment and that there was therefore a "real risk" that Adelphia would be indicted in the absence of meeting the Government's $1 billion demand.

As the discussions continued, Adelphia's management, Board and advisors came to believe (and I believe reasonably so) that the Government's very tough and resistant position in the settlement negotiations was based upon an estimate of what the Government believed it had the power to do to the Debtors, and what costs the Government could impose upon the Debtors by exercising those powers. The magnitude of those costs appeared to be the crucial determinant in arriving at the settlement figure on which the Government insisted in the negotiations. And given the powers the Government had, and its very credible threat to exercise them with devastating

consequences, Adelphia's Board felt (once more, reasonably, in my view) that it had no
practical alternative other than to acknowledge the reality of the very tough spot Adelphia
found itself in.  The Board therefore began to view potential settlement offers against the
benchmark of whether (notwithstanding the precedents) the cost of settlement was
outweighed by the harm that settlement avoided—by insuring that the Government did
not exercise its powers in the way the Government was threatening.  In other words, the
focus evolved from a review of "comparables" in similar settlements to a more self-
introspective analysis of the situation Adelphia was in, and the damage to Adelphia that
could result if Adelphia were indicted.

        As a result, with a unanimous vote, the Adelphia Board authorized a second,
higher, offer (partly in litigation trust certificates and partly in stock) that had been
recommended by the Company's advisors.   This offer was communicated to the
Government in December 2004.  As with Adelphia's prior offer, this second offer was
contingent on Adelphia obtaining title to the Managed Entities.

        But the DOJ responded to the second offer by reaffirming its $1 billion proposal,
noting that the Debtors' proposal (even at this higher number) was "just this side of
insulting."

        As part of the preparation for a Board meeting to be held on February 10, 2005,
the four law firms advising Adelphia's Board prepared and delivered a detailed joint
memorandum—25 pages in length, single spaced—that reviewed (i) the risks posed by
the Government's claims, (ii) the status of the settlement negotiations between
Adelphia's advisors and the Government, and (iii) the approval process that would be
required for a settlement of the Government Claims and the legal framework the Board

should use to determine whether to enter into such a settlement. I have reviewed this memorandum, but consider it unnecessary and inappropriate to discuss it in detail here— particularly in light of the possibility that any decision on my part approving the settlement might be overturned on appeal. It is sufficient for purposes of this discussion to say that the memorandum was thorough and thoughtful, and that it very ably counseled the Board on the strengths and weaknesses of Adelphia's position, and the risks Adelphia faced.

Ultimately, after lengthy consideration and debate, the Adelphia Board concluded that Adelphia was likely to lose more if it did not go forward with a settlement on terms much closer to what the Government had been demanding for months. The Board discussed the fact that the Government fully appeared to intend to take the Managed Entities by forfeiture if a settlement was not promptly reached. I find that this conclusion was, at the least, reasonable. While the Adelphia Board had been informed that Adelphia had arguments it could make against forfeiture, it was told that Adelphia's prospects of prevailing were uncertain at best, and there was thus a very real risk that these arguments would be unavailing and forfeiture would deprive the estate of assets worth between $800 million to $1 billion. Even worse, the Board had come to believe that the Government would demand, on threat of indictment, that Adelphia make up the difference if the Managed Entities lost value in the Government's hands, as was almost certain, since the Government would not have the expertise or the resources to operate cable companies.

Thus, Adelphia faced a "double hit" of losing the Managed Entities and being forced to compensate for the loss of value of the Managed Entities in the Government's hands. With those factors, among others, in mind, the Adelphia Board considered a third

proposal to the Government, at a still higher amount, at its meeting of February 10.
While the third offer the Board was considering was now quite large, the Board believed
that it would still save Adelphia, at minimum, hundreds of millions of dollars in this
extremely plausible scenario.  It would also eliminate once and for all the still very real
risk of an indictment that would have had catastrophic consequences for the Debtors.

In considering the third proposal, the Board considered concerns voiced by the
Creditors' Committee, and by a major unsecured creditor, W.R. Huff.  The Creditors'
Committee took the position, among others, that any settlement should be funded by
value that would otherwise be provided to the holders of bank claims, and that if
Adelphia came to a settlement inconsistent with that position, the Creditors' Committee
would object to any settlement.  Huff took the position that the Adelphia directors would
be breaching their fiduciary duties to Adelphia if they authorized the offer that the
Board's advisors had recommended.

The Board concluded that there was no way to reconcile the Creditors' Committee
position with the reality of the negotiations with the Government.  I agree.  Also, there
was no way to reconcile the Creditors' Committee position with the requirements of due
process.  As discussed more fully below, it may turn out to be, after full opportunity for
all parties to put on evidence and be heard, that co-borrowing banks, or others, should
bear financial responsibility for the damage Adelphia suffered.  But this was not the
appropriate time, or manner, to do that.  And at the risk of stating the obvious, a decision
to charge the banks would be one for me or a higher court to make, and not an
appropriate one to be made as part of a deal between Adelphia and the Government, in

which the banks would have no opportunity to present their defenses or otherwise be heard.

Similarly, I cannot agree that by making a settlement proposal at the level of the third offer (or, for that matter, at higher levels, up to the level of the proposal that is the subject of this motion), the Board would, or did, breach its fiduciary duty. To the contrary, I find exactly the opposite. While as discussed more fully below, the propriety of a settlement is gauged by a standard more demanding than the business judgment rule (which more demanding standard, as discussed below, I find likewise to have been satisfied), the Board's conduct more than amply satisfied all of the requirements of the business judgment rule.[1] The Board's business decision was made with disinterestedness and in good faith, and with much more than due care—indeed with painstaking care, after considering the views of skilled advisors and the stakeholders in this case, and with an appropriate consideration of the good of the enterprise as a whole. My review ensures that there was no abuse of discretion on the part of the Board, or waste of corporate assets. Any suggestion that the Board's actions were a breach of fiduciary duty would be frivolous.

---

[1]    In four published decisions, and countless unpublished ones, I have noted the standards applicable to an exercise of business judgment in this Circuit and district, most notably as articulated by Chief Judge Mukasey of this district in *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650 (S.D.N.Y. 1992) (Mukasey, C.J.) ("*Integrated Resources*"). As described in *Integrated Resources:*

> The business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: "(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets.

*Id.* at 656. *See also In re Global Crossing Ltd.,* 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Adelphia Communications Corp.,* 2003 WL 22316543, at *30-*31 (Bankr. S.D.N.Y. Mar. 4, 2003); *In re Adelphia Communications Corp.,* 2004 WL 1634538, at *2 (Bankr. S.D.N.Y. June 22, 2004); *Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.),* --- B.R. ---, 2005 WL 674717, at *29 (Bankr. S.D.N.Y. Mar. 24, 2005).

Adelphia's third offer to the Government was not accepted, but it elicited a counteroffer of $750 million. Subsequent efforts by Adelphia's counsel were successful in getting the Government to move down to $725 million, but the Government refused any further reductions. At about this time, the Government expressed the desire to include, as part of any settlement with Adelphia, a resolution of the Government's claims against the Rigases and of Adelphia's claims against the Rigases. The Government also told Adelphia that it would permit the Rigases to keep approximately $90 million in property (including 23,000 of their approximately 227,000 cable subscribers), and that the Government not only would permit this, but wanted this—even though Adelphia was opposed to it.

On February 28, 2005, Adelphia CEO William Schleyer and Lead Director Anthony Kronman, the former Dean of the Yale Law School, met with David Kelley, the United States Attorney for the Southern District of New York, to see if their personal involvement could help bridge the gap between Adelphia's third offer and the Government's $725 million demand. Mr. Schleyer and Dean Kronman once more tried to make the points that Adelphia's lawyers had made before, but Mr. Kelley was not moved by those arguments. He stated that the Government believed it would win any forfeiture litigation, and was prepared to face whatever risks might exist regardless— including the risk that whatever assets the Government might take would be worth much less in its hands than in the hands of a cable operator. Dean Kronman also made the point that Adelphia's creditors make here—that providing value to shareholder victims would be inconsistent with the "absolute priority rule" in bankruptcy. Mr. Kelley was once more unmoved, observing that Adelphia's creditors knew or should have known, at

-23-

the time of their investments, that the absolute priority rule could be trumped by the Government's power to seek restitution for victims.

