UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Adelphia Communications Corp., *et al.*, | ) | Case No. 02-41729 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

_____

DECISION ON MOTIONS BY AD HOC COMMITTEE OF ARAHOVA
NOTEHOLDERS TO APPOINT TRUSTEE OR NONSTATUTORY FIDUCIARY; TO
DISQUALIFY COUNSEL; AND TO TERMINATE EXCLUSIVITY

APPEARANCES:

WHITE & CASE
Counsel for the Ad Hoc Committee of Arahova Noteholders
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131
By:    Thomas E. Lauria, Esq.


1155 Avenue of the Americas
New York, New York 10036
By:    J. Christopher Shore, Esq.
        Gerard Uzzi, Esq.


SHEPPARD MULLIN RICHTER & HAMPTON
Counsel for U.S. Bank, N.A., as Indenture Trustee with Respect to the Arahova Notes
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
By:    Daniel L. Brown


WILLKIE FARR & GALLAGHER
Counsel for Debtors and Debtors in Possession
787 Seventh Avenue
New York, New York 10019
By:    Marc Abrams, Esq.
        Roger Netzer, Esq.
        Brian E. O'Connor, Esq.
        Rachel C. Strickland, Esq.
        Morris J. Massel, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for the Official Committee of Unsecured Creditors
1633 Broadway
New York, New York 10019
By:    David M. Friedman, Esq.
       Adam L. Shiff, Esq.
       Daniel N. Zinman, Esq.

MORGENSTERN, JACOBS & BLUE
Counsel for the Official Committee of Equity Security Holders
885 Third Avenue
New York, New York 10022
By:    Gregory A. Blue, Esq.

HENNIGAN, BENNETT & DORMAN LLP
Counsel for the Ad Hoc Committee of ACC Senior Noteholders
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
By:    Bruce Bennett, Esq.
       James O. Johnston, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Counsel for the Ad Hoc Committee of FrontierVision Noteholders
1177 Avenue of the Americas
New York, New York 10036
By:    Kenneth H. Eckstein, Esq.
       Jeffrey S. Trachtman, Esq.

BROWN RUDNICK BERLACK ISRAELS LLP
Counsel for the Ad Hoc Adelphia Trade Claims Committee
One Financial Center
Boston, Massachusetts 02111
By:    Steven D. Pohl, Esq.

STROOCK & STROOCK & LAVAN
Counsel for the Ad Hoc Convertible Notes Committee
180 Maiden Lane
New York, New York 10038
By:    Gerald Bender, Esq.
       Erez Gilad, Esq.

KIRKLAND & ELLIS
Counsel for the Ad Hoc Committee of Non-Agent Lenders
777 South Figueroa Street
Los Angeles, California 90017
By:    James H.M. Sprayregen, Esq.

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
Counsel for W.R. Huff
One New York Plaza
New York, New York 10004
By:    Gary L. Kaplan, Esq.

KELLEY, DRYE & WARREN
Counsel for Wilmington Trust Company
101 Park Avenue
New York, New York 10178
By:    Joseph A. Boyle, Esq.

SEWARD & KISSEL
Counsel for the Law Debenture Trust Company of New York
One Battery Park Plaza
New York, New York 10004
By:    Arlene R. Alves, Esq.

SIMPSON THACHER & BARTLETT LLP
Counsel for Wachovia Bank, N.A.
425 Lexington Avenue
New York, New York 10017
By:    Peter V. Pantaleo, Esq.

HAYNES AND BOONE, LLP
Counsel for Bank of America, N.A.
901 Main Street, Suite 3100
Dallas, Texas 75202
By:    Robin E. Phelan, Esq.

153 E. 53rd Street, Suite 4900
New York, New York 10022
By:    Judith Elkin, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
33 Whitehall Street, 21st Floor
New York, New York 10004
By:    Tracy Hope Davis, Esq.


BEFORE:    ROBERT E. GERBER
           UNITED STATES BANKRUPTCY JUDGE


In this contested matter under the umbrella of the jointly administered chapter 11

cases of Adelphia Communications Corporation ("Adelphia Parent") and its subsidiaries,

the Ad Hoc Committee of Arahova Noteholders (the "Arahova Noteholders

Committee")—holders of bond debt issued by Arahova Communications Inc.

("Arahova"), an intermediate subsidiary of Adelphia Parent, one of the 231 debtors (the

"Debtors") whose chapter 11 cases are being jointly administered in this Court—moves

for orders:

           (1)  appointing a chapter 11 trustee for Arahova (which is a holding

company) and its operating company subsidiaries (together, the "Arahova

Debtors"), or, alternatively, (a) directing the recusal of the Arahova Debtors'

officers and directors with respect to interdebtor disputes (the "Interdebtor

Disputes"), and (b) ordering the appointment of nonstatutory fiduciaries—

"independent" officers and directors—and "unconflicted counsel" to represent the

Arahova Debtors in intercreditor disputes (the "Intercreditor Disputes") now

pending in this Court, described more fully below (the "Trustee Motion");

           (2)  disqualifying Willkie Farr & Gallagher ("WF&G"), the counsel that

has represented all of the debtors since these chapter 11 cases were filed 3-1/2

years ago, from representing (a) the Arahova Debtors, and (b) any of the other

debtors, in the Interdebtor Disputes (the "Disqualification Motion");[1] and

(3) terminating the Arahova Debtors' exclusive right (now held, in

common with all of the other debtors in the Adelphia corporate family) to file a

reorganization plan—referred to, in bankruptcy parlance, as "exclusivity" (the

"Exclusivity Motion").[2]

---

[1]     The Arahova Noteholders Committee's original motion was broader, and sought disqualification
of WF&G from acting not just on interdebtor issues but also for the Arahova Debtors in any way.
*See* Arahova Noteholders Comm. Disqual. Motion at 2 (seeking an order "disqualifying [WF&G]
(i) from representing [the Arahova Debtors] in any of the chapter 11 cases . . . of [Adelphia
Parent] and its affiliated debtors . . . and (ii) from representing the Debtors on all intercompany
claims issues"). Thereafter, presumably recognizing that such would serve no useful purpose and
be highly damaging to the Arahova Debtors, the Arahova Noteholders Committee narrowed its
request, and by the time of summation sought to disqualify WF&G only in the Interdebtor
Disputes. *See* Jan. 6, 2006 Hrg. Tr. at 76 ("[WF&G] must now be disqualified as to all inter-
debtor issues"), 79 ("Now as a practical matter, I think that relief can be fashioned that would
permit [WF&G] to continue advising regarding issues that are not the subject matter of the
conflict. I think that would mean that [WF&G] would get to continue working on the
consummation of the Time Warner/Comcast transaction, would get to continue working on other
issues that come up on a day-to-day basis that need resolution in these cases. But that they have to
step back from the issues that address—that relate to the intercompany disputes.").

[2]     U.S. Bank, the indenture trustee for the Arahova bonds, has joined in the motions, though it has
stipulated, using language that is somewhat puzzling to the Court, that it "did not vote in favor" of
any of the motions. However, the Arahova Noteholders Committee's motions are opposed, in
whole or in most respects, by all of the other parties in interest that have weighed in on the
motions. The Debtors, the Official Committee of Unsecured Creditors (the "Creditors'
Committee"); the Official Committee of Equity Security Holders (the "Equity Committee"); and
the Ad Hoc Committee of ACC Senior Noteholders (the "Adelphia Parent Noteholders
Committee")—holders of bond debt issued by Adelphia Parent, who are the Arahova Committee's
principal adversaries in the Intercreditor Disputes—oppose the motions in toto. (However, the
Adelphia Parent Noteholders Committee also argues that if a trustee were to be appointed for
Arahova and/or the Arahova Debtors, one would have to be appointed for Adelphia Parent also.)
Then, the Ad Hoc Committee of FrontierVision Noteholders (the "FrontierVision Noteholders
Committee")—holders of bond debt issued by FrontierVision, another intermediate subsidiary of
Adelphia Parent, who are also players in the Intercreditor Disputes—likewise oppose appointment
of a trustee. But they argue that if the Arahova Debtors get a trustee, the FrontierVision Debtors
should get one too, and they like the idea of appointing independent management for
FrontierVision, which they would likely seek if consistent with this Court's rulings on the
Arahova Noteholders Committee's motions.

Finally, the agents for several of Adelphia's secured lender bank groups have stated that the Court
should grant the relief sought by the Arahova Noteholders Committee only if the Court finds that
it would be in the interests of their lending syndicates' particular borrowers—a finding that the
Court plainly could not make. And the Ad Hoc Adelphia Trade Claims Committee (the "Trade
Claims Committee")—holders of trade claims, principally against operating company Debtors that
are direct or indirect subsidiaries of Adelphia Parent—oppose granting any of the motions to the

The motions rest on a factual predicate that is common in multi-debtor chapter 11 cases (especially large ones), in this district and elsewhere.  In multi-debtor cases, individual debtors frequently, if not always, have actual or arguable obligations to each other—by reason of money lent, or funds or other assets having been transferred, from one debtor to another; by reason of one debtor having provided or obtained services for other debtors; by reason of allocations of overhead or charges for shared facilities or other property; or by reason of other interdebtor dealings.  As corporate families grow in size to achieve economies of scale, and to avoid duplication of services as between individual family members, the number and complexity of such dealings and relations increase.  In many instances (typically varying from case to case), the amount one debtor owes to another as a result of such dealings is undisputed or ultimately is not material. But in many other instances, it is not.

As creditor recoveries from particular debtors rise or fall as a function of the assets and liabilities of the particular debtors with whom those creditors dealt, and particular debtors in a corporate family frequently also dealt with each other or used property or services provided by each other, intercreditor disputes frequently arise with respect to the appropriate treatment of such individual debtors' transactions with each other; with respect to the allocation of value, after an asset sale, for assets that had been contributed by many individual debtors; with respect to liability for expenses incurred on

---

extent that might they impair or cause undue delay in closing the Time Warner/Comcast asset purchase agreements, discussed below—which would be an almost certain consequence of granting any material part of the Arahova Noteholders Committee's motions.

behalf of multiple debtors; or for a host of other reasons, limited only by the creativity of creditor counsel in finding bases to increase their clients' shares of the collective pie.[3]

The motions, especially the first two of them, raise the issue whether, as a matter of law or an exercise of the Court's discretion, chapter 11 trustees, or some kind of nonstatutory fiduciaries (assuming that appointment of the latter is permissible under the Code) must be appointed for individual debtors in a multi-debtor chapter 11 case with such interdebtor disputes, and what actions debtors and their counsel, and/or bankruptcy courts, must take when such intercreditor or interdebtor disputes arise. But in this case, the Court does not need to decide those issues in their broadest form, and instead decides them under the particular facts that the Court finds to be present here. In this case, the Debtors and their counsel:

> — focused their efforts on maximizing value for every debtor;

> — never acted adversely to the interests of any individual debtor;

> — proposed a mechanism (thereafter approved, with some fine-tuning, by this Court) for the Intercreditor Disputes to be litigated in a fashion that would give the creditors whose ox might be gored in the controversy a fair and full opportunity to press their respective positions (and where the creditors affected by

---

[3]   In one sense, these disputes are, as the Arahova Noteholders Committee puts it, "interdebtor" disputes. In another sense—more consistent with the real world and the usual practice in chapter 11—these disputes are "intercreditor" disputes, as it is the creditors of the respective individual debtors who are directly affected by those debtors' asset-liability mix, and who normally negotiate out (or, in some cases, litigate) the controversies that affect their particular recoveries.

The Code recognizes the latter reality, expressly providing, in section 1109 of the Code, for the right of a party in interest to raise, appear and be heard on any issue in a chapter 11 case. *See also* Goldstein Dep. Tr. at 94 ("[i]t may have been more accurate to say the interestate dispute, but I think intercreditor dispute is probably considered to be the same—have the same meaning.").

The Court considers the disputes here to be both, and in the course of the discussion that follows uses whichever expression is more appropriate in the given context.

the outcome would have the incentive, and the resources, to press their respective

interests);[4] and

— stayed neutral in the Intercreditor Disputes, and have confirmed their

intention to remain so, proposing a reorganization plan that would effectively

escrow the disputed value pending further determinations of the Court on the

intercreditor issues.

The Court further decides these motions in the context of the fact that—using the

words of the Arahova Noteholders Committee's own counsel—the motions represent the

"nuclear war button,"[5] with devastatingly adverse consequences that would result if the

Arahova Noteholders Committee's Trustee Motion were granted, too numerous to list in

this summary here.

And the Court further decides these motions in light of the compelling inference

that the motions were filed as part of a scorched earth litigation strategy that would

provide the Arahova Debtors with little benefit that they do not already have (trumped,

dramatically, by a resulting prejudice to the Arahova Debtors themselves, along with all

of the other Debtors), and which would have the effect (and, the Court believes, the

purpose) of imperiling the pending Time Warner/Comcast transaction and the Debtors'

DIP financing in an effort to extract a greater distribution, sidestepping the Court-

---

[4]    The Arahova Noteholders Committee states that it represents approximately $540 million in
bonds; its principal opponent, the Adelphia Parent Noteholders Committee, states that it represents
approximately $1.7 billion in bonds (and hence is the largest group of unsecured creditors in this
case), and the FrontierVision Noteholders Committee states that it represents approximately $358
million in bonds.  (All figures are in par amount; the value that should be distributed on account of
those holdings is of course a matter of sharp dispute, and the issue underlying the Intercreditor
Disputes.)  The Court notes these figures not to suggest that it is engaging in a counting exercise in
deciding the motions, but rather to note one of the bases for its finding that the creditors have the
incentive to prosecute their interests in the Intercreditor Disputes.

[5]    Jan. 6, 2006 Hrg. Tr. at 72.

approved process for determining the Intercreditor Dispute issues on their respective merits.

Finally, the Court is troubled, to say the least, by the 11th hour time at which the conflict issues were raised, when the supposedly disabling conflicts were apparent 3-1/2 years ago. If the concerns were material and genuine; if the appointment of trustees or nonstatutory fiduciaries was truly necessary; and/or if the more traditional means of letting creditors negotiate out, or litigate, intercreditor issues were unsatisfactory, creditors in this case, and/or the committees acting for them, would have sought this relief long ago. The Court does not need to address whether the delay gives rise to a waiver, estoppel, or even laches; the circumstances instead go to the motions' bona fides. The Court's concerns as to the motions' bona fides are amplified by the Arahova Noteholders Committee's entry into a standstill agreement under which these supposedly critical motions would not be pressed while negotiations as to its recovery under the reorganization plan progressed.

Facts like these would make granting these motions a dreadful exercise of the Court's discretion, and the relief the Arahova Noteholders seek here thus would appropriately be granted only if such relief were required as matter of law. But except in one respect (where WF&G has already acted, and largely made the motions moot), it is not. To the contrary, it is quite clear, in this Court's view, under the Bankruptcy Code and the case law, that there is no requirement of law, nor should there be one, that says that any time interdebtor disputes exist in a multi-debtor chapter 11 case, and a creditor constituency is upset that it may not be paid in full, independent fiduciaries (of any kind) must be appointed for any or all of the individual debtors so affected. The imposition of

any such requirement would represent a sea change in the law and in chapter 11 practice, with a highly destructive effect on the manner in which multi-debtor chapter 11 cases are run.  As importantly or more so, any such rule would in nearly all, if not all, such cases have a material adverse effect on creditor recoveries.

Under the Code and the relevant caselaw, in this Court's view, the existence of interdebtor disputes, even material ones, is not by itself cause for the appointment of a trustee or (assuming one might be permissible) a nonstatutory fiduciary.  The existence of such disputes must instead be considered as one of many factors—including, most significantly, the advantages and disadvantages to affected creditors that would result from the desired appointment; the existence of less damaging alternatives; and the extent to which the alternatives would address legitimate needs and concerns with fairness, due process and appropriate advocacy.

The record here does not come close to satisfying the requirements of section 1104(a)(1) of the Code, requiring the appointment of a trustee for debtor wrongful conduct or mismanagement.  And while section 1104(a)(2) of the Code authorizes discretionary appointment of a trustee where such is in the interests of creditors, the record here does not support that either.  Indeed, the appointment of a trustee for Arahova and/or its subsidiaries under these facts would be *antithetical* to creditor interests, subjecting them to actual and potential prejudice in many ways, with no corresponding benefit.

Then, the Court does not need to decide broad issues as to the extent to which nonstatutory fiduciaries can be appointed under the Code (or whether a debtor's continued possession in a chapter 11 case can be conditioned, under section 1107 of the

-10-

Code or otherwise, on the appointment of nonstatutory fiduciaries). The Court has
considerable doubt that section 1107(a) can be used to appoint a trustee equivalent. But
even assuming, *arguendo*, that nonstatutory fiduciaries *could* be appointed, the Court
could not appropriately *require* their appointment without at least a showing akin to that
which the Second Circuit requires in other instances where it has authorized the
deputization of nonstatutory fiduciaries on behalf of an estate—that the deputization be in
the best interests of the estate, and that it be necessary and beneficial to the fair and
efficient resolution of the bankruptcy proceedings. No such finding could appropriately
be made here.

The Court pauses, at the risk of stating the obvious, to make its thinking clear.
Where interdebtor issues exist and are material, they cannot, of course, be swept under
the rug. Even though consensual resolution is the normal (and preferred) practice, some
means, consistent with fairness, due process, and appropriate advocacy, must be
formulated to resolve them if those issues cannot be settled. But the means established to
resolve them should be the least destructive available. And neither the interests of a
debtor's creditor body, nor the integrity of the bankruptcy system, can tolerate the use of
motions like these as a tactic to assist creditor groups wishing to augment their personal
recoveries.

The motions to appoint a trustee for the Arahova Debtors, or, alternatively, to
require the appointment of nonstatutory fiduciaries, are denied. The motions for an order
directing the Arahova Debtors' officers and directors to recuse themselves on interdebtor
issues, and to disqualify WF&G from representing the Arahova Debtors and any of the
other debtors in the Interdebtor Disputes—*i.e.,* to ensure the continuing neutrality of

each—are granted; without finding that present management or WF&G have in any way acted inappropriately to date, the Court believes that their voluntary neutrality in such disputes, as a prophylactic measure, should be mandatory. The motion to terminate the Arahova Debtors' exclusivity is denied.

The following are the Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion in connection with the motions.

<u>Findings of Fact</u>

The motions raised material disputed issues of fact, requiring an evidentiary hearing over three days, and development of an extensive factual record. The motions also required this Court to bring to the table the knowledge of these cases—most significantly their history, and the matters that had to be, and will have to be, decided— that it acquired over the 3-1/2 years that these cases have progressed under this Court's watch. The factual record underlying these motions thus came to be extraordinarily detailed, and it would be manifestly impractical, in the Court's view (particularly for a decision that must be issued in "real time") for the Court to discuss in detail every factual finding it could or did make.[6] As the most sensible alternative, the Court regards it as best first to address the critical background; the most important of the underlying facts (most of which are historical or otherwise not subject to serious dispute); and its factual findings with respect to the disputed issues.[7]

---

[6]    Likewise, in the interests of relative brevity, the Court has omitted citations with respect to background facts, and has limited record citations to the most significant matters.

[7]    The Court took trial testimony from Adelphia CEO William Schleyer, and Adelphia CFO Vanessa Wittman, on behalf of Adelphia, and from Matthew Doheny, of the Distressed Products Group at Deutsche Bank Securities, on behalf of the Arahova Noteholders Committee. In each case, in accordance with the Court's Case Management Order #3, direct testimony was taken by affidavit or declaration, and cross-examination and subsequent examination was taken live. Mr. Schleyer was subjected to minimal cross-examination, and the Court finds his testimony fully credible. Ms. Wittman was cross-examined at length, and while the questioning revealed memory deficiencies

-12-

A. *Relevant History and Events*

1. *Background*

Adelphia, one of the largest cable companies in the United States, was founded by John J. Rigas, who later brought his sons and other members of his family into the business. Over the years, Adelphia grew substantially, principally as a result of acquisitions, many of which were financed by borrowings. With the acquisitions, Adelphia became much larger, and its operations became much more complex. Additionally, the Rigases themselves owned a number of cable companies and other, non-cable, assets through a variety of corporations, partnerships, and LLCs (together, "Rigas Family Entities"). The day-to-day affairs of the Rigas Family Entities that were cable companies were managed by Adelphia. Those cable companies have been referred to, in this Court and elsewhere, as "Managed Entities."

By 2002, John Rigas and members of his family occupied the top officer positions at Adelphia, and many (but not all) of the seats on its Board of Directors (the "Board"). In March 2002, Adelphia disclosed that it was jointly and severally liable for more than $2 billion of borrowings attributed to certain of the Managed Entities under credit facilities (the "Co-Borrowing Facilities") that were not reflected as debt on Adelphia's consolidated financial statements. It also appeared that a portion of the borrowings for

---

with respect to matters that had been raised on cross-examination, those deficiencies did not appear to the Court to be material, and the questioning did not undercut the truthfulness of her direct testimony. On more than one occasion, the Court had to remind Ms. Wittman to answer the questions put to her, and to await redirect to make points she wanted to make, but the Court nevertheless found her direct testimony to be truthful and otherwise credible, and likewise accepts it in full, rejecting the Arahova Noteholders Committee's contention that flaws in her testimony on cross made all of her direct testimony unworthy of belief. Mr. Doheny was not subjected to any cross-examination, and the Court takes that testimony as fully truthful and credible as well.

Additionally, the Court was presented with a considerable mass of designated deposition testimony, some of which it observed live on videotape. Having no basis for questioning the credibility of any of it, the Court accepts that deposition testimony as well.

which Adelphia entities were jointly and severally liable had been advanced to various

Rigas Family Entities to finance purchases of Adelphia securities.

In the aftermath of this disclosure, the stock of Adelphia Parent was delisted from

the NASDAQ National Market; Deloitte & Touche LLP ("Deloitte"), the Debtors'

independent auditor at that time, suspended its auditing work on Adelphia's consolidated

financial statements for the year that ended December 31, 2001, and withdrew its opinion

for prior consolidated financial statements.  Adelphia and its subsidiaries ultimately

defaulted under various credit facilities, notes and preferred stock.

In addition, a special committee of the Board, composed of three members of the

Board who were not members of the Rigas Family, commenced a formal investigation

into related party transactions between Adelphia entities and Rigas Family Entities and

Rigas Family members.  This investigation led to the public disclosure of previously

undisclosed information about the Rigas Family's co-borrowing activities, related party

transactions, and involvement in accounting irregularities.  In May 2002, the Rigases

resigned their positions as officers and directors of Adelphia.

With no access to traditional sources of liquidity in the capital markets, pending

governmental agency investigations, mounting litigation, default notifications under

various credit instruments, and the resulting risk of collection and foreclosure actions by

creditors, the Debtors filed for chapter 11 protection in June 2002.

At this point, the chapter 11 cases of 231 individual Debtors are being jointly

administered in the Adelphia chapter 11 cases, on this Court's watch.  The Debtors'

presently proposed reorganization plan (the "Present Plan")—which, more precisely,

consists of 18 separate plans—calls for a partial (but not total) substantive consolidation.[8]

But at least up to this time, none of the individual Debtors' estates have been

substantively consolidated.

### 2. Early Case Proceedings

As is customary in chapter 11 cases, the Court considered, very shortly after the

filing of the bulk of the Adelphia cases,[9] "first day" orders, which included, as relevant

here, orders approving the Debtors' continuation of their centralized cash management

system and the Debtors' retention of professionals, including counsel.  The Court

approved the retention of WF&G by all of the Debtors to provide them with, among other

things, "general restructuring advice."  Additionally, the Court approved postpetition

financing—referred to in bankruptcy parlance as "DIP Financing"—in the original

maximum amount of $1.5 billion (now $1.3 billion), to be used for operations and capital

expenditures.

Shortly thereafter, the U.S. Trustee formed the Creditors' Committee.  As

originally appointed by the U.S. Trustee, the Creditors' Committee was well balanced,

and included trade creditors (Home Box Office, Viacom, and Scientific-Atlanta);

bondholder creditors of Adelphia Parent; Law Debenture Trust Co. (the indenture trustee

---

[8]     In very general (and possibly imprecise) terms, the 18 individual plans that collectively comprise
the Present Plan cover clusters of individual Debtors that have been grouped in that fashion, to the
Court's understanding, as a consequence of operational considerations and their prepetition history
and borrowings.  Clusters of Debtors have been referred to in the parlance of the *Adelphia* case as
"silos."  The silos in the Present Plan may or may not correspond to silos referred to in other
contexts in these chapter 11 cases.

