<u>CONFIDENTIAL – FILED UNDER SEAL</u>

SIDLEY AUSTIN LLP
Larry J. Nyhan
Jessica C. Knowles
One South Dearborn Street
Chicago, IL  60603

Alan M. Unger (AU-6747)
Lee Attanasio (LA-3054)
John G. Hutchinson (JH-9328)
787 Seventh Avenue
New York, New York 10019
Tel: (212) 839-5300
Fax: (212) 839-5599

Attorneys for the Ft. Myers Noteholders

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - X
                                                   :    Chapter 11
In re                                              :
                                                   :    Case Nos. 02-41729 (REG)
ADELPHIA COMMUNICATIONS                            :
CORPORATION, et al.,                               :    (Jointly Administered)
                                                   :
            Debtors.                               :
                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - X
```

## HEARING FOUR BRIEF OF THE FT. MYERS NOTEHOLDERS PURSUANT TO THE ORDER IN AID OF CONFIRMATION

CONFIDENTIAL – FILED UNDER SEAL

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................1

I.    BRIEF STATEMENT OF FACTS ...................................................................3

    A.    The Resolution Process ..........................................................................3
    B.    The Ft. Myers Noteholders' Claims ......................................................4
    C.    The Sale Process......................................................................................4

II.   ARGUMENT.......................................................................................................5

    A.    The Starting Point for Allocating Value Among the Various Debtor
          Groups Must be the Price Obtained for the Debtors' Assets in the Sale
          Transaction ...............................................................................................5
    B.    Allocation of Sale Transaction Value Within the Four Bundles of the
          Debtors' Assets........................................................................................8
          1.    Value Within the Four Bundles Should be Allocated Based on
               Operating Cash Flow....................................................................8
          2.    Proper Means of Allocating Value Using OCF .........................9
    C.    The Discounted Cash Flow Analysis Set Forth in the Outlying Flynn
          Report is Results-Oriented and Should be Discounted .........................9

APPENDIX ......................................................................................................................a

CONFIDENTIAL – FILED UNDER SEAL

# TABLE OF AUTHORITIES

*Cases*

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship, 526 U.S. 434 (U.S. 1999) .....5

In re Gagnon, 2005 Bankr. LEXIS 991 at *6 (Bankr. D.N.H. 2005) ............................................6

In re Hannigan, 2005 Bankr. LEXIS 2445 (Bankr. D. Mass. 2005) ............................................6

Keener v. Exxon Co., USA, 32 F.3d 127, 132 (4th Cir. 1994), cert. denied, 513 U.S. 1154, 130 L.
    Ed. 2d 1074, 115 S. Ct. 1108 (1995) ...............................................................................6

Norman v. United States, 63 Fed. Cl. 231, 270 (Ct. Cl. 2004).....................................................6

United States v. Cartwright, 411 U.S. 546, 551 (U.S. 1973)........................................................6

CONFIDENTIAL – FILED UNDER SEAL

The holders (the "Ft. Myers Noteholders") of the Term Note issued by Ft. Myers Acquisition Limited Partnership ("Ft. Myers") in the outstanding principal amount of $108,000,000, and secured by an interest in Olympus Communications, L.P. ("Olympus"), submit this brief (the "Brief") in support of the legal determinations they request with respect to "Issue Four" of the Court's Order in Aid of Confirmation, Pursuant to Sections 105(a) and 105(d) of the Bankruptcy Code, Establishing Pre-Confirmation Process to Resolve Certain Inter-Creditor Issues (the "Order in Aid").[1]  In support of their positions contained herein, the Ft. Myers Noteholders respectfully represent as follows:

## PRELIMINARY STATEMENT

As this Court is well aware, four experts have submitted reports[2] addressing the proper allocation of value from the sale of the Debtors' assets to Time Warner and Comcast (the "Sale Transaction"), the primary focus of Issue Four.[3]  Three of these reports, the Cornell Report, the Lambert Report, and the Hardie Report, generally agree that (i) the value obtained in a market transaction is the best indication of an asset's value, and in light of the fact that the Debtors' assets have been sold through a carefully designed auction process supervised by an

---

[1]  Pursuant to section 5(c) of the Order in Aid, "[e]ach Participant's Brief shall be deemed to be a motion for resolution of those particular Disputed Issue(s) raised in that Participant's Final Issues Statement and, to the extent such a dispute otherwise may be required to be filed as an adversary proceeding pursuant to Bankruptcy Rule 7001, such motion shall be deemed to satisfy the requirements of the Bankruptcy Rules."

[2]  The Expert Reports are (i) Expert Report of Bradford Cornell on behalf of the Ad Hoc Committee of ACC Senior Noteholders (the "Cornell Report"); (ii) Expert Report of Randall L. Lambert on Behalf of Official Committee of Equity Security Holders Pursuant to Order in Aid of Confirmation (the "Lambert Report"); (iii) Expert Report of William H. Hardie III re Adelphia/FrontierVision (the "Hardie Report"); and (iv) Expert Report of Robin Flynn on behalf of the Ad Hoc Committee of Arahova Noteholders (the "Flynn Report").

[3]  Although it was originally contemplated that Issue Four would also address the allocation of tax costs of the Sale Transaction as well as the costs and benefits of the government settlement, the Ft. Myers Noteholders understand that these issues will now be addressed as part of the hearings with respect to Issue Six, which hearings will follow the hearings with respect to Issue Four.  The Ft. Myers Noteholders take no position with respect to these issues, but reserve their right to dispute any position taken by any party which the Ft. Myers Noteholders believe would negatively impact either (i) the treatment of the Ft. Myers' Noteholders' Claim under the Plan or any subsequently filed Plan or (ii) any and all other rights, claims, interests and defenses of the Ft. Myers Noteholders.

CONFIDENTIAL – FILED UNDER SEAL

experienced team of financial advisors in order to maximize the value obtained, the price paid by

Time Warner and Comcast, as identified in the Asset Purchase Agreements with Time Warner

and Comcast (the "APAs"), is the best indication of the market value of such assets and (ii)

operating cash flow ("OCF") should be used either exclusively (in the case of Cornell and

Lambert) or non-exclusively (in the case of Hardie) to allocate value to the individual Debtor

Groups set forth in the Debtors Fourth Amended Joint Plan of Reorganization.[4]  While the results

obtained by these experts differ slightly based on variances in methods and metrics, as a result of

these points of agreement, Cornell, Lambert and Hardie reach generally consistent results.

        In stark contrast to these reports, and in order to achieve a more favorable

outcome for Arahova and its subsidiaries, the Flynn Report (on behalf of Arahova) takes a more

subjective and results-oriented approach than do the other expert reports.  Specifically, the Flynn

Report (i) gives no weight to the fact that the market value of the Debtors' assets has already

been established through an extensive and open sale process, instead attempting to estimate the

value of the Debtors' assets from the ground up, and (ii) allocates value using a subjective and

easily manipulated discounted cash flow ("DCF") methodology, the numerous flaws of which

are discussed in greater detail below.  Based on this approach, Flynn ascribes $1.7 billion more

in transaction value to Arahova and its subsidiaries than is provided for such entities under the

Plan.

