CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

Peter D. Morgenstern (PM-5021)
Mark R. Jacobs (MJ-6248)
Gregory A. Blue (GB-9569)
Eric B. Fisher (EF-1209)
Andrew L. Buck (AB-4298)
MORGENSTERN JACOBS & BLUE, LLC
885 Third Avenue
New York, New York 10022
Tel. (212) 750-6776

*Attorneys for the Official
Committee of Equity Security Holders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

|  |  |
|---|---|
| In re: | Chapter 11 Cases |
| Adelphia Communications Corporation, et al., | Case No. 02-41729 (REG) |
| Debtors | (Jointly Administered) |

--------------------------------------------------------x

## Official Committee of Equity Security Holders' Hearing 4 Pretrial Memorandum

TO THE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

The Official Committee of Equity Security Holders (the "Equity Committee") of Adelphia Communications Corporation ("ACC"; collectively with the other above-captioned debtors and debtors in possession, the "Debtors" or "Adelphia"), by its undersigned attorneys, hereby submits this Pretrial Memorandum with respect to the issues to be adjudicated in Hearing 4 in accordance with the Court's Order in Aid of Confirmation, Pursuant to Sections 105(a) and 105(d) of the Bankruptcy Code, Establishing Pre-Confirmation Process to Resolve Certain Inter-Creditor Issues, dated August 4, 2005 (the "Order in Aid").[1]

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order in Aid.

CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................. 1

II.  RELEVANT FACTS ............................................................................................................ 2

   A.   The Sale Process ........................................................................................................ 2

III. ARGUMENT ........................................................................................................................ 6

   A.   Sale Proceeds Must Be Allocated in Accordance with the TW/C APAs ........................ 6

   B.   The Court Should Reject the Arahova Committee's Speculative, Outcome-Based
        Approach .................................................................................................................. 10

   C.   The Court Should Reject the FrontierVision Committee's Approach ........................... 12

IV.  CONCLUSION ................................................................................................................... 13

CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

# TABLE OF AUTHORITIES

**CASES**

*Boyce v. Soundview Tech. Group, Inc.*, 2004 U.S. Dist. LEXIS 20635 (S.D.N.Y. Oct. 14, 2004) ................................................................................................ 7

*Herndon v. Commissioner, 1962 Tax Ct. Memo LEXIS 125* (August 3, 1962) ............................ 8

*In re Cuisinarts, Inc.*, 115 B.R. 744 (Bankr. D. Conn. 1990) ......................................................... 7

*In re Schreiber*, 163 B.R. 327 (Bankr. E.D. Ill. 1994) .................................................................. 7

*In re Submicron Systems Corp.,* 2006 U.S. App. LEXIS 344 (3d Cir. January 6, 2006) .............. 7

*Schonfield v. Hilliard*, 218 F.3d 164 (2d Cir. 2000) ...................................................................... 7

*Selig v. United States*, 740 F.2d 572 (7th Cir. 1984) ..................................................................... 7

*United States v. Cartwright*, 411 U.S. 546 (1973) ......................................................................... 7

CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

I.  **INTRODUCTION**

The Court must determine at Hearing 4 the appropriate manner to allocate the proceeds from the sale of the Debtors' assets among the 18 Debtor Groups.[2]  In doing so, the Court should adopt an approach – as advocated by the Equity Committee and the Ad Hoc Committee of ACC Senior Noteholders (the "ACC Noteholders Committee") – that is based on sound legal principles and grounded in the facts of the sale transaction, not one that simply backs into the most favorable result for any one constituency.

Such an approach must begin from the values ascribed to the Debtors' assets as a result of their extensive marketing and bidding process – namely, the values set forth in the TW/C APAs (as defined below).  From those values it is a relatively simple, almost mechanical, matter to derive values for the assets of each Debtor Group, using information available to all bidders at the time the TW/C APAs were negotiated.  Such a methodology is reasonable, objective, and verifiable.

Consistent with its tactics throughout these disputes, however, the Arahova Committee has again abandoned objective fact for biased conjecture.

First, the Arahova Committee ignores the obvious – the Debtors' sale process generated the real value attributable to four distinct groups of assets.  Instead, it discards those values entirely to start from scratch, leading to the inescapable conclusion that it simply does not like the results such values generate.

