UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                                                    )
In re:                                                              )         Chapter 11
                                                                    )         Case No. 02-41729
Adelphia Communications Corporation, *et al.*,                      )
                                                                    )         Jointly Administered
Debtors.                                                            )
_____)
                                                                    )
Keys Gate Community Association, Inc. and                           )
                                                                    )
                                                                    )         Adversary Proceeding
                                                                    )         No. 05-01133
M & H Homestead, Ltd.,                                              )
                                                                    )
                    Plaintiffs                                      )
                                                                    )
               -against-                                            )
                                                                    )
Adelphia Communications Corporation,                                )
                                                                    )
                    Defendant                                       )
_____)

APPEARANCES:

W. James Mac Naughton, Esq.
Counsel for Plaintiffs Keys Gate Community
Association, Inc. and M&H Homestead, Ltd.
90 Woodbridge Center Drive
Suite 610
Woodbridge, New Jersey 07095

Willkie Farr & Gallagher
Counsel for Defendant Adelphia Communications Corporation
787 Seventh Avenue
New York, New York 10019
By:    Brian E. O'Connor, Esq.
         Eilish M. Cahalan, Esq.
         Brian P. Guiney, Esq.

-1-

Bench Decision[1] On Motion for Relief from Stay

After hearing the evidence, and gauging the credibility of the witnesses, I find that Keys Gate has not shown a repudiation on the part of Adelphia of its obligations under the Adelphia-Keys Gate contract. I further find Adelphia's failures to satisfy minor obligations under the contract, which were never noticed or objected to by Keys Gate until it suited Keys Gate's litigation interests to do so, were insufficient to trigger the forfeiture Keys Gate seeks here; they were not sufficiently material to justify termination and to justify what would effectively amount to the forfeiture of property that cost Adelphia millions of dollars to install.

Accordingly, relief from the stay to capture that property, at the bargain-basement price that would be the consequence of Keys Gate's theory, is denied. Keys Gate will be free to get its cable service from another provider if it wishes, but not by using Adelphia's property, and with the subsidy that would result from what in essence would be the seizure of Adelphia's property.

I'm not going to issue detailed findings of fact in this bench decision on undisputed or largely undisputed factual matters—Adelphia is to prepare complete findings if Keys Gate wishes to appeal—but these are my factual findings and legal conclusions on the issues that are the heart of the controversy in this trial, and the principal reasons why I came to the conclusions I did.

---

[1] I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where time does not permit more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have fewer citations and other footnotes, and have a more conversational tone.

Facts

*1. The Agreement*

Adelphia doesn't provide service to Keys Gate residents under the more common arrangement, with a contract between the individual consumer and the cable company. Instead, Adelphia provides the service to Keys Gate under a bulk services arrangement, under which the cable company contracts with the Homeowners Association (which at all relevant times has been controlled by the developer, rather than the residents), whereby Adelphia charges the agreed-on rate for every community resident who uses the service.[2] That payment is made by the Association on behalf of the residents. As residents sign up for the cable service, or drop it, the number of subscribers changes, and the total price paid by the Association is adjusted accordingly.

The Agreement between Keys Gate and Adelphia, which was first entered into in 1987, called for Adelphia to provide cable service to Keys Gate in exchange for a fixed per-subscriber price. The Agreement called for adjustments in that per-subscriber price under a formula that could be analogized to an adjustment for inflation, but prevailing cable prices have increased more than the formula permitted, and rates under the Agreement (even taking into account the discount that results from a bulk services arrangement) now appear to be quite a bit lower than those now charged to consumers who pay prevailing market rates. Adelphia installed the system in Keys Gate, and upgraded it from time to time. Adelphia's investment in its Keys Gate plant and equipment is sizeable, in the millions of dollars. The cost to install an alternate system would likewise be sizeable, also in the millions of dollars.

---

[2] The computation is complicated by individual subscribers' decisions to sign up for extra services, but that nuance isn't relevant to this discussion.

The Agreement has two key sections dealing with breach. Section 22 of the Agreement provides:

> ASSOCIATION, DEVELOPER and ADELPHIA agree that in the event that any party breaches any of its obligations under this Agreement as to which there is no adequate remedy at law, the non-breaching party or parties will be entitled to injunctive relief in a court of competent jurisdiction, in addition to other remedies (including, without limitation, those under the bond required to be maintained by Adelphia).

