UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Adelphia Communications Corp., *et al.*, | ) | Case No. 02-41729 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

———————————————————————

DECISION ON BANK LENDERS' CLAIMS TO
ADDITIONAL INTEREST

APPEARANCES:

WILLKIE FARR & GALLAGHER LLP
Counsel for the Debtors and Debtors in Possession
787 Seventh Avenue
New York, NY 10019
By:     Shelley C. Chapman, Esq.
        Brian E. O'Connor, Esq.
        Terence K. McLaughlin, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for the Official Committee of Unsecured Creditors
1633 Broadway
New York, NY  10019
By:     David M. Friedman, Esq. (argued)
        Jonathan E. Minsker, Esq.
        Daniela Raz, Esq.

SIMPSON THACHER & BARTLETT LLP
Counsel for Wachovia Bank, N.A., as Administrative Agent for the UCA Lenders
425 Lexington Avenue
New York, NY 10017
By:     Peter V. Pantaleo, Esq. (argued)
        William T. Russell, Jr., Esq.

HAYNES AND BOONE, LLP
Counsel for Bank of America, N.A., as Administrative Agent for the Century Lenders
901 Main Street, Suite 3100
Dallas, TX 75202
By:      Robin E. Phelan, Esq. (argued)

153 East 53rd  Street, Suite 4900
New York, NY 10022
By:      Judith Elkin, Esq.

MAYER, BROWN, ROWE & MAW LLP
Counsel for Bank of Montreal, as Administrative Agent for the Olympus Lenders
1675 Broadway
New York, NY 10019
By:      Robert J. Ward, Esq. (argued)

MILBANK, TWEED, HADLEY & MCCLOY LLP
Counsel for Citibank, N.A., as Administrative Agent for the Century-TCI Lenders
One Chase Manhattan Plaza
New York, NY 10005
By:      Robert E. Winter, Esq.

MILBANK, TWEED, HADLEY & MCCLOY LLP
Counsel for JPMorgan Chase Bank, N.A., as Administrative Agent for the FrontierVision
Lenders
One Chase Manhattan Plaza
New York, NY 10005
By:      James C. Tecce, Esq.

LUSKIN, STERN & EISLER LLP
Counsel for The Bank of Nova Scotia, as Administrative Agent for the Parnassos Lenders
330 Madison Avenue
New York, NY 10017
By:      Michael Luskin, Esq.
         Trevor Hoffman, Esq.

MORGENSTERN JACOBS & BLUE, LLC
Counsel for the Official Committee of Equity Security Holders
885 Third Avenue
New York, NY 10022
By:      Gregory A. Blue, Esq.

BEFORE:      ROBERT E. GERBER
             UNITED STATES BANKRUPTCY JUDGE

In this contested matter in the jointly administered chapter 11 cases of Adelphia

Communications Corporation and its subsidiaries (the "Debtors" or "Adelphia"), the

Court has before it, as now relevant to the size of the reserves that the Debtors will have

to fund under their plan of reorganization, issues with respect to aspects of the

allowability of the claims that the Debtors' prepetition secured bank lenders will have in

these cases.

To fix plan reserves (and as a precursor to other bank claims allowance matters to

come),[1] the Court must decide the extent to which the bank lenders' claims may include

incremental amounts of from $187 million to $300 million[2] beyond the approximately

$1.5 billion[3] in pre- and post-petition interest that the bank lenders have already received

in these cases.  The bank lenders contend that financial information provided to them

during the Rigas era (or some of it) was inaccurate, and that this caused the bank lenders

to receive interest less than they otherwise would have received.

The interest in dispute has colloquially been referred to as "Grid Interest."  As

discussed below, the interest rates on the bank lenders' loans are computed based on

spreads above floating base rates, which spreads vary with reported borrower financial

---

[1]     As the bank lenders note (Bank Lenders' Joint Resp. at n.3), at this stage the dispute involves only whether the Debtors should create a reserve for the payments of amounts claimed by the bank lenders.  Other aspects of the allowability of the bank lenders' claims, which are intertwined with claims the Official Committee of Unsecured Creditors (the "Creditors' Committee") has asserted in plenary litigation against the bank lenders which is now before Judge McKenna in the district court, are not now before the Court.

[2]     The bank lenders filed amended proofs of claim for up to approximately $300 million in the aggregate, but later "refined their calculation," and now assert that their claims will total "not less than" $187 million as of June 30, 2006, the assumed effective date of the Debtors' plan.  (Bank Lenders' Joint Resp. ¶ 26)  The bank lenders reserve the right "to further refine the amount of the claims . . . ."  *Id.* at n.28.

[3]     Cred. Comm./Debtors Joint Obj. ¶ 1.  The statement as to the amount of interest already paid is deemed admitted under this Court's Case Mgmt. Order #3, dated July 26, 2004, ¶ 2.

condition and performance, as specified in a "grid" or table.  But whether, under the applicable credit agreements, those spreads are automatically and retroactively readjusted when the borrower inaccurately reports its financial condition—or, alternatively, whether the bank lenders must look to the different remedies provided for under those credit agreements—is a matter of debate between the bank lenders and the other parties in interest in the Adelphia estate.  And whether any entitlement to the incremental interest (or for damages in an equivalent amount) is a secured claim, under section 506(b) of the Code, is likewise a matter of debate.

In that connection, the objecting parties note that inaccurately reporting financial condition is an event of default under each bank credit facility, entitling the bank lenders to default interest at levels even higher than the Grid Interest levels.  But the bank lenders bargained away their claims to default interest, under a DIP financing agreement under which the bank lenders obtained the continuing payment of interest as "adequate protection."  Thus the default interest remedy is no longer available to them.

