PACHULSKI STANG ZIEHL YOUNG JONES
    & WEINTRAUB LLP
780 Third Avenue, 36th Floor
New York, NY 10017-2024
Telephone: 212/561-7700
Facsimile: 212/561-7777
Dean A. Ziehl (DZ-6154)

PACHULSKI STANG ZIEHL YOUNG JONES
    & WEINTRAUB LLP
10100 Santa Monica Blvd., #1100
Los Angeles, CA 90067
Telephone: 310/277-6910
Facsimile: 310/201-0760
Richard M. Pachulski (CA 90073)
Dean A. Ziehl (CA 84529)
Jeremy V. Richards (CA 102300)

Attorneys for Murray Capital Management; Inc; Stark & Roth; Franklin Mutual Advisors, LLC; Citadel Limited Partnership; Avenue Capital Management; Citigroup Financial Products, Inc.; HBK Investments, L.P.; Varde Partners, Inc.; Lionhart Investments, Ltd. (collectively, the "ACC II Committee")

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| Adelphia Communications Corporation, et al., | ) | Jointly Administered |
| | ) | |
| Debtors | ) | Case No. 2-41729 (REG) |

**STATEMENT OF POSITION AND RESPONSE OF ACC II COMMITTEE WITH RESPECT TO: (A) APPROVAL OF SECOND DISCLOSURE STATEMENT SUPPLEMENT TO FIFTH AMENDED JOINT CHAPTER 11 PLAN FOR ADELPHIA COMMUNICATIONS CORPORATION AND CERTAIN AFFILIATED DEBTORS; (B) OBJECTIONS OF CERTAIN ACC SENIOR NOTEHOLDERS TO SECOND SUPPLEMENTAL DISCLOSURE STATEMENT; (C) MOTION OF CERTAIN ACC SENIOR NOTEHOLDERS TO UNSEAL RECORD ON PLAN ISSUES AND ADJUDICATE INTERCOMPANY CLAIMS; (D) MOTION OF CERTAIN ACC SENIOR NOTEHOLDERS TO TERMINATE EXCLUSIVITY; AND (E) MOTION OF CERTAIN BANKS TO TERMINATE EXCLUSIVITY OR TO CONVERT <u>CASES TO CHAPTER 7 LIQUIDATIONS</u>**

The ACC II Committee (an ad hoc committee comprised of holders of ACC Notes and Arahova Notes) hereby files its statement with respect to the motion ("Disclosure Statement Motion") of certain Debtors and the Creditors Committee (collectively, the "Proponents") seeking approval of that certain Second Supplemental Disclosure Statement and its responses to: (a) the objections ("Dissident ACC Noteholders Objections") of certain dissident members of the ACC- I Committee (the "Dissident ACC Noteholders") to approval of the Second Supplemental Disclosure Statement[1]; (b) the motion (the "Dissident ACC Noteholders Exclusivity Motion") of the Dissident ACC Noteholders seeking to terminate the Debtors' exclusivity herein, (c) the motion (the "MIA Motion") of the Dissident ACC Noteholders seeking, inter alia, resumption of the MIA Process and (d) the motion (the "Bank Motion") of the Banks seeking to terminate exclusivity with respect to the Operating Company Debtors or, in the alternative, convert their cases to chapter 7 liquidations. The purpose of this pleading is to provide a brief statement in support of approval of the Second Supplemental Disclosure Statement and to address specific issues raised by the Dissident ACC Noteholders and the Banks. The ACC II Committee believes that other parties in interest (including the Proponents) will be filing more extensive pleadings addressing objections to the Second Supplemental Disclosure Statement, the Dissident ACC Noteholders' pleadings and the Bank Motion. The ACC II Committee generally joins in the more detailed positions taken in those pleadings.

A.    **Preliminary Statement**

The two facts that all parties in interest are able to agree upon is that these Cases have been pending more than four years and that, notwithstanding several attempts, the Debtors have

---

[1] The Dissident ACC Noteholders are a subgroup of the ACC-I Committee. The ACC-I Committee now finds itself divided into three separate factions, namely the Dissident ACC Noteholders, the Supporting ACC Noteholders (defined below), i.e., those ACC Noteholders who support confirmation of the Fifth Amended Plan, and the "fence sitters", i.e., those ACC Noteholders who have yet to take a position with respect to the Fifth Amended Plan.

been unable to proceed with confirmation of a global plan of reorganization. Indeed, the Settlement Plan embodied in the Debtors' last all encompassing plan, the Modified Holdback Plan (filed on April 12, 2006), was received with universal, or almost universal rejection.

