UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

――――――――――――――――――――――――――
                                          )
In re:                                    )        Chapter 11
                                          )
Adelphia Communications Corp., *et al.*,  )        Case No. 02-41729 (REG)
                                          )
                      Debtors.            )        Jointly Administered
――――――――――――――――――――――――――)


BENCH DECISION[1] ON MOTION TO
TERMINATE EXCLUSIVITY; TO RESUME
LITIGATION OF INTERDEBTOR ISSUES; AND
TO UNSEAL PROTECTED MATTER


APPEARANCES:

WILLKIE FARR & GALLAGHER LLP
Counsel for Debtors and Debtors in Possession
787 Seventh Avenue
New York, NY 10019-6099
By:    Marc Abrams, Esq. (argued)
       Paul V. Shalhoub, Esq.
       Morris J. Massel, Esq.
       Jamie M. Ketten, Esq.


KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for the Official Committee of Unsecured Creditors
1633 Broadway
New York, NY  10019
By:    David M. Friedman, Esq. (argued)
       Adam L. Shiff, Esq.


KLEE, TUCHIN, BOGDANOFF & STERN LLP
Counsel for the Official Committee of Unsecured Creditors
2121 Avenue of the Stars, 33rd Fl
Los Angeles, CA 90067
By:    Edward T. Attanasio, Esq.

―――――――――――――――――
[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate
       in open court, but where time does not permit more extensive or polished discussion. Because they
       often start as scripts for decisions to be dictated in open court, they typically have fewer citations
       and other footnotes, and have a more conversational tone.

       This decision is subject to technical corrections.

David M. Stern, Esq.

WEIL, GOTSHAL & MANGES LLP
Counsel for the Ad Hoc Committee of ACC Senior Noteholders
 ("ACC Bondholder Group")
767 Fifth Avenue
New York, NY  10153
By:      Martin J. Bienenstock, Esq. (argued)

700 Louisiana, Suite 1600
Houston, Texas 77002
By:      Sylvia Ann Mayer, Esq.

HENNIGAN, BENNETT & DORMAN LLP
Counsel for the Ad Hoc Committee of ACC Senior Noteholders
865 South Figueroa Street, Suite 2900
Los Angeles, CA 90017
By:      Bruce Bennett, Esq.

MORGENSTERN JACOBS & BLUE LLC
Counsel for Official Committee of Equity Security Holders
885 Third Avenue
New York, NY  10022
By:      Gregory A. Blue, Esq.
          Eric B. Fisher, Esq. (argued)

SHEPPARD MULLIN RICHTER & HAMPTON LLP
Counsel for U.S. Bank National Association, as Indenture Trustee in Respect of the
Arahova Notes and the FrontierVision Notes
333 South Hope Street, 48th Floor
Los Angeles, CA 90071
By:      David McCarty, Esq.

SEWARD & KISSEL LLP
Counsel for Law Debenture Trust Company of New York, as ACC Senior Notes Trustee
One Battery Park Plaza
New York, NY 10004
By:      Arlene R. Alves, Esq.

BROWN RUDNICK BERLACK ISRAELS LLP
Counsel for the Ad Hoc Adelphia Trade Claims Committee
Seven Times Square
New York, NY 10036
By:    Edward S. Weisfelner, Esq. (argued)

WHITE & CASE LLP
Counsel for the Ad Hoc Committee of Arahova Noteholders
1155 Avenue of the Americas
New York, NY 10036-2787
By:    J. Christopher Shore, Esq. (argued)
       Sarah Nye Campbell, Esq.

Wachovia Financial Center, Suite 4000
200 South Biscayne Blvd.
Miami, FL 33131
By:    Richard S. Kebrdle, Esq.

FRIED FRANK HARRIS SHRIVER & JACOBSON LLP
Counsel for W.R. Huff Asset Management Co., L.L.C.
One New York Plaza
New York, NY 10004-1980
By:    Gary Kaplan, Esq. (argued)
       Craig M. Price, Esq.

HAYNES AND BOONE, LLP
Counsel for Bank of America, N.A., as Administrative Agent for the Century Cable
Lenders
901 Main Street, Suite 3100
Dallas, TX 75202
By:    Robin E. Phelan, Esq.

153 East 53rd Street, Suite 4900
New York, NY  10022
By:    Judith Elkin, Esq.

MAYER, BROWN, ROWE & MAW LLP
Counsel for Bank of Montreal, as Administrative Agent for the Olympus Lenders
1675 Broadway
New York, NY 10019
By:    Kenneth E. Noble, Esq.

