# EXHIBIT A

<u>Hearing Date and Time</u>: **January 16, 2007 at 9:45 a.m.**
<u>Objection Deadline</u>: **December 18, 2006**

DEWEY BALLANTINE LLP
Lisa Hill Fenning (Pro Hac Vice)
333 South Grand Avenue, 26th Floor
Los Angeles, California 90071-1530
(213) 621-6000
(213) 621-6100
lfenning@dbllp.com

*Attorneys for ESPN, Inc. and its Affiliates*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| | |
| ADELPHIA COMMUNICATIONS CORPORATION, *et al.*, | Case No. 02-41729 (REG) Jointly Administered |
| | |
| Debtors. | |

-----------------------------------------------------x

## ESPN'S MOTION FOR ENTRY OF AN ORDER FOR
## ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS
## <u>PURSUANT TO SECTION 503 OF THE BANKRUPTCY CODE</u>

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ...................................................................................1

II. JURISDICTION .......................................................................................................1

III. BACKGROUND .....................................................................................................1

IV. DISCUSSION .........................................................................................................7

    A. Under Binding Second Circuit Precedent, Debtors Are Fully Liable For
       Administrative Priority Damage Claims If They Terminate Post-Petition
       Contracts Without Justification. ...................................................................7

    B. The Debtor's Decision to Liquidate, Rather Than Reorganize, Does Not
       Excuse Its Payment Obligations Under the Agreements. ............................. 10

       1. The Debtor Had No Contractual Right to Terminate The Agreements
          Upon Sale. ...................................................................................... 10

       2. The Debtor Breached Its Obligations to Deliver All Services to Its
          Subscribers for the Full Term of the Agreements. ................................ 11

       3. The Debtor Breached Its Obligations to Pay License Fees at the
          Contract Rates for the Full Term of the Agreements. ........................... 12

       4. The Debtor Also Violated the Implied Covenant of Good Faith and
          Fair Dealing by Failing to Ensure the Continued Operation of the
          Systems Under the Terms of the Agreements. ..................................... 13

    C. ESPN'S Lost Revenues Constitute the Appropriate Measure of its Damages. .......... 15

V. CONCLUSION ......................................................................................................18

VI. WAIVER OF MEMORANDUM OF LAW....................................................................18

# TABLE OF AUTHORITIES

## Cases

In re Frontier Properties,
  979 F.2d 1358 (9th Cir. 1992) ....................................................................... 9

In re Klein Sleep Products, Inc.,
  78 F.3d 18 (2d Cir. 1996) .................................................................... 8, 9, 18

In re Lamparter Org., Inc.,
  207 B.R. 48 (E.D.N.Y. 1997) ...................................................................... 8

In re Mammoth Mart, Inc.,
  536 F.2d 950 (1st Cir. 1976)........................................................................ 7

In re Merry-Go-Round Enterprises, Inc.,
  180 F.3d 149 (4th Cir. 1999) ....................................................................... 7

In re White Motor Corp.,
  831 F.2d 106 (6th Cir. 1987) ....................................................................... 7

Jones v. H.N.S. Management Co., Inc.,
  92 Conn. App. 223 (2005) ......................................................................... 14

Metabolite Laboratories Inc. v. Laboratory Corp. of America Holdings,
  370 F.3d 1354 (Fed. Cir. 2004) ................................................................. 16

Shoreline Communications, Inc. v. Norwich Taxi, LLC,
  2001 WL 477390 (Conn. Super. Ct. 2001)..................................... 12, 15, 16

## Statutes

28 U.S.C. § 157(b)(2)(A) and (B)............................................................... 1, 7

28 U.S.C. § 1334 ............................................................................................ 1

28 U.S.C. §§ 1408 and 1409 .......................................................................... 1

11 U.S.C. § 363............................................................................................... 4

11 U.S.C. § 503(b)(1)(A).......................................................................... 1, 7

11 U.S.C. § 507(a)(2)..................................................................................... 1

## Other Authorities

4 Collier on Bankruptcy § 503 (15th ed. 2006) ............................................. 7

Restatement (Second) of Contracts § 205 (1981).......................................... 14

## I.   PRELIMINARY STATEMENT

1.      ESPN, Inc., ESPN Classic, Inc., and ESPN Enterprises, Inc. (collectively, "ESPN") seek allowance and payment of their administrative expense claims pursuant to Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code (the "Motion"). In support of its Motion, ESPN represents as follows:

2.      ESPN's claims arise from breaches of certain post-petition long-term programming agreements contracted by Adelphia Communications Corporation ("Adelphia" or the "Debtor") in the ordinary course of its business. As of July 31, 2006, the Debtor unilaterally terminated ESPN's agreements in violation of the Debtor's obligations thereunder, causing ESPN to suffer damages for lost revenues and profits in the approximate aggregate amount of $198,368,000.00 over the remaining multi-year terms of the agreements. Because these agreements are post-petition, ordinary course contracts, ESPN's damage claims are entitled to allowance and payment as administrative priority claims.

## II.   JURISDICTION

3.      This Court has subject matter jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. A motion for allowance and payment of an administrative claim is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.   BACKGROUND

4.      The Debtor filed its Chapter 11 case in June 2002. During the bankruptcy case, it continued the regular operations of its cable systems, including certain systems directly owned by the Rigas family (the "Rigas Systems"), until the closing of its sale of its cable systems to Time Warner and Comcast (the "Buyers") on July 31, 2006 (the "Sale").

5.      In the ordinary course of its business of operating cable systems both before and during the Chapter 11 proceedings, the Debtor regularly negotiated and entered into multi-year contracts to obtain programming to transmit to its cable and broadband Internet subscribers. As a result of this practice, at the time of its June 2002 bankruptcy filing, the Debtor was a party to

certain programming contracts to provide ESPN programs and network services: a contract for ESPN service, expiring September 26, 2006; and contracts for the ESPN2 and ESPNEWS, expiring December 31, 2004.   The ESPN Classic service was also being provided pursuant to a term sheet and draft agreement that was still being negotiated.

6.      As of the petition date, the Debtor owed more than $35 million for several months' worth of these ESPN services.[1]   After the bankruptcy filing, the Debtor informed ESPN that it did not intend to assume the prepetition agreements and would not cure these payment defaults.  The parties continued to operate under the terms of the prepetition contracts and term sheets until new contracts were in place.

7.      In early 2004, with the ESPN2 and ESPNEWS contracts due to terminate at the end of the year, ESPN and the Debtor engaged in negotiations about the terms of new agreements.  The Debtor asked ESPN to include the ESPN contract in these negotiations even though that contract still had nearly three more years to run (through September 27, 2006); the Debtor was seeking an immediate reduction in the ESPN subscriber rates to improve its operating cash flow.  ESPN was willing to renegotiate the existing ESPN contract but only if the Debtor committed to a binding ten-year agreement (*i.e.*, eight years beyond the end of the term of the existing prepetition contract).

8.      In late 2004, the parties reached agreement in principle on a term sheet. Long-form agreements were executed in early 2005, with most of the agreements effective as of January 1, 2004.  Adelphia achieved its goal of substantial cost reductions with respect to the early renegotiation of the ESPN contract:  the reduced rates in the new ESPN agreement saved Adelphia tens of millions of dollars in license fees during the period from January 1, 2004 through July 31, 2006, when it closed the Sale and repudiated any further obligations under its post-petition agreements.

---

[1] Although ESPN's proofs of claim (Claims 13108 and 13106) originally totaled about $47 million, the parties negotiated the allowance of the claims in a reduced amount, as approved pursuant to stipulated orders.

9.    ESPN and the Debtor entered into six long-term agreements (collectively, the "Affiliation Agreements") to provide various programming content to the Debtor's more than 200 cable television systems ("Systems") and their Subscribers[2] through July 31, 2014, two supplemental agreements regarding high-definition formats (the "HD Agreements"), and one license agreement to provide content to the Debtor's Internet broadband customers through June 30, 2009 (the "360 License," and together with the Affiliation and HD Agreements, the "Agreements"), as follows:

| ESPN ENTITY | AGREEMENT[3] |
|---|---|
| ESPN, Inc. | ESPN Cable Television Affiliation Agreement ("ESPN Agreement") |
| ESPN, Inc. | ESPN High Definition Television Agreement (supplement to ESPN Agreement) ("ESPN-HD Agreement") |
| ESPN, Inc. | ESPN2 Cable Television Affiliation Agreement ("ESPN2 Agreement") |
| ESPN, Inc. | High Definition Television Supplement to ESPN2 Agreement ("ESPN2-HD Agreement") |
| ESPN, Inc. | ESPNEWS Affiliation Agreement ("ESPNEWS Agreement") |
| ESPN Classic, Inc. | ESPN Classic Affiliation Agreement ("Classic Agreement") |
| ESPN, Inc. | ESPN Deportes License Agreement (Spanish-language broadcasts) ("Deportes Agreement") |
| ESPN, Inc. | ESPNU License Agreement (university sports) ("ESPNU Agreement," and together with the ESPN, ESPN2, ESPNEWS, ESPN Classic, and Deportes Agreements, the "Affiliation Agreements") |
| ESPN Enterprises, Inc. | ESPN Enterprises License Agreement for ESPN360 (broadband internet programming) (the "360 License") |

---

[2] All capitalized terms not otherwise defined herein have the meaning ascribed to them in the respective agreements. The Affiliation Agreements use the same definitions, section numbering, and essentially similar relevant provisions, except as otherwise noted.

