Hearing Date:  December 7, 2006
Objection Deadline:  November 24, 2006

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------

|                                                    |   |                          |
|----------------------------------------------------|---|--------------------------|
|                                                    | : | Chapter 11               |
| In re                                              | : | Case No.:  02-41729 (REG)|
|                                                    | : | Jointly Administered     |
| Adelphia Communications Corporation., *et al*.,    | : |                          |
|                                                    | : |                          |
|                       Debtors.                     | : |                          |
|                                                    | : |                          |

------------------------------------------------------------

# Official Committee of Equity Security Holders' Objection to Confirmation of Fifth Amended Joint Chapter 11 Plan of Reorganization for Adelphia Communications Corporation <u>and Certain of its Affiliated Debtors</u>

Peter D. Morgenstern (PM-5021)
Gregory A. Blue (GB-9569)
Eric B. Fisher (EF-1209)
Andrew L. Buck (AB-4298)
MORGENSTERN JACOBS & BLUE, LLC
885 Third Avenue
New York, New York 10022
Tel: (212) 750-6776

*Attorneys for the Official Committee*
*of Equity Security Holders*

# Table of Contents

Table of Authorities.................................................................................................... ii

**Preliminary Statement** ...............................................................................................1

**Background Facts**......................................................................................................5

**Legal Argument** .......................................................................................................19

    **I.**    This Court lacks jurisdiction to remove the Equity Committee as a plaintiff in the Bank Litigation, to transfer the Equity Committee Claims to the CVV, or to substitute the CVV Trustees as plaintiffs, because the reference has been withdrawn. ................................................19

    **II.**    The Debtors cannot transfer the Equity Committee Claims to the Contingent Value Vehicle. .................................................22

        **A.**    The Equity Committee now owns and controls the Equity Committee Claims. ................................................. 22

        **B.**    The Creditors' Committee and any CVV Trustees appointed by the Creditors' Committee would be hopelessly conflicted if placed in sole control of the Bank Litigation.................................. 26

    **III.**    The Plan's proposed distribution of proceeds from the Contingent Value Vehicle violates the absolute priority rule........................................30

        **A.**    A number of the claims that would be transferred under the Plan to the CVV belong only to ACC. ................................................ 30

        **B.**    Recovery of damages suffered by ACC can only be distributed to ACC's creditors, and then to its equity holders. ................................................ 32

    **IV.**    If confirmed, the Plan would deprive the Equity Committee of the right to litigate its own objection to the Banks' claims.................................35

    **V.**    The deathtrap provision violates the absolute priority rule..........................38

    **VI.**    The procedure for valuing the stock component of the Plan consideration is unreliable.........................................41

    **VII.**    The Equity Committee should continue to exist post-confirmation for certain limited purposes.................................42

**Conclusion** .................................................................................................45

# Table of Authorities

## Cases

*Commodore Intern., Ltd. v. Gould (In re Commodore Intern., Ltd.)*,
  262 F.3d 96 (2d Cir. 2001) ................................................................................................ 22

*Enron Corp. v. New Power Co. (In re New Power Co.)*,
  438 F.3d 1113 (11th Cir. 2006) ........................................................................................ 36

*Ford v. Citizens & Southern Nat'l Bank*, 700 F.Supp. 1121 (N.D. Ga. 1988) ............................. 31

*Glinka v. Murad (In re Housecraft Industries USA, Inc.)*,
  310 F.3d 64 (2d Cir. 2002) ........................................................................................... 9, 22

*In re Adelphia Communications Corp*, 336 B.R. 310, (Bankr. S.D.N.Y. 2006) .................... 12, 17

*In re Adelphia Communications Corp.*, 285 B.R. 848 (Bankr. S.D.N.Y. 2002) .......................... 23

*In re Allegheny Int'l, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990) .............................................. 39

*In re Beck Indus., Inc.*, 479 F.2d 410 (2d Cir.), *cert. denied*, 414 U.S. 858 (1973) .................... 33

*In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714 (Bankr. S.D.N.Y. 1992) .................. 40

*In re Evans Prods. Co.*, 58 B.R. 572 (S.D. Fla. 1985) ........................................................... 26, 44

*In re Horizon Air, Inc.,* 156 B.R. 369 (N.D.N.Y. 1993) .............................................................. 21

*In re Interpictures, Inc.*, 86 B.R. 24  (Bankr. E.D.N.Y. 1988) .................................................... 19

*In re MCorp Financial, Inc.*, 137 B.R. 219 (Bankr. S.D. Tex. 1992) .......................................... 40

*In re Proof of the Pudding, Inc.*, 3 B.R. 645 (Bankr. S.D.N.Y. 1980) ........................................ 26

*In re Railworks Corp. v. Martin*, 325 B.R. 709 (Bankr. D. Md. 2005) ........................................ 25

*In re Saxon Indus., Inc.*, 29 B.R. 320 (Bankr. S.D.N.Y. 1983) ................................................... 26

*In re Smart World Technologies, LLC*, 423 F.3d 166 (2d Cir. 2005) ......................... 22, 23, 24, 25

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) ......................... 21

*Official Committee of Equity Security Holders v. Monsanto Co. (In re Solutia Inc.)*, 2006 Lexis
  2295, No. 03-17949 (Sept. 14, 2006) .............................................................................. 36

*Orion Pictures Corp. v. Showtime Networks, Inc.*, 4 F.3d 1095 (2d Cir. 1993)...................... 21, 36

*Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman),*
*Inc.*, 216 B.R. 371 (Bankr. S.D.N.Y. 1998) ........................................................................ 33, 34

*SEC v. Goren*, 00 Civ. 970 (TCP), 2002 WL 32963582  (E.D.N.Y. Mar. 6, 2002)...................... 20

*Smith v. City of New York*, 611 F. Supp. 1080 (S.D.N.Y. 1985).................................................. 28

*Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN*
*Enterprises)*, 779 F.2d 901 (2d Cir. 1985) ............................................................................. 22

**Statutes**

11 U.S.C. § 1123(b)(3) ............................................................................................................... 35

11 U.S.C. § 1129(b)(2)(B)(ii)........................................................................................................ 3

11 U.S.C. § 1129(b)(2)(C)(i)....................................................................................................... 38

11 U.S.C. § 1129(b)(2)(C)(ii)...................................................................................................... 39

11 U.S.C. § 502(a)....................................................................................................................... 35

28 U.S.C. § 157(c)(2) .................................................................................................................. 20

**Other Authorities**

1 Charles R.P. Keating, *et al.*, Fletcher Cyclopedia of the Law of Private Corporations, §  25
(1997 Supp.)............................................................................................................................ 33

22 NYCRR § 1200.24. ................................................................................................................ 29

4 Collier on Bankruptcy ¶ 502.02 (15th Ed. Rev. 2006) ............................................................ 35

**Rules**

Fed. R. Bankr. P. 7012(b)............................................................................................................ 20

**TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:**

The Official Committee of Equity Security Holders (the "Equity Committee") of

Adelphia Communications Corporation ("ACC," and together with all of the above-

captioned debtors and debtors in possession, the "Debtors"), by its undersigned attorneys,

for its objection (the "Objection") to Confirmation of Fifth Amended Joint Chapter 11

Plan of Reorganization for Adelphia Communications Corporation and Certain of its

Affiliated Debtors, dated October 16, 2006 (the "Plan"),[1] respectfully represents as

follows:

## Preliminary Statement

1.     The Plan, which grew out of a court-ordered mediation process from

which the Equity Committee was excluded, disregards the fundamental jurisdictional

limitations that constrain this Court and violates the rights of equity holders in these

proceedings.  The Plan cannot be confirmed in its current form.

2.     *First*, if confirmed, the Plan would impermissibly transfer the Equity

Committee Claims in the Bank Litigation[2] to the Contingent Value Vehicle, placing this

potentially valuable asset under the control of CVV Trustees selected solely by the

---

[1]     Unless otherwise indicated, capitalized terms used herein refer to terms defined in the Plan and
Disclosure Statement.

[2]     The "Bank Litigation" is captioned *Adelphia Communications Corporation, et al. v. Bank of
America, N.A.*, *et al.*, Adv. Proceeding No. 03-04942 (REG). The Equity Committee's Intervenor
Complaint in the Bank Litigation adopted most of the causes of action asserted by the Creditors'
Committee, and also asserted additional claims that the Debtors and the Creditors' Committee
refused to bring.  Those additional claims fall into three categories: (i) claims for violations of the
Racketeer Influenced and Corrupt Organizations Act ("RICO") against those Banks that acted as
agents under the Co-Borrowing Facilities; (ii) contract or quasi-contract claims against several
investment banks; and (iii) one state law fraud claim against those Banks that acted as agents
under the Co-Borrowing Facilities and their investment bank affiliates.  The claims asserted solely
by the Equity Committee are referred to herein as the "Equity Committee Claims."

1

Creditors' Committee.  The Bank Litigation and, in particular, the Equity Committee

Claims, are of paramount importance to equity security holders: potential litigation

recoveries are the last chance for equity security holders to recoup a portion of their

monumental losses incurred as a result of the fraud at Adelphia, which exceed $6.5

billion.  Put simply, the Equity Committee Claims, which are potentially worth more than

$10 billion and which this Court has indicated will survive pending motions to dismiss (at

least in substantial part), are an asset over which equity security holders cannot and

should not lose control.

3.      In fact, the Equity Committee claims cannot be transferred to the

Contingent Value Vehicle because the District Court withdrew the reference of the Bank

Litigation, except with regard to the pending motions to dismiss.  Thus, this Court no

longer has jurisdiction to dismiss the Equity Committee as a plaintiff (except for the

grounds argued in the pending motions to dismiss), or to transfer the claims to the CVV,

or to substitute the CVV Trustees as plaintiffs in the place of the Equity Committee.

Further, this Court granted *only* the Equity Committee standing to prosecute the Equity

Committee Claims.  Accordingly, neither the Debtors, the Creditors' Committee, nor the

CVV Trustees acting on their behalf can prosecute or settle those claims.