At some point at about this time, the Government signaled that it would alternatively take $695 million if all of that was in cash, but Adelphia properly reasoned that this would be much less attractive for its estate than a settlement that provided the Government with as much of its value as possible in stock, interests in a litigation trust, or another alternative currency.

Given the circumstances with which it was faced, Adelphia's Board authorized acceptance of the Government's $725 million counteroffer.  Because the Rigases were permitted by the Government to keep two of their cable companies, Bucktail Broadcasting Corp ("Bucktail Broadcasting") and Coudersport Television Cable Co. ("Coudersport Cable"), Adelphia was ultimately successful in reducing the settlement amount somewhat more, down to $715 million, provided that a portion of the payment was paid in cash.  Thus Adelphia agreed to pay $715 million, consisting of: (a) in the event of a standalone emergence, $600 million of common stock and $115 million of interests in the litigation trust; or (b) in the event of a sale, (i) $400 million of common stock of Adelphia's successor, (ii) $115 million of an interest in the litigation trust, and (iii) $200 million in cash (provided the Debtors are sold on terms that include more than $10 billion in cash).  A condition of this payment is that Adelphia obtain full and clear title to all of the Managed Entities other than the two the Rigases were allowed to keep, Bucktail Broadcasting and Coudersport Cable.

In approving the settlement the Board itself had the experience of months of discussions and consideration of settlement issues and was abundantly aware of two overarching facts:

> (a) the Government's hard-nosed negotiation position that Adelphia make a substantial payment (initially $1 billion, and later no less than $695 million (in cash)) in order to resolve the government claims; and

> (b) the Government's escalating threats that if a resolution was not reached on terms satisfactory to the Government, the Debtors or the Managed Entities (or both) would be indicted, and/or the Managed Entities would be forfeited (in which case Adelphia would be required to pay the difference in value that any such forfeiture may cause).

The Board reached its decision without further input from the Creditors' Committee, having been told by the Government that if Adelphia informed the Creditors' Committee of the proposed settlement terms, the settlement would be taken off the table, and the Government would take action adverse to the Company.  Rather, the Government said, creditor inquiries should be referred to the Government, and Adelphia's Board was advised that, despite several requests from Adelphia that it do so, the Creditors' Committee had not contacted the Government.  Adelphia's management and outside counsel decided not to defy the Government on this point, even though they were uncomfortable proceeding with such a significant decision without directly updating and discussing the issues with Adelphia's committees in advance.

The $715 million in value that Adelphia has agreed to contribute to a victim restitution fund is a substantial financial obligation and exceeds the amount that Adelphia initially hoped would be acceptable to the Government based on existing precedents. But Adelphia's professionals—highly skilled professionals—advised that a lesser negotiated number was not achievable. Having reviewed all of the evidence, I am not in a position to quarrel with that view. It is plain to me that Adelphia's lawyers (and others on the negotiating team) put into the negotiations all of the skill, and effort, that any stakeholder, or judge, could reasonably expect. They did an excellent job. Given the enormous pressures, and risks, faced by Adelphia, its settlement on these terms was, at the least, reasonable.

Under all of the circumstances, I find the settlement in the best interests of the estate, and fair and equitable.

*E. Settlement Specifics*

The Settlement Agreements are in three parts and are composed of three separate but interdependent agreements:

      (1) The DoJ-Adelphia Agreement;

      (2) The SEC-Adelphia Agreement; and

      (3) The Rigas-Adelphia Agreement.

The terms are complex. More detailed terms are in the motion, and, of course, the underlying agreements. The most important terms, from my perspective, are as follows:

*(1) Forfeited Managed Entities and Real Estate*

The Rigas Family will forfeit to the Government their direct and indirect interests in all of the Managed Entities except Bucktail Broadcasting and Coudersport Cable. They will also forfeit various real estate properties and all securities in ACC. The

-26-

Government will transfer to the Debtors, free and clear of all liens and encumbrances, the forfeited assets (other than certain forfeited real estate not related to the Debtors' cable operations).

*(2) Victim Restitution Fund*

The Government will establish a restitution fund for the purpose of providing restitution to persons or entities who held publicly traded securities of the Debtors that, in the sole determination of the Government, were victims of the conduct alleged in the Indictment. Adelphia will contribute $715 million in value to the fund. This settlement payment is conditioned upon Adelphia receiving full and clear title to the Forfeited Managed Entities, various real estate properties and, at Adelphia's option, Adelphia securities owned by members of the Rigas Family. It will be comprised of the following:

(a) In the event of a standalone emergence of Adelphia from bankruptcy, Adelphia will contribute (i) $600 million of common stock of the reorganized Adelphia, and (ii) $115 million of an interest in the Trust, which interest will share a first priority with claims of unsatisfied senior creditors and will enjoy a liquidation preference entitling the holder to receive 50% of the initial net recoveries until up to $115 million has been distributed on account of such interest in the Trust. The common stock portion of this payment will be valued at the valuation fixed for such stock by this Court in connection with Adelphia's approved plan of reorganization.

(b) In the event of a sale of Adelphia or substantially all of its assets, Adelphia will contribute (i) up to $400 million of common stock of Adelphia's purchaser, (ii) $115 million of an interest in the Trust, which interest will share a first priority with claims of unsatisfied senior creditors and will enjoy a liquidation preference entitling the holder to receive 50% of the initial net recoveries until up to $115 million has been distributed on account of such interest in the Trust, and (iii) the balance consisting of not less than $200 million in cash. The cash portion of this payment is conditioned upon a sale of Adelphia or substantially all of its assets for an amount that includes at least $10 billion in cash. The substitution of cash for common stock, as provided for above, will be at Adelphia's sole option. The common stock portion of this

payment will be valued at the valuation fixed for such stock by this Court in connection with Adelphia's approved plan of reorganization.

Unless extended on consent of the Government, which consent will not be unreasonably withheld, Adelphia will make the above-referenced payments on or before the earlier of: (a) October 15, 2006; (b) 120 days after confirmation of a standalone plan of reorganization; or (c) seven days after the first distribution of stock or cash, as the case may be, to creditors under any plan of reorganization.

Pursuant to the Rigas-Government Agreement, the Rigas Family will have no right to assert a claim against or participate in the Restitution Fund. As a condition to receiving a distribution from the Restitution Fund, the Government will require any recipient, other than Adelphia, to release and discharge the Rigas Family (except for John and Timothy Rigas) from any and all actions, claims or liabilities of any nature whatsoever, and to dismiss any claim or litigation commenced by such recipient against the Rigas Family.

### (3) The SEC Final Judgment

Adelphia will agree to the entry of a final judgment resolving the SEC's claims against ACC in its separate action *Securities and Exchange Commission v. Adelphia Communications Corp., et al.,* 02 Civ. 5776 (PKC), pending before Judge Castel of the district court in this District. Pursuant to this final judgment, ACC will be permanently enjoined from violating various provisions of the federal securities laws.

Also pursuant to this final judgment, the SEC has agreed that if Adelphia makes that payment of $715 million in value to the victim restitution fund, Adelphia will not be required to pay disgorgement or a civil money penalty to satisfy the SEC's claims.

*(4) Rigas Legal Defense Costs and Indemnities*

Adelphia will pay $11.5 million into a legal defense fund to pay the obligations to professionals retained by the Rigas Family.  Adelphia intends to charge the Forfeited Managed Entities for this payment.

The Rigas Family and Peter Venetis, on the one hand, and Adelphia, on the other hand, will enter into mutual releases.

*(5) Non-Prosecution and Continued Cooperation*

The Government will not criminally prosecute: (1) Adelphia; (2) the subsidiaries listed in Adelphia's Form 10-K for fiscal year 2003; (3) subsequently-formed or acquired subsidiaries; and (4) any joint ventures in which the Debtors have or acquire a controlling interest for any crimes (except for criminal tax violations) related to Adelphia's participation in the conduct set forth in the Superseding Indictment against John, Timothy and Michael Rigas, and the SEC Complaint.