[9]     Filings for a few of the Adelphia Debtors preceded the bulk of the filings by about a week.  There
were, in addition, a number of tag-along cases that came substantially later.

for the Adelphia Parent bonds); bondholder creditors of subsidiaries like Arahova;[10] and

U.S. Bank, the indenture trustee for the Arahova (and also FrontierVision) bonds.[11]

However, as described more fully below, distressed debt traders and other

investors in claims have been a major presence in these cases, and since the filing of

these cases in 2002, there was a substantial turnover in the membership of the Creditors'

Committee. By March 2004, the Creditors' Committee had lost most of its Adelphia

Parent bondholder membership (though it continued to include a major bondholder who,

to the Court's understanding, had positions at both the Adelphia Parent and subsidiary

levels), and by July 2004, the Creditors' Committee lost each of the original three trade

debt members, though an acquirer of trade claims had joined the Creditors' Committee in

December 2003. The lack of a meaningful presence on the Creditors' Committee of

Adelphia Parent bondholders became a matter of concern to the Court, and it was

remedied in May 2005, with the appointment of two additional members to the Creditors'

Committee that the Court understands to be holders of Adelphia Parent debt.

The members of the Creditors' Committee, all of whom were parties to

confidentiality agreements, had access to a great deal of information with respect to the

Debtors—including, without limitation, financial information generally, and information

as to interdebtor issues in particular. But even in 2002, those reviewing public

information (such as operating reports) could see interdebtor issues, and perceptive

---

[10]    One bondholder creditor of Arahova was (and is) Appaloosa Management ("Appaloosa"), a hedge
fund and distressed debt trader. With access to confidential information, the Appaloosa
representative on the Creditors' Committee was "restricted"; it could not trade or share that
information with others who did. But an "ethical wall" was established, permitting others at
Appaloosa (who, like other "unrestricted" entities, had access only to public information) to trade.

[11]    *See* U.S. Bank's Rule 2019 Statement, filed Sept. 9, 2002, Bankr. S.D.N.Y. Docket No. 02-41729
(REG), ECF #601.

creditors (such as Appaloosa) could see interdebtor issues even from the pre-petition SEC filings issued during the Rigas era.

Also in the opening weeks of these cases, the U.S. Trustee appointed the Equity Committee, as the ultimate value of the Debtors was uncertain, and it was possible that there might be residual value for equity.

### 3. Early Case Stabilization Matters

During the first year of these cases, the Rigases were gone, but getting senior replacement management to take their place was a major undertaking. During that time, the Debtors were led by interim management that lacked significant cable experience, operating under a Board consisting of the former independent directors (the "Carry-Over Directors"). By necessity, interim management focused on stabilizing operations, identifying and hiring an experienced successor management team, creating state-of-the-art corporate governance structures, and conducting an investigation of the Rigases' activities. Early on, the Board also commenced work on establishing better corporate governance procedures, which would give the Debtors' creditors (and, significantly, the United States Department of Justice ("DoJ") and the SEC) comfort that transgressions of the type perpetrated during the Rigas era would not recur.

From August 2002 through July 2003, the Carry-Over Directors began to reconstitute the Board with new independent directors. In addition, because prior to May 2002 virtually all of the directors of Adelphia Parent's subsidiaries were members of the Rigas Family, the Debtors appointed a new slate of directors to each of the subsidiary boards. When interim management was replaced in the Spring of 2003, the subsidiary management and boards were reconstituted yet again.

-17-

In early 2003, the Debtors (with extensive input from the Creditors' Committee)
replaced interim management with permanent executives who have substantial cable
experience.  After an evidentiary hearing (at which the Court considered objections on
the part of the Equity Committee and a few other constituencies, principally with respect
to the executives' compensation), the Court approved the Debtors' motion, widely
supported by the Debtors' creditors, for approval of the employment contracts of William
Schleyer and Ronald Cooper, their present CEO and COO, respectively.[12]  The Debtors
thereafter hired Vanessa Wittman, their CFO.[13]  Then and only then, in the second year of
these cases, once new management was in place and all of the Debtors' boards were
reconstituted, the Debtors were able to turn their attention to the Debtors' restructuring.

### 4. *Debtors' Efforts With Respect to Their Accounting Records*

In light of the fiscal mismanagement and fraud on the part of the Rigases, the
Debtors initiated investigations and engaged forensic accountants.  After the filing of
their chapter 11 cases, the Debtors' accounting personnel initiated an analysis, review,
and in certain cases, reconstruction of Adelphia's historical books and records (the
"Restatement").  It included:

> (a) an attempt to re-audit and restate financial statements for 1999 and
> 2000;

> (b) the preparation of financial statements for 2001, 2002 and 2003; and

> (c) the review of over 7 million lines of intercompany transactions (the
> "Intercompany Transactions").

---

[12]   *See In re Adelphia Communications Corp.*, 2003 WL 22316543 (Bankr. S.D.N.Y. Mar. 4, 2003).

[13]   Mr. Schleyer, Mr. Cooper and Ms. Wittman are the members of the Board of Directors for
Arahova and each of its subsidiaries, as they are for Adelphia Parent's other direct and indirect
subsidiaries.

The Restatement was a massive undertaking that was critical to the reorganization effort that was about to begin.  By ensuring that the Debtors' financial records and statements would be presented in accordance with generally accepted accounting principles ("GAAP"), the Debtors could obtain an audit opinion from PricewaterhouseCoopers LLP ("PwC"), the Debtors' new independent accountants.  The Debtors believed that audited financials would be required by either a buyer if their business was sold, or by the SEC if they were to emerge as standalone companies.

Although the Debtors initially intended to prepare separate audited financials for each subsidiary Debtor that was a reporting company under the '34 Act and similar securities laws (each, a "Subsidiary Reporting Company"), they ultimately determined that they would be unable to complete financial statements for the Subsidiary Reporting Companies that would be compliant with GAAP.  Early on, the Debtors' management learned of possible fraudulent conveyances associated with the prior movement of subsidiaries among various Debtors during the Rigas era.  Thereafter, in early 2004, the Debtors learned of other issues that could increase or decrease assets or liabilities of one or another of the individual Debtors vis-á-vis each other.  By early in the Fall of 2004, it was determined that without a resolution of each of these issues, separate financial statements for the Subsidiary Reporting Companies could not be completed.

Throughout the Restatement process, the Debtors kept constituents abreast of their progress.  Over the course of the project, the Debtors' senior executives had ongoing discussions with representatives and members of both official committees, including representatives of Appaloosa, U.S. Bank and other parties in interest.

The Restatement culminated with the filing of 10-Ks for Adelphia, on a

consolidated basis, for the years 2003 and 2004, in December 2004 and October 2005,

respectively.

In order to complete the Restatement, generate consolidated financial statements,

and obtain an audit opinion, the Debtors had to reconcile their balance sheet accounts,

including intercompany general ledger accounts.  These accounted for, among other

things: (a) Intercompany Transactions among consolidated entities, including

consolidated joint venture partners, and (b) affiliate balances with non-consolidated

entities, such as the Managed Entities and Century/ML Cable Venture—a joint venture

between Century Communications Corporation (an Arahova subsidiary), and ML Media

Partners L.P. (an investment vehicle managed on behalf of unrelated investors by Merrill

Lynch), which, until a recent sale, operated two cable systems in Puerto Rico.

In conjunction with this review, unless a transaction was evidenced by

documentation between two Debtors, Intercompany Transactions (*e.g.*, cash receipts,

disbursements, acquisition accounting and cost allocations) were deemed to have been

made by or to a single entity, Adelphia Cablevision, LLC ("Adelphia Cablevision").  This

methodology, often referred to as the "Bank of Adelphia paradigm," aggregated

Intercompany Transaction balances (the "Intercompany Balances") consistent with the

actual flow of funds within the Debtors' cash management system.  In addition to

ensuring the consistent application of the Bank of Adelphia paradigm, the Debtors: (a)

corrected erroneous and inconsistent Intercompany Transactions reflected in the income

statement; (b) applied a consistent allocation methodology for, among other things,

corporate and high speed data overhead, high speed data and video call center costs and

interest on Intercompany Balances; and (c) otherwise reviewed and adjusted, when they

regarded it as necessary, the Intercompany Transactions.[14]

The Bank of Adelphia Paradigm is one way to ascertain intercompany obligations

that arose during the Rigas era, but it is not the only way.  Whether it is the appropriate

way or not is one of the issues to be tried as part of the Intercreditor Disputes.

The extent to which the Debtors appropriately drew conclusions as to the

appropriate accounting for Intercompany Transactions is a matter of sharp dispute

between some of the creditor groups, particularly the Arahova Noteholders Committee

and the Adelphia Parent Noteholders Committee.  In this respect, the Court cannot agree

fully with either of them, and makes certain alternative findings instead.  The Court's first

bottom line finding (rejecting a contention of the Arahova Noteholders Committee) is

that the Debtors approached the task with neutrality, without intending to aid or prejudice

any individual debtor.  The Court's second bottom line finding (rejecting a contention of

the Adelphia Parent Noteholders Committee) is that notwithstanding the effort and care

that the Debtors put into the task, the Debtors' conclusions will not necessarily be

considered to be binding on individual Debtors or creditors, particularly as to judgmental

matters and legal determinations.  The Court will take evidence and briefing on these

matters in the future proceedings in this case.

Underlying the Court's first finding is its threshold finding that an important

aspect of the accounting review was simply to determine what happened before the

filing—what assets, or cash, went where—and what the accounting consequences for that

should be.  The fact that some of the transactions were between Debtors did not make the

---

[14]        *See* Wittman Decl. at ¶ 18.

effort of getting one's arms around the facts, and reporting on them to one's creditors and other parties in interest, wrongful on the part of the Debtors. That is particularly so since while the facts would seem to be whatever they are, the Debtors made the raw data available, to give any constituency the opportunity, if it wished, to suggest that facts were otherwise.

A more controversial aspect of the accounting process was the judgmental part, and an even more controversial aspect of it was legal conclusions that should attach to the historic facts. But as to each of these, the Debtors took pains to make clear that their accounting judgments were not binding, and that they were not purporting to decide legal issues that only this or another Court could decide. And where the Debtors made corrective entries, they left "footprints," so one disagreeing with the corrections could argue that the corrections were inappropriate.

The application of accounting principles necessarily involves a certain amount of judgment. The Court finds that while Adelphia's accounting team was aware that the restatement of the Intercompany Transactions could affect creditor recoveries, the process was guided solely by the desire to achieve accuracy in the accounting treatment — not by the impact that correct methods of accounting might have on any particular creditor group.[15] Until the Restatement and subsequent reconciliation of Intercompany Transactions was complete and the substantive consolidation structure and other elements of a plan were finalized, no party, including the accountants, could predict accurately the impact that any given decision would have on recoveries.[16]

---

[15]    *See id.* at ¶ 19.

[16]    *See id.*

After Adelphia completed and issued the 2003 10-K, in January 2005, the Debtors

filed an amended Schedule of Liabilities with the Court (the "January 2005 Intercompany

Schedule"). This schedule listed each Debtor's net intercompany payable to, or

receivable from, Adelphia Cablevision, and contained significant qualifications and

reservations of rights. Thereafter, the Debtors' accounting team identified additional

accounting issues, prompting the Debtors to file an amended Schedule of Liabilities on

May 11, 2005 that listed each Debtor's net intercompany payable to, or receivable from,

Adelphia Cablevision (the "May 2005 Intercompany Schedule").

After the Debtors did so, the Arahova Noteholders Committee, which was formed

in or before May 2005,[17] moved to strike the May 2005 Intercompany Schedule. This

Court denied the motion, though it noted the limits as to the extent that any conclusions

in the May 2005 Intercompany Schedule would be binding on creditors.

By the time of the hearing on the Arahova Noteholders Committee's motion to

strike, on July 26, 2005, the Debtors were intentionally refraining from publicly

advocating a particular position or preferred outcome as to the intercreditor issues.[18] In

that connection, this Court then observed:

> There's been a lot of talk about the Debtors'
> neutrality in connection with such issues, but while,
> as I noted in the status conference, a debtor may

---

[17]    *See* Arahova Noteholders Committee's Rule 2019 Statement, filed May 25, 2005, Bankr.
S.D.N.Y. Docket No. 02-41729 (REG), ECF #7643.

[18]    The Court advised the Debtors and parties in interest in this case, in at least one chambers
conference at the end of which it expressed its thoughts, that it saw no problems in the Debtors
(and, by the same logic, the Creditors' Committee) trying to facilitate a settlement between the
Arahova Noteholders Committee and the Adelphia Parent Noteholders Committee—and, in that
connection, sharing their views as to the likely litigation outcome, if the disputes ultimately came
before the Court, based on their analysis of the facts and applicable law. But the Court expressed
the view that the Debtors should act as a facilitator and not an advocate, and that if push came to
shove, and they did not succeed in bringing the feuding creditor groups together, the Debtors
should remain neutral in the controversy, and assist or oppose neither party. The evidence
convinces the Court that the Debtors did exactly that, and the Court so finds.

> take sides in such disputes and debtors not
> infrequently do, no statutory or case law has been
> brought to my attention suggesting that Debtors
> must choose sides in intercreditor disputes and I'm
> aware of none, at least in a situation where the
> creditors with an interest in the outcome have both a
> large enough amount in controversy to suggest
> vigorous negotiation and/or litigation, have skilled
> counsel to present their positions, and have the will
> to press their respective positions.[19]

### 5.   Early Efforts to Resolve the Intercreditor Disputes

Beginning in August 2003, the Debtors convened a series of meetings with key restricted parties (the bank groups' agents to the prepetition credit facilities, the Creditors' Committee and the Equity Committee) to review and discuss the four primary factors in determining potential recoveries: the "Waterfall" analysis (*i.e.*, the analysis of how distributable value would flow through the corporate structure), the Debtors' long range business plan, the Intercompany Transactions, and valuation/allocation. This was the first set of highly detailed presentations that confirmed that the treatment of the Intercompany Transactions was an important issue that needed to be resolved in order to bring the *Adelphia* cases to a successful conclusion.[20] While the underlying facts were not a major subject of controversy, the accounting judgment calls and application of the law to the facts were a matter of considerable debate. The Debtors brought the issues, and the uncertainties concerning their resolution, to the attention of the creditor groups involved, with the hope that they would consensually resolve them.[21] Appaloosa and

---

[19]    July 26, 2005 Hrg. Tr. at 321.

[20]    *See* Wittman Decl. at ¶ 29.

[21]    *See* Golden Dep. Tr. at 52-53 ("My understanding was the debtors were attempting to forge a consensus on the intercompany claim issues by creating doubt and uncertainty in the parties who had disagreements as to the proper application of the facts underlying the intercompany claims.").

U.S. Bank, members of the Arahova Noteholders Committee, received all of these presentations.[22]

The presentations distributed by the Debtors in the Fall and Winter of 2003 informed parties of the potential for significant disputes between creditors of Arahova and Adelphia Parent. At that time, the precursors to the Arahova Noteholders Committee and the Adelphia Parent Noteholders Committee—Appaloosa and The Blackstone Group ("Blackstone," which at the time was a major holder of Adelphia Parent bonds), respectively—were restricted and actively representing their interests. In an effort to bridge the gap between these creditor groups, in December 2003, the Debtors hosted several meetings and conference calls with Appaloosa, Blackstone and their respective counsel. But those efforts proved to be unsuccessful in bridging the gap.

### 6. *The First Plan*

Adelphia filed a first proposed plan of reorganization (the "First Plan") in February 2004. The First Plan did not purport to have meaningful creditor support, and instead was intended to provide a basis for the start of negotiations with and between creditors. Significantly, Adelphia's first proposed plan was a "standalone" plan—*i.e.*, one that contemplated that reorganized Adelphia Parent and its subsidiaries would remain ongoing entities continuing in their business operations, to be owned largely (if not wholly) by their creditors, whose claims would be satisfied by the issuance of reorganized Adelphia stock.[23] The First Plan proposed to treat all Intercompany

---

[22]    *See* Wittman Decl. at ¶¶ 22, 31, 39-42.

[23]    That is in contrast to Adelphia's present proposed plan, which, like many others in this district, is a "liquidating" plan, under which the debtor's businesses and/or assets are sold before or on the effective date of the reorganization plan, and the value realized on the sale(s) is then distributed to creditors under the plan.

Transactions as either reinstated (all or in part) or discharged (all or in part) and to pay

holders of the Arahova notes in full.  The Debtors made no effort to solicit acceptances of

the First Plan, and parties in interest were informed that it was designed to focus attention

on important issues that remained unresolved, including the Intercreditor Disputes and

claims asserted by the SEC and the DoJ.[24]

However, the enterprise value of reorganized Adelphia under the First Plan—

$17.39 billion—was a matter of sharp dispute, particularly with equity holders and

creditors with the more junior claims to the Debtors' assets.  They had a fear that the

standalone enterprise was undervalued, causing them to be unjustifiably "out of the

money," depriving them of any recovery from the bankruptcy—which would be

particularly unfortunate if the reorganized company were then sold at a higher value,

providing a windfall to the more senior classes.[25]

---

[24]    The SEC had commenced an enforcement action against Adelphia in the District Court, and filed a very substantial proof of claim in this Court, estimated to exceed $5 billion in amount, based on Adelphia's violations of the federal securities laws during the Rigas era.  Then, the DoJ threatened to indict Adelphia—the company itself, as compared and contrasted to the individuals (John, Timothy and Michael Rigas, and former Adelphia employees who had assisted them) who were convicted or pleaded guilty to a variety of federal charges relating to their conduct while at Adelphia.  Adelphia ultimately settled those matters (along with the civil action it had brought against the Rigases), and the settlements—which *inter alia* called for the payment, partly in cash and partly in stock, of $715 million to the Government, which the Government was likely to use for partial restitution to victims—were approved by Judge Sand of the District Court (who had the Rigas criminal action); Judge Castel of the District Court (who had the SEC action); and this Court.  *See In re W.R. Huff Asset Mgt. Co., LLC*, 409 F.3d 555 (2d Cir. 2005) (in substance affirming, by denial of mandamus, decision of Judge Sand approving the settlement in the criminal action); *In re Adelphia Communications Corp.*, 327 B.R. 143 (Bankr. S.D.N.Y. 2005) (approving settlement in this Court.)  This Court's decision approving the settlement is now on appeal, before Judge Kaplan of the District Court.

[25]    In reaction to the First Plan, various parties in interest sought to terminate the Debtors' periods of exclusivity, asserting that a sale of the Debtors' assets would yield a higher valuation than a stand-alone plan.  Several substantial creditor groups, representing diverse parts of the capital structure, also objected to the standalone plan and to the Debtors' then pending request for an extension of their periods of exclusivity.

*7. Sale of the Company*

The Debtors were sensitive to these concerns.  So was the Court, and it told the parties so, though the Court recalls its belief at the time that the Debtors had already focused on the issue and were considering means to address it.  In April 2004, the Debtors advised the Court in a chambers conference that with the support of both the Creditors' Committee and Equity Committee, they would explore parallel alternatives. The Debtors would market the company, to see what it would fetch in a sale.  But to keep bidders honest, and to protect against the risk of giving away the company at too low a price, they would reserve the option, as an alternative, to proceed with a standalone plan.

After a thorough search process, the Debtors retained Allen & Company ("Allen") and UBS Securities ("UBSS") as financial advisors, and Sullivan & Cromwell (S&C), as legal advisor, in the effort to sell the company.  During the Summer of 2004, the Debtors and their advisors engaged in extensive analysis and effort to achieve a robust sale process.  Ultimately, the Debtors and their advisors determined to market the Debtors' assets in clusters, and to allow potential purchasers to bid on multiple clusters and the entire enterprise.  The process of forming clusters was motivated by a desire to maximize the value of all of the Debtors' assets in a sale, and, the Court also finds, by that desire alone.  By breaking the company into clusters, the Debtors sought to maximize the number of possible bidders, thereby ensuring a higher value for their assets.  The number and composition of the clusters was established, with the assistance of the advisors, to realize the highest possible value.[26]

---

[26]    To that end, several "guiding principles" affected the composition and number of clusters, including: (a) grouping assets that were in geographical proximity; (b) balancing the number of clusters in order to increase the certainty of closure of the transactions; and (c) most importantly, attracting numerous and varied bidders, including private equity buyers, second-tier strategic

Not only did the Debtors need to determine how to package the assets; they also needed a process to market and sell the assets. The Debtors created a two-phase process. During Phase I, from September 2004 through October 2004, the Debtors solicited preliminary indications of interest in the assets from potential buyers. Subsequently, during Phase II, from October 2004 through January 2005, the Debtors provided extensive due diligence, sought binding bids and provided bidders an opportunity to refine their offers. In Phase II, the Debtors provided the bidders with extensive access to management and a virtual data room consisting of operational, financial, technical, legal, tax, and other information.

On September 15, 2004, the Debtors gave various creditors that were subject to appropriate confidentiality agreements, including Appaloosa and U.S. Bank, a general update on the sale process. At that meeting, the Debtors also disclosed the composition of the seven clusters of assets (the "Clusters").[27] No one in attendance criticized or raised any objection to the Debtors' strategy or the composition of the Clusters.

It is the common practice for bankruptcy courts, in connection with sales of businesses or lines of business, to enter orders approving bidding procedures and bidding-related obligations, especially no-shop requirements and breakup fees,[28] before being asked to approve the resulting sale itself. In September 2004, the Debtors sought the first of two orders of that character. The requested order, among other things, would:

---

operators, nontraditional purchasers of cable assets, and other potential purchasers, to the sale process to encourage a competitive and vigorous auction process. In addition, the advisors sought input from potential bidders as to what assets would be attractive to them in order to achieve the optimal composition of each cluster. *See* Wittman. Decl. at ¶¶ 54-55; Schleyer Decl. at ¶¶ 19-21.

[27]    *See* Wittman Decl. at ¶ 66.

[28]    *See generally In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y. 1992) (Mukasey, C.J.), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993), laying out the considerations in this area.

(a) establish the timing and method for the submission of bids for all or a

portion of the Debtors' assets in a one-step auction;

(b) outline the parameters for entry into a purchase agreement, including

provisions that would limit the Debtors' ability to actively pursue bids after an

agreement had been reached with a bidder (the "No-Shop Requirement"); and

(c) authorize payment of a breakup fee in certain limited circumstances

(the "Breakup Fee").

No party in interest objected to the relief sought by the Debtors, and the Court granted the

requested relief.

At the conclusion of Phase I in October 2004, the Debtors had received non-

binding indications of preliminary interest from a large number of potential bidders,

expressing an even larger number of indications of such interest.

In January 2005, the Debtors received what the Court considers to be an

impressive number of bids.  After considering the bids, the Board concluded that the bid

submitted by Time Warner and Comcast for substantially all of the Debtors' assets was

the bid most likely to maximize the value of all estates and each estate.  While the Court

will not recite the more detailed evidence that was introduced with respect to the bids, it

notes its finding that the Debtors did not receive any bids for Arahova assets alone that

could be regarded as more favorable than Arahova's share of the Time Warner/Comcast

bid would be.

Prior to the execution of definitive documents with Time Warner and Comcast,

the Debtors sought and obtained a second bidding procedures order from this Court (the

"Supplemental Order"), supplementing the earlier Bid Protections Order described above.

As relevant here, the Supplemental Order expanded the events that would trigger payment of the Breakup Fee. And notably, the Supplemental Order ordered that the Breakup Fee would be a joint and several liability of each Debtor; and that neither the definitive purchase agreement nor the relief granted by the Supplemental Order would prejudice or affect the rights of any creditor with respect to the distribution or allocation of any consideration received by the Debtors in connection with the sale (the "Sale Proceeds") among creditors and other stakeholders.[29]

Only three parties formally responded to the request for approval of the Supplemental Order and two of those responses, filed by U.S. Bank, constituted reservations of rights already reserved. Neither U.S. Bank, Appaloosa nor any other member of the Arahova Noteholders Committee objected to the entry of the Supplemental Order.

The Debtors kept the estates' fiduciaries and parties to confidentiality agreements updated through detailed presentations. Constituents were even present at meetings with Time Warner and Comcast, and, at times, negotiated directly with Time Warner and Comcast on key points.

Ultimately, in April 2005, Adelphia executed the asset purchase agreements (collectively, the "Purchase Agreements") with Time Warner and Comcast. The transaction contemplated by such agreements provides for aggregate consideration of nearly $17.6 billion. This amount reflects a substantial control premium over the standalone valuation of the Debtors at that same April 2005 time—*i.e.*, a substantial

---

[29]     *See* Supplemental Order, dated April 21, 2005, Bankr. S.D.N.Y. Docket No. 02-41729 (REG), ECF #7334 at ¶¶ 5, 7.

premium over the estimated post-emergence trading value of the Debtors.[30]  But if the

closing of the sale does not take place by July 31, 2006, Time Warner and Comcast will

have termination rights.  The Court finds that the closing of the Time Warner/Comcast

transaction is highly beneficial to the Debtors, both collectively and individually, and that

the loss of that transaction would be extraordinarily damaging to all of the Debtors,

including the Arahova Debtors.