        As set forth in greater detail below, the Ft. Myers Noteholders agree with Cornell,

Lambert and Hardie, that because market value is the best indication of an asset's value, the

---

[4]  The Hardie Report suggests that both OCF and subscriber-based metrics should be used to allocate value from the Sale Transaction.  As discussed in greater detail below, however, allocating value based on number of subscribers presents a number of problems that valuation based on OCF avoids.

CONFIDENTIAL – FILED UNDER SEAL

starting point for any allocation of sale value should be the actual purchase price to be paid by

TWC and Comcast for the four severable portions of the Debtors' business (as identified in the

Purchase Agreements and discussed in greater detail below). Further, the value attributable to

each of these four groups should then be allocated among the legal entities in such groups based

upon the operating cash flows of each entity, multiplied by a multiple derived separately for each

group by dividing the total purchase price for such group by the total OCF for the group (both

Cornell and Lambert adopt this exact approach in their respective reports). Fundamentally, the

Ft. Myers Noteholders believe that the Cornell approach is the most accurate since it relies upon

actual OCF for the last available 12 month period (as opposed to projected OCF), but also

support the Lambert and Hardie analyses to the extent they are based on the market value of the

Debtors' assets as determined through the Sale Transaction and allocate value based upon OCF.

I.    **BRIEF STATEMENT OF FACTS**

    A.    **The Resolution Process**

        The Court entered the Order in Aid on August 4, 2005. (Docket No. 8044.) The

Order in Aid established a process for resolving certain disputed issues among the various parties

in interest in these cases (the "Resolution Process").[5] "Issue Four," the issue addressed in this

Brief, is intended to address (a) the "[a]llocation of Sale Transaction Value" from the

TWC/Comcast Sale (as defined below), (b) the "[a]llocation among the Debtors of the Tax Cost

of the" TWC/Comcast Sale, and (c) the "[a]llocation among the Debtors of the Cost and Benefits

of the Government Settlement." (Order in Aid, at 10.) As set forth above, The Ft. Myers

Noteholders take no position with respect to the allocation of the tax costs of the Sale

---

[5] During the course of the Resolution Process, the Debtors submitted their Fourth Amended Joint Plan of
Reorganization (the "Plan") (Docket No. 8973) and their Fourth Amended Disclosure Statement (the "Disclosure
Statement") (Docket No. 8973). The Court approved the Disclosure Statement on November 23, 2005 (Docket No.
8993), but has not yet confirmed the Plan.

CONFIDENTIAL – FILED UNDER SEAL

Transaction or the costs and benefits of the government settlement, although they reserve their right to dispute any position taken by any party which the Ft. Myers Noteholders believe would negatively impact either (i) the treatment of the Ft. Myers' Noteholders' Claim under the Plan or any subsequently filed Plan or (ii) any and all other rights, claims, interests and defenses of the Ft. Myers Noteholders. This Brief addresses the proper method for allocating the value to be obtained from the Sale Transaction.

### B.    The Ft. Myers Noteholders' Claims

The Ft. Myers Noteholders incorporate by reference sections IA and IB of the Hearing Two Brief of the Ft. Myers Noteholders Pursuant to the Order in Aid of Confirmation dated January 30, 2006 (the "Hearing 2 Brief"). As set forth in the Hearing 2 Brief, the Debtors have classified the Ft. Myers Noteholders' claim solely in the Ft. Myers Debtor Group even though Olympus, the general partner of Ft. Myers and a debtor in the Adelphia chapter 11 proceedings, has pledged one-third of its redeemed partnership in Olympus as a security for the Note. The resolution of Issue 4, which will determine the allocation of Sale Transaction value, could materially impact the residual equity value available at the Olympus Parent Debtor Group, and may therefore have a material impact on the Ft. Myers Noteholders' recovery.

### C.    The Sale Process

As this Court is well aware, the Sale Transaction pursuant to which the Debtors' assets were sold to Time Warner and Comcast was the result of a carefully designed auction process which was supervised by an experienced team of financial advisors in order to maximize the value obtained. Specifically, following a two-phase auction process, selected parties were invited to submit final bids for the Debtors' operations as a whole or for one or more of six groups of assets known as "Clusters." After receiving thirteen final bids for various clusters, as

4

CONFIDENTIAL – FILED UNDER SEAL

well as three bids for the Debtors' operations as a whole,[6] the Debtors' Board of Directors

aggregated the high bids for each of the various clusters, and compared this total with the bids

received for the Debtors' entire operations. (See Cornell Report at 6-7) The Board ultimately

determined that the $17.6 billion bid submitted by Time Warner and Comcast represented the

highest and best bid. (Id.)

This extensive marketing effort and the successful bid of Time Warner and

Comcast ultimately culminated in the two APAs. The APAs ascribe values to four severable

portions of the Debtors' business: Comcast Non-MCE ($2.351 billion),[7] Comcast MCE ($592

million), Time Warner Non-MCE ($13.724 billion), and Time Warner MCE ($375 million)

(collectively, the "Four Bundles"). (See Lambert Report at 6)

## II.    ARGUMENT

### A.    The Starting Point for Allocating Value Among the Various Debtor Groups Must be the Price Obtained for the Debtors' Assets in the Sale Transaction

The best indication of the value of an asset is fair market value, or the price

obtained for an asset in a transaction between a willing buyer and a willing seller, each having

access to relevant information. (Cornell Report at 8-9, 14-15; Lambert Report at 3) See also,

e.g., Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship, 526 U.S. 434 (U.S. 1999)

(holding that "the best way to determine value is exposure to a market"). In fact, and as set forth

in the Cornell Report, IRS Revenue Ruling 59-60 defines "fair market value" as "the price at

---

[6] According to the Hardie Report, the marketing process resulted in ten final bids for separate clusters and two bids for the entire company.

[7] Comcast also contributed additional consideration for the purchase of the Comcast Non-MCE assets in the form of a discharge of Comcast's allocable portion of debt and liabilities associated with the purchased assets.

CONFIDENTIAL – FILED UNDER SEAL

which property would change hands between a willing buyer and a willing seller when the

former is not under any compulsion to buy and the latter is not under any compulsion to sell,

both parties having reasonable knowledge of the relevant facts." (Cornell Report at 14-15) See

also, e.g., Norman v. United States, 63 Fed. Cl. 231, 270 (Ct. Cl. 2004) (stating that "fair market

value is defined as 'the price at which the property would change hands between a willing buyer

and a willing seller, neither being under any compulsion to buy or to sell and both having

reasonable knowledge of the relevant facts.'") *citing* United States v. Cartwright, 411 U.S. 546,

551 (U.S. 1973).

While fair market value can be difficult to estimate if an asset has not been

subjected to a market test, where an asset has been sold through an open sale process, the price

obtained will typically represent the actual fair market value of the asset. See, e.g., Keener v.