---

[2]  Pursuant to the Order in Aid, the Equity Committee and other Participants had originally contemplated that issues concerning allocation of the benefits and burdens of the Government Settlement (as defined below) would be litigated in connection with Hearing 4, as reflected in their respective Final Issues Statements. Pursuant to an agreement among the Participants, all allocation issues other than the allocation of sale proceeds have been reassigned to Hearing 6.

1

CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

Second, having jettisoned the TW/C APAs' concrete values, the Arahova Committee no longer feels constrained to restrict itself to verifiable methodologies, choosing rather to employ discounted cash flow ("DCF"), an approach requiring numerous assumptions ranging from future performance to appropriate discount rates.  As described below, not a single one of the experts – except for the Arahova Committee's expert – believes that DCF is appropriate in a circumstance where, as here, there has been an actual sale transaction to define overall value.

Third, although the Arahova Committee's expert could have performed her analysis based on projections prepared by the Debtors and provided to bidders, she unilaterally decided that those were not good enough.   Instead, she created her own projections that were manipulated to result in greater values attributable to Arahova and its subsidiaries.

In sum, the Arahova Committee's outcome-driven, speculative value allocation methodologies should be rejected in favor of an objective approach based upon the actual sale transaction embodied in the TW/C APAs.

## II. **RELEVANT FACTS**

### A. The Sale Process

Adelphia is the nation's fifth-largest cable systems operator, comprising approximately 2,700 franchises, held in and managed by more than 230 distinct legal entities, providing services to customers in 31 states.[3]

In mid-2004, in response to motions filed by the Equity Committee and others, the Debtors agreed to market their assets for sale as an alternative to a stand-alone plan of

---

[3]    Restated 10-K at 6, 25, 28-29; Disclosure Statement Relating to Debtors' Fourth Amended Plan of Reorganization (the "Disclosure Statement") [Docket No. 8993], Section  II.C.1.  Adelphia Form 10-Q dated June 30, 2005, Page 51.

2

CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

reorganization.[4] Accordingly, in September, 2004, the Court authorized the Debtors to employ UBS Securities LLC ("UBS") and Allen & Co., Inc. ("Allen"; collectively with UBS, the "M&A Advisors") as their joint mergers and acquisition advisors to assist in marketing their assets.[5]

Subsequently, with the assistance of the M&A Advisors, the Debtors developed a strategy to market Adelphia's assets in a manner that would yield the highest overall value, either in a sale of all the assets as a whole or through the sale of several smaller asset packages.[6] To that end, the Debtors and the M&A Advisors ultimately grouped the assets into 7 "clusters"[7] designed to generate "multiple credible bids for each cluster,"[8] while at the same time encouraging strategic bidders – specifically Time Warner – to bid for the entire company.[9] The decision to group particular assets together in a cluster was driven by many factors, including geography and balancing the inclusion of both attractive and less attractive assets within each cluster.[10]

Importantly, the Debtors do not own 100% of all the assets that were marketed for sale. Specifically, the Debtors own respective 75% and 67% equity interests in the Century-TCI and Parnassos joint ventures (the "JVs"); Comcast holds the minority position.[11] Additionally, the Debtors marketed certain entities then owned by members of the Rigas family (the "MCEs").[12]

---

[4] Adelphia Confidential Information Memorandum, dated September 2004, at p. 6 [Bates No. SBD00019588].

[5] Order Authorizing Employment and Retention of UBS Securities LLC and Allen & Company LLC as Mergers & Acquisitions Financial Advisors for the Debtors, dated September 14, 2004 [Docket No. 5875].

[6] *See generally* Deposition of Ehren Stenzler, November 21, 2005 ("Stenzler"), at 17-65 (discussing overall cluster-definition process)

[7] Stenzler 63:16-65:4.

[8] Stenzler 34:18-25.

[9] Stenzler 26:2-27:3

[10] Stenzler 35:8-36:8.