Def. Exh. 12.

Section 23 of the Agreement provides, in relevant part:

> Upon a default hereunder by ADELPHIA, DEVELOPER shall have the option to purchase all of the EQUIPMENT . . . at a price equal to the value of the EQUIPMENT as located within the PROJECT . . . established by appraisal in the manner set forth below. Should DEVELOPER exercise such option and pay the applicable purchase price, ADELPHIA shall convey title to the subject provisions of the EQUIPMENT by standard form Bill of Sale with full warranties of title and right to sell, free and clear of all liens and encumbrances.
>
> The provisions of this Section 23 shall constitute an independent covenant which shall survive any termination of this Agreement by its terms or otherwise.

*Id.*

2. *Non-renewal and Repudiation*

Turning to the events in 2004, I have to say that this case was in great respects about credibility, and it was for that reason that I placed considerable reliance on the witnesses I heard from and saw—Paige Latterner and Teresita White in particular—and the witness I wish I had heard from and seen, Property Manager Sheri Murillo.

-4-

I found Adelphia's witnesses much more credible than Keys Gate's. As I heard her testify, Paige Latterner's testimony was almost a textbook example of things that would make a witness's testimony unworthy of belief—evasiveness, contradiction with her own earlier testimony on deposition, contradiction with her own testimony at trial (sometimes just a question or two earlier), contradiction with the documents (including documents that were before her at the very time she was testifying), talking off an apparent script (as when she repeatedly asserted that she was doing what she was doing for the benefit of the Keys Gate residents, when the documents (*e.g.*, O'Connor Decl. Exh. H) made clear that the overriding purpose of the Keys Gate strategy was to turn cable into a profit center for the developers), and testimony that defied common sense. The timing of the events also makes the Keys Gate account of what happened improbable or impossible—most significantly the fact that Keys Gate starting taking the measures to put in its own cable system, and turn cable into a profit center, well before the time that it claims that Adelphia repudiated.

I also found the failure to present the testimony of Sheri Murillo noteworthy. As Paige Latterner testified, Ms. Murillo was the Property Manager. July 6 Hrg. Tr. at 203. She was the most likely initial recipient of Adelphia's March 16, 2004 non-renewal letter (also referred to as the "Notice of Nonrenewal"), Def. Exh. 14 (which was addressed to 888 Kingman Road, with a "Dear Property Manager"), since that is where Ms. Murillo worked. Ms. Murillo was also the supposed recipient of complaints about Adelphia's failure to wire new single-family homes in the Shores. Of course I had to exclude as hearsay Ms. Latterner's testimony of what she heard from Ms. Murillo as to Adelphia's alleged sluggishness in wiring the Shores single family homes, when offered for the truth

of whether or not the homes had been wired, and when (especially since this was in fact double-hearsay), there was no showing that Ms. Murillo herself knew the facts, and instead was allegedly passing on remarks made by some residents.

I found Teresita White's business style unsophisticated and amateurish, but I found her honest and credible. Looking at her as she testified, I believed Ms. White's account that she sent out the letter addressed in accordance with the copy in her files, and I particularly believe that *she* believed she had sent out the letter. The earlier December 22, 2003 letter, Pl. Exh. 375, raising Keys Gate's rates, was addressed nearly the same way, and was almost certainly received—since Keys Gate paid the higher rates, and there is no evidence in the record to suggest that Keys Gate ever asked, in words or substance, "why are you charging us more"? The non-renewal letter was addressed the same way as Keys Gate's bills, which on the whole were paid relatively timely after each was sent out. *See* July 7 Hrg. Tr. at 500.

Other factors that I took into account in believing Ms. White, and disbelieving much of what I heard from Paige Latterner (and also much of what I heard from David Beall) are as follows.