The Creditors' Committee and the Debtors, joined by the Official Committee of Equity Security Holders, dispute the bank lenders' entitlement to the extra interest.  The objectors also contend that to the extent the bank lenders ever had an entitlement to the extra interest, the bank lenders waived it and are judicially estopped from asserting it, by reason of knowledge the bank lenders had and communications that took place early in these cases, when the Court considered and approved DIP financing arrangements.  The objectors also contend that the bank lenders' proofs of claim failed, by the time of the claims bar date, to assert satisfactorily claims for the additional interest.

The Court does not have to reach all of these contentions.  As described more fully below, the Court rules that under these credit agreements, the interest rate is not automatically and retroactively adjusted in the event reported financial information turns out to have been false; that is not one of the contractual remedies that any of the bank lenders bargained for.  What the bank lenders did bargain for would have given them an even greater interest entitlement, but the bank lenders elected to give that up, in exchange for other advantages.

The Court further rules that most or all of the bank lenders are correct in their assertion that they retained tort remedies if they were defrauded or if misrepresentations were made to them.  But the bank lenders' tort remedies do not include expectancy damages, and the bank lenders are limited under tort remedies for restitutionary relief—being made whole for out-of-pocket loss—as contrasted to getting the benefit of the bargain.  As the Debtors' reorganization plan already provides for repayment in full to the bank lenders of their principal (and, for that matter, other interest, to the extent not already received, and a host of other things as well), the Debtors need not reserve the additional amounts sought to backstop Grid Interest claims here.

The following are the Court's Findings of Fact[4] and Conclusions of Law in connection with its determination.

---

[4] The Court held an evidentiary hearing, but both sides waived the opportunity to submit live witnesses, and relied on the relevant documents and, in a few cases, designations of deposition testimony.  The Court found the deposition testimony credible, and takes it as true.

Findings of Fact

*Credit Agreements and Grid Interest*

Prior to the Petition Date, various Debtors and bank lenders were parties to secured credit agreements, establishing seven lending facilities.[5]  It is undisputed that the bank lenders on all seven are oversecured.

There is no material variation in the applicable contracts from one bank lender to the next.  Each of the credit agreements contains "grid pricing interest" provisions under which the non-default rate of interest is the sum of a floating "Base Rate"[6] and an "Applicable Margin."  The terms for the Century Facility, for which Bank of America was the agent, are typical.  They provide for the regular nondefault interest to be computed quarterly, by adding together the floating Base Rate and the "Applicable Margin," as defined in the credit agreement, in effect at the time.[7]

The "Applicable Margin," in turn, is based upon a data grid that causes the Applicable Margin to increase as a function of the borrower's reported "Leverage Ratio," or "Debt Ratio"—*i.e.*, the ratio of senior debt to operating cash flow.  "Applicable Margin," which is defined in each credit agreement's "Definitions" section, in each instance turns on what the Leverage Ratio *is reported to be,* based on compliance

---

[5]     They have been colloquially referred to as the Century-TCI Facility, the UCA Facility, the FrontierVision Facility, the Parnassos Facility, the Century Facility, the HVA Facility, and the Olympus Facility.

[6]     For example, the "Base Rate" in the Century Facility Credit Agreement, for any given day, is defined as the rate per annum which is the higher of the Federal Funds Rate plus .5%, and the Prime Rate.  *See* Century Facility Credit Agreement (Joint Exh. 21) § 1.1.  Each of the "Federal Funds Rate" and the "Prime Rate" is likewise defined in that agreement.  *See id.*  The Base Rates are not a matter of dispute in this controversy.

[7]     In separate provisions, the credit agreements also authorize the bank lenders to collect default interest after the occurrence of an event of default, as specified in the credit agreements.  *See*, *e.g.*, UCA Facility Credit Agreement (Joint Exh. 22) §§ 1.1, 3.2.2; Century Facility Credit Agreement §§ 1.1, 3.6.

certificates, and related financial information, to be delivered by borrower to lender under

the credit agreement.

For instance, Section 1.1(a)(ii) of the Century Facility Credit Agreement (its

"Definitions" section) defines "Applicable Margin," as relevant here, to be:

> on any date of determination occurring after
> October 16, 2000, the percentage per annum
> set forth in the table below for the Type of
> Borrowing that corresponds to the Leverage
> Ratio at such date of determination, *as
> calculated based on the quarterly
> Compliance Certificate . . . most recently
> delivered* pursuant to Section 9.3 hereof . . .
> . .[8]

The other agreements contain similar language, providing that the rate is determined

based on the compliance certificates "most recently delivered" or "delivered" by the

borrower to the bank lenders' agent.[9]

It is true, as many of the bank lenders assert, that "[t]here is nothing in the Credit

Agreements that limits the Lenders' damages to the payment of default interest."[10]  But

---

[8]     Emphasis added; italicization of "Section 9.3" removed.