While parties objecting to the Second Supplemental Disclosure Statement focus on the shorter portion of the settlement process commenced in April, 2006 under the auspices of the Monitor, those parties overlook the fact that the major constituencies in these Cases have been attempting to develop a global consensus since the early part of 2005. The negotiations overseen by the Monitor represent the culmination (or near culmination) of those lengthy negotiations, not the entirety of the settlement process. That process has resulted in a plan (the "Fifth Amended Plan") which has the support of all of the participants to the MIA Process with the exception of the Dissident ACC Noteholders. Tellingly, Highfield and Tudor (the "Supporting ACC Noteholders"), two members of the ACC-I Committee (and half of the four entity "restricted" group that participated in the Monitor Process on behalf of the ACC-I Committee), actively support the Fifth Amended Plan.

Developing a consensus has taken a long time in these Cases and the confirmability of the Fifth Amended Plan will be determined in less than two months. The alternative course of delaying consideration of the Fifth Amended Plan and terminating exclusivity instead will result in a proliferation of plans, a multiplicity of litigation through the flawed MIA Process, and increasing disorder at the very moment when the momentum in the Cases appears to be driving towards a global resolution.

Contrary to the position repeatedly asserted by the Dissident ACC Noteholders in their pleadings, neither they nor the ACC-I Committee own or control the ACC Debtors' interests in the Intercompany Claims, which, on the contrary, remain vested with the ACC Debtors. Nor

should those rights and interests be vested with the Dissident ACC Noteholders (or the ACC-I Committee), who although they profess to represent the interests of all ACC creditors, neither do so in law or in fact. Instead, before considering returning these cases to the mired MIA process, the settlement among the Debtors proposed in connection with the Fifth Amended Plan should be considered by the Court after allowing the Proponents to solicit acceptances on the plan.

To the extent the Dissident ACC Noteholders hold the MIA Process out as a meaningful alternative to plan confirmation, they are offering a "false alternative". It is not the case, and cannot be, that the parties to the MIA Process must litigate each and every issue to a final, non-appealable judgment. A settlement of at least some of the issues presented by that process, at some point in time, is likely inevitable and must be permissible. If there is to be a settlement of the Dispute Issues, the best way to gauge creditor support for the result is through a plan vote. That is exactly what now is proposed and is far better than deferring resolution to a process that will not take any account of individual creditor preferences. Moreover, linking settlement to plan confirmation resolves the issue of authority to settle the Dispute Issues. Absent linking settlement to a plan (and assuming confirmation of some plan before a settlement is conceivable and occurs), it would be unclear who would (or should) be entitled to settle the Dispute Issues post-confirmation.[2]

The Proponents should be given an opportunity to solicit votes on, and seek confirmation of the Fifth Amended Plan. The "good faith" of the Plan Proponents, which has been raised as an issue for consideration now, is ultimately a confirmation issue, and challenges thereto should not impede approval of the Second Supplemental Disclosure Statement. While the ACC II

---

[2] Indeed, this issue created one of the greatest problems with respect to the confirmability and fairness of the Holdback Plan formerly proposed by the Debtors. The Holdback Plan contemplated that parties in interest would continue to litigate the Intercreditor Disputes beyond confirmation but did not contain any provisions as to who would have the authority to settle those issues post-confirmation, or through what procedure and subject to what safeguards.

Committee has no doubt that this "good faith" condition will be satisfied, the process that led to the Fifth Amended Plan makes nonsensical the notion that the Plan is a product of "bad faith."

As to the Bank Motion, to ignore the heated dispute over the disposition of any funds in excess of legitimate senior claims does nothing to move the Cases of any of the Debtors closer to resolution. Neither "cause" nor any other ground for conversion has been demonstrated nor would conversion result in a more expeditious administration of any of the Cases.

For all of the reasons set forth herein, the Court should permit the Proponents to proceed with confirmation of the Fifth Amended Plan, deny all pending motions to terminate exclusivity and/or convert certain cases and decline the Dissident ACC Noteholders request to presently resume the MIA Process.