71 South Wacker Drive
Chicago, Illinois 60606
By:    J. Robert Stoll, Esq.

BRACEWELL & GIULIANI, LLP
Counsel for the Ad Hoc Committee of Non-Agent TCI and Parnassos Lenders
1177 Avenue of the Americas
New York, NY 10036
By:      Mark E. Palmer, Esq.
         David C. Albalah, Esq.

SIMPSON THACHER & BARTLETT LLP
Counsel for Wachovia Bank, N.A., as Administrative Agent for the UCA Lenders
425 Lexington Avenue
New York, NY 10017
By:      Peter Pantaleo, Esq. (argued)
         Elisha D. Graff, Esq.

GOODWIN PROCTER LLP
Counsel for Tudor Investment Corporation
53 State Street, Exchange Place
Boston, MA 02109
By:      Gina Lynn Martin, Esq.

599 Lexington Avenue
New York, NY 10022
By:      Allan S. Brilliant, Esq. (argued)
         Brian W. Harvey, Esq.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB P.C. LLP
Counsel for Murray Capital Management
780 Third Avenue, 36th Floor
New York, NY 10017
By:      Richard Pachulski, Esq. (argued)

STUTMAN TREISTER & GLATT P.C.
Counsel for Elliot Associates (via telephone)
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
By:      Isaac Pachulski, Esq. (argued)

CLIFFORD CHANCE US LLP
Counsel for Calyon Securities
31 West 52nd Street
New York, NY 10019
By:      Andrew Brozman, Esq. (argued)

LATHAM & WATKINS LLP
Counsel for the Olympus Bondholders
885 Third Avenue
New York, NY 10022
By:     Robert J. Rosenberg, Esq.

SIDLEY AUSTIN LLP
Counsel for the Fort Myers Noteholders
787 Seventh Avenue
New York, NY 10019
By:     Lee S. Attanasio, Esq.

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Counsel for the Class Action Plaintiffs
460 Park Avenue, 8th Floor
New York, NY 10022
By:     John H. Drucker, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Counsel for the FrontierVision Ad Hoc Committee
1177 Avenue of the Americas
New York, NY 10036
By:     Kenneth H. Eckstein, Esq. (argued)

MILBANK, TWEED, HADLEY & MC CLOY LLP
Counsel for JPMorgan Chase Bank
One Chase Manhattan Plaza
New York, NY 10005
By:     James C. Tecce, Esq.

KIRKLAND & ELLIS LLP
Counsel for ACC
777 South Figueroa Street
Los Angeles, CA 90017
By:     Richard L. Wynne, Esq.
        Michael I. Gottfried, Esq. (via telephone)

WILMER CUTLER PICKERING HALE & DORR LLP
Counsel for Credit Suisse First Boston
399 Park Avenue
New York, NY 10022
By:     Philip D. Anker, Esq.

LAW OFFICES OF FEDERICO SAYRE
Counsel for Moctesuma Esparza
By:       Giovanni Orantes, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
33 Whitehall Street, 21st Floor
New York, NY 10004
By:    Tracy Hope Davis, Esq.


BEFORE:    ROBERT E. GERBER
           UNITED STATES BANKRUPTCY JUDGE


A group of bondholders ("ACC Bondholder Group") of Adelphia

Communications Corporation ("ACC Parent"), the highest entity in Adelphia's capital

structure, moves to terminate the Debtors' plan exclusivity.  The ACC Bondholder Group

also moves for a determination on my part to resume the now-suspended litigation of the

interdebtor and intercreditor disputes in these cases, and to unseal matter that had been

subject to confidentiality orders, and/or had been filed under seal, in connection with the

litigation of those issues.

The motion to terminate exclusivity is denied.  The motion to resume the now-

suspended litigation of the interdebtor issues is likewise denied.  The motion to unseal

protected matter is granted in part, subject to the Debtors' ability to protect commercially

sensitive matter (and for other parties in interest to be heard to protect matter that should

be protected for other reasons), as set forth more fully below.

I don't agree with the ACC Bondholder Group's suggestion[2] that the factors set

forth in the caselaw for exclusivity termination determinations are "platitudes."  I do

agree with it, however, to the extent that I consider this exclusivity termination motion

not just by a checking off, or any mechanical counting or even weighing, of the

enumerated factors, but also by taking a broader, more global view—focused on what is

---

[2]      Arg. Tr. 125.

best for these chapter 11 cases; most in keeping with the letter and spirit of chapter 11; and what is most appropriate under the unique facts of a case that has been aptly described as one of the most challenging in bankruptcy history.