[3] As the Agreements contain confidentiality provisions to protect trade secret and proprietary information, copies are not attached to this Motion. The Debtor, of course, is a signatory to all of the Agreements and should have copies in its files.

3

## The General Structure of the Agreements

10.     Under the terms of the Affiliation Agreements, ESPN granted the Debtor the right to carry a particular network or channel on its Systems and is obligated to provide programming content and format that comply with the contract terms. (*See, e.g.,* ESPN Agreement § 2.) The Debtor received a non-exclusive license to provide ESPN's copyrighted programming to its 200-odd Systems and their Subscribers for a ten-year contract term (*see, e.g.,* ESPN Agreement § 1.2, Schedule A), in exchange for which it was obligated to assure minimum penetration levels that vary for the different ESPN services, (*see, e.g.,* ESPN Agreement § 7.2(c)), and to pay the monthly License Fees for each Subscriber, (*see, e.g.,* ESPN Agreement § 4.2(a)).   The HD Agreements were short riders to the ESPN and ESPN2 Agreements that authorized those channels to be carried in high-definition format.   The 360 License was structured somewhat differently, but generally required the Debtor to provide the ESPN360 service to its Internet broadband customers for a specified fee.   License Fees were payable 30 to 60 days after the services have been provided, based upon Subscriber counts reported by the Debtor to ESPN after the close of each calendar month's books.

## Adelphia's Breach of Its Contractual Obligations

11.     In April 2005 – after all of the ESPN Agreements had been negotiated and signed – the Debtor entered into an agreement to sell its Systems to the Buyers pursuant to a plan of reorganization. A year later, having encountered problems negotiating the plan terms, the Debtor instead obtained approval to close the Sale pursuant to Section 363.   The Sale terms gave the Buyers the right to choose which  contracts they wanted to include in their purchase. The Debtor may continue to add contracts to the list of assumed contracts up to the Effective Date.  (Plan § 14; Second Disclosure Statement Supp. § III(K)(4).)  Under the Sale terms, any potential liability for excluded contracts remains the Debtor's responsibility.[4]

---

[4] The Order Authorizing Sale of Substantially All Assets of Adelphia, dated June 28, 2006 (the "Sale Order") provides that the Sale is "free and clear of claims against . . . the Debtors . . . including, but not limited to . . . . (b) all debts arising in any way in connection with any <u>agreements</u>, acts, or failures to act, of the Debtors or the

*continued on the following page...*

12.     On or about June 30, 2006, the Debtor mailed letters to ESPN on account of each of the ESPN services (the "June 30 Letters"), announcing its position that: (i) upon the closing of the Sale, "all such affiliation agreements will terminate with respect to the Cable Systems" because they would no longer belong to the Debtor, and (ii) based upon that change of ownership, "Adelphia will no longer be responsible for any aspect of the operations of the Cable Systems after the Closing Date, including, but not limited to, the payment of license fees." Adelphia did not cite any provision of the Agreements that expressly gave it a right to terminate upon sale, nor did the Debtor assert that ESPN had breached any of its obligations under the Agreements.

13.     Pursuant to the Agreements, the Debtor paid for ESPN services in the ordinary course of its business for services rendered through July 31, 2006. No payment has been made by the Debtor on account of ESPN services provided since then, consistent with the Debtor's June 30 Letters disclaiming any intention to do so.

14.     On July 31, 2006, the Buyers cut off all programming and services under the ESPNU Agreement, the Deportes Agreement, and the 360 License (the "Terminated Services"), because they did not have contracts with ESPN for these services. By allowing these services to be discontinued, Adelphia violated the terms of the Agreements that require that all of the Subscribers to the Debtor's Systems continue to receive them. Since then, the Buyers have been negotiating new contracts for ESPN Deportes, but they will probably be at lower rates than Adelphia's, and will not be effective until January 1, 2007 at the earliest. However, no such contract negotiations are pending for ESPNU or ESPN360. The Buyers have continued to carry

---

*...continued from the preceding page*

Debtors' predecessors or affiliates, including without limitation, <u>Claims, obligations, liabilities</u>, demands, guaranties, options, rights, <u>contractual or other commitments</u>, . . ., whether known or unknown, contingent or otherwise, whether arising prior to or in connection with or <u>subsequent to the commencement of these chapter 11 cases</u>, including, but not limited to, <u>claims otherwise arising under doctrines of successor liability</u>." (emphasis supplied). (Sale Order, ¶ R at 10-11; ¶ 8 at 16-17.) The Buyers are to be liable only for Assumed Sale Liabilities, as defined therein.

ESPN, ESPN-HD, ESPN2, ESPN2-HD, ESPNEWS, and ESPN Classic services (the "Continued Services") on the Debtor's former Systems. The Buyers' rates and payment obligations are essentially similar for ESPN2 and ESPN2-HD, but result in substantially lower aggregate payments for ESPN, ESPN-HD, ESPNEWS, and ESPN Classic.

15.    Instead of performing its contractual obligations to carry all of the ESPN services and pay for such services for the full term of the Agreements, the Debtor has breached its obligations under the Agreements by:

- purporting to terminate the Agreements without just cause;

- failing to deliver the Terminated Services to the Subscribers to its Systems for the full contractual term;

- repudiating its obligations to pay the full amounts due for the Continued Services after July 31, 2006; and

- violating the implied covenant of good faith and fair dealing by failing to assure that either (i) it continued to operate the Systems under the terms of the Agreements or (ii) the Buyers would assume the Debtor's obligations under the Agreements.

Unless the Buyers restore the Terminated Services and assume the Debtor's payment and other obligations under the Agreements, ESPN will suffer damages in the approximate amount of $198,000,000.00. The magnitude of the damages is attributable to the long-term nature of the contracts. These amounts have been calculated to give the Debtor credit for the estimated subscriber rates that the Buyers will be paying under the terms of their own contracts with ESPN during the remaining terms of the Agreements. The explanation of these calculations is set forth in proofs of claim prepared for each agreement and attached hereto as Exhibits A - F.

## IV.   DISCUSSION

### A.   Under Binding Second Circuit Precedent, Debtors Are Fully Liable For Administrative Priority Damage Claims If They Terminate Post-Petition Contracts Without Justification.

16.   The Bankruptcy Code encourages creditors and others to do business and enter into post-petition contracts with Chapter 11 debtors who continue to operate their businesses while they attempt to reorganize.  To provide incentives for non-debtor parties to contract with Chapter 11 debtors in the ordinary course of business, Section 503(b)(1)(A) confers administrative priority status on all claims arising from post-petition contracts for the "actual, necessary costs and expenses" of post-petition operations.  See, e.g., In re White Motor Corp., 831 F.2d 106 (6th Cir. 1987); In re Mammoth Mart, Inc., 536 F.2d 950 (1st Cir. 1976); In re Crystal Apparel, Inc., 220 B.R. 816 (Bankr. S.D.N.Y. 1998) (post-petition employment contracts for non-executives were ordinary course transactions entitled to administrative priority).  If the debtor later chooses to liquidate, instead of reorganize, or if events do not yield the full contractual benefits expected by the debtor for some other reason, the debtor nevertheless remains fully obligated under such contracts and is not excused from liability.  See, e.g., In re Coastal Carriers Corp., 128 B.R. 400 (Bankr. D. Md. 1991) (full post-petition contract price for towing the debtor's barge was an actual and necessary expense, even though the barge sank due to a storm due to no fault of the tug and was thus not delivered to its destination).

17.   If a debtor breaches a post-petition contract, then damages arising from that breach are also entitled to administrative priority treatment.  See, e.g., In re Merry-Go-Round Enterprises, Inc., 180 F.3d 149 (4th Cir. 1999) (all future rent on assumed lease qualified as an administrative expense priority claim); 4 Collier on Bankruptcy § 503 (15th ed. 2006) ("As long as the nonbreaching party can demonstrate that the contract obligations are entitled to administrative treatment status, the full amount of such obligations will constitute administrative expenses.").