4.      ***Second***, even if the Bank Litigation could be transferred to the CVV, the

Plan impermissibly proposes to place control of the CVV in the hands of the Creditors'

Committee and its hand-selected CVV Trustees, all of whom would suffer from

intractable and unlawful conflicts of interest *vis-à-vis* ACC equity holders.  They would,

*inter alia*, be unable to discharge their conflicting fiduciary duties to the various

constituents with regard to selecting which claims to press and which to settle, in making

2

legal arguments concerning the ownership of the claims or the extent of damages suffered by particular debtors, or in determining how to distribute the proceeds of the claims. Perhaps more significant, counsel for the Creditors' Committee is legally and ethically disqualified from pursuing claims on the equity holders' behalf because they have advocated in the past, and will continue to advocate, for positions directly contrary to equity holders' interests. As one example among many, the Creditors' Committee currently is spearheading efforts to deprive defrauded equity holders of the opportunity to participate in the victim restitution fund established pursuant to the Government Settlement and is required to continue to do so under the terms of the Plan. Moreover, giving sole control of the Bank Litigation to the creditors and their designees would be tantamount to abandoning the Equity Committee Claims, because creditors have every incentive to settle those claims for less than their full potential in order to maximize *creditors'* recoveries at the expense of equity security holders.

5.        ***Third***, the Plan's distribution scheme for CVV recoveries is fundamentally flawed because it violates the absolute priority rule.[3] Proceeds of litigation belonging to ACC cannot be distributed to creditors of other estates absent substantive consolidation; litigation proceeds can be distributed only to creditors and equity holders of those legal entities that now own the claims. Because the Plan violates these fundamental principles, it cannot be confirmed.

6.        ***Fourth***, the Plan deprives the Equity Committee of its right as a party in interest to litigate its objection to the Bank Claims under section 502(a) of the

---

[3]        11 U.S.C. § 1129(b)(2)(B)(ii).

Bankruptcy Code.  That objection to billions of dollars in claims against the estates was timely filed by the Equity Committee and remains unadjudicated.

7.      **Fifth,** the Plan contains an impermissible deathtrap provision that coerces equity holders to vote for the Plan by threatening penalties.  While the Plan Proponents could legally have offered enhancements to shareholder recoveries in exchange for votes in favor of the Plan, they cannot deprive equity holders of their rightful place in line under the absolute priority rule.

8.      **Sixth**, the Plan contains a flawed mechanism for valuing the stock component of the Plan consideration, which may deprive claimants of hundreds of millions of dollars by undervaluing the Time Warner Cable stock to be received by the estates.

9.      **Finally**, the Plan provides that the Equity Committee will terminate on the Effective Date (Plan § 16.19).  There are, however, a number of ongoing matters (including the Bank Litigation), appeals (including the appeals from this Court's Order approving the Government Settlement),[4] likely appeals from any confirmation of the Plan, and other unresolved issues that will require the Equity Committee's continued participation.   The Equity Committee's continued existence would place relatively little burden on the assets available for ultimate distribution and is essential to protect the ongoing interests of ACC's equity security holders.  The Plan should not be confirmed so long as it proposes to deprive equity holders of representation during the crucial period after the Effective Date.

---

[4]      Order (Docket No. 7655) Approving Three Related Agreements Between The Debtors And The Securities And Exchange Commission, The Debtors And The Department Of Justice, And The Debtors And The Rigas Family (the "Government Settlement").

10.     For these reasons, the Plan cannot be confirmed in its current form.[5]

# Background Facts

11.     Insofar as the Plan and Disclosure Statement contain a detailed discussion of the pre- and post-petition factual background concerning the Debtors and these chapter 11 proceedings, the Equity Committee simply summarizes briefly below the key events that are relevant to this Objection.

## A.     Appointment of Statutory Committees

12.     The United States Trustee appointed the Creditors' Committee on July 11, 2002, and appointed the Equity Committee (collectively with the Creditors' Committee, the "Statutory Committees") on July 31, 2002.

13.     Beginning shortly after their appointment, the Statutory Committees and their retained professionals undertook an extensive investigation of the roles played by the Debtors' pre-petition lenders and investment banks in the fraud that came to light in the spring of 2002, and eventually led to the Debtors' filing of petitions for relief under chapter 11 of the Bankruptcy Code.

## B.     The Investigation Deadline

14.     At the outset of these cases, the Debtors sought and obtained a postpetition financing facility (the "DIP Facility") from a consortium of banks and other financial institutions, including many that were participants in the Debtors' prepetition credit

---

[5]     In addition to the arguments set forth herein, the Equity Committee joins in the arguments of the ACC Bondholders represented by Weil Gotshal & Manges LLP that the purported settlement embodied in the Plan is not an authorized settlement and that, even if it is an authorized settlement, it does not fall within the range of reasonableness.

facilities.  Pursuant to the final order approving the DIP Facility, the Debtors stipulated to

the amount, validity, priority, perfection, and enforceability of the prepetition Banks'

liens.[6]

15.    The DIP Order, however, preserved the Statutory Committees' rights to

investigate the Banks' liens, as well as any potential causes of action against the Banks in

connection with the fraud at Adelphia.[7]  Specifically, the Final DIP Order established

January 9, 2003 as the deadline (as extended from time to time, the "Investigation

Deadline") to commence an adversary proceeding or contested matter against the Banks,

and provided that the Statutory Committees, in bringing such actions, could seek standing

to contest the Debtors' admissions in paragraph 2 of the Final DIP Order and to bring

claims on the Debtors' behalf.[8]  The Investigation Deadline was extended by stipulations

and amendments to the Final DIP Order until August 5, 2003.

**C.    The Bank Litigation**

16.    In July 2003, the Debtors and the Creditors' Committee advised the Equity

Committee that the Debtors had agreed to permit the Creditors' Committee to prosecute

certain claims against the Debtors' pre-petition lenders, alleging wrongdoing in

connection with their pre-petition dealings with Adelphia's former management, the

---

[6]    Final Order (i) Authorizing Debtors (a) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) and (b) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (ii) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362 and 363 (the "Final DIP Order"), dated August 23, 2002 [Docket No. 525], at ¶ 3, a copy of which is attached as Exhibit A to the Declaration of Andrew L. Buck in Support of this Objection, dated November 24, 2006 (the "Buck Declaration") and filed concurrently herewith.

[7]    Final DIP Order at ¶ 15

[8]    Final DIP Order at ¶ 7.

Rigases.[9]  These claims included many – but not all – of the claims identified by the

Equity Committee through its own investigation.  The Creditors' Committee's claims

were set forth in the complaint filed by the Creditors' Committee commencing the Bank

Litigation (the "Creditors' Committee Complaint").

      17.     In order to avoid a dispute over which party or parties should prosecute

the valuable claims that both of the Statutory Committees had identified and were

prepared to bring on the Debtors' behalf, and in recognition of the Equity Committee's

right to protect the interests of its own constituency, the Equity Committee, together with

the Debtors and the Creditors' Committee, entered into a Stipulation[10] providing that:

(a) the Creditors' Committee should be granted leave and standing to file and prosecute

the claims asserted in the Creditors' Committee Complaint; and (b) the Equity Committee

should be granted leave to intervene in that adversary proceeding.  On July 6, 2003, the

Creditors' Committee filed the Creditors' Committee Complaint and a motion to approve

the Stipulation (the "Approval Motion"), and the Equity Committee filed a Joinder in the

Approval Motion.

      18.     Shortly thereafter, the Equity Committee requested that the Debtors and/or

the Creditors' Committee either: (i) assert against the Banks certain additional claims that

the Equity Committee had identified, including intentional fraud and violations of the

---

[9]      Adelphia also filed suit against the Rigases for their looting of the company (the "Rigas Action").
By Memorandum of Decision dated November 25, 2002, the Bankruptcy Court granted the motion
of the Creditors' Committee and the Equity Committee to intervene in the Rigas Action.

[10]    Stipulation Authorizing the Creditors' Committee to Prosecute Claims and Claims for Relief
Against the Pre-Petition Agents and Pre-Petition Secured Lenders, filed and submitted for
Bankruptcy Court approval on July 6, 2003 [Exhibit A to Motion to Approve Stipulation
Authorizing Creditors' Committee to Prosecute Claims and Causes of Action Against the Pre-
Petition Agents and Pre-Petition Secured Lenders and Granting the Equity Committee the Right to
Intervene, Docket No. 1855], a copy of which is attached as Exhibit B to the Buck Declaration.

Racketeer Influenced and Corrupt Organization Act ("RICO"), but which were not

included in the Creditors' Committee Complaint; or (ii) consent to have the Equity

Committee assert those claims on the Debtors' behalf.  On July 31, 2003, after the

Debtors and the Creditors' Committee declined the Equity Committee's request and

before the Investigation Deadline, the Equity Committee filed a Motion and

Memorandum of Law for Order Granting the Equity Committee Leave to Assert Certain

Additional Claims on the Debtors' Behalf against the Defendants in the Adversary

Proceeding Commenced by the Creditors' Committee, together with its proposed

intervenor complaint (the "Intervenor Complaint").[11]

19.    In addition to filing the Intervenor Complaint, the Equity Committee

objected to the Banks' claims against the Debtors' estates for all of the reasons set forth

in the Intervenor Complaint.[12]

20.    Thus, the Investigation Deadline expired without the Debtors or the

Creditors' Committee asserting the additional claims raised by the Equity Committee in

their Intervenor Complaint or filing an objection to the claims filed by the Banks.[13]

---

[11]    Exhibit A to Official Committee of Equity Security Holders' Motion and Memorandum of Law
for Order Granting the Equity Committee Leave to Assert Certain Additional Claims on the
Debtors' Behalf against the Defendants in the Adversary Proceeding Commenced by the Official
Committee of Unsecured Creditors, dated July 31, 2003 [Docket No. 1940], a copy of which is
attached as Exhibit C to the Buck Declaration.