In connection with any matter relating to the Debtors' operations, finances and corporate governance between 1997 and emergence from bankruptcy, the Debtors:

> (a) will truthfully and completely disclose all information about all matters about which the Government inquires;
>
> (b) will fully cooperate with the Government and use their best efforts to provide information and testimony as requested by the Government; and
>
> (c) will bring to the Government's attention all criminal conduct by or criminal investigations of Adelphia or its senior managerial employees which comes to the attention of Adelphia's Board or senior management.

The protections afforded by the non-prosecution agreement are expected to apply to any purchaser of all or substantially all of the assets of Adelphia (such as buyers Comcast and Time-Warner under the Sale Agreements), if the purchasers agree to cooperate with the Government in connection with its law enforcement needs.

Conclusions of Law

I.

Legal Standards

Fed. R. Bankr. P. 9019(a) provides:

> On motion by the trustee and after notice and a
> hearing, the court may approve a compromise or
> settlement.

The legal standard for determining the propriety of a bankruptcy settlement is

whether the settlement is in the "best interests of the estate." *In re Purofied Down Prods.*

*Corp.,* 150 B.R. 519, 523 (S.D.N.Y. 1993) (Leisure, J.) ("*Purified Down Products*"). To

determine that a settlement is in the best interests of the estate, the Supreme Court held in

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390

U.S. 414 (1968) ("*TMT*"), that the settlement must be "fair and equitable." *Id.* at 424.

Such a finding is to be based on "the probabilities of ultimate success should the claim be

litigated," and:

> [A]n educated estimate of the complexity, expense,
> and likely duration of . . . litigation, the possible
> difficulties of collecting on any judgment which
> might be obtained, and all other factors relevant to a
> full and fair assessment of the wisdom of the
> proposed compromise. Basic to this process in
> every instance, of course, is the need to compare the
> terms of the compromise with the likely rewards of
> litigation.

*Id.* at 424-25. *See also Purofied Down Products,* 150 B.R. at 523; *Official Comm. of*

*Unsecured Creditors of Int'l Distrib. Ctrs., Inc. v. James Talcott, Inc. (In re Int'l Distrib.*

*Ctrs., Inc.),* 103 B.R. 420, 422 (S.D.N.Y. 1989) (Conboy, J.) ("*International Distribution*

*Centers*") (determination as to whether proposed compromise is fair and equitable

requires exercise of informed, independent judgment by court).

-30-

The settlement need not be the best that the debtor could have obtained. *See In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979) ("*Penn Central*"); *accord International Distribution Centers,* 103 B.R. at 423 ("Indeed, a court may approve a settlement even if it believes that the Trustee ultimately would be successful.") (citations omitted). Rather, the settlement must fall "within the reasonable range of litigation possibilities." *Penn Central,* 596 F.2d at 1114. "[T]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion—and the judge will not be reversed if the appellate court concludes that the settlement lies within that range." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.) (Friendly, J.), *cert. denied*, 409 U.S. 1039 (1972) (construing *TMT* in context of settlement of derivative suit).

A bankruptcy court need not conduct an independent investigation into the reasonableness of the settlement but must only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir. 1983) (internal quotation marks omitted).

It is not necessary for the court to conduct a "mini-trial" of the facts or the merits underlying the dispute. *Purofied Down Products,* 150 B.R. at 522; *International Distribution Centers,* 103 B.R. at 423. Rather, the court only need be apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment about the settlement. *See Purofied Down Products,* 150 B.R. at 522; *In re Energy Coop., Inc.,* 886 F.2d 921, 924-25 (7th Cir. 1989). In doing so, the

court is permitted to rely upon "opinions of the trustee, the parties, and their attorneys."

*International Distribution Centers*, 103 B.R. at 423.

The decision whether to accept or reject a compromise lies within the sound discretion of the court. *See Purofied Down Products*, 150 B.R. at 522 ("A Bankruptcy Court's decision to approve a settlement should not be overturned unless its decision is manifestly erroneous and a 'clear abuse of discretion.'").

<u>II</u>

The *Texaco* Factors

<u>A.</u>

In *In re Texaco Inc.,* 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988), Judge Schwartzberg of this Court listed a number of factors to consider in approving a settlement. Drawing in part from class action litigation, he suggested that the Court consider:

> (1) The balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis a vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures;

> (2) The prospect of complex and protracted litigation if the settlement is not approved;

> (3) The proportion of the class members who do not object or who affirmatively support the proposed settlement;

> (4) The competency and experience of counsel who support the settlement;

> (5) The relative benefits to be received by individuals or groups within the class;

> (6) The nature and breadth of releases to be obtained by the directors and officers as a result of the settlement; and

> (7) The extent to which the settlement is truly the product
> of "arms-length" bargaining, and not of fraud or collusion.

*See Texaco,* 84 B.R. at 902.

B.

As is typical in motions where the exercise of a court's discretion is informed by multiple factors, here some of the *Texaco* factors have more relevance, and properly should have more weight, than others. I consider the *Texaco* factors as follows:

*1. Benefits of Settlement v. Likely Rewards of Litigation*

This factor—which tracks the first of the factors identified by the Supreme Court in *TMT, see* 390 U.S. at 424 ("the probabilities of ultimate success should the claim be litigated")—is in my view the most important factor, and I weigh it accordingly.

Adelphia faces litigation risks of extraordinary magnitude. The Settlement Agreements provide the Debtors with certainty on issues that, if not resolved favorably, could have a devastating impact on the Debtors. In return for an agreement to provide the Government with $715 million in value for the creation of a restitution fund, the Settlement Agreements:

> (a) Eliminate a "real risk" of a criminal indictment of Adelphia that would have disastrous consequences to this reorganization.

> (b) Resolve more than $5 billion in disgorgement claims asserted by the SEC in a lawsuit against Adelphia arising from much of the same conduct for which John and Timothy Rigas already have been convicted.

> (c) Ensure that the Debtors' estates include hundreds of millions of dollars of Forfeited Managed Entities, title to which otherwise might only be obtainable by winning hard fought litigation against the Rigases and defeating competing claims to these assets by, for example, the Government and creditors of the Rigas Family; and

-33-

(d) Prevent a forced sale of the Forfeited Managed Entities that would destroy hundreds of millions of dollars in value that the Debtors otherwise likely would have to make up themselves.

In criminal cases, the conduct of an employee or other agent within the scope of the agent's employment, and for the benefit of the corporation, is often imputed to the corporation. Thus the Government could indict Adelphia for the imputed criminal conduct of Rigas Management, some of whom already have been convicted of substantial wrongdoing. Although Adelphia could assert certain defenses, courts differ on whether such defenses would be applicable. And the collateral consequences of an indictment likely would be disastrous for the Debtors and their stakeholders. Among other things:

(a) An indictment of the Debtors constitutes an "Event of Default" under their debtor in possession financing, providing the lenders with the right to require immediate repayment of the borrowings thereunder. Such acceleration would permit the lenders to terminate the agreement and declare all loans under the agreement immediately due and payable, which could force the Debtors either: (i) at best, to obtain a substitute facility, which likely would not be available given the indictment, or (ii) to liquidate their assets, destroying billions of dollars of value.

(b) In April 2005 Adelphia entered into sale agreements with Time Warner and Comcast pursuant to which they agreed to purchase substantially all of the Debtors' assets—a transaction that I was told is worth approximately $17.5 billion. With exceptions not material here, each of the Time-Warner and Comcast sale agreements requires, as a condition to the buyer's obligations to close, a settlement, dismissal or other resolution of the Government's claims, pursuant to which no portion of the assets or joint ventures to be transferred will have any post-closing liability—including risk of criminal prosecution.

(c) An indictment also could result in the loss of critical cable franchises and licenses, which would materially impact the value of the Debtors' business through a loss of ability to do business.