There is no basis to find, and the Court does not find, that the Debtors sacrificed

an opportunity to get more value for the Arahova Debtors in order to gain a better deal

for any of the remaining Debtors, or for all of the Debtors' estates generally.  The

Arahova Noteholders Committee introduced no evidence of any alternative sale

transaction that is (or was) available to Arahova or any of its subsidiaries, nor did it

introduce evidence from which the Court could see how it would provide for the Arahova

Debtors to continue as standalone entities in the absence of facilities and services

provided by other Adelphia Debtors.  There is nothing in the record to suggest that the

Arahova Debtors would have any opportunity to monetize their assets that would be

superior to getting their share of the Time Warner/Comcast proceeds, nor to show that

"going it alone" would be a superior business strategy.  The Court finds that the Time

Warner/Comcast sale is as beneficial to the Arahova Debtors as its is to all of the other

Debtors, and that it is in the interests of the Arahova Debtors, just as it is in the interests

of all of the other Debtors.[31]

---

[30]        *See* Wittman Decl. at ¶ 63.

[31]        The attractiveness of the Time Warner/Comcast sale to any one of the 231 Debtors in this case
presupposes, of course, that such Debtor will receive its fair share of the total consideration for
that sale.  But measures have been established to litigate the consideration allocation issue in this
Court to achieve a fair result.

### 8. *The Escalation of the Intercreditor Disputes*

Once the sale process began in April 2004, the Intercreditor Disputes took a "back seat" to the sale process, at least in terms of the Debtors' activity. The Debtors were cognizant of the fact that sale consideration in excess of the Debtors' February 2004 valuation could effectively moot the Intercreditor Disputes.

However, other parties in interest were simultaneously addressing the Intercreditor Disputes. On November 9, 2004, the Creditors' Committee announced that its six members, which included Appaloosa and U.S. Bank, unanimously approved a settlement term sheet that resolved all "inter-creditor" disputes and "enjoy[ed] the support of other holders of Adelphia's unsecured debt."[32] But unfortunately, creditors of Adelphia Parent had not been included, at least in any meaningful way, in the intercreditor negotiations that had led to the announced settlement, and many, if not all, of the Adelphia Parent creditors had not agreed to it. The Court well recalls the chambers conference at which it first heard from counsel for the Adelphia Parent bondholders, and learned, to the Court's considerable surprise, that holders of over a billion dollars of funded debt claims had not agreed to the purported settlement.[33] Prior to this time, the Intercreditor Disputes and all of their sub-aspects—fact finding, accounting analysis, legal analysis and negotiation—had been behind the scenes, invisible to the Court. Now they were painfully obvious. But the Court was of the hope, perhaps naïve in retrospect, that with further effort, the feuding creditor groups would reach agreement, as such groups normally do.

---

[32]    *See* Debtors' Trial Exh. 39, Creditors' Committee Press Release, "Adelphia Creditors Announce Agreement on Reorganization Plan" (November 9, 2004), at 1.

[33]    The number mentioned may have been well in excess of a billion dollars. The mention of a "billion" was sufficient to get the Court's attention.

The Debtors tried to facilitate such an agreement.[34]  In June 2005, William

Schleyer, certain of the Debtors' professionals, and Adelphia CFO Vanessa Wittman met

with representatives and professionals of the Arahova Noteholders Committee, Adelphia

Parent Noteholders Committee, W.R. Huff Asset Management Co., LLC ("Huff"), and

McKay Shields LLC ("McKay"), who, at that time, were major creditors and were

affected by the Intercreditor Disputes.  The Debtor representatives presented each group

with detailed information about potential outcomes of the Intercreditor Disputes.

At the June 2005 meeting with the Arahova Noteholders Committee, attended by

two of the top people at Appaloosa and their counsel, the Debtor representatives

discussed potential treatments of Intercompany Transactions, potential consolidation

structure approaches, the allocation of value, issues related to possible fraudulent

conveyance claims by one Debtor against another, and estimated recoveries of each

constituency under different scenarios.  The Arahova Noteholders Committee requested

additional financial data, which Ms. Wittman's team and advisors provided in the

following weeks.  The Debtors had similar conversations and meetings with the other

---

[34]    The Creditors' Committee also sought to resolve these issues.  In April 2004, it moved for Court
approval of its retention of a financial advisor, Weiser, LLP, to enable the Creditors' Committee
"to formulate its own position concerning the proper amount, characterization and treatment of the
intercompany claims."  This triggered an objection by creditors of Adelphia Parent (who then had
little or no representation on the Creditors' Committee), who argued that both the Debtors and the
Creditors' Committee should remain neutral on the interdebtor/intercreditor issues.

This Court agreed, noting, *inter alia*, that "[t]he level playing field aspect is a matter of major
concern to me."  It ruled that Weiser could be retained but would have to make its work product
available to all interested parties, and that the Weiser work product could not be presented to the
Court in any manner.  Responding to the imbalance in the membership of the Creditors'
Committee that had arisen over time, the U.S. Trustee appointed two creditors of Adelphia Parent
to the Creditors' Committee shortly thereafter.  So far as the Court can tell, the Creditors'
Committee, which could be said to suffer from many (if not all) of the same conflicts as the
Debtors themselves, has since that time remained neutral in the underlying Intercreditor Disputes
and interdebtor disputes.  But it has, as noted above, nevertheless opposed these motions.

constituencies affected by the Intercreditor Disputes, each with the purpose to facilitate a settlement and mediate a resolution.

In September 2005, Mr. Schleyer, Ms. Wittman and Adelphia's advisors convened a second set of meetings with the Adelphia Parent Noteholders Committee, the Arahova Noteholders Committee, McKay and Huff. At these meetings, they again discussed the Intercreditor Disputes, and the fact that, to prevent the loss of value in the Time Warner/Comcast sale, it was in all creditors' interests to close the sale transaction expeditiously. Although the Debtor representatives had preliminary views of the relative strengths and weaknesses of the parties' positions in the Intercreditor Disputes, they shared only some of their views, and were deliberate in informing the Arahova Noteholders Committee and Huff that ultimately, absent a settlement, the Bankruptcy Court would have to make its own determinations.[35]

Thereafter, in October 2005, Mr. Schleyer and Ms. Wittman facilitated a meeting between the Arahova Noteholders Committee and the Adelphia Parent Noteholders Committee to discuss a possible settlement. In advance of the meeting, Ms. Wittman and her colleagues supplied the Arahova Noteholders Committee with information it requested to assist it in its negotiations. But at the parties' request, representatives of the Debtors did not attend the meeting.

After hearing all of the evidence, much of it set forth in detail above, the Court finds that the Debtors intended to and did maintain their neutrality with respect to the Interdebtor Disputes,[36] and limited their activities, exactly as they should have, to

---

[35]    *See* Wittman Decl. at ¶ 45.

[36]    *See, e.g.,* comments by this Court in July, 2005:

providing relevant information and support, and assuming roles as facilitator and

mediator.[37]  Without question, the Debtors expressed views as to potential litigation

outcomes to the feuding creditor groups—as this Court expressly authorized them to do,

and as mediators often do.  But the Debtors did not advocate publicly particular outcomes

with respect to the Intercreditor Disputes.[38]

    *9.  The Motion in Aid*

In that same 2005 time period (both before and after the intercreditor meetings

described just above), the Debtors saw the clock ticking, with no agreement between the

creditor groups yet in sight.  In the Spring of 2005, after over a year and a half of trying

to mediate the gap between the creditor constituencies, the Debtors believed that the

Intercreditor Disputes would jeopardize the value of the sale to Time Warner and

Comcast.  To avoid that disastrous result, and to facilitate the resolution of the

Intercreditor Disputes, the Debtors filed a "Motion for Order in Aid of Confirmation

---

> [T]he criticisms that have been principally leveled at the
> Debtors have not been that they have acted adversely to one
> estate for the benefit of another estate, but they have elected to
> take a position of neutrality in the potential issues between
> debtors . . . .

July 26, 2005 Hrg. Tr. at 320.  *See also* further comments by this Court in October, 2005:

> In other words, based on the facts presented in this hearing
> and in previous proceedings before me, there's no reason to
> believe now that the debtors and their counsel, in declining to
> take sides in the inter-creditor disputes, have in any way dealt
> with actual or perceived conflicts inappropriately, but they
> would be put in an arguably different and much more difficult
> position if they then were asked [to] or did act in a way that
> could be argued to be . . . contrary to the interests of one or
> another of the creditor groups.

Oct. 28, 2005 Hrg. Tr. at 111-112.

[37]   *See* n.18, *supra*.

[38]   *See* Wittman Decl. at ¶ 48.

Establishing Pre-Confirmation Process to Resolve Certain Inter-Creditor Issues."[39]  It

was colloquially referred to by the parties, and this Court, as the "Motion in Aid," or

sometimes "MIA."

    The purpose of the Motion in Aid was to put the Intercreditor Disputes into a

judicially-approved and supervised framework to resolve outstanding issues that were not

settled (the "Resolution Process") within a time frame consistent with the Purchase

Agreements' deadlines.[40]  This process was designed to provide creditors with prompt

---

[39]    Bankr. S.D.N.Y. Docket No. 02-41729 (REG), ECF #7844.

[40]    The Motion in Aid was also compliant with a direction by this Court when it approved the
Debtors' settlement with the SEC and DoJ.  In connection with the settlement approval motion,
the Arahova Noteholders Committee, the Adelphia Parent Noteholders Committee and the Trade
Claims Committee each voiced concerns not just with respect to the settlement itself, but also the
individual Debtors that would be contributing to it.  The objecting creditor groups each contended,
in essence, that the burdens of the settlement should be absorbed by Debtors other than the ones
against whom the objectors had their claims.  The Adelphia Parent Noteholders Committee went a
step further, and argued that the settlement could not be approved until the Intercreditor Disputes,
which could also involve benefits, along with burdens of the settlement, were resolved.

This Court rejected the Adelphia Parent Noteholders' contention that the settlement could not be
approved until the Intercreditor Disputes were resolved, but agreed that the creditor groups were
entitled to a mechanism to resolve them.  It held:

> However, I agree with those creditors when they say that the
> allocation of the burdens and benefits of the settlement—*e.g.,*
> the payment of the $715 million, and the allocation of the
> excess value deriving from the Managed Entities—should be
> done in a fashion that does not prejudice their rights in their
> respective intercreditor disputes. . . . Fairness requires that
> mechanisms be created to permit those issues to be resolved—
> consensually, if possible, but otherwise with due process.
>
> All would agree, I think, that the rights of various creditor
> constituencies on these intercreditor disputes should not be
> prejudiced by the settlement approved today, and paragraph 9
> of the proposed order does that quite capably.  But the creditor
> groups have a legitimate need to get a determination on the
> allocation issues, if they cannot agree, and supplemental
> mechanisms need to be established to accomplish that.  I am
> uncomfortable with the proposal made by the Debtors, in their
> reply papers, that this be left to the plan negotiation process.
> While I always welcome consensual agreement, I think the
> Debtors' proposal lacks the necessary mechanism for giving
> creditors their day in court on the allocation issues if
> agreement cannot be achieved.

access to information and discovery, a reasonable but expeditious discovery and litigation

schedule, and notice and an opportunity to be heard.  In short, it was designed to give the

creditors who would be affected by the disputes a full opportunity to litigate their needs

and concerns.

After a chambers conference and extensive hearing on the Motion in Aid, the

Court approved the motion, with some fine-tuning to provide further procedural

protections.  In the Resolution Process Order, the Court scheduled six separate hearings

to be held on the Intercreditor Disputes commencing January 31, 2006 and concluding

March 6, 2006.  The Debtors established a data room with a huge body of relevant

information, and made witnesses available for discovery.

The Resolution Process, which is embodied in the approved Disclosure Statement

(the "Disclosure Statement") and plan that is currently being balloted, provides the

Arahova Noteholders with a full opportunity to litigate the Intercreditor Disputes.  If the

Arahova Noteholders Committee prevails in the litigation, the plan provides that the

Arahova Noteholders will receive payment in full, with postpetition interest—the

proverbial "par plus accrued"—and with a full reserve of all plan consideration should

the Resolution Process extend beyond the closing of the Sale.

---

Accordingly, I believe that such an opportunity for judicial resolution, if necessary, must be provided.

At this juncture, I will direct that stakeholders who wish to take a position on allocation issues caucus amongst themselves, together with professionals for the Debtors and the Creditors' Committee (who likely will not be antagonists on these issues, but who are likely to be helpful in the process) to establish a game plan for the resolution of the allocation issues.  That game plan should include the creation of an escape valve litigation mechanism (to be handled as a contested matter) to resolve any disputes if necessary.

327 B.R. at 172-73.

*10. The Present Plan*

On November 21, 2005, the Debtors filed a Fourth Amended Plan (the "Present Plan") and Disclosure Statement. After four days of hearings that addressed over 40 separately filed objections, on November 23, 2005, this Court approved the Disclosure Statement. The Debtors commenced solicitation of the Present Plan on December 5, 2005. Among many other things, the Present Plan provides for:

— the Debtors to sell substantially all of their assets to Time Warner and Comcast for aggregate consideration of approximately $17.6 billion, subject to adjustments, consisting of approximately $12.7 billion in cash and shares of Time Warner Cable's Class A Common Stock ("Common Stock") with a deemed value of approximately $4.96 billion;

—payment in full, including postpetition interest, through cash and/or Common Stock on the Present Plan's Effective Date, to the creditors of the 14 Debtor Groups that the Debtors believe are solvent; and

—no immediate distribution to, among others, creditors of the Arahova Debtors (unless a minimum initial distribution is authorized by this Court in conjunction with the Confirmation Hearing), with the maximum potential distribution (*i.e.*, payment in full plus postpetition interest) to such creditors being escrowed until the resolution of the Intercreditor Disputes and a determination of such group's solvency.[41]

---

[41] *See* Present Plan, filed November 21, 2005, Bankr. S.D.N.Y. Docket No. 02-41729 (REG), ECF #8973 at §§ 9.03(a), 9.04.

### 11. The Present Motions

Following this Court's approval of the Motion in Aid, the Arahova Noteholders

Committee sought leave, in the District Court, to file an expedited appeal, and for a stay

pending appeal.  Judge Scheindlin of the District Court, to whom the requests were

referred, denied both.[42]  Then, still not content with a mechanism that will pay them in

full—"par plus accrued"—if, but only if, the underlying facts and law support their

position, and which will escrow the value to pay them in full, the Arahova Noteholders

Committee filed the present motions.

The Arahova Noteholders Committee attempted to bring these motions on, by

Order to Show Cause, on shortened notice.  But as this Court did when the Equity

Committee (then represented by different counsel) had sought to bring on another motion

with potentially highly prejudicial consequences on shortened notice,[43] this Court had

concerns that motions of this character could not be heard that way, consistent with the

complexity of the factual and legal issues, their potential impact on the Debtors'

reorganization, and fairness.  So as it had done with the Equity Committee's motion, the

Court set a conference on the motion on shortened notice instead.  The issues before the

Court raise questions of extraordinary importance not only in this case, where there are

billions of dollars at stake (and at risk), but in dozens of other multi-debtor chapter 11

cases, in this district and elsewhere.[44]

---

[42]    *See In re Adelphia Communications Corp.*, 333 B.R. 649, 653 (S.D.N.Y. 2005) (Scheindlin, J.).

[43]    *See* Order to Show Cause, dated January 9, 2003, Bankr. S.D.N.Y. Adversary No. 03-2017 (REG), ECF #2.

[44]    The Arahova Noteholders Committee provided this Court with the transcript of its oral argument before Judge Scheindlin of the District Court, on its motion for leave to file the expedited appeal. It cited to comments by Judge Scheindlin which it argued should be regarded as a suggestion that the Arahova Noteholders Committee simply file a one-page motion for the relief it seeks, which, if

Having some understanding of the needs and concerns of the creditors holding billions of dollars worth of claims in this case, the potential consequences of granting a motion of this character, and of the applicable law, the Court was unwilling to let the future of Adelphia and its creditors be decided that way. It put the motions on a fast track, but with appropriate opportunity to consider the motions and their implications, and to provide enough time for the many opposing parties in interest to make a record on their objections.

12. *The Standstill Agreement*

Finally, the Court notes a matter of concern to it. On October 13, 2005, about two weeks after Judge Scheindlin issued her decision, the Arahova Noteholders Committee and the Debtors entered into an agreement. It was captioned "Standstill Agreement

---

denied as anticipated, would provide a basis for it to take the motion back to her on an appeal of a final order.

This Court cannot decide the issues now before it in that way. First, but hardly unimportantly, such a suggestion is significantly absent from the thorough (and exhaustive) decision of the District Court. Nor is there any other mandate from the District Court. Thoughts voiced by judges in oral argument do not always find their way into final decisions, often intentionally and for good reason.

Second, the issues require analysis and explanation, and the implications are enormous. As discussed more fully below, it is at best highly debatable whether the standards for appointment of a trustee, under section 1104(a) of the Code and the caselaw construing it, have been satisfied. And it is even more debatable whether, if *STN* authority is inappropriate, the appointment of some kind of other non-statutory fiduciary for an estate would be required, appropriate, or even permissible. Were all of the other multi-debtor chapter 11 cases where no such relief was granted, notwithstanding similar disputes, that far off base?

Third, a motion that could torpedo the receipt by the estate of $17.6 billion in proceeds from the now-pending Time Warner/Comcast sale and the estate's $1.3 billion in DIP financing, and otherwise throw these chapter 11 cases into chaos, required basic due process. The Debtors, the Creditors' Committee, the Equity Committee and the thousands of stakeholders in this case who would be impacted by the pending motions—many of whom weighed in opposing the motions— were entitled to a fair opportunity to be heard and make their record in opposition.

Fourth, as this Court has previously noted, its role is not that of a meaningless way station on the way to an appeal. Rather, in a case in which creditors have billions of dollars at stake; which this Court has been shepherding, for 3-1/2 years, with a detailed knowledge of the implications of its decisions, both legal and financial; and where the issues involve matters of bankruptcy law and practice where at least some might say this Court has some expertise, this Court cannot abdicate the responsibility it has in managing the 231 Adelphia cases under its watch, and to bring its knowledge of these cases, and of bankruptcy law and practice, to the table.

Between the Ad Hoc Committee of Arahova Noteholders and the Debtors" (the

"Standstill Agreement"), and as its name implies, there were no other parties to it—

omitting, most significantly, the Adelphia Parent Noteholders Committee, which was the

Arahova Noteholders Committee's principal antagonist; the FrontierVision Noteholders

Committee, which was also becoming increasingly involved in the Intercreditor Disputes;

and a fair number of other creditor groups who, while affected to a much lesser degree,

had filed "issue statements" setting forth their positions on aspects of the Intercreditor

Disputes.  It was filed with the Court, on the Court's ECF system, with a "Notice of

Filing of Standstill Agreement," with the Standstill Agreement itself as an attachment.[45]

But while it looked very much like a stipulation (having a caption, and being signed by

counsel, and not parties), it had no place for a Court approval signature, and Court

approval was neither sought nor obtained.

     In substance, the Standstill Agreement provided that for a two-week period

(terminable on two days' notice), the Arahova Noteholders Committee would not file any

papers "relating to issues raised" in Judge Scheindlin's opinion.  The Debtors would

adjourn the consideration of issues raised in an Arahova Noteholders Committee

objection to the adequacy of the Debtors' proposed plan disclosure statement, which was

then up before the Court for approval; agreed not to hold the passage of time against the

Arahova Noteholders Committee; and agreed to oppose the efforts of any nonsignatory to

do so.  The parties also agreed that if, following the standstill period, the Arahova

Noteholders Committee proceeded to seek relief, the Debtors consented to having that

---

[45]     Bankr. S.D.N.Y. Docket No. 02-41729 (REG), ECF #8762.

relief considered on an expedited basis, provided that the Debtors were provided "a

reasonable opportunity under the circumstances" to respond.[46]

The deal points of the agreement were preceded by two paragraphs of recitals.

They read, in material part:

> WHEREAS [the Arahova Noteholders
> Committee] and [the Debtors] . . . are engaged in
> settlement discussions (the "Settlement
> Negotiations") in an attempt to resolve certain
> disputes; and

> WHEREAS the Debtors believe that, in the
> interests of facilitating the Settlement Negotiations,
> the Arahova Noteholders should refrain from filing
> certain pleadings, motions, and other papers in the
> [Bankruptcy Court] during the pendency of the
> Settlement Negotiations . . . .

An agreement of this character would have been entirely understandable if the

subject of the negotiations were refinements as to the procedures to be used in the Motion

in Aid, or procedural arrangements to set up briefing or discovery schedules on any

motion that might be filed.  But evidence at the hearings on these motions established that

the negotiations related not to matters of that character, but rather to possible revisions in

the then-pending reorganization plan, which revisions had been proposed by the Arahova

Noteholders Committee two days earlier, at an October 11, 2005 meeting between

representatives of the Arahova Noteholders Committee and the Debtors.[47]

---

[46]   The Standstill Agreement preceded, by about three weeks, the filing of the motions here.  How the
Court should respond to the respective rights that the parties had given themselves to
consideration of the relief requested "on an expedited basis," and "a reasonable opportunity under
the circumstances to respond" was a subject of discussion at the early conference that the Court
conducted as an alternative to then hearing the entire dispute on the merits under an expedited
order to show cause.

[47]   *See* Arahova Trial Exhs. 55, 56.

At the recent hearing, the Court directed the parties not to tell it the specifics of
the plan proposal.  It is possible that the plan revisions might have been immaterial, or
have involved nothing more than revisions in the arrangement to escrow plan
consideration pending the resolution of the Intercreditor Disputes.  But the Court draws
the more likely inference that the discussions involved plan treatment of the Arahova
Debtors in a material and substantive way.[48]  Such plan treatment, because of the limited
size of the Adelphia pie and the "zero sum game" character of the Intercreditor Disputes,
would necessarily have had an effect on other creditors who were not parties to the
negotiations—an adverse one, if, as one would assume, it helped the Arahova
Noteholders.

The Court has insufficient basis to find, and does not find, that entering into the
Standstill Agreement was unethical or otherwise improper, or that the Debtors'
willingness to enter into the Standstill Agreement was a breach of the fiduciary duties
they had to the much broader universe of stakeholders, or a violation of any order or
direction of the Court that had been stated in other than precatory words.  But the Court
can and does make certain narrower findings.

First, it plainly appears, and the Court finds, that the filing of the motions now
before the Court was a tactical measure, subject to deferral or a decision not to file them
at all if plan desires of the Arahova Noteholders were satisfied.  The Court does not

---

[48]     *See id*.  Upon review of Exhs. 55 and 56 together, the Court believes that consideration of Exh. 55
is necessary to understanding Exh. 56, and that statements in the first sentence of Exh. 55 are
Arahova Noteholders Committee party admissions under Fed. R. Evid. 801(d)(2).  The Arahova
Noteholders Committee's objection to consideration of Arahova Trial Exh. 56 in unredacted form
is sustained, under Fed. R. Evid. 403 and 408.  The Court has elected not even to see it, and took
steps so that it did not see it; the Court has seen and considered Arahova Trial Exh. 56 only in its
redacted form.  Accordingly, the Court draws these inferences from the surrounding facts and
circumstances, in contrast to anything that may have been said in the redacted portion of that
exhibit.

accept the Arahova Noteholders Committee's contentions to the contrary.[49]  If, as the

Arahova Noteholders claimed, there were interdebtor conflicts that creditors could not

waive, what was the purpose, or effect, of the standstill?  By all appearances, better plan

treatment for the Arahova creditors threatening trustee or disqualification motions could

make the motions go away.  Since any plan treatment change in favor of the Arahova

Noteholders would come at the expense of creditors of Adelphia Parent (and, perhaps,

other creditor groups as well), the Court cannot accept the sincerity of the institutional

concerns that the Arahova Noteholders Committee professes to advance.[50]  Neutrality

could be abandoned if the Debtors sided with the Arahova Noteholders Committee.