Exxon Co., USA, 32 F.3d 127, 132 (4th Cir. 1994), cert. denied, 513 U.S. 1154, 130 L. Ed. 2d

1074, 115 S. Ct. 1108 (1995) (stating that "fair market value is, by necessity, best set by the

market itself. An actual price, agreed to by a willing buyer and a willing seller, is the most

accurate gauge of the value the market places on a good. Until such an exchange occurs, the

market value of an item is necessarily speculative."); In re Hannigan, 2005 Bankr. LEXIS 2445

(Bankr. D. Mass. 2005) ("The best evidence of the fair market value of a property would be a

sale, but in the absence of a sale the Court may rely upon other valuation methodologies."); In re

Gagnon, 2005 Bankr. LEXIS 991 at *6 (Bankr. D.N.H. 2005) ("For obvious reasons, the best

evidence of the fair market value of any property would be the actual sale price between a

willing buyer and a willing seller."). According to Randall L. Lambert for example, "[a]ny

model for valuation of assets is only an estimate of fair market value. An auction sale by

contrast, represents actual, realizable value." (Declaration of Randall L. Lambert filed February

6

CONFIDENTIAL – FILED UNDER SEAL

4, 2004, page 3, paragraph 5(a))  Similarly, the Hardie Report states that "[u]nlike most chapter

11 bankruptcy cases where various constituencies attempt to determine the fair market value of a

debtor or its assets, the value of Adelphia was established in April 2005 via a successful and

competitive auction process run by the M&A Advisors." (Hardie Report at 29)

Accordingly, unlike other situations where complex theoretical valuation

methodologies might be required to reach a (potentially inaccurate) estimate as to what an entity

might be worth, in the present case the fair market value of the Debtors' assets can easily be

discerned by looking at the APAs and the price to be paid for such assets by Time Warner and

Comcast.  Not only were interested parties given access to a Confidential Information

Memorandum and a web-based management presentation in Phase I of the sale process, parties

who submitted indications of interest and moved on to Phase II were given access to a virtual

data room with a substantial number of documents, and were also granted face to face meetings

with the Debtors' management and were allowed to ask additional follow-up questions.  (Cornell

Report at 6, *citing* Stenzler Deposition, p. 144, ln 9-15)  The bids were the result of a managed

auction, resulting in sale prices reflective of the substantial data that was reviewed by the

bidders.

Not only did the sale prices result in an overall market value of $17.6 billion for

the Debtors' assets as a whole, the APAs actually ascribe value to each of Four Bundles of the

Debtors' assets.  Accordingly, and in light of their agreement that market value (especially when

established through an actual sale) is the best indication of the value of an asset, Cornell,

Lambert and Hardie (as well as the Ft. Myers Noteholders) all agree that any allocation of sale

value should be based on a method that first takes into account the actual purchase price to be

paid by TWC and Comcast for these Four Bundles of the Debtors' assets.

7

CONFIDENTIAL – FILED UNDER SEAL

B.    **Allocation of Sale Transaction Value Within the Four Bundles of the Debtors' Assets**

1.    **Value Within the Four Bundles Should be Allocated Based on Operating Cash Flow**

Assuming that any allocation of value from the Sale Transaction should first take into account the actual purchase price to be paid by TWC and Comcast for the four severable portions of the Debtors' business, the next question becomes how best to allocate the value attributable to each of these Four Bundles among the legal entities in such Bundles. As set forth above, the Cornell Report, Lambert Report and Hardie Report all agree that OCF should be used either exclusively (in the case of Cornell and Lambert) or non-exclusively (in the case of Hardie) to allocate value to the individual Debtor Groups in each Bundle.

The Lambert Report defines OCF as representing "the unleveraged, pretax cash flow generated by a business before accounting for capital expenditures and changes in working capital." (Lambert Report at 5) Because OCF measures the amount of cash that a business generates, a primary consideration for stakeholders, it is a good measure for determining value. (See Cornell Report at 23) In the present case, OCF provides a far more logical means of allocating value than do other competing metrics such as Average Revenue per Subscriber ("ARPU") or number of subscribers, neither of which directly measures cash produced by operations (the most important measure of value for stakeholders). (Id.)

The advantage of using OCF as an allocation methodology is particularly clear when compared against valuation based on number of subscribers. For example, allocating value based upon number of subscribers fails to account for the fact that affluent subscribers in one cable system may order far more expensive services than less well off subscribers in another system. Assuming the two systems have an equal number of subscribers, a valuation metric

8

CONFIDENTIAL – FILED UNDER SEAL

based solely on number of subscribers would value them equally even though the system with

more affluent subscribers generates far more cash for investors and accordingly is far more

valuable. (See Cornell Report at 24) Using OCF as the allocation metric eliminates this problem

because it attributes value based on cash generated and would therefore recognize the additional

value of the system with more affluent subscribers. (Id.)

2.    **Proper Means of Allocating Value Using OCF**

The Ft. Myers Noteholders agree with the approach taken in the Cornell and

Lambert Reports that value attributable to each of the Four Bundles under the APAs should be

allocated among the legal entities in such Bundles based upon the OCF of each entity included

therein, multiplied by a multiple derived separately for each Bundle by dividing the total

purchase price for such Bundle by the total OCF for the Bundle. Although the Ft. Myers

Noteholders believe that the Cornell approach is the most accurate since it relies upon actual

OCF for the last available 12 month period (as opposed to projected OCF), the Ft. Myers

Noteholders also support the Lambert and Hardie analyses to the extent they are based on the

market value of the Debtors' assets as determined through the Sale Transaction and allocate

value based upon OCF.

C.    **The Discounted Cash Flow Analysis Set Forth in the Outlying Flynn Report
is Results-Oriented and Should be Discounted**

As indicated above, the Flynn Report takes a far more subjective and results-

oriented approach than do the Cornell, Lambert and Hardie Reports, apparently with the

objective of achieving a more favorable outcome for Arahova and its subsidiaries. To begin

with, the Flynn Report completely ignores the fact that the market value of the Debtors' assets

has already been established through an extensive and open sale process, instead attempting to

CONFIDENTIAL – FILED UNDER SEAL

estimate the value of the Debtors' assets from the ground up (and providing an opportunity to attribute additional value to Arahova).

Moreover, the Flynn Report also allocates value using a subjective discounted cash flow ("DCF") methodology, which methodology (or the application thereof) is flawed for a number of reasons.  Specifically:

- **Discount Rates:** The Flynn DCF methodology applies identical discount rates to clusters that she specifically argues have varying growth characteristics.  By doing so, Flynn fails to account for the fact that higher growth markets would likely attract higher levels of competition.  (Cornell Report at 11-14; 24-25)  Higher levels of competition would in turn increase the risk of realizing significant operating cash flows from these high growth markets.  It can therefore be argued that this higher level of risk to realizing the projected operating cash flows should have been modeled in Flynn's analysis using higher discount rates since investors would expect higher returns in exchange for the higher risk levels.  Not surprisingly, it appears that if Flynn had applied a higher discount rate to the faster growing markets (such as the Southern California markets in Cluster D) it would have reduced the allocation of value that Flynn claims for Arahova and its subsidiaries.

- **Projection Bias:** The forecast Flynn used to derive the DCF values is based on projections from 2010 through the year 2015 that were prepared by Flynn (and not the Debtors) and result in a substantially higher proportion of value being allocated to the Arahova clusters than the Debtors' 2005 through 2009 projections would apply.