[11] Comcast had rights of first refusal under the Century-TCI joint venture agreements, as well as other consent rights, which rights were to remain intact if Century's assets were sold to a third-party. Flanigan 42:15-43:12; 47:13-48:5; 48:12-15; 49:25-50:12; Aronson 153:5-20. Additionally, Comcast was to retain its

CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

The Debtors publicly announced their intention to sell their assets on September 21, 2004,[13] and subsequently sought and obtained Court approval of a two-phase marketing process.[14] At the conclusion of the initial phase of marketing, the Debtors had received 43 "non-binding indications of preliminary interest" in acquiring all or part of their assets, from 25 different bidders.[15] Of these 25 bidders, 22 were invited to participate in the more intensive "Phase II," which provided qualified bidders with access to expanded diligence materials, including management's projections for 2005 (the "Management Projections").[16] Of those 22 bidders, 15 chose to submit final bids on January 31, 2005.[17]

Although bidders had initially expressed interest in purchasing the assets in "Cluster D" – which consisted largely of assets owned by subsidiaries of the Arahova Debtor Group and

---

management rights, as managing member in the Joint Venture agreement, if the Century-TCI assets were sold to a third party. Flanigan 50:13-51:3. Similar issues exist with respect to the Parnassos joint ventures. *See* Flanigan 43:24-44:6. All potential bidders would have been made aware of the legal ownership arrangements that were in place. Flanigan 51:24-52:4. The consents would have had an impact on the value of Adelphia's interest in Century-TCI as could have the terms and conditions of the limited partnership agreement. Aronson 154:25-157:4; 248:15-250:2; 157:22-158:20.

[12] The Debtors subsequently entered into settlement agreements among the Rigas family, the Securities and Exchange Commission, and the Department of Justice, whereby the Debtors will obtain title to the MCEs (and avoid criminal indictment and civil penalties) in exchange for, among other things, their contribution of $715 in value to a victim restitution fund. These settlements are collectively referred to herein as the "Government Settlement).

[13] Adelphia Press Release: "Adelphia Launches Sale Process; Company To Be Sold in Whole or in Part Through the Sale of Seven Strategic Clusters; Plan Designed To Maximize Value for All Stakeholders," September 21, 2005, available at http://adelphia.com/pdf/Adelphia_Clusters_Release.pdf.

[14] *See* Motion for Order, Pursuant to Sections 105, 363, 503, 507, and 1123 of the Bankruptcy Code Approving Bidding Procedures and Bid Protections in Connection with the Direct or Indirect Sale of Substantially All of the Assets of Adelphia Communications Corporation and Certain of its Affiliates, dated September 29, 2004 [Docket No. 6006] (the "Bid Procedures Motion"); Order Approving Bidding Procedures and Bid Protections in Connection with the Direct or Indirect Sale of Substantially All of the Assets of Adelphia Communications Corporation and Certain of its Affiliates, dated October 22, 2004 [Docket No. 6163] (the "Bid Procedures Order")

[15] Motion for Supplemental Order Pursuant to Sections 105, 363, 364, 503, 507 and 1123 of the Bankruptcy Code, approving Supplemental Bid Protections in Connection With the Sale of Substantially All the Assets of Adelphia Communications Corporation and Certain of its Affiliates, dated April 8, 2005 [Docket No. 7321] (the Supplemental Bid Protections Motion") at 2; Stenzler at 67:5-69:8; Stenzler Exhibit 6.

[16] *Id*. at 3-4.

[17] *Id*. at 4.

4

CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

located in California, including the JVs[18] – none of the final bids included an offer to purchase those assets outside a deal for all the Debtors' assets.[19]

After extensive further negotiations with the bidders, the Debtors' board of directors concluded that the joint bid submitted by Time Warner NY Cable LLC ("Time Warner") and Comcast Corporation ("Comcast"; collectively with Time Warner, "TW/C"), which offered approximately $17.6 billion in cash and stock, represented the bid most likely to maximize value to all stakeholders.[20] The Court ultimately approved modifications to the bidding protections it had previously approved, and the Debtors entered into binding asset purchase agreements with TW/C (the "TW/C APAs") on or about April 20, 2005.[21]

The TW/C APAs contemplate the acquisition of four distinct groups of Adelphia assets (the "Four Components"): (i) MCEs purchased by Comcast ("Comcast MCEs") for $592 million cash;[22] (ii) MCEs purchased by Time Warner ("TW MCEs") for $375 million cash and stock;[23] (iii) the Debtors' interests in the JVs purchased by Comcast ("Adelphia JV Interests") for $2.351

---

[18] Stenzler 86:3-87:7; Stenzler Exhibit 7.