*1. The Non-renewal Letter*

The White letter of March 16, 2004, Def. Exh. 14, was addressed "Dear Property Manager." It wasn't addressed to a named, particular, person, nor of course, was it addressed or sent in accordance with the notice requirements of the contract. A more thoughtful business person likely would have looked at the contract to see how a non-renewal notification should have been addressed, and likely would have addressed a letter

of that importance to a particular, personally identified, person.[3] Thus, I am not in a position to find that the notice to terminate that Teresita White drafted conformed to the requirements of the contract—in fact, I find that it did *not* so conform—and Adelphia was wise to keep performing under the contract at the old pricing. If Adelphia had not voluntarily agreed to continue performing its obligations for another year, it would have been in trouble with me; I would have found that it was required to.

But I am persuaded, and expressly find, that the contract non-renewal letter was sent; that it was addressed to an address that would reach Keys Gate; and that it was received by Keys Gate. The evidence supporting that conclusion, particularly when considered in the aggregate, is quite strong.

First, Teresita White was very firm in her testimony that the non-renewal letter got to the mailroom, and that she saw it getting stamped and being put in the bin for outgoing mail. (I don't think her initial failure to say that this letter was one of several undercuts that testimony). She didn't go so far as saying that it got into a US Postal Service mailbox, and for that reason I am not relying on a *presumption* that it was received. Rather, I am so finding as a garden-variety inference, by reason of the totality of the facts and circumstances. Adelphia had a practice of sending out all of its mail the same way, by delivery to its mailroom, with subsequent delivery of the mail by a mailroom employee to the US Postal Service. Ms. White got it to the mailroom, along with other similar notice letters, and there is no indication that the notice letters to other recipients that were brought in the same batch did not arrive. More importantly, the discussions that followed about a week later, on or about March 20, strongly support the

---

[3] Many a business person would have also kept a backup copy on his or her hard drive, though I'm not sure all would have, and keeping a second printed (and then signed) copy in the file cannot, in my view, be regarded as a wholly unsatisfactory substitute.

-7-

conclusion that the letter arrived. Why else would Paige Latterner immediately get engaged in negotiations over what the rates would be upon non-renewal? If no notice had been sent, there would be nothing to negotiate, because Adelphia's ability to raise its rates was limited by the contract, to the lesser of 6% or the cost of living increase. And there would be nothing for the parties to negotiate even if I were to assume (contrary to all reason) that Paige Latterner was negotiating in March 2004 for a rate increase that would take place, as she asserted, only in January 2005. Rather, I believe that the negotiations that started in March 2004 and went on through June 2004, had a context and a purpose—with the context being the notice that had been sent on March 16, and the purpose being to deal with the contractual void that would exist after June 18. I also believed Teresita White when she said she gave another copy to Paige Latterner when they met in person.

Second, I don't find it credible that Paige Latterner and Teresita White were talking about rates to be effective the following year. That is so first because then too the contract wouldn't have expired unless notice of non-renewal had been given; second, because the supposed new rates effective date was so far off in the future; and third, because the documents all provided for *2004* effective dates. Rather, I come back to the context and purpose of the negotiations in the period March through June, and the fact that there would have been no reason for all of those negotiations if the notice had not been sent. There was no need to negotiate a rate increase if the existing contract were to renew in June 2004, as it would have if no notice had been sent.

Third, the meeting shortly before March 29 meshes closely with the date of the non-renewal letter, March 16. What would the purpose of that meeting have been if no letter had been sent out?

Fourth, the level of the proposed rate increase that Adelphia desired could not in any way be regarded as consistent with a contract that, according to Paige Latterner's account, had not expired. Either by design or inattention (more likely the latter), Adelphia had failed to exercise its option to raise rates under the existing contract for most of the several preceding years, leading to a situation where Adelphia was charging a rate of about $5.73 per household per month for its service. The rates that Adelphia proposed to charge were at levels of from about $15 to $21 dollars per month. That increase—about a tripling of the rate—would get any homeowner's association's attention, and more fundamentally, could not in any way, shape or form be regarded as consistent with the existing contract. Clearly the rates Adelphia was proposing to charge could be collected only under a new contract, as they were far higher than the rates Adelphia would ever have been entitled to if the contract had automatically renewed.