[9]     *See* Olympus Facility Credit Agreement (Joint Exh. 23) § 1.1, definition of "Applicable Margin"
        (Applicable Margin determined by the "percentage per annum set forth in the table below . . . that
        corresponds to the Leverage Ratio at any date of determination, *as calculated based on the
        quarterly Compliance Certificate of the Borrowers most recently delivered*" by the borrowers);
        UCA Facility Credit Agreement § 1.1, definition of "Applicable Margin" (determined based upon
        the "Leverage Ratio *set forth in the Compliance Certificate most recently delivered* by the
        Borrowers to the Administrative Agent"); Parnassos Facility Credit Agreement (Joint Exh. 27)
        § 1.01, definition of "Applicable Margin" ("the Leverage Ratio used to compute the Applicable
        Margin shall be the Leverage Ratio *set forth in the Compliance Certificate most recently delivered*
        by the Borrower to the Administrative Agent"); FrontierVision Facility Credit Agreement (Joint
        Exh. 25) § 1.01, definition of "Applicable Margin" (based on "[t]he Debt Ratio . . . [which] shall
        be determined on the *basis of a certificate of a Senior Officer setting forth a calculation* of the
        Debt Ratio as at the last day of the fiscal quarter immediately preceding such Payment Period . . .
        ."); Century-TCI Facility Credit Agreement (Joint Exh. 24) § 1.01, definition of "Applicable
        Margin" (determined upon "the *delivery* to the Administrative Agent of *a certificate of a Financial
        Officer of the Borrower demonstrating*" the Leverage Ratio) (emphasis added in each instance).

[10]    *See* Bank Lenders' Joint Resp. ¶ 9.

-7-

there is also nothing in the credit agreements that provides for the recomputation of the

"Applicable Margin" as a consequence of the delivery of inaccurate certificates.[11]

The credit agreements contain broad definitions of "Obligations," and call for

representations and warranties by the borrower that it would, among other things, report

accurate financial information to the bank lenders.  But they do not provide for

recomputation of the "Applicable Margin" if the reported information is inaccurate.

All but one of the credit agreements also contain provisions which, among other

things, reserve the bank lenders' rights to assert damage claims against the Debtors for

breach of contract and tort claims.[12]

To avoid repetition, the Court addresses other specifics of the credit agreements'

content in its Conclusions of Law below.

*DIP Financing and Adequate Protection*

Shortly after the petition date, the Debtors sought and obtained approval of DIP

financing.  The DIP financing "primed" the bank lenders' prepetition liens, at least in

material respects, and consequently the DIP financing orders provided the bank lenders

with adequate protection, which was a matter of negotiation between the Debtors and the

bank lenders.[13]  The adequate protection arrangements gave the bank lenders (1) an

---

[11]    Several bank lender agents, when deposed, could not point to any provisions in their respective
credit agreements that would provide for the recalculation of the Grid Interest, or any negotiations
preceding the execution of the credit agreements that would support claims for the entitlement
they claim.  But the Court regards the credit agreements themselves to be the best evidence of their
content, and does not regard the agreements as ambiguous.  Accordingly, the Court does not place
material reliance on what the bank lender agents said.

[12]    *See, e.g.*, UCA Facility Credit Agreement § 10.13; Parnassos Facility Credit Agreement § X.13;
HVA Facility Credit Agreement (Joint Exh. 26) § 10.13; Century-TCI Facility Credit Agreement §
10.15; Olympus Facility Credit Agreement § 13.15; Century Facility Credit Agreement § 13.15.
(The FrontierVision Credit Agreement does not have such a provision.)

[13]    The Creditors' Committee objected to those adequate protection arrangements, but after satisfying
itself, *inter alia*, that the requisite mechanisms existed for a return of adequate protection

-8-

immediate payment of pre-petition accrued and unpaid interest, and (2) current interest payments going forward, on a monthly basis, at the non-default grid interest rates in effect as of the petition date—*i.e.*, at rates calculated using the compliance certificates actually provided by the Debtors during the Rigas era.  In exchange for those entitlements (the granting of which, for reasons stated by the Creditors' Committee in its objection and others, was a matter of fair debate), the bank lenders gave up any entitlements they had or might have had to default interest.  As a result, the bank lenders have now received approximately $1.5 billion in postpetition interest.

*The Banks Lenders' Claims*

By this Court's order, January 9, 2004 was established as the deadline for filing proofs of claim against the Debtors' estates—a deadline that is colloquially referred to in bankruptcy parlance as a "Bar Date."  On or prior to the Bar Date, the bank lenders' agents filed master proofs of claim for the bank lenders under their respective facilities asserting secured claims for payment of the principal, interest and certain other contractual entitlements under their respective facilities' credit agreements.  Certain, if not all, of those proofs of claim, relying on boilerplate reservations of rights found in the pre-petition credit agreements, asserted breach of contract and tort claims assertedly arising from the Debtors' conduct.

Over two years after the bar date, one agent filed the first of a series of amended proofs of claim by agents on behalf of bank lenders seeking the additional interest that is the subject of this dispute.  The other agents followed suit, filing amended proofs of claim. Certain of the amended proofs of claim seek additional interest in a specified

---

payments, this Court approved the adequate protection payments to the bank lenders, over the Creditors' Committee's objection.

amount, while others simply seek additional grid interest in an undetermined amount.

Each of the amended proofs of claim seeks secured treatment for such claims.

*Financial Accounting With Respect To Grid Interest*

As part of an extensive effort to restate their financial statements to correct for

inaccuracies that resulted from the Rigases' fraud, the Debtors considered whether they

should accrue, for financial accounting purposes, amounts claimed by the bank lenders

for the additional interest. Accounting personnel at the Debtors initially determined that

no accrual of additional grid interest was required, principally after review of FASB

Statement No. 5.[14] But after further consideration, the Debtors revisited the matter, and

concluded that they should accrue additional grid interest on their books as a deemed

contractual obligation—because, with respect to debt agreements that continued to be

open and unpaid, all of the respective lenders had filed claims broad enough to cover grid

pricing interest and, for agreements that were repaid and closed, certain banks had filed

claims that were broad enough to cover grid pricing interest. The Debtors accrued for the

liability conservatively, accruing for the maximum amount by using the highest potential

rate of interest. A memorandum issued at the time stated that the "banks can assert"

claims for interest amounts "that were not paid but would have been payable if the

restated grid pricing rates had been used at the time of delivery of the inaccurate

certificates."[15] It also stated that "all of the respective lenders have filed claims in

connection with [Adelphia's] bankruptcy that are broad enough to cover grid pricing

---

[14]     "FASB Statement No. 5," one of a number of financial reporting standards laid out by the
Financial Accounting Standards Board, addresses financial reporting for loss contingencies. The
details of its application go beyond the scope of this decision.