**B.    The Plan Settlement Process Has Been Fair and Balanced**

The issue of whether the Fifth Amended Plan has been proposed in "good faith" is ultimately for this Court to decide at the confirmation hearing. 11 U.S.C. § 1129(a)(3). However, given that so much effort has been devoted by the Dissident ACC Noteholders to impugning the settlement process, the ACC-II Committee believes that it is incumbent upon it to at least make a few comments now in response.

First and foremost, as the Dissident ACC Noteholders are well aware, the Monitor Process represented a small (but highly productive) part of the settlement process in these Cases, which has spanned more than a year. Numerous previous efforts to achieve consensus (including the Debtors' abortive Settlement Plan) have largely gone nowhere. However, the Monitor Process, which involved the full and complete participation of four "restricted" representatives of the ACC-I Committee, has led to a plan which, although not fully consensual at this time, has far greater and wider support than any of its predecessors. Further, and perhaps most telling, the Fifth Amended Plan is actively supported by Highfield and Tudor, two of the four "restricted"

members of the ACC-I Committee who were designated by that committee to participate in the Monitor Process and negotiate a settlement to be recommended to the Debtors.

Indeed, perhaps one of the reasons that Highfield and Tudor support the Fifth Amended Plan is that, at the end of the day, the economic difference between the Fifth Amended Plan and the terms that the ACC-I Committee was prepared to accept (referred to in the Dissident ACC Noteholders' pleadings as the "Negotiated Term Sheet") is neglible.[3] In its objection to the Second Supplemental Disclosure Statement, the ACC Dissident Noteholders purport to identify five differences between the Fifth Amended Plan and the Negotiated Term Sheet which aggregate to a bid/ask differential of more than $500 million, rather than the $50 million set forth in the Second Supplemental Disclosure Statement. However, the ACC Dissident Noteholders' analysis is, at best illusory and, at worse, simply wrong.

- The Dissident ACC Noteholders' statement that the True-Up Mechanism effectively grants subsidiary creditors an "in-the-money call option worth approximately $187 million" is incomprehensible. The Negotiated Term Sheet proposed that the value of the TWC Class A Common Stock would be established through an independent public offering or "IPO", a procedure that is estimated to cost at least $100 million in fees and expenses. The Fifth Amended Plan, on the other hand, calls for a Deemed Value of $4.85 billion subject to the True-Up Mechanism. The True-Up Mechanism allows for a market determination of the value of the TWC Class A Common Stock without necessarily

---

[3] The Dissident ACC Noteholders argue that the disclosure of this differential in the Second Supplemental Disclosure Statement violates the confidentiality of the Monitor Process. What this argument ignores is that the Monitor was not only authorized to communicate with the Court regarding the status of settlement negotiations but was authorized to, and did in fact file a report with the Court. Moreover, even if confidentiality obligations were ever an issue, the ACC Dissident Noteholders have clearly waived all of those restrictions by themselves disclosing in detail their perception of the disparity between the final offer of the Dissident ACC Noteholders and the Fifth Amended Plan.

incurring the expense of an IPO and could result in an increase in the Deemed Value (based upon actual market conditions) to almost $5.6 billion.[4]

- The ACC Dissident Noteholders contend that differences in the treatment of CVV proceeds under the Fifth Amended Plan compared to treatment under the Negotiated Term Sheet accounts for a $122 million differential (based on a $2 billion CVV recovery). While it is difficult to determine how they arrived at this differential, the Dissident ACC Noteholders' calculation is flawed in that it fails to recognize that under the Fifth Amended Plan, ACC creditors' percentage recovery of CVV proceeds increases as the specified recoupments of other creditor groups (including Arahova ) from the CVV proceeds cap out. In reality, the CVV proceeds differential is closer to $60 million (at a $2 billion CVV recovery level), without taking into account time value or expected value discounts with respect to CVV recoveries, which result in the differential being far less than $50 million.