Here the Debtors have proposed, jointly with the Creditors Committee, a reorganization plan that, among other things, proposes a compromise of intercreditor disputes (and of the interdebtor disputes, which in huge respects drive the intercreditor disputes) that have plagued this case for years. The plan follows weeks of court-ordered settlement efforts, amongst the parties and then with the assistance of Judge Morris of this Court. The Joint Plan has secured very substantial, but not universal, indications of potential approval. While I will say now and again that I don't regard decisions of this character as a mechanical exercise in counting noses (or tallying up dollars, in par amount, of claims held), I believe that the proposed plan plainly deserves to be put up for a vote. While the settlement process did not include for a time (that, in retrospect, was too long) bank lenders and unsecured creditors (like Olympus) that were not players in the interdebtor disputes, the Debtors have now brought those parties in, or at least tried to do so. I disagree with the contentions that the process that led up to the term sheet that underlies it was in any way unlawful or illegitimate.

The proposed plan will go out for a vote. Many creditors, particularly bondholders at the ACC Parent level, have not been heard from, one way or the other. And at least for the relatively brief period of 6 to 8 weeks during which we'll ascertain whether the Joint Plan has the requisite support and is confirmable, I will keep exclusivity in place.

The following factors inform my exercise of discretion in this regard.

-7-

<u>Relevant Factual Considerations</u>

I can and do decide these motions on undisputed facts.

As the Creditors' Committee fairly observes,[3] this case "may very well be the largest and most complicated and difficult case of all time." Matters that made it so have been listed or addressed in prior decisions in these cases—more than 25 of my published decisions have been in this case alone—and needn't be discussed at length in this decision. It's sufficient, for purposes of this discussion, to note that the amalgam of pre-distribution matters to be addressed in these cases—the things to be fixed from the Rigas era; the claims to be defended against, or prosecuted, in connection with the Rigases' conduct; the efforts to stabilize and maximize the value of a business that had no management at the highest levels with cable expertise, and which lacked accounting records upon which managers or the public could rely; and the effort to market a company that ultimately fetched $17 billion—by themselves presented extraordinary challenges. And just as it appeared that the Debtors had met all of these challenges, it appeared that intercreditor disputes could still destroy this case. As it turned out, they nearly did, and still may.

When uncertainties as to interdebtor liabilities; allocation of the burdens of the DoJ/SEC settlement; allocation of the consideration of the sale of the Company to Time Warner and Comcast, and a host of other issues proved to be incapable of consensual ruling amongst creditors, the Debtors moved for a mechanism in aid of the process to resolve the interdebtor and related intercreditor disputes, to tee up the issues for judicial determination. Their initial motion, referred to in shorthand by parties in this case as the

---

[3]      Creditors' Comm. Opp. at 5.

"Motion in Aid," was granted and led to a process referred to in these cases as the

"MIA."  But the time budgeted for the MIA process, which had been envisioned to

encompass seven phases, to be determined in a series of hearings (for the most part,

evidentiary trials) of one week each, proved to be wholly unrealistic, in light of the

factual and legal complexity of the underlying issues—exacerbated by the desire of the

litigants to litigate every arguable legal and factual issue, and to leave no stone unturned.

After about 6 weeks, we were (and still are) in Phase II, with supplemental briefs to be

submitted on 14 issues that I identified for the parties that I thought would have a

material effect on the Phase II outcome.

    Realizing that the MIA litigation could drag on for a very long period;

recognizing the strain that the MIA litigation was putting on the Debtor's personnel,

operations and finances, and fearing that the inability to resolve the intercreditor disputes

would at least paralyze, and perhaps destroy, the case, I first ordered the parties to the

MIA into mandatory settlement negotiations, requiring the MIA litigants to attend twice

weekly negotiation sessions, one day per week with lawyers and principals, and one

additional day per week with principals only.  (The lawyer representatives were excused

from the second day of attendance, as they were otherwise on trial before me, or working

on their next rounds of briefs and trial preparation.)  When that was insufficiently

productive, and I was concerned about the pace and seriousness of the negotiations, I then

enlisted my colleague, Hon. Cecilia Morris, U.S.B.J., to act as a non-adjudicative monitor

and facilitator of the discussions.  She brought the parties together for intensified efforts

to settle the intercreditor disputes.  At a chambers conference in May, at which all

restricted parties were represented, including all of the parties to the interdebtor disputes,

-9-

I asked the parties if any objected to my receiving a report from Judge Morris concerning the settlement negotiations. Nobody objected. Thereafter, she submitted a report to me, which included a term sheet for a now superseded plan, which had some support, but none at the ACC Parent level, and much less support than the plan that later secured the agreement of the Debtors and Creditors' Committee. Judge Morris stated that in her view, settlement was a better alternative to continued litigation of the MIA, and continuing proceedings under the MIA process.