7

18.    A debtor is not entitled to relief from its contractual liabilities just because its reorganization fails and it no longer needs the benefits for which it bargained in its post-petition contracts – as has happened with the Debtor.  In such circumstances, under controlling Second Circuit precedent,  "the entire liability resulting from breach of an assumed lease [or post-petition contract] is a cost of administering the estate."    In re Klein Sleep Products, Inc., 78 F.3d 18, 24 (2d Cir. 1996).

19.    In Klein Sleep, the debtor assumed a real property lease during the case, but then the reorganization failed.  As part of the liquidation, the debtor rejected the lease and surrendered the premises.  The landlord sought allowance of an administrative claim for the future rent due for the balance of the lease term, less the amounts actually received as mitigation when it re-let the premises.  The bankruptcy court denied administrative priority to the future rent claim on the basis that the debtor did not actually benefit from the use of the facility after it surrendered the premises.  The district court affirmed the bankruptcy court's decision.  The Second Circuit reversed, holding that post-petition contracts – and thus assumed leases and contracts – are entitled to allowed administrative priority claims for the full amount of contractual damages. The court explained:

> In short, we decline to find that Klein Sleep did not benefit by assuming its lease simply because the lease was no longer profitable at the time it stopped displaying mattresses on the premises.   Such a holding would mean that any post-bankruptcy contract, entered into for the benefit of a bankrupt's estate, would cease to be entitled to priority the moment the deal turned sour. Acquisition of [the right to occupy the premises immediately and in the future] clearly constituted a benefit to the estate even if, later, the benefit turned to dust.

Id. at 26.

20.    The same principle applies to new post-petition contracts as to assumed prepetition agreements.  In In re Lamparter Org., Inc., 207 B.R. 48 (E.D.N.Y. 1997), the district

court reversed a bankruptcy court's holding that future rents arising out of a <u>new</u> post-petition lease constitute only a general unsecured claim. Applying the rule of <u>Klein Sleep</u>, the court held that damages arising out of new post-petition contracts are equally entitled to administrative priority treatment as damages arising out of assumed pre-petition agreements, because granting administrative priority to both cases is consistent with the Code's policy to encourage parties to contract with the debtor post-petition. <u>Id.</u> at 51-52.

21.     This same logic – and rule of law – governs the Agreements. The estate and unsecured creditors reaped the benefits of the Agreements, including tens of millions of dollars of savings from January 1, 2004 to July 31, 2006 due to the reduction in ESPN rates as a result of ESPN's willingness to renegotiate the ESPN Agreement nearly three years before it expired. That reduction helped the Debtor's cash flow and aided its reorganization efforts. Most of ESPN's damages result from the rate differential relating to the new ESPN Agreement – the very agreement from which Adelphia received the benefit of the early renegotiation and rate reduction.

22.     Like the debtor in <u>Klein Sleep</u>, the Debtor cannot walk away from its contractual obligations just because its reorganization turned into a liquidation. The Code requires that the unsecured creditors, not the contracting party, bear the risk and suffer the loss of a gamble by the debtor-in-possession to enter into a post-petition contract. <u>See</u> In re Frontier Properties, 979 F.2d 1358, 1367 (9th Cir. 1992) (affirming award of post-judgment interest arising out of the foreclosure of a land sale contract assumed by the trustee: "When a trustee proves wrong in his gamble that the benefits of an assumed executory contract will outweigh the burdens, the Code requires that the unsecured creditors, not the contracting party, bear the risk and suffer the loss."). Any relief short of granting administrative priority to all damages flowing from the Debtor's breach of the Agreements would be inconsistent with recognized policy to encourage parties to contract with debtors.

**B.**     <u>The Debtor's Decision to Liquidate, Rather Than Reorganize, Does Not Excuse Its Payment Obligations Under the Agreements.</u>

23.     Conspicuously absent from the Debtor's June 30 Letters was any reference to any contract provision authorizing the Debtor's unilateral termination of the Agreements or its attempted repudiation of its obligations to deliver the ESPN services to all of its Subscribers and to pay the License Fees specified in the Agreements. The reason is obvious: the Agreements simply do <u>not</u> give the Debtor the right to terminate free of liability solely because it sold the Systems to purchasers that did not want these contracts. In the absence of a contractual right to terminate the Agreements under these circumstances, the Debtor has breached the Agreements under applicable Connecticut law (*e.g.,* ESPN Agreement § 8.2), giving rise to damages that constitute administrative expense priority claims.

### 1.     The Debtor Had No Contractual Right to Terminate The Agreements Upon Sale.

24.     The Agreements permit termination by the Debtor only for ESPN's material misrepresentation or "material breach." (*See, e.g.,* ESPN Agreement § 7.) No such ESPN misrepresentation or breach was asserted in the Debtor's June 30 Letters. On the contrary, ESPN has fully performed and complied with, and at all times stood willing, reading, and able to perform, all its obligations in the Agreements.

25.     Section 7.2 (d) of the Affiliation Agreements does, however, grant <u>ESPN – **not**</u> Adelphia – the unilateral right to terminate the agreement if the Debtor incurs a "change of control," including the transfer of the Debtor's Systems and operations to a third party. <u>This provision is not symmetrical: Adelphia is not granted an equivalent right.</u>[5] The Debtor's June

---

[5] A special exception was created to address one isolated problem: the Debtor was permitted to drop a system from the Agreements without breaching the Agreement in the event that the federal government required divestiture of the Rigas Systems as part of the criminal and civil forfeiture proceedings that were then in progress. Post-petition disclosures arising from that investigation revealed that Adelphia had long been improperly including the Rigas Systems in its ESPN contracts. Under these peculiar circumstances, ESPN agreed to allow Adelphia to continue to include the Rigas Systems under the new Agreements during the government case, with the proviso that,

*continued on the following page...*

10

30 Letters simply ignore this key element of the Affiliation Agreements. The Debtor cannot rewrite the Agreements merely by declaring, as it did in the June 30 letters, that, because of the change of ownership to the Buyers, "the Cable Systems . . . shall be considered deleted from any such affiliation agreements." The Debtor's unilateral termination, without cause, thus constitutes a material breach of the Affiliation Agreements.

26.    Other than this express exception giving ESPN – but not Adelphia – the right to terminate upon change of control, the Agreements mandate that they will "be binding on the respective transferees and successors of the parties." However, assignment to a third-party successor, such as the Buyers, requires ESPN's consent. (*See, e.g.*, ESPN Agreement § 8.5.) It should be noted that Adelphia has never requested ESPN's consent to assignment to the Buyers – ESPN would have consented, if asked. Nothing in Section 8.5 relieves <u>the Debtor</u> of liability for the payment obligations under the Agreements if ESPN does consent to assignment to a purchaser. Although the terms of the Sale order relieve the Buyers of liability for the Debtor's contracts unless they elect to include them in the purchased assets, that order leaves the Debtor liable for any excluded contracts.

## 2.    The Debtor Breached Its Obligations to Deliver All Services to Its Subscribers for the Full Term of the Agreements.

27.    As of the close of business on July 31, 2006, all the Debtor's Subscribers were cut off from the Deportes, ESPNU and ESPN360 services. This cancellation of the Terminated Services violated the provisions of the ESPN Deportes and ESPNU Agreements obligating the Debtor to deliver each service to a required percentage of the Debtor's Subscribers. (Deportes Agreement § 3.3 (the Debtor "shall distribute *Deportes* in each of Affiliate's Distribution Systems that has a digital 'Spanish language tier'. . . by September 27, 2005"); ESPNU

---

*...continued from the preceding page*

"Any System that is divested shall cease to be a System hereunder," so as to address all potential outcomes of the pending governmental divestiture action. (*See, e.g.*, ESPN Agreement § 1.2.)

Agreement § 3.3 ("Minimum Distribution Requirement. Within ninety days of Network Launch, Affiliate shall distribute ESPNU (i) in each of Affiliate's Distribution Systems that has a 'Digital Basic' tier . . and (ii) within the Los Angeles, California market in all Distribution Systems" meeting certain technical requirements).)    Similarly, the 360 License requires that all of the Debtor's broadband customers must receive the ESPN360 service.  (360 License § 2 ("By June 30, 2006, and continuously thereafter throughout the term, Adelphia will distribute ESPN360 in [residential high speed Internet (HSI)] systems comprising 100% of the Debtor's HSI customer base.").)  In violation of these contractual obligations, the Debtor permitted the Buyers to pull the plug on these three ESPN services as of the close of business on July 31, 2006.