[12]    Objection to the Claims of the Debtors' Pre-Petition Lenders, dated August 5, 2003 (attaching
copy of Intervenor Complaint as a supporting exhibit) [Docket No. 1964] (the "Equity Committee
Claims Objection"), a copy of which is attached as Exhibit J to the Buck Declaration.

[13]    Approximately three years later, the Creditors' Committee did file an objection to the Banks'
claims, asserting that the effective date of the objection should relate back to the date of its
original complaint in the Bank Litigation.  *See* Creditors' Committee's Omnibus Objection to
Allowance of Claims of Bank Litigation Defendants, dated April 27, 2006 [Docket No. 10623];
Creditors' Committee's Motion to Hold Back Distributions to Pre-Petition Bank Lenders in
Accordance with Section 6.16 of the Debtors' Plan, dated April 26, 2006 [Docket No. 10601] at
¶ 25 ("The [Bank Litigation] constitute[s] a long-standing objection to the allowance of the Bank
Claims . . . .").

21.     Pursuant to a scheduling stipulation, the parties agreed to proceed with
motions to dismiss under Fed. R. Civ. P. 12(b)(6) (the "Motions to Dismiss") and
simultaneously to resolve the Banks' challenges to the Committees' requests for standing
to prosecute the Bank Litigation.  This Court held a hearing on the Motions to Dismiss
and the Banks' standing challenges on December 20 and 21, 2004.  By Memorandum of
Decision dated August 30, 2005 (the "Standing Order"),[14] this Court granted the
Creditors' Committee's motion for leave, pursuant to *Housecraft*,[15] to prosecute the
claims asserted in the Creditors' Committee Complaint against the Banks.  *Id.* at 38.  This
Court also granted the Equity Committee's motion for authority to assert the Equity
Committee Claims.  *Id.*  As of the date of this Objection, this Court has not yet ruled
upon the pending Motions to Dismiss, but has indicated that at least some of the Equity
Committee Claims, including the RICO claims, will survive those motions.[16]

22.     Since this Court's decision granting the Equity Committee standing, the
two Statutory Committees have served document demands upon the lead defendants and
have been involved in document production.

23.     On February 9, 2006, upon the motion of certain of the Banks, U.S.
District Court Judge Lawrence M. McKenna issued an order withdrawing the reference

---

[14]    Decision on Motions by Creditors' Committee and Equity Committee to Prosecute Claims on
Behalf of the Debtors' Estates, dated August 30, 2005 [Adv. Pro. No 03-04942 (REG); Docket
No. 326], a copy of which is attached as Exhibit D to the Buck Declaration.

[15]    *See Glinka v. Murad (In re Housecraft Industries USA, Inc.)*, 310 F.3d 64 (2d Cir. 2002)
("*Housecraft*").

[16]    Decision on Motions by Creditors' Committee and Equity Committee to Prosecute Claims on
Behalf of the Debtors (Bank Litigation Docket No. 326) at p. 36 (explaining that, "while some of
the Equity Committee's claims will likely not survive 12(b)(6) motions, and while others—
especially the RICO claims—will be at some substantial risk at the time of motions for summary
judgment, some of the Equity Committee's claims have potential promise.").

with respect to the Bank Litigation.  Under the District Court's decision, the Bank

Litigation is now within the exclusive jurisdiction of the District Court except for the

pending Motions to Dismiss, which (with the consent of all parties) remain before this

Court.[17]

**D.    The Government Settlement**

24.    By order dated May 26, 2005, this Court approved three related

agreements (collectively, the "Government Settlement") between the Debtors and the

Securities and Exchange Commission, the Debtors and the Department of Justice

("DoJ"), and the Debtors and the Rigas Family, respectively.[18]  The Government

Settlement provides, *inter alia*, that the SEC and the DoJ will establish a Victims'

Restitution Fund, to which ACC will contribute $715 million in cash, TWC Class A

common stock and CVV interests.

25.    Several parties appealed the Bankruptcy Court's order approving the

Government Settlement to the District Court.  Most notably, the Creditors' Committee

has challenged the right of the SEC and DoJ to distribute proceeds from the Victim

Restitution Fund within those agencies' sole discretion on the grounds that such proceeds

must be distributed in accordance with the absolute priority rule.[19]  The Equity

Committee filed a Notice of Cross-Appeal, appealing only that portion of the Court's

---

[17]    Memorandum and Order dated February 9, 2006, entered in *In re Adelphia Communications Corporation Securities and Derivative Litigation*, S.D.N.Y. Docket No. 03-MDL-1529 (LMM) , a copy of which is attached as Exhibit E to the Buck Declaration.

[18]    Docket No. 7655.

[19]    Section 8.5(c) of the Plan also provides that the Settlement Parties will the United States Government to distribute the maximum amount of the Government Settlement for the benefit of unsecured creditors in accordance with the absolute priority rule.

Order granting the Debtors' pre-petition lenders new liens in the assets that, pursuant to the settlement agreements, were forfeited to the government and transferred to the Debtors.

26.     By Memorandum and Order dated February 23, 2006, District Judge Lewis A. Kaplan affirmed this Court's Order approving the Government Settlement. That decision is currently on appeal to the Court of Appeals for the Second Circuit and has been fully briefed.  The Creditors' Committee continues to press its argument that the Victim Restitution Fund must be distributed by the Government in accordance with the absolute priority rule.

**E.**      **The Sale to Time Warner and Comcast**

27.     Effective April 20, 2005, with this Court's approval, ACC entered into two asset purchase agreements (the "Asset Purchase Agreements"), pursuant to which Time Warner New York ("TW NY") and Comcast Corporation ("Comcast") have, between them, purchased substantially all of the Debtors' U.S. assets and assumed certain of their liabilities.

28.     The Sale Transaction was initially contemplated to be consummated in the context of a plan of reorganization.  As a result of the deadlock of the inter-creditor disputes (described below), however, the Debtors filed a motion on May 26, 2006 seeking this Court's permission to close the Sale Transaction pursuant to Section 363 with respect to all Debtors except the JV Debtors, as to whom plans of reorganization would be proposed.  The Debtors' approach ultimately resulted in confirmation of plans of reorganization for the JV Debtors, and the Sale Transaction closed on July 31, 2006 (the "Closing Date").

29.    As a result, subject to certain adjustments, the Debtors received:
(i) approximately $12.7 billion in cash; and (ii) shares of stock in TW NY's parent, Time
Warner Cable ("TWC") equal to 16% of the equity securities of TWC as of the Closing
Date.

**F.    The Inter-Creditor Resolution Process**

30.    By order dated August 4, 2005 (Docket No. 8044), this Court established
the Resolution Process, intended to be a series of six hearings, which provided a
framework for litigating and resolving the Inter-Creditor Disputes that are the lynchpin to
value allocation in any reorganization.

31.    Because of its central importance to the proceedings, the Resolution
Process was crafted to "give the creditors who would be affected by the [inter-creditor]
disputes a full opportunity to litigate their needs and concerns." *In re Adelphia
Communications Corp*, 336 B.R. 310, 633-34 (Bankr. S.D.N.Y. 2006).  While the
Resolution Process empowered individual constituencies to protect their respective
interests through litigation, this Court considered it essential to the integrity of the
process that the Debtors "stay[] neutral in the Inter-Creditor Disputes," *id.* at 618,
because of the diametrically opposed interests of the different Debtor groups.  In order to
preserve their neutrality, this Court directed that the Debtors could not "advocate publicly
particular outcomes with respect to the Inter-Creditor Disputes." *Id.* at 633.

32.    Before it was placed on indefinite hold, the Equity Committee actively
participated in the Resolution Process as a "Deemed Participant."  Because the Equity
Committee represents the interests of ACC's shareholders only, the Equity Committee's
interests in the Resolution Process were often aligned with those of the ACC

12

Noteholders' Committee.  Specifically, the Equity Committee designated issues for resolution, participated in documentary discovery, attended and conducted fact and expert depositions, submitted an expert report concerning, among other things, the proper allocation of the proceeds of the Sale Transaction, filed joinders in the arguments raised by the ACC Committee for resolution during Hearings 1, 2, and 3, filed its own Hearing 4 Brief, and attended weeks of hearings.  The Equity Committee also actively opposed the motions by the Arahova Committee to terminate exclusivity, disqualify Debtors' counsel, and appoint a trustee, which were litigated while the Resolution Process was pending.

33.      In the course of Hearing 2, the Resolution Process was stayed to allow the Debtors to focus their energies on consummation of the Sale Transaction.  At the time, this Court directed certain of the parties to the Inter-Creditor Disputes to continue settlement negotiations.

## G.      The April 6th Order and the Modified Fourth Plan of Reorganization

34.      In April 2006, the Debtors sought this Court's permission to amend their Fourth Amended Joint Plan of Reorganization,[20] which had previously drowned in a sea of objections filed by nearly every constituent group.

35.      On April 6, 2006, this Court held a hearing to consider whether the Debtors should be permitted to file an amended plan that provided options for either holdback of distributions pending conclusion of the Resolution Process or a settlement of the Inter-Creditor Disputes.  At the hearing, the issue of the Debtors' neutrality was front

---

[20]      Docket No. 8973 (the "November Plan").

13

and center.  In particular, the question was whether, consistent with the principle that the

Debtors must remain neutral with regard to the substance of the Inter-Creditor Disputes,

they could propose a plan of reorganization premised on a particular outcome in that

dispute.  At the hearing, this Court explained that, "if handled with restraint and care, the

principle of neutrality isn't violated."[21]  Specifically, this Court forbade the Debtors from

cramming down any particular resolution of the Inter-Creditor Disputes (without further

Court consideration) and required that any plan proposed by the Debtors also include a

holdback plan that would be agnostic as to the outcome of the Inter-Creditor Disputes.

36.    Later that day, this Court entered an order (the "April 6th Order")[22]

permitting the Debtors to file an amended plan provided that the plan "shall be

structured" to allow stakeholders to choose a holdback option.  (April 6th Order at ¶ 3.)

Essentially, the holdback option provided for reserves that would be held in escrow

pending the outcome of the court-ordered Resolution Process.  The Debtors were

required to propose a holdback option to ensure that the Debtors did not require any

particular resolution of the Inter-Creditor Disputes as a condition of confirmation.