(d) An indictment inevitably would discourage potential future creditors and business partners, making it difficult, if not impossible, for the Debtors to enter into asset sales or to obtain surety bonding needed to

support important corporate activities such as franchise agreements or construction undertakings.

I consider these potential consequences—particularly the loss of postpetition financing and the failure to meet conditions for the Time-Warner and Comcast transactions—to be extraordinarily prejudicial to the interests of the stakeholders in these chapter 11 cases. Even if the probability of an indictment, and its occurrence, were quite small, the gravity of the consequences would nevertheless warrant extensive measures to forestall any such possibility.

Even in the absence of a sale, if the Debtors ultimately were able to emerge from bankruptcy on a standalone basis without resolving the Government's claims, (i) the pendency of an active case by the SEC could impact negatively the Debtors' ability to issue new securities and, thus, impact negatively the timing of emergence, and (ii) any securities issued in those circumstances could trade subject to a substantial discount for the risks arising from such uncertainties.

Further, if the Debtors were convicted, they would face the prospect of governmental fines or restitution. Pursuant to 18 U.S.C. §§ 3613(e) and (f), a bankruptcy discharge does not affect a debtor's liability for criminal fines and restitution obligations. Such a fine could exceed $8.6 billion.

Similarly, if the Debtors were held responsible for the approximate loss in the market value of ACC's common stock, the Debtors could be ordered to pay restitution of $4.3 billion, which would not include the additional restitution that might be ordered to non-shareholder victims of the fraud.

And if the Debtors were indicted and convicted, the Government also could seek forfeiture of property that constitutes proceeds of a crime, or property traceable to the

proceeds of a crime, *see* 18 U.S.C. § 981—possibly major portions of the Adelphia estate.

Then, Adelphia already is a defendant in a civil enforcement action brought by the SEC, and the SEC also has filed a proof of claim in the bankruptcy based on its lawsuit. Under the federal securities laws, the SEC is entitled to seek disgorgement as well as civil monetary penalties. Absent a settlement, the SEC staff has stated that, under a disgorgement theory, it intends to seek from the Debtors the approximately $5 billion to $6 billion in funds raised through public offerings during the period that the Debtors' financial statements contained material misrepresentations and omissions. By contrast, pursuant to the Settlement Agreements, the SEC has agreed to forego seeking any disgorgement or civil monetary penalties.

The elimination of any risk of liability to the SEC is an extremely significant benefit to the estate. First, absent a settlement, Adelphia has only a limited ability to defend against the SEC's liability case in the SEC Action. Adelphia does not contest the wrongdoing of the Rigas Family that the SEC alleges as the predicate of Adelphia's own liability. Thus, Adelphia could only prevail in litigation if it could avoid liability as a corporate entity for the admitted acts of its top corporate officers.

Second, absent a settlement, the SEC's claim that it could be entitled to billions of dollars from Adelphia is a credible threat. Once it has been established that federal securities laws have been violated, a court has discretion to apply the equitable remedy of disgorgement to strip the wrongdoer of all profits collected through its securities violations. Although Adelphia could assert a variety of defenses to try to limit its liability, the SEC has a reasonable basis for its theory that the $5 billion to $6 billion of

dollars raised by Adelphia in the public markets through fraud constitutes unjust

enrichment subject to disgorgement. Moreover, in addition to the disgorgement amount,

the SEC could seek and be entitled to civil monetary penalties equal to the amount of

Adelphia's gross pecuniary gain as a result of its securities law violations. In effect, this

could double the SEC's possible recovery.

Of course, the Creditors' Committee brought an adversary proceeding against the

SEC to address these concerns, and points the Creditors' Committee made and would

make in that adversary proceeding might well have merit. But the Creditors'

Committee's ability to prevail in that adversary proceeding would be uncertain. At the

least, the Creditors' Committee' action would be vigorously resisted, and likely would

result in lengthy appeals, at least up to the Second Circuit. I am not in a position to

predict the outcome of the Creditors' Committee's action against the SEC, but am in a

position to say, and find, that it could go either way.

At this point, the Managed Entities are still owned by the Rigas Family. They are

very valuable. In Adelphia's arms-length dealings with Time-Warner and Comcast, the

Managed Entities were valued at $990 million ($967 million when Bucktail Broadcasting

and Coudersport Cable are excluded), and the estate will suffer a corresponding reduction

in the sale price under the Time-Warner and Comcast deals if the Debtors cannot deliver

up the Managed Entities as part of the cable properties to be conveyed. The Settlement

Agreements benefit the Debtors by insuring that the estates include the full value of these

assets.

Of course it is true that the Debtors brought claims against the Rigases that, if

successful, could result in the Debtors obtaining the right to all of the Managed Entities in

litigation, either through a constructive trust, or by executing on these assets pursuant to a

judgment.  But that litigation, which I have seen first hand, has been hotly contested, and

the Rigas Family has asserted (and in the absence of a settlement reasonably could be

expected to continue to assert) numerous legal and factual defenses against the Debtors'

claims.  Based on the evidence I have seen to date (which I will grant is probably much

less than all of the evidence I would ultimately see), I think there is quite a high

probability that Adelphia would ultimately prevail on at least some of its claims,

particularly the damage claims for waste and breach of fiduciary duty.  But whether

Adelphia could win quickly, such as on its motion for summary judgment, and on its

constructive trust claim, which is simultaneously more important to prevail on and

difficult to show, is a closer question.  And Adelphia might well have to address the

complexities of a situation where it might establish wrongful conduct on the part of John,

Timothy, Michael, and even James Rigas, but might not be able to show it on the part of

others who might have an interest in the Managed Entities.  Thus there is a material risk

that the Debtors could not obtain the right to 100% ownership of the Managed Entities

through litigation.  And even a successful outcome in such litigation likely would take

substantial time.

    The Settlement Agreements eliminate these risks to Adelphia, along with the

enormous costs of pursuing that litigation, which I discussed in my recent decision on the

Rigases' funding motion.  *See Adelphia,* --- B.R. at ---, 2005 WL 674717, at *29.  Under

the Government-Adelphia Agreement, Adelphia's settlement payment is conditioned

upon receiving full and clear title to the Forfeited Managed Entities from the

Government.

Of course, the $715 million in value that Adelphia has agreed to contribute to a victim restitution fund is a substantial financial obligation. But I agree with Adelphia and the other settlement proponents that given the tremendous advantages of settling, the benefits of the Settlement Agreements far outweigh the discounted probability of achieving a similar outcome through litigation.

By itself, the complete resolution of Adelphia's issues with the Government provide enormous value to the estates that could justify a settlement payment by Adelphia of hundreds of millions of dollars pursuant to the standards of Bankruptcy Rule 9019. The settlements resolve the SEC's claims against the estates of over $5 billion, as well as eliminate the devastating risks of a criminal prosecution. It is far from certain that Adelphia ever could achieve the same, or a remotely similar, result through litigation. And even if Adelphia could ultimately defeat a criminal prosecution by the DoJ, the decision to indict alone would be devastating for the reasons explained above.

The Settlement Agreements, however, go beyond simply resolving Adelphia's issues with the Government and also are contingent upon a transfer of ownership of the Managed Entities to Adelphia. This ensures the Debtors' estates hundreds of millions of dollars in value that might never otherwise be achieved, even through protracted litigation. It also ensures that Adelphia does not face the "double hit" of seeing the Managed Entities forfeited to the Government and then having to compensate the Government for the diminished value of these assets in a forced sale.

## 2. Prospect Of Complex And Protracted Litigations If The Settlement Is Not Approved

I consider this factor—which tracks the second of the *TMT* factors, *see* 390 U.S. at 424 ("the complexity, expense, and likely duration of the litigation")—to be worthy of considerable weight as well.

Any litigation with the Government necessarily will be complex. Any criminal prosecution of Adelphia would entail a lengthy and complicated presentation of evidence; indeed, the criminal trial of John, Timothy and Michael Rigas took over four months. In the event of a conviction, the Government likely would pursue criminal forfeiture proceedings to extinguish Adelphia's claim to the Managed Entities, or worse, the assets of Adelphia itself—in either case a proceeding with additional, complex issues of law and fact. The SEC's civil action likewise would entail complex legal and factual issues with potentially enormous adverse consequences to Adelphia.