Second, the Court finds that while the Debtors ultimately did nothing that the

Court could find wrongful or a violation of their fiduciary duties, they came close to

stepping over the line.  If the negotiations referred to in the recitals had led to the next

step—an agreement that would have bought off the creditors of the Arahova Debtors—

that agreement almost certainly would have come at the expense of one or more of the

other Debtors, and their creditor groups.  Faced with threats of litigation that would cost

the estate hundreds of thousands of dollars (or more), and, more importantly, that risked

---

[49]       Counsel for the Arahova Noteholders Committee argued, in summation:

> They're going to present innuendo regarding our motions, and
> argue to you, as they already have, about our improper tactics.
> They're going to try to blame the creditors for their prior
> inaction.
>
> With respect to the last point, I just want to pause for a
> moment and remind the Court that the notion that any creditor
> or creditors or all of them could waive these issues is a dead-
> end argument.  These are inter-debtor disputes and conflicts.

Jan. 6, 2006 Hrg. Tr. at 68-69.

[50]       *E.g.,* "[T]he matters before the Court are extremely important, not only to the Arahova
Noteholders Committee, but also to the integrity of the Debtors' global reorganization process."
Arahova Noteholders Comm. Trustee Motion at ¶ 4.  Seemingly the integrity of the process
would not be a matter of as pressing concern if the Arahova Noteholders Committee's plan
proposal were accepted.

dooming the reorganization, it may have made sense to enter into the standstill, in the
hope of making the problems go away. But the Court hopes and expects that before
going to the next step, the Debtors thought, or would have thought, about whether
acceding to the threats of the creditors of one of the debtors would have been damaging
to the interests of the other debtors. The same fiduciary duties were owed to them.[51]

## B. *Business Considerations Relevant to the Motions*

The Court took considerable evidence on the business implications of the
motions, and on the effects granting them might have on Arahova and its creditors. The
Court's findings in these respects follow.

### 1. *Failure to Consummate the Transaction with Time Warner and Comcast*

The relief sought by the Arahova Noteholders Committee could (and in certain
instances, will) give Time Warner and Comcast the right to terminate the Purchase
Agreements. If the sale transaction is not consummated, there will be a severe, negative
economic impact on all of the Debtors, including the subsidiaries of Arahova. Ironically,
should the Time Warner/Comcast deal not close, among the estates that would be
adversely affected would be those of the Arahova Debtors. The breakup fee of
approximately $443 million in the aggregate that must be paid to Time Warner and/or

---

[51]    The Court's indications of its views that the Debtors should maintain neutrality on interdebtor
disputes became increasingly specific. The Court assumes that such views had not been regarded
as a direction as of the time of the meeting on October 11, and assumes that neither the Arahova
Noteholders Committee nor the Debtors would have engaged in such a meeting if they had been
so regarded. However, the Court believes that there could have been no ambiguity by the end of
the Disclosure Statement Hearing on October 28, 2005, and infers that this was a factor underlying
Mr. Schleyer's statement at the end of his November 3 letter to Ronald Goldstein (the Appaloosa
executive, acting on behalf of the Arahova Noteholders Committee, with whom Mr. Schleyer had
met on October 11), "we will continue discussions with your counterparts in the ACC [Adelphia
Parent] ad hoc group, and hopefully with your group as well in the hope of reaching a rational
solution to the issues confronting us." Arahova Trial Exh. 56.

Comcast under certain termination scenarios is a joint and several obligation of all of the

Debtors, including the Arahova Debtors.[52]

### 2. The DIP Facility

Appointment of a trustee will constitute an event of default under the $1.3 billion

DIP Facility, which could trigger termination of the loans and acceleration of all

indebtedness. Such an event would materially impair all of the Adelphia Debtors' ability

to operate their businesses on a day-to-day basis. The Century and Century-TCI Debtor

Groups, which are included in the Arahova Debtors, currently borrow under the DIP

Facility. Other Arahova Debtors have borrowed under the DIP Facility in the past.

Without the ability to borrow under the DIP Facility (or incur other substantial

indebtedness), these Debtors would face considerable obstacles to emergence from

chapter 11.

### 3. Agreements with LFAs

Additionally, though the Arahova Debtors currently have agreements with various

local franchising authorities ("LFAs") to provide service, the continuance of such

agreements is by no means assured. Mr. Schleyer testified that were the Arahova Debtors

to divorce themselves from the rest of the enterprise, he understood that certain LFAs

might assert that a change of control of the franchisee had occurred, and that they could

exercise rights that would directly affect the Arahova Debtors' operations. He stated that

he disagreed with that assertion, but thought some LFAs might be inclined to litigate the

---

[52]    As noted above, none of the creditors of the Arahova Debtors, including Appaloosa and other
members of what is now the Arahova Noteholders Committee, had objected to that when the
commitment had been made.

matter.  Approximately 245 of the 438 franchises held by the Arahova Debtors contain

"change of control" provisions.

Mr. Schleyer further testified that, although arguably not required, in the event the

sale transaction were modified or terminated, over 1,500 LFAs could assert that the

Debtors would be required to submit new Form 394s (*i.e.*, forms to obtain consent for the

transfer of a franchise) under the federal Cable Act which would afford each such LFA

an additional 120-day period to review the newly proposed transfer and determine

whether or not to consent.

Once more, Mr. Schleyer was not cross-examined on those views, and no contrary

evidence as to that was introduced.  The Court does not make a finding that those risks

would necessarily materialize, or that any parties' contentions as to this matter would or

would not have merit, but it can and does find that avoiding risks of that character is a

relevant consideration.

### 4. Government Settlement

As noted above, the Debtors' settlement with the government (the "Government

Settlement") requires the Debtors to contribute $715 million in value to a victims

restitution fund.  Under the Government Settlement, such payments must be made no

later than certain prescribed times.  Although those deadlines could be extended by the

SEC and the DoJ, there is no assurance that the Debtors would be granted those

extensions to comply with the Government Settlement and the Settlement Order, or that

the SEC and DoJ would not use the resulting delays as a basis for trying to extract

consideration for the extension, or otherwise trying to renegotiate the deal.  Thus, even if

Time Warner and Comcast were willing to proceed with the sale without the inclusion of

Arahova's assets as part of the purchase, the delay that would result from the relief

requested by the Arahova Noteholders Committee could force the Debtors into non-

compliance with the Government Settlement, and re-expose the Debtors to the same risks

that motivated the settlement in the first place.

    5. *Issues of Efficiency, Cost, and Delay*

    These are complex cases.  They are operationally complex, factually complex,

and legally complex, and matters in these cases that involve several debtors or silos are

exceedingly common.  The Balkanization of the decision making in this case would be

highly damaging to all of the debtors, and their creditors, and the Arahova Debtors and

their creditors would be no exception.  The need for fiduciaries for individual estates to

confer with each other, and often to act jointly, vis-à-vis individual estates on their watch,

would be extraordinarily difficult.  It would add a layer of delay, potential confusion, and

error to corporate decision making that would be a daily element of these chapter 11

cases.

    Additionally, any trustee appointed would need to be educated on a wide range of

Adelphia business, operational and legal issues, along with the remaining plan issues that

need to be resolved.  The time necessary for such trustee's education would delay and

interfere with that trustee's ability to confirm a plan in a timely way, and would present a

significant obstacle to the consummation of the Time Warner/Comcast sale in the

timeline contemplated by the Purchase Agreements.

    Assuming that such could be done, appointing trustees or fiduciaries limited in

authority to litigating interdebtor matters—without a charge to get involved in

operational issues—would not be a practical solution.  The factual and legal issues that

underlie the Intercreditor Disputes are extraordinarily complex and difficult to get one's

arms around. And while the Arahova Noteholders Committee, the Adelphia Parent

Noteholders Committee and, to an arguably lesser extent, the FrontierVision Noteholders

Committee have a great deal of knowledge in this area (and will be prepared to try the

issues on the Intercreditor Disputes by the time the hearings on those issues will begin at

the end of this month), no newcomers could come close in acquiring their knowledge,

much less being prepared for hearings or trials, in that time frame. It would take many

months, and perhaps even longer.

Three days after the last hearing day on these motions, the Court considered the

desirability of appointing a mediator to assist the creditors in reaching agreement. As

much as this Court welcomed a settlement, many of the same considerations caused this

Court to conclude that the appointment of a mediator would not be helpful, and to

reluctantly abandon that as an option. If any mediator were to be taken seriously by the

parties, he or she would have to spend considerable time catching up to the parties as to

the factual and legal issues underlying the disputes. These are not the kinds of issues as

to which executive summaries, position papers, or briefing books would be useful. No

trustee or fiduciary could become competent to negotiate, or litigate, the issues in a

reasonable time frame, and would take many months to acquire a knowledge level that

the creditors already have.

### 6. Limits on WF&G Activities

The Court has also considered facts relevant to the extent to which any of the

above factors, or any others, should bear on disqualification of WF&G.

The Court has noted that the Arahova Noteholders Committee no longer seeks to disqualify WF&G generally. That is understandable. WF&G has acquired an extraordinary expertise in Adelphia affairs, and has performed its responsibilities with distinction. The loss of either of those, especially at this late date, would be terrible for creditors, and would materially delay, if not torpedo, the Debtors' timely reorganization.

Different considerations apply, however, with respect to the narrower motion now before the Court, disqualifying WF&G from participation in the Intercreditor Disputes, or, as the Arahova Noteholders Committee calls them, the Interdebtor Disputes. The Court finds no prejudice to creditors or other stakeholders there. The affected creditors already have the knowledge, means and inclination to litigate those issues, and do not need WF&G to do so. WF&G can use its knowledge of the underlying issues to try to facilitate agreement, while at the same time refraining from taking any public role that would cause one or another creditor group to feel that WF&G is acting contrary to individual debtors' interests. WF&G has done nothing wrong. But the prophylactic imposition of mandatory neutrality on WF&G on interdebtor issues would not cause WF&G, or the Debtors, any material prejudice either.

## C. Facts Relevant to Exclusivity

The Court makes certain other factual findings, which are particularly relevant to exclusivity.

### 1. Jointly Shared Services and Assets

Cable operators often consolidate their operations in order to achieve economies of scale. The Debtors have managed their assets and operations in a manner similar to that employed by their industry counterparts. Given the significant economies to the enterprise achieved by such consolidation, it is unlikely that the Arahova Debtors, were

they to be somehow extricated from the rest of Adelphia, could manage their businesses as cost-effectively as management currently does.

The Debtors' engineering assets are shared regionally and across the enterprise. Such assets include, but are not limited to: (a) head-ends; (b) redundant fiber rings; (c) a single technology laboratory that serves all of the Debtors; (d) a single national Network Operations Center that serves all of the Debtors; and (e) assets and liabilities relating to "VOIP" (or Voice-over-Internet-Protocol). It would be incredibly expensive and time-consuming to physically separate the Arahova Debtors' engineering processes from those of the other Debtors.

The Debtors' high-speed internet businesses are also operated at a national level. For instance, there is one "backbone," a single national provisional center, and shared physical facilities, circuits and contracts for such businesses. In addition, while there are multiple call centers within the enterprise, such centers share one interactive voice recognition system, and calls are routed nationwide to various centers.

Additionally, many corporate functions of the Debtors' enterprise, among others, are consolidated on a regional or national level: (a) treasury, including cash management; (b) accounting; (c) media services, including certain ad insert and marketing research contracts; (d) legal; and (e) human resources. Similarly, many other essential corporate matters are addressed solely at a consolidated level: (i) employee benefit structures (*e.g.,* payroll, workman's compensation, health benefits); (ii) insurance policies; (iii) taxing issues (*i.e.,* filing of sales, property and income tax returns, and audits); (iv) rate filing issues; and (v) intellectual property matters. Moreover, billing for all of the Debtors is performed at a national level by two outside vendors.

If the Arahova Debtors attempted to emerge as a standalone entity, they would

face several challenges.  The procurement of additional physical equipment and facilities

for a standalone entity comprised of the Arahova Debtors alone would require a

considerable expenditure by such Debtors.  The Arahova Debtors would need to obtain

separate engineering assets and parcels of real property to develop headquarters, regional

offices and call centers, among other things.  The Arahova Debtors would also have to

invest significant capital to obtain information technology systems that assist in treasury,

accounting, and other similar functions.  Essentially, the Arahova Debtors would be

obligated to duplicate every service shared across the present Adelphia family in order to

emerge from chapter 11 as a separate organization.

     *2.  Agreements with Programmers*

Agreements with programmers represent the operational backbone of a cable

operator.  As the Debtors' access to content—*i.e.*, the programs consumers watch, which

are transmitted by broadcast or cable networks—is governed by agreements executed by

Adelphia Parent, the Arahova Debtors would either have to negotiate separate contracts

with over 150 programmers or opt into agreements of programming cooperatives.

Regardless of their approach, however, the Arahova Debtors would no longer enjoy the

large-volume discount afforded to the enterprise.

     *3.  Managerial Services*

It is possible that the Arahova Debtors would request certain managerial services

from the Debtors or their successors in order to effectively remain operationally

integrated with the rest of the company.  The Court assumes, notwithstanding caveats

expressed by Mr. Schleyer in that regard, that the remaining Debtors would, if necessary,

come to agreements with respect to providing joint managerial services and jointly shared

assets. But doing so would be complex and time consuming. And determining the

obligations and liabilities as between the Debtor groups would be as complex, or more so,

than doing so would be in the present environment. The Court faced similar issues in

dealing with the services and assets shared between the Debtors and Adelphia Business

Solutions ("ABIZ"), a business once owned by Adelphia that had been spun off and

which had its own, separately administered, chapter 11 cases before this Court.[53] This

Court well remembers the many hearings and chambers conferences that it had to devote

to untangling the affairs of the two estates, and determining their respective rights and

obligations vis-à-vis each other. The process was time-consuming and painful, even

though most of it was ultimately consensually resolved.

Then, the Arahova Debtors would have to attract employees to their operations.

And in order to present themselves as a business enterprise distinct from the rest of the

Debtors, the Arahova Debtors would have to embark upon an extensive and expensive

marketing and re-branding campaign. It costs approximately $30 million to re-brand a

cable company with five million subscribers. The Arahova Debtors have over 1.75

million subscribers.

Mr. Schleyer testified that while it would not be impossible, it would take at least

a year, and likely much longer, to sever the Arahova Debtors from the company as a

whole. He also testified that it was not an endeavor that any multi-system cable operator

would find cost-effective, practicable or reasonable. Mr. Schleyer was not cross-

---

[53]    The *ABIZ* cases, which were filed a few months earlier, have been jointly administered under
Docket No. 02-11389 (REG). The chapter 11 cases of Adelphia Parent and its subsidiaries were
filed as cases related to ABIZ, and thus were assigned to this Court. A reorganization plan for
ABIZ was confirmed in December 2003, and became effective shortly thereafter.

examined on those views, and no contrary evidence as to that was introduced.  The Court

finds those views to be true.

### 4.  *Marketing the Arahova Debtors*

Mr. Schleyer testified that since Arahova's assets had already been marketed

extensively, any attempt to repackage and remarket such assets was likely to be viewed

as a "clearance sale" or liquidation, which would be perceived as an involuntary or

distressed sale by the market.  In that environment, he concluded, it was unlikely that any

party would submit a fair market bid.  Once more Mr. Schleyer was not cross-examined

on those views, and no contrary evidence as to that was introduced.  The Court finds

those views to be true.

### 5.  *Plan Process*

This is not a case in which the Debtors have failed to formulate or file a proposed

reorganization plan.  Nor is it a case where the Debtors have abused exclusivity, as, for

example, by trying to prefer incumbent equity or management; by spurning a testing of

the value of the company in the marketplace; or by trying to circumvent the absolute

priority rule.  Rather, the Debtors have in essence maximized the estate's value and

handed over the estate to their creditors, with the principal remaining issue being the

creditors' respective shares of the pie that the Debtors have put on the table.

The Debtors now have an approved Disclosure Statement, and are in the process

of soliciting acceptances of their Present Plan.  The Court does not yet know whether it

will be accepted, and has no means, short of awaiting the creditors' votes, of determining

whether it will be accepted.  A hearing on confirmation of the plan is scheduled to begin

in March.

Without question, many creditors have threatened to vote "no" on the Present

Plan. Many of those are creditors who will be paid in full under the Present Plan, but are

threatening to vote "no" because of differences in perceptions over what being paid in

full means (such as differences as to the postpetition interest rate that would be applicable

to their claims, or issues as to when they might be entitled to indemnification for legal

expenses, after already being paid in full on account of principal, interest and fees), and

because of their reluctance to have their incremental entitlements determined by this

Court or higher courts.

Whether such creditors will ultimately vote against the Present Plan, and risk the

loss of the $17.6 billion now being offered by Time Warner and Comcast, is yet to be

determined. What is clear, however, is that whatever dissatisfaction there may be with

the Present Plan would not be obviated by terminating exclusivity for the Arahova

Debtors. The stated dissatisfaction is not limited to the distributions that would come

from the Arahova Debtors. And any plan treatment with respect to Arahova Debtors'

creditors would still have to take into account the same interdebtor issues that are present

under the Debtors' Present Plan—including, most obviously, any Arahova Debtors

liabilities to other individual Debtors as to whom exclusivity would not be terminated.

*D. Practices in Other Cases*

Multi-debtor chapter 11 cases with disputes or apparent conflicts between or

amongst debtors are quite common. The Court finds the following with respect to how

interdebtor disputes have been addressed in other multi-debtor cases.[54]

---

[54]    The Arahova Noteholders Committee offered a chart that summarized how interdebtor disputes
have been dealt with in other large multi-debtor cases. The Debtors objected to its introduction in
evidence because the Arahova Noteholders Committee had failed to give them enough time to
check the matter underlying it, as Fed. R. Evid. 1006 requires, and the Court sustained this

*1. WorldCom*[55]

In this mega-case, filed in July 2002 by WorldCom, Inc. and approximately 200

of its subsidiaries, in which WorldCom had tens of billions of dollars in liabilities on a

consolidated basis,[56] serious interdebtor issues arose by April 2003.  One of WorldCom's

many subsidiaries was MCI Communications Corp. ("MCI"), which WorldCom had

acquired prior to its chapter 11 filing.  An Ad Hoc MCI Trade Claims Committee (the

"Ad Hoc Committee") moved for "the immediate appointment of a chapter 11 trustee,"

under each of Bankruptcy Code sections 1104(a)(1) and (a)(2), or alternatively for the

appointment of an examiner for MCI.[57]  As the bases for its motion, the Ad Hoc

Committee asserted that WorldCom had alleged the existence "of billions of dollars in

intercompany claims against MCI" but had not provided any support for that view, and

---

objection.  But the Court considered the Arahova Noteholders Committee's effort to gather information of this character to be helpful, and it agreed to take the information in the chart as precedent (subject to the evidentiary ruling below, which results in the redaction of information in one of its columns), subject to the Debtors' right to supplement the chart or assert that any of it was erroneous.  The Court gave the Debtors time to do so, and they supplemented the chart in material respects.  Each side commented on the others' submissions, and the Court is now comfortable that it has received reliable and useful information.

The Court also has the benefit of its own prior knowledge as to how these issues have been dealt with in this Court, especially the cases *(Global Crossing, ABIZ, PSINet* and *Casual Male*) that it personally supervised, and (without objection) permitted counsel for the Arahova Noteholders Committee to speak in summation of his personal knowledge of the *Mirant* case and of other matters he had handled in his career.

The Adelphia Parent Noteholders Committee's objection to the inclusion in the chart of information (in the column "Treatment Under Plan") showing amounts for which interdebtor controversies were settled, and how affected creditors came out, has been sustained.  The fact that the controversies were settled is relevant; the amounts for which they were settled is not.  The suggestion, in the Arahova Noteholders Committee's supplemental letter that such information "provides context as to what a settlement of intercompany claims would look like" is unpersuasive, and indeed suggests that consideration of it is objectionable under Fed. R. Evid. 403 and 408, as well as 402.

[55]    Bankr. S.D.N.Y. Docket No. 02-13533 (AJG).

[56]    The petitions of debtors in multi-debtor cases typically show their assets and liabilities on a consolidated basis.  Because intercompany obligations then cancel each other out, those petitions at least normally do not reveal the size of the intercompany claims.

[57]    An examiner for WorldCom as a whole, who looked into the accounting for the company generally, had been appointed earlier.

that the debtors had not performed any investigation of the validity of such claims.  The

Ad Hoc Committee further asserted that the appointment of a trustee was required, in the

interests of creditors, in light of "the failure of any MCI fiduciary to investigate

intercompany claims and to oppose substantive consolidation of the Debtors' estates."[58]

Judge Gonzalez denied the motion to appoint a chapter 11 trustee for MCI.  In a

lengthy opinion (that appears on the Court's ECF system, but not in the Bankruptcy

Reporter or the electronic research services), he rejected the arguments under each of

Bankruptcy Code sections 1104(a)(1) and 1104(a)(2).  He found that the necessary

"cause" for appointment of a trustee under subsection (a)(1) was lacking, and that

appointment of a trustee was likewise not appropriate, in the interest of creditors, under

subsection (a)(2).

In his discussion of subsection (a)(1), Judge Gonzalez stated:

> The Court recognizes that significant obstacles exist
> in accurately recreating a map of these complex
> intercompany claims.  However, the Court believes
> that, given the circumstances, Movants had access
> to the most comprehensive information available.
> The Court does not believe that the appointment of
> a chapter 11 trustee is needed to ensure that
> Movants continue to receive accurate information
> from the Debtors, or that the Debtors' disclosure to
> date is insufficient, rendering necessary the
> appointment of a trustee.[59]

In his discussion of subsection (a)(2), he observed:

> The appointment of a trustee would be very costly
> to the Debtors and their estates, with no apparent

---

[58]    Motion of the Ad Hoc MCI Trade Claims Committee for the Appointment of a Chapter 11 Trustee
for MCI Communications Corporation and its Subsidiaries, dated April 17, 2003, Docket No. 02-
13533 (AJG), ECF #4896 ("MCI Trustee Motion") at 2.

[59]    Memorandum Decision and Order Denying Motions for Appointment of a Chapter 11 Trustee and
Examiner, dated May 16, 2003, Bankr. S.D.N.Y. Docket No. 02-13533 (AJG), ECF #5923
("WorldCom Memorandum Decision and Order") at 19.

benefit.  Given the size and complexity of the
Debtors and their operations, the delay and expense
that would be caused by the trustee's (and new
professionals') need to learn about the Debtors'
assets, liabilities, businesses, and chapter 11 cases
would be substantial and would likely seriously and
adversely affect the prospects of rehabilitation.  The
appointment of a trustee would severely impede the
Debtors' ability to confirm a consensual chapter 11
plan of reorganization within the next few months.
As has been stated previously in this decision, the
issues raised by the Movants throughout are most
appropriately addressed in the context of the Plan
confirmation process.[60]

Judge Gonzalez likewise denied the alternative request for the appointment of an

examiner,[61] "to investigate the propriety of the questionable intercompany claims,"[62] for

substantially the same reasons.  The underlying interdebtor issues were thereafter

resolved consensually, in a manner satisfactory to MCI creditors.

## 2. *Enron*[63]

In this mega-case, initially filed in December 2001 by Enron Corporation

("Enron") and, ultimately, about 180 of its subsidiaries, in which Enron's petition

reflected approximately $13 billion in liabilities on a consolidated basis (not counting off-

balance sheet obligations, which were substantial), major interdebtor disputes existed, but

no trustee was appointed.

However, an examiner was appointed, for one of Enron's subsidiaries, Enron

North America Corp. ("ENA").  ENA was engaged in an energy trading business that

---

[60]    *Id.* at 23.

[61]    The appointment of an examiner was not requested by the Arahova Noteholders Committee, and
thus this Court does not need to address all of the reasons why the Court would regard the
appointment of an examiner at this late date to be as ineffective as the appointment of a mediator,
and as causing prejudicial delay, unnecessary expense, and to be otherwise undesirable.

[62]    MCI Trustee Motion at 3.

[63]    Bankr. S.D.N.Y. Docket No. 01-16034 (AJG).

allegedly was more profitable than many of the other entities in the Enron family. The ENA creditors thought that they were entitled to greater recoveries than the creditors of other Enron debtors, but the extent of the ENA creditors' recoveries could be affected materially by the extent to which cash was taken out of ENA for the benefit of other debtors, intercompany obligations existed, or substantive consolidation might be warranted—which would effectively cause the assets of ENA to be subject to greater claims. Issues particularly existed with respect to intercompany receivables, the treatment of transactions effected through Enron's centralized cash management system, and Enron's and ENA's respective equity interests in various entities.[64]

Between January and February 2002, 10 different creditors moved for appointment of a trustee or examiner for ENA, appointment of a separate creditors' committee for ENA, or appointment of separate counsel for ENA. The motion of various trade creditors argued that a fiduciary should be appointed because additional books and records were in danger of being destroyed, and the cash and other assets of ENA might be used to pay the creditors of the debtors other than ENA.