- **Growth Rates:** Even though the Debtors project that Clusters B, C and D (three of the six "Clusters" of Adelphia assets that prospective purchasers were able to bid on) will

CONFIDENTIAL – FILED UNDER SEAL

have similar growth rates between 2006 and 2009, as set forth in the Rebuttal Report of

Professor Bradford Cornell (the "Cornell Rebuttal"), Flynn applies a downward

adjustment to the growth rate for cluster C greater than that applied to clusters B and D

for the period 2009 to 2015.  As might be expected, the Arahova Debtor Group is heavily

weighted towards the B and D clusters.  (See Cornell Rebuttal at 21-23)

- **Terminal Growth Rates:**  The Flynn DCF analysis applies varying terminal growth
  rates for businesses with similar prospects.  Her application of terminal growth rates of
  4% for certain clusters and only half of that rate (2%) for other clusters at the end of ten
  year projections is inconsistent with financial theory which states that terminal growth
  rates are intended to reflect the growth of the economy overall and should therefore be
  uniform – especially for the same company.

- **Inclusion of MCE Value in Arahova Debtor Group:**  In her valuation of Arahova,
  Flynn includes the value of the MCEs, which according to the Plan fall outside of the
  Arahova Debtor Group.  As this Court is well aware, this inclusion could be material
  given that the entire value of the MCEs is $967 million, approximately $558 million of
  which is attributable to Century MCEs.

Basically, Flynn's DCF approach is far more susceptible to reverse engineering to achieve a

particular result than are the (generally OCF-based) methodologies employed by the other

experts.

Indeed, based on this flawed methodology, Flynn reaches an allocation result that

is far out of line with the conclusions reached by the Debtors and the three other experts (all of

whose allocation calculations for all of the Bundles fall within a much narrower range).  Not

11

CONFIDENTIAL – FILED UNDER SEAL

surprisingly, the primary difference in Flynn's allocation results is that she ascribes $1.7 billion
more in value to Arahova and its subsidiaries than the treatment provided for such entities under
the Plan, and far more than any of the other experts allocated.  In fact, the average amount of
value allocated to the Arahova Debtor Group by the three other experts and the Debtors is $6.2
billion (with a high of $6.4 billion and a low of $6.1 billion), while the Flynn approach results in
a far higher allocation of $7.8 billion.

    In light of the flaws in Flynn's methodology (which is highly subjective and
appears to be crafted in order to achieve a particular result), as well as the result itself (which
ascribes far more value to Arahova than any of the other experts or the Debtors), the Ft. Myers
Noteholders respectfully submit that the Court should discount any weight that would otherwise
be given to the Flynn Report.

CONFIDENTIAL – FILED UNDER SEAL

WHEREFORE, the Ft. Myers Noteholders respectfully request that the Court (i) make a legal determination that the allocation of sale value should be based on a method that first takes into account the actual purchase price to be paid by TWC and Comcast for the four severable portions of the Debtors' business, as identified in the Purchase Agreements, and that then allocates the value attributable to each of these four groups among the legal entities in such groups based upon the operating cash flows of each entity, multiplied by a multiple derived separately for each group by dividing the total purchase price by the total OCF for the group and (ii) grant such other and further relief as the Court may deem just and proper.

Dated: March 14, 2006
      New York, New York

                          SIDLEY AUSTIN LLP

                          By:   /s/ Lee S. Attanasio
                                     Alan M. Unger (AU-6747)
                                     Lee S. Attanasio (LA-3054)
                                     John G. Hutchinson (JH-9328)
                                     787 Seventh Avenue
                                     New York, New York 10019
                                     (212) 839-5300 (tel)
                                     (212) 839-5599 (fax

                                     -and-

                                   Larry J. Nyhan
                                   Jessica C. Knowles
                                   Matthew E. McClintock
                                   One South Dearborn Street
                                   Chicago, IL 60603
                                   (312) 853-7000 (tel)
                                   (312) 853-7036 (fax)

                                   Attorneys for the Ft. Myers Noteholders

CONFIDENTIAL – FILED UNDER SEAL

# APPENDIX

Exhibit A:    In re Hannigan, 2005 Bankr. LEXIS 2445 (Bankr. D. Mass. 2005)

Exhibit B:    In re Gagnon, 2005 Bankr. LEXIS 991 (Bankr. D. N.H. 2005)

CONFIDENTIAL – FILED UNDER SEAL

**EXHIBIT A**

Service: **Get by LEXSEE®**
Citation: **2005 Bankr. LEXIS 2445**

*2005 Bankr. LEXIS 2445, \**

In re: Carl J. Hannigan, Debtor

Chapter 7, Case # 02-46969 - JBR

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MASSACHUSETTS, WESTERN
DIVISION

2005 Bankr. LEXIS 2445

October 3, 2005, Decided

**NOTICE: [\*1]** NOT FOR PUBLICATION

**PRIOR HISTORY:** In re Hannigan, 2005 Bankr. LEXIS 2438 (Bankr. D. Mass., June 24,
2005)

## CASE SUMMARY

**PROCEDURAL POSTURE:** A bankruptcy debtor contended that a creditor's judicial lien
impaired the debtor's homestead exemption, but the creditor asserted that the debtor
undervalued the homestead property and that his lien did not impair any part of the
homestead exemption. The debtor moved for partial avoidance of the lien under 11
U.S.C.S. § 522(f) and the creditor moved for relief from the bankruptcy stay.

**OVERVIEW:** The debtor's homestead property consisted of two lots, one of which
contained the debtor's residence and the other of which was vastly larger but was vacant
land. The debtor valued the property based on an appraisal which valued the residence
and its lot based on comparable sales and valued the other lot based on the per acre value
for raw land. The creditor valued the property based on its potential for subdivision and
development which resulted in a value substantially greater than that proposed by the
debtor. The bankruptcy court held that no impairment of the debtor's homestead
exemption was shown since the debtor failed to establish that the creditor's lien plus the
debtor's exemption exceeded the value of the property. While the appraisal properly
determined the value of the residence and its lot, it was proper to value the lot with raw
land in view of its potential for development, and thus the property was worth at least as
much as the lien plus the exemption.

**OUTCOME:** The creditor's motion for relief from the automatic stay was granted.

**CORE TERMS:** acre, per acre, appraisal, valuation, fair market value, frontage, parcel,
homestead exemption, front, subject property, exemption, appraiser, acreage, impair, foot,
undeveloped, backland, feet, evidentiary hearing, exact amount, developable, comparable

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Bankruptcy Law > Creditor Claims & Objections > Types of Claims > Secured Claims & Liens 

Bankruptcy Law > Exemptions

HN1 ⚡ Application of 11 U.S.C.S. § 522(f) mandates that a judicial lien be avoided to the extent all of the liens on a debtor's property, plus the debtor's exemption, exceed the property's value. The debtor bears the burden of proving all the elements required for avoiding the judicial lien pursuant to § 522(f)(1). Therefore, it is the debtor's burden to establish that the judicial lien, plus any other liens on the property, plus any exemption exceeds the property's value. More Like This Headnote

Bankruptcy Law > Creditor Claims & Objections > Types of Claims > Secured Claims & Liens 🔍

Bankruptcy Law > Exemptions

HN2 ⚡ The proper valuation for property in the instance of a motion to avoid a lien is the fair market value as of the date of the filing of the petition. 11 U.S.C.S. § 522(a)(2). The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The best evidence of the fair market value of a property would be a sale, but in the absence of a sale a court may rely upon other valuation methodologies. More Like This Headnote

Bankruptcy Law > Exemptions

HN3 ⚡ In determining which appraisal figure to use for purposes of establishing value of exempt property, a bankruptcy court is not bound by any figure in particular, but merely guided by them all. More Like This Headnote

**COUNSEL:** For Carl J. Hannigan, Townsend, MA, Debtor: David M. Nickless, attorney, Nickless & Phillips, PC, Fitchburg, MA.; James M. Donovan, Bovenzi & Donovan, Leominister, MA.