[19] Stenzler 71:16-22.

[20] Supplemental Bid Protections Motion at 5-6.

[21] Order Approving Supplemental Bid Protections, dated April 21, 2005 [Docket No. 7334]; *see generally* Asset Purchase Agreement between ACC and Time Warner, dated as of April 20, 2005 (the "TW APA"); Asset Purchase Agreement between ACC and Comcast, dated as of April 20, 2005 (the "Comcast APA").

[22] Comcast APA at 25 (defining "MCE Purchase Price" as $600 million); Expert Report of Randall L. Lambert (the "Lambert Expert Report") at 6; Expert Report of Bradford Cornell (the "Cornell Expert Report") at 6-8, 15-16. The variation in value between that originally specified in the Comcast APA and the expert reports is a result of certain MCEs being retained by members of the Rigas family pursuant to the Government Settlement. *See* Disclosure Statement at 95.

[23] TW APA at 25 (defining "MCE Purchase Price" as $390 million); 50-53 (describing adjustments related to MCEs; Lambert Expert Report at 6; Cornell Expert Report at 8, 15-16. The variation in value between that originally specified in the TW APA and the expert reports is a result of certain MCEs being retained by members of the Rigas family pursuant to the Government Settlement. *See* Disclosure Statement at 95.

5

billion;[24] and (iv) wholly-owned and operated cable assets purchased by Time Warner ("Wholly-Owned Subscribers") for $13.724 billion.[25]

The Debtors' Fourth Amended Plan of Reorganization (the "Plan") proposes that the value from the TW/C Sale will be allocated based upon the latest twelve months ("LTM") financial information that reflect actual company performance as of September 30, 2005, based on a simple pro-ration of the Debtor Groups' respective contribution to the LTM operating cash flow ("OCF")[26] of the Company, net of certain adjustments.[27] Notwithstanding the Debtors' proposal regarding the allocation of sale transaction value, the Debtors have been ordered by this Court to remain neutral on the issue.[28]

## III. ARGUMENT

### A. *Sale Proceeds Must Be Allocated in Accordance with the TW/C APAs*

It is a well-established legal and valuation principle that the most accurate indication of the fair market value of an asset or group of assets is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion

---

[24] Comcast also contributed additional consideration to the purchase of the Company's JV interests in the form of a discharge in Comcast's allocable portion of debt and liabilities associated with the purchased assets. Per the low end of a range dictated by Comcast's APA, this discharge amount has been estimated at $549 million, with $297 million relating to Century-TCI and $252 million relating to Parnassos. *See* Comcast APA at 40-56; Lambert Expert Report at 6; Cornell Expert Report at 6-8, 15-16.

[25] Time Warner is purchasing all of the Company's wholly-owned and operated subscribers, which includes all subscribers in the following Debtor Groups: ACC Ops, Century, Century Communications Corp., FrontierVision Opco, Funding Company, Olympus and UCA. *See generally* TW APA at 43-58 Lambert Expert Report at 6; Cornell Expert Report at 6-8, 15-16.

[26] Broadly speaking, OCF represents the unleveraged, pretax cash flow generated by a business before accounting for capital expenditures and changes in working capital. The Debtors, in their Fourth Amended Disclosure Statement, define OCF as operating income or loss, excluding "Investigation, re-audit and sale transaction costs, Depreciation and Amortization, Provision for uncollectible amounts due from the Rigas Family and Rigas Family Entities and Impairment of long-lived assets." Disclosure Statement at 11.

[27] *See* Disclosure Statement Section II.A.1 (Distributable Value), Exhibit N (Reconciliation of OCF to GAAP).

[28] *See* Decision on Motions by Ad Hoc Committee of Arahova Noteholders to Appoint Trustee or Nonstatutory Fiduciary; to Disqualify Counsel; and to Terminate Exclusivity, dated January 25, 2005 [Docket No. 9460] at 11-12, 101.