Fifth, the e-mail Paige Latterner sent on June 16—"where are we," Def. Exh. 47—is consistent with Adelphia's account, and with the importance of the June 18 expiration. It also is inconsistent with Paige Latterner's testimony that they were talking about a rate that would become effective only 6 months later. With the existing contract expiring on June 18, and with no new contract in hand, it is perfectly understandable that Paige Latterner sent Teresita White an e-mail 2 days before the previously announced contract expiration date, for a status update. The imminent non-renewal also provides a highly reasonable explanation for the Teresita White response, proposing by-hand

-9-

delivery of documents, even if the e-mails are a little cryptic in indicating whether they were still then talking about drafts, on the one hand, or execution copies, on the other. But all of these exchanges make little sense if, as Paige Latterner now tells us, all of this was in the context of a continuing contract which had never expired, and if all they were discussing was rates that would be effective 6 months later.

Sixth, my conclusions are also supported by the chronology of the behind-the-scenes events at Keys Gate. On June 23, 2004, we have the first written evidence of Keys Gate's efforts to find an alternate provider of cable service. *See* O'Connor Decl. Exh. I. David Beall, an advisor to Paige Latterner's father, Michael Latterner, at Homestead, Keys Gate's developer, wrote to Paige Latterner:

> I have negotiated the framework for a deal today
> with Digital Community Networks that both your
> father and Wayne [Michael Latterner's partner] felt
> was very good for our side . . . . *But the real issue to
> making a lot of money on our investment in this deal
> is you being able to hold off Adelphia on signing the
> old contracts as long as possible.*

*Id.* (Emphasis added).

First, of course, that tells us that months before Keys Gate accused Adelphia of repudiation and breach, Keys Gate was looking for means to separate itself from Adelphia, so that Keys Gate and/or Keys Gate's developer could make a profit on cable and related services. Second, it demonstrates an awareness and confirmation of the ongoing negotiations that were then underway, and, most importantly, that there was not then an existing contractual relation with Adelphia. That's why it was so important for Paige Latterner not to sign the new contracts. And it seems to me that Paige Latterner acted in accordance with Mr. Beall's instructions, and then began stalling, as confirmed by Teresita White's testimony that when she called Paige Latterner, at the end of June,

-10-

Paige Latterner said she didn't know what Ms. White was talking about. No truthful person could have told Teresita White that.

Additionally, it appears that deal negotiations between DCN and Keys Gate—or at the very least, discussions regarding the possibility of DCN replacing Adelphia as Keys Gate's cable provider—began well before Adelphia supposedly repudiated, perhaps as early as April 2004. David Beall testified that he first met with DCN's Bob Miscavage in the "April or May time frame." July 7 Hrg. Tr. at 609. Mr. Miscavage testified that believed his first meeting with Mr. Beall was in the "late spring, early summer" of 2004. July 6 Hrg. Tr. at 283.

That's also consistent with the July 20 letter from Mr. Miscavage to Mr. Beall that said that as of that time, "we're still behind schedule", O'Connor Decl. Exh. H (emphasis added), suggesting that they not only were behind schedule then, but had been behind schedule at an earlier time as well. And I note that when DCN listed things DCN did, one of which was analyzing the Adelphia contract and showing Keys Gate a means of delaying its decision to sign, once more that would have been an act that would be wholly meaningless if notice had not been sent out.

Seventh, I find Paige Latterner's stated ignorance of what her father was doing with respect to her development wholly non-credible.

Eighth, the non-renewal letter was addressed to "Property Manager." The Property Manager was Sheri Murillo. The address used was where Ms. Murillo worked. After an earlier letter from Adelphia, dated December 22, 2003, Pl. Exh. 375, raising rates, which was sent to Keys Gate at very nearly the same address ("888-A Kingman

-11-

Road"), Keys Gate paid higher rates for Keys Gate residents. It's hardly a jump for me to conclude that both letters were received.

I can't accept Keys Gate's argument that there is significance to the fact that one address for Keys Gate had an "A" in it, and another didn't; Keys Gate itself used the address in each form, as shown in O'Connor Decl. Exh. E, the May 2004 contract with DCN. Nor would there be any significance (or, especially, prejudice), other than in a failure to satisfy the contract's notice requirements, in Adelphia's using a more current address, rather than the older 1987 address set forth in the contract.