[15]     Adelphia Communications Corp. Issue Summary D-2 (Joint Exh. 118) at 1.

-10-

interest,"[16] and that "[t]o the extent that all or some of the additional accrued interest for the open and closed debt agreements is not ultimately paid, [Adelphia] will adjust its accrual at the time it exits from bankruptcy consistent with its other liabilities subject to compromise."[17]

However, the Court finds as a fact that the Debtors' taking of an accrual for liabilities that might be imposed with respect to Grid Interest was focused only on financial accounting obligations, with a mindset based on the importance of conservative accounting, particularly after the excesses of the Rigas era. The Court finds no evidence that the Debtors' accounting personnel intended to waive any defenses the Debtors might have to those claims, and finds no intent to waive such defenses. The Court further finds as a fact (or mixed question of fact and law) that the Debtors did not waive their defenses to bank lender claims for the additional interest.

On the other side of the transactions in question, the bank lenders did not accrue, as receivables, their claims for additional grid interest. The Court finds that the bank lenders' actions too were based solely on financial accounting concerns, and that there is no indication that the bank lenders intended to waive claims for the recovery of sums that they did not accrue. The Court further finds as a fact (or mixed question of fact and law) that the bank lenders did not waive their claims to the additional interest sought here.

Put another way, the Court finds as a fact (or mixed question of fact and law) that neither side, by its financial accounting, evidenced an intention to, or did, waive its claims or defenses with respect to the additional interest in dispute.

---

[16]    *Id.* at 2.

[17]    *Id.*

*Plan of Reorganization*

The Debtors' Modified Fourth Amended Joint Plan of Reorganization reserves approximately $187 million for the additional interest claimed by the bank lenders.[18]  If the objectors are successful on the present controversy, the Debtors will be relieved of this obligation.

<u>Conclusions of Law</u>

<u>I</u>.

The claimed incremental interest (or damages that would equal or approximate the incremental interest in amount) might assertedly have been payable—at least before any claims for it might have been waived or made unavailable by judicial estoppel or failure to assert them by the Bar Date—as a matter of contract or tort.  The Court takes these alternate bases in turn.

A.  *As Matter of Contract.*

The bank lenders contend that they have a contractual entitlement to the incremental interest, and that the asserted contractual entitlement is recoverable as a secured claim under section 506(b) of the Code.[19]  The Court disagrees.

---

[18]    *See* Debtors' Modified Fourth Amended Joint Plan of Reorganization §§ 4.04(c)(ii), 4.17(c)(ii), 4.21(c)(ii), 4.25(c)(ii), 4.46(c)(ii), 4.49(c)(ii).

[19]    Section 506(b) of the Code, in its pre-BAPCPA form, the form that is applicable to these cases, provides:

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b).

-12-

The provisions of the Century Facility, for which Bank of America was the agent, are typical.[20] They provide for the regular nondefault interest to be computed quarterly, as determined each quarter by adding together the floating Base Rate[21] and the "Applicable Margin," as defined in the agreement, in effect at the time.[22]

So the definition of "Applicable Margin"—the spread that will determine the total interest rate—is critical. The bank lenders speak unduly broadly and imprecisely when they say, as agent Bank of America did in its brief,[23] that "[t]he Applicable Margin is determined by reference to the Debtors' 'Leverage Ratio,' as set forth on a chart or grid in the Credit Agreement—thus, the term 'Grid Interest.'" While if the Leverage Ratio were accurately reported, the alternate formulations would turn out the same, that is not what the Century Facility Credit Agreement says, or what any of the credit agreements say.

Rather, "Applicable Margin" is actually determined, by unambiguous language in the Century Facility Credit Agreement's "Definitions," Section 1.1, by what the Leverage Ratio *is reported to be,* based on a compliance certificate provided under the agreement. Section 1.1 provides, in relevant part:

> *Applicable Margin* means either:
>
> (a)    Solely with respect to Borrowings under the Revolver Facility and the Discretionary Revolver Subfacility:

---

[20]    To facilitate analysis, and to avoid inaccuracies that might creep in by paraphrasing, the Court has quoted from and otherwise used the Century Facility Credit Agreement by way of example. But none of the bank lenders has contended that the language in its agreement is different than the others in any material respect, or requires separate analysis.

[21]    *See* n.6 *supra*.

[22]    Century Facility Credit Agreement § 3.4.

[23]    Bank of America Resp. ¶ 3.

-13-

. . .

> (ii)    on any date of determination occurring after October 16, 2000, the percentage per annum set forth in the table below for the Type of Borrowing that corresponds to the Leverage Ratio at such date of determination, *as calculated based on the quarterly Compliance Certificate . . . most recently delivered* pursuant to Section 9.3 hereof . . . .[24]

Needless to say, the contract's actual language trumps the paraphrase of it, and neither a party, nor the Court, is free to restate the contractual language actually used by the parties.