- The $46 million discrepancy relating to the trade "give up" is wholly illusory. Trade and other unsecured creditors take the risk as to whether the funds from which they can recoup ever would materialize.[5] The $39 million differential purportedly relating to bank indemnification funds is an equally illusory number in that it is derived from the "Identified Sources". "Identified Sources" are sources of funds that the ACC-I Committee has conceded would likely not be available to anyone absent a timely resolution of the MIA Process. It is irrelevant from which one of the multiple Identified Sources funds are made available to ACC Creditors to effect confirmation of the Fifth

---

[4] In fact, in a proposal that preceded the Negotiated Term Sheet, the ACC-I Committee offered to set the Deemed Value of the TWC Class A Common Stock at $4.95 billion, with no true-up or adjustment mechanism.

[5] It should be noted that in an effort to effect a global settlement, trade and other unsecured creditors are contributing a significant portion of their post-petition interest recovery to ACC Creditors, even though this Court has already ruled on their entitlement to such interest.

Amended Plan. Accordingly, if there is a shortfall generated from funds earmarked for bank indemnification but the shortfall is made up from other Identified Sources, ACC Creditors are indifferent. If the shortfall is not made up, by its own terms the Fifth Amended Plan may not become effective.

- The Dissident ACC Noteholders rightly point out that the timing difference between the anticipated confirmation of the plan embodied in the Negotiated Term Sheet and the anticipated confirmation of the Fifth Amended Plan results in an incremental interest expense and loss to creditors. That fact is undeniably true, but what the Dissident ACC Noteholders overlook is that this delay (and expense) flows directly from their failure to agree to a reasonable settlement. (The irony of this point is that, absent the approval of a resolution as embodied in the Fifth Amended Plan and resumption of the MIA Process, recoveries to unsecured creditors may be diminished by more than a $1 billion.)

C.  **The Dissident ACC Noteholders Do Not Control Resolution or Settlement of the ACC Debtors' Intercompany Claims**

The Dissident ACC Noteholders repeatedly assert that, through the MIA Order, only the ACC-I Committee has the power to prosecute and/or settle the ACC Debtors' Intercompany Claims. This, however, is a complete mischaracterization of the MIA Order. Nothing in the MIA Order transfers to any party in interest the Debtors' undisputed right to prosecute and/or settle the issues raised in the MIA Process. Indeed, Section 12(a) of the MIA Order expressly provides that:

> Nothing contained herein shall preclude the Debtors from seeking to compromise one or more of the Dispute Issues (either by separate motion or in connection with the proposed plan of reorganization) . . . .

See also, MIA Order, (¶12(b) "Nothing contained herein shall preclude the Debtors from taking a position with respect to any Dispute Issues, including, without limitation, in a plan of reorganization or otherwise").[6]

It is ironic that the Dissident ACC Noteholders make accusations about the true motivations or economic interests of the ACC-II Committee (arguing that its interests, at least in the aggregate, are more aligned with the Arahova than the ACC estate). The Dissident ACC Noteholders have never revealed what interests they truly represent. Have they hedged themselves by acquiring claims against other estates or even by shorting ACC positions? Absent a full disclosure with respect to these, and other issues, the purity of the Dissident ACC Noteholders and their oft touted mantra that they represent or champion the interests of all ACC creditors must be doubted. At the same time, contrary to the suggestions of the Dissident ACC Noteholders, and notwithstanding their vague and generalized assertions regarding the economic motivations of the ACC-II Committee, the fact of the matter is that the entity authorized to negotiate a settlement on behalf of the ACC-II Committee has, at all relevant times, held an ACC position that was more than three times as large as its Arahova position and thus, at least according to the logic advanced by the Dissident ACC Noteholders, would have the economic incentive to increase the ACC recovery over the Arahova recovery.

While it would have clearly been inappropriate to vest the ultimate resolution of the Dispute Issues with a non-fiduciary body such as the ACC-I Committee, as noted below, in approving settlements, courts routinely consider the "reasonable views" of creditors. While not determinative, the outcome of votes on a plan embodying a settlement is certainly relevant to determining creditor support. The ACC-II Committee believes that there will be widespread

---

[6] Even if the MIA Order did support the Dissident ACC Noteholders position, pursuant to Section 10(a) thereof, the Court retained its right to ". . . vary the terms of the Resolution Process as necessary, sua sponte or on motion of a Participant".

creditor support for the Fifth Amended Plan, including support among creditors of the ACC Debtors. The Dissident ACC Noteholders, on the other hand, would rather attempt to improperly appropriate to themselves the power to resolve the Dispute Issues than allow a broader referendum thorough plan voting to determine creditor support.