The negotiations assisted by Judge Morris led to a series of term sheets for plan proposals that would embody a settlement of an increasing percentage of the various intercreditor disputes. Early on, much less than all of the affected parties signed on, but with time, various unsecured (and later, secured) creditors agreed. The earliest negotiations involved only the parties to the MIA. With the benefit of hindsight, I think this was not the best way to do it, and when holders of bank claims complained of this (at a chambers conference whose transcript I will unseal), I agreed with many of their points, and I urged that they be brought in to the process. Later discussions included the agents for holders of bank claims that had not previously reached agreements as to plan treatment (3 of the 6 principal bank agents having already done so), and unsecured creditors who had not been litigants in the MIA. With time, more and more creditors reached agreement, including two major holders of bonds at the ACC Parent level, Tudor and Highfields (who are also members of the Creditors' Committee), and Wachovia and the Bank of Montreal, the agents on 2 of the 3 bank syndicates that had not previously reached agreement. Two major holders of unsecured claims at the ACC Parent level,

who are members of the ACC Bondholder Group, were parties to the negotiations, but did not agree to the proposed plan treatment.

The Debtors and Creditors' Committee proposed a Joint Plan of Reorganization that would embody the compromises reached up to that point in time. (The Debtors disclaimed being a plan proponent with respect to adverse treatment of holders of bank claims with whom the Debtors had not reached a settlement, consistent with an earlier agreement with holders of bank claims to which the Debtors had agreed.) The Joint Plan now appears to have very considerable, but not total, support. Its supporters include Tudor and Highfields, which had been participants in the settlement process from the very outset—and were at various times the representatives, or among the representatives, of the ACC Parent bondholders. But the members of the ACC Bondholder Group (some of whom were also participants in the settlement process, at least toward the end) don't like the Joint Plan. I regard it as now unnecessary to discuss why parties like it or don't like it. Accusations have flown between feuding creditors as to these matters, but they raise disputed issues of fact, and perhaps law, and ultimately need not be resolved on this motion. Parties' rights as to these issues will be reserved.

The ACC Bondholder Group has contended that that the negotiation process that led to the present Joint Plan was procedurally defective—to the point that the Joint Plan should not even be allowed to be solicited. As I indicated on the record at the first day of the disclosure statement hearing on the Joint Plan, I disagree. The Joint Plan was the result of weeks of effort to bring seemingly intractable disagreements to a consensual conclusion. The negotiations that led to it were done in full view of the members of the ACC Bondholder Group, and at least some of them were participants in it. The

-11-

negotiation process was at least partly successful; whether it's more than that will be
determined by the votes of creditors, and a confirmation process that guarantees
participants in the chapter 11 process the protections to which they're entitled under law.
The ACC Bondholder Group's objections are insufficient to warrant depriving the
Debtors of their right to put the plan up for a vote.

These chapter 11 cases, which were filed in July 2002, have now gone on for
more than 4 years, by reason of the complexities described (in part) above, and by reason
of the intercreditor disputes, described above and below.  At this point, by reason of a
combination of early Debtor motions to extend exclusivity; a bridge order extending
exclusivity that was never followed up or objected to; failures to move to terminate
exclusivity; and a denial of a motion to terminate exclusivity for a subset of the Debtors,
the  Debtors retain exclusivity.  The Debtors' plan proposals, until this one, have not
generated creditor enthusiasm, but that hasn't been because the Debtors were trying to
feather their own nest, or to advance their own parochial desires.  To the contrary, it has
been by reason of the difficulty of the intercreditor issues, and the aggressiveness with
which creditors (not just the members of the ACC Bondholder Group) have sought to
maximize their individual recoveries.  If creditors come to the view that bringing this
case to an end may require them to stop doing battle to squeeze out incremental
recoveries, they may support the Joint Plan.

I.

Exclusivity

The ACC Bondholder Group argues that the Debtors involuntarily waived
exclusivity by co-proposing their plan of reorganization with the Creditors' Committee.
The ACC Bondholder Group also argues that an extension of the Debtors' exclusivity is

-12-

unwarranted at this time, and that the plan process should now be opened up to competing plans.

A.  *Involuntary Waiver.*

Section 1121(b) grants a debtor exclusive periods for the filing, and solicitation, of a reorganization plan.  These periods are subject to extension, or contraction, for cause.[4]  But section 1121 doesn't mention a waiver of exclusivity, much less articulate standards under which a waiver of a debtor's section 1121 rights may be found.  Nor has any case been brought to my attention holding that a debtor has waived exclusivity by sharing it in an assertedly improper way.  Both common sense and waiver doctrine generally, and highly relevant case law, cause me to reject the ACC Bondholder Committee's contentions that the Debtors have waived exclusivity here.