### 3.    The Debtor Breached Its Obligations to Pay License Fees at the Contract Rates for the Full Term of the Agreements.

28.    The Debtor's June 30 Letters repudiated its obligation to pay any further License Fees at the rates set forth in the Agreements, thereby breaching its obligation to pay the monthly License Fees for each Subscriber pursuant to Section 4.2(a) of the Affiliation Agreements and Section 3 of the 360 License.  The Debtor has not, in fact, paid for any services delivered after the July 31, 2006 closing of the Sale.  Under applicable Connecticut law (which governs the Agreements), failure to pay contractual royalty fees is a material breach and wrongful termination of a contract, giving rise to a claim for damages based upon the benefit of the bargain and lost profits.  See, e.g., Shoreline Communications, Inc. v. Norwich Taxi, LLC, 2001 WL 477390 (Conn. Super. Ct. 2001) (unpublished) (defendant-licensee materially breached a long-term, non-exclusive license agreement when it discontinued royalty payments a few months after it entered into the license; licensor was awarded the full amount of remaining payments due under the terms of license).

**4.     The Debtor Also Violated the Implied Covenant of Good Faith and**
**Fair Dealing by Failing to Ensure the Continued Operation of the**
**Systems Under the Terms of the Agreements.**

29.     In addition to the foregoing breaches of the Debtor's <u>express</u> covenants that the Debtor would deliver and pay for the distribution of the ESPN programming to all of its Systems and Subscribers for the full term of the Agreements, the Debtor has also breached its <u>implied</u> covenant that the Debtor would honor its ten-year commitments either by continuing to operate the Systems or by ensuring that any successor agreed to be bound by the terms of the Agreements.   In exchange for the Debtor's long-term commitment, ESPN agreed to early renegotiation of the existing ESPN contract and gave up its right to insist upon payment at the higher rates set forth therein through September 27, 2006, the expiration date for the prepetition contract.   The difference in the renegotiated rates resulted in a savings for Adelphia of tens of millions of dollars in ESPN fees.   Having conferred substantial benefits upon the Debtor under the renegotiated ESPN Agreement in particular, ESPN is entitled to the benefit of its bargain, *i.e.*, the economic benefit of the long-term pricing and carriage obligations under the Agreements.   The Debtor is simply not entitled to shed its contractual obligations without liability.

30.     In the event of a sale, the Affiliation Agreements expressly provide that the Debtor will be relieved of its obligations only under specified circumstances: (i) if ESPN either exercised its right to terminate the Agreements based upon the "change of control" clause in Section 7.2 (d), or refused to consent to assignment pursuant to Section 8.5, in which case Adelphia would have no further obligations under the Agreements; or (ii) if the Debtor assigned the Agreements to the purchaser with ESPN's consent pursuant to Section 8.5, in which case the purchaser would be responsible for further performance.   None of these exceptions applies here. The Debtor did <u>not</u> bargain for – and ESPN did <u>not</u> agree to – a unilateral right for the Debtor to terminate these Agreements upon the sale of the Systems.

13

31.     Nevertheless, the Debtor chose to sell its assets without assuring that the Agreements would be assumed by the Buyers.  In selling off its Systems, the Debtor was responding to pressure from the Equity Committee in the belief that a sale would maximize recovery for equity holders and general unsecured creditors.  The Debtor thereby voluntarily disabled itself from further performance of its obligations under the Agreements without assuring that the Buyers would assume them.  The Debtor sought to maximize the sale price – and did not insist upon the Buyers' assumption of the Agreements[6] – to enhance the recovery of equity holders and prepetition unsecured creditors at the expense of administrative creditors like ESPN.

32.     In so doing, the Debtor not only violated its express covenants to deliver and pay for the ESPN services for the full term of the Agreements, it also violated the implied covenant of good faith and fair dealing that is built into all contracts.  Under this doctrine, each party is deemed to have promised not to do anything which will deprive the other parties of the essential benefits of the contract.  A breach of this covenant by failure to deal fairly or in good faith gives rise to an action for damages.  Restatement (Second) of Contracts § 205 (1981).[7]

33.     Connecticut law follows this general doctrine in imposing liability for breaches of the implied covenant.   In Jones v. H.N.S. Management Co., Inc., 92 Conn. App. 223, 227 (2005), the appellate court explained the applicable rule:

> Bad faith in the context of the implied covenant of good faith and fair
> dealing implies both actual or constructive fraud, or a design to mislead or
> deceive another, or a neglect or refusal to fulfill some duty or some

---

[6] The License Fees in the Agreements were more expensive than the Buyers would otherwise have to pay for ESPN services mostly due to their high-volume discounts, for which the Debtor did not qualify.  The logical inference is that the purchase price might have been lower if the Buyers faced higher operating expenses due to the Debtor's higher contract rates for the acquired Systems.

[7] A leading legal treatise defines an implied covenant in the following way: "An implied covenant is one that may reasonably be inferred from the whole agreement and the circumstances attending its execution.  A covenant is implied in nature when its existence is inferred by legal construction from the use of certain words and phrases, or from the conduct of the parties.  A covenant may also be implied if it appears from the express terms of the contract that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it." 20 Am. Jur. 2d Covenants § 36.

contractual obligation, not prompted by an honest mistake as to one's rights

or duties, but by some interested or sinister motive.

34.     The Debtor breached the covenant of good faith and fair dealing when it
voluntarily disabled itself from delivering the ESPN services by selling off the Systems without
assuring that the Buyers, as its successors, would honor the terms of the binding ESPN
Agreements.  The Debtor's actions in electing to sell, rather than operate, and to sell without
assuring continuance of the Agreements furthered the interests of its equity holders and
unsecured creditors at the expense of its administrative contract counterparties like ESPN.  The
appropriate remedy is the allowance and payment of ESPN's administrative claims for damages
to compensate it for the revenues it was entitled to receive for the balance of the term of the
Agreements.

C.     **ESPN'S Lost Revenues Constitute the Appropriate Measure of its Damages.**

35.     As a result of the Debtor's breach of the Agreements, ESPN is entitled to
compensatory damages measured by future lost profits.  Compensatory damages put the
nonbreaching party where it would have been had the promise been performed.  The standard
measure of damages is based on an expectation measure of damages, *i.e.*, "benefit of the
bargain" damages.  Future profits can be recovered to extent they are the natural and direct
consequence of breach and they can be estimated with reasonable certainty, as they can be here.

36.     Where the licensee unilaterally stops making royalty payments under a long-term
license, courts generally award breach of contract damages, measured by the benefit of the
bargain and lost profits on the remaining payments due under the terms of the agreement.  For
example, in Shoreline Communications, Inc. v. Norwich Taxi, LLC, 2001 WL 477390 (Conn.
Super. Ct. 2001) (unpublished), the court awarded the full amount of remaining payments due
under the terms of a long-term, non-exclusive license for use of a broadcast tower.  The
defendant had contracted for a multi-year license, but then discontinued royalty payments a few
months later when it concluded that the broadcast range of the tower did not suit its new business

needs. The court awarded <u>the full amount of remaining payments due under the terms of the license agreement</u>. In doing so, the court observed that:

> If such an agreement were breached for nonpayment and the licensee could simply walk away without any financial consequence for its breach, what incentive would the licensee have to abide by its agreement and how could the licensor rationally cover costs and calculate profits?

Similarly, the court in <u>Metabolite Laboratories Inc. v. Laboratory Corp. of America Holdings</u>, 370 F.3d 1354 (Fed. Cir. 2004) (applying New Jersey law), upheld the award of full contract damages for royalties due under a long term patent license, where the licensee had stopped paying when it ceased using the licensor's product and switched to a competitor's.

37.     In these licensing cases, the license was both non-exclusive and long-term. Like other "lost volume" cases where the plaintiff does not incur additional costs in making the licensed product or facility available to the defendant, each of these plaintiffs was held to be entitled to recover for the loss of its bargain, measured by the lost revenues.

38.     Here, like the debtors in <u>Shoreline</u> and <u>Metabolite</u>, the Debtor has stated its intention to discontinue paying royalty payments – *i.e.*, the License Fees – merely because it no longer has any use for the services under the Agreements, as it is liquidating rather than reorganizing. The Debtor's disregard for its obligations under the Agreements entitles ESPN to full contractual damages.