37.    Following the April 6th Order, the Debtors proposed their Modified

Fourth Amended Joint Plan of Reorganization (the "April Plan"),[23] which set forth one

plan option that based recoveries upon a potential resolution of the Inter-Creditor

Disputes and a second holdback option.  Like the November Plan, the April Plan went

nowhere.

---

[21]    April 6, 2006 Hearing Transcript at 10:22-23, a copy of which is attached as Exhibit I to the Buck
Declaration.

[22]    Docket No. 10359.

[23]    Docket No. 10410.

14

38.     In April 2006, after months of negotiations, certain parties to the
Resolution Process were ordered to submit to a "monitoring" process before Bankruptcy
Judge Cecilia Morris.  According to the Court, Judge Morris was to act as a "hall
monitor" in the settlement discussions among the parties to the Inter-Creditor Disputes.[24]
The Equity Committee understood that Judge Morris' role was limited to simple
oversight of the negotiation process to ensure that the parties negotiated in good faith, but
not to substantively mediate the Inter-Creditor Disputes or address issues outside the
scope of those specifically defined disputes.  In other words, Judge Morris was, by
design, a "monitor" – not a "mediator."  *Id.*   Accordingly, the Equity Committee did not
seek to be included in the process at that time.

**H.**     **The Term Sheet and Subsequent Plan Agreement**

39.     The inter-creditor negotiations monitored by Judge Morris did not go as
expected.  Much to the surprise of the Equity Committee, Judge Morris transmitted an
Agreement Concerning Terms and Conditions of a Modified Chapter 11 Plan (the "Judge
Morris Term Sheet") to this Court in the form of a "Monitor's Report," which this Court
posted to the docket on June 21, 2006.[25]  Not only did the Judge Morris Term Sheet
propose a substantive resolution of the Inter-Creditor Disputes, but it also contained other
proposed plan provisions, including provisions concerning the CVV and the Government
Settlement – issues of great concern to the Equity Committee.  Further, even though
Judge Morris had received input from only a subset of the parties-in-interest, Judge

---

[24]     April 27, 2006 Hearing Transcript at 32:6-10 [Docket No. 11149], a copy of which is attached as
Exhibit F to the Buck Declaration.

[25]     Docket No. 11384, a copy of which is attached as Exhibit G to the Buck Declaration.

15

Morris endorsed the term sheet, advising all parties in interest of her view that the term
sheet was "beneficial to and in the best interests of all parties," and was a "better
alternative" to previous plans filed by the Debtors.[26]

40.    Once the Equity Committee became aware that Judge Morris had been
working with various parties to hammer out global terms for a new plan of reorganization
and that those terms would be communicated directly to this Court, the Equity Committee
immediately sought to be included in this process.  In a June 27, 2006 letter to Judge
Morris (a copy of which is attached as Exhibit H to the Buck Declaration), counsel for
the Equity Committee highlighted provisions of the Judge Morris Term Sheet that
directly affected equity holders, including:

- "The term sheet proposes to vest control of the CVV solely in the
  hands of the unsecured creditors, but the Equity Committee holds a
  significant stake in the Bank Litigation, the most significant
  litigation to be transferred to the CVV . . . . The Equity Committee
  does not believe that the unsecured creditors can arrogate to
  themselves control over claims brought solely by the Equity
  Committee when *only* the Equity Committee has been granted
  standing to pursue those claims."

- "The term sheet proposes a particular priority of distributions from
  the CVV, including when equity holders would begin to share in
  those proceeds."

- "The term sheet proposes to require the Debtors to negotiate with
  the Department of Justice to obtain a distribution of the
  Government Settlement solely to unsecured creditors, to the
  detriment of equity holders who may have a claim to such
  proceeds."

41.    In a subsequent telephone conversation with counsel for the Equity
Committee, Judge Morris politely, but firmly, refused to allow the Equity Committee to

---

[26]    *Id.*

participate in the negotiations, despite the fact that equity holders are directly affected by the Judge Morris Term Sheet and now the Plan based thereon.

42.    Negotiations concerning the Judge Morris Term Sheet ensued among various parties, including the Debtors and the Creditors' Committee.  On July 21, 2006, the Debtors and the Creditors' Committee signed an amended version of the Judge Morris Term Sheet (the "Amended Term Sheet").

**I.**    **The Current Plan**

43.    On August 17, 2006, by order to show cause, the Debtors and the Creditors' Committee jointly moved for an order approving the Second Disclosure Statement Supplement.

44.    The Plan, which is based on the Amended Term Sheet, takes an unequivocal position on the merits of the Inter-Creditor Disputes.  In the words of the ACC Senior Noteholders' Committee, the Amended Term Sheet, which the Plan would implement, improperly assumes a "grand slam victory for both Arahova Noteholders and FrontierVision Holdco Noteholders (whose support was effectively purchased by diverting value from ACC)."[27]  The recoveries to Arahova Noteholders, in particular, are premised on disregarding major intercompany claims held by ACC – claims that were recognized in the May 2005 Schedules prepared by Pricewaterhouse Coopers LLC after two years of painstaking work.  *In re Adelphia*, 336 B.R. at 624-25.

45.    The Plan establishes a liquidating trust known as the Contingent Value Vehicle, or CVV.  If the Plan is confirmed, the CVV would be administered by five

---

[27]    ACC Senior Noteholders' Motion to Terminate Exclusivity [Docket No. 11818] at ¶ 37.

trustees to be selected by the Creditors' Committee alone, without input from the Equity

Committee or others. Plan Section 9.1(b). On the Effective Date, "title to all of the

Debtors' Causes of Action automatically will be transferred" to the CVV. Plan Section

9.2(a)(i). Schedule Y of the Plan makes clear that the transferred causes of action include

the Equity Committee Claims. Plan at SY-1.

46.     The Plan also includes a "deathtrap" provision. Specifically, Sections

5.1(h)(ii) and (i)(ii) of the Plan provide that holders of ACC Preferred Stock Interests and

ACC Common Stock Interests, respectively, will receive no distributions unless their

class votes in favor of the Plan. However, if these classes do vote in favor of the Plan,

they will receive CVV Series ACC-6 Interests and CVV Series ACC-7 Interests,

respectively, which would entitle holders thereof to their pro-rata shares of CVV

recoveries after payment in full (with post-Effective Date interest) of all senior claims

and equity interests, in accordance with the absolute priority rule.

47.     Section 5.1(j) of the Plan provides that if any of the CVV Series ACC-4,

ACC-5, ACC-6, or ACC-7 Interests are not issued because the applicable class that

would have otherwise received such CVV Interests has voted to reject the plan, the CVV

Distributions on account of such non-issued CVV Interests will be shared among senior

creditors holding CVV Series ACC-1, ACC-2, and ACC-3 Interests, notwithstanding that

such holders will necessarily have been paid in full (with post-Effective Date interest)

before any distributions can be made on account of the junior CVV Interests.

48.     On October 16, 2006 the Court entered an order approving the Second

Disclosure Statement Supplement and authorizing the Debtors to commence solicitation

of the Plan.

## <u>Legal Argument</u>

**I.      This Court lacks jurisdiction to remove the Equity Committee as a plaintiff in the Bank Litigation, to transfer the Equity Committee Claims to the CVV, or to substitute the CVV Trustees as plaintiffs, because the reference has been withdrawn.**

49.      The Plan cannot be confirmed because this Court no longer has jurisdiction to remove the Equity Committee as a plaintiff in the Bank Litigation (other than on the grounds asserted in the pending motions to dismiss), to transfer the Equity Committee Claims to the CVV, or to substitute the CVV Trustees as party plaintiffs with respect to the Equity Committee Claims.

50.      "Bankruptcy Court jurisdiction is derived only from, through and under the District Court which passes certain of its jurisdiction to the Bankruptcy Court by virtue of the District Court's reference of the case." *In re Interpictures, Inc*., 86 B.R. 24, 28 (Bankr. E.D.N.Y. 1988). The limited jurisdiction given to the federal bankruptcy courts is "exercised only by virtue of a referral from the District Court: without District Court referral, the Bankruptcy Court is not empowered to exercise jurisdiction over any aspect of a bankruptcy case." *Id.*

51.      After this Court granted the Equity Committee leave to assert its claims against the Banks, Bank of America, Wachovia and Deutsche Bank (joined by other Banks) brought a motion in the District Court for withdrawal of the reference of the Bank Litigation, including the Equity Committee's Claims. In granting the motion and withdrawing the reference, the District Court held that withdrawal of the reference as to the Equity Committee's RICO claims (and certain other claims) was mandatory under 28

U.S.C. § 157(d), and that withdrawal of the reference as to all of the other claims was

also warranted because the relevant factors weighed strongly in favor of permissive

withdrawal.  Memorandum and Order, 03 MDL 1529 (LMM), at 6, 11-12 (S.D.N.Y. Feb.

9, 2006) (the "Withdrawal Decision").

     52.    Delineating only a discrete area of continuing jurisdiction for this Court,

the District Court further directed that the "motions for dismissal pending in the

Bankruptcy Court…will (with the consent of the moving defendants) remain for decision

with Judge Gerber, who has clearly devoted considerable time and effort to them

already."  *Id*. at 12 n.8.[28]

     53.    Thus, aside from the pending motions to dismiss, the Equity Committee's

Claims are not before this Court and this Court has no jurisdiction over them.  *See*

*generally SEC v. Goren*, 00 Civ. 970 (TCP), 2002 WL 32963582, at *3 (E.D.N.Y. Mar.

6, 2002) (withdrawal of the reference vests the District Court with exclusive jurisdiction).

     54.    An order approving the Plan in its current form would plainly be an

improper exercise of jurisdiction over the Equity Committee Claims.  Specifically, the

Plan proposes to remove the Equity Committee as a plaintiff in the Bank Litigation, to

transfer the Bank Litigation to the CVV, and to substitute the CVV Trustee as a plaintiff.