Because any potential actions or claims taken by the Government against the Debtors could destroy billions of dollars of value, the Debtors would necessarily have to pull out all the stops in their efforts to resist the Government's efforts. They would be involved in "bet the company" litigation.

Likewise, on the Adelphia-Rigases adversary proceeding front, I do not have current figures, and may never have learned with any degree of accuracy, how much that litigation has cost Adelphia, or what its current monthly legal fees budget is. But based on the many proceedings in that litigation I have seen, and the papers I have had occasion to read, I can reasonably conclude that the fees have been enormous, and that they would likewise increase enormously with time.

### 3. Competency And Experience Of Counsel Who Support The Settlement

I give this factor—which along with the factors discussed below, is encompassed within the third of the factors identified in *TMT*, *see* 390 U.S. at 424 ("all other factors relevant to a full and fair assessment of the wisdom of the compromise")—considerable weight, though less than the first two factors.

The Debtors were advised by a group of outside counsel with preeminent experience in the relevant fields. I will not repeat my factual findings in this respect (see page 14 above) here. It is sufficient to say that Adelphia received first-rate advice. No objector argues, or could argue, to the contrary.

4. *Proportion of "Class Members" Who Support or Do Not Object*

I consider this factor, which plainly cuts against approval of the settlement, but give it only modest weight. This settlement is quite unpopular with unsecured creditors, because many of them acquired their claims after the fraud at Adelphia became known—which would not affect their rights in any way in this bankruptcy case, but likely would affect their rights to share in any victims restitution fund.[2] And they oppose it because equity holder victims could recover from the fund the Government establishes outside of the bankruptcy court, but creditors would have priority over equity holders with respect to assets remaining in the estate. The settlement is popular with the estate's common stock equity holders, for exactly the same reasons. And the banks are essentially neutral, because the settlement leaves the estate's claims against them for another day.

But in my view, the approval of a settlement cannot be regarded as a counting exercise. Rather, it must be considered in light of the *reasons* for any opposition, and the more fundamental factors—such as benefits of settlement, likely rewards of litigation, costs of litigation and downside risk—described above. That is particularly so in cases like this one where a debtor's board is the fiduciary for *all* parties in interest, who naturally have competing interests with respect to limited assets that are insufficient to

---

[2]    I note that despite some argument I heard at the hearing implying to the contrary, this "numerosity" factor is the only area where the time creditors acquired their claims is relevant on this motion. It is fundamental, in bankruptcy cases, that an acquirer of a claim has no lesser rights than any other creditor.

satisfy everyone's needs and concerns.  In such cases, where the settlement proponent is

trying to maximize value for all, or to minimize risk for all, concerns of that character

plainly trump the head count in support.

*5. Relative Benefits Within the Class*

I give this factor (which also cuts, somewhat, against approval of settlement)

some weight, but only some weight, for the reasons described in connection with the

numerosity discussion just above.  In my view, it was preferable, and not just appropriate,

for Adelphia's Board to consider the good of the entire enterprise, as contrasted to the

needs and concerns of any particular constituency, even a major one.

*6. Nature and Breadth of Releases*

I give this factor (however broadly or narrowly it is construed) no weight, as I

regard it as inapplicable.  The Adelphia Board members who considered the settlement

were wholly disinterested, and the cross-releases Adelphia would exchange with the

Rigases were not unduly broad under the circumstances.

*7. Extent To Which The Settlement Is A Product Of Arms Length Bargaining*

I give this factor moderate weight on the motion now before me, though I would

give it much greater weight if I ever thought it had not been satisfied.  The Debtors and

the Government have been engaged in protracted negotiations for nearly a year.  During

this period, the Debtors and the Government met more than 10 times and had countless

additional discussions about a possible settlement.  The Debtors repeatedly tried to

negotiate a lower settlement number with the Government and agreed to pay $715

million in value only after the Government rejected several prior lower settlement offers.

And Adelphia's ultimate offer was only in the context of a global settlement that ensured

that all but two of the Managed Entities would be transferred to the Debtors.

As I saw firsthand, the Debtors fought the Rigases with extraordinary vigor—even to the point of taking two of my decisions up on appeal, and securing a partial reversal of one of them.  They also met on numerous occasions with counsel for the Rigases.  Since prior to the inception of these cases, the Debtors tried, through negotiation and litigation with the Rigas Family, to resolve the Managed Entities ownership issues.  None of these efforts were successful prior to the entry into these agreements.  The Settlement Agreements resolve these issues, after vigorous litigation and negotiation.

<u>C.</u>

For the foregoing reasons, I conclude, in the exercise of my discretion, and based upon my independent judgment, that the settlement is fair and equitable, and in the best interests of the estate.  In its effort to protect the estate against consequences that could cost stakeholders billions of dollars, and doom not just a reorganization but the very future of the enterprise, it falls well within the range of reasonableness.

<u>III.</u>

<u>The Objections</u>

Notwithstanding the foregoing, the motion has elicited numerous objections, principally by unsecured creditors, and most extensively by the Creditors' Committee. To the extent I have not previously addressed them, I will discuss them in turn.

<u>A.</u>

<u>General Objections</u>

*1. Too Much to the Government*

Of course most of the stakeholders in this case—and, for that matter, the Court—would be happier if the estate's exposure on the risks it faced could have been satisfied

for less.  But any settlement cannot be viewed in a vacuum.  *See Texaco*, 84 B.R. at 901

("The duty of a bankruptcy judge to reach an intelligent, objective and educated

evaluation of settlements cannot be carried out absent factual background.") (internal

quote marks omitted).  Rather, any settlement must be evaluated in light of the strengths

and weaknesses of the settling entity's case, and the downside risks in the event of an

adverse outcome.

The objectors, or at least most of them, do not quarrel with the Board's business

judgment given the threats the company faced, but say that the settlement arose from

Government coercion—indeed, what one Board member described as a "shakedown."

They argue that even if the Board could not be expected to stand up to the unfair pressure

on Adelphia, I, as a reviewing court, should recognize the coercion and decline to

approve the settlement for that reason.  But fully understanding the frustration of

stakeholders (and Board members, for that matter) in this regard, I think that the

argument stretches the "coercion" concept too far.  It is really a double entendre.  Where

coercion is unlawful—the stuff that makes RICO cases, for example—disapproval of any

resulting settlement presumptively would be appropriate, and perhaps essential.  But

where the "coercion" results from differences in bargaining power, as a consequence of

law or fact, or governmentally granted authority and discretion (such as the authority and

discretion we grant to prosecutors, to achieve a common good), that is a wholly different

kind of "coercion."  As one of the banks' counsel aptly noted in argument on this motion,

it is what we call "leverage."

The bargaining power with which Adelphia had to negotiate was hardly optimal,

and the amount proposed to be paid to the Government is reflective of that.  But there is

no rule of law, nor should there be one, that says that litigants with weaker negotiating positions cannot enter into settlements commensurate with their weaker positions; indeed, in many instances they will be the ones whose needs are best served by a settlement.

Then, the Creditors' Committee, along with most of the other objectors, argues, as a major predicate for its objection, that the DoJ was bluffing, and that it never would have really indicted Adelphia. This, unfortunately, cannot be proved or disproved, at least without inappropriate inquiry into internal governmental processes and plans. Any conclusion on my part that the DoJ would not have done what it threatened to do would be sheer speculation.

Would the DoJ have indicted Adelphia, with the threat to the recoveries for innocent stakeholders that such an indictment would have entailed? One would think not, but the DoJ had done exactly that to Arthur Andersen, with those exact consequences. It was at least prudent for Adelphia's Board to protect the entity under its stewardship from its destruction, and to avoid taking such a gamble. Though I would likely not condemn this or any other Board if it had made a different decision, based on a belief (if founded on appropriate due diligence) that the DoJ would not act irresponsibly, I do conclude, and expressly find, that premising a settlement on the avoidance of such draconian consequences was plainly reasonable, and well within the range of reasonableness for making a tactical judgment of this nature. Gauging downside risk is a critical aspect of the litigation (and settlement) process. When the consequences of a wrong decision are so huge, it is not unreasonable to hedge against them.