Judge Gonzalez appointed an examiner for ENA, who examined the matters in dispute (such as the use of the cash management system, outward payments of cash to other debtors, and the other debtors' ability to pay the cash back), as well as other matters. Significantly, the examiner was instrumental as a plan facilitator in aiding the parties to reach a largely consensual settlement of the issues. However, the ENA examiner did not have the power to sue or appear as a party on litigated matters for ENA.

---

[64]     *See* Disclosure Statement for Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code, dated January 9, 2004, Bankr. S.D.N.Y. Docket No. 01-16034 (AJG), ECF #15414 at §§ I.B.2.a. (xiii), I.B.2.d.

A trustee was not appointed.  But the appointment of a trustee was not actually

denied.  Those creditors who had previously sought a trustee deferred their motions to

await the efforts of the examiner.  They never sought to put their motions back on the

calendar.

Between January and March 2002, early in the *Enron* case, certain class action

plaintiffs filed motions for appointment of a trustee, appointment of either a trustee or

examiner, or appointment of an examiner for Enron.  The debtors agreed to the

appointment of an examiner for Enron, to inquire into special purpose vehicles and off-

balance sheet transactions that prepetition Enron had utilized.  This inquiry did not

involve interdebtor disputes in any significant way.

A trustee was not appointed for Enron either, but once again Judge Gonzalez did

not deny any motion requesting the appointment of a trustee.  The movants, having the

benefit of a new chief executive officer and reconstituted board of directors, who had

been installed with the efforts and support of the Enron creditors' committee, to replace

the prepetition management, put their motions on hold and never sought to restore their

motions to the calendar.

*3.  Global Crossing*[65]

In this mega-case, filed in January 2002, by Global Crossing Ltd. ("Global

Crossing") and 53 of its subsidiaries, in which Global Crossing's petition reflected

approximately $12 billion in liabilities on a consolidated basis, no trustee was appointed.

An examiner was appointed, at the very outset of the case and on a consensual basis, but

for reasons unrelated to interdebtor disputes, principally with respect to issuing an audit

---

[65]      Bankr. S.D.N.Y. Docket No. 02-40188 (REG).

opinion on the Debtors' consolidated financial statements for the 2001 year which had

just ended, and for the 2002 year in which the case was filed.[66]  A motion by an equity

holder (who was badly out of the money) to appoint a chapter 11 trustee early in the case

(for reasons unrelated to interdebtor disputes) was denied.  Motions by that equity holder

and another equity holder for appointment, in the alternative, of an examiner led to the

consensual appointment of the examiner, as described above (once more, for reasons

unrelated to interdebtor disputes).

There *was* a significant intercreditor/interdebtor dispute in Global Crossing, late

in the case, at the time of confirmation, which neither the Arahova Noteholders

Committee nor the objectors noted but which this Court recalls.  It again did not result in

the appointment of a trustee or examiner, and presumably was not noted by the opposing

parties on the motions here because there were no motions for appointment of a trustee or

examiner at that time.

Instead, an Ad Hoc Committee of Bondholders of Global Crossing North America

(which was a subsidiary of Global Crossing Ltd.) (the "Global Crossing Ad Hoc

Committee") objected to the disclosure statement and then confirmation.[67]  Global

Crossing North America was the successor to Frontier Communications (which in turn

had once been known as Rochester Telephone Corporation) ("Frontier"), which Global

Crossing Ltd. had acquired; Frontier had been an issuer of its own bonds before the

acquisition.  The Global Crossing Ad Hoc Committee complained about the debtors'

---

[66]    *See* Order for the Appointment of an Examiner, dated August 7, 2002, Bankr. S.D.N.Y. Docket
No. 02-40188 (REG), ECF #1582.

[67]    *See* Supplemental Objection of Ad Hoc Committee to Disclosure Statement, dated October 21,
2002, Bankr. S.D.N.Y. Docket No. 02-40188 (REG), ECF #2025; Objection of Ad Hoc
Committee to Joint Plan of Reorganization, dated November 30, 2002, Bankr. S.D.N.Y. Docket
No. 02-40188 (REG), ECF #2337 ("Confirmation Objection").

efforts to reconcile intercompany claims, and argued, among other things, that the plan improperly released intercompany claims between the Global Crossing debtors.

The Global Crossing Ad Hoc Committee was particularly concerned with respect to the debtors' argued failure to enforce or even preserve "billion dollar causes of action"[68] that Frontier assertedly would have had as a result of the alleged diversion of the proceeds of the sale of Frontier assets to or for the benefit of other Global Crossing debtors.[69]  The Ad Hoc Committee also objected to substantive consolidation, which would dilute their higher recoveries while giving up those assertedly valuable claims.[70]

The objection to confirmation was litigated on the merits, with the Ad Hoc Committee putting on its case.  The objection was opposed by the debtors and the creditors' committee, who were joint proponents of the Global Crossing plan, and who considered the proposed plan treatment fair.  After a few of days of hearings (and before the Court ruled on the Ad Hoc Committee's contentions), the dispute was consensually resolved.

*4. ABIZ*[71]

In this mega-case, which was filed by a former subsidiary of Adelphia Parent (that had been spun off from the main Adelphia family) and six of its subsidiaries, the petition reflected liabilities of approximately $882 million.  No trustee or examiner was appointed.  Major disputes existed between ABIZ entities and various debtors in the Adelphia cases, with respect to the untangling of the various debtors' operations and the obligations each might owe to the other, which were settled.  While there were

---

[68]       Confirmation Objection at 18.

[69]       *See id*. at 21.

[70]       *See id*. at 18-21.

[71]       Bankr. S.D.N.Y. Docket No. 02-11389 (REG).

intercreditor disputes in the *ABIZ* case, which were settled, interdebtor disputes amongst the various ABIZ entities, if any, never were brought to the Court, or otherwise came to its attention.

### 5. *PSINet and PSINet Consulting Solutions Holdings*[72]

In this mega-case, filed in June 2001, in which *PSINet*'s petition reflected approximately $4 billion in liabilities, PSINet had a number of direct and indirect subsidiaries, one of which was PSINet Consulting Solutions Holdings ("Holdings"). PSINet caused Holdings, which in turn had another subsidiary, PSINet Consulting Solutions, formerly known as Metamor Worldwide ("Metamor"), which had its own public bond debt, to file its own chapter 11 petition in September 2001, about 3 months after the original filing. The chapter 11 cases of PSINet and Holdings were separately administered (and each of PSINet and Holdings had its own creditors' committee), but when Holdings filed, PSINet and Holdings continued to have joint management, and the same counsel.

Within a few months after the Holdings filing, it became apparent that interdebtor disputes were serious, and that PSINet's management and counsel were conflicted. The dispute principally involved differences over whether about $98 million that PSINet had transferred to or spent on behalf of Metamor (and that had been largely booked as intercompany debt) should be characterized as debt or equity, and as to whether PSINet had mismanaged Metamor. PSINet's creditors regarded the $98 million PSINet had laid out as a receivable from Holdings (a characterization with which Holdings' creditors

---

[72]        Bankr. S.D.N.Y. Docket Nos. 01-13213 (REG) ("*PSINet*") and 01-14916 (REG) ("*PSINet Consulting Solutions Holdings*").

disagreed), and disputed Holdings' creditors' contentions that PSINet had mismanaged Metamor.

In November 2001, Holdings' creditors' committee moved before this Court for *STN* authority to proceed against PSINet to litigate those issues. But shortly before that motion was heard, the PSINet directors and officers that had led Holdings resigned, leaving Holdings without any management; PSINet's counsel indicated that it would represent only PSINet; and PSINet cross-moved to convert Holdings' case to chapter 7, or alternatively to appoint a chapter 11 trustee or other responsible person to oversee Holdings—observing that "in light of the resignations" of Holdings' directors and officers, "some corporate governance figure (be it a Chapter 7 trustee, Chapter 11 trustee or other responsible person) would be required to oversee the wind-down and distribution process."[73]

This Court appointed a chapter 11 trustee, in the interests of creditors, under Code section 1104(a)(2). By reason of the cross-motion, that relief had been consented to. The officer and director resignations created a vacuum that needed to be filled, and creditor advocacy, even with *STN* authority, would be insufficient. Holdings and its subsidiaries then had little if anything in the way of continuing operations. Holdings' principal activity by then was recovering on its receivables and any valid causes of action it could assert, and defeating the PSINet claims. No business considerations (such as the loss of an impending sale, or of DIP financing) militated against the appointment of a trustee. After the resignations and appointment of the chapter 11 trustee for Holdings, PSINet's management and counsel did not stay neutral, and instead sided with PSINet.

---

[73] Motion of Official Committee of Unsecured Creditors of PSINet Consulting Solutions Holdings, Inc. for Authority to Prosecute Claims on Behalf of the Debtor, dated November 9, 2001, Bankr. S.D.N.Y. Docket No. 01-14916 (REG), ECF #53.

The Holdings creditors' committee's *STN* motion was denied without prejudice as moot. When considering its alternatives in dealing with the interdebtor dispute and the management vacuum, this Court considered, but rejected, the idea of appointing a "responsible person." This Court ruled at the time:

> As I said, I am concerned about the corporate governance vacuum that I am faced with here, and concerned that I have a ship without . . . a board of directors, and I need to have somebody who could be subject to fiduciary duties.
>
> There was some suggestion of the appointment of a responsible person. The U.S. Trustee objects for reasons that I fully understand and which I lean in favor of agreeing with, but expressly do not rule on now because it is unnecessary to do so because the appointment of a [c]hapter 11 [t]rustee would skin the cat just as effectively, in my view.
>
> I need not reach the issue of whether . . . a responsible person might ever [be] appropriate in some future case. It is unnecessary and inappropriate with the facts of this case.[74]

The Holdings chapter 11 trustee thereafter retained his own counsel, who litigated the Holdings side of those issues in this Court against a team of counsel for PSINet and the PSINet creditors' committee. The controversy was settled before the Court's decision issued.

### 6. Casual Male[75]

In this mega-case, in which the parent's petition reflected $244 million in debt, the debtors consisted of a parent and 15 subsidiaries, whose businesses were sold in section 363 sales in the course of the chapter 11 cases. A single joint plan of liquidation

---

[74]   Nov. 20, 2001 Hrg. Tr. at 59.

[75]   Bankr. S.D.N.Y. Docket No. 01-41404 (REG).

(jointly proposed by the debtors and the creditors' committee) was confirmed, which did

not substantively consolidate the estates (and which strictly speaking consisted of

separate plans for each of the debtors),[76] but which allocated value received in the sales

amongst creditors of different debtors, and at different levels, to the end that they

received varying percentages of recovery of the total proceeds obtained in the sales.

The distributions to the creditors were premised upon the allocation of asset sale

proceeds of the various estates pursuant to a settlement, described in greater detail in the

plan's disclosure statement,[77] which was the result of the debtors' and the creditors'

committee's joint efforts to establish valuations for the debtors' various estates, and to

allocate the debtors' sale proceeds based upon the values of each of the 16 estates. While

the confirmation of the case was delayed somewhat, after the last of the section 363 sales,

to permit the settlement to be agreed on and approved, the valuation and related

interdebtor allocation issues were never litigated. No trustee or independent fiduciary

was appointed. None was requested.

*7. Williams Communications*[78]

In this mega-case, filed by Williams Communications Group and a subsidiary,

and where the petition reflected debt of approximately $8 billion on a consolidated basis,

neither a trustee nor an examiner were sought or appointed. A special counsel for the

Williams Board was appointed, but for reasons unrelated to interdebtor issues. The Court

can see no indication from the parties' submission indicating that interdebtor issues were

a prominent feature in the case.

---

[76]     *See* Disclosure Statement, dated August 18, 2003, Bankr. S.D.N.Y. Docket No. 01-41404 (REG), ECF #1525 at 12.

[77]     *See id*. at 23-24 ("Summary of the Settlement Agreement").

[78]     Bankr. S.D.N.Y. Docket No. 02-11957 (BRL).

*8. NTL* [79]

In this mega-case, filed by NTL, Inc. and five of its subsidiaries, and where the petition reflected debt of approximately $23 billion on a consolidated basis, no trustee or examiner was appointed. It does not appear that interdebtor disputes were a prominent feature of that case.

*9. NRG* [80]

In this mega-case, filed by NRG Energy, Inc. and 25 of its subsidiaries, and where the petition reflected approximately $9 billion in liabilities, no trustee or examiner was appointed. There is no indication that interdebtor disputes were a prominent feature of that case.

*10. Conseco*[81]

Intercompany claims were an issue in the *Conseco* cases, but no party raised the need for a trustee or examiner for any of the debtors. No trustee or examiner was appointed, and the same counsel represented all 24 debtors.

*11. Kmart*[82]

No trustee or examiner was appointed. Two committees of creditors were appointed (one of which contained trade vendors and other general unsecured creditors, and the other of which contained financial institutions), but there is no indication that the separate committees were appointed to represent the opposite sides of interdebtor disputes. The debtors' counsel, together with the board of directors and the statutory committees, investigated various allegations of malfeasance by former management.

---

[79]    Bankr. S.D.N.Y. Docket No. 02-41316 (ALG).

[80]    Bankr. S.D.N.Y. Docket No. 03-13024 (PCB).

[81]    Bankr. N.D. Ill. Docket No. 02-49672.

[82]    Bankr. N.D. Ill. Docket No. 02-02474.

*12.  FINOVA*[83]

No trustee, or examiner, was appointed.  A single law firm (from out of town)
acted as debtors' counsel for all debtors, while a second law firm (in Delaware) served as
Delaware counsel for all debtors.

*13.  IT Group*[84]

No trustee was appointed.  However, an examiner was appointed about two
months after the case was filed.  A few days before, the creditors' committee (represented
by the same counsel that represents the Arahova Noteholders Committee) moved for the
appointment of a trustee and examiner with expanded powers to investigate cost-cutting
and revenue enhancement measures for the debtors.  It was alleged that the debtors had
no reorganizational purpose (being "wedded to . . . a liquidation of their assets") and that
they had preordained a sale of substantially all of their assets prior to contemplating a
chapter 11 filing.  The creditors' committee argued that "there [was] no one left acting on
behalf of the estate to pursue the reorganization scheme identified in December by the
debtors but scuttled in January under pressure by the debtors' prepetition lenders."[85]  The
motion did not express any concern regarding the investigation or analysis of
intercompany claims.[86]

IT Group was the parent of 92 direct and indirect subsidiaries, and had direct and
indirect ownership interests in 43 LLCs and JVs.[87]  Nevertheless, only one examiner was
appointed, to serve case-wide.  It appears that in one place in a 26-page report, the

---

[83]    Bankr. D. Del. Docket No. 01-0697.

[84]    Bankr. D. Del. Docket No. 02-10118.

[85]    IT Group Creditors' Comm. Motion for Trustee/Examiner, dated March 7, 2002, Bankr. D. Del.
Docket No. 02-10118 at ¶¶ 7, 9, 28, 50.

[86]    *See id.* at ¶¶ 1-21.

[87]    *See id.* at ¶ 13.

examiner mentioned intercompany payables, but they do not appear to be a very significant aspect of that report.[88]

*14.  Mirant*[89]

The *Mirant* cases, which were filed in July 2003, involved 83 debtors that had been operated as a single enterprise and held many interdebtor contracts and shared assets.  All of the debtors were operated by the same management and used the same professionals.  No trustee was appointed, for any debtor.  There were, however, two official creditors' committees, one of which represented creditors at the structurally senior level, and one of which represented creditors at the structurally junior level.[90]  The debtors stayed neutral in the interdebtor disputes, and the committees acted as the advocates for their creditor groups.

On April 13, 2004, the *Mirant* court issued an order directing the appointment of an examiner to perform certain investigatory duties, one of which was to ensure that transactions among debtors or their affiliates were fair and not prejudicial to the estates or creditors of any debtor.  The court thereafter determined that closer supervision by the examiner was necessary.  On April 29, 2004, approximately two weeks after having appointed the examiner, the *Mirant* court issued an order defining the examiner's role to, among other things, review prospective transactions and courses of dealing between debtors to provide an opportunity for the court to determine whether such transaction or course of dealing was fair and consistent with the best interests of each debtor affected by it.

---

[88]    *See* IT Group Examiner's Report Supplement, dated April 18, 2002, Bankr. D. Del. Docket No. 02-10118 at 16.

[89]    Bankr. N.D. Tex. Docket No. 03-46590 (DML).

[90]    *See* Jan. 6, 2006 Hrg. Tr. at 65.

Thereafter, the *Mirant* court expanded the role of the examiner to include, among other things, the identification of any issue of fact or law the resolution of which might be necessary or useful to the advancement of the debtors' reorganization, to take steps to resolve those issues consistent with the examiner's duty to remain neutral; and, if an issue could not be resolved, to consult with the committees and the parties affected by the issue over how and when that issue should be resolved through litigation. In the event no party commenced litigation to resolve the issue, the examiner could seek court authority to commence that litigation, unless to do so would compromise his neutrality as to each of the debtor's estates. As described by the Arahova Noteholders Committee's counsel, the examiner served as a "lubricant" with respect to the resolution of the interdebtor issues and disputes.[91]

Thus the examiner's powers with respect to the resolution of intercompany claims were expressly limited by reason of the *Mirant* court's concern for preserving the examiner's neutrality. Although interdebtor issues existed, as described above, no trustee was appointed. And while the examiner was given a fact finding and facilitator role, the appointment was subject to the need to get a further court order to gain litigation authority. Committees acted as the advocates for their creditors' interests.

## 15. *Federal Mogul Global*[92]

A combination of a single out-of-town firm and a single Delaware firm represented all debtors, and there is no indication of additional bankruptcy counsel on a debtor by debtor basis. No trustee or examiner was appointed.

---

[91] *Id.*

[92] Bankr. D. Del. Docket No. 01-10578.

*16. U.S. Airways*[93]

A combination of a single out-of-town firm and a single Virginia firm represented all debtors, and there is no indication of additional bankruptcy counsel on a debtor by debtor basis. No trustee or examiner was appointed.

\* \* \*

As is apparent from the foregoing, interdebtor disputes are common in multi-debtor chapter 11 cases. But the appointment of chapter 11 trustees to deal with them is not. In none of the 14 cases that the Arahova Noteholders Committee brought to the Court's attention (and only one of the additional cases of which this Court has knowledge) was a trustee appointed. And there the debtors themselves had moved for that relief, and the driving factor was not the presence of the interdebtor disputes (which the respective estates' committees could have litigated), but rather the management vacuum at the affected debtor, by reason of the resignations of all of its officers and directors.

Similarly, in none of these cases was any kind of nonstatutory fiduciary appointed, such as a responsible officer or designated corporate employee.

In a few cases, examiners were appointed, to be fact finders, facilitators of settlements, or both. But none was granted authority to litigate on behalf of one debtor against another.

*E. Ultimate Findings of Fact*

Based on all of the evidence, the Court makes the following ultimate Findings of Fact:

---

[93]    Bankr. E.D. Va. Docket No. 02-83984.

Neither the Debtors nor their counsel have engaged in fraud, dishonesty, incompetence or gross managements of the Debtors' affairs. To the contrary, both have performed their duties in an exemplary manner.

The appointment of a trustee for the Arahova Debtors, especially at this late time, would be highly prejudicial to the Arahova Debtors. The appointment of one or more non-trustee "fiduciaries," especially at this late time, would be highly prejudicial to the Arahova Debtors.

The Debtors marketed the company conscientiously and effectively. By obtaining the sale to Time Warner and Comcast, they obtained the maximum value for it. There is no evidence to suggest that by carving out the Arahova Debtors from a sale of the rest of the Debtors, the Debtors or their advisors could have secured more consideration for the Arahova Debtors. There is no evidence to suggest that there is any alternative prospective buyer for the Arahova Debtors, much less one offering more attractive consideration.

The Debtors likewise engaged in their accounting analysis conscientiously and effectively, recognizing (as does the Court) that their judgments in this regard (including as to methodology) would not be binding on the Court, and that the ultimate interdebtor/intercreditor issues in this case—including, without limitation, judgmental matters, legal determinations, determinations as to the voidability of past transactions, and factual determinations as to disputed facts (to the extent factual disputes exit)—are the Court's province, and not the Debtors', to decide.

Interdebtor Disputes do now exist, which must be resolved in some fashion. But the only fact that could tilt toward appointment of a trustee or nonstatutory fiduciary (to

the extent one is permissible and otherwise appropriate under the law) is the mere existence of such Interdebtor Disputes.

Interdebtor disputes are very common in large multi-debtor chapter 11 cases. In most cases, they are resolved by negotiations between or among the creditors whose recoveries are determined by the outcome of those disputes—with a subcurrent underlying those negotiations that creditors have the right to litigate them if agreement cannot be reached. The appointment of a trustee to litigate such disputes is not unprecedented, but is nearly so. The appointment of a nonstatutory fiduciary to litigate those disputes would be unprecedented. The appointment of an examiner to litigate those disputes (though not requested here) would be unprecedented.

At all relevant times, the Debtors and their counsel maintained neutrality in the Interdebtor Disputes. The Debtors' decision to maintain neutrality, and to refrain from taking sides as an advocate for or against either the Arahova Noteholders or any of the Debtors (including, most significantly, Adelphia Parent) was sensible and taken in good faith.

The Court agrees with the Adelphia Parent Noteholders Committee[94] that the motions are "not reflective of any genuinely held concern over conflicts of interest. If that were the case, the Motions would have been filed months, if not years, ago." Rather, they are a tactical measure, to secure greater recoveries.[95]

---

[94]    *See* Adelphia Parent Noteholders Comm. Obj. at 2.

[95]    *See also* the Arahova Noteholders Committee's admission in summation, albeit to make a different point: "This is the last step in a failed negotiation, not the first one." Jan. 6, 2006 Hrg. Tr. at 72.

The record is devoid of any evidence from which the Court could find, and it does

not find, that the Arahova Debtors in any way acted in violation of their duty of loyalty.

Nor does the Court find postpetition self-dealing.

Discussion

I.

Trustee/Nonstatutory Fiduciary

A.  *Appointment of Trustee*

In the first of its motions, the Arahova Noteholders Committee seeks an order of

this Court, pursuant to section 1104(a) of the Code, appointing a trustee for Arahova and

its subsidiaries.[96]  This motion is denied in all respects.

In the form applicable to the Adelphia chapter 11 cases,[97] section 1104(a)

provides:

> (a) At any time after the commencement of the case
> but before confirmation of a plan, on request of a
> party in interest or the United States trustee, and
> after notice and a hearing, the court shall order the
> appointment of a trustee—
>
> > (1) for cause, including fraud, dishonesty,
> > incompetence, or gross mismanagement of

---

[96]    The Adelphia Parent Noteholders Committee notes that the Arahova Noteholders Committee members are creditors of Arahova, a holding company, and not of Arahova's subsidiaries.  Among several points it makes based on that distinction, it argues accordingly that the Arahova Noteholders Committee lacks standing to seek the appointment of one or more trustees for the separate subsidiaries that are also Arahova Debtors; that the interests of Arahova as an equity holder of the Arahova Debtors' subsidiaries would not necessarily be the same as those of the structurally senior creditors of those subsidiaries; and that to the extent any of the Arahova Noteholders Committee's arguments for the appointment of a trustee would have merit, they would require separate trustees for Arahova and its subsidiaries.  In light of the resolution of the motions on other grounds, the Court does not need to address these issues at this time.

[97]    Section 1104(a) was amended by provisions of the "Bankruptcy Abuse Prevention and Consumer Protection Act of 2005" (often referred to as "BAPCPA"), but the bulk of the BAPCPA amendments apply only in cases filed on or after October 17, 2005.  The Adelphia chapter 11 cases were filed 3-1/2 years ago, long before that date.  Thus the amendments to section 1104 (which in any event are not germane, and are not contended to be so) do not apply to this controversy, and the Court quotes section 1104 in its pre-BAPCPA form.

> the affairs of the debtor by current
> management, either before or after the
> commencement of the case, or similar cause,
> but not including the number of holders of
> securities of the debtor or the amount of
> assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of
> creditors, any equity security holders, and
> other interests of the estate, without regard
> to the number of holders of securities of the
> debtor or the amount of assets or liabilities
> of the debtor.