Assistant U.S. Trustee: Richard King, Office of US. Trustee, Worcester, MA.

For Tali A. Tomsic, Office of Tali A. Tomsic, North Andover, MA, Trustee: Herbert Weinberg, Rosenberg & Weinberg, North Andover, MA.; Jason Rosenberg, Law Offices of Jason Rosenberg, North Andover, MA.

**JUDGES:** Joel B. Rosenthal, United States Bankruptcy Judge.

**OPINIONBY:** Joel B. Rosenthal

**OPINION:** MEMORANDUM OF DECISION

This matter is before the Court on the Debtor's Motion to Partially Avoid a Judicial Lien and the Creditor's Motion for Relief from the Automatic Stay. For purposes of the evidentiary hearing, Carl J. Hannigan (the "Debtor") conceded the existence and validity of the judicial lien held by Robert R. White (the "Creditor"), but alleges that it impairs his homestead exemption to the extent of $ 57,200.00. The Creditor disputes the Debtor's valuation of the subject property and alleges that his lien does not impair any part of the homestead exemption.

Background

The Debtor filed a voluntary Chapter **[*2]** 7 petition on November 15, 2002 (the "Petition Date"). On October 31, 2002, a judicial lien for $ 95,000.00 was issued by the state court and it was recorded with the Registry of Deeds on November 18, 2002. As of the Petition

Date, the Debtor concedes that the amount of the claim secured by the judicial lien equaled $ 95,000.00. The Debtor alleges that the current amount of the claim is $ 128,450.00. The Creditor maintains that it totals $ 157, 838.78 as of June 9, 2005.

The property to which the lien attaches is a single-family dwelling located at 106 Haynes Road, Townsend, Massachusetts (the "Property") which consists of two parcels totaling approximately 34.36 acres with 200 feet of frontage on Haynes Road. The house sits on the front parcel. The back parcel is approximately 33 acres in size and is raw land. It is in compliance with the zoning regulations in Townsend. In July 2003, the Court limited the Debtor's homestead exemption to $ 135,000.00, the amount claimed on his Schedule C in his initial bankruptcy filing. [Docket # 42 and # 43] In re Hannigan, 409 F.3d 480 (1st Cir. 2005). There are no other encumbrances on the Property.

The Court held an evidentiary [*3] hearing to determine the value of the Property. Both parties provided testimony regarding the value of the Property.

Discussion

HN1 "Application of § 522(f) . . . mandates that the ... judicial lien be avoided to the extent all of the liens on the Debtor's property, plus the Debtor's exemption, exceed the property's value." In re Bozzelli, 227 B.R. 770, 772 (Bankr. E.D.Pa. 1998). The Debtor "bears the burden of proving all the elements required for avoiding . . . lien pursuant to § 522(f)(1)." In re Brasslet, 233 B.R. 177, 189 (Bankr. D.Me. 1999). Therefore, in the instant case it is the Debtor's burden to establish that the judicial lien, plus any other liens on the Property, plus the Debtor's exemption exceeded the Property's value.

HN2 The proper valuation for property in the instance of a motion to avoid a lien is the fair market value as of the date of the filing of the petition, in this case November 15, 2002. 11 U.S.C. § 522(a)(2). The fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having [*4] reasonable knowledge of relevant facts." In re Gagnon, 2005 Bankr. LEXIS 991, 2005 WL 1331142 (2005), citing U.S. v. Cartwright, 411 U.S. 546, 551, 93 S.Ct. 1713, 1716 (1973). The best evidence of the fair market value of a property would be a sale, but in the absence of a sale the Court may rely upon other valuation methodologies.

The Debtor offered Leon Boudreau, an appraiser for thirty-five years, as an expert and he was qualified as such. This expert testified that on the date of the appraisal, June 26, 2003, the Property was worth $ 195,000.00. The appraisal occurred after the Petition Date. The expert reduced the fair market value of the Property by half of one percent for each month between the Petition Date and the appraisal date to determine the fair market value as of the Petition Date. He determined that the value of the Property on the Petition Date was $ 185,000.00.

The Debtor's expert used the direct sales comparison approach as the basis for his opinion. The direct sales comparison approach entails a review of sales of generally similar-type properties that are compared to the subject property with adjustments then made to account for differences between [*5] the subject property and the comparison properties. Debtor' Exhibit 1, p. 16. The Debtor's expert used three residential properties in Townsend that he believed were most comparable to the Property, but recognized that none of the comparable properties contained the same amount of acreage as the Property. n1 He reviewed four land sales in Townsend to determine a value for the remaining acreage and appraised the subject Property's additional acreage at $ 1,000.00 per acre. n2 In formulating his appraisal, the Debtor's expert told the Court that he assumed that the existing house would remain on the Property. His appraisal did not consider whether the Property was developable beyond its current use.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 Residential property # 1 contained .96 acres; property # 2 contained .46 acres; and property # 3 contained .55 acres. The Property in question contained 34.36 acres. (Debtor's Exhibit 1, p. 20)

n2 The land sales: (1) 50 acres, 1,400 foot frontage, $ 42,000.00, $ 840.00 per acre; (2) 103.6 acres, no frontage, $ 150,000, $ 1,448.00 per acre; (3) 10 acres, 33 foot frontage, $ 18,000.00, $ 1,800.00 per acre; and (4) 7.6 acres, 50 foot frontage, $ 20,000.00, $ 2,632 per acre. (Debtor's Exhibit 1, Addendum D)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*6]**

The Court accepts the value proposed by the Debtor's expert for the house and front lot only (the value for the 34.36 acres as of 11/15/02 minus the value of the "backland" equals the value of the house and front lot [185,000.00 - 33,000.00 = 152,000.00]). The Court does not find the valuation for the undeveloped lot of land to be reliable, however. The Debtor's expert did not consider the possibility of the Property being developed into a sub-division. Further, the Debtor's expert did not provide adequate explanation for assessing the value of the 33 acres of "backland" of the subject Property at $ 1,000.00 per acre. At the very least, if the sales prices per acre of the four other Townsend parcels used by the Debtor's expert are averaged, the per acre price equals $ 1,680.00 which exceeds the proposed valuation by $ 680.00 per acre. n3 Moreover, based on the testimony of the Creditor's witness, the Court finds even this figure too low as it assumes that the undeveloped land should remain in that state when there are feasible alternatives. Even if the Creditor put in no testimony, the Court would not find the Debtor's evidence sufficient to meet the Debtor's burden on value. *HN3* ⊼"In **[*7]** determining which appraisal figure to use for purposes of establishing value of exempt property, bankruptcy court is not bound by any figure in particular, but merely guided by them all." *In re Rehbein, 49 B.R. 250, 253* (Bankr. D.Ma. 1985). Even the vacant land comparables of the Debtor's appraiser reflect that the land is worth much more than stated in the appraisal.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 The Court does not have to find the exact amount of the value of the Property. It is enough if the Property is worth at least what the Creditor says is the amount of his claim plus the $ 135,000.00 homestead exemption.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

While the Creditor's witness regarding valuation of the subject Property was only found to be marginally qualified by the Court, n4 the Creditor's witness stated that he would pay between $ 750,000.00 - $ 825,000.00 for the Property. His valuation of the Property was based upon his observations of the Property after walking part of the land, and upon subdivision plans he created in light of these observations. **[*8]** He testified to at least two options for developing the Property. Under Option (1) two and one half acres of land would be utilized for a road approximately 2000 feet in length, providing seventeen developable lots in the rear of the property, and possibly one lot at the front of the property. Option (2) contemplated developing only seven or eight lots. The Creditor's witness explained that under either scenario the value he proposed was viable. The Court agrees that the amount

this witness testified he would pay for the Property better reflects its value than the numbers presented by the Debtor's expert. The Court does not have to find the exact amount of the value of the Property. It is enough if the Property is worth at least more than what the creditor says is the amount of his claim, $ 157,838.78, plus the $ 135,000.00 homestead exemption. The Court finds that it is.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 Frank Gorman, the Creditor's "expert," is not an appraiser. He is, however, an experienced developer in the area. While he has not developed parcels in Townsend, he has developed several properties in the surrounding area over the last 29 years.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*9]

Conclusion

The Court finds that the Debtor did not meet his burden of proof under 11 U.S.C. § 522. Therefore, the Court finds that the judicial lien held by the Creditor does not impair the Debtor's exemption. The Court will grant the Creditor's Motion for Relief from the Automatic Stay, but stay the Creditor from action for forty-five (45) days to afford the Debtor an opportunity to sell or refinance the Property or to work out an arrangement with the Creditor.