6

CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

to buy or to sell and both having reasonable knowledge of relevant facts."[29] The TW/C APAs are a result of an exhaustive sale process, run in good faith by the Debtors and their M&A Advisors – indeed, every party to these disputes has recognized that the sale to TW/C will realize the highest possible distributable value to the Debtors' economic constituencies. Because the TW/C APAs are the manifestation of the value TW/C is paying as a willing buyer to the Debtors as a willing seller, any analysis of how that value should be allocated among the Debtor Groups[30] must necessarily begin with those contracts and the value ascribed to the Four Components by TW/C at the time of the contract.[31] All experts, except the one employed by the Arahova Committee, generally agree.[32]

---

[29] *United States v. Cartwright*, 411 U.S. 546, 551 (1973); *see also Schonfield v. Hilliard*, 218 F.3d 164, 177 (2d Cir. 2000) (in context of determining damages, "[t]he market value of an income-producing asset . . . represents what a buyer is willing to pay for the chance to earn the speculative profits"); *Selig v. United States*, 740 F.2d 572, 578 (7th Cir. 1984) (upholding valuation of baseball team based on "club" market because purchase price in such market is result of arm's-length negotiation between willing buyer and willing seller); *In re Submicron Systems Corp.,* 2006 U.S. App. LEXIS 344 *32 (3d Cir. January 6, 2006) (free market sale best reflects the economic realities of assets' worth). Lambert Expert Report at 3; Cornell Expert Report at 14-16; Declaration of Randall L. Lambert filed February 4, 2004, page 3, paragraph a ("Any model for valuation of assets is only an estimate of fair market value. An auction sale, by contrast, represents actual, realizable value."); Deposition of Bradford Cornell, January 9, 2006 ("Cornell") at 40:15-25

[30] The propriety of the proposed Debtor Group substantive consolidation structure will be addressed either at Hearing 5 of the Resolution Process or at the confirmation hearing.

[31] *See also Schonfield*, 218 F.3d at 177 (market value determined at a specific point in time); *Boyce v. Soundview Tech. Group, Inc.*, 2004 U.S. Dist. LEXIS 20635 * 6 (S.D.N.Y. Oct. 14, 2004) ("Estimates as to the potential value of a stock or predictions as to future stock prices are notoriously unreliable. Admitting market projections of shares in the months following a breach as evidence would be tantamount to relying on the Farmer's Almanac predictions of rain for the upcoming harvest."); *In re Schreiber*, 163 B.R. 327, 332 (Bankr. E.D. Ill. 1994) (In the event the property is actually sold, regardless of the purpose for valuation, valuation of the collateral should normally be based on the sale price, provided that such consideration is fair and was arrived at by parties at arm's length); *In re Cuisinarts, Inc.*, 115 B.R. 744, 748 (Bankr. D. Conn. 1990) (contract sets value of asset; collateral was being valued for purposes of section 506(a) of the Bankruptcy Code).

[32] Expert Report of Randall L. Lambert (the "Lambert Expert Report") at 3; Expert Report of Bradford Cornell (the "Cornell Expert Report") at 14-16; Expert Report of William H. Hardie, III (the "Hardie Expert Report") at 18, 29; Deposition of William H. Hardie, January 11, 2003 ("Hardie") at 59:18-80:8 (Mr. Hardie notes the different value components as relevant to an allocation analysis, but departs somewhat from the Four Component approach); 66:11-22 (The decision to sell the assets as between the debtors collectively and Time Warner and Comcast fix the value and shift to the buyer essentially the future performance risk of the business, and by allocating the value amongst the debtor groups as of any date other than the date that the decision was reached to sell the businesses, I think inappropriately leaves open among the debtor groups the risk of future performance of the businesses and, as a consequence, is logically inconsistent and inappropriate."); Declaration of Randall L. Lambert filed February 4, 2004 [Docket No. 3631], page 3, paragraph a ("Any model for valuation of assets is only an

7

TW/C, as would any sophisticated bidder for groups of assets, assuredly assigned value based not on a simple count of subscribers, but rather on information concerning the actual cash flow generated by those assets. Thus, the most reasonable and appropriate method for distributing value among the Debtor Groups is one that takes into account each subscriber's relative contribution to operating cash flow, utilizing the information available to TW/C at the time it negotiated the APAs, including the Management Projections.[33]

The Asset Purchase Agreement Operating Cash Flow multiples methodology ("APA OCF Methodology"), as described in detail in the Lambert Expert Report, allocates the proceeds from the sale to TW/C across the 18 Debtor Groups by first dividing the purchase price for the Four Components by the OCF to be produced by those assets in 2005 as presented in the

---

estimate of fair market value. An auction sale, by contrast, represents actual, realizable value."). Professor Cornell puts it most succinctly:

> Q:    Is it fair to say that what you're saying there is that the best indicator of fair market value for an asset is the value that a willing buyer who is unrestricted will place on it?
>
> A.    It's really even a stronger statement than that. It's not only the best, it is, in my mind, the definition of fair market value. There are other estimates of fair market value, but that's what you're trying to estimate. That's what it is.