But as noted, there was no testimony by Ms. Murillo, and no denial that Ms. Murillo received the non-renewal letter and told Paige Latterner about it.[4] I find suspect David Beall's testimony that months later, there was a search for the non-renewal letter and it could not be found. (I also find suspect several other aspects of his testimony, especially his testimony as to things he claims he heard on a conference call that he says he listened in on without identifying himself.) But even assuming that Beall's testimony was true, it is insufficient to tell us whether the non-renewal letter was ever received (and, for example, misplaced), and it is insufficient to trump all of the other factors I've identified above.

Teresita White sent out a large number of letters, and this isn't the only one for which a copy didn't remain on the hard drive. Once more, in terms of business competence, I think a more thoughtful business person would have kept a copy on the hard drive of every letter that was sent, but there are several letters that were sent out on

---

[4]  Indeed, the August 17, 2004 letter from Keys Gate counsel Maria Victoria Arias stated that the Association "never received notice by certified or registered mail"—as compared and contrasted to stating that it never received notice at all—and asked Adelphia to provide proof of its compliance with the certified/registered mail requirement.

that day for which no copies were kept on the hard drive—not just this one—and there is no evidence that any of the others that were said to have gone out, and for which file copies were printed, failed to arrive. I do not believe that the letter she put in the file was a fabrication or backdated.

It is possible, I suppose, to infer that Ms. Latterner was so incompetent as to have never reviewed the contract until the very late time that she claims that she did, and to have had all of the extensive negotiations with Adelphia that she did—giving up an extraordinarily attractive rate for Keys Gate residents—without once considering on what basis Adelphia was thinking that it could triple Keys Gate's rates, and without once reviewing the contract. But I don't believe that she was that incompetent. I just don't believe her account.

As ultimate facts, I therefore conclude that while Adelphia failed to convey its election to let the contract expire in a manner that complied with the contract and would be effective, Adelphia thought it had duly done so. Adelphia did not believe it was repudiating anything. Adelphia believed that it had met the requirements for non-renewal, and it never intended to repudiate any existing obligations.

Now if Adelphia had ceased to provide service based on its erroneous view that it had let the contract expire, it would be at least arguable that Adelphia would then have been in breach. But Adelphia did not do so. To be sure, Adelphia's failure to have done something as basic as reading its contract, and sending out a non-renewal notice in compliance with the contract's requirements, was hardly a model of business competence. And Adelphia's blustering and threats, *see* Def. Exhs. 52 and 62, based on its belief that the contract had been duly allowed to expire (and without stopping to look

to see if its nonrenewal complied with the requirements of the Agreement), was hardly a model of legal competence. But ultimately Adelphia never stopped providing service, nor did it take any action to recover more than the contractual rate under the then-continuing agreement. Nor did Adelphia actually go to existing subscribers, as threatened in Def. Exhs. 52 and 62. As repudiation must be unequivocal, as discussed below, I find as a fact or mixed question of fact and law that Adelphia did not repudiate.

Moreover, even if Adelphia had been deemed to have repudiated at some point in the fall of 2004 (contrary to my finding), Mr. Yonkin's letter of December 6, 2004, Def. Exh. 64, could only be regarded as a retraction of the repudiation. In the meantime, there was no detrimental reliance. Keys Gate contends that Adelphia repudiated (or first repudiated) on August 20, 2004, *see* Compl. ¶ 22, but Keys Gate entered into the Arbors contract with DCN before that date, on August 11, 2004, and started dealing with DCN long before that date. Similarly, Keys Gate entered into its other agreement with DCN on April 19 of the following year, after Adelphia had retracted whatever repudiation might otherwise have been found to exist. Focusing on the gap period between alleged repudiation and retraction, I find that there was no detrimental reliance in that gap period. What Keys Gate was going to do upon the asserted repudiation, and ultimately did, was bring an action in this Court to get a determination that it could get Adelphia's property, and that was done only much later. *See* Draft Compl., Def. Exh. 63.

2. *Other Breaches*

Adelphia's performance under the Agreement was less than perfect, and, once again, in many respects amateurish. I find that Adelphia never posted the performance bond it was required to post under the contract; failed to provide Keys Gate with the community access channel Adelphia was obligated to provide; billed for sales taxes and

-14-

franchise fees as a separate item, when under the Agreement, those charges should have been included in the monthly fee; and did not "pre-wire" new single family units at Keys Gate during construction, as it was obligated to do. Additionally, though overall Adelphia did not charge Keys Gate more for services Adelphia provided than Adelphia could have charged if Adelphia had availed itself of all of its rights to raise rates (and because of apparent inattention or ineptness, thus charged Keys Gate materially less than the Agreement would have permitted), Adelphia increased its rates between 2001 and 2004 more than the 6% per year that Adelphia was authorized to.