The Section 9.3 there referred to is one of a number of paragraphs of "Covenants"—promises—which the borrower is to honor.  Section 9.3, which is too lengthy to quote in full, starts by saying that "Restricted Borrowers shall cause the following to be furnished to Administrative Agent for delivery to Lenders . . . ."  Section 9.3 then continues with five subparagraphs listing the material that must be provided.

Section 9.3's subparagraph (a) requires the submission of year-end information, and its subparagraph (b) requires the submission of quarterly information; each includes "Compliance Certificates," along with relevant financial information, among the things to be provided.  And Subsection (d) of Section 9.3 provides in substance for a borrower promise that promptly after any of the information or disclosures previously provided becomes outdated or incorrect in any material respect, revised or updated information must be provided.

---

[24]    Emphasis added; italicization of "Section 9.3" removed.

But Section 9.3 is a subset of the borrower's many covenants, and (not surprisingly, given the structure of the agreement) does not address—there or anywhere else in the Section 9 listing of Covenants—the failure to honor a Section 9.3 covenant. And while the credit agreement does speak, in a fashion, to the consequences of providing incorrect information as part of earlier performance of a Section 9.3(a) or 9.3(b) covenant (by its Section 9.3(d), just described), it merely imposes *another covenant*—a promise to provide revised or corrected information or disclosures.

In short, Section 9, the "Covenants" section, is limited to listing the promises to be performed.  Not surprisingly, as it is a promises section and not a remedies section, it is silent in providing for the recomputation of the "Applicable Margin" in the event financial data provided under Section 9.3 turns out to be false.

There are, of course, other sections of the credit agreements that address failures to perform covenants, or the delivery of false information pursuant to covenants.  To the extent they exist, they can be found in Section 10, "Default," and Section 11, "Rights and Remedies."  And in that connection, Section 10 lays out, in 10 separate paragraphs, circumstances that constitute events of default.  One of them, Section 10.5, "Misrepresentation," is most plainly relevant, as it makes an event of default a circumstance under which "[a]ny representation or warranty made by any Loan Party contained herein or in any Loan Document shall at any time prove to have been incorrect in any material respect when made."[25]  But once more the "Default" section, Section 10

---

[25] The Court considered whether Section 10.2, "Covenants," was also relevant, as the failure to "punctually and properly perform, observe, and comply with" certain covenants would, to the extent provided in Section 10.2, also be an event of default, and section 9.3(d) imposed a duty to correct false statements of financial information.  But Section 10.2(b), applicable to Section 9.3 covenants, made failures to perform Section 9.3 covenants events of default only if uncured after a 30 day notice period, and there is no contention that such notice was sent.  In any event, that would merely be a cumulative event of default.

(again perhaps understandably, given the credit agreement's structure), does not speak to the consequences of an event of default, or the remedies in such an event.

Then, Section 11, "Rights and Remedies" (which would be the most logical place to look for remedies for inaccurate compliance certificate information), speaks to the bank lenders' contractual remedies in the event of default.  It includes some obvious things, such as accelerating the indebtedness and declaring it immediately due and payable, terminating commitments to lend further, and reducing claims to judgment.[26] But it does not include, as one of the Rights and Remedies, any change in the loan's interest rate.

And the provisions of the credit agreement that determine the applicable interest rate loan, which can be found in the agreement's Section 3, "Terms of Payment," provide bases for duties to pay interest at a "Default Rate," but do not provide for a change in the interest rate other than by the imposition of default interest.  Section 3.6, captioned "Default Rate," gives the bank lenders an automatic right to collect default interest with respect to certain obligations, and the option to collect it with respect to others.  But significantly, the key section describing the interest rate on the loan, Section 3.4, "Interest Options"—another of the sections following "Terms of Payment"—continues to base the interest rate on the "Applicable Margin," even though it adjusts other rights "when a Default or Potential Default exists . . . ."

Nor do the sections on "Default" or "Rights and Remedies" provide for alternate computations of the "Applicable Margin" under the credit agreement, retroactively or otherwise.

---

[26]    Century Facility Credit Agreement § 11.1(b).

Thus the amount payable as Grid Interest, as a matter of contract law, is determined by the compliance certificates.  Under the agreements, whatever is said in the compliance certificates is controlling.  And there is no mechanism in the agreements for a recomputation of the Applicable Margin if the compliance certificates turn out to be inaccurate, by reason of either mistake or fraud.

But are the bank lenders without a remedy?  No, they are not, because if it turns out that they were underpaid by reason of compliance certificates that were wrong, they have the right to declare a default.  The credit agreements expressly contemplate that inaccurate compliance certificates might be delivered, and they provide that the delivery of inaccurate compliance certificates constitutes an Event of Default.[27]  And if the bank lenders declare a default, they get additional interest, in an amount that exceeds the maximum they would have received if the compliance certificates were right.[28]

The credit agreements could have provided for a readjustment of the Applicable Margin based on what the true facts turned out to be, but they did not.  That is so even though, significantly, the credit agreements did provide for an automatic readjustment of the interest rate in the event of another borrower offense, the failure to provide compliance certificates at all.[29]  But while providing for that automatic adjustment, the credit agreements included no comparable automatic readjustment provision for the

---

[27]    *See* Century-TCI Facility Credit Agreement § 7.02(a); FrontierVision Facility Credit Agreement § 9(d); Parnassos Facility Credit Agreement § VIII.1.2; Century Facility Credit Agreement §10.5; UCA Facility Credit Agreement § 8.1.2; Olympus Facility Credit Agreement § 10.2; HVA Facility Credit Agreement § 8.1.2.