### D.    Termination of Exclusivity And/Or Conversion Will Complicate Rather than Simplify the Manifold Issues Presented in These Cases

In any event, it is crystal clear that termination of exclusivity will not help advance these Cases towards resolution. Termination of exclusivity will result in a multiplicity of competing plans of reorganization and, as a practical matter, lead to the resumption of the MIA Process. That will, in turn, likely lead to another settlement, but only after further depletion of the Debtors' assets and possibly years and years of delay.

Exclusivity should be maintained at least for the limited purpose of allowing the Proponents to seek confirmation of the Fifth Amended Plan. The Fifth Amended Plan, by its own terms, must be confirmed on or before October 31, 2006. Accordingly, within a short period of time, the Court and all parties in interest will know whether there is creditor support for the compromises embodied in the Fifth Amended Plan.

### E.    There Is No Benefit to Resuming the MIA

The Fifth Amended Plan embodies the resolution of all of the Dispute Issues that are the subject of the MIA Process. The fairness of those resolutions will be tested at plan confirmation. However, at that time, the Court will have one very important piece of information available to it which is presently inaccessible and will remain inaccessible if confirmation does not proceed, namely the views and preferences of creditors (in particular, ACC creditors), expressed through their votes. Courts have uniformly held that the informed views of creditors are to be carefully considered in determining whether to approve compromises. See, e.g., 10 Collier on Bankruptcy

¶ 9019.02 (15th Ed. Rev. 2006) ("Taking their cue from [<u>Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed. 2d. 1 (1968)], most circuit courts that have considered the issue have adopted a uniform standard by which the bankruptcy judge or other trial officer should be governed in the hearing on a motion to approve a compromise. According to these cases, the court should consider: (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) <u>the paramount interest of the creditors and a proper deference to their reasonable views in the premises</u>. [citations]" [Emphasis Added]).

The idea that the MIA Process is a viable alternative to either the Fifth Amended Plan or any other settlement plan is unrealistic and untenable. Unless this Court is prepared to accept that the MIA Process requires that each and every Dispute Issue be litigated to a final and non-appealable judgment, the MIA Process must, and indeed does encompass the possibility of settlement. <u>See, e.g.</u>, MIA Order, § 12(a) (quoted above). Given this option, it is surely better that the Dispute Issues be resolved in the context of a plan (with all of the disclosure and confirmation protections attendant thereto and the voting process to test creditor support) than by allowing some unspecified (non-fiduciary) parties to enter into unspecified settlements according to unspecified standards and procedures, post-confirmation, with no means to gauge the support of creditors at large.

**F.     Conclusion**

For all of the reasons set forth herein, the Court should permit the Fifth Amended Plan to proceed to confirmation as expeditiously as possible. If the Fifth Amended Plan is confirmable, all of the outstanding issues in these Cases will likely be resolved. The possibility of achieving such a global resolution of issues makes worthwhile any small risk attendant to the short delay

which would be occasioned by the confirmation effort.[7] With a viable and widely supported plan on the table whose confirmability will be determined in short order, it makes no sense to terminate exclusivity or convert certain cases and invite the chaos that will ensue. Moreover, unless a creditor constituency has bet against any successful conclusion by taking short positions, resuming the MIA Process at this time makes no sense. The Court already has conducted extensive proceedings in the MIA Process and is fully cognizant that one would have to be deaf, dumb and blind to believe that litigating to conclusion the Dispute Issues through the MIA Process will be better for some creditor constituency than the Plan Settlement.

Dated: Los Angeles, California
        September 7, 2006

                                    PACHULSKI STANG ZIEHL
                                     YOUNG JONES & WEINTRAUB LLP
                                    Attorneys for ACC II Committee


                            By:    /s/ Jeremy V. Richards
                                    Jeremy V. Richards

TO: THOSE LISTED ON THE SERVICE LIST ANNEXED HERETO

---

[7] All of the evidence relating to the MIA Process has already been gathered and stored in a virtual data room. There have been no assertions that the ability to take discovery or preserve evidence will be undermined by a further short delay in any resumption of the MIA Process.