First, as a matter of common sense and waiver doctrine generally, I am loath to find inadvertent waiver here.  At least as relevant here, a waiver is the intentional relinquishment of a known legal right.[5]  Because waiver of a right must be proved to be intentional,[6] I don't find accidental waivers lightly.  There is nothing in the record here from which I can find that a waiver of any type—much less the type said to have occurred here—was ever intended by the Debtors.

---

[4]     As applicable to these cases, section 1121(d) provides:

> On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

[5]     *See, e.g., United States v. Johnson,* 391 F.3d 67, 75 (2d Cir. 2004), citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (defining waiver as an "intentional relinquishment or abandonment of a known right or privilege"); *City of New York v. State*, 40 N.Y.2d 659, 669, 389 N.Y.S.2d 332 (1976) (under New York law, a waiver is "the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it").

[6]     *See, e.g.,  Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc*., 448 F.3d 573, 585 (2d Cir. 2006), and cases it cites.

As importantly, the waiver argument cannot be squared with the relevant caselaw. In the *Texaco* case in this district,[7] Judge Schwartzberg of this Court rejected the notion of an exclusivity waiver by implication. There the Icahn group argued that Texaco had lost exclusivity by permitting Pennzoil to co-propose a joint plan. Judge Schwartzberg agreed with Texaco that no waiver had occurred, observing that "there are no cases which support this novel idea."[8] To the contrary, he noted that "Texaco and Pennzoil have done precisely what 11 U.S.C. § 1121 contemplated; namely the negotiation of a plan of reorganization that may be acceptable to creditors and other interested parties."[9]

Debtors and other parties in interest—most commonly, unsecured creditors' committees—often propose joint chapter 11 plans, and do so while the debtor has exclusivity. Chapter 11 plans confirmed on my watch in *Adelphia Business Solutions*[10] and *Casual Male,*[11] both while the debtors still had exclusivity, are just a couple of the examples of this. Joint plans are proposed for good reason; they are reflective of the consensus building that's the goal in chapter 11, and give the creditors who are asked to vote on the plan comfort that those who've been following the case and share their interests believe that the plan should be solicited. I am not going to penalize these Debtors for having done likewise.

B. *Termination for Cause.*

In addition to providing for a debtor's exclusive periods, section 1121 of the Code authorizes a bankruptcy court to reduce or increase the exclusivity period for cause. A

---

[7]        *In re Texaco Inc.,* 81 B.R. 806, 810 (Bankr. S.D.N.Y. 1988) (Schwartzberg, J.).

[8]        *Id.*

[9]        *Id.*

[10]       S.D.N.Y. Case No. 02-11389 (REG).

[11]       S.D.N.Y. Case No. 01-41404 (REG).

decision to extend or terminate exclusivity for cause is within the discretion of the

bankruptcy court,[12] and is fact-specific.  The elements that constitute "cause" aren't

outlined in the Code, but the caselaw has identified factors that normally are considered

when determining whether "cause" exists to reduce or increase the Debtor's exclusivity

period.

Courts typically rely on nine enumerated factors:

(a) the size and complexity of the case;

(b) the necessity for sufficient time to permit the debtor to

negotiate a plan of reorganization and prepare adequate information;

(c) the existence of good faith progress toward reorganization;

(d) the fact that the debtor is paying its bills as they become due;

(e) whether the debtor has demonstrated reasonable prospects for

filing a viable plan;

(f) whether the debtor has made progress in negotiations with its

creditors;

(g) the amount of time which has elapsed in the case;

(h) whether the debtor is seeking an extension of exclusivity in

order to pressure creditors to submit to the debtor's reorganization

demands; and

(i) whether an unresolved contingency exists.[13]

---

[12]       *In re Adelphia Communications Corp.,* 336 B.R. 610, 674 (Bankr. S.D.N.Y.) (Gerber, J.)
("*Adelphia Arahova Motions Decision*"), *aff'd* 342 B.R. 122 (S.D.N.Y. 2006) (Scheindlin, J.); *In
re Gibson & Cushman Dredging Corp.,* 101 B.R. 405, 409 (E.D.N.Y. 1989).

[13]       *In re Dow Corning Corp.,* 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997); *Adelphia Arahova
Motions Decision,* 336 B.R. at 674 (citing *Dow Corning*).