39.     Over the remaining term of the Agreements, ESPN's lost revenues from the Terminated Services and from the rate reductions for four of the Continued Services, are as follows:

| ESPN Entity | Contract[8] | Basis for Claim | Amount of Damages |
|---|---|---|---|
| ESPN, Inc. | ESPN | Lost revenues due to lower rates | $127,591,000 |
| ESPN, Inc. | ESPN-HD | Lost revenues due to lower rates | $16,010,000 |
| ESPN, Inc. | ESPNEWS | Lost revenues due to lower rates | $21,554,000 |
| ESPN Classic, Inc. | ESPN Classic | Lost revenues due to lower rates | $1,008,000 |
| **Subtotal** | **Rate differential from 8/1/2006 – 7/31/2014** | | **$166,163,000** |
| ESPN, Inc. | Deportes[9] | Lost revenues due to temporary suspension | $127,000 |
| ESPN, Inc. | ESPNU | Lost revenues due to termination | $25,884,000 |
| ESPN Enterprises, Inc. | ESPN360 | Lost revenues due to termination | $6,194,000 |
| **Subtotal** | **Terminated contract lost revenues** | | **$32,205,000** |
| **TOTAL** | **All damages** | | **$198,368,000** |

40.    These amounts have taken mitigation into account.  As to the Continued Services, ESPN's losses are mitigated by the fees it will be receiving from the Buyers on account of the Debtor's former Subscribers and Systems under the Buyers' own ESPN contracts.  Such mitigation amounts have been deducted from ESPN's claims.  As to Terminated Services, the Deportes calculation includes estimated mitigation that would result if ESPN succeeds in reaching agreements with the Buyers to carry that service, as it expects to do shortly.  However, so long as the Buyers refuse to provide and pay for the ESPNU and 360 services to the Debtor's former Subscribers and Systems, ESPN has no ability to mitigate its losses as it has no other

---

[8]    No claim for damages is being asserted with respect to the ESPN2 and ESPN2-HD Agreements, as the Buyers have continued these services under their own contracts at essentially similar rates and terms as provided in the Debtor's agreements.

[9]    The damage calculation for the Deportes Agreement assumes that the Buyers will enter into agreements with ESPN to begin carrying this network effective January 1, 2007, and thus reflects the lost revenues only during this period.  If such agreements are not reached, then ESPN reserves the right to amend its administrative claim to reflect the lost revenues for the entire remaining eight-year term of the Deportes Agreement.

means by which it can deliver the Terminated Services to the Debtor's former Subscribers who are now the Buyers' subscribers.

41.    The ESPN Agreements also contain attorneys' fee provisions. (*See, e.g.*, ESPN Agreement § 6.3.) As a result of the Debtor's breach of the Agreements and other wrongful acts alleged in this Motion, ESPN is entitled to an award of reasonable attorneys' fees, witness fees, and other costs incurred in prosecuting this action. ESPN reserves the right to supplement its administrative claims with respect to its attorneys' fees and costs.

## V.    CONCLUSION

42.    During this Chapter 11 proceeding, the Debtor negotiated and entered into these complex long-term Agreements with ESPN to achieve immediate cash flow benefits – in the form of reduced ESPN Subscriber rates – and the bargained-for right to assume the Agreements under a stand-alone plan. The Debtor's subsequent decision to sell its Systems, rather than keep them, does not nullify the benefit it received from the acquisition of the long-term rights to the ESPN services pursuant to the Agreements under which it operated for two-and-a-half years during the case. The controlling Second Circuit authority, <u>Klein Sleep</u>, applied this principle in remarkably similar circumstances where the debtor gave up on reorganization, closed its doors, and abandoned its leased property. <u>Klein Sleep</u> held that the full damages resulting from the debtor's decision not to continue performance of its contract are entitled to administrative priority treatment. The same result must obtain here.

## VI.    WAIVER OF MEMORANDUM OF LAW

43.    This Motion includes citations to the applicable authorities and does not raise any novel issues of law. Accordingly, ESPN respectfully requests that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted.

WHEREFORE, ESPN respectfully requests the Court to grant the Motion and enter an order allowing and requiring payment of ESPN's administrative expense claims in their entirety and granting such other and further relief as is just and appropriate.

Dated: November 22, 2006

DEWEY BALLANTINE LLP

By:    /s/ Lisa Hill Fenning
       Lisa Hill Fenning (LHF-9016) (Pro Hac Vice)

       Attorneys for ESPN, Inc.,
       ESPN Classic, Inc. and
       ESPN Enterprises, Inc.

234239

# EXHIBIT A

## ESPN INC. CABLE TELEVISION AFFILIATION AGREEMENT AND
## ESPN HIGH DEFINITION TELEVISION AGREEMENT
## ADMINISTRATIVE EXPENSE CLAIM

### In re Adelphia Communications Corp.
### Case No. 02-41729 (REG) (Bankr. S.D.N.Y.)

---

**I.    The Contracts at Issue**

During the administration of the above-captioned Chapter 11 case, ESPN, Inc. ("ESPN") and Adelphia Communications Corporation (the Debtor or "Adelphia") entered into the ESPN Inc. Cable Television Affiliation Agreement, dated as of January 1, 2004 (the "ESPN Agreement"), and the ESPN High Definition Television Agreement , dated as of March 26, 2004 (the "ESPN-HD Agreement" and collectively with the ESPN Agreement, the "Agreements").[1]  The ESPN-HD Agreement is a short rider to the ESPN Agreement that authorizes that channel to be carried in high-definition format.  Because the Debtor entered into the Agreements in the ordinary course of its business during the administration of its Chapter 11 case, any payments or damages owed to ESPN with respect to the Agreements are entitled to administrative priority pursuant to Section 503 (b)(1)(A) of the Bankruptcy Code.

**II.    Nature of the Claim**

The Debtor has materially breached each of the Agreements, resulting in approximately $127,591,000.00 in damages for lost revenues for ESPN under the ESPN Agreement, and $16,010,000.00 in damages for lost revenues under the ESPN-HD Agreement.  ESPN's administrative claim for these Agreements totals approximately **$143,601,000.00** (the "Claim").

**A.    The Terms of the Agreements**

The ESPN Agreement obligates Adelphia to deliver the ESPN Service to the 200-plus Systems listed on Schedule A of the Agreement for the full ten-year contract term ending on July 31, 2014.  (ESPN Agreement § 1.2).  Adelphia is required to pay monthly License Fees at a specified per-Subscriber rate.  (ESPN Agreement § 4.2(a)).

The ESPN-HD Agreement obligates Adelphia to distribute the high definition ("HD") simulcast version of the ESPN Service to the Systems receiving the ESPN Service (ESPN-HD Agreement § 2) for the full four-year contract term ending on December 31, 2008.  (ESPN-HD Agreement §§ 3, 5).  Adelphia is required to pay monthly License Fees at a specified per-Subscriber rate.  (ESPN-HD Agreement § 9).

**B.    Adelphia's Breach of the Agreements**

On July 31, 2006, Adelphia sold substantially all of its assets (the "Sale"), including the Systems, to Comcast and Time Warner (the "Buyers").  A month before the Sale closed, Adelphia sent a letter to ESPN announcing that, after the Sale closed, it would no longer pay License Fees for ESPN

---

[1] All capital terms not otherwise defined herein shall have the meaning ascribed to them in the respective Agreements.  The Agreements are not attached to this Claim because they contain trade and proprietary information.  As the counterparty, Adelphia already has copies of the Agreements, but additional copies will be made available upon request subject to appropriate confidentiality protections.

programming provided to the Systems and the Subscribers and that it deemed the Agreements to have terminated. However, the Debtor did not cite any provision of the Agreements giving it the right to terminate upon a sale of its assets to a third party.

The Sale contract allowed the Buyers to select which Adelphia contracts they wanted to have assumed and assigned to them. To date, they have not included the Agreements in the list of acquired contracts. Although the Buyers are continuing to deliver the ESPN programming to the former Adelphia Systems and Subscribers, ESPN has suffered damages measured by the difference between the License Fees that Adelphia would have been required to pay under the terms of the Agreements and the amounts payable under the Buyers' contracts.

Adelphia has breached the Agreements by: (1) terminating them without cause; (2) failing to pay License Fees at the contract rates for the full terms of the Agreements; and (3) breaching the implied covenant of good faith and fair dealing by failing to ensure that either it continued to operate the Systems under the terms of the Agreements or the Buyers would do so. Adelphia's breaches of the Agreements entitles ESPN to compensatory damages.

## III.    Explanation of Calculation of Damages

**In General**: ESPN has mitigated its damages by continuing to provide the ESPN Service and ESPN-HD on the former Adelphia Systems pursuant to separate contracts it has negotiated with the Buyers. However, the Buyers' agreements with ESPN provide for lower payments than required by the Agreements.