(Plan, Article IX.)  The Trustees would then be vested with complete control over the

Equity Committee's Claims, including decisions about how to maximize the value of

---

[28]    The consent of the parties was required for this Court to continue to exercise jurisdiction over the Equity Committee's Claims with regard to the limited matter of the pending motions to dismiss because the RICO, Bank Holding Company Act and state law tort claims are all non-core.  *Id.* at 9. Non-core claims cannot be referred to the Bankruptcy Court without the "consent of all the parties to the proceeding."  28 U.S.C. § 157(c)(2).  *See also* Fed. R. Bankr. P. 7012(b) ("In non-core proceedings final orders and judgments shall not be entered on the bankruptcy judge's order except with the express consent of the parties.")

those claims, the selection of professionals and whether or not to pursue the claims at all. (Plan, Section 9.4.)

55.     None of those actions affecting the Bank Litigation is contemplated by the pending motions to dismiss and, therefore, this Court is without jurisdiction to order them.  Indeed, in addition to running afoul of the Withdrawal Decision, federal jurisdictional statutes and the Bankruptcy Rules, it would violate Article III of the Constitution for this Court to continue to enter orders concerning the Equity Committee Claims, other than by rendering decisions on the pending motions to dismiss.  *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982); *Orion Pictures Corp. v. Showtime Networks, Inc.*, 4 F.3d 1095, 1100 (2d Cir. 1993) (vacating District Court order denying withdrawal of the reference and explaining that "our Constitution reserves for Article III courts traditional functions of the judicial power"). In the absence of a reference from the District Court, the entry of orders concerning the Bank Litigation would constitute an improper exercise of Article III powers by this Court.  *Orion Pictures*, 4 F.3d at 1102-03 (2d Cir. 1993) (vacating all orders issued by Bankruptcy Court after District Court's decision on withdrawal of the reference); *In re Horizon Air, Inc.*, 156 B.R. 369, 378-79 (N.D.N.Y. 1993) (calling into question the validity of a bankruptcy court order issued prior to district court's order withdrawing the reference where such withdrawal was mandatory).

56.     Accordingly, this Court lacks the power to enter an order approving a Plan that would affect the Bank Litigation over the objection of the Equity Committee.  Since the proposed Plan requires such an order, it cannot be confirmed.

## II.    The Debtors cannot transfer the Equity Committee Claims to the Contingent Value Vehicle.

### A.    The Equity Committee now owns and controls the Equity Committee Claims.

57.    When this Court granted the Equity Committee standing under the *STN-Commodore-Housecraft* line of cases[29] to assert the Equity Committee Claims, it vested ownership and control over those claims in the Equity Committee.  As a consequence, neither the Debtors nor other parties in interest have the right to control that litigation.  Because the Plan would place control of the Bank Litigation, including the Equity Committee Claims, entirely under the control of the Creditors' Committee and its designated CVV Trustees, the Plan cannot be confirmed.

58.    The Second Circuit's decision in *In re Smart World Technologies, LLC*, 423 F.3d 166 (2d Cir. 2005) shows that an order pursuant to the *STN-Commodore-Housecraft* line of cases granting a committee standing effectively shifts ownership and control of the claims from a debtor to an official committee.  In *STN*, a sale of assets by a debtor pursuant to section 363 of the Bankruptcy Code led to litigation between the debtor, Smart World, and the buyer, Juno Online Services.  While the debtor itself asserted claims on behalf of the estate, its efforts to prosecute those claims were frustrated because Juno obtained numerous stays of the litigation based upon its representation to the bankruptcy court that it was close to a settlement with Smart

---

[29]    While the Bankruptcy Code contains no explicit authority for committees to initiate adversary proceedings to prosecute claims on behalf of the debtor or the debtor's estates, *see, e.g., Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN Enterprises)*, 779 F.2d 901 (2d Cir. 1985) ("*STN*"), the Second Circuit, through a trilogy of opinions, has extended standing to bring actions to additional parties, including to official creditor or equity committees or individual creditors, when to do so is in the best interest of the estate.  *STN; Commodore Intern., Ltd. v. Gould (In re Commodore  Intern., Ltd.)*, 262 F.3d 96 (2d Cir. 2001) ("*Commodore*"); *In re Housecraft Industries USA, Inc.*, 310 F.3d 64 (2d Cir. 2002) ("*Housecraft*").

World's creditors which would have obviated the need for such litigation.  Eventually, Juno entered into a settlement agreement with one of Smart World's creditors, WorldCom, and WorldCom and the creditors' committee thereafter filed a motion pursuant to Bankruptcy Rule 9019 to settle the adversary proceeding.  The bankruptcy court approved the settlement over Smart World's objection.  After the district court affirmed the decision of the bankruptcy court, Smart World appealed to the Second Circuit, arguing that neither WorldCom nor the creditors' committee had the power to settle the litigation absent the consent of the debtor, as plaintiff in the adversary proceeding.

59.    The issue before the Court of Appeals was whether WorldCom or the creditors' committee had the authority to settle the case under Bankruptcy Rule 9019.  The decision of the Second Circuit turned on the Court's analysis of how and under what circumstances the "ownership" and concomitant control of litigation claims can shift from a debtor to a committee.  The Court of Appeals began with the undisputed premise that, at the outset of a chapter 11 case, a debtor in possession (or trustee) controls, or "owns," the estate's legal claims.   "As legal representative, the debtor-in-possession has the power to sue and be sued on the estate's behalf."  *Smart World*, 423 F.3d at 174 (citing 11 U.S.C. § 323(b)).  *See also In re Adelphia Communications Corp.*, 285 B.R. 848, 855 (Bankr. S.D.N.Y. 2002) ("in the first instance, the debtor owns the cause of action in an adversary proceeding and asserts it on behalf of the estate…").

60.    While acknowledging that legal claims are controlled in the first instance by the debtor, Smart World's creditors argued that they could take control of litigation under the doctrine of derivative standing established in *STN*.  423 F.3d at 176.  The

Second Circuit, assessing that argument in the light of the *STN* line of decisions,

concluded that "ownership" and control over claims *does* shift to a committee with a

grant of standing pursuant to *STN*.  In making that determination, the Court of Appeals

adopted this Court's reasoning in an earlier decision in these chapter 11 cases:

> [I]n *In re Adelphia Communications Corp.*, the
> bankruptcy court granted the [official] committees'
> motion[s] to intervene, but "took under advisement
> exactly what the Committees' rights as a consequence of
> [*Caldor*] would be." 285 B.R. at 850. After observing that
> Caldor had not overruled *STN*, the court ultimately
> concluded that § 1109(b) entitled the creditors to
> "standing to raise issues and to appear and be heard," but
> that the right did "not equate to ownership of the causes
> of action in question." *Id. at 851*. In order to "secure the
> latter," the court noted that the creditors would have to
> meet the standard for derivative standing under STN.  *Id.*
>
> We agree with the reasoning of *Adelphia*…

*Smart World*, 423 F.3d at 182 (emphasis added).

61.    In *Smart World*, the Court of Appeals ultimately concluded that the

creditors could *not* settle the litigation because they could not show that they were

entitled to *STN* standing.  Specifically, the creditors made no showing that the debtor

itself had unjustifiably refused to prosecute the claim or, for that matter, unjustifiably

refused to settle the claim.  Furthermore, as discussed below, the Court of Appeals also

found that the right of the committee in Smart World to intervene under Bankruptcy Code

§ 1109 did not give it the power to settle the claim.  The Court of Appeals therefore

found that the creditors had no standing and were powerless to settle Smart World's

claims.

24

62.    Here, the converse is true.  The Equity Committee has demonstrated to the satisfaction of this Court that the Debtors "unjustifiably" (as that term is used in *STN*) refused to assert the Equity Committee Claims.  The Creditors' Committee also chose not to assert the Equity Committee Claims, and has not sought to intervene in connection with the prosecution of those claims.  This Court's grant of standing to the Equity Committee to prosecute the Equity Committee Claims therefore *does* "equate to ownership of the causes of action in question."  *Smart World*, 423 F.3d at 182, *quoting In re Adelphia Communications Corp.*, 285 B.R. at 851.  Therefore, just as the creditors in *Smart World* could not take control of or settle the litigation over the objection of the debtor, which owned the claims, the creditors and Debtors in this case cannot take control of or settle the Bank Litigation over the objection of the Equity Committee.

63.    Nor can a Trustee take control of those claims because any post-confirmation litigation trustee would similarly lack control over claims with respect to which the Equity Committee has been vested with ownership and control.  *See In re Railworks Corp. v. Martin*, 325 B.R. 709, 715, 719 (Bankr. D. Md. 2005) (litigation trustees "derive their standing" from "their capacity as representatives of the estate" and "the post-confirmation Litigation Trustee possesses the same standing as that of a trustee during the existence of the estate").

64.    Because the Plan would divest the Equity Committee of power over claims it was authorized to litigate under *STN*, and shift that authority to those who do not own those claims, the Plan cannot be confirmed.

**B.**    **The Creditors' Committee and any CVV Trustees appointed by the Creditors' Committee would be hopelessly conflicted if placed in sole control of the Bank Litigation.**

65.    The Plan also cannot be confirmed because it would create conflicts of interest for the CVV Trustees and their counsel.  "Stockholders are no less entitled than creditors to independent, zealous representation by professionals free of any compromising influences or loyalties."  *In re Evans Prods. Co.*, 58 B.R. 572, 576 (S.D. Fla. 1985).  The Plan denies equity holders that basic right.

66.    When it comes to the "variant priorities and interests" of equity holders and creditors, the Bankruptcy Code is careful to "prevent even the possibility of conflicts of interest."  *In re Saxon Indus., Inc.*, 29 B.R. 320, 321 (Bankr. S.D.N.Y. 1983); *see also In re Proof of the Pudding, Inc.*, 3 B.R. 645 (Bankr. S.D.N.Y. 1980) (same attorneys could not represent interests of different committees).  Because the interests of equity holders diverge from those of creditors, their interests must be represented by unconflicted professionals.  Only strict adherence to that principle can "keep the standard of conduct for fiduciaries at a level higher than that trodden by the crowd."  *In re Saxon*, 29 B.R. at 322.