Likewise, the Creditors' Committee's argument that that if the DoJ ever fairly considered the so-called "Thompson" factors, the DoJ would not indict, calls for the same

kind of speculation. This is the exact point argued by Adelphia's negotiation team, without success. Once more, the Adelphia Board cannot be faulted for declining to bet the company on what would be little more than a guess as to the decision the DoJ would make. That is especially true since the "Thompson" factors are merely internal DoJ guidelines, and do not provide a private right of action, or a predicate for judicial review.

I am not in a position to condemn the Adelphia Board, or this settlement, based on what is in essence speculation as to what the DoJ would have done. That is what settlements are all about.

Listening to the arguments made by the Creditors' Committee and other objectors on this motion, I was struck by how so many of the points they made to me had likewise been made by Adelphia's negotiating team, in their own communications with the Government. And upon review of the PowerPoint slides the Adelphia team used, it plainly appears that the Adelphia team made those points to the Government with the same skill that the Creditors' Committee made those points to me. When all of the right negotiating arguments have been made, and made well, it gives rise to a compelling inference that the negotiators got the best deal obtainable, and, at the least, that their deal falls well within the range of reasonableness.

## 2. *Too Little From the Rigases*

The Creditors' Committee and other creditors likewise object to the fact that the Government let the Rigas keep part of their assets, and along with that, allowed them to have some remaining funds to defend themselves. My reaction to that is simply a variant of the observations just noted. Allowing the Rigas to keep what they would keep was something that the Government wanted, and, indeed, that the Government paid for,

reducing its settlement demand by $10 million to take into account the Rigases' rights to retain Bucktail Broadcasting and Coudersport Cable.

Moreover, any analysis of what the Rigases gave up, and could keep, requires consideration of the alternatives—recognizing the DoJ's ability to get the Rigases' assets by forfeiture, and the hurdles Adelphia faced in recovering the Rigases' assets before the DoJ, and/or with a priority over the DoJ. As previously noted, based on facts now known to me, I regard it as likely—strongly likely—that Adelphia would ultimately prevail over the Rigases on Adelphia's common law claims, especially those for breach of fiduciary duty. But whether Adelphia could prevail quickly, on summary judgment, and especially on its constructive trust claim, is much more debatable, by reason of the heavy burdens in this and every other Circuit to obtain victory on summary judgment; by reason of the demanding requirements for the imposition of a constructive trust; and because of the difficulty of securing summary judgment against *each* of the persons or entities who had an interest in the Forfeited Assets, and not just John, Timothy and even Michael and James Rigas. And success on Adelphia's part on the constructive trust claim would be of considerable importance, because if Adelphia merely secured a money judgment against the Rigases, that might well not trump the DoJ's property interest in forfeited property.

In short, given the limits on the collectibility of Rigas assets, and the burdens and delays that due process in litigation sometimes entails, Adelphia did very well in securing as much from the Rigases as it did.

### 3. Too Little From the Banks

The Creditors' Committee, and many creditors, also complain of the fact that Adelphia did not fund the settlement out of the hide of the prepetition banks, especially those that were the lenders on Adelphia's co-borrowing facilities. I find that argument

unpersuasive. It fails satisfactorily to recognize the entitlement of the banks, like any other litigant, to due process before their claims, security interests, or other property could be taken away. The Creditors' Committee, with Adelphia as a co-plaintiff, has a major adversary proceeding pending, on behalf of the estate, against the banks. And if the Creditors' Committee prevails, the banks will then be held fully accountable for any and all wrongful conduct for which any of them is responsible. But the banks have not been found to have acted wrongfully yet, if they ever will be, and it will be this Court, or a higher court, that makes that determination—not the Debtors, and not the Debtors' unsecured creditors. The structuring of this settlement was not the appropriate time, or manner, to do that.

*4. Use of Victims' Fund*

The next point, urged by the Creditors' Committee, all or substantially all of the other unsecured creditor objectors, and the Ad Hoc Committee of Senior Preferred Shareholders, is that the settlement should be disapproved because of the likelihood that the DoJ or SEC will make the victims restitution fund available, in major part, to victims who are equity security holders, or to investors of debt securities who, if they asserted claims in these chapter 11 cases, would be subordinated under Bankruptcy Code section 510(b). The objectors likewise argue that the SEC would in essence be trying to recover a penalty, which is subordinate to normal unsecured claims under Bankruptcy Code section 726(a)(4).

I assume that the Government will indeed distribute the value as the unsecured creditors fear. I also assume that it is at least arguable that if we had a liquidation here, the SEC's claim would be subordinated as a penalty. But I do not find either of these grounds to be a satisfactory basis for disapproval of the settlement here.

-48-

I start with the assumption, not surprisingly, that the ability of equity security holders to share in assets of the Adelphia estate, under any plan of reorganization, would be subject to the Absolute Priority Rule, and that except to the extent creditors might otherwise agree, equity holders could not receive distributions under any plan until and unless more senior claims, such as those of unsecured creditors, were satisfied in full. I similarly start with the assumption that claims of one-time creditors arising out of their purchases or sales of Adelphia securities would have to be subordinated to the claims of existing creditors of the same class, as section 510(b) expressly provides.

But here equity holders and defrauded noteholders would not be sharing in assets of the estate under a plan, or in a chapter 7 liquidation. Rather, they would be sharing in a fund to be created and owned by the Government, sharing in assets the Government would be obtaining as a consequence of the totality of its bargaining power in this case— which bargaining power in turn derives from the DoJ's indictment power, the DoJ's forfeiture power, and the SEC's ability to bring an enforcement action and to file and recover on a proof of a claim.

Thus, while defrauded equity holders will plainly have to confront the Absolute Priority Rule and section 510(b) when trying to share in assets of the estate *in this Court*, what I am asked to approve here is twice removed from that scenario. Not only does this motion not involve a reorganization plan contemplating a distribution to equity; it does not even involve an objection to the SEC's claim, or the merits of the Creditors' Committee adversary proceeding, with its related subordination issues. Rather it is a 9019 motion, raising the fundamentally different issues, under the standards discussed at page 30 above, as to whether controversies—one (but only one) of which is differences in

views as to how the SEC's proof of claims would be dealt with at such time as its allowability and priority were litigated—should be compromised.

Whether the SEC's claim would have been allowed under these circumstances, and/or subordinated, is a matter of fair debate. The issue is one that bankruptcy judges, practitioners and scholars have discussed amongst themselves for some time, without a definitive answer. So far as I am aware, the issue is, for all practical purposes, one of first impression.

But while the issue of the allowability or subordination of the SEC claim, when and if litigated, is a close and difficult one, it is not the issue I have to determine here. And indeed, the very difficulty of the underlying issue makes the wholly different issue before me—whether a settlement of such a controversy is inappropriate or unlawful—a rather easy one. The real issue before me, of course, is whether the Government and the Debtors could settle a controversy as to which that close and difficult issue is an element, and the answer to that plainly is "yes." It is no different than the multitude of other difficult issues that are settled in litigation all the time.

If there ever was any doubt as to that, it was resolved by the decision of Judge Gonzalez of this Court, dealing with the essentially identical issue, in *In re WorldCom*, Case No. 02-13533 (AJG), ECF #8125 (Bankr. S.D.N.Y. Aug. 6, 2003). There Judge Gonzalez approved a settlement involving this very issue, finding no need or occasion to decide the underlying question, but finding that the undecided nature of the issue itself was a factor warranting approval of the settlement. He observed in this connection:

> Finally, although it is argued that the ultimate
> distribution to securities holders as contemplated by
> the settlement is violative of the "absolute priority
> rule" and subject to subordination under section 510

> of the bankruptcy code, and even if this were
> ultimately determined to be the correct legal
> interpretation from a bankruptcy standpoint,
> nonetheless, there are sufficient legal issues that
> must be addressed—including the identity of the
> claimant, the discretion afforded the SEC in its use
> of the penalty, and the overall impact of Sarbanes-
> Oxley, as well as other issues that may be raised in
> a litigation to subordinate the claim—which issues,
> when combined with the unsettled nature of the law
> in this area, furnish sufficient doubt as to the
> outcome of any such litigation.