As the Second Circuit has noted, "the standard for § 1104 appointment is very

high."[98] "Chapter 11 of the Code is designed to allow the debtor-in-possession to retain

management and control of the debtor's business operations unless a party in interest can

prove that the appointment of a trustee is warranted,"[99] and there is a strong presumption

that the debtor should be permitted to remain in possession absent a showing of need for

the appointment of a trustee.[100]  It has been repeatedly held that the appointment of a

chapter 11 trustee is an "extraordinary remedy."[101]  As the Third Circuit has held:

> It is settled that appointment of a trustee should be
> the exception, rather than the rule. . . .  The movant

---

[98]   *In re Smart World Technologies, LLC*, 423 F.3d 166, 176 (2d Cir. 2005).

[99]   *In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990) (Lifland, C.J.)
("*Ionosphere*"), citing *In re General Oil Distributors, Inc.,* 42 B.R. 402, 409 (Bankr. E.D.N.Y.
1984); *In re BAJ Corp.,* 42 B.R. 595, 597 (Bankr. D. Conn. 1984); *In re La Sherene, Inc.,* 3 B.R.
169, 174 (Bankr. N.D. Ga. 1980).

[100]   *See Comm. of Dalkon Shield Claimants v. A.H. Robbins Co., Inc.,* 828 F.2d 239, 241 (4th Cir.
1987); *Ionosphere*, 113 B.R. at 167; *In re Evans,* 48 B.R. 46, 47 (Bankr. W.D. Tex. 1985); *In re
Eichorn,* 5 B.R. 755, 757 (Bankr. D. Mass. 1980).

[101]   *Ionosphere*, 113 B.R. at 167; *In re Stein & Day, Inc.,* 87 B.R. 290, 294 (Bankr. S.D.N.Y. 1988)
(Schwartzberg, J.); *In re William A. Smith Construction Co., Inc.,* 77 B.R. 124, 126 (Bankr. N.D.
Ohio 1987); *In re Parker Grande Development, Inc.,* 64 B.R. 557, 560 (Bankr. S.D. Ind. 1986);
*Midlantic National Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.),* 4 B.R.
635, 644 (Bankr. E.D.N.Y. 1980).

. . . must prove the need for a trustee by clear and
convincing evidence.[102]

A party seeking appointment of a trustee has the burden of showing, by clear and
convincing evidence, cause under section 1104(a)(1) or the need for a trustee under
section 1104(a)(2).[103]  The decision to appoint a trustee in a chapter 11 case is a factual
determination left to the discretion of the bankruptcy judge.[104]

The standards for the application of the two subsections of section 1104(a) "are
quite flexible and give the judge wide discretion in deciding whether there is cause to
appoint a trustee."[105]

*1. Appointment of Trustee for Cause—Section 1104(a)(1)*

While the Arahova Noteholders Committee moves under both sections, its
reliance on section 1104(a)(1) is nearly frivolous.  Subsection (a)(1) authorizes the
appointment of a trustee for cause, including fraud, dishonesty, incompetence, or gross
mismanagement of the affairs of the debtor by current management.  With the Rigases
out, and on the factual record here, the Arahova Noteholders Committee does not come
close to making the necessary showing.

While the words following "including" do not, by definition, represent the only
bases for a finding of cause,[106] words are nevertheless known by the company they keep,
and here there is no basis for any finding of misconduct or lack of managerial skill.  The
Arahova Noteholders Committee acknowledged the extraordinary job the Debtors had

---

[102]    *In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3d Cir. 1989) ("*Sharon Steel*").

[103]    *See In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 471 (3d Cir. 1998) ("*Marvel*");
*Ionosphere*, 113 B.R. at 168.

[104]    *See Schuster v. Dragone (In re Dragone)*, 266 B.R. 268, 271 (D. Conn. 2001) ("*Dragone*").

[105]    Alan N. Resnick, *Bankruptcy Law Manual* § 9.29 at 954 (Thompson-West 5th Ed.).

[106]    *See* 11 U.S.C. § 102(3) ("includes" and "including" are not limiting).

done,[107] but went on to say "that's not what these motions are about."[108]  But when the

Court examines the narrower alleged Debtor offenses that do supposedly evidence

misconduct or mismanagement, the Court finds neither.  The Court has rejected as a fact

the Arahova Noteholders Committee's contention that in conducting the sale process, the

Debtors' focus on maximizing the value of the Adelphia enterprise somehow came at the

expense of particular estates and their stakeholders, and has noted, to the contrary, that

the Court cannot find that the Debtors sacrificed an opportunity to get more value for the

Arahova Debtors to gain a better deal for the remaining Debtors, or for all of the Debtors'

estates generally.  It likewise has rejected, as a fact, the Arahova Noteholders

Committee's contention that the Debtors engaged in their accounting to aid or hurt any

particular debtor or constituency.

     As discussed in its Findings of Fact above, the Court has also found that the

Debtors have maintained neutrality in the Interdebtor and Intercreditor Disputes.  They

have not acted adversely to any debtor estate.[109]  Thus the Court is left with the mere

---

[107]    Their counsel stated:

> And I want to make clear in my summation that I am in awe of
> the job that has been done by the debtors' management and
> advisors in stabilizing the business, in dancing through the
> minefield of the Rigas fraud, and negotiating an M&A
> transaction to sell the business for $17.6 billion.  It's truly a
> phenomenal set of achievements.

Jan. 6, 2006 Hrg. Tr. at 60-61 (transcription error corrected).

[108]    *Id.*

[109]    Similarly, the Court previously noted:

> [T]he criticisms that have been principally leveled at the
> Debtors have not been that they have acted adversely to one
> estate for the benefit of another estate, but they have elected to
> take a position of neutrality in the potential issues between
> debtors . . . .

July 26, 2005 Hrg. Tr. at 320.

*presence* of interdebtor conflicts, which, as the Court has noted above, are present in

many, if not most, large multi-debtor cases.  Interdebtor disputes do not by themselves

evidence (much less establish) fraud or mismanagement, or misconduct of the type that

constitutes cause under section 1104(a)(1).

Most of the cases cited by the Arahova Noteholders Committee in the portion of

its Trustee Motion seeking relief under subsection (a)(1)[110] had characteristics of either

management self-dealing or misconduct, or instances in which management ignored

potential causes of action.[111]  In the exception, *In re L.S. Good & Co.,*[112] the trustee was

---

> In other words, based on the facts presented in this hearing
> and in previous proceedings before me, there's no reason to
> believe now that the debtors and their counsel, in declining to
> take sides in the inter-creditor disputes, have in any way dealt
> with actual or perceived conflicts inappropriately, but they
> would be put in an arguably different and much more difficult
> position if they then were asked [to] or did act in a way that
> could be argued to be . . . contrary to the interests of one or
> another of the creditor groups.

Oct. 28, 2005 Hrg. Tr. at 111-112.

After hearing the entirety of the Arahova Noteholders Committee's evidence and argument,
nothing has caused this Court to believe those conclusions were incorrect or ill-advised.

[110]    *See* Arahova Noteholders Comm. Trustee Motion at ¶¶ 47-55.

[111]    *See, e.g., Sharon Steel,* 871 F.2d 1217 (3d Cir. 1989) (there was "conclusive evidence of self-
dealing," including transfer of the debtor's yacht and plane to an affiliate of the debtor, and the
payment of $3.7 million to an affiliate on the eve of bankruptcy); *Oklahoma Refining Co. v. Blaik
(In re Oklahoma Refining Co.),* 838 F.2d 1133 (10th Cir. 1988) (debtor had been involved in
questionable transactions, including heavily discounted sales to its affiliates, even after filing of
chapter 11 case); *In re PRS Insurance Group, Inc.* 274 B.R. 381 (Bankr. D. Del. 2001) (Walrath,
J.) (diversion of assets to corporate president, and creditors' committee and debtor's management
were conflicted out of pursuing claims against insiders for diversion of funds); *In re Intercat, Inc.,*
247 B.R. 911 (Bankr. S.D. Ga. 2000) (Davis, J.) (closely-held corporate debtor was involved in
self-dealing, and management was guilty of dishonesty); *In re Microwave Products of America,
Inc.* 102 B.R. 666 (Bankr. W.D. Tenn. 1989) (self-dealing had occurred, which debtor was not
pursuing); *In re Humphreys Pest Control Franchises, Inc.,* 40 B.R. 174 (Bankr. E.D. Pa. 1984)
(hundreds of thousands of dollars transferred from debtor subsidiary to parent for supposed
"management fees," with no documentation).

This is not a self-dealing case.  Conspicuously absent is any suggestion by the Arahova
Noteholders Committee that any director, officer, or employee of any of the Debtors stands to gain
anything from any outcome of any of the interdebtor disputes here.

[112]    8 B.R. 312 (Bankr. N.D.W. Va. 1980).

appointed under subsection (a)(2), and not, as the Arahova Noteholders Committee

implied,[113] subsection (a)(1).  In fact, the *L.S. Good* court said:

> [T] motion should not be granted under the
> provisions of 11 U.S.C. § 1104(a)(1) for the record
> before me is devoid of clear and convincing proof
> that the current management of Knapp is guilty of
> fraud, dishonesty, incompetence or gross
> mismanagement.[114]

Though it might be regarded as faint praise for the Debtors in this case, that is no less true

here.

### 2.  *Appointment in the Interests of Creditors, et al.*

Section 1104(a)(2) authorizes the appointment of a trustee on a separate ground,

where such is "in the interests of creditors, equity security holders, and other interests of

the estate."  In exercising the considerable discretion this Court has in deciding the

motion insofar as it rests on this subsection, the Court engages in a fact-driven analysis,

principally balancing the advantages and disadvantages of taking such a step, and

mindful of the many cases, noted above, that have held that appointment of a trustee is an

extraordinary remedy,[115] and should be the exception, rather than the rule.[116]

---

[113]    *See* Arahova Noteholders Comm. Trustee Motion at ¶¶ 28-29.

[114]    *Id.* at 314.  The *L.S. Good* court appointed a chapter 11 trustee under subsection (a)(2), just as this Court would have under the facts presented in that case.  But there the debtor—a company that owned three department stores, owned by three subsidiary corporations (also debtors) and that in turn was owned by a holding company (another debtor)—was bleeding money badly, in part by reason of its own losses and its subsidiaries' losses, and in part because of the payment of management fees to an affiliate that could be eliminated if the chapter 11 trustee were appointed. The debtor was found to have little hope of reorganization, no source for the money it needed, and with no alternative but to liquidate.  (It converted to chapter 7 a month later.)  While there were apparently receivables due from other debtors, there is no indication that the amounts were in doubt, and there is no indication in the *L. S. Good* decision of interdebtor disputes of the type present in this case.  The *L.S. Good* court merely noted its expectation that the chapter 11 trustee would seek to realize the maximum amount of monies possible, "including the collection of any and all monies due and owing [the debtor] from all sources."  *Id.* at 315.  And significant to any subsection (a)(2) analysis, there were no factors mentioned tilting *against* the appointment of a trustee.

[115]    *See* n.101, *supra*.

Subsection (a)(2) envisions a flexible standard.[117]  It has been repeatedly held that "'[i]n determining whether the appointment of a trustee is in the best interests of creditors, a bankruptcy court must necessarily resort to its broad equity powers.'"[118]  In considering requests under subsection (a)(2), courts "'eschew rigid absolutes and look [ ] to the practical realities and necessities.'"[119]  Thus there is no basis for a conclusion that the mere presence of interdebtor disputes alone mandates the appointment of a trustee.

Among the factors that are considered are: (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.[120]  Plainly, any need to find a mechanism to address interdebtor issues should be considered as part of that balancing, but it is not by itself determinative.

Here, after the ouster of the Rigases, the Debtors' trustworthiness is not an issue. Similarly, the Arahova Debtors, like the other Debtors, have had more than satisfactory performance, and their rehabilitation (at least if not disrupted by the present motions) is strongly likely.  And those lacking axes to grind (such as the Creditors' Committee) have voiced no dissatisfaction or lack of confidence with the Arahova Debtors' management.

---

[116]    *See* n.102, *supra*.

[117]    *See Marvel*, 140 F.3d at 474.

[118]    *Dragone*, 266 B.R. at 272, quoting *In re Clinton Centrifuge, Inc.,* 85 B.R. 980, 984 (Bankr. E.D. Pa. 1988).

[119]    *Ionosphere*, 113 B.R. at 168 (citation omitted); *accord Dragone*, 266 B.R. at 272-273.

[120]    *Ionosphere*, 113 B.R. at 168 (citations omitted).

Thus the Court turns to the final factor—which, in this case and so many other cases—is the most important.[121]

The relevant facts tilt overwhelmingly against the appointment of a trustee, especially from the perspective of the Arahova Debtors' unsecured creditors.[122]  Among many other things, as noted above, such an appointment would constitute an act of default under the pending $17.6 billion Time Warner/Comcast sale, the loss of which would cost the Arahova Debtors their share of that amount—an amount that, as Mr. Schleyer testified, could not be fetched by a sale of the Arahova Debtors alone.  It also would constitute an act of default under the Debtors' DIP financing facility, resulting in the loss of funding essential to all of the Debtors' operations and capital expenditures— including, the Court notes, certain of the Arahova Debtors as well.  Each of these would be disastrous for the Arahova Debtors, just as they would be disastrous for all of the others.

Appointment of a trustee also almost certainly would result in a slowdown, if not halt, in the progress of the Arahova Debtors in their emergence from bankruptcy.  And if

---

[121]    The Court notes, in this connection, that no case has ever held that the presence of interdebtor disputes, without more, makes the appointment of a trustee mandatory, under either subsection (a)(1) or subsection (a)(2).  To state the obvious, the Code does not say so either.  Rather, the Court looks to the presence of interdebtor disputes as a factor to be considered, to be weighed along with the other factors tending to favor, or oppose, the appointment of a trustee.  That is consistent with the holdings of the Second Circuit in *Katz v. Kilsheimer*, 327 F.2d 633, 635 (2d Cir. 1964) (Friendly, J.) ("*Katz*") (discussed at n.169 *infra*); and *In re International Oil Co.*, 427 F.2d 186, 187 (2d Cir. 1970) ("*International Oil*") (the existence of intercompany claims by itself was not a basis "to saddle these estates with the expense of separate trustees and trustees' attorneys").

[122]    The appointment of a trustee for the Arahova Debtors plainly would be extraordinarily prejudicial to all of the Debtors.  But the Court does not decide the motion on that basis.  Granting the motion would be extraordinarily prejudicial to the interests of the *Arahova Debtors*, along with the others, and with no countervailing advantages to the *Arahova Debtors*.  Thus the Court does not need now to decide, and does not decide, whether the good of the many would outweigh the good of the few or the one, or whether debtors or their counsel could appropriately consider such a factor in taking action.

the closing of the Time Warner/Comcast sale were delayed past July 31, 2006, that would

give the buyers termination rights.[123]   Such a scenario would put the receipt of the $17.6

billion sale price at risk, and additionally subject the Debtors, including the Arahova

Debtors, to risk of the loss of $443 million in breakup fees.  Even if Time Warner and

Comcast were still willing to do the deal, the Debtors' estates, including the Arahova

Debtors' estates, would still be subject to the risk that Time Warner and Comcast would

use that as a basis to lower the price.  Even with the appointment of a trustee for the

Arahova Debtors, the interdebtor issues will still need to be addressed.  But it is difficult,

if not impossible, to see how the hearings on them could then commence at the end of

this month, as the Court now has directed.

The Court cannot speculate as to exactly how long it would take a new trustee and

his/her advisors to acquire the knowledge that it took Appaloosa and the other members

of the Arahova Noteholders Committee (and their adversaries) years to acquire, but that

time necessarily would be lengthy.  And there is grave uncertainty as to how much time it

would take the new trustee to get up to speed on Arahova *operational* issues that

presumably would also have to be addressed, particularly if the Arahova Debtors are to

be run, in whole or in part, independently.

Delay in exiting bankruptcy will materially prejudice the unsecured creditors of

the Arahova Debtors, just as it will materially prejudice substantially all of the other

unsecured creditors in the Adelphia cases.  The Arahova Debtors, like most of the others,

have secured debt, which is at least seemingly oversecured and entitled to postpetition

interest.  The Arahova Debtors' unsecured creditors are junior in priority, and as the

---

[123]      *See* Wittman Decl. at ¶ 64.

interest on secured claims continues to accrue, unsecured creditor recoveries will decrease.  To a certain extent, delay in this case was unavoidable, as these were cases of extraordinary complexity, with the need to address changes in the Board and in senior management; to stabilize and grow the business; to deal with the legacy of the Rigases; to settle disputes with the SEC and DoJ; and, of course, to market the company.  And to the extent that delay was unavoidable, everyone must accept it.  But it is the responsibility of the Court to ensure that there be no further delay that can be avoided.  And, of course, delay in the effectiveness of the Present Plan and the closing of the Time Warner/Comcast sale will risk the loss of the sale proceeds and, at the same time, the loss of the breakup fee, presaging even greater risks to the Arahova Debtors' unsecured creditors.

Whether on operational issues, the sale to Time Warner and Comcast, or on reorganization plans, the appointment of a trustee (and, one can presume, newly hired counsel) for the Arahova Debtors would indeed, as the Debtors argue, result in the Balkanization of decision making in the case, impeding prompt decision making, and adding one or more extra layers of delay.  No party could seriously suggest that any of this is in the interests of creditors.  It will be quite the opposite.  That is especially true since, as the Adelphia Parent Noteholders Committee and FrontierVision Noteholders Committee have noted (while opposing appointment of a trustee for the above reasons, among others), if a trustee were to be appointed for the Arahova Debtors, then trustees would have to be appointed for their borrower Debtors as well.[124]

---

[124]    Thus the Court has some difficulty in understanding the Arahova Noteholders Committee's assertions that the appointment of a trustee or trustees "will provide the Arahova Debtors with their rightful statutory advantages. . . ." (Arahova Noteholders Comm. Trustee Motion at ¶ 5.)  If any of the requested relief were to be granted, the Court necessarily would have to give the

Against this, there would be few, if any, benefits of appointing a trustee for the

Arahova Debtors here.  The Arahova Noteholders Committee is quite able to litigate and

protect its economic interests without the assistance of a trustee, as its many filings on

these motions and on predecessor motions have evidenced.  And from all appearances, it

has the motivation and desire to press the fight to maximize its recovery; indeed it

justifies its resort to the "nuclear war button" as a legitimate device in light of its

motivation.[125]

To the extent it matters (when the motion is to appoint a trustee for the Arahova

Debtors alone), the Arahova Noteholders Committee's principal adversary—the Adelphia

Parent Noteholders Committee—likewise has the ability and motivation to litigate the

Intercreditor Disputes, so there is no litigating ability vacuum to be filled.  This is not a

case where claims or issues needing to be prosecuted or defended will have nobody to

engage in the necessary effort.  There is nothing that substituting warriors in the

interdebtor/intercreditor battles would accomplish that the affected estates (and creditors)

do not already have.  Importantly, the appointment of a trustee will not make the

---

Arahova Debtors' opponents—Adelphia Parent, the FrontierVision Debtors and any others—like
benefits, to preserve a level playing field.  The Court will not permit litigants to have advantages,
statutory or otherwise, in the Interdebtor Disputes.

[125]   The Arahova Noteholders Committee asserts that it is an unsatisfactory advocate for the Arahova
Debtors, because it is not a fiduciary for them, and that it could abandon the fight at any time.
Given the Arahova Noteholders Committee's past conduct and the amount its bondholders have at
stake, the Court regards this as a highly unlikely possibility.  But even if that were so, Arahova
bondholders would still have another advocate, U.S. Bank, their indenture trustee.  And U.S. Bank
is, of course, a fiduciary for them, and, so far as the record reflects, is fully aware of its fiduciary
duties and prepared to discharge them whenever necessary.  Thus the Court regards this argument
as a red herring.

Similarly, the Court sees little risk that nonfiduciaries—*e.g.*, the Arahova Noteholders Committee
and the Adelphia Parent Noteholders Committee—could settle their disputes at the expense of the
Arahova Debtors or Adelphia Parent, or creditors of the Arahova Debtors or Adelphia Parent who
are not members of those committees.  The Rule 9019 process would provide more than ample
opportunity for the Court to examine the fairness of any such settlement.

Intercreditor Disputes go away.  It will just lengthen the time it will take to get them
resolved.[126]

In argument before Judge Scheindlin of the District Court on its motion for leave
to file an expedited appeal, the Arahova Noteholders Committee noted three areas where
it thought it had been prejudiced by the absence of a trustee for the Arahova Debtors.
Two were illusory, and one is justified by sound bankruptcy policy.

In the first, the Arahova Noteholders Committee expressed concern about not
being paid its legal fees in carrying on the battle.[127]  But as Judge Scheindlin observed,[128]
the Arahova Noteholders Committee, if it benefited the Arahova Debtors by carrying on
the fight in the interdebtor dispute, could seek reimbursement, for "substantial
contribution," under section 503(b) of the Code.[129]  The Code already gives the Arahova
Noteholders Committee the opportunity to get what it is looking for,[130] and without the
trauma and expense of a trustee.[131]

---

[126]    Nor does this Court accept the notion that acrimony leading to an inability to cooperate in
reorganization (*see* Arahova Noteholders Comm. Trustee Motion at ¶ 60) here justifies
appointment of a trustee.  Unfortunately, as the Court has seen in e-mails and other
communications between parties in interest, acrimony amongst creditors is commonplace in this
district.  Appointment of a trustee would be unlikely to make the intercreditor acrimony go away,
and would simply result in expense and delay that would reduce creditor recoveries and decrease
the pot they were fighting over.  In *Marvel*, cited by this Court above and discussed by the
Arahova Noteholders Committee repeatedly, where the Third Circuit ruled that Judge McKelvie's
appointment of a trustee was not an abuse of discretion, 140 F.3d at 472-73, the acrimony was
between the *debtor* and the creditors, and replacing the debtor eliminated one of the two feuding
parties.  Here that would not be the case.  In fact, even then, as the Third Circuit noted, "[w]e
expressly hold that there is no per se rule by which mere conflicts or acrimony between debtor and
creditor mandate the appointment of a trustee."  *Id.* at 473.

[127]    *See* Sept. 20, 2005 Hrg. Tr. at 17 ("a consequence of not being a debtor is that you cannot hire
counsel and be paid by the estate").

[128]    *Id.*

[129]    The Court hastens to note that the Arahova Noteholders Committee's principal opponents, the
Adelphia Parent Noteholders Committee and the FrontierVision Noteholders Committee, would
have the same rights.

[130]    It is true that substantial contribution applications are heard only at the end of the case.  Parties in
interest, and the bankruptcy courts, need an understanding, with as much information as possible,

The Arahova Noteholders Committee also made an argument before Judge Scheindlin that the appointment of a trustee or fiduciary would assist it with respect to matters of attorney-client privilege—such as by destroying the attorney-client privilege of WF&G, and "getting [its] work on the interdebtor dispute. . . . [I]t is privileged from, I guess, everybody."[132]  Once parsed, this has little in the way of substance.  First, the Arahova Noteholders have moved for a determination that they are entitled to puncture the privilege, and they could win, without the damage to the estate of a trustee.  Second, this Court has difficulty seeing how one thing has anything to do with the other.  Any trustee appointed presumably could waive the Arahova Debtors' own privilege, and, if he or she wanted, could share new privileged information and/or work product with the Arahova Noteholders Committee.  But he or she could just as easily be of a mind to regard that committee as a litigant with an agenda and remain independent, hardly making the disclosure of even the trustee's counsel's work product a foregone conclusion.  And in any event, it is not clear that a newly appointed trustee could authorize the disclosure of privileged matter generated in the *past*, as, *inter alia*, he or she might not be in a position to give the necessary consent on behalf of others for whom

---

of the extent of the benefits constituting the asserted substantial contribution.  Considering them (and, presumably, making payment) at an earlier time (which this Court has never seen) would encourage parties to routinely make such applications to finance their private agendas, and, if granted, add significant administrative costs to already expensive chapter 11 cases without any real indication of their resulting benefit.

[131]  Additionally, of course, any trustee appointed for the Arahova Debtors would have his or her own counsel (with the Arahova Noteholders Committee's present counsel seemingly being conflicted from such a role).  The Arahova Noteholders Committee could not tell the Arahova trustee what to do.  And the appointment of such a trustee would ironically make it harder for the Arahova Noteholders Committee to recover on its own substantial contribution application, as any incremental benefits it would be providing would be less significant.

[132]  *See* Sept. 20, 2005 Hrg. Tr. at 17.

WF&G was also counsel, and subject to a "joint interests" privilege.[133]  Third, but most
importantly, the Arahova Noteholders' Committee's desire to peek over WF&G's
shoulder is insufficient to outweigh all the damage and risk to the Arahova Debtors'
estates, described above.