Separate Orders will issue.

Dated: October 3, 2005

Joel B. Rosenthal

United States Bankruptcy Judge

Service: **Get by LEXSEE®**
Citation: **2005 Bankr. LEXIS 2445**
View: Full
Date/Time: Friday, March 10, 2006 - 3:49 PM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
[Q]- Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
❶ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis™   About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

CONFIDENTIAL – FILED UNDER SEAL

**EXHIBIT B**

Service: **Get by LEXSEE®**
Citation: **2005 BNH 17**

*2005 BNH 17; 2005 Bankr. LEXIS 991, \**

In re: Mark R. Gagnon and April D. Gagnon, Debtors

Bk.No. 03-10934-JMD, Chapter 13

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW HAMPSHIRE

2005 BNH 17; 2005 Bankr. LEXIS 991

June 1, 2005, Decided

### CASE SUMMARY

**PROCEDURAL POSTURE:** Movant debtors sought to avoid a lien of objector creditor pursuant to 11 U.S.C.S. § 522(f)(2). The debtors had filed a notice of amendment to Schedule C of their Chapter 13 petition, "stacking" the state wildcard exemption under N.H. Rev. Stat. Ann. § 511:2(XVIII) on top of their homestead exemption. The creditor objected to the lien avoidance motion and challenged the valuation of the property and the stacking of the wildcard exemption.

**OVERVIEW:** The creditor argued that "any property" as set forth in § 511:2(XVIII) was singular and could not be split to protect multiple items of real and personal property. Relying on the plain meaning of the statute and interpreting the exemption broadly, the court found that the debtors were entitled to use the wildcard exemption to protect multiple items in the bankruptcy estate. The court also found that the creditor's lien was avoided under 11 U.S.C.S. § 522(f)(2)(A). The court looked to the fair market value of the property on the petition date and examined the testimony and resolved the differences in a weighted average analysis of all reliable and credible evidence. The court determined that the debtors' valuation of the residence was entitled to greater weight than the creditor's valuation because the debtors' valuation was closer in time to the petition date, was based upon actual exposure to the market, and was offered as a value outside the high range of what the value should be on the petition date. The court found the impairment of the debtors' exemption exceeded the amount of the creditor's lien, and thus, it was proper to avoid the creditor's lien.

**OUTCOME:** The court granted the debtors' motion to avoid the creditor's lien in its entirety.

**CORE TERMS:** exemption, valuation, appraiser, wildcard, neighborhood, fair market value, listing, comparable, actual value, actual sale, homestead, reliable, appraisal, broker, homestead exemption, willing seller, willing buyer, challenging, avoidance, weighted, credible, entirety, stacking, top, real estate market, personal property, greater weight, month period, asking price, exposure

### LexisNexis(R) Headnotes ✦ Hide Headnotes

Bankruptcy Law > Exemptions > Individual State Exemptions 🔦

*HN1* ⬥ New Hampshire law provides an exemption for: The debtor's interest in any

property, not to exceed $ 1,000 in value, plus up to $ 7,000 of any unused amount of the exemptions provided under paragraphs III, VI, VIII, IX, XVI and XVII of this section. N.H. Rev. Stat. Ann. § 511:2(XVIII).  More Like This Headnote

Governments > Legislation > Interpretation

HN2⯇When interpreting a statute, a court will rely on the plain meaning of the words in the context of statute as a whole.  More Like This Headnote

Bankruptcy Law > Exemptions > Individual State Exemptions

Governments > Legislation > Interpretation

HN3⯇As a general matter, the United States Bankruptcy Court for the District of New Hampshire has consistently interpreted exemption statutes broadly.  More Like This Headnote

Bankruptcy Law > Exemptions > Individual State Exemptions

Governments > Legislation > Interpretation

HN4⯇The legislative history of the amendment creating the wildcard exemption, N.H. Rev. Stat. Ann. § 511:2(XVIII), reflects an intent to interpret the exemption broadly. For these reasons, the United States Bankruptcy Court for the District of New Hampshire holds that debtors may use the wildcard exemption to protect multiple items of real and personal property in the bankruptcy estate.  More Like This Headnote

Bankruptcy Law > Creditor Claims & Objections > Types of Claims > Secured Claims & Liens

Bankruptcy Law > Exemptions > Bankruptcy Code Exemptions

Real & Personal Property Law > Property Valuation

HN5⯇The proper valuation in the context of a motion to avoid lien is the fair market value on the petition date.  More Like This Headnote

Bankruptcy Law > Chapter 13 (Individual With Regular Income) > Estate Property

Bankruptcy Law > Exemptions > Bankruptcy Code Exemptions

Real & Personal Property Law > Property Valuation

HN6⯇The fair market value of an asset is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. For obvious reasons, the best evidence of the fair market value of any property would be the actual sale price between a willing buyer and a willing seller. However, in the context of a Chapter 13 bankruptcy proceeding, where the ultimate goal of a debtor is to retain the homestead, not sell it, such evidence will not be offered. Consequently, the court must rely on valuation methodologies other than actual sale to decide fair market value. However, by definition, all alternative methods of valuation are based on a subjective evaluation of the amount that could be obtained in an actual sale. Not surprisingly, in the absence of a comparable sale of identical properties in terms of size, condition, and location, reasonable minds may, and often

do, vary regarding the fair market value for a particular property. Variance in opinion of value often results in conflicting testimony by owners and appraisers over the actual value of the property. More Like This Headnote | *Shepardize: Restrict By Headnote*

Bankruptcy Law > Creditor Claims & Objections > Allowances & Objections 🔧

Bankruptcy Law > Creditor Claims & Objections > Types of Claims > Secured Claims & Liens 🔧

Bankruptcy Law > Exemptions > Bankruptcy Code Exemptions 🔧

Bankruptcy Law > Exemptions > Individual State Exemptions 🔧

Real & Personal Property Law > Property Valuation 🔧

*HN7* ⊥ The United States Bankruptcy Court for the District of New Hampshire has previously resolved conflicting valuation testimony in the context of a motion to avoid a lien under 11 U.S.C.S. § 522(f)(2)(A) by examining the testimony and resolving the differences in a weighted average analysis of all reliable and credible evidence presented by the parties. More Like This Headnote