Cornell 40:15-25; *see also* Deposition of Randall L. Lambert, January 10, 2006 ("Lambert") at 87:5-14 (indicating that he utilized the TW/C values because he "wanted to use a methodology that was not arbitrary. So we had in this particular instance a transaction that was a result of an auction process that in my opinion was fair and robust. And we had specific data points for specific assets. And I think that the auction process, that in this case gave the best estimate of fair market value. And that estimate allowed for a precise calculation in a mechanistic way of how to allocate the value.").

In distinct contrast, The Arahova Committee's expert, Robin Flynn, abandons the concrete values in the TW/C APAs for a theoretical, arbitrary methodology geared solely to achieving the best result for Arahova. *See* Deposition of Robin Flynn, January 13, 2006 ("Flynn") at 99:24-100:9; 108:12-115:19. Indeed, she would not even accept the utterly clear value ascribed to the MCEs in the TW/C APAs. *Id.* 169:2-25; 189:2-192:14. Although Ms. Flynn does ultimately acknowledge that the overall price generated by the sale process was fair she seems to believe that any similarity between her value analysis and the sale price is merely coincidental. *Id.* at 95:12-103:12.

[33]    *See Herndon v. Commissioner,* 1962 Tax Ct. Memo LEXIS 125, *8 (August 3, 1962) ("Allocations of a purchase price made by the parties to a sales contract are evidence of the value of items sold."); *see also* Lambert Expert Report at 3-5, Exhibit B; *see also* Cornell Expert Report at 22-27. Although Professor Cornell has adopted the Debtors' use of LTM OCF multiples as the basis for allocation, he has nonetheless also acknowledged the validity of the Management Projections as a basis for calculating OCF. Cornell at 200:23-202:20 ("To the extent that you're comfortable, you have unbiased forecasts at the time of the deal, I'd be comfortable using those, yes.").

8

CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

Management Projections to generate a multiple for each of the Four Components. Because the individual assets within each of the Four Components can be easily allocated among the Debtor Groups, allocable value can be obtained through a mathematical calculation by multiplying the projected OCF for each Debtor Group by the relevant multiple (a chart graphically depicting this methodology is annexed hereto as Exhibit A).

Per the Management Projections,[34] the Four Components were projected to generate 2005 OCF as follows: (i) $45 million generated by the Comcast MCEs; (ii) $24 million generated by the TW MCEs; (iii) $233 million generated by the Adelphia JV Interests;[35] and (iv) $944 million generated by the Wholly-Owned Subscribers. Dividing the respective consideration paid by TW/C for each of the four components by the OCF generated thereby yields the following OCF multiples: (i) 13.3x for the Comcast MCEs; (ii) 15.9x for the Time Warner MCEs; (iii) 10.1x for the Adelphia JV interests; and (iv) 14.5x for the Wholly-Owned Subscribers.[36] Applying these four multiples to the OCF generated by the assets in the respective 18 Debtor groups pursuant to the Management Projections yields the allocations set forth in the chart annexed as Exhibit B hereto.

Because this approach yields results that are fact-based and free of outcome-driven, subjective assumptions, it represents the most reliable approach to asset valuation and should be adopted by this Court.

---

[34] Again, the Management Projections offer the most appropriate OCF numbers for performing the APA OCF Methodology because they represented the most current information available to the prospective bidders at the time of the M&A sale process.

[35] The calculation must necessarily exclude OCF attributable to portions of the subscribers not wholly owned by the Debtors, namely Comcast's ownership percentage of the Century-TCI and Parnassos JV's and OCF attributable to entities not being purchased by TW/C, including the Century/ML JV. *See* Lambert Expert Report at 5.