But I find that Keys Gate never noticed any of these matters (or at least commented on them), or ever brought any of them to Adelphia's attention, until it was in Keys Gate's litigation interests to do so.[5] Then, instead of asking for Adelphia to perform those additional obligations, or seeking damages or other compensation for any losses it suffered by reason of these matters, Keys Gate sought to utilize them as additional justification for termination of the entire Agreement for cause, and thus to secure the forfeiture of Adelphia's assets.

I find that in the context of an Agreement under which Adelphia provided cable services day in and day out for about 17 years—and, more significantly, continued to provide service, at no more than the permissible contract rate, in the key 2004-2005 time period here in question—these were very minor omissions. I find that they did not constitute material breaches of the Agreement.

---

[5] In fact, these issues do not appear to have been raised in Keys Gate's initial litigation papers, and first appeared only in Keys Gate's amended adversary complaint. Compare Compl. to Am. Compl. at ¶¶ F-J.

Conclusions of Law

*1. Repudiation*

"The doctrine of anticipatory repudiation is part of the law of contracts in Florida." *Southern Crane Rentals, Inc. v. City of Gainesville*, 429 So. 2d 771, 773 (Fla. Dist. Ct. App. 1983). Under the law of Florida, as in most states, a party to a contract that announces its intention not to perform a contract in the future—that repudiates its obligations to perform—is guilty of breach, and defaults under its obligations under the contract.

But under the law of Florida, as elsewhere, repudiation must be unequivocal. A repudiation may be evidenced by words or voluntary acts, but the refusal must be distinct, unequivocal, and absolute. *Gaylis v. Caminis*, 445 So. 2d 1063, 1065 (Fla. Dist. Ct. App. 1984), *quoting Mori v. Matsushita Electric Corp.,* 380 So. 2d 461, 463 (Fla. Dist. Ct. App. 1980), *cert. denied*, 389 So. 2d 1112 (Fla. 1980).

While I have found as a fact (and likewise find as a mixed question of fact and law) that Adelphia failed to meet the Agreement's requirements for exercising its right of non-renewal, all that means is that the Agreement continued in effect, and Adelphia could charge no more under the Agreement than the modest monthly rates that the Agreement now provides for. But I have also found as a fact that Adelphia believed that it had met the requirement for non-renewal, and it never intended to repudiate any existing obligations. As importantly or more so, Adelphia neither stopped providing service, nor unequivocally announced its intention to do so. Its blustering and threats to take action in the future, which it never followed up on, did not constitute the unequivocal repudiation that the law of Florida requires.

Moreover, even if Adelphia's words and actions after its ineffective nonrenewal were sufficiently unequivocal to constitute a repudiation, its decision to continue to perform after its earlier inept communications caused any repudiation that I otherwise might have found to have been retracted. Putting it another way, while I do not find that Adelphia repudiated, I find (as a mixed question of fact and law) that if I had found Adelphia to have repudiated, I would also find that it retracted its repudiation.

In the meantime, as I have found above, Keys Gate never materially changed its position in reliance on the alleged repudiation. What Keys Gate was going to do, and ultimately did, was bring an action in this Court to get a determination that it could do what it wanted to do, and that was only done much later. If there had been a repudiation, Adelphia retracted it in time, and I find, as a mixed question of fact and law, that any asserted repudiation was satisfactorily retracted. *See In re Estate of Johnson*, 566 So. 2d 1345, 1348 (Fla. Dist. Ct. App. 1990), quoting *Restatement of Contracts 2d* § 256 ("The effect of a statement as constituting a repudiation under § 250 or the basis for a repudiation under § 251 is nullified by a retraction of the statement if notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final.").