[28]    The Grid Interest provisions provide for a maximum interest rate boost of 150 basis points, or 1.5%.  The default interest provisions provide for an interest rate boost of 200 basis points, or 2.0%.

[29]    *See* Century Facility Credit Agreement §1.1 ("Applicable Margin" definition at (d)(ii)); Olympus Facility Credit Agreement § 1.1 ("Applicable Margin" definition at (d)(ii)); FrontierVision Facility Credit Agreement § 1.01 ("Applicable Margin" definition).

similarly foreseeable scenario that the compliance certificates, or the financial

information underlying them, while having been provided, would be inaccurate.

The drafters of the credit agreements provided for a different remedy—an even

greater one—which is, of course, their right.  But if the bank lenders wished to contract

for additional remedies (which likewise was their right, if their contract counterparty was

agreeable to providing such), the bank lenders could have done so.

The Creditors' Committee contends that the decisions in connection with the

*Shenandoah Nursing Home* bankruptcy case[30] are closely on point, and the Court agrees.

There the debtor nursing home incurred secured debt from its lender, at a fairly high

interest rate, under a contractual agreement that prohibited prepayment.  But the loan

documentation failed to include contractual provisions providing for a remedy, such as a

prepayment premium, in the event that the loan was prepaid anyway.  The debtor

proposed a reorganization plan calling for payment of principal and interest in full, but

without any prepayment premium, make-whole equivalent, or any other damages

alternative for the loss of the lender's interest income expectancy.  The bankruptcy court

found no contractual entitlement to a prepayment premium or damages equivalent,

disabling the lender from reliance on section 506(b),[31] and found that payment of

---

[30]    *Continental Securities Corp. v. Shenandoah Nursing Home Partnership*, 193 B.R. 769 (W.D. Va. 1996), *aff'd in unpublished opinion*, 104 F.3d 359, 1996 WL 733941 (4th Cir. 1996).

[31]    The bankruptcy court ruled that:

> "[w]hile there is a prepayment prohibition, which is not enforceable in this context, there is no prepayment penalty provision provided for anywhere in the contract. Therefore, there can be no prepayment fees, costs, or charges allowed under the confirmed Plan as none are provided for in the note under § 506(b)."

193 B.R. at 774 (quoting appellate record).

-18-

principal and accrued interest alone was sufficient to compensate the lender in full.[32]

Affirming on appeal, the district court agreed, and in a less extensive opinion, essentially

affirming the decision of the district court below—the Fourth Circuit agreed.[33]

While the district court agreed that a prepayment premium,[34] if it had been

provided for under the loan agreement, would have been enforceable and recoverable as a

secured claim under section 506(b), it could not find an entitlement to the prepayment

premium, under section 506(b) or otherwise.  In this connection, it noted that:

> adopting amorphous formulations of claims such as
> that proffered by [the lender] would provide
> creditors with an escape-hatch from § 506(b)'s
> requirement that certain payments sought by
> secured creditors *must be provided for in the
> instrument.* After all, most payments sought by
> creditors can be re-characterized as necessary to
> provide the creditor with the "full value" of an
> agreement.[35]

Like the bankruptcy, district and circuit courts in *Shenandoah Nursing Home*, this Court

cannot agree that claims, and especially secured claims, can be defined so broadly as

"inherently encompassing"[36] expectancy rights not provided for in the agreements in

question.

---

[32]    *See id.* at 774-775.

[33]    *Shenandoah Nursing Home*, 1996 WL 733941, at *2.

[34]    The *Shenandoah Nursing Home* courts used an expression once in common use, "prepayment penalty."  Since this Court uses "penalty" as a word of art to describe a contractual damages provision lacking the necessary nexus to true economic loss, and many prepayment or "make-whole" provisions will have the necessary nexus and hence be enforceable, this Court prefers to use the term "prepayment premium" instead.

[35]    *Shenandoah Nursing Home*, 193 B.R. at 775 (emphasis added).  In *Shenandoah Nursing Home*, the court dealt with a "charge" not provided for in the loan agreement, and thus not allowable under section 506(b) of the Code.

[36]    *Id.*

The Court then turns to the other arguments made by the bank lenders, or some of them, in connection with their contractual entitlements.

The principal point made by the bank lenders—that their contractual documents reserved the bank lenders' rights to invoke rights not found in the credit agreements themselves—is correct in its premise, but not in its conclusion.  The premise will be discussed below, in the Court's consideration of non-contractual remedies, such as remedies in tort.  But those reservations of rights do not confer upon the bank lenders contractual rights that the contracts themselves do not contain.

Then, Wachovia and a number of the other bank lenders argue that during the Rigas era, the Debtors violated covenants to keep their books GAAP-compliant, and also made false representations—thereby violating contractual provisions relating to both covenants and false representations.[37]  For purposes of this discussion, the Court assumes that to be true.  But the issue is not whether there were breaches of covenants, false representations, or both; the issue is the *remedy* for them.  As noted above, the credit agreements define the "Applicable Margin" clearly and unambiguously, and the contractual remedies that were provided for do not include recomputation of the "Applicable Margin."  That is not, of course, in any way to condone defrauding bank lenders, or to turn a blind eye to the fraud of the Rigas era; it is only to say that, particularly in a case where the recoveries of the bank lenders come at the expense of other creditors, no party can make a contractual claim that goes beyond its contractual rights.

---

[37]        *See* May 3, 2006 Arg. Tr. at 80.