I note that displeasure with a plan on file is not one of the enumerated factors, and is not a

basis for terminating exclusivity. Nor, without more, is creditor constituency unhappiness

with a debtor's plan proposals, with or without a formal plan on file.[14]

No one disputes that the factors listed in *Dow Corning* and in the *Adelphia

Arahova Motions Decision* are the factors that have been identified in the caselaw as

factors that are to be considered. While the ACC Bondholder Group characterizes the

enumerated factors as "platitudes"[15] (implying that these are less than worthy of being

considered), I can't agree. They're objective factors which courts historically have

considered in making determinations of this character, as a means of ensuring that at least

these factors are considered. While they don't prohibit the consideration of other relevant

factors, they nevertheless can't be ignored.

The first factor—the size and complexity of the case—favors preservation of the

Debtors' exclusivity. This case is of unprecedented complexity and overwhelming size.

As I indicated in the *Adelphia Arahova Motions Decision*:

> The Debtors' cases involve 231 debtors, 6 different
> prepetition credit facilities, approximately 30
> issuances of outstanding public indebtedness at
> different levels of a complex capital structure,
> numerous and exceedingly complex Intercreditor
> Dispute issues, SEC and DoJ investigations and
> settlements, massive ongoing litigation among
> stakeholders, the wholesale departure of Rigas
> Family management, the effects of the massive
> prepetition fraud of Rigas Family management, an
> approximately $17.6 billion sale transaction of
> unprecedented size and scope in a chapter 11

---

[14]   *See Adelphia Arahova Motions Decision,* 336 B.R. at 676 & n.183 ("the notion that creditor
       constituency unhappiness, without more, constitutes cause to undermine the debtor's chances of
       winning final confirmation of its plan during the exclusivity period has been judicially rejected"),
       *citing In re Geriatrics Nursing Home, Inc.,* 187 B.R. 128, 134 (D.N.J. 1995).

[15]   *See* Arg. Tr. 125.

proceeding, and numerous other complicated
matters and issues.[16]

The second factor—the necessity of sufficient time to permit the debtor to
negotiate a plan of reorganization and prepare adequate information—also favors the
Debtors' retention of exclusivity.  Here the Debtors, together with the Creditors'
Committee, have already filed a plan, that can be quickly solicited.  We aren't talking
about the time to negotiate and file a plan; we're talking about the time to solicit
acceptances to it, and we'll quickly learn if this plan gets the acceptances.  In the context
of a four year-old case, the 6 to 8 weeks of extra time now requested by the Debtors to
solicit the acceptances and possibly secure confirmation is *de minimus*.

The third factor is the existence of good faith progress toward reorganization.
Back in January, at the time of the Arahova Noteholders' effort to terminate exclusivity,
I'd noted the Debtors' progress on the operational side, their cooperation with their
stakeholders, and their good faith efforts to achieve emergence.[17]  Since that time, the
Debtors have shown me more of the same, bringing the Time Warner/Comcast sale to a
successful conclusion, despite creditor feuding that subjected that sale to substantial risk.
The failure to have confirmed a plan up to this point has hardly been the Debtors' fault;
it's been the consequence of the continuing feuding between the Debtors' creditors.  Now
the creditors have made substantial progress in coming to an agreement, and there has
been huge progress toward reorganization.  The Debtors, in cooperation with the
Creditors' Committee, have now proposed a plan that has the apparent support of nearly
all the unsecured creditor constituencies in this case, and several of the bank lender

---

[16]     *Adelphia Arahova Motions Decision,* 336 B.R. at 675.

[17]     *See id.*

-17-

agents as well.  This factor, which I regard as one of the more important factors under the facts of these cases, strongly favors retention of exclusivity by the Debtors.

The fourth factor—the debtor's payment of bills as they become due—would be more of a factor if it were *not* satisfied here.  I give it modest weight, since the Debtors' have consistently met their financial obligations, and note only that it plainly doesn't warrant terminating exclusivity.

The fifth factor is whether the debtor has demonstrated reasonable prospects for filing a viable plan.  Here, of course, we aren't talking about the *filing* of a plan (since a plan has been filed, and its solicitation is imminent), but rather are focusing principally on whether this plan (or a modification of it) will secure favorable reaction from the Debtor's creditors.  This factor requires only that a debtor be able to attain confirmation of at least *some* viable plan,[18] not necessarily the plan currently proposed.  The ACC Bondholders Group hasn't persuaded me that the Debtors lack any realistic prospect of proposing a viable plan.  The Debtors have already confirmed plans for the Joint Venture Debtors.  And as I've noted, we have a plan that's about to be solicited, and the support of it by creditor groups holding billions of dollars in par amount strongly suggests that it's hardly dead on arrival, and is, at the least, viable.  This factor, which I consider to be the most important under the facts of these cases, also strongly favors retention of exclusivity by the Debtors.