**The ESPN Agreement**: The Buyers are continuing to provide the ESPN programming under the terms of their own contracts, resulting in ESPN's loss of the revenues to which it is entitled under the terms of the Agreements. The exact price differential is confidential, proprietary, trade secret information that can be provided to the Debtor under an appropriate confidentiality agreement. The ESPN Subscriber Rates in both the ESPN Agreement and the Buyers' contracts with ESPN vary from year to year during their ten-year term. The ESPN Agreement was negotiated based upon projections of Adelphia's expected growth in its Subscriber counts. Those projected Adelphia Subscriber counts were used in ESPN's damages calculations. ESPN's compensatory damages equals the sum of the products of the number of former Adelphia Subscribers transferred to the Buyers multiplied by the rate differential between the Subscriber Rates in the ESPN Agreement and Buyers' respective contract rates for each year remaining under the ESPN Agreement, taking into account a projected growth rate for Adelphia Subscribers. ESPN's damages under the ESPN Agreement in the period between the July 31, 2006 closing of the sale of the Systems and the July 31, 2014 expiration of the agreement total $127,591,000.00.

**The ESPN-HD Agreement**: The Buyers are continuing to provide the ESPN-HD programming under the terms of their own contracts, resulting in ESPN's loss of the revenues to which it is entitled under the terms of the ESPN-HD Agreement. The exact price differential is confidential, proprietary, trade secret information that can be provided to the Debtor under an appropriate confidentiality agreement. The ESPN-HD Subscriber Rates in both the ESPN-HD Agreement and the Buyers' contracts with ESPN vary from year to year during the approximate four-and-a-half-year term. The ESPN-HD Agreement was negotiated based upon projections of Adelphia's expected growth in its Subscriber counts. Those projected Adelphia Subscriber counts were used in ESPN's damages calculations. ESPN's compensatory damages equals the sum of the products of the number of former Adelphia Subscribers transferred to the Buyers multiplied by the Subscriber Rates in the ESPN-HD Agreement for each year remaining under the ESPN-HD Agreement, taking into account a projected growth rate for Adelphia Subscribers, less all amounts payable under the terms of the Buyers' ESPN-HD contracts during that period. ESPN's damages under the ESPN-HD Agreement in the period between the July 31, 2006

2

closing of the sale of the Systems and the December 31, 2008 expiration of the agreement total $16,010,000.

## IV.   Miscellaneous

### A.   Attorneys' Fees and Costs

ESPN has incurred and continues to incur attorneys' fees and expenses with respect to prosecution of this Claim, for which it is entitled to indemnification, and reserves the right to amend this Claim accordingly.  (ESPN Agreement § 6.3.)

### B.   Reservation of Right to Amend

Because, among other things, the exact nature, timing and amount of the losses may vary depending upon whether the Agreements are ultimately assumed or rejected, ESPN reserves the right to amend, supplement and/or revise this Claim from time to time, as appropriate.

3

# EXHIBIT B

**ESPNEWS AFFILIATION AGREEMENT
ADMINISTRATIVE EXPENSE CLAIM**

**In re Adelphia Communications Corp.
Case No. 02-41729 (REG) (Bankr. S.D.N.Y.)**

---

## I.        The Contract at Issue

During the administration of the above-captioned Chapter 11 case, ESPN, Inc. ("ESPN") and Adelphia Communications Corporation (the Debtor or "Adelphia") entered into the ESPNEWS Affiliation Agreement, dated as of January 1, 2004 (the "ESPNEWS Agreement" or "Agreement").[1] Because the Debtor entered into this contract in the ordinary course of its business during the administration of its Chapter 11 case, any payments or damages owed to ESPN with respect to the Agreement are entitled to administrative priority pursuant to Section 503 (b)(1)(A) of the Bankruptcy Code.

## II.        Nature of the Claim

The Debtor has materially breached the ESPNEWS Agreement, resulting in approximately **$21,554,000.00** in damages for lost revenues for ESPN (the "Claim").

### A.        <u>The Terms of the Agreement</u>

The ESPNEWS Agreement obligates Adelphia to deliver the ESPNEWS service to the 200-plus Systems listed on Schedule A of the Agreement for the full ten-year contract term ending on July 31, 2014.  (ESPNEWS Agreement § 1.2).  Adelphia is required to pay monthly License Fees at a specified per-Subscriber rate.  (ESPNEWS Agreement § 4.2(a).)

### B.        <u>Adelphia's Breach of the Agreement</u>

On July 31, 2006, Adelphia sold substantially all of its assets (the "Sale"), including the Systems, to Comcast and Time Warner (the "Buyers").  A month before the Sale closed, Adelphia sent a letter to ESPN announcing that, after the Sale closed, it would no longer pay License Fees for ESPNEWS provided to the Systems and the Subscribers and that it deemed the Agreement to have terminated. However, the Debtor did not cite any provision of the Agreement giving it the right to terminate upon a sale of its assets to a third party.

The Sale contract allowed the Buyers to select which Adelphia contracts they wanted to have assumed and assigned to them.  To date, they have not included the ESPNEWS Agreement in the list of acquired contracts.  Although the Buyers are continuing to deliver the ESPNEWS programming to the former Adelphia Systems and Subscribers, ESPN has suffered damages measured by the difference between the License Fees that Adelphia would have been required to pay under the terms of the ESPNEWS Agreement and the amounts payable under the Buyers' contracts.

---

[1] All capital terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. The Agreement is not attached to this Claim because it contains trade and proprietary information.  As the counterparty, Adelphia already has a copy of the Agreement, but additional copies will be made available upon request subject to appropriate confidentiality protections.

Adelphia has breached the ESPNEWS Agreement by: (1) terminating it without cause; (2) failing to pay License Fees at the contract rates for the full term of the Agreement; and (3) breaching the implied covenant of good faith and fair dealing by failing to ensure that either it continued to operate the Systems under the term of the Agreement or the Buyers would do so. Adelphia's breach of the Agreement entitles ESPN to compensatory damages.

## III. Explanation of Calculation of Damages

The Buyers are continuing to provide the ESPNEWS programming under the terms of their own contracts, resulting in ESPN's loss of the revenues to which it is entitled under the terms of the ESPNEWS Agreement. The Subscriber Rates in the ESPNEWS Agreement vary from year to year during its ten-year term. The Agreement was negotiated based upon projections of Adelphia's expected growth in its Subscriber counts. Those projected Adelphia Subscriber counts were used in ESPN's damages calculations. ESPN's compensatory damages equals the sum of the products of the number of former Adelphia Subscribers transferred to the Buyers multiplied by the Subscriber Rates in the Agreement for each year remaining under the term of the Agreement, taking into account a projected growth rate for Adelphia Subscribers, less any amount that would be received from the Buyers under the terms of their contracts. ESPN's damages under the Agreement in the period between the July 31, 2006 closing of the sale of the Systems and the July 31, 2014 expiration of the Agreement total $21,554,000.00.

## IV. Miscellaneous

### A. <u>Attorneys' Fees and Costs</u>

ESPN has incurred and continues to incur attorneys' fees and expenses with respect to prosecution of this Claim, for which it is entitled to indemnification, and reserves the right to amend this Claim accordingly. (ESPNEWS Agreement § 6.3.)

### B. <u>Reservation of Right to Amend</u>

Because, among other things, the exact nature, timing and amount of the losses may vary depending upon whether the Agreement is ultimately assumed or rejected, ESPN reserves the right to amend, supplement and/or revise this Claim from time to time, as appropriate.

# EXHIBIT C

## ESPN CLASSIC CABLE TELEVISION AFFILIATION AGREEMENT
### ADMINISTRATIVE EXPENSE CLAIM

### In re Adelphia Communications Corp.
### Case No. 02-41729 (REG) (Bankr. S.D.N.Y.)

---

**I.      The Contract at Issue**

During the administration of the above-captioned Chapter 11 case, ESPN Classic, Inc. ("ESPN Classic") and Adelphia Communications Corporation (the Debtor or "Adelphia") entered into the ESPN Classic Cable Television Affiliation Agreement, dated as of January 1, 2004 (the "ESPN Classic Agreement" or "Agreement").[1] Because the Debtor entered into the Agreement in the ordinary course of its business during the administration of its Chapter 11 case, any payments or damages owed to ESPN Classic with respect to the Agreement is entitled to administrative priority pursuant to Section 503 (b)(1)(A) of the Bankruptcy Code.

**II.     Nature of the Claim**

The Debtor has materially breached the Agreement, resulting in approximately **$1,008,000.00** in damages for lost revenues for ESPN Classic (the "Claim").

**A.      The Terms of the Agreement**

The ESPN Classic Agreement obligates Adelphia to deliver the ESPN Classic service to the 200-plus Systems listed on Schedule A of the Agreement for the full ten-year contract term ending on July 31, 2014.  (ESPN Classic Agreement § 1.2.)  Adelphia is required to pay monthly License Fees at a specified per-Subscriber rate.  (ESPN Classic Agreement § 4.2(a).)