67.    Under the proposed Plan, the Creditors' Committee will select the CVV's Trustees.  (Presumably, the CVV Trustees will retain the Creditors' Committee's current counsel to prosecute the Bank Litigation.)  If confirmed, this scenario would create unavoidable conflict for the fiduciaries in litigating the claims on behalf of two classes of CVV Interests: senior CVV Interests distributed to creditors, and junior CVV Interests distributed to equity holders.  Those holding senior CVV Interests will seek the quickest

possible resolution that wholly (or substantially) satisfies their senior claims without any regard to whether holders of junior CVV Interests could benefit from greater recoveries.

68.    While there is nothing inappropriate about a recovery structure in which creditors' and equity holders' interests are not aligned – in fact, it is probably unavoidable – it *is* inappropriate to leave both groups with only one board of CVV Trustees and one law firm to safeguard their differing interests. Almost inevitably, those fiduciaries will be forced to choose between what is good for creditors and what is good for equity holders, and in making that decision they will not be able to discharge their duty to both.

69.    This conflict is exacerbated by the Plan's proposed CVV Trustee selection procedure. Under the Plan, the five trustees are to be identified by the Creditors Committee at or before the Confirmation Hearing and appointed in accordance with the CVV Declaration. Plan, Article 9.1(b) (emphasis added). Because the Trustees will owe their positions to their appointment by the creditors, equity holders can hardly expect that the Trustees will impartially weigh the creditors' interests against those of equity holders.

70.    Significantly, no matter how faithfully they attempt to discharge their fiduciary duties, CVV Trustees with obligations of simultaneous loyalty to both creditors and equity holders would be unable to approve an aggregate settlement of the Bank Litigation claims. The New York Lawyers' Code of Professional Responsibility, DR 5-106, requires that a lawyer settling similar claims of clients on an aggregate basis can do so only with the approval of each client after full disclosure:

> A lawyer who represents two or more clients shall not make or participate in the making of an aggregate settlement of the claims of or against the clients, unless

> each client has consented after full disclosure of the
> implications of the aggregate settlement and the advantages
> and risks involved, including the existence and nature of all
> the claims involved and the participation of each person in
> the settlement.

71.     A single board of CVV Trustees cannot give effective consent for both

creditors and equity holders to approve an aggregate settlement of the Bank Litigation

(especially if the Trustees are appointed only by creditors).  Indeed, the "recommendation

of a middle ground compromise" that does not realize the full potential value of the

Equity Committee Claims breaches the fiduciary duties owed to equity holders.  *In re*

*Saxon*, 29 B.R. at 322.  The Plan, as proposed, therefore would leave Bank Litigation

counsel unable to obtain approval for a settlement as required by the disciplinary rules.

*See generally Smith v. City of New York*, 611 F. Supp. 1080, 1089 (S.D.N.Y. 1985)

(discussing the "bargaining chip" syndrome, in which there is a risk that counsel would

not zealously pursue the interests of one client, in order to achieve a favorable outcome

for the other).

72.     This is not a theoretical conflict.  Creditors' Committee's counsel cannot

represent the interests of equity security holders in the CVV because they repeatedly have

taken, and will continue to take, positions antagonistic to those of equity holders.  Among

other things, the Creditors' Committee's counsel is actively opposing the Government

Settlement, which establishes a restitution fund for the benefit of defrauded investors,

including equity holders.  The Creditors' Committee also has announced its intention to

lobby the government to distribute the proceeds of the restitution fund only in accordance

with the absolute priority rule – a distribution scheme that would, if adopted by the

government, disadvantage equity holders more than any other group.  As explained

28

below, the Creditors' Committee and its counsel also seek to deny equity holders who

vote against the Plan any share in CVV recoveries.  With this history and its expressed

intention to continue pressing positions harmful to equity holders, the Creditors'

Committee's counsel cannot represent equity holders' interests in the CVV consistent

with the Lawyers' Code of Professional Responsibility, DR 5-105, which provides:

> (a) A lawyer shall decline proffered employment if the exercise of
> independent professional judgment on behalf of a client will be or
> is likely to be adversely affected by the acceptance of the proffered
> employment, or if it would be likely to involve the lawyer in
> representing differing interests, except to the extent permitted
> under subdivision (c) of this section.

> (b) A lawyer shall not continue multiple employment if the
> exercise of independent professional judgment on behalf of a client
> will be or is likely to be adversely affected by the lawyer's
> representation of another client, or if it would be likely to involve
> the lawyer in representing differing interests, except to the extent
> permitted under subdivision (c) of this section.

22 NYCRR § 1200.24.

73.    Indisputably, the same counsel cannot simultaneously seek to deprive

equity holders of a distribution from the government restitution fund, while at the same

time purporting to represent equity holders' best interests in the prosecution of the Bank

Litigation.[30]

74.    The debilitating conflicts described above are unavoidable if the Plan is

confirmed in its current form.  The Plan, therefore, cannot be confirmed.

---

[30]    The Equity Committee anticipates that the Creditors' Committee, and perhaps others, will argue
that the possibility of recoveries on account of the Equity Committee Claims is too speculative to
justify the costs and expenses associated with court-appointed professionals representing equity
holders after the Effective Date.  To address this objection, and in order to assure zealous and
unconflicted prosecution of the Equity Committee Claims, undersigned counsel would consider
prosecuting such litigation post-confirmation on a full or partial contingency fee basis.

### III.    The Plan's proposed distribution of proceeds from the Contingent Value Vehicle violates the absolute priority rule.

75.    Under the proposed Plan, the CVV will in effect be substantively consolidated.  Proceeds will be distributed to creditors according to the Plan's priority scheme without regard to which estate's litigation claims generated those recoveries.  Most significantly for equity holders, recoveries attributable to claims owned solely by ACC would improperly be distributed to creditors of other Debtors.  The Court cannot approve a Plan that distributes litigation recoveries to creditors who are not entitled to them.  Thus, the Plan's proposed distribution of litigation proceeds from the Contingent Value Vehicle violates the absolute priority rule by distributing litigation proceeds to creditors who have no right to receive them, and the Plan cannot be confirmed.

### A.    A number of the claims that would be transferred under the Plan to the CVV belong only to ACC.

76.    The Plan's proposed distribution scheme is perhaps most egregious with respect to the Equity Committee Claims, which primarily seek the recovery of value for the ACC estate; *e.g.*, the Equity Committee's Fifty-Seventh and Fifty-Eighth claims for relief.  These claims allege that Salomon Smith Barney ("SSB") is liable in breach of contract and negligence for rendering a fairness opinion to ACC stating that ACC was receiving fair value from the Rigases for ACC securities.  Because the Rigases used funds from the Co-Borrowing Facilities to purchase those securities, ACC received no real consideration for issuing those securities.

77.    This distribution problem is not limited to the Equity Committee Claims. A number of claims in the Creditors' Committee Complaint (including claims adopted by the Equity Committee in its own Intervenor Complaint) seek damages on behalf of the ACC estate.  By way of example, the Creditors' Committee alleges that the Rigas family purchased approximately $1.9 billion of Adelphia securities, "including common stock and convertible bonds" using proceeds from the Co-Borrowing Facilities.  (Creditors' Committee Complaint and Intervenor Complaint at ¶ 461).  The complaints further allege that "the Debtors suffered significant harm from these transactions because the Debtors issued stock to the Rigas Family for zero net value, when such stock could have been sold to third parties to raise fresh capital."  *Id.*  Although the complaints refer to "the Debtors," ACC suffered a direct injury because it was deprived of the proceeds that could have been generated by a bona fide sale of ACC securities.

78.    ACC also was directly harmed when the Banks took security interests in the stock of the operating subsidiaries that were owned, directly or indirectly, by ACC.[31] In order to secure the indebtedness under the Co-Borrowing Facilities, the Banks took a senior security interest in the stock of the ACC subsidiaries that were members of the co-borrowing groups.[32]  By doing so, they directly impaired and diminished ACC's rights and property interests in those subsidiaries.[33]

---

[31]    Intervenor Complaint ¶ 20.

[32]    *Id.*  ¶¶ 427, 433, 439, 1051, 1082.

[33]    *See Ford v. Citizens & Southern Nat'l Bank*, 700 F. Supp. 1121, 1126 (N.D. Ga. 1988) (holding that, "[a] security interest is a "valuable thing" that, allegedly, was demanded and received from [the plaintiff] in violation of RICO," and finding that the plaintiff sufficiently alleged that he was suffered a RICO injury).

79.    In addition to the Bank Litigation, many of the other claims to be included in the CVV belong solely to ACC, and not to other debtors or their creditors:

- The Plan provides for the transfer of the Deloitte Litigation to the CVV. ACC is the *only* plaintiff in that litigation, and ACC's creditors and equity holders therefore are the only claimants entitled to distributions from any recovery in that litigation.

- The Plan provides for the transfer to the CVV of *Adelphia Communications Corporation et al. v. Prestige Communications of NC, Inc., et al.* Ad Pro. 04-03293 (REG), but ACC and Adelphia Cablevision, L.L.C. are the only debtor plaintiffs in that case. The Complaint seeks to recover a fraudulent transfer made by ACC through Adelphia Cablevision, L.L.C., and ACC's creditors and equity holders therefore are the only claimants entitled to distributions from any recovery in that litigation.

- The Plan provides for the transfer to the CVV of *Adelphia Communications Corporation et al. v. FPL Group Inc., et al.* Ad Pro. 04-03295 (REG), but ACC and Adelphia Cablevision, L.L.C. are the only debtor plaintiffs in that case.

80.    The foregoing is not intended to be an exhaustive list of litigation for which the proposed distribution scheme is unlawful.  In fact, such an exhaustive schedule is not possible at present, because the Plan proposes to transfer to the CVV other unspecified litigation on behalf of other unspecified plaintiffs.  Plan Schedule Y.  The Plan further proposes that the proceeds (if any) of such litigation be distributed in a rigid priority to claimants without regard to the source of those recoveries or the rights of those claimants in such recoveries.  Plan Section 9.3.