Exh. A at 3-4.  He further noted that this uncertainty supported WorldCom's position that

the settlement was appropriate.  *Id.* at 4.  And he noted, in connection with that absolute

priority rule dispute, the fundamental principle, noted above, that:

> In considering approval of a settlement, the Court is
> not required to resolve the underlying legal issues
> related to the settlement.  Rather, the Court must
> canvas the issues and determine whether the
> settlement "falls below the lowest point in the range
> of reasonableness.

*Id.*

To the extent this motion is not identical to the one considered in *WorldCom*, the

issue is even more appropriately one appropriate for settlement.  For here, as noted, the

fund to be established by the Government—whose disposition, the Government might

well legitimately say, is *its* business—will have been derived from a settlement emerging

from the DoJ's indictment power and forfeiture power, along with the SEC's right to file

and recover on a proof of a claim.

Likewise, while it is very possible that what the SEC might receive on its proof of

claim would be deemed to be a penalty or forfeiture, it is also possible that what the SEC

might receive would be deemed to be restitution or something else, making this aspect of

the controversy no less a fair matter for debate.  And to state the obvious, this is not a

case under chapter 7, and will hopefully never be one. In chapter 11, by contrast, section 726(a)(4) arguments might be of limited usefulness. While it is true that chapter 11's "Best Interests of Creditors" rule, *see* Code section 1129(a)(7), would make the section 726(a)(4) status of any SEC claim relevant in a case under chapter 11 of the Code, it is also true that such would turn on a host of other factors incapable of prediction at this time—most notably the degree of acceptances of a reorganization plan by creditors, and the value to be distributed under any chapter 11 plan. And in chapter 11, the failure to satisfy the Best Interests of Creditors rule would merely result in the inability to confirm a plan—not subordination or disallowance of the claim in question in the chapter 11 case.

As a result, the objections by unsecured creditors and preferred shareholders premised on the "penalty" argument are not quite as strong as they were asserted to be. "Penalty" issues would present the same kind of gray area for which settlement would be classically appropriate.

Here, as in *WorldCom*, I have canvassed the issues; have determined that the matter of SEC claim allowability and subordination is an exceedingly close question, which could easily go either way; have determined that the matter of SEC claim allowability is only one of several underpinnings for the settlement; and have determined that a settlement that avoided rolling the dice on the underlying issues hardly "falls below the lowest point in the range of reasonableness."

### 5. Prejudice to the Bank Litigation

The Creditors' Committee voiced a fear that this settlement could prejudice the estate in the presently pending adversary proceeding against the banks. This was a legitimate concern, and requires the addition of language in the approval order to ensure

that such does not happen.  Neither side's position in that controversy should be

strengthened or weakened as a consequence of the settlement.

Adelphia, the Creditors' Committee and certain banks worked to agree upon

protective language, now embodied in paragraph 9 of the proposed order, and unless

there is unanimous agreement as to any alternative, I will utilize that language without

change.  I will not, however, issue an advisory opinion as to how I might construe

paragraph 9 in the event of any future controversy with respect to it—especially when the

circumstances that might trigger such a controversy have not yet become known.  *See,*

*e.g., Bank of New York v. Adelphia Communications Corp. (In re Adelphia*

*Communications Corp.),* 307 B.R. 432 (Bankr. S.D.N.Y. 2004) (declining to issue

advisory opinion on meaning of bond indenture "X Clause").  Parties' rights to be heard

before me in the event of any future controversy will be reserved.

## B.

### "Sub Rosa Plan"

Huff argues that the settlement amounts to a "sub rosa" plan.  Huff argues, in

substance, that "cornerstone issues" concerning the subordination of the SEC's claim and

compliance with the absolute priority rule should be subject to the safeguards of

confirmation, and that they should not be decided within the context of a motion to

approve a settlement.

I cannot agree with the contention that this is a sub rosa plan—among other

reasons, because I cannot agree with the premise.  The settlement does not invoke the

asserted "cornerstone issues," for the reasons described in Section III(A)(4) above.

Rather, it is twice removed from them, as it involves only a settlement, and, indeed, one

under which the resolution of the SEC claim is only a part.  It is well established, of

-53-

course, that compromises may be effected separately during reorganization proceedings or in the body of the reorganization plan itself. *See Texaco*, 84 B.R. at 901.

C.

Requiring Victims to Issue Releases

The Class Actions Plaintiffs and Huff object to provisions in the settlement agreements that require victims to provide certain Rigases (not John Rigas and Timothy Rigas) a release. They argue that this would undermine victims' ability to recover non-forfeited assets.

However, this is not an appropriate objection to the settlement, at least in this Court. The argument was presented to Judge Sand, and rejected by him, in the court where the argument should have been made. To the extent any such arguments were not presented to Judge Sand, or addressed by him, they should be raised in his court. The objections, which focus on the needs and concerns of victims and their right to share in the victims fund, should be heard in the court that will supervise the fund, and do not go to whether the settlement agreements are in the best interests of the estate.

D.

Burdens/Benefits Allocation Issues

Several groups of unsecured creditors—the Ad Hoc Committee of ACC Senior Noteholders, the Ad Hoc Committee of Arahova Noteholders, and the Ad Hoc Trade Claims Committee (who hold claims against entities at different levels in Adelphia's rather complex parent-subsidiary structure) voice concerns—in many respects, mirror images of each other—as to whether they would inappropriately be prejudiced by any payment on behalf of the estate. In the view of each, the burden of the settlement should be borne, in whole or in material part, by creditors at other levels, or by creditors of

different entities.  The ACC Senior Noteholders go a step further, and argue that this

settlement cannot be approved until the intercreditor disputes, which could also involve

benefits of the settlement, along with burdens, are resolved.

Turning to the second issue first, which raises a threshold issue as to whether the

settlement should be approved at all, I disagree with the ACC Senior Noteholders.  For

the reasons stated above, I believe that this settlement should be approved, and I will note

expressly that I find it to be in the best interests of, and for the benefit of, *all* of the 220 or

so debtors in Adelphia's jointly administered chapter 11 cases—all of which would be

hugely prejudiced if either they or their affiliates were indicted, and all of whose assets

would be subject to forfeiture in the event the controversies with the Government were

not settled.  While I recognize that the *magnitude* of the burdens, or benefits, from this

settlement might appropriately vary from one to another of the 220 debtors, I have no

doubt whatever that the settlement is advantageous for all, and I reject the notion that

approval of the settlement should be denied or delayed for the resolution of these

individual intercreditor disputes—especially given the importance to Adelphia of the

prompt resolution of the issues underlying this settlement.  *Cf. Nellis v. Shugrue,* 165

B.R. 115 (S.D.N.Y. 1994) (Sotomayor, J., then a district judge) (affirming Chief Judge

Lifland's approval of a settlement agreement even though it did not contain any

distribution plan but left ultimate resolution of distribution issue to outside neutral party).

That is particularly so since the consideration under this settlement would not actually be

paid by Adelphia any time soon, and, indeed, since the currency by which the settlement

is paid would not be fixed until a materially later time.

-55-

However, I agree with those creditors when they say that the allocation of the burdens and benefits of the settlement—*e.g.*, the payment of the $715 million, and the allocation of the excess value deriving from the Managed Entities—should be done in a fashion that does not prejudice their rights in their respective intercreditor disputes. It is reasonable to expect that creditors at the different levels in the corporate chain will have different perceptions as to what is fair when it comes to the allocation of settlement burdens and benefits. Fairness requires that mechanisms be created to permit those issues to be resolved—consensually, if possible, but otherwise with due process.