Finally, the Arahova Noteholders Committee expressed the concern that if it were
to seek a stay pending appeal, it would have to post a bond, while a trustee would not.[134]
The Court finds that true, but hardly offensive.  The Arahova Noteholders Committee
wished to push the "nuclear war button" and put the closing of a $17.6 billion transaction
at risk to augment its personal recovery.  The Arahova Debtors' share of the $17.6 billion
to be received will likely run into the hundreds of millions, if not billions, of dollars.  And
if that transaction is lost, there may be no recoveries, or only minimal recoveries, for the
Arahova Noteholders Committee or any other creditor of Arahova.  The requirement for
bonds to secure stays pending appeal provides important protection to appellees and their
stakeholders—even then, arguably insufficient—against the damage that might occur by
reason of a stay.  The Court has some difficulty seeing how this or any other Court should
have sympathy for a litigant in the Arahova Noteholders Committee's position seeking to
be excused from that requirement.  There is no good reason to subject the Arahova
Debtors' estates to the resulting costs, damage, and risk resulting from the appointment of
a trustee, to provide the Arahova Noteholders Committee with dispensation from further
costs and damage it might inflict.

---

[133]    Briefs have recently been submitted on the privilege issues, but they have not yet been argued.  As
is apparent, the Court is not deciding them now.

[134]    Sept. 20, 2005 Hrg. Tr. at 18.

The Court assumes that in some case, at some time, with a combination of a need that is not present here, an absence of factors making the appointment of a trustee affirmatively prejudicial, and/or with consent of the affected debtor, the appointment of one or more chapter 11 trustees to address otherwise unaddressed interdebtor issues might be appropriate. *PSINet Consulting Solutions,* where this Court appointed a chapter 11 trustee under subsection (a)(2), was such a case—by reason of a confluence of a management that was about to side with the parent in the interdebtor issues; a management that had resigned from the subsidiaries, leaving a management vacuum; an absence of factors tending against the appointment; and the debtor's consent to such relief. But this case has none of those factors, and *PSINet Consulting Solutions* is relevant only by way of contrast.

However, quite relevant is the analysis by Judge Gonzalez in *WorldCom,* where another creditor group moved for the appointment of a trustee on the basis of interdebtor conflicts:

> The appointment of a trustee would be very costly to the Debtors and their estates, with no apparent benefit. Given the size and complexity of the Debtors and their operations, the delay and expense that would be caused by the trustee's (and new professionals') need to learn about the Debtors' assets, liabilities, businesses, and chapter 11 cases would be substantial and would likely seriously and adversely affect the prospects of rehabilitation. The appointment of a trustee would severely impede the Debtors' ability to confirm a consensual chapter 11 plan of reorganization within the next few months. As has been stated previously in this decision, the issues raised by the Movants throughout are most appropriately addressed in the context of the Plan confirmation process.[135]

---

[135]   WorldCom Memorandum Decision and Order at 23.

Similar (though fewer) downside factors there resulted in denial of the *WorldCom* motion.

For reasons set forth above and in its Findings of Fact, the Court finds that appointment of a trustee for the Arahova Debtors would *not* be in the interests of their creditors, equity holders, or other interests of their estates. In fact, it would be exactly the opposite.

## B.  Recusal and Appointment of Alternative Fiduciary

As an alternative to the appointment of a trustee, the Arahova Noteholders Committee seeks an order "requiring that, as a condition to continuing to act as the debtor-in-possession for the Arahova Debtors, the current officers and directors charged with assisting in any Inter-Debtor Issue recuse themselves and appoint independent officers and directors who can then retain unconflicted counsel to represent the Arahova Debtors' estates in respect of the Inter-Debtor Issues."[136]  The Court addresses these in turn.

### 1. Appointing Fiduciaries.

The first (and principal) aspect of the requested alternative relief—for the appointment, under sections 105(a) and 1107(a) of the Code, of "independent" officers and directors, who can then retain "unconflicted counsel"—must be denied.

Section 105(a), which provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title,"[137] is plainly an inappropriate basis upon which such relief can be based. This Court has already considered the propriety of a trustee under section 1104(a) of the

---

[136]      Arahova Noteholders Comm. Trustee Motion at ¶ 30.

[137]      11 U.S.C. § 105(a).

Code—considering whether the appointment of such might be required by law or might be appropriate as a matter of discretion—and has rejected both.  The Second Circuit has repeatedly held that the lower courts cannot use section 105(a) to circumvent the Code.[138]  Using section 105(a) to appoint a fiduciary to act as a trustee shorn of the name, but with few other substantive differences, would be the exact kind of wrongful judicial action that the Second Circuit has forbidden.  Section 1104 already provides for two kinds of fiduciaries, trustees[139] and examiners.[140]  The Arahova Noteholders Committee has not shown an entitlement to the first, and has not asked for the second.  Appointing a trustee equivalent, under these circumstances, would be doing exactly what the Second Circuit told the lower courts *not* to do: using section 105(a) "to create substantive rights that are otherwise unavailable under applicable law,"[141] and to "invent remedies that overstep statutory limitations."[142]

Section 1107 of the Code provides, in relevant part:

---

[138]    *See, e.g., In re Momentum Manufacturing Corp.,* 25 F.3d 1132, 1136 & n.4 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process. . . . We have repeatedly emphasized the importance of the bankruptcy court's equitable power." But "[t]his power is not unlimited. Thus, a bankruptcy court may not exercise this power in contravention of provisions of the Code."); *In re Joint Eastern & Southern District Asbestos Litigation,* 982 F.2d 721, 751 (2d Cir. 1992) ("*Asbestos Litigation*") ("[A] reorganization is assuredly governed by equitable considerations, but that guiding principle is not a license to courts to invent remedies that overstep statutory limitations."); *see also In re Aquatic Development Group, Inc.,* 352 F.3d 671, 680 (2d Cir. 2003) (Straub, J., concurring) ("*Aquatic Development*") ("[T]his Court has repeatedly cautioned that 105(a) 'does not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." ' "), quoting *In re Dairy Mart Convenience Stores, Inc.,* 351 F.3d 86, 92 (2d Cir. 2003) ("*Dairy Mart*"), in turn quoting *U.S. v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986).

[139]    *See* 11 U.S.C. § 1104(a).

[140]    *See* 11 U.S.C. § 1104(c).

[141]    *See Dairy Mart,* 351 F.3d at 92 (citation omitted); *Aquatic Development*, 352 F.3d at 680 (Straub, J., concurring) (citation omitted).

[142]    *See Asbestos Litigation,* 982 F.2d at 751.

> (a) Subject to any limitations on a trustee serving in
> a case under this chapter, *and to such limitations or
> conditions as the court prescribes,* a debtor in
> possession shall have all the rights, other than the
> right to compensation under section 330 of this title,
> and powers, and shall perform all the functions and
> duties, except the duties specified in sections
> 1106(a)(2), (3), and (4) . . . .[143]

Though without articulating standards to be used in any determination, section

1107(a) expressly authorizes a bankruptcy court (with stated exceptions not relevant

here) to prescribe at least some kinds of "limitations or conditions" on the rights, powers,

and duties of a debtor in possession. But as *Collier* observes, "[s]ection 1107(a) is silent

as to the nature of the limitations and conditions that a court may impose under this

section."[144] Likewise, the caselaw addressing the imposition of conditions is very sparse.

Nevertheless, several guiding principles emerge from the words and structure of section

1107(a), and Second Circuit pronouncements with respect to other broad (and seemingly

limitless) grants of authority to bankruptcy courts.

First, the Court believes that, at least as a general matter, the imposition of

limitations or conditions under section 1107(a) is within the discretion of the court. The

sentence structure; the absence of more binding direction (such as the limits on court

discretion that can be found in the BAPCPA amendments); the express authority to

"prescribe"; and the inherently fact-driven context in which decisions of this character are

made all dictate the conclusion that the matter is at least generally one of court discretion.

Conversely, there is nothing to suggest that any exercise of the power to prescribe

limitations or conditions would ever be mandatory. The Code has too many instances in

---

[143]        11 U.S.C. § 1107(a) (emphasis added).

[144]        7 *Collier on Bankruptcy* ¶ 1107.01 (Matthew Bender 15th Ed. Rev.).

which it has made directions mandatory—*e.g.*, by its frequent use of "shall"—for the Court to believe that more should be implied.

But how should the Court exercise that discretion?  Neither section 1107(a) nor relevant case law provides useful guidance, so the Court substitutes consideration of the remainder of the Code, relevant caselaw in this Circuit and elsewhere, and common sense.

First, we know that continued status as a debtor in possession, with the full array of debtor in possession rights, is the norm in chapter 11.  We also know, with more than 25 years of experience, that chapter 11, as already drafted, balances the needs and concerns of debtors and creditors, and creditors against other creditors, very well already, and that section 1107(a) has been utilized very rarely.  That suggests that the circumstances under which a bankruptcy court exercises its discretion to prescribe conditions and limitations on normal debtor in possession status should be relatively limited, and that the court's power to prescribe additional conditions and limitations restricting normal debtor in possession rights and powers should be exercised with restraint.  Courts, like doctors, should be careful to "do no harm."

Second, we know, from the Second Circuit's section 105(a) cases, construing another broadly drafted grant of authority, that section 105(a) cannot be used to circumvent other, more specific, sections of the Code.  While section 1107(a) does not, like section 105(a), expressly say that its grant of authority is to "carry out the provisions of this title,"[145] the Court has considerable doubt whether section 1107(a) can fairly be read as a license to circumvent or displace more specific sections of the Code any more

---

[145]     11 U.S.C. § 105(a).

than section 105(a) could.  At the least, where imposing the desired conditions would

have the effect of circumventing other sections of the Code, or come close to doing so

(as, for example, appointing the desired "fiduciary" would, after the denial of a request to

appoint a trustee—especially when a major purpose of the desired nonstatutory fiduciary

is to then have the fiduciary retain counsel), the Court believes that it should be very slow

to exercise its discretion in that manner.  Indeed, that may be altogether forbidden.

Though there is no case yet unequivocally so holding in the section 1107(a) context,

relevant caselaw—ironically cited by the Arahova Noteholders Committee—comes

close, displacing a debtor in possession with a nontrustee only where there was consent,

and suggesting that the presence of consent to it was the controlling factor.[146]

Third, we can draw useful guidance from the three cases in which the Second

Circuit has authorized the deputization, subject to court approval, of creditors'

committees and individual creditors to bring litigation on behalf of an estate, even though

the Code does not expressly authorize it.  In doing so, the Circuit has articulated

standards for the lower courts to consider when asked to grant such approvals.

This Court discussed that caselaw in detail in its recent decision in the *Adelphia*

cases granting the Creditors' Committee "*Housecraft* authority"[147] to proceed with

---

[146]    *See In re Gaslight Club, Inc*., 782 F.2d 767 (7th Cir. 1986) ("*Gaslight Club*") (approving
replacement of debtor's president and majority shareholder as individual exercising debtor in
possession powers, without appointing trustee, but where the individual who had been replaced
consented to it).

[147]    *See Glinka v. Murad (In re Housecraft Industries USA, Inc.)*, 310 F.3d 64 (2d Cir. 2002)
("*Housecraft* ").  *Housecraft*, the third of the Second Circuit's trilogy of standing-to-sue cases—
following *Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN
Enterprises)*, 779 F.2d 901 (2d Cir. 1985) ("*STN*") and *Commodore International Ltd. v. Gould (In
re Commodore International Ltd.)*, 262 F.3d 96 (2d Cir. 2001) ("*Commodore* ")—permits the
bankruptcy court to confer standing upon a committee to sue as a co-plaintiff with the debtor on
behalf of the estate when the requirements for conferring such standing have been satisfied.

litigation against Adelphia's bank lenders,[148] and will not discuss it in comparable length here. This Court there referred to the "trilogy" of decisions of the Second Circuit, beginning with *STN*, that authorize the deputization of committees and creditors to bring litigation on behalf of an estate.[149] When committees or creditors are so appointed, they are of course another species of nonstatutory fiduciaries. Like the ones the Arahova Noteholders Committee wants to appoint here, they are not expressly authorized under the Code.

This Court noted in the *Adelphia Housecraft Decision* that although the words used by the Second Circuit in each of the cases in the *STN* trilogy differed slightly, they shared a common underpinning requiring the bankruptcy court to satisfy itself that the appointment of such an estate representative would be in the best interests of the estate.[150] That is instructive for the analysis here, in this Court's view, for it teaches that the appointment of fiduciaries to act on behalf of bankruptcy estates, with the consequences to those estates that such appointments may bring, must be helpful, and not damaging, to an estate. The *STN* trilogy cases suggest to this Court that even assuming it has the

---

[148]     *See Adelphia Communications Corp. v. Bank of America, N.A. (In re Adelphia Communications Corp.)*, 330 B.R. 364 (Bankr. S.D.N.Y. 2005) (Gerber, J.), appeal pending ("*Adelphia Housecraft Decision*").

[149]     In *STN*, the first of the *STN* trilogy, the Second Circuit confirmed the authority of bankruptcy courts to deputize committees to prosecute litigation on behalf of the estate with the approval of the bankruptcy court. Approval would be appropriate where the committee presented a colorable claim or claims for relief that on appropriate proof would support a recovery, and where the trustee or debtor in possession unjustifiably failed to bring suit or abused its discretion in not suing. *Adelphia Housecraft Decision*, 330 B.R. at 374.

          *Commodore* extended the *STN* principles to encompass situations where the debtor in possession, while not prosecuting the litigation itself, *consented* to its prosecution by a committee. In *Commodore,* the Second Circuit ruled that a committee could appropriately act on behalf of the estate under such circumstances, with the approval of the bankruptcy court, if (1) the committee has the consent of the debtor in possession or trustee, and (2) the court finds that suit by the committee is (a) in the best interest of the bankruptcy estate, and (b) is "necessary and beneficial" to the fair and efficient resolution of the bankruptcy proceedings.

[150]     330 B.R. at 369.

-94-

discretion to appoint nontrustee fiduciaries to act on behalf of an estate under section
1107(a), it should engage in a similar inquiry, and satisfy itself that it can make a similar
finding—that the appointment will be in the interests of that estate, and be "necessary and
beneficial to the fair and efficient resolution of the bankruptcy proceedings." And if an
*STN* trilogy inquiry is not mandatory, those cases suggest that as factors to consider in an
exercise of discretion, they would at least be helpful.

* * *

Significantly, the Arahova Noteholders Committee cites no case appointing one
or more fiduciaries under section 1107(a) to deal with interdebtor disputes in a multi-
debtor case—whether because such is mandatory or whether it is desirable as a matter of
court discretion. The request is unprecedented, and, like most of the Arahova
Noteholders Committee's requests on these motions, it would result in extraordinarily
prejudicial consequences to the Arahova Debtors and their creditors, with no material
corresponding gain other than for the Arahova Noteholders Committee's tactical desires.
The Court holds that, assuming *arguendo* that the Court would have any discretion to
order the appointment of trustee equivalent fiduciaries under section 1107(a),[151] as an

---

[151]    That is not to say, and the Court does not hold, that the same considerations would apply to
conditioning continued status as a debtor in possession on more modest or constructive conditions,
such as hiring or retaining restructuring assistance. It is fairly common, in the bankruptcy
community, for debtors in financial difficulty to retain or employ expert help—to provide the
debtors with general business, financial or accounting expertise, in the effort to increase their
profitability. That is a salutary practice, from which everybody gains. The Court can see how, in
an appropriate case, a struggling debtor's continued status as debtor in possession might be
conditioned, under section 1107(a), upon securing extra help.

But while turnaround specialists have frequently been named as *statutory* trustees, and while the
court assumes (without deciding) that turnaround specialists hired by debtors as officers (such as
Chief Restructuring Officer) have at least some fiduciary duties, just as ordinary corporate officers
do, the Court would not expect any individuals so hired to have the powers of a board of directors,
or of a trustee. Indeed, at least in some cases, a contrary understanding will be expressly stated.
*See* the "Jay Alix Protocol," posted by the US Trustee for this Region and District on the US
Trustee website, www.usdoj.gov/ust/r02/manhattan/chapter11.htm.

alternative to satisfying the requirements of section 1104(a) or determinations made under the latter section, this is not the case in which any such discretion should be exercised.

Here the Arahova Noteholders Committee is not looking for a turnaround expert, to act under the supervision of a board; it is seeking the appointment of one or more "independent fiduciaries," to displace the board, with the power to make decisions on whether or not to commence or settle litigation, and to retain counsel to prosecute it.[152]  It may even include deciding whether the Arahova Debtors should try to make a go of it alone, as entities separated from the rest of the Debtors.  Even without (but especially with) the latter, that is in substance if not name a trustee, and represents a back-door means of circumventing the statutory requirements, and case law, applicable to the appointment of trustees under section 1104.

That is not the type of relief that, in this Court's view, it should exercise its discretion to grant.  The Seventh Circuit held in *Gaslight Club*:[153]

> We would certainly question recourse to the present
> procedure as a means generally to avoid
> appointment of a trustee. But we think the peculiar

---

Persons furnished by [the crisis manager] for executive officer
positions shall be retained in such positions upon the express
approval thereof by an independent Board of Directors whose
members are performing their duties and obligations as
required under applicable law ("Board"), and will act under
the direction, control and guidance of the Board and shall
serve at the Board's pleasure (*i.e.* may be removed by majority
vote of the Board).

Where the nonstatutory fiduciary appointee is not a trustee with another name, the Court might not be troubled at all by such an appointment, and, where justified by the facts, might find it very useful.  But what is requested here is very different.

[152]  Presumably the Arahova Noteholders Committee wants the nonstatutory fiduciary to hire its present counsel, and that, in no small part, motivates its request.  But it is objectionable either way.

[153]  *See* n.146, *supra*.

circumstances of the case before us as well as the
consent on all sides to the procedure followed make
this case different.[154]

But here consent is lacking, and the circumstances are not extraordinary or peculiar. As

noted above, interdebtor conflicts in large multi-debtor chapter 11 cases are very

common. It would be only the very rare case, in which alternate mechanisms to resolve

those disputes are lacking *and* where appointment of a trustee under section 1104(a)(2) is

not a viable option, that could fairly be regarded as extraordinary.

Here, the Court is not in a position to find that appointing the requested

fiduciaries would in any way be in the interests of the Arahova Debtors' estates, much

less "necessary and beneficial to the fair and efficient resolution of the bankruptcy

proceedings." For many of the same reasons this Court denied the Arahova Noteholders

Committee *STN* authority to bring the fraudulent conveyance proceedings it wished to

bring,[155] the Court cannot find the appointment of the desired fiduciaries to be

necessary—as the same goals could be achieved, much more economically and much

more quickly, under the Motion in Aid. Nor would it be beneficial. Though the

appointment of nonstatutory fiduciaries would seemingly not constitute a breach of the

agreements with Time Warner and Comcast, or of the DIP facility, all of the other

factors, described in Section B of the facts, and Section I(A)(2) of the Court's legal

discussion, would militate equally against the appointment. Nor would they be

"efficient." As the Creditors' Committee in this case aptly noted in its opposition to the

---

[154]     782 F.2d at 772.

[155]     It is not quite all of the same reasons, for there the Arahova Noteholders Committee wanted to
          pursue fraudulent conveyance actions, which were only a small subset of the totality of the
          interdebtor issues that needed to be determined, and which, for that reason and others, might
          themselves be affected by other issues the Arahova Noteholders Committee did not propose to
          resolve.

Arahova Noteholders Committee motions,[156] the motions fail to address, or provide any

comfort with respect to, how an award of the relief sought in the motions can be

reconciled with the timely consummation of the agreements with Time Warner and

Comcast—a result which is of paramount importance to the Debtors and their estates, and

in the best interests of all creditors.

Without deciding the outer limits on a court's power to prescribe conditions on

the rights and powers of a debtor in possession under section 1107(a), it appears obvious

to the Court that it should use its discretion in this regard only when the conditions would

be in the interests of creditors, and not prejudicial to them.  Here they would be quite the

opposite.  For reasons described above, the exercise of the power to prescribe conditions

is not mandatory, and would be a dreadful exercise of discretion.

### 2. Recusal

The second prong of the Arahova Noteholders Committee's alternative relief,

insofar as it requests that the Court order that the current officers and directors of the

Arahova Debtors recuse themselves on interdebtor issues, is granted, under section

1107(a), to that extent only.

All sides agree that debtors in possession have fiduciary duties, which include,

among others, the duty of loyalty.[157]  The officers and directors of the Arahova Debtors

have that duty, to the Arahova Debtors themselves,[158] for that reason and under Delaware

---

[156]    *See* Creditors' Comm. Obj. at ¶ 4.

[157]    *See*, *e.g.*, *In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 361 (Bankr. S.D.N.Y. 2001) (Gerber, J.) ("*Hampton Hotel*") ("The United States Supreme Court has made clear that a debtor in possession, like a chapter 11 trustee, owes the estate and its creditors a general duty of loyalty.").

[158]    The Arahova Debtors, or individual Debtors within that group, may or may not be insolvent, depending on the outcome of the interdebtor disputes.  If the Arahova Noteholders Committee's contentions in the Intercreditor Disputes are upheld, most or all of the Arahova Debtors will be found *not* to be insolvent.  Nevertheless, the Arahova Noteholders Committee has contended, from

law.[159]  The duty of loyalty "includes an obligation to refrain from self-dealing, to avoid

conflicts of interests and the appearance of impropriety, to treat all parties to the case

fairly, and to maximize the value of the estate."[160]

Here, as the Court has found, the Debtors have in no way engaged in self-dealing,

and plainly have sought to maximize the value of all of the Debtors' estates, by the

combination of their own efforts to maximize value across the board and by establishing

a mechanism for creditors to maximize value further, to the extent value would result

from interdebtor litigation.  But the Debtors also have the duty to avoid conflicts of

interest and the appearance of impropriety, and to treat all parties to the case fairly.

Whether the Arahova Debtors' estates could be maximized further by success in

litigation on Interdebtor Disputes issues is a matter of debate between affected creditor

groups.  It was clearly appropriate (and, in the Court's view, under the facts here,

desirable, if not essential) for the Debtors to have brought the Motion in Aid, to provide

the necessary mechanism for resolving Interdebtor and Intercreditor Disputes.  But

---

time to time, that because the Arahova Debtors were in the "zone of insolvency," the Arahova
Debtors' directors owed fiduciary duties to their creditors.

Though there is language in earlier Second Circuit authority (which this Court has echoed)
supporting that view, that has since become an imprecise description of the fiduciary duties owed
by a corporation that is insolvent or in the zone of insolvency.  As this Court noted at greater
length in its decision in *Adelphia Communications Corp. v. Rigas (In re Adelphia
Communications Corp.),* 323 B.R. 345, 386 n.140 (Bankr. S.D.N.Y. 2005), the more precise
formulation is that stated in *Production Resources Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d
772, 790-91 (Del. Ch. 2004) ("*Production Resources*")—that the directors' obligations are "*to the
firm itself.*"  (emphasis added). While directors continue to have the task of attempting to
maximize the economic value of the firm, the fact of insolvency "affect[s] the constituency on
whose behalf the directors are pursuing that end."  *Production Resources,* 863 A.2d at 791.

[159]   The Arahova Debtors are Delaware corporations (*see* Amended and Restated By-Laws of Arahova
Communications, Inc., adopted December 19, 2003, Arahova Trial Exh. 57)**,** and the parties agree
that matters of their corporate governance are governed by Delaware law.

[160]   *Hampton Hotel,* 270 B.R. at 362 (citation omitted).

having done so, the Debtors must continue to avoid conflicts of interest and the

appearance of impropriety.

As this Court noted at the hearing on approval of the Disclosure Statement:

> I will neither require or permit the debtors to
> express their views as to outcome in the disclosure
> statement at this time, and . . . , in the absence of a
> material change in circumstances, will not permit
> such disclosure in the absence of agreement on the
> part of all of the parties to the inter-creditor
> disputes, that such is appropriate.
>
> . . . .
>
> . . . [I]f a fiduciary were to act contrary to the
> interest of an entity to whom it owes the fiduciary
> duty, that could be materially prejudicial, and I
> think we need to avoid that, absent consent from
> those who might be hurt thereby.  I don't know
> whose ox would be gored by the debtors'
> expression of views, but one or the other, and likely
> both[,] of the stakeholders in the Arahova and
> [P]arent groups might well be troubled, prejudiced,
> and/or damaged by aspects of what the debtors or
> their counsel might say.  And that might be
> regarded or alleged by some as inconsistent with the
> fiduciary duties the debtors' management[,] board
> and professionals hold to individual debtors, one or
> more of the 230 of them.
>
> That is a road upon which I don't want to embark,
> especially since the present status quo—which
> status quo I manifestly disagree is tantamount to
> having ships without captains—presents no
> apparent prejudice to anyone, much less material
> prejudice to anyone, and would be plainly nothing
> in comparison to the prejudice that might be alleged
> if anyone on the debtors' side seemingly acted
> adversely to the interests of a particular debtor or
> debtor group.
>
> In other words, based on the facts presented in this
> hearing and in previous proceedings before me,
> there's no reason to believe now that the debtors
> and their counsel, in declining to take sides in the

> inter-creditor disputes, have in any way dealt with
> actual or perceived conflicts inappropriately, but
> they would be put in an arguably different and
> much more difficult position if they were then asked
> or did act in a way that could be argued to be …
> contrary to the interests of one or another of the
> creditor groups.[161]

The Debtors' decision to tee up the Interdebtor Disputes for Court determination, and to step to the side while affected creditors fought the issues out, was sensible, and hardly a breach of fiduciary duty.  But if the Debtors actually took sides in a way that injured one or another of the estates to whom they owed their duties of loyalty, that would result in at least the appearance of impropriety, and, the Court fears, the reality as well.