**COUNSEL: [*1]** Attorney for Debtors: Robert M. Koch, Esq., Concord, New Hampshire.

Attorney for Northern Building Supply, Inc.: H. Edward McBurney, McBurney Law Offices, PLLC, North Conway, New Hampshire.

**JUDGES:** J. Michael Deasy, Bankruptcy Judge.

**OPINIONBY:** J. Michael Deasy

**OPINION: MEMORANDUM OPINION**

### I. INTRODUCTION

The Court has before it Mark and April Gagnon's (the "Debtors") Notice of Amendment to Schedule C (Doc. No. 89) (the "Amendment") "stacking" the state wildcard exemption under NH Rev. Stat. Ann. § 511:2(XVIII) ("NH RSA")on top of the homestead exemption and the Debtors' Motion to Avoid Lien Pursuant to 11 U.S.C. 522(f)(2) (Doc. No. 31) (the "Motion"). Northern Building Supply, Inc. ("Northern Building") objects to the lien avoidance motion challenging the Debtors' valuation of the property as well as the stacking of the wildcard exemption.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, **[*2]** C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

### II. PROCEDURAL HISTORY

On December 9, 2002, approximately three months prior to bankruptcy filing, Northern Building obtained an attachment on the Debtors' homestead in the New Hampshire state district court in the amount of $ 6,000.00. The Debtors filed for protection under chapter 13 of the United States Bankruptcy Code on March 21, 2003 (the "Petition Date"). The Debtors listed their homestead on Schedule A (the "Residence") at a value of $ 240,000.00. Schedule C listed a first and second mortgage on the Residence totaling $ 133,367.94. Northern

Building was listed in the petition as an unsecured creditor but filed a secured proof of claim asserting a $ 6,000.00 lien on the Residence.

On January 16, 2004, the Debtors filed the Motion seeking to avoid the Northern Building lien under 11 U.S.C. § 522(f)(2). In the Motion, the Debtors allege the value of the Residence is $ 200,000.00, although they have not amended their bankruptcy schedules to reflect this lower value. Northern Building filed an objection to the motion challenging the Debtors' valuation of **[*3]** the Residence. The parties are in agreement regarding all other numbers in the lien avoidance calculation. After several continuances, an evidentiary hearing was scheduled for December 20, 2004.

The day before the hearing, the Debtors filed a notice of amendment to schedule C, seeking to stack a portion of their unused state wildcard exemption on top of the homestead exemption previously claimed on the Residence. At the hearing, the Court heard evidence on the value of the Residence and allowed additional time for Northern Building to file a written objection to the Amendment with the Debtors having ten days to respond to the objection. Northern Building filed its objection to the Amendment (Doc. No. 92) on January 13, 2005 and the Debtors filed their response (Doc. No. 93) on January 20, 2005. The Court then took both matters under advisement.

## III. DISCUSSION

### A. Objection To The Amendment

The Court must first determine whether the Debtors may split their state wildcard exemption to protect multiple items of real and personal property or, as Northern Building argues, they must chose one piece of property for the wildcard exemption. *HN1*New Hampshire law provides an **[*4]** exemption for:

> The debtor's interest in any property, not to exceed $ 1,000 in value, plus up to $ 7,000 of any unused amount of the exemptions provided under paragraphs III, VI, VIII, IX, XVI and XVII of this section.

NH RSA 511:2(XVIII). In essence, Northern Building argues that "any property" is singular and not plural.

*HN2*When interpreting a statute, the Court will rely on the plain meaning of the words in the context of statute as a whole. Vaillancourt v. The Granite Group (In re Vaillancourt), 260 B.R. 66, 69 (Bankr. D.N.H. 2001). Looking at the exemption statute as a whole, the Court notes the New Hampshire legislature used numerically limiting language in eight of the nineteen listed exemptions including one cook stove, one heating stove and one refrigerator (NH RSA 511:2 IV); one sewing machine (NH RSA 511:2 V); one hog and one pig (NH RSA 511:2 X); six sheep (NH RSA 511:2 XI); one cow, a yoke of oxen or a horse (NH RSA 511:2 XII); one pew in any meetinghouse (NH RSA 511:2 XIV); **[*5]** one lot or right of burial (NH RSA 511:2 XV); and one automobile (NH RSA 511:XVII). In contrast, the wildcard exemption was designated to apply to "any" property. If the legislature meant to limit the wildcard to a single piece of property, they would have chosen language that clearly stated their intention. *HN3*As a general matter, this Court has consistently interpreted exemption statutes broadly. Specifically, *HN4*this Court has found the legislative history of the amendment creating the wildcard exemption reflected an intent to interpret the exemption broadly. In re Vaillancourt, 260 B.R. at 69. For these reasons, the Court holds the Debtors may use the wildcard exemption to protect multiple items of real and personal property in the bankruptcy estate.

## B. Valuation of the real property

The next matter before the Court is the dispute over the value of the Residence. *HN5* The proper valuation in the context of a motion to avoid lien is the fair market value on the petition date. In re Vokac, 273 B.R. 553, 557 (Bankr. N.D.Ill. 2002).

*HN6* The fair market value of an asset is "the price at which the property would change hands between [*6] a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551, 36 L. Ed. 2d 528, 93 S. Ct. 1713 (1973). For obvious reasons, the best evidence of the fair market value of any property would be the actual sale price between a willing buyer and a willing seller. However, in the context of a chapter 13 bankruptcy proceeding, where the ultimate goal of a debtor is to retain the homestead, not sell it, such evidence will not be offered. Consequently, the Court must rely on valuation methodologies other than actual sale to decide fair market value. However, by definition, all alternative methods of valuation are based on a subjective evaluation of the amount that *could* be obtained in an actual sale. Not surprisingly, in the absence of a comparable sale of identical properties in terms of size, condition, and location, reasonable minds may, and often do, vary regarding the fair market value for a particular property. Variance in opinion of value often results in conflicting testimony by owners and appraisers over the actual value of the property in question. *HN7* This Court has [*7] previously resolved conflicting valuation testimony in the context of a motion to avoid a lien under section 522(f)(2)(A) by examining the testimony and resolving the differences in a weighted average analysis of all reliable and credible evidence presented by the parties. In re Dore, 1999 Bankr. LEXIS 1876, 1999 BNH 028 (adopting an weighted two-part analysis to determine fair market value under section 522(f)(2)(A)).