[36] The four different multiples reflect the real world fact that the market placed different values on Adelphia's various assets.

CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

**B.**     *The Court Should Reject the Arahova Committee's Speculative, Outcome-Based Approach*

Not surprisingly, the Arahova Committee argues for an approach that abandons measurable metrics such as OCF and the actual values ascribed to Adelphia's assets by TW/C in favor of pure speculation carefully designed to overvalue certain assets to benefit their constituency at the expense of all others. This approach lacks intellectual coherence, disregards objective facts in favor of subjective surmise, and yields unfair results.

Specifically, the Arahova Committee's expert was apparently not satisfied with the results she would have received limiting herself, as did other experts, to the actual values derived from the groups of assets defined by the TW/C APAs and information actually available to TW/C. Instead, she constructed her own 10-year projections through 2015,[37] despite the fact that no bidder could have possibly relied on such calculations in formulating an offer.[38] Additionally, even in those years for which management projections were available, Ms. Flynn chose to adjust certain assumptions made by the Debtors in favor of her own estimates.[39] Ms. Flynn's DCF analysis – an analysis considered but rejected by the other experts in these disputes[40] – results in a drastically inflated value for Arahova: $7.68 billion instead of $6.1 billion obtained through a fact-based calculation using the APA OCF Methodology. Of course, this conveniently ignores the fact that no individual bids were generated for Cluster D, which was substantially comprised

---

[37]     Expert Report of Robin Flynn (the "Flynn Expert Report") at 6; Flynn 174:2-177:18.

[38]     Flynn 175:20-176:23; 192:17-23 (conceding that she had no evidence that the Debtors, Comcast, or Time Warner expressed any opinion as to performance past 2009 or based their transactions on her conclusions).

[39]     *See* Cornell Rebuttal Report at 38 (illustrating differences between the Debtors' numbers and Ms. Flynn's). Conveniently, Ms. Flynn's projections for Cluster D performance increase substantially from 2009 through 2015, while that of other clusters declines. Flynn 126:21-131:11.

[40]     *See* Lambert 170:2-172:10 (criticizing DCF as "arbitrary," particularly where value has already been determined pursuant to an actual sale transaction); Cornell 29:10-30:6 (DCF is inappropriate in the presence of actual transaction data), 205:25-206:2 ("I felt that the DCF type approach was too subject to engineering."); Hardie 87:8-12 ("We don't believe there exist, as created by the debtors, a long-term forecast for the Adelphia assets on a silo basis and, as a consequence, we would not be in a position to perform a DCF"); 88:3-89:19.

10

of subscribers contained in Century-TCI and which the Arahova Debtor Group would nonetheless have the Court believe are the "crown jewel" of the Company.[41]

The most striking flaw in the Arahova Committee's valuation analysis is the inherently theoretical nature of Ms. Flynn's independent DCF valuation of the Debtors assets, particularly in light of the well-run auction process that generated an indisputable market price for the assets.[42] DCF, at its core, requires at least two arbitrarily assigned values: perpetual growth rate (i.e., an assumed constant rate of growth beyond available projections) and a discount rate. Ms. Flynn, of course, further clouds the waters by imposing her own 10-year projections. Moreover, Ms. Flynn does not use a constant perpetual growth rate, but rather assigns a higher rate to – no surprise here – Arahova assets.[43] By way of illustration, if one were to use uniform perpetuity growth rates, as opposed to those arbitrarily assigned by Ms. Flynn – which is most appropriate when valuing assets within the same industry, particularly one impacted by rapidly changing technology and increased competition[44] – the resultant swing in the valuation of all of Adelphia's assets would be in the magnitude of billions of dollars.

---

[41] *See, e.g*, Stenzler 71:16-22; 77:10-83:7; Flynn Expert Report at 8-9.

[42] Ms. Flynn admits that she "was retained by counsel for the [Arahova Committee] to provide valuation analysis and perspective on the proper allocation of value among the Debtor Groups of the proceeds of $17.6 bil. Which would be realized from the sale of substantially all of the U.S. assets of [the Debtors to TW/C," Flynn Expert Report at 3, her report in fact ignores the sale transaction's expressions of value entirely, proceeding instead with a completely independent valuation that arrives, interestingly enough, at approximately the same aggregate value as the sale process. Flynn 98:2-99:23 (giving valuation ranges from $16.9 billion to $18.1 billion).