Under these circumstances, Adelphia did not default under the Agreement, and its conduct did not trigger the rights Keys Gate might otherwise have under Section 23 of the Agreement. Adelphia came close to defaulting, and its business and legal personnel would be well served to exercise more care (and thought) in their work in the future. But ultimately Adelphia did not default, and because it did not default, Keys Gate is not

-17-

entitled to buy up Adelphia's equipment at the bargain-basement prices that Keys Gate could otherwise have done if Adelphia had indeed decided to default.

*2 Other Breaches*

I also agree with Adelphia that "breach" and "default" do not mean the same thing. Any sensible construction of "default" means repudiation, material breach, or conduct or (though not applicable here) an event that is specifically stated to be an Event of Default. Adelphia's other transgressions, while breaches of the Agreement, do not constitute material breaches, and do not amount to a "default" under the Agreement. Under such circumstances, Keys Gate may have a right to the performance bond and community access channel that were not provided, and/or for damages for the failures to provide them (or for any contractual overcharges). Keys Gate may also have a right to damages for any other Adelphia slip-ups. But Keys Gate cannot base the taking of Adelphia's property on those trivial breaches. That is especially so since the breaches never were of sufficient important to warrant attention until Keys Gate was looking for excuses to turn cable into a developer's profit center. The failure to mention those issues at an earlier time suggests that they are now a pretext. But even if they were not, the failure to mention them earlier underscores the point that they are not material.

*3. Ultimate Conclusions*

Because Adelphia did not breach, Keys Gate is not entitled to capture Adelphia's wiring and equipment at the bargain price Keys Gate proposes. Relief from the stay must be denied.

Keys Gate does not have to continue with Adelphia going forward, but if it wishes to put in its own system, Keys Gate must do so with its own wiring and equipment, and at its own expense.

Further Proceedings

This decision addresses Keys Gate's request for relief from the stay. Here I'm ruling that Keys Gate cannot use the supposed default to take or exercise control of Adelphia's wires, equipment and other property, *see* Bankruptcy Code § 362(a)(3),[6] and, as related to that, Adelphia has the right to keep anyone else from using its wires. But Adelphia will not have the right to provide its services on the wholesale basis under which it has provided them after the expiration of the Agreement, and whether Adelphia can provide them directly to Keys Gate residents without Keys Gate's consent (which means, as a practical matter, the developer's consent) depends on the remaining issues on the Declaratory Judgment adversary proceeding.

The extent, if any, to which Adelphia can run its wires over land in the Keys Gate development (which turns principally on the extent to which Adelphia has the necessary easements, as a matter of Florida or federal law) represents the principal issue in Keys Gate's related adversary proceeding. I had thought everyone had the opportunity to, and did, put in everything they wanted to on the Declaratory Judgment portion. But I specifically asked Mr. Mac Naughton on summation:

> Pause, please, Mr. Mac Naughton, because early on, probably in the first day of trial, first morning of trial, there was some question as to whether you were just looking to try the relief from stay issue today, or whether you wanted to deal with the totality of the issues raised by your complaint. Whether your folks get [Adelphia's] wire sounds to me, subject to people's rights to be heard, like a relief from stay issue. Issues relating to transition seem to go beyond that to go to issues in your

---

[6] Section 362(a) of the Bankruptcy Code provides in relevant part: ". . . a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of . . . (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate".

>    complaint. Did you get in all the evidence that you
>    want so I can decide all of the disputed issues—
>
>    MR. Mac NAUGHTON:    No, Your Honor.
>
>    THE COURT:    —on the complaint?
>
>    MR. Mac NAUGHTON:    No, Your Honor.
>    This application is simply for lifting the stay.

July 28 Hrg. Tr. at 23-24.

Accordingly, the parties are to confer as to a joint proposal for the submission of further evidence and argument for the determination of the remainder of the issues in the adversary proceeding.

## Conclusion

For the reasons set forth above, relief from the stay is denied. Adelphia is to settle an order in accordance with the foregoing. If Keys Gate wishes to appeal, it should first advise Adelphia informally, and in that event, Adelphia is authorized (though not required) to submit more extensive proposed findings of fact and law to accompany the related order to address details not included in this decision, upon which Keys Gate may comment or submit counter findings if it is so advised.

Dated:  New York, New York           *s/Robert E. Gerber*
        March 31, 2006               United States Bankruptcy Judge