Wachovia and a number of the other bank lenders also contend that most of the contracts have a very broad definition of "Obligations," and include all obligations "arising under or in connection with the credit agreements."[38]  Thus, they argue, the incremental interest collectible is one of the "Obligations" under the credit agreements, and the Grid Interest, as one of the "Obligations," is thus recoverable.  But the argument is circular, and the Court must reject it.  The desired additional interest constitutes part of the "Obligations" under the facilities to the extent, but only the extent, that it is provided for under the contracts.  And it is such only to the extent that it falls within the contractual definitions of "Applicable Margin."  "Obligations" must have a contractual predicate in the credit agreements to exist, and that contractual predicate here is lacking.

Wachovia and other bank lenders also contend that they have the necessary contractual entitlement because in some or all of the agreements, each borrower must indemnify the bank lenders against all losses and damages incurred in connection with the bank lenders entering into and performing under the credit agreements.[39]  The Court is not persuaded.  The key word there is "indemnify," which has long been held to be synonymous with "hold harmless,"[40] and which has been variously defined as "[t]o *restore* the victim of a loss, in whole or in part, by payment, repair, or replacement,[41] or "to make good a loss that someone has suffered because of another's act or default."[42]

---

[38]     *Id.*

[39]     *Id.* at 81.

[40]     Bryan A. Garner, *A Dictionary of Modern Legal Usage* 436 (2d ed. 1995) ("*Garner*").

[41]     *Black's Law Dictionary* 769 (6th ed. 1990) (emphasis added).  It continues with other definitions, to the same effect, several of which use the words "save harmless" and "reimbursement."  *Id.*

[42]     *Garner* at 436.

Indemnification provisions give rise to restitutionary rights, and are not back-door means to get the benefit of one's bargain.

Finally, the bank lenders argue that the Court should rely on asserted admissions by the Debtors that they had a liability for Grid Interest by reason of accruals they took on their books as part of their efforts to correct their financial statements after the Rigas era, and memoranda Debtors' accounting personnel issued at the time. But the Court does not consider itself bound by either the Debtors' or the bank lenders' supposed admissions on this motion, in light of the caselaw holding that evidence of financial accounting reserves and accruals is inadmissible (and in some instances even undiscoverable) as evidence of liability—and also in light of the fact that it is the content of the contracts themselves that is determinative.

First, the Court considers it inappropriate to penalize the Debtors or the bank lenders for their accounting decisions with respect to accrual of additional interest claims. As the Debtors and Creditors' Committee note, the Debtors' decision to accrue for the claim is no more relevant or a legally cognizable admission than the bank lenders' decision not to accrue for it.[43] The Court is also persuaded by the objectors' points that allowing the admission of financial accounting reserves to try to prove liability would pose a disincentive to responsible accounting.[44] It would seem particularly inappropriate

---

[43]    *See Sundance Cruises Corp. v. American Bureau of Shipping*, 1992 U.S. Dist. LEXIS 3759, at *3 (S.D.N.Y. 1992) (Grubin, Mag. J.) ("[T]hese reserves are, simply, not relevant. Defendant's assessment or its underwriter's assessment or its counsel's assessment of exposure to liability in this or prior cases has nothing to do with whether here there is liability."); *Fidelity & Deposit Co. v. McCulloch*, 168 F.R.D. 516, 525 (E.D. Pa. 1996) (Joyner, J.) ("In short, setting aside reserves does not amount to an admission of liability.").

[44]    *See J.C. Assocs. v. Fidelity & Guaranty Insurance Co.,* 2003 U.S. Dist. LEXIS 6145, at *4 (D.D.C. 2003) (in context of an insurance company's reserves, "[w]hatever societal interest there is in the accuracy of reserves is foregone if insurance companies yield to the temptation to state them inaccurately, lest they be used as damaging admissions against their interests").

to penalize the Debtors for careful and conservative accounting when their accounting personnel were leaning over backwards to avoid the concealment of actual and potential contractual liabilities that was the hallmark of the Rigas era. It would be even more inappropriate to consider those accounting measures as admissions when the accounting decisionmakers were not there at the time that the underlying contracts were drafted, and were merely trying to assess (or address) how a court might rule as to the contractual claims. And as the bank lenders had their own responsibilities to their stakeholders, and to regulatory authorities, and their accounting personnel had to engage in a like exercise, the Court is not of a mind to penalize the bank lenders for their accounting personnel's decisions either.

Second, at least in a case, like this one, where the contractual documents are unambiguous, it is the content of the documents that determines their meaning and effect, and not the views of the accounting personnel at the Debtors or the bank lenders. The Court also believes, with due respect, that it has greater expertise in analyzing contractual obligations than do the Debtors' (or the bank lenders') accounting personnel.

B. *As Matter of Tort*

The preceding discussion concerned rights in contract, but not in tort. In one way or another, at least all but one of the bank lenders[45] preserved their ability to enforce any rights they might have in tort. In addition to sometimes creating rights in contract (to the extent, but only the extent, that the contracts so provide, and with only the remedies for which the contracts so provide, all as discussed above), fraud and misrepresentation give rise to rights in tort. And the Court assumes, for the sake of this discussion, that at least

---

[45]   The Court does not have to decide whether the bank lenders on the FrontierVision Facility, the exception, who did not have as express a reservation of rights as the others, should be in a different category, in light of the conclusions that follow.

some of the financial data delivered to the bank lenders was materially false, and that

when executing compliance certificates, the Rigases and/or those acting in concert with

them knew that to be so.[46]

But where claims are based in tort, as contrasted to contract, section 506(b) does

not apply, and the tort claims do not give rise to a secured claim.  Section 506(b), by its

terms, provides holders of oversecured claims "interest on such claim, and any reasonable

fees, costs, or charges provided for under the agreement under which such claim arose."[47]

But tort damages are neither of those.  Caselaw, as exemplified by the *Shenandoah*

*Nursing Home* cases, supports that view, even when the damages sought to be recovered

under section 506(b) relate to a loss of interest income.