The sixth factor is whether the debtor has made progress in negotiations with its creditors.  Under the facts here, it overlaps materially with factors already discussed, and

---

[18]    See *Dow Corning*, 208 B.R. at 665.  The ACC Noteholders assert potential non-confirmability of the Debtors' plan as a cause to terminate exclusivity.  But the merits of the plan are to be examined at confirmation and don't play a meaningful role in the court's decision as to whether or not to terminate exclusivity.

like those factors, also strongly favors the retention of exclusivity by the Debtors.  In

light of the contentious nature of this case, the Debtors have made tremendous progress

in their negotiations with their creditors.  Securing the support of Tudor, Highfields, and,

later, the Olympus and Ft. Myers Bondholders was a major step forward.  So was

securing agreements with secured lender agents Wachovia and the Bank of Montreal, and

"nominal agents," such as Credit Suisse and the Royal Bank of Scotland.

      The seventh factor—the time elapsed in the case—seemingly would favor

terminating the Debtors' exclusivity, which they have enjoyed for 4 years, but giving that

factor material weight under the facts of this case would in my mind be inappropriate.

This case has been anything but ordinary.  For a large part of these 4 years, and to this

day, the Debtors have been held hostage to bitter inter-creditor disputes and have been

peppered with motions and objections of unhappy creditors, who've shown little interest

in maximizing the value of the estate for all creditors and who've attempted to tilt—and

if necessary derail—the negotiation process to maximize their individual recoveries.  At

least in the absence of an agreement amongst creditors, it would hardly have been

realistic to expect confirmation of a plan at an earlier time.  And now that many creditors

are in agreement, it would be premature to say that it's time for the Debtors to abandon

their efforts to bring creditors together, and to subject the estate to the discord that would

result from competing plans.  That's particularly so since within just a few more weeks,

we'll be able to ascertain, with much more precision, the level of creditor support for the

Joint Plan.  Spending a few more weeks with exclusivity would hardly be inappropriate

in light of the complexity of this case.

-19-

The eighth factor is whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands. This, like one of the predecessor factors, would be significant if I were to find it to be present, but has no material weight here. While the ACC Bondholder Group contends that the Debtors are using exclusivity to "attempt to strong-arm" them "into accepting the harsh economic impact" of the Joint Plan, and that such is "coercive, improper, and warrants a termination of exclusivity,"[19] I see no basis for such a charge. Creditors at every level in the corporate capital structure, including at ACC Parent, have expressed support for the Joint Plan. While reasonable parties can disagree as to the benefits of the settlement the Joint Plan embodies, widespread approval doesn't make the plan coercive. I've already taken steps, in connection with the disclosure statement approval process, to ensure that the solicitation for the Joint Plan is *not* coercive. The ACC Bondholder Group's real issue is that other creditors (including some, like Tudor and Highfields, that are creditors of ACC Parent) may not agree with the ACC Bondholder Group's views of the merits of the settlement, or as to the desirability or undesirability of settling at all. If the ACC Bondholder Group's unhappiness is shared by other creditors (and the ACC Bondholder Group will be free to express its unhappiness with the merits of the plan, and the reasons for it, to other creditors, of ACC Parent and other Debtors), the Joint Plan will presumably not secure the requisite votes.

The ninth factor—the existence of an unresolved contingency—is not, at this stage of the game, particularly relevant in either direction. The existence of a huge contingency—the outcome of the MIA—is in my mind not the kind of unresolved

---

[19]    ACC Bondholder Group Exclusivity Motion ¶ 57.

-20-

contingency that this factor addresses.  In other cases, the "unresolved contingency"

factor might support continuing exclusivity to see how the unresolved contingency pans

out, but I don't see it as applicable here.  It plainly doesn't cut in favor of terminating

exclusivity in this case, at this time.

    As I noted above, I agree with the ACC Bondholder Committee to a certain

extent; I agree that the caselaw factors might not, in every case, by themselves be

determinative.  It has been held that the primary consideration for the court in

determining whether to terminate the debtor's exclusivity is whether its termination will

move the case forward,[20] and that this "is a practical call that can override a mere toting

up of the factors."[21]  I agree with that in substantial part—though I'd say that the test is

better expressed as determining whether terminating exclusivity would move the case

forward materially, to a degree that wouldn't otherwise be the case.  Certainly practical

considerations, or other considerations in the interests of justice, could override, in

certain cases, the result after analysis of the nine factors.[22]  But here, looking to a broader

view, including examination of practical considerations and what is best in this case,

leads me to the same result that the nine factors do.  In this case, termination of

exclusivity, just a few weeks before the Debtors might be in the position to confirm a

plan, would be at odds with moving the case forward, and could be disastrous.