**B.      Adelphia's Breach of the Agreement**

On July 31, 2006, Adelphia sold substantially all of its assets (the "Sale"), including the Systems, to Comcast and Time Warner (the "Buyers").  A month before the Sale closed, Adelphia sent a letter to ESPN Classic announcing that, after the Sale closed, it would no longer pay License Fees for ESPN Classic programming provided to the Systems and the Subscribers and that it deemed the Agreement to have terminated.  However, the Debtor did not cite any provision of the Agreement giving it the right to terminate upon a sale of its assets to a third party.

The Sale contract allowed the Buyers to select which Adelphia contracts they wanted to have assumed and assigned to them.  To date, they have not included the Agreement in the list of acquired contracts.  Therefore, although the Buyers are continuing to deliver the ESPN Classic programming to the former Adelphia Systems and Subscribers, they are paying for such service at the rates set forth in their own separate contracts with ESPN – not in compliance with the terms of the Agreement.

---

[1] All capital terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. The Agreement is not attached to this Claim because it contains trade and proprietary information.  As the counterparty, Adelphia already has a copy of the Agreement, but additional copies will be made available upon request subject to appropriate confidentiality protections.

Adelphia has breached the Agreement by: (1) terminating it without cause; (2) failing to pay License Fees at the contract rates for the full term of the Agreement; and (3) breaching the implied covenant of good faith and fair dealing by failing to ensure that either it continued to operate the Systems under the terms of the Agreement or the Buyers would do so. Adelphia's breach of the Agreement entitles ESPN Classic to compensatory damages.

## III.    Explanation of Calculation of Damages

ESPN Classic has mitigated its damages by continuing to provide the ESPN Classic service on the former Adelphia Systems pursuant to separate contracts it has negotiated with the Buyers. However, the Buyers' agreements with ESPN Classic provide for lower rates in the aggregate than required by the Agreement.

The Buyers pay monthly per-Subscriber fees for the ESPN Classic service that are lower in the aggregate than the Subscriber Rates in the Agreement. The exact price differential is confidential, proprietary, trade secret information that can be provided to the Debtor under an appropriate confidentiality agreement. The ESPN Classic Subscriber Rates in the Agreement and the Buyers' contracts with ESPN Classic vary from year to year during the ten-year term. The Agreement was negotiated based upon projections of Adelphia's expected growth in its Subscriber counts. Those projected Adelphia Subscriber counts were used in ESPN Classic's damages calculations. ESPN Classic's compensatory damages equals the sum of the products of the number of former Adelphia Subscribers transferred to the Buyers multiplied by the rate differential between the Subscriber Rates in the Agreement and the Buyers' contract rates for each year remaining under the term of the Agreement, taking into account a projected growth rate for Adelphia Subscribers. ESPN Classic's damages under the Agreement in the period between the July 31, 2006 closing of the sale of the Systems and the July 31, 2014 expiration of the agreement total $1,008,000.00.

## IV.    Miscellaneous

### A.    <u>Attorneys' Fees and Costs</u>

ESPN Classic has incurred and continues to incur attorneys' fees and expenses with respect to prosecution of this Claim, for which it is entitled to indemnification, and reserves the right to amend this Claim accordingly. (ESPN Classic Agreement § 6.3.)

### B.    <u>Reservation of Right to Amend</u>

Because, among other things, the exact nature, timing and amount of the losses may vary depending upon whether the Agreement is ultimately assumed or rejected, ESPN Classic reserves the right to amend, supplement and/or revise this Claim from time to time, as appropriate.

2

# EXHIBIT D

ESPN DEPORTES LICENSE AGREEMENT
ADMINISTRATIVE EXPENSE CLAIM

In re Adelphia Communications Corp.
Case No. 02-41729 (REG) (Bankr. S.D.N.Y.)

## I.    The Contract at Issue

During the administration of the above-captioned Chapter 11 case, ESPN, Inc. ("ESPN") and Adelphia Communications Corporation (the Debtor or "Adelphia") entered into the ESPN Deportes License Agreement, dated as of March 1, 2005 (the "Deportes License" or "Agreement").[1]  Because the Debtor entered into this contract in the ordinary course of its business during the administration of its Chapter 11 case, any payments or damages owed to ESPN with respect to the Agreement are entitled to administrative priority pursuant to Section 503 (b)(1)(A) of the Bankruptcy Code.

## II.    Nature of the Claim

The Debtor has materially breached the Deportes License, resulting in approximately **$127,000.00** in damages for lost revenues for ESPN (the "Claim").

### A.    The Terms of the Agreement

The Deportes License obligates Adelphia to deliver the Deportes service to the 200-plus Systems listed on Schedule A of the Agreement for the full nine-year contract term ending on July 31, 2014.  (Deportes License § 1.2).  Adelphia is required to pay monthly License Fees at a specified per-Subscriber rate.  (Deportes License § 4.2(a).)

### B.    Adelphia's Breach of the Agreement

On July 31, 2006, Adelphia sold substantially all of its assets (the "Sale"), including the Systems, to Comcast and Time Warner (the "Buyers").  A month before the Sale closed, Adelphia sent a letter to ESPN announcing that, after the Sale closed, it would no longer pay License Fees for Deportes services provided to the Systems and the Subscribers and that it deemed the Agreement to have terminated.  However, the Debtor did not cite any provision of the Agreement giving it the right to terminate upon a sale of its assets to a third party.

The Sale contract allowed the Buyers to select which Adelphia contracts they wanted to have assumed and assigned to them.  To date, they have not included the Deportes License in the list of acquired contracts.  The Buyers cut off all Deportes services when the Sale closed on July 31, 2006, but ESPN is negotiating with them about restoring Deportes as of January 1, 2007.  Assuming that the Buyers do enter into new contracts for Deportes on substantially the same terms as the Deportes License, ESPN will have suffered damages measured by its lost revenues from August 1, 2006 through December 31, 2006 as the result of Adelphia's failure to assure continued delivery and payment for the distribution of the Deportes service for the full term of the Deportes License.

---

[1] All capital terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. The Agreement is not attached to this Claim because it contains trade and proprietary information.  As the counterparty, Adelphia already has a copy of the Agreement, but additional copies will be made available upon request subject to appropriate confidentiality protections.

Adelphia has breached the Deportes License by: (1) terminating it without cause; (2) failing to deliver the Deportes service to the Systems and the Subscribers for the full term of the Agreement; (3) failing to pay License Fees at the contract rates for the full term of the Agreement; and (4) breaching the implied covenant of good faith and fair dealing by failing to ensure that either it continued to operate the Systems under the term of the Agreement or the Buyers would do so. Adelphia's breach of the Agreement entitles ESPN to compensatory damages.

## III.    Explanation of Calculation of Damages

As a result of the Sale, the Buyers shut down the Deportes services. ESPN's damages are calculated on the basis of its lost revenues during the five months of discontinued Deportes services. ESPN's compensatory damages equals the sum of the products of the number of former Adelphia Subscribers transferred to the Buyers multiplied by the Subscriber Rates in the Agreement for each month of this discontinued period, taking into account a projected growth rate for Adelphia Subscribers. ESPN's damages under the Deportes License in the period between the July 31, 2006 closing of the sale of the Systems and the January 1, 2007 expected effective date of the new Buyers' contracts for the Deportes service total $127,000.00.

## IV.    Miscellaneous

### A.    Attorneys' Fees and Costs

ESPN has incurred and continues to incur attorneys' fees and expenses with respect to prosecution of this Claim, for which it is entitled to indemnification, and reserves the right to amend this Claim accordingly. (Deportes License § 6.3.)

### B.    Reservation of Right to Amend

Because, among other things, the exact nature, timing and amount of the losses may vary depending upon whether the Buyers enter into new Deportes contracts with ESPN and whether the Deportes License is ultimately assumed or rejected, ESPN reserves the right to amend, supplement and/or revise this Claim from time to time, as appropriate.

2

# EXHIBIT E

# ESPNU LICENSE AGREEMENT
# ADMINISTRATIVE EXPENSE CLAIM

## In re Adelphia Communications Corp.
## Case No. 02-41729 (REG) (Bankr. S.D.N.Y.)

---

## I.      The Contract at Issue

During the administration of the above-captioned Chapter 11 case, ESPN, Inc. ("ESPN") and Adelphia Communications Corporation (the Debtor or "Adelphia") entered into the ESPNU License Agreement, dated as of March 1, 2005 (the "ESPNU License" or "Agreement").[1]  Because the Debtor entered into this contract in the ordinary course of its business during the administration of its Chapter 11 case, any payments or damages owed to ESPN with respect to the Agreement are entitled to administrative priority pursuant to Section 503 (b)(1)(A) of the Bankruptcy Code.