**B.    Recovery of damages suffered by ACC can only be distributed to ACC's creditors, and then to its equity holders.**

81.    To the extent that successful litigation results in the recovery of damages for harm suffered by ACC, those recoveries must be distributed *only* to satisfy <u>ACC's</u>

creditors and then to <u>ACC's</u> equity holders.  The Plan cannot be confirmed because,

absent full substantive consolidation, a solvent parent's (or corporate sibling's) assets

cannot be used for payment of the claims against an insolvent subsidiary.  *See Regency*

*Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.*,

216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) (citing *Mellon Bank, N.A. v. Metro*

*Communications, Inc.*, 945 F.2d 635, 643 (3d Cir. 1991), *cert. denied*, 503 U.S. 937

(1992)) ("parent's creditors have no claim to the subsidiary's assets, and *vice versa*.").

82.      "As a rule, parent and subsidiary corporations are separate entities, having

separate assets and liabilities."  *See, e.g.*, *In re Regency Holdings (Cayman), Inc.*, 216

B.R. at 375 (Bankr. S.D.N.Y. 1998); *See also* 1 Charles R.P. Keating, *et al.*, Fletcher

Cyclopedia of the Law of Private Corporations, § 25, at 30 (1997 Supp.)).  The parent's

ownership of all of the shares of the subsidiary does not make the subsidiary's assets the

parent's, nor the parent's assets the subsidiary's.  *See Regency Holdings (Cayman), Inc.*,

216 B.R. at 375; *In re Beck Indus., Inc.*, 479 F.2d 410, 415-16 (2d Cir.), *cert. denied*, 414

U.S. 858 (1973).  Thus, creditors of the parent corporation have no direct claim to the

subsidiary's assets (absent payment in full of the subsidiary's creditors, at which point

any residual value of the subsidiary would be an asset of the parent available to satisfy

the parent's creditors) and the creditors of the subsidiary corporation have no claim to the

parent's assets (not subject to the preceding parenthetical exception).  *See Regency*

*Holdings (Cayman), Inc.* at 375.  Accordingly, any "party seeking to overcome the

presumption of separateness must pierce the corporate veil, or prove that the two entities

should be substantively consolidated."  *Id.* (citing, *e.g.*, *Helena Chem. Co. v. Circle Land*

*& Cattle Corp. (In re Circle Land & Cattle Corp.)*, 213 B.R. 870, 874-76 (Bankr. D. Kan.1997).

83.     In *Regency Holdings*, the parent holding company and certain of its wholly-owned subsidiaries confirmed plans under which they were substantively consolidated with other affiliates, but not with each other.  *See Regency Holdings (Cayman), Inc.*, 216 B.R. at 375.  Neither the parent company nor the subsidiaries had sought to pierce the corporate veil or requested a full substantive consolidation. *Id.* Nevertheless, the parent company sought to recover for the benefit of its own creditors, as preferential transfers, loan repayments made by its subsidiary and its subsidiary's subsidiary.

84.     The court held that the creditors of the parent company had no legal claim against the assets of its subsidiary corporation and that, similarly, the creditors of the subsidiary corporations had no legal claim against the assets of the parent corporation. *Id.*  The court further held that in order for a party to overcome the presumption of separateness of the parent and subsidiary corporations, the party must either pierce the corporate veil or prove that they should be substantively consolidated.  To hold otherwise, the court stated, would "eviscerate the absolute priority rule …."  *Id.* at 376. Finding that the parties had not requested either substantive consolidation or sought to pierce the corporate veil, the court ruled that the parent company could not recover assets of its subsidiaries for the benefit of the creditors of the parent company.

85.     Here, the Plan neither requests nor provides for substantive consolidation. Likewise, the Plan does not attempt, or otherwise suggest, a piercing of the corporate veil.  Nonetheless, the Plan's distribution scheme impermissibly proposes to use the

34

Contingent Value Vehicle proceeds that result from claims based on injury to ACC to "top off" distributions to other subsidiary debtor entities (for example, Arahova and Frontier Vision debtors).

86.    The Debtors are not seeking substantive consolidation – indeed, they concede that there is no basis for such consolidation.  Accordingly, creditors of other debtors cannot share in ACC's litigation recoveries.  Because the Plan proposes to distribute litigation recoveries that properly belong to ACC's creditors and equity holders to creditors of other estates, the Plan cannot be confirmed.

## IV.    If confirmed, the Plan would deprive the Equity Committee of the right to litigate its own objection to the Banks' claims.

87.    The Plan also cannot be confirmed because it would deprive the Equity Committee of its right to prosecute the Equity Committee Claims Objection.[34]

88.    The Bankruptcy Code provides that a proof of claim is deemed allowed unless a party in interest objects to that claim.  11 U.S.C. § 502(a).  Once a claim has been objected to, the objecting party is responsible for going forward with evidence concerning the validity and amount of the claims.  4 Collier on Bankruptcy ¶ 502.02 (15th Ed. Rev. 2006).  The Code and the Rules anticipate the continued resolution of claims objections and avoidance actions *after* confirmation.  11 U.S.C. § 1123(b)(3). This serves "to make possible the formulation and consummation of a plan before completion of the investigation and prosecution of causes of action such as those for previous insider misconduct and mismanagement of the debtor" and to further the "purpose of preserving

---

[34]    Under the Plan, the Equity Committee Claims Objection, among other matters, is preserved because it falls within the definition of "Bank Actions," as set forth in Exhibit A to the Plan.

all assets of the estate while facilitating confirmation of a plan." *Enron Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113, 1121 (11th Cir. 2006) (quoting *In re Kroh Bros. Dev. Co.*, 100 B.R. 487, 494 (Bankr. W.D. Mo. 1989)).

89.    More than three years ago, the Equity Committee objected to the Banks' claims (in the form of a formal claims objection) on the same grounds as stated in the Bank Litigation, including those claims asserted in the Intervenor Complaint.  Because the grounds of the Equity Committee's objection are co-extensive with the claims in the Equity Committee's Intervenor Complaint (including the claims in the Creditors' Committee's Complaint adopted by the Equity Committee), this Court is without jurisdiction to resolve the objection due to the withdrawal of the reference.  *See Orion Pictures*, 4 F.3d at 1095.  However, even if this Court still had jurisdiction over the claims objection, the Equity Committee is entitled to prosecute its own objection, and cannot be forced to rely upon the Plan Administrator, the Creditors' Committee, the CVV Trustees, or any other person or entity to protect its interests.

90.    The Equity Committee's right to pursue its own claims objection is independent of its right to continue to litigate the Equity Committee Claims on the Debtors' behalf.  In fact, the Equity Committee's right to prosecute that objection cannot be terminated by the transfer of the Bank Litigation to the CVV, or even an eventual settlement of the Bank Litigation.

91.    Judge Beatty's recent decision in *Official Committee of Equity Security Holders v. Monsanto Co. (In re Solutia Inc.)*, 2006 Lexis 2295, No. 03-17949 (Sept. 14, 2006), is instructive on this point.  In *Solutia*, the equity committee commenced an adversary proceeding against Monsanto Company and Pharmacia Corporation to pursue

claims on the debtors' behalf.   The debtors, though, pursued those claims and eventually

reached a settlement with Monsanto and Pharmacia, and argued that the equity committee

therefore lacked standing under *STN* to continue to litigate.  Judge Beatty agreed and

denied the equity committee standing to assert affirmative claims on the debtor's behalf

under *STN*.  Id. at * 3-4.

92.    Judge Beatty recognized, however, that the equity committee's complaint

also was "in the nature of an objection to the claims of Monsanto and Pharmacia."  *Id*. at

* 4.   As a "party in interest" within the meaning of Bankruptcy Code § 1109(b), the

equity committee was entitled to object to claims under § 502(a).  As a result, Judge

Beatty concluded, the equity committee was entitled to pursue its claims objection, even

though it did not have standing to prosecute the affirmative claims, and even though the

debtors were actually settling with the parties who were subject to the committee's

objection.  Solutia's settlement did not divest the equity committee of its right to object to

those defendants' claims.

93.    *Solutia* is directly relevant here.  In this case, the Equity Committee filed

its own objection to the Banks' claims.  Therefore, whatever the ultimate outcome of the

Bank Litigation -- whether it is transferred to the CVV, whether it is placed under the

control of Trustees, or even settled -- that outcome cannot deprive the Equity Committee

of the right to litigate its own objection.

94.    As proposed, the Plan would improperly prevent the Equity Committee

from prosecuting its own objection because the Equity Committee will be dissolved on

the Effective Date.

37

## V.    The deathtrap provision violates the absolute priority rule.

95.     The Plan violates the absolute priority rule, is unfair and inequitable, and unfairly discriminates against holders of ACC Common Stock Interests, ACC Preferred Stock Interests, and other junior creditors of ACC through its improper "deathtrap" provisions.

96.     The Bankruptcy Code prohibits a debtor from confirming a plan of reorganization that discriminates unfairly against, or is unfair and inequitable with respect to, rejecting classes of claims and equity interests.  In order to cram down a plan over the objection of holders of equity interests, those holders must receive, at a minimum, property of equivalent value to their equity interests. 11 U.S.C. § 1129(b)(2)(C)(i).[35]

97.     Here, rather than comply with the requirements of the Bankruptcy Code to ensure that equity holders receive the value of their interests – namely, a place in line to receive distributions from the CVV once all senior claims have been paid in full – the Debtors have instead imposed a take-it-or-leave-it condition: equity holders were required to vote for the Fifth Plan as proposed in order to preserve their basic right to distributions in accordance with the absolute priority rule.  Under the Plan, if confirmed, equity holders who voted against the Plan will be stripped of that basic right.