All would agree, I think, that the rights of various creditor constituencies on these intercreditor disputes should not be prejudiced by the settlement approved today, and paragraph 9 of the proposed order does that quite capably. But the creditor groups have a legitimate need to get a determination on the allocation issues, if they cannot agree, and supplemental mechanisms need to be established to accomplish that. I am uncomfortable with the proposal made by the Debtors, in their reply papers, that this be left to the plan negotiation process. While I always welcome consensual agreement, I think the Debtors' proposal lacks the necessary mechanism for giving creditors their day in court on the allocation issues if agreement cannot be achieved.

Accordingly, I believe that such an opportunity for judicial resolution, if necessary, must be provided. But it need not be done on a lightning fast basis, and indeed should not be, as the issues are complex and they likely will be interwoven with other complex issues involving intercompany obligations. Also, none of the Debtors will actually be writing out a check to the Government any time soon, and I thus think that

-56-

concerns creditors articulated as to how any such payment would be accounted for prior to resolution of the allocation issues are illusory.

At this juncture, I will direct that stakeholders who wish to take a position on allocation issues caucus amongst themselves, together with professionals for the Debtors and the Creditors' Committee (who likely will not be antagonists on these issues, but who are likely to be helpful in the process) to establish a game plan for the resolution of the allocation issues. That game plan should include the creation of an escape valve litigation mechanism (to be handled as a contested matter) to resolve any disputes if necessary. The game plan should provide sufficient time to get these issues resolved before confirmation, and, if possible, before the finalization of any reorganization plan. I will leave it to the parties, in the first instance, to decide on the best way to move the process forward, but I will make myself available, as usual, for conference calls, chambers conferences, or more formal hearings if desired.

### E.

### Banks' Substitute Liens

Several prepetition banks filed responses or limited objections noting that they do not oppose the settlement as such, but that they wished to ensure that security interests they now have in the Managed Entities, which would be lost when the Managed Entities passed to Adelphia in "cleansed" condition—free and clear of liens—would be replaced with substitute liens to protect their collateral position. After caucusing with the banks, the Debtors agreed to language in the proposed approval order that would meet the banks' concerns in this regard.

However, the Debtors' measures to meet the banks' concerns then triggered objections from others—particularly the Equity Committee, which otherwise supports the

settlement.  They argue that the banks thereby got more than that to which they were entitled, and that if the banks want to protect their liens, they should go before Judge Sand, in forfeiture ancillary proceedings to do so.

I will not deprive the banks of the protections the Debtors agreed to, and will include the desired provisions in any approval order.  In addition to having the liens they wish to protect, which are on partnership and similar ownership interests, the banks have guaranties from the underlying entities that would be claims on their underlying assets in any event, to which the ownership interests would be structurally subordinate.  In other words, the ownership interests would have value only to the extent that the guaranty obligations had been satisfied anyway.  Thus there would be minimal prejudice to other stakeholders in the case as a consequence of giving the banks the comfort they requested. And the concept underlying the substitute lien measures to protect the banks, which may be analogized to an "adequate protection," is not offensive to me.

### F.

### Asset Sale Ambiguities

Time-Warner and Comcast have provisions in their asset purchase agreements that give them comfort that the cable properties Time-Warner and Comcast will be buying would not be indicted or subject to forfeiture.  The Creditors' Committee has expressed a concern that even after approval of this settlement, Time-Warner and Comcast might have lingering doubts as to their protection in this regard, and that such might give them an unintended ability to be relieved of their contractual duties under their asset purchase agreements with Adelphia.  This, the Creditors' Committee argues, could destroy the mutuality of obligation under the asset purchase agreements, and deprive Adelphia of one of the most important benefits of the settlement.

Though I have no reason to question Time-Warner's or Comcast's sincerity, I agree that preserving mutuality of obligation, and avoiding uncertainties and ambiguities down the road, is of the highest importance. Adelphia, the Creditors' Committee, Time-Warner, Comcast and the DoJ are to work cooperatively to ensure that upon approval of the settlement, Time-Warner and Comcast will have the comfort they need, and that Time-Warner and Comcast will then acknowledge that—and thus that Time-Warner and Comcast will give the Creditors Committee and Adelphia the comfort they need. I am flexible as to the mechanics. Any means that reasonably satisfies those needs and concerns will be satisfactory to me.

## G.

### Class Action Plaintiffs' Objections

Certain class action plaintiffs argue that the settlement is too favorable for Adelphia. In particular, they contend that forfeited Rigas assets will inappropriately wind up in Adelphia's hands, because Adelphia could not establish a superior claim to the Rigas assets in a forfeiture proceeding in the district court. Hence, they argue, the aspect of the settlement providing for the Managed Entities to pass to Adelphia is unlawful, as violative of the Justice for All Act.

However, I cannot disapprove the settlement on that basis. After review of the transcript of the proceedings before Judge Sand, I believe that Judge Sand ruled on this exact issue, after he explicitly asked counsel for the class action plaintiffs to articulate the bases for their contention that the settlement was unlawful, and no meaningful response was forthcoming. And to the extent that he did not rule on the matter, I believe that any concerns in this regard properly should be brought before Judge Sand, and not me. The stated objection by the class action plaintiffs urges not that the settlement is too expensive

for Adelphia, but rather that it is too favorable.  An objection of that character does not address the needs and concerns of the estate, nor does it involve any legally cognizable rights over which I have jurisdiction.

Accordingly, the class action plaintiffs' objection must be overruled.

**H.**

**Cable Venture Objections**

Century/ML Cable Venture, a joint venture of Adelphia's subsidiary Century Communications and of an affiliate of Merrill Lynch, does not oppose the settlement, but has filed a limited objection to ensure that it is not prejudiced in claims and plenary litigation it has with Highland Holdings, one of the Rigas Owned Entities that will be forfeited.  But I am confident that either the Joint Venture would not be prejudiced at all by the forfeiture of Highland Holdings under this settlement, or would not be prejudiced in any material way.

The Cable Venture has asserted claims against Highland, but Highland is subject to forfeiture to the Government with or without Adelphia's consent, and the harsh truth, from the Cable Venture's perspective, is that any claims the Cable Venture has against Highland will be against a defendant who is judgment-proof.  The Cable Venture's other concern, that Highland would proceed against the Cable Venture, and the Cable Venture could not assert setoffs against Highland, while theoretically possible, is unlikely to occur, and could easily be protected against.  If the Government keeps Highland after the forfeiture, the Government is unlikely to continue Highland's litigation against the Cable Venture (particularly given the Government's first-hand knowledge of the Rigas conduct that would be imputed to Highland), and if Adelphia ultimately gets Highland after the forfeiture, Adelphia is likely to act similarly.  And since any Cable Venture litigation will

-60-

be before me in any event, I can put into place measures to ensure that Highland does not

unfairly deprive the Cable Venture of setoff defenses to which it would otherwise be

entitled.

Adelphia has provided clarifications to address the Cable Venture's other stated

concerns, which I find to be satisfactory.

## I.

### Franchisors' Objections

Several local franchising authorities—communities in which Managed Entities do

business—have not objected to the settlement as such, but wish to ensure that their

regulatory rights with respect to the Managed Entities are not impaired.  The Debtors

have agreed to a stipulation under which the local franchising authorities' rights will be

preserved, and an agreement of that character is satisfactory to me.

## J.

### Other Objections

To the extent other objections have been made (such as the argument that the

administration of insolvent companies or assets that once came from them should be

performed by bankruptcy courts, and not the SEC), I find them unsupported by the facts,

repetitive, or otherwise lacking in merit, and plainly immaterial to the approval of this

settlement.  All are rejected.

### Conclusion

For the foregoing reasons, the settlement is approved.  None of the settlement

agreements need be changed in any way, but counsel for Adelphia is to amend its

proposed approval order, in consultation with objectors, to fully address the additional

protective provisions and reservations of rights that I have authorized and required in this

decision, and to otherwise conform with this decision.  In the event of a failure to secure

unanimous consent to the form of the order (without prejudice, of course, to rights to

appeal), Adelphia is authorized and directed to settle the order on no less than two

business days' notice by fax or hand.

     As I find that the required business need for a waiver has been shown, the order

may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g).

Dated: New York, New York  
     May **_20_**, 2005

     **_s/Robert E. Gerber_**  
     United States Bankruptcy Judge