As noted above, the Court is doubtful that section 1107(a) can be used as a back-door means of circumventing the statutory requirements, and case law, applicable to the appointment of trustees under section 1104(a).  But the Court believes that the use of section 1107(a) to give creditors comfort that the Debtors will maintain their neutrality, and not act to the detriment of particular estates, does not invoke like concerns.  It is a modest limit on the exercise of the powers of the debtors in possession, and does not tread on areas otherwise addressed by the Code.  Unlike the appointment of new fiduciaries at this late date, this aspect of the motion *is* in the interests of creditors.

The aspect of the motion seeking an order of the Court directing the Debtors, as a condition to their continued incumbency as debtors in possession,[162] to continue their neutrality and to recuse themselves from the Interdebtor Disputes, is granted.[163]

---

[161]   Oct. 28, 2005 Hrg. Tr. at 106, 110-12 (transcription errors corrected).

[162]   The Court recognizes that the Debtors are already maintaining neutrality without a new ruling telling them that they must.  But given the importance of neutrality in this case, and the Court's

-101-

## II.

## Disqualification of WF&G

In the second of its motions, as narrowed, the Arahova Noteholders Committee

seeks to disqualify WF&G from representing (a) the Arahova Debtors, and (b) any of the

other debtors, in the Interdebtor Disputes.  For essentially the same reasons that the Court

has granted the similar relief with respect to the Debtors themselves, this motion is

granted.[164]

---

earlier pronouncements in *Hampton Hotel*, the Court grants this relief, as a prophylactic measure, in what some might regard as an excess of caution.

[163]   The Court emphasizes that it is not ruling that a debtor's board or management can never take sides in an intercreditor, as contrasted to interdebtor, dispute.  It is only because the debtor's board and management have duties of loyalty to each of the debtors, and cannot take actions to harm any of them, that the issue arises.  There are many cases in which creditors in different classes of the same debtor have different perceptions as to the way by which the value in an estate should be allocated.  The natural conflict between senior debt and subordinated debt is one such example.  It is at least arguable that the bankruptcy system could not function, or at least function efficiently, if debtors or creditors' committees (who would be subject to analogous obligations) could not make proposals for allocating value, and proposing the currency by which that value will be provided.  If a debtor's taking sides in an intercreditor dispute within a single debtor is in the debtor's best interests, the Court sees no reason why that would be improper.

[164]   However, the Arahova Noteholders' Committee's apparent additional desire, that WF&G be disqualified from prosecuting any substantive consolidation request in connection with the Debtors' reorganization plan (Jan. 6, 2006 Hrg. Tr. at 79), is denied without prejudice.  It has not been adequately briefed, and more importantly, is not ripe for decision.  *See Bank of New York v. Adelphia Communications Corp. (In re Adelphia Communications Corp.)*, 307 B.R. 432 (Bankr. S.D.N.Y. 2004) (declining to decide "X-Clause" controversy between senior and subordinated debt creditors at the time, because controversy was then not yet ripe for review).

To be sure, this Court is unaware of any instance in which counsel for a debtor proponent of a plan has been disqualified, as an ethical matter, from proposing substantive consolidation of the debtors in a multi-debtor case.  And that is so even though, at least seemingly, every plan that employs substantive consolidation, if it is to be meaningful at all, tends to help or hurt creditors of the various individual debtors whose estates are being substantively consolidated—and, at least arguably, the debtors themselves.

But exactly what remains as the substantive consolidation proposal may change, and it may be that litigants in the Motion in Aid may not care about substantive consolidation, or may care only in the event of certain outcomes in the Motion in Aid.  (The Court notes that the Debtors have not proposed, by way of example, substantively consolidating the Arahova Debtors with Adelphia Parent, which would raise much more confrontational substantive consolidation issues.)  At such time, if any, that anyone wants to disqualify WF&G from acting on the substantive consolidation aspects of its effort to secure confirmation of the Debtors' Present Plan, the Court will need the parties to address the effect of Motion in Aid decisions that by then may have been determined;

Though at the outset of these cases, and for most their 3-1/2 year duration to date, no one suggested that interdebtor issues made WF&G conflicted in any way, it now appears that intercreditor issues have expanded to the point that they are now a prominent feature of these chapter 11 cases. Because the parties to the Intercreditor Disputes hold debt of different debtors in the Adelphia overall corporate structure, the Arahova Noteholders can accurately say, even if driven by a tactical agenda, that these cases also present interdebtor disputes. WF&G, which represented all of the Debtors without complaint before the intercreditor issues blew up,[165] must, under the rules applicable to any law firm, now respond to that new circumstance.

At the outset, the Court notes that this plainly is a case involving changed circumstances, in contrast to a case where counsel was conflicted at the outset. "'[I]nterests are not considered "adverse" merely because it is possible to conceive a set of circumstances under which they might clash.'"[166] As the Arahova Noteholders

---

the extent (if any) to which the substantive consolidation of individual debtors in the Arahova Debtors group into a larger Arahova Debtors group is objected to; the extent (if any) to which it is proposed that the assets of the Arahova Debtors will be substantively consolidated with those of other Debtors; and last, but not least, the extent to which the proposed plan then is or is not the same as it is now. Also, the Court will need the parties to brief the extent to which Debtors' counsel have or have not ever been disqualified from litigating the desirability of substantive consolidation (at confirmation or otherwise) by reason of asserted conflicts.

[165]    WF&G, or any other law firm that was the subject of the innuendo in the Disqualification Motion, would be justifiably offended. And it might wonder why, if the supposed conflicts were as bad as argued, the Arahova Noteholders' Committee (and before it was formed, Appaloosa) never bothered to complain at an earlier time. While the Court respects (and indeed agrees with) the Adelphia Parent Noteholders' point that the disqualification motion is simply another tactical measure (Adelphia Parent Noteholders Comm. Obj. at 19), and should indeed be wary of disqualification motions filed for tactical purposes, *Universal City Studios, Inc. v. Reimerdes,* 98 F. Supp. 2d 449, 455 (S.D.N.Y. 2000) (Kaplan, J.), the Court nevertheless feels that the importance of neutrality, and applicable ethical rules, compels the Court to grant the motion in its now-narrower form.

[166]    *In re Caldor, Inc.,* 193 B.R. 165, 172 (Bankr. S.D.N.Y. 1996) (Garrity, J.), quoting *In re Leslie Fay Companies, Inc.,* 175 B.R. 525, 532 (Bankr. S.D.N.Y. 1994).

Committee acknowledges,[167] recognizing the two decisions of the Second Circuit on

point,[168] the presence of intercompany claims between debtors represented by the same

counsel does not automatically warrant the disqualification of that counsel.  Rather, the

Second Circuit[169] and the lower courts,[170] recognizing the substantial cost of requiring

additional trustees or counsel in cases where individual debtors have claims against each

other, have taken a "wait and see," fact-driven, approach, to determine the extent to

which such is necessary.  As *Collier* observes:

> The case law suggests that, rather than disapproving
> of multi-debtor representation as a *per se* conflict,
> courts generally examine the factual circumstances

---

[167]    Arahova Noteholders Comm. Disqual. Motion at ¶ 29.

[168]    *See Katz*, (*supra* n.121 and discussed at greater length in n.169 *infra*) and *International Oil, supra* n.121 (the existence of intercompany claims by itself was not a basis "to saddle these estates with the expense of separate trustees and trustees' attorneys").  Lower court decisions, in this district and elsewhere, hold similarly; *see Hassett v. McColley (In re O.P.M. Leasing Services)* 16 B.R. 932 (Bankr. S.D.N.Y. 1982) (Lifland, C.J.) ("*O.P.M. Leasing*"); *In re Mulberry Phosphates, Inc.,* 142 B.R. 997, 998 (Bankr. M.D. Fla. 1992) (Paskay, C.J.) ("In fact, it is quite common for a single law firm to represent a parent company and all its subsidiaries either when they are all debtors or when only the parent is a debtor.").

[169]    As the Second Circuit, speaking through Judge Friendly, held in *Katz*, a case under Chapter X of the former Bankruptcy Act:

> We can appreciate that to read [former Act §] 158(4) as
> meaning that any substantial assertion of a claim by a
> subsidiary or its security holders against the parent or with
> respect to the parent's claims against or interests in the
> subsidiary would automatically require separate trustees and
> counsel might cause serious additional expense in the already
> expensive process of reorganization under Chapter X.
> Although such a construction may indeed be required, we
> would not wish to adopt it without more opportunity for
> briefing and consideration than the parties and we will have
> before the hearing on February 5. On the other hand, as the
> SEC readily agreed, it is easy to think of situations where the
> conflict between parent and subsidiary may be so intense and
> important that sound discretion would demand separate
> representation or, at the very least, the appointment of special
> counsel, . . . even if the statute does not make this mandatory.

327 F.2d at 635-36 (citation omitted).

[170]    *See O.P.M. Leasing*, 16 B.R. at 939; *In re Guy Apple Masonry Contractor*, 45 B.R. 160, 166 (Bankr. D. Ariz. 1984).

surrounding the representation to determine whether
it is appropriate.[171]

The caselaw above, with its fact-driven approach, makes it clear that no relief

beyond requiring neutrality on the Interdebtor Disputes themselves is warranted—

especially since the Court has no basis for a conclusion that WF&G has acted wrongfully

in any way.  But now that the Interdebtor Disputes are in litigation, WF&G cannot, under

a variety of disciplinary pronouncements,[172] act on both sides of the litigated

controversy.[173]  It must withdraw from acting against, or for, the Arahova Debtors in

those disputes.[174]

## III.

## Termination of Exclusivity

In the third of their motions, the Arahova Noteholders Committee seeks to

terminate the Arahova Debtors' plan exclusivity.  This motion too is denied.

By reason of the series of requests to extend exclusivity applicable to all of the

Debtors in this case, the Arahova Debtors continue to have exclusivity.  Now, however,

the Arahova Noteholders Committee seeks to terminate the exclusivity now held by the

---

[171]    3 *Collier on Bankruptcy* ¶ 327.04[5][a] (Matthew Bender 15th Ed. Rev.)

[172]    *See*, *e.g.*, 22 N.Y. Comp. Codes R. & Regs. §§ 1200.24(b) ("A lawyer shall not continue multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under subdivision (c) of this section.").

[173]    The Court continues to believe, as it has stated previously, that WF&G can continue to act as a facilitator to privately try to assist the creditor groups whose money is at stake to reach a settlement.  But now that the controversy has come to this point, WF&G will have to refrain from "going public"; from being an advocate for either side; and from taking any steps that might be regarded by any of the feuding parties as tilting the playing field.

[174]    The Debtors argue (Debtors Obj. at ¶ 130) that under several possible outcomes of the Interdebtor Disputes, no conflict would exist.  That may be true, but the Court is not comfortable that the Debtors have accounted for all of the possibilities.  And in any event, it will take a litigation for the parties to know the answers.  In the meantime, WF&G needs to stay out of the battle.  If it is important enough to the Debtors, they may revisit this determination after the Interdebtor Disputes have been resolved.

Arahova Debtors.[175]  While the Code permits a bankruptcy court to shorten or end a

debtor's exclusivity period for cause, here that cause is entirely lacking, and the facts

instead favor the continuation of exclusivity for the Arahova Debtors, along with all of

the others.

In addition to providing for a debtor's exclusive periods, section 1121(d) of the

Code enables a bankruptcy court to extend or reduce such periods for cause.[176]  A

decision to extend or terminate exclusivity is within the discretion of the bankruptcy

court.[177]  While the elements that constitute "cause" for termination of the exclusive

periods are not stated in the Code, courts have held that certain factors should be

considered when determining whether "cause" exists to, "on the one hand, extend, or on

the other, terminate, a debtor's statutory period of exclusivity."[178]

Those factors include:

(a) the size and complexity of the case;

(b) the necessity of sufficient time to permit the debtor to negotiate a plan

of reorganization and prepare adequate information to allow a creditor to

determine whether to accept such plan;

(c) the existence of good faith progress towards reorganization;

---

[175]    The Court emphasizes, in this connection, that the request is not to terminate exclusivity for all of the Debtors in this case, but just the Arahova Debtors—who, it is to be believed, would somehow be able to timely confirm a plan of their own.

[176]    As applicable to these cases, section 1121(d) provides:

"[o]n request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section."

[177]    *See In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989) (citation omitted).

[178]    *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997).

(d) the fact that the debtor is paying its bills as they become due;

(e) whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(f) whether the debtor has made progress in negotiations with its creditors;

(g) the amount of time which has elapsed in the case;

(h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

(i) whether an unresolved contingency exists.[179]

When applied to these cases, none of the factors support the termination of the exclusive periods. The overwhelming size and complexity of the Debtors' cases has been evident from their inception, and is confirmed by the complexity of the Present Plan and the resolution process that the court has established to resolve the Intercreditor Disputes. The Debtors' management has been praised repeatedly for its progress with respect to the Debtors' operations.[180] The Debtors' directors and management have been working cooperatively with their stakeholder constituencies, and have demonstrated good faith in their efforts to achieve emergence.

Indeed, in the face of significant challenges,[181] the Debtors have used the exclusive periods to develop a plan that will result in a sale of the Company that will

---

[179]    *See id.* at 664; *In re Express One International, Inc.,* 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996).

[180]    *See* Creditors' Committee Statement in Support of Debtors' Motion for Extension of Exclusive Periods, Netzer Decl. Exh. 19 at 2 (noting that the exclusive periods should be extended because the Debtors have overwhelmingly demonstrated good faith progress, and indicating that the Creditors' Committee "applauds the Debtors' efforts and accomplishments during these large, complex, and litigious Chapter 11 cases").

[181]    The Debtors' cases involve 231 debtors, 6 different prepetition credit facilities, approximately 30 issuances of outstanding public indebtedness at different levels of a complex capital structure, numerous and exceedingly complex Intercreditor Dispute issues, SEC and DoJ investigations and settlements, massive ongoing litigation among stakeholders, the wholesale departure of Rigas

-107-

bring in $17.6 billion in value, and distribute that value in accordance with statutory priorities. There is no indication of any efforts to play games with the absolute priority rule. There is no indication that the Debtors are trying to give creditors anything other than their legal entitlements—as evidenced by the Debtors' efforts to create a framework for the efficient resolution of disputes that could otherwise forestall emergence under this or any other plan. The Debtors are perfectly willing to give creditors (and, if value permits, equity holders) recoveries based on the rulings of this and higher courts on the disputed issues of law and fact that will determine the assets and liabilities that each individual debtor has to work with, and will hold aside the funds to do it.[182]

In light of the considerable burdens that the Debtors inherited, their filing of the Present Plan cannot fairly be characterized as "delayed." Given the complexity of these cases, the Debtors' progress has warranted the prior exclusivity extensions, and warrants a continuation of exclusivity now that the Disclosure Statement has been approved and a plan is being balloted under which the Arahova Noteholders have the opportunity to obtain payment in full. A hearing to consider confirmation of the Present Plan is scheduled to begin in March.

To be sure, other creditor constituencies, and not just the Arahova Noteholders Committee, have threatened to vote against the Present Plan. Whether creditors will turn their backs on $17.6 billion in value to achieve such incremental recoveries is yet to be determined. But the Court notes a critical point. The Arahova Noteholders Committee's

---

Family management, the effects of the massive prepetition fraud of Rigas Family management, an approximately $17.6 billion sale transaction of unprecedented size and scope in a chapter 11 proceeding, and numerous other complicated matters and issues.

[182]   Indeed, the Present Plan provides the Arahova Noteholders Committee with a recovery of the full "par plus accrued" they are demanding if the Court's rulings in the Interdebtor Disputes support that entitlement. But because the Plan provides such a recovery *only* if the Court's rulings support that entitlement, the Arahova Noteholders Committee has expressed its dissatisfaction.

motion is not to terminate exclusivity with respect to *all* Debtors, to address any concerns of other creditors.  A motion of that character is not on the table.

Frequently, a creditor constituency will not be happy with a debtor's plan.  Though the Arahova Noteholders Committee's exclusivity submissions lack focus in many respects, its dissatisfaction is clear.  But the notion that creditor constituency unhappiness, without more, constitutes cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period has been judicially rejected.[183]

That is particularly so where the unhappy creditor constituency has been saying inconsistent things, and has not given the Court comfort that there is an objective other than disrupting things.  Here the Arahova Noteholders Committee variously supported the sale;[184] criticized it;[185] said the sale would be supported if it got its desired allocation of the proceeds;[186] and now professes not to want to interfere with it.[187]  Even with all of the Arahova Noteholders Committee's submissions, the Court does not know what the Arahova Noteholders Committee would do if exclusivity were terminated in terms of a sale, or even with continued operations as a standalone entity, once shorn of the linkage with the other Adelphia Debtors that provide the Arahova Debtors, along with all of the

---

[183]   *See In re Geriatrics Nursing Home, Inc.,* 187 B.R. 128, 134 (D.N.J. 1995).

[184]   *See* Schleyer Decl. at ¶ 37 (During the sale process, Ronald Goldstein, Appaloosa's Chief Financial Officer, told Schleyer "we've got to get this deal done."); Goldstein Dep. Tr. at 74:20-23, Netzer Decl. Exh. 1.

[185]   *See* Arahova Noteholders Comm. Exclusivity Motion at ¶¶ 2, 4, 7, 36, 37, 38, 45, 46, 49, 50, 55, 56 and 61.

[186]   *See* Goldstein Dep. Tr. at 121-122 (supporting all aspects of sale unless allocation is not "proper"), Netzer Decl. Exh. 1.

[187]   *See* Jan. 4, 2006 Hrg. Tr. at 113.

other Debtors, with shared programming, facilities and services.[188]   The Arahova

Noteholders Committee's various exclusivity points fail to express a common theme

other than the common denominators that it does not want to subject the Interdebtor

Disputes to Court scrutiny, and wants to use the plan process to have its way instead.  But

the interdebtor issues will not go away—if, as the Court assumes, other creditor

constituencies care equally as to the needs and concerns of their own debtors.  And the

interdebtor issues—*e.g.*, of sale proceeds allocation, settlement expense allocation,

intercompany liabilities and avoidable transfers—will all have to be addressed one way

or another, and if not agreed to, litigated.

     Before the Court embarks on a course that could be disastrous to the Arahova

Debtors, it needs some confidence that it is being presented with an exit strategy.  If the

Arahova Noteholders Committee has alternatives that have a business, and not just

rhetorical, underpinning, it has not shared them with the Court.

---

[188]   The Arahova Noteholders Committee also makes a legal contention, which the Court has considered but rejects.  The Arahova Noteholders Committee argues that the Supreme Court's decision in *Bank of America National Trust & Savings Ass'n v. 203 N. LaSalle St. Partnership*, 526 U.S. 434 (1999) ("*LaSalle*") requires termination of exclusivity, by reason of the argued failure of the Arahova Debtors to market test their proposed plan.  The Court does not agree.  The *LaSalle* court held that, despite the new value exception to the absolute priority rule, a plan may violate absolute priority if "old equity acquire[s] or retain[s] the property interest without paying full value."  *LaSalle*, 526 U.S. at 457.  There, the only way to ensure that old equity had paid full value was to subject the sale to a market test, which did not occur because the debtor had the exclusive right to file a plan.

The Debtors note that this is not a new value case, and of course they are right in that regard.  To the extent Adelphia Parent obtains any value from the Arahova Debtors (a matter yet to be decided, as it is one of the issues to be litigated in the Interdebtor Disputes), it will be because the Arahova Debtors *owe* the money to Adelphia Parent, and not on account of Adelphia Parent's equity interest.

The Court regards *LaSalle* as an absolute priority rule case, and is doubtful that *LaSalle* requires *any* plan be market tested, even if that plan does not provide for a distribution to old equity, or otherwise raise fairly debatable issues as to compliance with the absolute priority rule.  But that issue is academic here, because the Arahova Debtors' plan *was* market tested.  It was that market testing that led to the Time Warner/Comcast sale.  The Court heard no evidence suggesting that a more attractive sale opportunity for the Arahova Debtors was turned down in order to secure a recovery from the sale for Adelphia Parent or, for that matter, any of the other Debtors.

-110-

This Court, like other bankruptcy courts, has been quite willing to terminate exclusivity where a debtor has been unduly intransigent in dealing with its creditors; has inappropriately sought to favor equity or another stakeholder group; has sought to feather the nest of incumbent management; or has caused the Court to lose confidence that it could ever come up with a confirmable plan. However, this case presents none of those scenarios. Instead, the Court concludes that the Arahova Noteholders Committee's wish to terminate exclusivity is still another tactical measure, to muddy the waters and complicate the Debtors' presently pending plan efforts, with no corresponding ability to propose a plan that would work for the Arahova Debtors, much less one that would give the Arahova Debtors' creditors more value.

Given the lack of meaningful alternatives and the dire consequences associated with imperiling the Plan and its sale to Time Warner and Comcast, a balancing test tilts decidedly in favor of continuing exclusivity. The Court declines to terminate it.

IV.

The Arahova Noteholders Committee's Delay

Finally, the Court has noted the considerable evidence of delay on the part of the Arahova Noteholders Committee in bringing these motions. But ultimately the Court considers an award of the relief sought inappropriate for the much more fundamental reasons discussed above. It does not need to determine whether the Arahova Noteholders Committee, or its prominent member Appaloosa (which noticed transfers that would suggest possible interdebtor claims from Adelphia SEC filings, before these cases were even filed), should be denied relief by reason of waiver, estoppel, or laches.

As previously noted, however, the Court considers the delay highly relevant to the bona fides of the motions. It is highly relevant, in the Court's view, that the supposed

institutional concerns that the motions purport to vindicate never were of sufficient importance to raise until this late in the case, when the Arahova Noteholders Committee became unhappy with its plan treatment; that it raised these issues as "the last step in a failed negotiation . . .";[189] and was willing to put them to the side, with its Standstill Agreement, while it negotiated for better plan treatment.

Conclusion

The bringing of motions like these is not unethical, or sanctionable, but neither should it be encouraged, or rewarded. Motions that would bring on intolerable consequences for an estate should not be used as a tactic to augment a particular constituency's recovery.

Except for the aspects of this ruling that require the Debtors and their counsel to act as they have already committed to do, these motions are wholly without merit. The presence of interdebtor conflicts, which is characteristic of nearly every large multi-debtor chapter 11 case, does not by itself require the appointment of trustees or nonstatutory fiduciaries for each of the affected debtors. If there ever were such a rule, it would paralyze chapter 11 practice, and result in untold damage to the recoveries of creditors. As the Second Circuit indicated in *Katz* and *International Oil,* interdebtor issues cannot be swept under the rug, but they need to be addressed in the most sensible, and least destructive, way possible.

For the reasons set forth at length above, the motions to appoint trustees or nonstatutory fiduciaries for the Arahova Debtors are denied. The motions to require the debtors to recuse themselves in the Interdebtor Disputes, and to disqualify WF&G from

---

[189]    *See* n.95, *supra*.

acting for or against any debtor in the Interdebtor Disputes—*i.e.,* to make their neutrality

in such disputes mandatory—are granted.  The motion to terminate exclusivity with

respect to the Arahova Debtors is denied.

The Debtors are to settle an order in accordance with the foregoing, on two days'

notice by hand, fax, or e-mail.  Notice of Settlement shall be served no later than 8:00

p.m., E.S.T., on the business day following this decision.  The time to appeal or move for

leave to appeal shall run from the date of the resulting order, and not from the date of this

decision.

Dated:  New York, New York
       January **23**, 2006[190]

            ___*s/Robert E. Gerber*___
            United States Bankruptcy Judge

---

[190] As revised, January 25, 2006, to eliminate disclosure of commercially sensitive information and to make technical corrections.