At the hearing, the Debtors offered no appraisal evidence. Instead, the Debtors presented testimony and written evidence of their attempt to sell the Residence in 2003. The Debtors listed the Residence with a sales broker on May 30, 2003, for $ 239,000.00, less than ten days after filing their petition. On August 14, 2003, the Court approved the retention of the broker (Doc. No. 23). Mr. Gagnon testified the Residence was on the market with the broker and listed in the multiple listing service ("MLS") through December 31, 2003. Mr. Gagnon testified that he determined the listing price after taking into account the actual cost to build the Residence and the amount of proceeds needed pay tax obligations to the Internal Revenue Service. He testified there were several showings [*8] of the house but no offers were received. He also testified that during the period the Residence was on the market several homes in the neighborhood sold at prices ranging from $ 169,000.00 to $ 189,000.00. No evidence was offered to suggest the Residence was not properly marketed or was not exposed to the market for a sufficient period of time. The Court found the testimony of Mr. Gagnon to be reliable and credible. However, that testimony viewed in the light most favorable to the Debtors does not establish a value for the Residence, but merely the fact that the Residence was likely worth less than the $ 239,000.00 listing price on the Petition Date.

Northern Building offered the testimony of a real estate appraiser and his written report. The appraiser testified that the fair market value of the Residence, as of April 13, 2004, was $ 246,000.00. The obvious problem with that testimony is the fact that the valuation date is over a year (389 days) after the Petition Date. The Court takes judicial notice that the real estate market for single family residences in New Hampshire between early 2003 and the spring of 2004 was robust due to low mortgage interest rates and a demand which [*9] exceeded the supply. However, general market conditions do not form a basis on which the Court can adjust Northern Building's evidence to provide an estimate of the value of the Residence as of the Petition Date.

The appraisal report submitted by Northern Building's appraiser also raised another issue affecting the use of the Report to determine the value of the Residence. Although the Debtors' home is located in a subdivision, the appraiser did not use any home sales in that neighborhood as comparable sales in his analysis of value. Instead, he chose to use houses of comparable quality outside the subdivision in other neighborhoods and made qualitative adjustments to their sales prices in order to determine a value for the Residence. n1 The neighborhood where the Residence is located is a mixed value subdivision. The appraiser testified that, although there were recent sales in the Debtors' neighborhood, they could not be used to determine the value of the Residence because the quality and size of the homes sold were not comparable to the Residence, even after adjustment. The fact that the Residence is unique or unlike any of the homes sold in its neighborhood in the past year, calls [*10] into question a valuation of the Residence which does not take this factor into account. The Court otherwise found the appraiser's testimony reliable and credible regarding the value of the Residence.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 The Court notes Mr. Gagnon testified, in his current job, he visits those other neighborhoods on a daily basis, and they are not similar to the neighborhood where the Residence is located.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Court finds the Debtor's evidence of an upper limit on the value of the Residence to be entitled to greater weight than the appraiser's testimony for several reasons. First, the Debtors' evidence is based upon actual exposure to the market. Second, that evidence was closer in time to the Petition Date than Northern Building's evidence of value. Finally, the appraiser's valuation of $ 246,000.00 for the Residence 389 days after the Petition Date is only 2.93% higher than the Debtors' listing price of $ 239,000.00 during the seven month period immediately after the Petition Date. Since several homes in the same neighborhood [*11] as the Residence were sold during that period, the evidence suggests that the Residence was worth less than the listing price on the Petition Date.

It is possible that the Debtors and Northern Building have no actual difference between them in their determination of the value of the Residence. If Northern Building's appraisal evidence was subject to a downward adjustment of only three percent to account for the existence of a generally rising real estate market during the nearly thirteen months between the Petition Date and the date of its appraisal evidence, the difference in value by the parties would be eliminated. However, the appraiser would not give any opinion on the likely change in value of the Residence during that thirteen month period because he had not studied comparable sales around the Petition Date. While the appraiser was correct in not speculating on changes in value in the Residence without data to back up his opinion, the fact remains his testimony of value on April 13, 2004, at best, is the right answer to the wrong question. The factual issue for the Court is the value of the Residence on the Petition Date, not a date thirteen months later.

Similarly, the Debtors' [*12] evidence of value presents problems of its own. Testimony regarding the asking price of the Residence when placed on the market for sale is not evidence of the actual value of the home. It does suggest that the value of the house is less than the asking price but nothing more. Again, the issue before the Court is the actual value of the Residence on the Petition Date, not estimated value or range of value.

While the record before the Court is not especially helpful in making the necessary determination of value, it is the only record available. The Court has no choice but to use $

239,000.00 as the Debtors' valuation of the Residence and $ 246,000.00 as Northern Building's valuation of the Residence. The Court determines that the Debtors' valuation is entitled to greater weight than Northern Building's valuation because it is closer in time to the Petition Date, is based upon actual exposure to the market, and is offered as a value outside the high range of what the value should be on the Petition Date.

Accordingly, the Court determines the value of the Residence as of the Petition Date as follows:

| | | | | |
|---|---|---|---|---|
| Debtors' Valuation | $ 239,000.00 | x | 3= | $ 717,000.00 |
| Northern Building's Valuation | $ 246,000.00 | x | 1= | $ 246.000.00 |
| | Total | | 4 | $ 963,000.00 |
| | Weighted Average | | | $ 240,750.00 |

[*13]

## C. Application of Section 522(f)(2)(A)

Based upon the exemptions claimed by the Debtors, the value of the Residence and the agreed upon values for the liens on the Residence, the formula under section 522(f)(2)(A) of the Bankruptcy Code results in the following:

| | |
|---|---|
| First Mortgage | $ 73,367.94 |
| Second Mortgage | $ 60,000.00 |
| Northern Building Attachment | $ 6,000.00 |
| Homestead Exemption | $ 100,000.00 |
| Unused Wildcard Exemption | $ 8.900.00 |
| Total | $ 248,267.94 |
| Less Value of Residence | $ 240.750.00 |
| Amount of Impairment | $ 7,517.94 |

The impairment of the Debtors' exemptions is $ 7,517.94 which exceeds the amount of Northern Building's lien of $ 6,000.00, Accordingly, pursuant to § 522(f)(2)(A), Northern Building's lien shall be avoided in its entirety.

## III. Conclusion

For the reasons stated above the Court shall enter a separate order granting the Motion to avoid Northern Building's lien in its entirety. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate judgment consistent with this [*14] opinion.

DONE and ORDERED this 1st day of June, 2005.

J. Michael Deasy

Bankruptcy Judge

Service: **Get by LEXSEE®**
Citation: **2005 BNH 17**
View: Full
Date/Time: Friday, March 10, 2006 - 3:32 PM EST

* Signal Legend:

- Warning: Negative treatment is indicated
Q - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
A - Citing Refs. With Analysis Available
ℹ - Citation information available

* Click on any *Shepard's* signal to *Shepardize*® that case.

LexisNexis®   About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.