[43] *See* Flynn Expert Report Exhibit C (assigning 4% perpetuity rates to Clusters A and D).

[44] As Professor Cornell described at his deposition:

> Q.   In fact, wouldn't it be unusual to see a different growth rate in perpetuity for two companies in the same industry ten years out from now?
>
> A.   Yeah, that's one of the problems I had with Ms. Flynn. Because if that happens, eventually one will get infinitely larger than the other. Once you're ten years out and they are the same business, if you're talking about forever, and that's a long time, you better have them growing at pretty much the same rate, or you get nonsensical results.

11

CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

Here is another example of just how completely Ms. Flynn divorces her analysis from the reality of the actual sale transaction: the APAs clearly assign a total value to the MCEs of $990 million (expressed in the form of a gross adjustment in the event the MCEs were excluded from the transaction).[45]  Despite the fact that there could be no clearer expression of value between a willing buyer and a willing seller, Ms. Flynn, amazingly, believes this is irrelevant for the purposes of her opinion.[46]

Given the blatant defects in Ms. Flynn's arbitrary analysis, this Court should reject it entirely.

C.    *The Court Should Reject the FrontierVision Committee's Approach*

Although the Ad Hoc Committee of FrontierVision Noteholders (the "FrontierVision Committee") has advocated a valuation methodology at least facially based on information available to TW/C at the time of its bids,[47] this approach, too, must be rejected as overly simplistic and speculative.  Simply stated, the FrontierVision Committee advocates allocation based on either simple subscriber numbers or, failing that, a combination of subscribers and OCF.[48]

---

> Q.    You're saying that's one of the problems you had with Ms. Flynn's analysis, you mean where she used, for example, 4 percent growth rate in perpetuity for two clusters, I think B and D, and 2 percent for other clusters?
>
> A.    Yeah. That really doesn't make sense.  Then she should extend her model or do something else.  I just don't see that that's a reasonable conclusion to have.

Cornell 230:4-24.

[45]    The TW/C APAs ascribe $990 million in value to the MCEs before accounting for the exclusion of certain MCEs as a part of the Government Settlement.  Per the Debtors, an adjustment for the value of those properties would be yield an aggregate value of roughly $967 million.  *See supra* n. 21, 22.

[46]    Flynn 169:2-25; 189:2-192:14.

[47]    Final Issues Statement of the FrontierVision Committee Pursuant to Order in Aid, dated January 9, 2006 [Docket No. 9328], at  8; Expert Report of William H. Hardie, III (the "Hardie Expert Report"), at 30.

[48]    Incidentally, the FrontierVision Committee agrees with the Equity Committee that OCF should be derived from the Management Projections, because those were part of the data available to and relied upon by TW/C at the time the APAs were negotiated.  *Id.* at 8-9.

12

CONFIDENTIAL – FILED UNDER SEAL – ATTORNEYS' EYES ONLY

The FrontierVision Committee initially advocates a pure subscriber-based analysis that assumes that all subscribers are of equal value. Perhaps realizing the facially deficient nature of that approach compared to one based on short-term OCF projections, the FrontierVision Committee somewhat adopts OCF as a metric but attempts to downplay its relevance.[49] Ultimately, though, the FrontierVision Committee concedes what is altogether evident: OCF calculations based upon the Management Projections are a reasonable valuation methodology.

## IV.  CONCLUSION

For the reasons set forth above, the proceeds of the sale of the Debtors' assets should be allocated according to the methodology described in the Lambert Expert Report.

Dated: March 14, 2006
      New York, New York

                MORGENSTERN JACOBS & BLUE, LLC

                By:   /s/ Eric B. Fisher
                     Peter D. Morgenstern (PM-5021)
                     Mark R. Jacobs (MJ-6248)
                     Gregory A. Blue (GB-9569)
                     Eric B. Fisher (EF-1209)
                     Andrew L. Buck (AB-4298)
                     885 Third Avenue, Suite 3040
                     New York, New York 10022
                     Telephone: (212) 750-6776

                *Attorneys for the Official Committee
                of Equity Security Holders*

---

[49]    Hardie Expert Report at 32.