Expectancy damages—like the incremental benefits of their respective bargains

that the bank lenders seek here—are not recoverable in claims for fraud.  Instead,

damages for fraud are restitutionary in nature.  As the New York Court of Appeals has

held:

> "The true measure of damage is indemnity for the
> actual pecuniary loss sustained as the direct result of
> the wrong" or what is known as the "out-of-pocket"
> rule . . . .  Under this rule, the loss is computed by
> ascertaining the "difference between the value of
> the bargain which a plaintiff was induced by fraud
> to make and the amount or value of the
> consideration exacted as the price of the bargain" . .
> . . *Damages are to be calculated to compensate*

---

[46]    The Creditors' Committee submitted evidence tending to show, with some force, that personnel
associated with bank lenders knew at least some of the true facts, including facts that would bear
on their borrowers' leverage ratios.  If that showing were made, it could be argued that any bank
lenders with such knowledge, or whose agents had such knowledge, were not defrauded, did not
rely on the financial information provided, and/or could not have reasonably relied on it.  But in
light of the discussion that follows, the Court does not need to address these matters in greater
depth, or with more specificity, at this time.

[47]    11 U.S.C. § 506(b) (emphasis added).  The Court once again quotes section 506(b) in the pre-
BAPCPA form applicable to these cases.

> *plaintiffs for what they lost because of the fraud, not*
> *to compensate them for what they might have*
> *gained . . . .  Under the out-of-pocket rule, there can*
> *be no recovery of profits which would have been*
> *realized in the absence of fraud . . . .* [48]

The law of Pennsylvania is to the same effect.[49]

Even assuming, without deciding, that fraud or misrepresentation committed largely or entirely after the bank lenders had disbursed the principal on their loans would nevertheless be actionable, the measure of the bank lenders' damages for fraud or misrepresentation would be their out-of-pocket loss—essentially or entirely,[50] their outstanding principal—and not the profits they would have realized in the absence of fraud.  The Debtors will pay that principal back upon confirmation, and, so far as the record reflects, the bank lenders will have no further out-of-pocket damages.

## C.  Other Bank Lender Arguments

To the extent that the bank lenders have made points not explicitly addressed above, the Court finds those points unsupported by the facts or the relevant agreements, repetitive, or otherwise lacking in merit.

---

[48]    *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421, 668 N.E.2d 1370 (N.Y. 1996) (emphasis added) (citations omitted); *accord MTI/The Image Group, Inc. v. Fox Studios East, Inc.*, 690 N.Y.S.2d 576, 578 (N.Y. App. Div. 1999) ("Lost profits are not recoverable under a fraud theory.") (citation omitted); *Orbit Holding Corp. v. Anthony Hotel Corp.*, 503 N.Y.S.2d 780, 783 (N.Y. App. Div. 1986) ("[T]he trial court properly excluded the claim for loss of future profits . . . .  A defrauded party is only entitled to recovery of 'out-of-pocket' and consequential damages, 'the sum necessary for restoration to the position occupied before the commission of the fraud,'" *quoting Clearview Corp. v. Gherardi*, 453 N.Y.S.2d 750, 755 (N.Y. App. Div. 1982)).

[49]    *See Savitz v. Weinstein,* 149 A.2d 110, 113 (Pa. 1959) ("In an action for deceit or fraud in Pennsylvania, the plaintiff can recover only his actual loss and not the value of his bargain.") (internal quotation marks deleted); *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1257 (Pa. Super. Ct. 1983) (Under Pennsylvania law, in an action based on fraud, the measure of damages is "actual loss," . . . "and not the benefit, or value, of that bargain.") (citations omitted).

[50]    The bank lenders have not argued that they suffered or would suffer any other out-of-pocket loss.

## II.

### Other Creditors' Committee and Debtor Contentions

In light of the foregoing, the Court does not need to address the Creditors' Committee's and Debtor's other contentions, asserting waiver of the claims for incremental interest; that bank lenders should be judicially estopped from asking for it; and that proofs of claim filed on behalf of the bank lenders before the Bar Date failed to assert the claims for the additional interest.[51]  There were no valid claims to waive.  The other arguments are likewise academic.

### Conclusion

For the foregoing reasons, the Court rules that the bank lenders will not have a claim for the incremental interest under their contracts.  While most or all of the bank lenders did indeed retain remedies against Adelphia in tort, those tort remedies do not include expectancy damages, and, at such time as the bank lenders are fully repaid the principal on their loans, they will have no claims in tort.  The Debtors do not have to reserve sums under their reorganization plan to satisfy bank lender claims for the "Grid Interest."  The bank lenders' rights to seek allowance of other aspects of their claims (and the rights of the Creditors' Committee, other parties in interest, and the Debtors to oppose them) are unaffected by this decision.  All parties' rights with respect to future aspects of the bank lenders' claims are reserved and preserved.

Dated:  New York, New York                    _**s/Robert E. Gerber**_____
       May **_15_**, 2006                              United States Bankruptcy Judge

---

[51]     Likewise, the Court does not have to consider the implications of the evidence submitted by the Creditors' Committee and the Debtors under seal, which would be relevant if, but only if, the bank lenders had the ability to assert expectancy damages, and contended that they had been defrauded.