Terminating exclusivity might well result in the solicitation of three or even more plans

(not just one or two), with some addressing only parochial concerns.  Or, given

predictions creditors have made to me, several creditor constituency might file their own

---

[20]     *See Dow Corning*, 208 B.R. at 670.

[21]     *Id.*

[22]     *See id.*

"wish list" plans, with each being no more palatable to other constituencies than all of the proposals that I've seen to date. A competing plans battle now might well jeopardize current fragile agreements between various stakeholders, re-ignite intercreditor disputes, and push this process back to square one. A competing plans battle would also likely drag out the solicitation process, subjecting the estate to substantial extra costs that might otherwise be avoided, including huge IPO costs associated with making Time Warner stock freely tradable.

As we'll know whether the Joint Plan has secured the necessary votes and is confirmable in just a few weeks, this time is, in my view, exactly the wrong time to be terminating exclusivity. The ACC Bondholder Group's Motion to terminate exclusivity is denied.

## II.

### Continuing MIA process

The ACC Bondholder Group has also asked me to revive the MIA process. Such a request is premature. A plan has been proposed that will settle the MIA issues, and make the MIA process unnecessary, relieving creditors of the extraordinary costs that continued litigation would entail, and relieving the Debtors and their continuing employees of the enormous strain the MIA process created. This is not the time to announce the MIA process's revival. If the Joint Plan is not confirmed, there will be time enough to revive the MIA process then.

## III.

### Unsealing

The ACC Bondholder Group has also asked me to "declassify" a variety of documents that were submitted to me, and/or filed, under seal, including evidence and

transcripts of proceedings in the MIA process, and documents (sometimes vaguely described) relating to the negotiations that led to the Joint Plan. This motion is granted, in part, subject to safeguards for the estate and its creditors.

Insofar as the "unsealing" motion involves "declassifying" evidence in the MIA process, and transcripts of the proceedings in the MIA process, I am granting the motion, subject to the rights of the Debtors to redact or withhold material that would otherwise be declassified, to excise material whose disclosure would be damaging to the interests of the estate. Frankly, I have doubts as to whether review of the MIA evidence, or transcripts, would assist creditors in any significant way in evaluating the MIA dispute (which is extraordinarily complex), or in making predictions as to its outcome. But I'm willing to let creditors try, and (more realistically) to let plan supporters and opponents make arguments based on MIA evidence.

Based on my knowledge of the proceedings before me, I assume that some, but much less than all, of the evidence will still be redacted or withheld. I think that preserving the Debtors' right to protect sensitive evidence is essential to protecting the Debtors, and their stakeholders, from prejudice. And I don't believe that by authorizing the withholding or redaction of evidence whose disclosure would be commercially prejudicial, I would be materially impairing the value of the evidence made public. For all practical purposes, the evidence will then all be "out there," and I assume (without deciding) that with so much information having been provided, bondholders who had been restricted because of access to that information will now be free to trade. If any party in interest believes that the Debtors erred in making a decision to protect or disclose any particular matter, it should first try to resolve any dispute with the Debtors

consensually, and in the event of an inability to agree, I will address any disputes by conference call.

I'll also declassify and unseal briefs and hearing or conference transcripts that were filed under seal in proceedings before me that related to the settlement process, except to the extent (which I believe is modest) that the submissions included commercially sensitive matter that is subject to protection by reason of my first ruling. That will result principally in the disclosure of certain briefs by bank lenders, and a conference transcript. I am otherwise denying authorization for disclosure of nonpublic matter relating to the settlement negotiation process. Such would be inconsistent with Rule 408 and the basic ground rules under which we encourage parties to negotiate settlements, and under which we request and authorize facilitative mediation. The wisdom of the interdebtor settlement that was ultimately proposed will of course be subject to full debate, assisted by very nearly wholly unfettered access to evidence and briefs introduced in the MIA process, in accordance with my earlier ruling.

<u>Conclusion</u>

The Debtors are to settle an order in accordance with the foregoing, as promptly as possible, but on no less than two business days' notice by hand or fax. The time to appeal or move for leave to appeal these determinations will run from the date of entry of the resulting order, and not from the time of this Bench Decision.

Dated:  New York, New York            ___*s/Robert E. Gerber*___
        September **_19_**, 2006              United States Bankruptcy Judge