## II.     Nature of the Claim

The Debtor has materially breached the ESPNU License, resulting in approximately **$25,884,000.00** in damages for lost revenues for ESPN (the "Claim").

### A.      The Terms of the Agreement

The ESPNU License obligates Adelphia to deliver the ESPNU service to the 200-plus Systems listed on Schedule A of the Agreement for the full nine-year contract term ending on July 31, 2014.  (ESPNU License § 1.2).  Adelphia is required to pay monthly License Fees at a specified per-Subscriber rate.  (ESPNU License § 4.2(a).)

### B.      Adelphia's Breach of the Agreement

On July 31, 2006, Adelphia sold substantially all of its assets (the "Sale"), including the Systems, to Comcast and Time Warner (the "Buyers").  A month before the Sale closed,  Adelphia sent a letter to ESPN announcing that, after the Sale closed, it would no longer pay License Fees for ESPNU provided to the Systems and the Subscribers and that it deemed the Agreement to have terminated. However, the Debtor did not cite any provision of the Agreement giving it the right to terminate upon a sale of its assets to a third party.

The Sale contract allowed the Buyers to select which Adelphia contracts they wanted to have assumed and assigned to them.  To date, they have not included the ESPNU License in the list of acquired contracts.  Upon the closing of the Sale, the Buyers, who do not have contracts of their own with ESPN with respect to the ESPNU service, shut down the ESPNU service.  They have not indicated any intention to resume its delivery to the former Adelphia Systems and Subscribers.  As a result of the total discontinuance of the ESPNU service, Adelphia breached its obligation to assure continued delivery of the ESPNU programming for the full term of the ESPNU License.  Consequently, ESPN has suffered

---

[1] All capital terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. The Agreement is not attached to this Claim because it contains trade and proprietary information.  As the counterparty, Adelphia already has a copy of the Agreement, but additional copies will be made available upon request subject to appropriate confidentiality protections.

damages in the full amount of the revenues that it would have been entitled to receive from Adelphia under the terms of the ESPNU License.

Adelphia has breached the ESPNU License by: (1) terminating it without cause; (2) failing to deliver the ESPNU service to the Systems and the Subscribers for the full term of the Agreement; (3) failing to pay License Fees at the contract rates for the full term of the Agreement; and (4) breaching the implied covenant of good faith and fair dealing by failing to ensure that either it continued to operate the Systems under the term of the Agreement or the Buyers would do so. Adelphia's breach of the Agreement entitles ESPN to compensatory damages.

## III. Explanation of Calculation of Damages

The Buyers do not have contracts with ESPN to provide the ESPNU service. Thus, ESPN has suffered the loss of all future revenues to which it is entitled under the terms of the ESPNU License. The Subscriber Rates in the ESPNU License vary from year to year during its ten-year term. The Agreement was negotiated based upon projections of Adelphia's expected growth in its Subscriber counts. Those projected Adelphia Subscriber counts were used in ESPN's damages calculations. ESPN's compensatory damages equals the sum of the products of the number of former Adelphia Subscribers transferred to the Buyers multiplied by the Subscriber Rates in the Agreement for each year remaining under the term of the Agreement, taking into account a projected growth rate for Adelphia Subscribers. ESPN's damages under the Agreement in the period between the July 31, 2006 closing of the sale of the Systems and the July 31, 2014 expiration of the Agreement total $25,884,000.

## IV. Miscellaneous

### A. Attorneys' Fees and Costs

ESPN has incurred and continues to incur attorneys' fees and expenses with respect to prosecution of this Claim, for which it is entitled to indemnification, and reserves the right to amend this Claim accordingly. (ESPNU License § 6.3.)

### B. Reservation of Right to Amend

Because, among other things, the exact nature, timing and amount of the losses may vary depending upon whether the Agreement is ultimately assumed or rejected, ESPN reserves the right to amend, supplement and/or revise this Claim from time to time, as appropriate.

# EXHIBIT F

## ESPN ENTERPRISES, INC. LICENSE AGREEMENT FOR ESPN360 ADMINISTRATIVE EXPENSE CLAIM

### In re Adelphia Communications Corp.
### Case No. 02-41729 (REG) (Bankr. S.D.N.Y.)

---

### I.    The Contract at Issue

During the administration of the above-captioned Chapter 11 case, ESPN Enterprises, Inc. ("Enterprises") and Adelphia Communications Corporation (the Debtor or "Adelphia") entered into the ESPN Enterprises, Inc. License Agreement for ESPN360, dated as of March 1, 2005 (the "ESPN360 License" or "Agreement").[1]  Because the Debtor entered into this contract in the ordinary course of its business during the administration of its Chapter 11 case, any payments or damages owed to Enterprises with respect to the Agreement are entitled to administrative priority pursuant to Section 503 (b)(1)(A) of the Bankruptcy Code.

### II.    Nature of the Claim

The Debtor has materially breached the ESPN360 License, resulting in approximately **$6,194,000.00** in damages for lost revenues for Enterprises (the "Claim").

#### A.    The Terms of the Agreement

The ESPN360 License obligates Adelphia to provide the ESPN360 content to Adelphia's high speed Internet Subscribers for the full four-year contract term ending on June 30, 2009.  (ESPN360 License ¶ 2.).   Adelphia is required to pay monthly License Fees at a specified per-Subscriber rate. (ESPN360 License ¶ 3.)

#### B.    Adelphia's Breach of the Agreement

On July 31, 2006, Adelphia sold substantially all of its assets (the "Sale"), including the Systems, to Comcast and Time Warner (the "Buyers").  The Sale contract allowed the Buyers to select which Adelphia contracts they wanted to have assumed and assigned to them.  To date, they have not included the ESPN360 License in the list of acquired contracts.

Upon the closing of the Sale, the Buyers shut down Adelphia's Internet portal that allowed Adelphia high-speed Internet Subscribers to access the ESPN360 content and services.  The ESPN360 has not been restored by either of the Buyers.  By allowing this disconnection to happen, Adelphia violated the terms of the ESPN360 License requiring that all of the Adelphia high-speed Internet Subscribers continue to receive the ESPN360 service.   As a result of Adelphia's breaches, Enterprises has suffered damages measured by the full amount of the License Fees that Adelphia would have been required to pay under the terms of the ESPN360 License.

---

[1] All capital terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. The Agreement is not attached to this Claim because it contains trade and proprietary information.  As the counterparty, Adelphia already has a copy of the Agreement, but additional copies will be made available upon request subject to appropriate confidentiality protections.

Adelphia has breached the ESPN360 License by: (1) terminating it without cause; (2) failing to deliver the ESPN360 service to the Systems and the Subscribers for the full term of the Agreement; (3) failing to pay License Fees at the contract rates for the full term of the Agreement; and (4) breaching the implied covenant of good faith and fair dealing by failing to ensure that either it continued to operate the Systems under the term of the Agreement or the Buyers would do so. Adelphia's breach of the Agreement entitles Enterprises to compensatory damages.

## III.    Explanation of Calculation of Damages

Due to Adelphia's failure to assure the continued availability of the ESPN360 services to all of its Subscribers, Enterprises has lost all revenues to which it was entitled under the terms of the ESPN360 License. The Subscriber Rates in the ESPN360 License vary from year to year during its four-year term. The Agreement was negotiated based upon projections of Adelphia's expected growth in its Subscriber counts. Those projected Adelphia Subscriber counts were used in Enterprises' damages calculations. Enterprises' compensatory damages equals the sum of the products of the number of former Adelphia Subscribers transferred to the Buyers multiplied by the Subscriber Rates in the Agreement for each year remaining under the term of the Agreement, taking into account a projected growth rate for Adelphia Subscribers. Enterprises' damages under the Agreement in the period between the July 31, 2006 closing of the sale of the Systems and the June 30, 2009 expiration of the Agreement total $6,194,000.

## IV.    Miscellaneous

### A.    Attorneys' Fees and Costs

Enterprises has incurred and continues to incur attorneys' fees and expenses with respect to prosecution of this Claim, for which it is entitled to indemnification, and reserves the right to amend this Claim accordingly. (ESPN360 License ¶ 12.4.)

### B.    Reservation of Right to Amend

Because, among other things, the exact nature, timing and amount of the losses may vary depending upon whether the Agreement is ultimately assumed or rejected, Enterprises reserves the right to amend, supplement and/or revise this Claim from time to time, as appropriate.