98.     Sections 5.1(h)(ii) and (i)(ii) of the Plan provide that holders of ACC Preferred Stock Interests and ACC Common Stock Interests, respectively, will receive no

---

[35]     Section 1129(b)(ii)(C)(ii) also permits cramdown where no junior equity classes would receive distributions. 11 U.S.C. § 1129(b)(ii)(C)(ii).  Here, it is unclear whether that standard can be met: if the ACC Common Stock Interests accept the Fifth Plan but the ACC Preferred Stock Interests reject, the ACC Common Stock Interests would receive CVV Interests while the ACC Preferred Stock Interests would not, thus unfairly discriminating against holders of the ACC Preferred Stock Interests.

distributions unless their class votes in favor of the plan.[36]  However, the *quid pro quo*
that holders of such claims would receive in exchange for their votes is not some
additional consideration to which they would not otherwise be entitled.  Rather, the most
that holders of ACC Common and Preferred Stock Interests will receive under the plan is
CVV Interests that reflect the absolute priority rule-dictated position of ACC Common
and Preferred Stock within the capital structure: holders of those equity interests are
entitled to receive a share in whatever is left after payment of all senior creditors.

99.     Section 5.1(j) spells out the consequences if the class of ACC Common
and Preferred Stock Interests fails to vote in favor of the Plan: the CVV Distributions that
would have otherwise gone to such holders will instead be split among the CVV Interests
held by senior creditors.  Since holders of ACC Common and Preferred Stock Interests
would be entitled to payment only once senior creditors have been paid in full, with post-
Effective Date interest, this provision results in an improper windfall to senior creditors,
who will receive in excess of their legal entitlement even as equity holders receive
nothing.

100.     Although few published opinions directly address the use of deathtrap
provisions, those that do have frowned upon the "carrot and stick" approach to coerce
reluctant creditor groups to vote in favor of a plan, noting that "[t]here is no authority in
the Bankruptcy Code for discriminating against classes who vote against a plan of
reorganization.  Therefore the absolute priority rule shall be followed."  *In re Allegheny
Int'l, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990) (striking plan provision whereby equity

---

[36]     The Plan contains similar provisions with respect to holders of ACC Subordinated Notes (Section
5.1(f)(ii)), ACC Existing Securities Law Claims (Section 5.1(g)(ii)), and Subsidiary Debtor
Existing Securities Law Claims (Section 5.2(k)).

classes rejecting plan would receive no distributions); s*ee In re MCorp Financial, Inc.*, 137 B.R. 219, 236 (Bankr. S.D. Tex. 1992) (finding that a deathtrap provision providing provisional sharing in litigation overflow was unfair and inequitable and that such provision resulted in unfair discrimination).

101.    Although one court in this District has approved a deathtrap provision, that ruling can easily be distinguished from the facts of this case.  In *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714 (Bankr. S.D.N.Y. 1992) (Conrad, J.), the proposed plan of reorganization sought to entice various groups of equity holders to vote in favor of the plan by offering those classes that voted in favor of the plan warrants to purchase shares of a newly-formed entity.  By offering these warrants, senior creditors were effectively agreeing to dilute their recoveries in exchange for a consensual confirmation. One class of equity holders rejected the plan, and argued against confirmation on the grounds that they had been unfairly discriminated against.  The bankruptcy court found "no conceptual problem with senior interests offering to junior interests an inducement to consent to the Plan and waive whatever right they have."  *Id*. at 717.  Further, the court found that, although the equity class that had rejected the plan would receive no distributions under the plan, there was no violation of the absolute priority rule because that class of equity holders would receive exactly what their interests were worth: nothing.  *Id.*

102.    The Debtors here have turned the carrot and stick concept on its head.  In *Drexel* the equity holders, who did not have the benefit of potential litigation recoveries that could satisfy senior creditors in full, were offered a recovery to which they would not otherwise have been entitled in exchange for their votes in favor of the plan.  In direct

contrast, here, the Debtors have required an affirmative vote in order for holders of ACC

Common and Preferred Stock Interests to receive CVV Interests representing no more or

less than the bare legal entitlement of such holders under the absolute priority rule to

share in the proceeds of the CVV after satisfaction of all senior creditors.  Far from

diluting recoveries to senior classes, such CVV Interests simply reflect the absolute

priority rule.  In fact, if the holders of ACC Common Stock reject the plan, and the CVV

returns proceeds sufficient to satisfy all senior claims, senior creditors would receive

distributions in excess of their legal entitlement.

103.    Accordingly, the deathtrap provisions render the Plan patently

unconfirmable.

## VI.    The procedure for valuing the stock component of the Plan consideration is unreliable.

104.    The Plan's "true-up" mechanism is flawed because it fails to take account

of the inherent unreliability of the market for TWC Class A Common Stock, during the

period immediately following public issuance of the stock.  This flaw may result in a

significant undervaluation of the stock component of the Plan consideration.

105.    Section 10.12(a) establishes a "true-up" mechanism intended to provide a

market test of the TWC Class A Common Stock valuation in the Plan.  Pursuant to that

mechanism, a certain amount of TWC Class A Common Stock will be withheld from the

initial distribution of such stock to holders of claims against Subsidiary Debtors (16.7%

of distribution withheld) and ACC Debtors (25% of distribution withheld)  (the "True-Up

Holdback").  Pursuant to Section 10.12(b), at the conclusion of a 60-day Test Period, the

True-Up Holdback will be distributed among all parties entitled to receive TWC Class A

41

Common Stock in accordance with the value established by a volume weighted average trading price during the Test Period, provided that the number of shares distributed to holders of claims against the Subsidiary Debtors cannot be less than 83.3% nor more than 125% of their total hypothetical original distributions.

106.    The Test Period is too short.  The period immediately following issuance of the stock is prone to unnatural volatility and is unlikely to provide a reliable indication of the true fair market value of the stock.  This significant valuation flaw is likely to lead to an undervaluation of the stock, potentially shortchanging all stakeholders by hundreds of millions of dollars.

## VII.    The Equity Committee should continue to exist post-confirmation for certain limited purposes.

107.    Pursuant to Article 16.19 of the Plan, the Equity Committee will terminate on the Plan's Effective Date, except that it may continue for the extremely narrow purpose of participating in the final fee application process.  Article 16.19 provides:

> Dissolution of Committees.  The Statutory Committees and the Fee Committee shall terminate on the Effective Date, except that (a) the Statutory Committees and the Fee Committee may evaluate, object to (if necessary), and appear at the hearing to consider applications for final allowances of compensation and reimbursement of expenses, including applications for compensation or reimbursement under section 503 of the Bankruptcy Code, and support or prosecute any objections to such applications, if appropriate and (b) the Creditors' Committee shall continue solely for the purpose of (i) monitoring the Plan Administrator, the Distribution Companies and the reorganized Debtors, (ii) ensuring that distributions take place in accordance with the Plan, (iii) monitoring the CVV Trustees on behalf of the beneficiaries of CVV Interest, (iv) objecting to Claims as provided in Section 11.1; and (v) prosecuting the appeal to the order approving the Government Settlement Agreement. The post-Effective Date professional fees of the Statutory Committees and

the Fee Committee for the services set forth in the preceding sentence shall be paid by the Estates.

This provision unfairly discriminates against, and severely prejudices the rights of, ACC's equity holders in several respects.

108.    First, as discussed above, the Equity Committee unquestionably has standing to prosecute and settle the Equity Committee Claims on behalf of ACC's estate and, as the Equity Committee is the owner of those claims, the Plan may not lawfully transfer such rights to the Contingent Value Vehicle or to any other party in interest. To preserve these valuable claims for the benefit of ACC's estate – particularly ACC's defrauded investors, whose only potential for a significant distribution is likely to be from a recovery on the Equity Committee Claims – it is imperative that the Equity Committee continues to exist for the purpose of aggressively pursuing the Equity Committee Claims.

109.    Second, the Plan provides that the Creditors' Committee and others will lobby the Government to distribute proceeds of the Victim Restitution Fund pursuant to the absolute priority rule, effectively denying defrauded equity holders an opportunity to participate in that fund. By dissolving the Equity Committee, the Plan silences any organized opposition to the Creditors' Committee's effort to deprive defrauded shareholders of the potential benefits of the Government Settlement.

110.    Third, dissolution of the Equity Committee upon the effective date would abruptly terminate its involvement in ongoing appeals that affect equity security holders. In particular, the Creditors' Committee is currently challenging the Government Settlement in an appeal to the Second Circuit. The Equity Committee is a party to that appeal and is defending the integrity of the Government Settlement, while also challenging the Banks' rights to liens in certain property that was forfeited under that

43

settlement.  Further, in the event that this Court confirms the Plan over the objection of the Equity Committee, the Plan would deprive the Equity Committee of its right to appellate review of any such order.

111.    Fourth, while the Creditors' Committee and the Fee Committee are entitled to have their professional fees that are incurred in connection with the final fee application process paid by the Contingent Value Vehicle, the Equity Committee is not. Neither the Plan nor the Disclosure Statement explains why the Plan unfairly discriminates against the Equity Committee in this manner.  To the extent that the Equity Committee participates in the final fee allowance process, the Equity Committee, as a statutory committee, is entitled to have the fees and expenses of its professionals paid by the estate.

112.    In sum, the "rights and fiduciary duties of the Equity Committee are no different from those of any committee appointed pursuant to section 1102," including the Creditors' Committee.  *In re Evans*, 58 B.R. at 575 (citing *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1069 (2d Cir. 1983)).  The "most basic concepts of due process require the courts to afford protection to the recognized and substantial rights represented by the Equity Committee in an impartial way."  *Id.* at 575.  Because the Plan violates the legal rights of equity holders, it cannot be confirmed.

## **Conclusion**

113.    For all of the reasons stated above, the Equity Committee respectfully

submits that the Plan in its current form cannot and should not be confirmed by this

Court.

Dated: New York, New York
           November 24, 2006

MORGENSTERN JACOBS & BLUE, LLC


By:  /s/ Peter D. Morgenstern
          Peter D. Morgenstern (PM-5021)
          Gregory A. Blue (GB-9569)
          Eric B. Fisher (EF-1209)
          Andrew L. Buck (AB-4298)

*Attorneys for the Official Committee
of Equity Security Holders*