*Hearing Date: December 7, 2006 at 9:45 a.m.*
*Objection Deadline: November 24, 2006 at 4:00 p.m.*

CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019
Telephone: (212) 878-8000
Facsimile: (212) 878-8375
Andrew P. Brozman (AB-2456)
Jennifer C. DeMarco (JD-9284)
Wendy Rosenthal (WR-4461)

*Attorneys for Calyon New York Branch,*
*Calyon Securities (USA) Inc., LCM I Limited*
*Partnership and Indosuez Capital Funding IIA, Ltd.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 Cases |
| | ) |
| ADELPHIA COMMUNICATIONS CORP., et al., a Delaware corporation, | ) Case No. 02-41729 (REG) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

OBJECTION OF THE CALYON PARTIES TO CONFIRMATION OF
THE FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

THE FACTUAL CONTEXT ................................................................................. 4

ARGUMENT ...................................................................................................... 9

I    THE CLASSIFICATION OF OBLIGOR DEBTOR CREDITORS VIOLATES
SECTIONS 1122(a), 1123 AND 1129(a)(1) OF THE BANKRUPTCY CODE ............ 9

    A.    The Classification Scheme of the Plan Undermines the Cardinal
Principles of Classification Embraced by the Bankruptcy Code ................ 9

    B.    Classification of the Bank Classes Disregards the Nature of the Bank
Claims as Secured Against Certain of the Obligor Debtors and
Unsecured Against Others ...................................................................... 11

    C.    To the Extent Unsecured by a Legal Entity, the Bank Claims Cannot
Properly Be Classified Separately From the Unsecured Subsidiary
Debtor Trade and Other Unsecured Claims ............................................ 13

    D.    Calyon's Legal and Contractual Rights Are Ignored by the Plan's
Classification of its Separate Claims Under Each Co-Borrowing Facility
in a Single Pan-Debtor Class of "Non-Administrative Agents" ................. 15

    E.    Even Were the Bank Classification Scheme Otherwise Appropriate,
the Plan Does Not Apply it Uniformly or Without Untoward Purpose ....... 16

    F.    The Convoluted Classification Scheme Cannot Be Justified by Any
Legitimate Reorganization Purpose. It Contravenes Bank Rights and
Obligor Debtor Obligations to Achieve a Gerrymandered Plan Result ...... 18

II    THE PLAN TREATS DIFFERENTLY CREDITORS WITH IDENTICAL OR, AT
LEAST, SUBSTANTIALLY SIMILAR RIGHTS AGAINST THE SAME OBLIGOR
DEBTOR IN VIOLATION OF SECTION 1123(a)(4) ............................................. 21

III    THE CLAIMS OF THE BANKS ARE *NOT* BEING "PAID IN FULL" UNDER THE
PLAN ............................................................................................................. 23

IV    THE PLAN CANNOT BE CONFIRMED AS TO THE OBLIGOR DEBTORS FOR
FAILURE TO SATISFY SECTION 1129(a)(10) OF THE BANKRUPTCY CODE ..... 33

i

A.    The Classes of Subsidiary Debtor Trade Claims and Subsidiary Debtor Other Unsecured Claims Are Artificially Impaired...................................... 33

B.    The Obligor Debtor Equity Interests Are Not Impaired ............................ 36

C.    The Bank Classes Cannot Be Re-Classified as "Unimpaired" Without a Change in Treatment Sufficient to Do So................................................ 37

V    OBJECTION TO STATEMENT TO MODIFY UNILATERALLY THE FRONTIERVISION LITIGATION FUND ................................................. 39

VI    LIMITED OBJECTION TO RESOLUTION ORDER ............................................. 39

VII    CONCLUSION ................................................................................... 41

## TABLE OF AUTHORITIES

### CASES

Boston Post Road L.P. v. FDIC (In re Boston Post Road L.P.), 21 F.3d 477
    2d Cir. 1994)..............................................................................................13, 14, 19

Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund,
    784 F.2d 42 (1st Cir. 1984)......................................................................................11

In re Adelphia Communications Corp., 336 B.R. 610 (Bankr. S.D.N.Y. 2006), aff'd,
    344 B.R. 122 (S.D.N.Y. 2006) ...................................................................................4

In re Armstrong World Indus., Inc., 432 F.3d 507 (3d Cir. 2005)......................................35

In re Barrington Oaks Gen. P'ship, 15 B.R. 952 (Bankr. D. Utah 1981) ...........................38

In re Bernhard Steiner Pianos USA, Inc., 292 B.R. 109 (Bankr. N.D. Tex. 2002).............14

In re Coram Healthcare, Corp., 315 B.R. 321 (Bankr. D. Del. 2004) ................................10

In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001).........................20

In re Huyler's, 107 F.Supp. 318 (S.D.N.Y. 1952), aff'd sub nom.,
    New York v. Feinberg, 204 F.2d 502 (2d Cir. 1953)..............................................9, 10

In re Johns-Manville Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1986), aff'd,
    78 B.R. 407 (S.D.N.Y. 1987), aff'd, 843 F.2d 636 (1988)....................................23, 26

In re Leslie Fay Companies, Inc., 207 B.R. 764 (Bankr. S.D.N.Y. 1997)...........................26

In re Lettick Typographic, Inc., 103 B.R. 32 (Bankr. D. Conn. 1989)................................33

In re Mastercraft Record Plating, Inc., 32 B.R. 106 (Bankr. S.D.N.Y. 1983),
    rev'd on other grounds, 39 B.R. 654 (S.D.N.Y. 1984).........................................14, 15

In re Northeast Dairy Coop. Fed'n, Inc., 73 B.R. 239 (Bankr. N.D.N.Y. 1987) ...................9

In re One Times Square Assocs. L.P., 159 B.R. 695 (Bankr. S.D.N.Y. 1993),
    aff'd,165 B.R. 773 (S.D.N.Y. 1994), aff'd, 41 F.3d 1502 (2d Cir.),
    cert. denied, 513 U.S.1153 (1995) .......................................................13, 14, 15, 19

In re Paolini, 312 B.R. 295 (Bankr. E.D. Va. 2004)..........................................................14

In re Pine Lake Village Apartment Co., 19 B.R. 819 (Bankr. S.D.N.Y. 1982)....................13

In re U.S. Truck Co., Inc., 800 F.2d 581 (6th Cir. 1986) ..................................................14

In re Valley Park Group, Inc., 96 B.R. 16 (Bankr. N.D.N.Y. 1989)...............................37, 38

In re Worldcom, Inc., 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003).........13, 23, 32

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC.),
    2005 WL 756900 at *6-7 (S.D.N.Y. April 4, 2005).....................................35

Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.),
    984 F.2d 1305 (1ˢᵗ Cir. 1992).................................................34, 35

Sure-Snap Corp. v. State Street Bank & Trust Co., 948 F.2d 869 (2d Cir. 1991) ...........40

Windsor on the River Assoc., Ltd. v. Balcor Real Estate Fin., Inc.
    (In re Windsor on the River Assoc., Ltd.), 7 F.3d 127 (8ᵗʰ Cir. 1993)..............33, 34, 36

## STATUTES

11 U.S.C. §506(b).....................................................................24, 27, 30

11 U.S.C. §541 ...........................................................................19, 20

11 U.S.C. §724(b)..............................................................................28

11 U.S.C. §726 .................................................................................35

11 U.S.C. §1122 ................................................................................10

11 U.S.C. §1122(a).....................................................................9, 13, 18,19

11 U.S.C. §1122(b)..............................................................................11

11 U.S.C. §1123(a)(2)........................................................................37, 38

11 U.S.C. §1123(a)(3)............................................................................38

11 U.S.C. §1123(a)(4) ...........................................................................21

11 U.S.C. §1124 ..........................................................................3, 33, 36

11 U.S.C. §1125 ................................................................................38

11 U.S.C. §1127 ................................................................................38

11 U.S.C. §1129 .........................................................................13, 20, 21, 24, 30

11 U.S.C. §1129(a)......................................................................18, 19, 33, 41

11 U.S.C. §1129(a)(1)..........................................................................9, 38

11 U.S.C. §1129(a)(3)............................................................................38

iv

11 U.S.C. §1129(a)(7) ........................................................ 25, 26, 28, 29, 30, 31

11 U.S.C. §1129(a)(10) ................................................................ 15, 33, 36, 37

11 U.S.C. §1129(b)(2)(A) .......................................................................... 25, 31

11 U.S.C. §1141(d)(3) ........................................................................................ 30

## TREATISES

7 COLLIER ON BANKRUPTCY (15th ed. rev. 2006) ...................................... 9, 10, 11

## OBJECTION OF THE CALYON PARTIES TO
## CONFIRMATION OF THE FIFTH AMENDED JOINT
## CHAPTER 11 PLAN OF REORGANIZATION

### PRELIMINARY STATEMENT[1]

The Plan is fraught with myriad obstacles to confirmation that directly and adversely affect the rights of the Calyon Parties. It is too facile to dismiss the objectionable provisions of the Plan as academic on the assumption that the Calyon Parties are slated to be "Paid in Full."[2] This is not now, nor has it ever been, a creditable or a demonstrable assertion. And, as addressed later, the record to be developed at the Confirmation Hearing will be devoid of admissible evidence to support a finding that the Calyon Parties in fact are afforded the full satisfaction of their claims.

Seeing past the "Payment in Full" illusion permits a dispassionate observer to recognize the Plan to be a unique construct that follows no normative principles, the design of which is to secure a result for the Settlement Parties and the Plan Proponents at the expense of others, including the Banks. Here are some of the more egregious of the Plan's legal deficiencies.

---

[1] For purposes of this objection, the "Calyon Parties" are: Calyon New York Branch ("Calyon"); Calyon Securities (USA), Inc. ("CSI"); LCM I Limited Partnership and Indosuez Capital Funding IIA, Ltd. To avoid duplication of arguments where possible, the Calyon Parties join in and adopt the legal arguments of the Objection of Bank of America, N.A. dated November 15, 2006 (Docket No. 12453) ("BoA Objection"), the Objection of the Ad Hoc Committee of "Non-Agent" Secured Lenders dated November 24, 2006 ("Kirkland Objection") *but, as to each, only to the extent specifically indicated herein* and CSI joins in and adopts the legal arguments of the Objection of Various Investment Banks dated November 22, 2006 (Docket No. 12507).

[2] Capitalized terms not otherwise defined herein shall have the meanings attributed to them in the Plan and the Second Disclosure Statement Supplement.

<u>The Classification Scheme is Illegal</u>:

1.   The scheme employed to allocate the lenders among five classes per Pre-Petition Credit Facility is not based upon the legal rights of the lenders or the legal obligations of their corresponding loan party Debtors.

2.   The various Bank Classes are populated in disregard of the nature of the debt owed by each legal entity to the lenders.  Although the Bank debt ultimately is over-secured, as to certain Obligor Debtors, the Bank obligations are unsecured claims.

3.   The Plan separately classifies the Obligor Debtors' respective Trade and Other Unsecured Claims, on the one hand, and, as to those Obligor Debtors obliged to lenders on an unsecured basis, the unsecured Bank Claims on the other hand.

4.   According to the Plan Proponents, the Plan predicates its classification of the Bank Claims upon purported differences among the Banks in the respective amounts of their cost indemnity.  In turn, the putative differences in the amounts of this portion of the various Bank Claims are attributed by the Plan Proponents to the lender caste into which the Bank Lender Avoidance Complaint arbitrarily deposits them.  Even if the Plan were fully faithful to these classification predicates, they afford no legitimate business justification for the splintering of the lenders into five separate classes.

5.   Consonant with the irrational differentiation among the defendants in the complaint, the Plan adopts the classification fiction of deeming Calyon to be a member of the "Non-Administrative Agent" class assigned to *each* Pre-Petition Credit Facility when, from the face of the loan documentation, it is obvious that Calyon is a so-called "Non-Administrative Agent" only in *certain* of those facilities.

2

NYA 809268.5

6. For the sole purpose of ensuring an accepting class, the Administrative Agent classes were broken into three separate classes for each facility. Apart from whatever else renders this classification illegitimate, it clearly is inconsistent with the classification schemes for the Non-Administrative Agent classes and the Syndicate Lender classes.

7. The classification of the creditors of the Obligor Debtors is designed to gerrymander an accepting class.

The Treatment is Disparate and Impermissible:

1. The impermissible classification scheme permits the Debtors to provide different and discriminatory treatment among creditors of identical priority and with identical legal rights against their respective Obligor Debtors.

2. Because the Plan eliminates or modifies both the rights of the lenders under the respective Pre-Petition Credit Agreements and the obligations of those Debtors party to those agreements, the lenders are not being "Paid in Full."

The Plan's Curious Impairment Designations are Tactical:

1. The Plan impermissibly empowers the classes of Subsidiary Debtor Trade Claims and the Subsidiary Debtor Other Unsecured Claims to vote when neither class is impaired within the contemplation of Section 1124 of the Bankruptcy Code.

2. The Plan impermissibly permits the Subsidiary Debtor Equity Interests Class to vote when each class member's stock interest is retained and when the full residual equity value of its subsidiary is passed through that equity interest to its creditors and interest holders.

3. There exists no legal basis to deem the Bank Classes "unimpaired" ex post facto and without any change in treatment to make them so.

3

NYA 809268.5

## THE FACTUAL CONTEXT

These administratively related chapter 11 cases have trudged toward confirmation, mostly unsuccessfully, for over four years. Although parochial infighting among subordinated bondholder groups had impeded the Debtors' efforts to create and consummate the sale of all of their material operating assets to Time Warner Cable and Comcast (the "Sale"), in July 2006 those obstacles were surmounted.[3] The Sale has generated approximately $17 billion in proceeds, all cash except for about $5.5 billion in Time Warner Cable stock. At this juncture, the separate estates of the Debtors are fully liquidated and awaiting distribution to their respective creditors.

Prior to the commencement date of these cases and over the course of several years, six separate syndicates of lenders (collectively for ease of reference only, the "Banks") loaned their respective borrowers an aggregate of approximately $6.8 billion dollars. Those loans were both guaranteed and secured by pledges of the stock in the respective guarantors (with the exception of the FrontierVision facility which was secured directly by borrower assets). These guarantor and borrower Debtors (collectively, plus the RME Debtors, infra, the "Obligor Debtors") owned the operating assets of the Debtors that generated the overwhelming amount of the Sale proceeds.

The Fifth Amended Joint Chapter 11 Plan of Reorganization (the "Plan") embraces plans of liquidation for each of the two hundred-plus Debtors that were not subject to the

---

[3]    See In re Adelphia Communications Corp., 336 B.R. 610 (Bankr. S.D.N.Y. 2006), aff'd, 344 B.R. 122 (S.D.N.Y. 2006). Certain of these warring bondholders have re-created themselves in the guise of Settlement Parties responsible for the linchpin "Global Settlement" underlying the Plan – evidence of what George Orwell in 1984 termed the "mutability of the past."

4

NYA 809268.5

JV Plan effective July 31, 2006.  Although the Obligor Debtors constitute the largest

number of Debtors which are the subject of the Plan, they do not embrace all of them.

Specifically, they exclude the non-operating company Debtors (some of which are deemed

"Subsidiary Debtors" by the Plan) and primarily all of the Debtors that issued public debt

and equity.  As a matter of the corporate ownership waterfall, the creditors of these non-

operating company Debtors are structurally subordinated to the creditors of the Obligor

Debtors.

     As a result of the Government Settlement Agreements (the "Government

Settlement"), certain entities held by affiliates of the Rigas Family (the "RMEs"), together

with all of their respective assets, were "repatriated" by the Debtors in the form of new

Debtors known as the "RME Debtors".  As a result of this repatriation, all of the loan

parties to the six pre-petition credit facilities became Obligor Debtors. The Government

Settlement order restored the liens of the respective Bank syndicates on these re-

constituted RMEs.

     Three of the six pre-petition credit facilities, Century, Olympus and UCA, were so-

called "Co-Borrowing Facilities" because both certain indirect subsidiaries of Adelphia

Communications Corporation ("ACC") and certain of the RMEs were respective parties to

one of them.  Under the terms of these facilities, each borrower could borrow up to the full

amount of credit available under such facility and each Obligor Debtor was jointly and

severally liable for the satisfaction of all of the obligations ("Obligations") arising under the

respective loan documentation.

     The respective Obligations of each Obligor Debtor are defined and determined by

the terms and provisions of the respective loan documentation.  The respective legal rights

NYA 809268.5

and entitlements of each Bank, in turn, are defined and determined by those same contractual terms and provisions.

Those Obligor Debtors that are borrowers under each Co-Borrowing Facility, in addition to their debt to the respective Bank syndicates, are indebted to a variety of trade and other unsecured creditors the claims of which aggregate slightly more than $500 million.[4] The Plan includes these creditors in the Subsidiary Debtor Trade (SD-4) and Subsidiary Debtor Other Unsecured (SD-5) classes. Certain large holders of the Subsidiary Debtor Trade Claims have entered into a yet-to-be-approved "Plan Support Agreement" with the Debtors. In connection with that agreement, the Court entered an order dated April 27, 2006 (the "Interest Order") determining that post-petition date "pendency" interest was appropriately fixed at 8% to be paid to Allowed Subsidiary Debtor Trade Claims and the Allowed Subsidiary Debtor Other Unsecured Claims. The Interest Order resolved a dispute between the Subsidiary Trade and the Debtors over the appropriate rate of interest required to be paid under the Bankruptcy Code to them as creditors of solvent estates.[5]

---

[4]     See Second Disclosure Statement Supplement at p. 30 (Docket No. 12198).

[5]     See Debtors' Memorandum of Law in Support of Section 8.14 of Debtors' Modified Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code With Respect to the Payment of Postpetition, Pre-Effective Date Interest on Unsecured Claims dated April 19, 2006 (at page 6) (Docket No. 10500):

> The Debtors' approach does not ignore, . . . , the **structural seniority** of creditors of **solvent subsidiary Debtors** that have not been substantively consolidated with structurally junior debtors . . . . . (Emphasis supplied.)

See also April 12, 2006 Disclosure Statement Supplement (Docket No. 10410). Each of these statements by the Debtors substantially preceded the June 21, 2006 Monitor Plan term sheet filed on June 22, 2006 effecting the so-called "Global Settlement."

NYA 809268.5

In June of 2006, in a process from which the Banks had been excluded (ostensibly on the ground that their interests would be unaffected), a group of structurally subordinated unsecured creditors negotiated among themselves and a monitor appointed by the Court a term sheet for a plan of reorganization (Docket No. 11384, the "Monitor Plan"). The Monitor Plan fundamentally employed proceeds of the Banks' collateral to fund deficiencies in the recoveries of creditors of structurally subordinated estates. At the same time, it left the Banks without full satisfaction of the Obligations owed by the respective Obligor Debtors. As noted in the Response of Certain Lenders to Inquires of the Court Regarding Case Planning and the Monitor's Report dated July 6, 2006 (Docket No. 11547) ("Bank Response"), the process by which the Monitor Plan was created fundamentally was flawed as, among other things, any information relevant to the merits of the Banks' substantial claims was supplied, if at all, by parties with interests diametrically opposed to the rights of the Banks. In addition to purloining the Banks' collateral and negating the Banks' significant rights, the Monitor Plan otherwise purported to fix the Banks' treatment under a plan of reorganization without the satisfaction of the Obligations of the respective Obligor Debtors.

Notwithstanding its provenance, the process leading to the Monitor Plan was permitted ultimately to expand to embrace certain other creditor constituencies (including the Subsidiary Debtor Trade). After consummating the Sale under Section 363 of the Bankruptcy Code and through the confirmation of the JV Plan, and upon further negotiations with certain ACC bondholders (deeply subordinated by the corporate structure) and three Banks, Wachovia, Bank of Montreal ("BMO") and JPMorgan Chase ("Chase"), the Plan and the Second Supplemental Disclosure Statement were filed.

7

Wachovia and BMO are Bank Proponents, pursuing confirmation of those portions of the Plan treating with the Banks.

In parallel to the administration of the bankruptcy cases, in August 2005 the Court authorized the Official Committee of Unsecured Creditors (the "Committee") to commence an action based upon the Bank Lender Avoidance Complaint against several hundred named financial institutions and roughly 200 more "John Doe" defendants (the "Committee Action").[6] Certain of the defendants in that action moved to dismiss the Bank Lender Avoidance Complaint in October 2003. Because of the passage of time and significant developments in facts and law material to the dismissal motions, those motions were supplemented in October and November 2006. They remain sub judice.

By order dated February 9, 2006, the District Court before which the Securities Actions are pending withdrew the reference of the Committee Action and, with the exception of the pending motions to dismiss, terminated the subject matter jurisdiction of the Bankruptcy Court over the Committee Action. (Docket No. 22 on District Court Docket 05-cv-09050-LMM). Nonetheless, the Committee subsequently filed in the bankruptcy cases objections to the claims of the Banks based upon the allegations and claims asserted in the Committee Action. Moreover, the Committee later filed a motion to "holdback" from the Banks any distributions to which they otherwise would be entitled, again based upon the allegations and the claims asserted in the Committee Action (the "Holdback Motion") (Docket No. 10601). The Holdback Motion was renewed by Notice of

---

[6]     Certain members of the Committee entrusted to prosecute the Committee Action are individual plaintiffs in consolidated securities law actions (against roughly the same defendants and based on almost identical allegations) pending before the District Court (the "Securities Actions").

NYA 809268.5

Filing dated November 15, 2006 (Docket No. 12455) and radically changed its targets so

that, now, only a Non-Accepting Bank Class is threatened with the pursuit of the renewed

Holdback Motion by the Committee.[7]  In contrast, the Plan provides that Accepting Bank

Classes will have the motion deemed withdrawn with prejudice.  The renewed Holdback

Motion threat plainly is meant to coerce Bank Class members into accepting a Plan that

derogates their fundamental legal and litigation rights as creditors and defendants,

respectively.

**ARGUMENT**

I

**THE CLASSIFICATION OF OBLIGOR DEBTOR CREDITORS
VIOLATES SECTIONS 1122(a), 1123 and 1129(a)(1) OF THE BANKRUPTCY CODE**

A.    The Classification Scheme of the Plan Undermines the Cardinal Principles of
Classification Embraced by the Bankruptcy Code.

The fundamental principle on which the classification provisions of the Bankruptcy

Code are based is that the *legal rights* of a creditor and the *reciprocal legal obligations* of

the debtor are determinative of classification.  See In re Northeast Dairy Coop. Fed'n, Inc.,

73 B.R. 239, 249 (Bankr. N.D.N.Y. 1987) (classification "is simply a method of recognizing

the rights of creditors which call for difference in treatment").  See also 7 COLLIER ON

BANKRUPTCY ¶ 1122.03[3] (15th ed. rev. 2006) ("'substantially similar' must be construed to

mean similar in legal character ... only the nature of the claim or interest is relevant to

classification, not the identity of the holder of the claim or interest") (citing In re Huyler's,

---

[7]    The Court is referred to the Objection of the Calyon Parties to the renewed Holdback Motion filed
contemporaneously with this objection and made a part hereof by incorporation.

9

NYA 809268.5

107 F.Supp. 318 (S.D.N.Y. 1952), aff'd sub nom., New York v. Feinberg, 204 F.2d 502 (2d Cir. 1953)).[8]

This Plan stumbles over this overarching principle of classification right out of the starting blocks. The co-borrowing claims of the Banks were segregated into five distinct classes of claims based solely upon each Bank's putative status as a defendant in the Committee Action.[9] Apparently, the Committee suggests that classification of the Bank Classes was predicated upon a "guesstimate" as to the respective amounts each Bank and each designated Bank group was imagined to expend in its defense of the Committee Action. In other words, the Plan's classification scheme is driven by *how much* the respective group of Obligor Debtors would be required to pay under their contractual indemnity obligations if circumstances required. Upon these payment assumptions, the Obligor Debtors established joint Litigation Indemnification Funds ("LIFs") for each defendant-designated group of Banks. (See Stipulation dated November 21, 2006 annexed hereto as **Exhibit "A"** ("Stipulation")).[10]

---

[8]     These pre-Code cases remain authoritative because the legislative history of Section 1122 "codified the then current body of case law." 7 COLLIER ON BANKRUPTCY ¶ 1122.03[3] (15th ed. rev. 2006).

[9]     This is not quite accurate. Although defendant status was the classification paradigm, the Committee applied this paradigm inconsistently to serve other masters. Thus, the Bank Lender Avoidance Complaint defines both the Administrative Agents and the so-called Non-Administrative Agents as "Agents," a grouping the Plan divides by segregating the Non-Administrative Agents into their own class. Although the Committee modifies the defendant paradigm with its subjective view of what class of defendant will spend more in the defense of its claims, the Committee provides no logical basis as to the class treatment discrepancies arising as a result. Indeed, both the Administrative Agents and the Non-Administrative Agents are the objects of the *identical causes of action*. See, Compl., Counts 1-16, and 32-52.

[10]    The Complaint alleges no basis for having attributed different levels of knowledge, conduct and liability between Non-Administrative Agents and Syndicate Lenders as it alleges nothing except as against the Administrative Agents. So, really, it is only the *presumption* of these differences that

(continued...)

10

NYA 809268.5

Although it is readily apparent that no creditable basis is explicated anywhere in the evidentiary record by the Plan Proponents for the amounts devoted to any particular LIF, what is even more clear is that the Plan's Bank classification scheme is based upon perceived differences in the *amounts* of distributions due in respect of each grouping of Bank defendants, each of which hold claims otherwise indistinguishable in any legal respect.[11]    Accordingly, the Plan's classification scheme is impermissible.  "When the difference between one claim and the remainder is simply the allowed amount, as distinguished from its legal status, separate classification is impermissible, except as provided in Section 1122(b) [not here applicable]."  7 COLLIER ON BANKRUPTCY ¶ 1122.03, n.1 (15 ed. rev. 2006) (citing Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund, 748 F.2d 42 (1st Cir. 1984)) (other citations omitted).

**B.    Classification of the Bank Classes Disregards the Nature of the Bank Claims as Secured Against Certain of the Obligor Debtors and Unsecured Against Others.**

The Plan employs many fictions to achieve its distributive scheme. One of them is that each legal entity Obligor Debtor bears the same debtor/creditor relation to the Bank Claims as does every other legal entity Obligor Debtor.  With this premise, the Plan purports to have each Obligor Debtor treat the respective Bank Claims identically,

---

(continued...)

supports the differences in alleged liability upon which, in turn, the *presumptions* supporting LIF and classification differences are based in the Plan.

[11]    Assuming a basis therefor, differences in indemnity amounts easily could have been accommodated without affecting the classification of each syndicate of lenders to their respective Obligor Debtors in a single class for each. The allowance of an amount of each lender's individual claim for principal and interest requires no segregation of lenders with different amounts into separate classes.  Just as no lender will be distributed in excess of its aliquot share of principal and interest, why is separate classification necessary to prevent a lender from receiving more than its share of an amount in respect of the indemnity portion of its claim?

11

NYA 809268.5

irrespective of the legality of the result.  This fictive premise is belied by the Debtors' Schedules.

In general terms, each co-borrowing group comprised certain Obligor Debtor borrowers, guarantors and pledgors and certain RME borrowers, guarantors and pledgors.  Upon the repatriation of the RMEs pursuant to the Government Settlement, each of the Co-Borrowing loan parties became Obligor Debtors.  As to certain of those Obligor Debtors, the obligations each undertook to the respective Bank syndicate were unsecured.  As to those loan party Obligor Debtors the obligations of which were secured by a pledge of stock by the pledgor Debtors, their obligations to the respective Bank syndicate were secured.  (**Exhibit "B"** annexed hereto displays these relationships in graphic form based upon information derived from the Debtors' Schedules.)

This distinction between unsecured and secured obligations becomes a classification issue only because the Plan purports to treat with each legal entity Obligor Debtor as distinct for purposes of voting on the Plan  (Plan at Section 7.3.)  But, if that truly is the intention, the Plan cuts across these differently situated Obligor Debtors as if they each bore the *same* relationship to the Bank Claims but a *different* one to their other creditors.  In so doing, it disregards for classification and voting purposes the actual legal relationships each of the Bank Claims, the Subsidiary Debtor Trade Claims and the Subsidiary Debtor Other Unsecured Claims bears to that particular legal entity.  That disregard has consequences affecting the rights of the Banks.

12

C.    To the Extent Unsecured by a Legal Entity, the Bank Claims Cannot Properly Be Classified Separately From the Unsecured Subsidiary Debtor Trade and Other <u>Unsecured Claims.</u>

Up front, we acknowledge that Section 1122(a) does not *mandate* that claims with substantially similar legal rights and obligations be classified together.  <u>Boston Post Road L.P. v. FDIC (In re Boston Post Road L.P.)</u>, 21 F.3d 477, 481 (2d Cir. 1994).  But we also must abide the overall command of proper classification that claims that do possess substantially similar legal rights and obligations may be classified separately *only if* a legitimate and reasonable means to achieve the overarching goals of the Bankruptcy Code is established in a manner that does not unfairly discriminate against one of the separate classes.  <u>In re One Times Square Assocs. L.P.</u>, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993), <u>aff'd</u>, 165 B.R. 773 (S.D.N.Y. 1994), <u>aff'd</u>, 41 F.3d 1502 (2d Cir.), <u>cert</u>. <u>denied</u>, 513 U.S. 1153 (1995) ("Unsecured creditors will ordinarily comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor) (<u>citing</u> <u>In re Pine Lake Village Apartment Co.</u>, 19 B.R. 819, 830 (Bankr. S.D.N.Y. 1982)) (other citation omitted).  It is the burden of the plan proponent to prove a legitimate reason for the separate classification of substantially similar claims.  <u>Boston Post Road</u>, 21 F.3d at 481.[12]

The controlling law instructs that the separate classification of substantially similar claims ought to be subject to close scrutiny.  <u>Boston Post Road</u>, 21 F.3d at 482.  It is not a sufficient basis to permit separate classification upon the assertion that the proposed classes embrace claims that derived from different circumstances of creation.  <u>Boston</u>

---

[12]    Of course, the Plan Proponents carry the burden of proof as to all the requisites of confirmation under Section 1129.  <u>In re Worldcom, Inc.</u>, 2003 WL 23861928 at *46 (Bankr. S.D.N.Y. Oct. 31, 2003) (debtor, as plan proponent, carried burden of proof under Section 1129).

13

NYA 809268.5

Post Road, 21 F.3d at 483; One Times Square, 159 B.R. at 703, 705 (lease rejection claims not separately classified from other unsecured claims).  Rather, the differentiation among unsecured claims which rest upon the same legal foundation, since not legally "unique," must serve some "legitimate purpose in the financial restructuring of the Debtor." Id.

Here, given that the Plan views voting as a Debtor-by-Debtor process, no apparent "legitimate purpose" is served through the separate classification of the unsecured Bank Claims from the unsecured Subsidiary Debtor Trade Claims from the unsecured Subsidiary Debtor Other Unsecured Claims with respect to those affected Obligor Debtors.  For example, this is not a case in which separately classified trade claimants will continue to do business with the reorganized debtor.  See In re Bernhard Steiner Pianos USA, Inc., 292 B.R. 109, 114 (Bankr. N.D. Tex. 2002) (good business reason justifying separate classification exists where unsecured creditors are essential to the continued business operations of the debtor).  Similarly, no separate business interest arises in support of justifiable separation as it might in the case of union contract claims.  See In re U.S. Truck Co., Inc., 800 F.2d 581, 587 (6th Cir. 1986) (permitting separate classification of claims arising from rejection of collective bargaining agreement between local union and debtor). Moreover, it is not a sufficient basis for separate classification that some of the unsecured claims are the subject of an objection while others are not.  See In re Paolini, 312 B.R. 295, 314 (Bankr. E.D. Va. 2004) ("existence of a dispute over claim validity does not [alone] support separate classification") (citing In re Mastercraft Record Plating, Inc., 32 B.R. 106, 108 (Bankr. S.D.N.Y. 1983), rev'd on other grounds, 39 B.R. 654 (S.D.N.Y. 1984)) (other citations omitted).  Finally, neither the nature of the separately classified creditors'

14

businesses, the nature of the respective Debtor's assets, nor the mechanics of any

particular creditor group's claims militates in favor of distinctions in classification. <u>See One</u>

<u>Times Square</u>, 159 B.R. at 704. Absent proof by the Plan Proponents of a "legitimate

purpose in the financial restructuring of the Debtor[s]," the Court should find that the

purpose of the separate classifications is solely to create an accepting impaired class to

satisfy Section 1129(a)(10). <u>One Times Square</u>, 159 B.R. at 705.

D.    **Calyon's Legal and Contractual Rights Are Ignored by the Plan's Classification of its Separate Claims Under Each Co-Borrowing Facility in a Single Pan-Debtor Class of "Non-Administrative Agents."**

The Bank Lender Avoidance Complaint asserts that Calyon was a "participating"

lender in the UCA/HHC ("UCA") Co-Borrowing Facility. (Compl. ¶ 430.) In each of the

Century Co-Borrowing Facility and the Olympus Co-Borrowing Facility, the same

complaint alleges that Calyon was a "Managing Agent." (Compl. ¶¶ 434, 440.) Putting to

the side the complaint's total disregard of the respective Pre-Petition Credit Agreements in

distinguishing between "Managing Agents" and "participating" lenders, the Plan pulls

Calyon out of the complaint's UCA "participating" lender hat and has it re-appear as a

UCA "Non-Administrative Agent" for purposes of classification and voting. This

classification prestidigitation both wars with the legal rights of Calyon described by the

UCA Credit Agreement and distinguishes without legal basis Calyon's treatment from that

afforded other UCA "participating" lenders (<u>i.e.</u> Syndicate Lenders) by the Plan.

There is no legitimate reorganization purpose served by the irrational classification

of Calyon. As we already have seen that classification based upon perceived differences

in indemnity amounts is not a legitimate basis for separate classification among the

lenders, what other overarching reorganization purpose is served by the fictive constitution

NYA 809268.5

of Calyon as a UCA "Non-Administrative Agent" for purposes of voting and treatment

under the Plan?  Other than the facile "pigeonholing" of Banks into "one size fits all"

classes, none is apparent.

### E.    Even Were the Bank Classification Scheme Otherwise Appropriate, the Plan Does Not Apply it Uniformly or Without Untoward Purpose.

Consistency may be the "last refuge of the unimaginative"[13] but it nonetheless is

useful in schemes of plan classification.  Here, because the Plan is otherwise so insistent

on forcing Banks into a single class across legal entity lines, it is particularly odd that the

classification scheme for the Administrative Agents adopts a diametrically opposed

paradigm.[14]

Quite apart from the Plan's other Bank classification defects, the "special"

classification afforded the Administrative Agents is transparently illegitimate.  Each

Administrative Agent is separately placed in a "class of one" for its respective Co-

Borrowing Facility.  (Classes SD 3CA, SD 3OA, and SD 3UA.)  Each Administrative Agent

is again placed in a "class of one" in each of the other two Co-Borrowing Facilities for

which it is *not* the Administrative Agent.  (Classes SD 3CWach, SD 3CBMO, SD 3OWach,

SD 3OBOFA, SD 3UBMO and SD 3UBOFA.)  This special classification scheme has a

number of observable characteristics: (1) the three Administrative Agents each *vote twice*

as a separate class in each Co-Borrowing Facility group and, as a group, *hold three votes*

---

[13]     Attributed to Oscar Wilde.

[14]     Unlike the Classes of Non-Administrative Agents and Syndicate Lenders, each of the three Classes of Administrative Agents is trifurcated into three separate "classes of one."  In six of those nine agent classes, however, the "class of one" is inconsistent with the respective rights under the credit agreements.  See Chart annexed hereto as **Exhibit "C"**.

16

in each Co-Borrowing Facility group; (2) unlike the Non-Administrative Agents and the Syndicate Lenders, the three Administrative Agents *never* vote as a group in a class of "Administrative Agents;" and (3) the classification of each of the two other Administrative Agents in a separate class from that of the Co-Borrowing Facility Administrative Agent classifies each of those <u>de facto</u> non-administrative agents differently from the group of Banks denominated "Non-Administrative Agents" for each such facility.[15] To what end? At least several.

First, the special Administrative Agent scheme permits each Administrative Agent to vote separately so that a class of Administrative Agents cannot reject the Plan without a countervailing, separate accepting class *comprising a Bank Proponent*. Indeed, were the Administrative Agents classed together in the same manner as the Non-Administrative Agents and the Syndicate Lenders, the negative vote of Bank of America (as the sole Administrative Agent that is not a Plan Proponent) potentially could cause a single Administrative Agent class to reject the Plan.[16] That risk disappears through the unique scheme proffered by the Plan.

The Plan Proponents also use the gerrymandered classes to insure that a Bank Proponent separately can serve as an "accepting impaired class of one" in each of the Co-Borrowing Facilities. The Plan affords each of the three Administrative Agents a separate vote, two of which are *always* by a Bank Proponent. Each of the Bank Proponents,

---

[15]   In this regard, it is no less noteworthy that the FrontierVision Banks suffer no such class diaspora. *All* FrontierVision Banks, Administrative Agent, Non-Administrative Agent and Syndicate Lender (to use the Plan's nomenclature) are comfortably situated in but a single class, Class SD 3 (FV).

[16]   The chart annexed as **Exhibit "D"**, using the UCA credit facility as an example, shows how, but for the contrived Agent classification anomaly, Bank of America could block acceptance of the Plan.

17

Wachovia and BMO, can carry its own Administrative Agent class of one for the UCA and Olympus facilities and, in the event that Bank of America's Administrative Agent class of one votes to reject, the separate classes granted to Wachovia and BMO in the Century facility will be used to claim that Section 1129(a)(10) has been satisfied for that facility as well.

Third, the scheme gives each Administrative Agent twice as many votes as each Non-Administrative Agent and Syndicate Lender when, in fact, in at least two of the three Co-Borrowing Facilities they *are* a Non-Administrative Agent or a Syndicate Lender.[17]

Each of the effects of the special Administrative Agent classification scheme are unrelated to any legitimate purpose in the restructuring of the Obligor Debtors and violates the immutable "thou shalt not . . . gerrymander" rule.

F.    **The Convoluted Classification Scheme Cannot Be Justified by Any Legitimate Reorganization Purpose.  It Contravenes Bank Rights and Obligor Debtor Obligations to Achieve a Gerrymandered Plan Result.**

> [S]eparate classification of unsecured claims solely to create an impaired assenting class will not be permitted; the debtor must adduce credible proof of a legitimate reason for separate classification of similar claims.

Boston Post Road, 21 F.3d at 483.  Thus, the Second Circuit aligned itself with every other circuit's prohibition against gerrymandering an accepting impaired class.  If credible proof

---

[17]    As earlier discussed, the fact that the Plan attributes a larger indemnity claim to the Administrative Agents does not require that each be separately classified one from the other or from the other classes of Banks.  The presumption in the Complaint about what Bank in which capacity in which facility will generate how much expense for reimbursement is entirely unsubstantiated.  More important, the Bank Lender Avoidance Complaint's election to distinguish among Banks with "substantially similar" legal rights is based upon no substantive allegations, at least against any Bank other than the Administrative Agents. That Calyon's classification and Plan treatment is predicated on no more than impermissible collectivized pleading is an affront to Sections 1122(a) and 1129(a).
(continued...)

18

NYA 809268.5

of a legitimate reason cannot be adduced, gerrymandering is the resulting conclusion and the classification scheme should be viewed to violate Sections 1122(a) and 1129(a) of the Bankruptcy Code.[18]

Rather than to "adduce credible proof," the Plan Proponents seem content to rest upon their thus far successful confusion of these two hundred plus estates into one indistinguishable, messy mass.[19] They continue to ignore the legal separateness of the myriad Debtors. They continue to ignore the separate property each estate comprises under Section 541.[20] They continue to assume each Debtor to bear the same legal

---

(continued...)

Compare One Times Square, 159 B.R. at 703 (separate classification of substantially similar claims permitted, if at all, only when there is no offense to "due process and fair play").

[18]    At first blush, it might seem odd discussing single asset real estate cases in relation to cases the size of Adelphia. However, when one shakes the illusion of the single, massive Adelphia bankruptcy case and views these cases more properly as some 250 separate and distinct debtors, the single asset case relation comes into clearer focus. One predicate for the refusal of the Second Circuit to countenance the separate classification of unsecured claims is that, in a single asset real estate case, the mortgagee's unsecured deficiency claim typically overwhelms in magnitude the balance of the unsecured claims. The circuit was offended by the notion that the separate classification of a significantly smaller group of unsecured creditors effectively disenfranchised the estate's largest creditor. The Court ruled this to be

> simply inconsistent with the principles underlying the Bankruptcy Code. A key premise of the Code is that creditors holding greater debt should have a comparably greater voice in reorganization.

Boston Post Road, 21 F.3d at 483. The Obligor Debtors comprise numerous examples of this "single asset real estate" creditor composition. (See Exhibit "B" annexed hereto.) The very same logic militates against permitting the comparably small separate class of unsecured creditors to control the fate of the much larger claims of the Banks, thereby effectively "disenfranchising" them contrary to the "key premise of the Code."

[19]    The only "legitimate business purpose" actually proffered by the Committee for it's tortuous classification of the Banks, the perceived differences in indemnity claim amounts, already has been seen to be unsustainable. See Point I(D), supra.

[20]    It is important to state in this context that the Plan further is objectionable for the unwarranted consolidation of certain assets of certain Debtors in the Contingent Value Vehicle ("CVV") and subsequent re-distribution of the proceeds of what were distinct assets of a distinct estate to creditors of other estates. This partial pseudo-substantive consolidation is not supported by any legal justification. Although the Committee, no doubt, will interject that this objectionable feature of

(continued...)

NYA 809268.5

relations to its distinct creditor bodies.  They continue to beguile the inattentive and

insouciant with the artifice of the "one for all" paradigm, pretending that each estate's

interests are identical to every estate's interests.

For it is only by having confounded the facts separating one Debtor from the next

that the classification scheme can be seen as anything *but* gerrymandering.  Failing the

labor of the Plan Proponents, it falls upon the Court to look at each of these Debtors as a

separate Plan Proponent.  See In re Genesis Health Ventures, Inc., 266 B.R. 591, 599

(Bankr. D. Del. 2001) ("Code imposes an independent duty upon the court to determine

whether a plan satisfies each element of 1129").  The Court must recognize that each

Obligor Debtor has a separate obligation to prove a legitimate rationale for the

classification of its separate and particular creditors, in accordance with each Debtor's

distinct legal obligations to those distinct creditors.  It is only by finding upon careful

---

(continued…)

the Plan is not one of which the Banks can legitimately complain, that argument cannot withstand
even slight scrutiny.  The whole Plan, insofar as it relates to the Banks, is driven by the Committee
Action.  That action's complaint uses the medium of Debtor confusion to obscure that some estates
do not hold one or more of the claims against the Bank defendants or do not hold claims at all.  The
simple truth is that a Debtor, in either its capacity as a plaintiff or as a transferor to the CVV can only
look to the property of its own estate as limited by Section 541.  One estate, and through it, its
creditors, can not recover damages from claims held by, or injury to, other Debtors.

Yet, it is only the pendency of these agglomerated claims that affords any predicate for the
Committee's objections to the Bank Claims, for the dramatic impairment of the Banks' cost and loss
indemnities and, of course, for the Holdback Motion.  But what has been lost in the sleight of hand
of both the Plan and the Committee Action is the obvious truth that not every Debtor possess every
claim against every Bank defendant.  Nor may such Debtor properly "borrow" from another estate
even a facial basis for this maltreatment of its particular Bank creditors. Not every Debtor, if any, has
established a basis to be relieved of its legal burden to satisfy in full every Obligation of its loan
documentation to its Bank creditors.

We should be very clear in making this argument that we do *not* engage the merits of the Committee
Action over which this Court lacks jurisdiction.  Rather, we assert that, by relying solely upon this
potpourri of Debtors, estates' assets and liabilities, the respective Debtors have failed to adduce
proof to establish by a preponderance of the evidence that the less than full satisfaction and
discriminatory treatment of the Bank Claims is justifiable.

NYA 809268.5

scrutiny that sound reorganizational purposes support the Plan's classification anomalies that the Court can overrule the presumption of gerrymandering that must attach to any facially irrational and internally inconsistent classification scheme.  However daunting the task may seem, there can be no expedient substitute that may otherwise satisfy the mandates of Section 1129.

II

### THE PLAN TREATS DIFFERENTLY CREDITORS WITH IDENTICAL OR, AT LEAST, SUBSTANTIALLY SIMILAR RIGHTS AGAINST THE SAME OBLIGOR DEBTOR IN VIOLATION OF SECTION 1123(a)(4)

Under the UCA Credit Agreement, Calyon is defined as a "Lender."  That Credit Agreement specifies a Lender to be a party to the facility that is neither an "Administrative Agent," a "Documentation Agent," nor a "Syndication Agent" (the latter two being the only so-called "Non-Administrative Agents" as defined in the Plan, Ex. "A" at 27).[21]  (UCA Credit Agreement, Section 1.1.)  As a UCA Lender, Calyon's rights and obligations under the UCA Credit Agreement against and from the UCA Obligor Debtors are *identical* to the rights and reciprocal obligations of every other Lender party to that agreement.

Particularly germane to this point are the provisions of the UCA Credit Agreement addressing the obligations of the UCA Obligor Debtors to reimburse and to indemnify the UCA Lenders.  Those provisions (Sections 10.3 and 10.4 of the UCA Credit Agreement) afford *each* Lender the identical rights to reimbursement (for costs of collection, etc.) and

---

[21]    The "Protocol" referenced in that definition is a document created to suit the contours of the Plan.  It is *not* based on the provisions of the UCA Credit Agreement to the extent it purports to support differences in the contractual rights among the UCA Lenders.

NYA 809268.5

indemnification from each UCA Obligor Debtor.[22]  No distinction is made in these provisions between so-called "Non-Administrative Agent" Lenders and so-called "Syndicate" Lenders.  *Only the Plan purports to make these distinctions.*

Ignoring the identical legal rights among the UCA Lenders, the Plan treats Calyon differently from other UCA Lenders.  It is only by the capricious classification of Calyon separate from the other UCA Lenders that the Plan determines Calyon's claim for reimbursement and indemnification for costs to be an equal share of $12 million.  (Plan at Section 5.02(c)(iii)(B).)  In contrast, the Plan contemplates that "Syndicate" Lenders contribute $35 million of their distributions in the aggregate to the Administrative Agents' LIFs and, in return, receive a share of a $3 million LIF and a release from the Administrative Agents of their inter-creditor indemnity obligations to the Administrative Agents arising under the UCA Credit Agreement.  (Plan at Section 5.2(c)(ii)(A) and Ex. A at 26.)  Yet, no differences exist in the respective rights of Calyon and any other UCA Lender to support this disparate treatment.

Similarly, in relation to the Olympus Credit Agreement, Wachovia and Calyon not only have identical legal rights under that agreement but also were characterized identically by the Bank Lender Avoidance Complaint, each as an "Olympus Agent Bank."  (Compl. ¶ 440.)  The Plan, however, separately classifies Wachovia, in its capacity as an Olympus Agent Bank, as a "class of one" for purposes of voting on the Plan and for distributions on the indemnification portion of its claims under the Olympus Credit Agreement.  Conversely,

---

[22]    For example, Section 10.4 of the UCA Credit Agreement provides in part: "each Borrower hereby jointly and severally indemnifies, exonerates and holds <u>each</u> Secured Party [including the Lenders] free and harmless from …. (emphasis supplied).

NYA 809268.5

the Plan purposefully excludes Wachovia from the class embracing every other Olympus Agent Bank, that class being the Olympus Non-Administrative Agent Bank Class.[23] (See chart annexed hereto as **Exhibit "E"**. The chart illustrates the anomalies in classifications between facilities and the weighting of the votes in favor of the Bank Plan Proponents and the Administrative Agent Classes.)

Just as these non-distinctions among lenders to the same Obligor Debtors cannot justify their separate classification, they also cannot support any differences in Plan treatment. In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), aff'd, 78 B.R. 407 (S.D.N.Y. 1987), aff'd, 843 F.2d 636 (1988) (Lifland, Chief Judge) ("[a] plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes [citations omitted]."); accord In re Worldcom, Inc., 2003 WL 23861928 at*59 (Bankr. S.D.N.Y. Oct. 31, 2003). The Plan's disparate treatment of the Banks, therefore, is not sustainable.[24]

### III

### THE CLAIMS OF THE BANKS ARE NOT BEING "PAID IN FULL" UNDER THE PLAN

In many respects, addressing the extraordinary provisions of the Plan is like trying to argue about the appearance of a unicorn – one first must accept that a unicorn can

---

[23]    See also Section 5.2(c)(ii)(B) of the Plan which further distinguishes the treatment of the Administrative Agents from that of the other Banks on the treatment of Pre-Effective Date Legal Fee Claims.

[24]    It would be disingenuous to attempt rebuttal of this argument based on the fact that the Plan treats with separate Debtors and, therefore, separate classes. Although the Plan Proponents profess an intention to count the ballots as to each Debtor separately, the treatment in the Plan is pan-Debtor. The Plan makes no distinctions in treatment based upon the separateness of the Debtors and, in

(continued...)

23

exist before one can differ on its physical characteristics.  The Committee's sole rejoinder

to just about every Bank objection to the Plan is the repeated, but unsupported, assertion

that the Plan pays the Bank Claims "in full."  If the Committee's say so is sufficient to

eradicate substantive rights of the Banks under the Pre-Petition Credit Agreements, there

is no meaning to the requirement that the Court independently satisfy itself that the Plan

Proponents have met their burdens under Section 1129.  But, since that cannot be the

case, the Court must pierce through a meaningful inquiry of the "Paid in Full" miasma upon

which the Committee places singular reliance.

   The Obligations of the respective borrowers under the Pre-Petition Credit

Agreements are secured by the pledges of stock granted in favor of the Banks by the

respective pledgor Debtor.[25]  The effect of those security interests is to block any residual

value from being passed by an Obligor Debtor to structurally subordinated creditors

lodged in the lower reaches of entitlement until the Obligations secured by the collateral

have been satisfied.  There is no dispute that these Bank Claims are the claims of over-

secured creditors.[26]

   As creditors holding over-secured claims, the Banks are entitled to receive

treatment in accordance with Section 506(b) of the Bankruptcy Code.  Additionally,

---

(continued…)

   fact, purposefully ignores that separateness in order to have Bank Classes transcend legal entity
   lines.

[25]   With the exception of the FrontierVision Obligor Debtors which granted their lenders a lien in their
   respective operating assets.

[26]   "Each of the Bank Claims (subject to the allowance thereof and the allegations asserted in the Bank
   Litigation) is oversecured under the Fifth Amended Joint Chapter 11 Plan for Adelphia
   Communications Corporation and Certain of Its Affiliated Debtors … and under a hypothetical
   liquidation under Chapter 7, in both cases as of the Effective Date of the Plan."  (Stipulation at ¶ 1.)

NYA 809268.5

Section 1129(a)(7) requires that a non-accepting holder of a secured claim receive or retain under the plan the full value of that holder's interest in the collateral. Finally, Section 1129(b)(2)(A) provides that a rejecting class of secured claimants must, as a preliminary requirement, retain the liens securing those claims in order for a plan to be confirmed over the dissent of that class.[27] It is only by the satisfaction of the applicable of these three provisions that a plan may be confirmed in the face of dissenting holders or rejecting classes, as the case may be.

The Plan propounded by each of the Obligor Debtors runs or will run (in a cramdown context) afoul of the mandates of the Bankruptcy Code. Here are some of the ways.

1.    The Plan does not provide for the retention of liens by the classes of over-secured Bank Creditors. In the context of a "non-consensual" (cramdown) treatment of Non-Accepting Bank Class Claims under Section 5.02(c)(vii) of the Plan, the distributions would be escrowed without retention of liens were the Holdback Motion to be granted.[28] As a consequence of the lien stripping, the proceeds of the collateral granted to secure the

---

[27]    Calyon refers the Court to and adopts the legal arguments of the Kirkland Objection (at Section IV(B)) for a complete discussion of Section 1129(b)(2)(A) and cramdown. Those arguments pertain with equal force to the attempted cramdown of a Non-Administrative Agent class.

[28]    The discussion of the Holdback Motion in this objection is not intended as a waiver of any objection to the Court's consideration of that motion. The contemporaneous objection of the Calyon Parties to the renewed and original Holdback Motion is incorporated herein and is integral hereto. The Calyon Parties note that this Court's jurisdiction to adjudicate the facts and claims asserted by the Committee in the Committee Action terminated with the withdrawal of the reference by the District Court. To the extent the Holdback Motion implicates the consideration of those facts and claims, Calyon objects to this Court's subject matter jurisdiction.

NYA 809268.5

Obligations of the respective Obligor Debtors will be dissipated to holders of unsecured claims and to other claims and equity interests of structurally subordinated rank.

Quite apart from the lien stripping issue, this Plan *can never be confirmed* so long as the Bank distributions escrowed pursuant to the Holdback Motion are subject to a "risk free" government security interest factor, *net of taxes and costs*. Under Section 1129(a)(7) of the Bankruptcy Code, the Banks must receive under the Plan not less than they would receive in a hypothetical chapter 7 liquidation on the Effective Date. See generally, Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988); In re Leslie Fay Companies, Inc., 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997). Absent a payment at the termination of the litigation that does not deduct taxes and costs, and that does account for the time value of money, the Banks *never* can be "Paid in Full" in satisfaction of the "best interests test" of Section 1129(a)(7).[29]

Additionally, because the Holdback Motion escrow must be held in anticipation of *any* possible outcome of the Committee Action, that escrow must be sufficient to pay the claims of the affected Banks in full in the event the Banks were to win the litigation through a final order or judgment. As the Court cannot involve itself in the merits of the litigation owing to its lack of subject matter jurisdiction, it otherwise must insure the adequacy of the funds escrowed on the assumption (as one of a range of assumptions) that the Banks defeat the Committee's claims after a trial and in a final judgment. Under no circumstances would the record support a finding that the amount to be escrowed either

---

[29]    Calyon refers the Court to and adopts the legal arguments of Point IV(A) of the Kirkland Objection and Points B and C of the BoA Objection for further discussion of the impermissible treatment, and consequent feasibility issue, in connection with a Non-Accepting Bank Class.

NYA 809268.5

by reason of the Holdback Motion or the original Estimation Motion even approaches a
level of sufficiency.[30]

Finally, as an over-secured creditor and pending the allowance of its claims in a
chapter 7 liquidation, Calyon would be entitled under Section 506(b) to receive its contract
interest rates rather than the "risk free" government securities rate contemplated by the
Plan.  In addition to the legal arguments in the Kirkland Objection (at IV(A)), Calyon rejects
the Committee's implicit argument that the treatment dictated by the Holdback Motion
(escrow at the risk free government security rate, less taxes and costs) is the same or
better than the treatment the Banks would receive in a chapter 7 liquidation as of the
Effective Date.  The Committee's argument fails to comprehend that, as of the Effective
Date, the Banks' over-secured Claims are Disputed Claims.  Under the Plan, those
Disputed Claims are to be escrowed at a below contract (and below market) interest rate
until they become Allowed Claims sometime down the road.  Were Calyon to hold in a
chapter 7 case identically over-secured Disputed Claims and to receive no payment
thereon as at the Effective Date until Allowed, Section 506(b) would mandate that *those
Disputed Claims continue to accrue interest at the contract rate until paid* -- not at some

---

[30]    The original Estimation Motion (Docket No. 10640) was predicated on the alleged excesses of the
Administrative Agents in incurring costs as of the date of the motion.  That motion bears no
relevance to any expenditures by the Calyon Parties during the same time period.  On November 21,
2006, the Committee filed an Amended and Renewed Motion for Order Estimating the
Indemnification Claims of Certain Bank Lenders in Connection with the Debtors' Fifth Amended Joint
Plan of Reorganization (Docket No. 12503) (the "Renewed Estimation Motion").  Responses to the
Renewed Estimation Motion are due on November 29, 2006.  The Calyon Parties reserve their rights
to incorporate their responses herein or otherwise supplement this objection in connection with the
Renewed Estimation Motion.

NYA 809268.5

lesser "no risk" government security rate.  <u>See</u> cases collected in the BoA Objection at page 15, n.7.[31]

The context in which the Plan purports to use this "no risk" rate must be understood.  It is *not* the credit risk of collection with which we here are concerned.  If the escrowed funds are held securely, that risk should be zero.  Rather, it is the risk that the escrowed funds, inclusive of the full range of potential litigation results and the time for which those results to be determined, will be insufficient to make the holder of the non-certificated interest in those funds whole when payment ultimately is made in respect of that interest.  This is *not* a context in which a debt instrument is afforded a creditor and the interest rate is a function of both market rate and credit risk.  Here, the elimination of the credit risk is irrelevant because the Banks are not receiving a new debt instrument in exchange for their respective Claims.  Rather, the Banks are receiving only a contingent, non-certificated interest in an escrow account in exchange for their Claims.  The "contingency" is insufficiently reserved in the escrow account both because it fails to account for any semblance of a reasonable cost indemnification and other contract rights and fails to account for the real potential of a victory by the Calyon Parties.  In other words, the contingency insufficiently accounts for the full range of value arising under the Pre-Petition Credit Agreements in the context in which the claims in the Committee Action fail in whole or in significant part.  It is precisely that value that Section 1129(a)(7) requires to be no less than what would exist in a hypothetical chapter 7 liquidation.  *The Bankruptcy*

---

[31]     Parenthetically, in chapter 7 no junior creditor could receive any distribution from the proceeds of the Banks' collateral until the Obligations secured by the liens are satisfied or Disallowed by final order.  <u>See</u> Section 724(b) of the Bankruptcy Code.

28

*Code calculates the compensation for that risk by requiring in a chapter 7 liquidation interest to accrue to an over-secured creditor at its contract rate so that, when its claims eventually are paid, the over-secured creditor will have been made whole.*

2.     The confirmation of a Plan over the dissent of an over-secured Bank creditor in an <u>Accepting Bank Class</u> also would be impermissible by reason of several Plan deficiencies inconsistent with the commands of Section 1129(a)(7).  The Plan specifically deletes, and thereby deprives the Banks of, essential and valuable parts of their constellation of rights under their respective contracts.  The negation of these rights appears from the face of the Plan and is not subject to genuine dispute.

At the outset, the Plan purports to terminate the respective Pre-Petition Credit Agreements, including those provisions that specifically were agreed by the Obligor Debtors to survive.  (Plan at Section 8.6)  Specifically, the Plan intends to terminate the cost reimbursement and cost and loss indemnity provisions of those agreements.  (<u>See</u>, <u>e.g.</u> UCA Credit Agreement at Section 10.5, respecting Sections 10.3 and 10.4 thereof.)[32] Each of those provisions gives rise to a secured Obligation which, under the Plan, is being eliminated.

Additionally, the Plan otherwise eliminates the loss indemnity rights of the Banks in an <u>Accepting Bank Class</u>.  Plainly, the Plan makes no provision through which the loss indemnity rights of the Banks will be satisfied.  (<u>Compare</u> Section 5.02(c)(iii) of the Plan

---

[32]     Quite apart from this transgression, the Plan purports to "cherry pick" for survival certain other provisions of the otherwise terminated agreements to govern the rights of the lenders.  Even were the credit agreements terminable notwithstanding the failure to satisfy prescribed Obligations, they certainly would not be terminable piecemeal and at the whim of the Obligor Debtors.

NYA 809268.5

which purports to satisfy the respective Obligations of the Obligor Debtors for cost reimbursement and cost indemnity.)  To drive home the point, at various places the Plan essentially extinguishes these rights by both a putative waiver and the putative termination of the Pre-Petition Credit Agreements.  (See Plan at Section 5.2(c)(ii)(C)(x)(II)(C), providing for the waiver of "any claim or entitlement to . . . (C) any affirmative recovery with regard to indemnification against any Debtor Party, . . . . "; Plan at Section 8.6, canceling the Pre-Petition Credit Agreements and deeming the obligations of and Claims against the Debtors to have been "released and discharged").[33]

Moreover, the Plan impermissibly circumscribes the claims of Calyon for the reimbursement of and indemnity for its costs.  The Non-Administrative Agent LIF aggregates $12 million.  (Plan at Section 5.2(c)(iii)(B).)  The Plan at Section 5.2(c)(ii)(B) further directs that this sum be allocated evenly among the members of the beneficiary class.  Based upon currently available information, Calyon's share of that LIF would be approximately $631,500.  In order for the Plan to comply with Section 1129(a)(7), the Plan Proponents would have to demonstrate, and the Court would have to find, that the Calyon share of the Non-Administrative Agent LIF is adequate to satisfy all of Calyon's reasonable costs to final judgment.  Even were this amount supportable in any circumstance of the Committee Action (which it is not), it can *never* be found adequate in the circumstance of a victory by Calyon.  Plainly, if the LIF is not sufficient to satisfy costs in the full range of

---

[33]    Calyon refers the Court to and adopts the legal arguments of Bank of America on the impropriety of a Plan discharge under Section 1141(d)(3).  (BoA Objection at pages 8-11.)

NYA 809268.5

possibility, it cannot be anything but less than the amount to which Calyon is entitled under the credit documentation.[34]

The Plan Proponents have offered no admissible evidence as to why this sum reasonably may be expected to compensate the Banks classified as Non-Administrative Agents for their reasonable costs of collection and their rights to be indemnified for any reasonable costs, including those associated with the Committee Action. In fact, the Plan Proponents seem to have simply "backed in" to this LIF allocation based upon the maximum amount of money the Settlement Parties were willing to set aside and the minimum amount the Bank Proponents were willing to take for their individual benefit. The rest was just arithmetic. But arithmetic is just a mechanic unguided by logic or reason. Absent proof of either, of which there is none, the Plan Proponents cannot sustain their burden on this issue.

Although we have left to others the full legal argumentation of the failure of the Plan to comply with Sections 506(b), 1129(a)(7) and 1129(b)(2)(A), the finding that the Banks are not being "Paid in Full" is really a simple one to make, even without the benefit of those legal arguments. It is an observable fact that the Plan specifically excises rights of the

---

[34]    The Committee is given to falling back on this Court's August 31, 2005 so-called "standing decision" every time a Bank introduces the reasonable probability of a Bank victory in the Committee Action. We do not here quarrel with the standing decision but, instead, point out that the facts and law upon which the Court might have relied have evolved greatly and favorably for the Banks. See supplemental briefs filed by the Calyon Parties (Adv. Proc. Docket 03-04942, Nos. 423 and 442) and other lenders. For present purposes, the Committee cannot look to that decision as its sole support for the reasonableness of the Plan's LIFs. The reference to the supplemental briefs is informational only and is not intended to incorporate the pending dismissal motions in this confirmation proceeding.

NYA 809268.5

Banks and excuses the respective Obligations of the Obligor Debtors.[35]  Whether one wishes to observe these rights and Obligations to be marginal (as the Court[36] and the Committee previously have done) in the face of the payment of principal and interest to an Accepting Bank Class, is *not* the question.  Rather, the question is whether the Plan *fully satisfies* the rights of the Banks under the respective Pre-Petition Credit Agreements.  Neither the treatment of a Bank in a Non-Accepting Bank Class or as the dissenting member of an Accepting Bank Class can be demonstrated to bear equivalence to the full satisfaction of rights under the Pre-Petition Credit Agreements.  That demonstration is the burden of the Plan Proponents (and *not* the Plan opponents) to satisfy by a preponderance of the evidence.  In re Worldcom, Inc., 2003 WL 23861928 at *46 (Bankr. S.D.N.Y. Oct. 31, 2003) (plan proponent must meet burden of proof under Section 1129 by a preponderance of the evidence).  This is a burden they have not met and cannot carry.

---

[35]  See **Exhibit "F"** annexed hereto illustrating the overwhelming impairment of the claims of the Calyon Parties.  In no sense are the Obligations to them satisfied.

[36]  See Transcript of status conference held June 13, 2006 at page 9 ("Now I would have thought that a secured lender, even if it's not a co-borrowing lender, would feel pretty good about getting paid in full, and would feel pretty good about getting post-petition interest up to the time that it got paid.")

NYA 809268.5

IV

## THE PLAN CANNOT BE CONFIRMED AS TO THE OBLIGOR DEBTORS
## FOR FAILURE TO SATISFY SECTION 1129(a)(10) OF THE BANKRUPTCY CODE

A.    The Classes of Subsidiary Debtor Trade Claims and Subsidiary Debtor Other
      Unsecured Claims Are Artificially Impaired.[37]

Although "impairment" within the ambit of Section 1124 of the Bankruptcy Code is a simple and broadly read concept, it is not one that permits a plan proponent to manipulate the confirmation process through the discretionary treatment of a class of creditors in order to manufacture the accepting impaired class required by Section 1129(a)(10). Perhaps more than most parts of Section 1129(a), Section 1129(a)(10) was designed to protect the essential fairness of the confirmation process by providing "some indicia of support by affected creditors and prevent confirmation where such support is lacking." Windsor on the River Assoc., Ltd. v. Balcor Real Estate Fin., Inc. (In re Windsor on the River Assoc., Ltd.), 7 F.3d 127, 130 (8th Cir. 1993) (citing In re Lettick Typographic, Inc., 103 B.R. 32, 38 (Bankr. D. Conn. 1989)). "Artificial impairment" is in diametric opposition to the Congressional intent of the adoption of Section 1129(a)(10). "Confirmation of a plan where the debtor engineers the impairment of the only approving impaired class 'so distorts the meaning and purpose of [section 1129(a)(10)] that to permit it would reduce (a)(10) to a nullity.'" In re Lettick Typographic, Inc., 103 B.R. at 38.

As the Eighth Circuit noted in Windsor, 7 F.3d at 132, Congress was vitally concerned to "discourage 'side dealing' between the shareholders of a corporation and

---

[37]    The Plan's Subsidiary Debtor Classes, in so far as they pertain to the classes other than the Bank Classes, are broader than and subsume the Obligor Debtors. This section of the objection is directed to these Classes (SD-4 and SD-5) only insofar as they affect the Obligor Debtors.

33

some creditors to the detriment of other creditors." Because the bias against "side dealing" is manifest in the intent of the statute, the Eighth Circuit held that "a claim is not impaired if the alteration of the rights in question arises solely from the debtor's exercise of discretion." Id.

Such is the intent and effect of the Debtors' agreement with the Subsidiary Debtor Trade creditors. That the "deal" was meant to provide the Debtors with voting benefit initially appeared from the terms of the Plan Support Agreement itself. In exchange for an 8% annual post-petition interest rate, the trade classes were *required* to acknowledge and agree *for the benefit of Debtors* that their payment in full, in cash, and with 8% interest "resulted in such Claims being 'impaired' within the meaning of the Bankruptcy Code." (Plan Support Agreement at paragraph 9, page 8.)

To the extent that "impairment by agreement" has been augmented by the newly minted "give up"/"earn back" theory, nothing legitimate has been added to prop up the impairment argument. The voluntary "give up" of plan distributions by a recipient class does not constitute impairment. Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305 (1st Cir. 1992), rehearing and rehearing en banc denied (1993). This sort of "side deal" to manufacture an impaired class is exactly the sort the Eighth Circuit in Windsor sought to prohibit.

SPM Mfg. involved a "give up" by a secured creditor of a negotiated portion of the proceeds of its blanket lien to a junior class of unsecured creditors, skipping priority tax creditors in the process. The First Circuit upheld the validity of the agreement of the

34

NYA 809268.5

secured creditor to share the proceeds with the general unsecured creditors

notwithstanding the objection of the chapter 7 trustee.

The rationale for the circuit's decision is that, although an estate may not distribute

funds in violation of the "absolute priority rule," a secured creditor is free to treat with its

distribution in any manner it sees fit. SPM Mfg., 984 F.2d at 1313. The absolute priority

rule is not offended, the Court reasoned, because the "give up" was of the secured

creditor's property and did not come from property of the estate. Id. Thus, the absolute

priority rule did not apply.

> Section 726 and the other Code provisions governing priorities
> of creditors apply only to distributions of property of the estate.
> The Code does not govern the rights of creditors to transfer or
> receive non[-]estate property. While the debtor and the
> trustee are not allowed to pay non[-]priority creditors ahead of
> priority creditors, creditors are generally free to do whatever
> they wish with the bankruptcy dividends they receive, including
> to share them with other creditors. [Citations omitted.]

Id.; see also Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium

Operating LLC), 2005 WL 756900 at *6-7 (S.D.N.Y. April 4, 2005) (applying SPM Mfg. in a

chapter 11 context.)[38]

-------

[38]    The Third Circuit has criticized the blanket application of SPM Mfg. to chapter 11 cases in which the
"give up" would violate the "absolute priority rule." In re Armstrong World Indus., Inc., 432 F.3d 507
(3d Cir. 2005). However, the give ups by Classes SD-4 and SD-5 do not implicate the absolute
priority rule. The only class junior to those classes is the various classes of Subsidiary Debtor Equity
Interests. Although we argue that those interests are left unimpaired by the Plan (an argument which
by itself would put the Armstrong concern to rest), even if those interests somehow are impaired, the
give up does not affect the application of the absolute priority rule to them. Here, the "give up" is not
to another class of creditors or interest holders in the *Debtor*. Rather, it is to creditors of the ultimate
equity holder of the Debtor. Since the holder of the equity in the Debtor from which the "give up"
emanates is merely a conduit to pass value through the equity chain to creditors of structurally
subordinated Debtors, the direct give up by the classes of unsecured creditors could just as easily
have been accomplished directly through the class of interests (assuming, as is plain, that the

(continued...)

35

NYA 809268.5

The implication of the trade and other unsecured creditor "give ups" upon their impairment status is clear. Each class either will receive and give up, or direct the Plan Administrator to pay over, a defined portion of its "Payment in Full." In either case, a transfer of estate property is not effected. Rather, each member of the Subsidiary Debtor Trade and Subsidiary Debtor Other Unsecured Classes is voluntarily re-distributing a portion of their respective Plan dividends *after having been paid in full with pendency interest*. Simply because they eschewed a portion of their respective distributions does not mean that those classes are in any sense "impaired" for purposes of Section 1124 or Section 1129(a)(10). It is entirely immaterial that a portion of the dividend is being paid in TWC stock. As this is a matter of negotiated choice and the capacity of the Debtors to pay each Allowed Claim in SD-4 and SD-5 in full and in cash is not reasonably in doubt, this treatment does not qualify as "impairment." Windsor, 7 F.3d at 132.

### B.    The Obligor Debtor Equity Interests Are Not Impaired.

The Plan treats the Subsidiary Debtor Equity Interests as impaired. However, the treatment they receive is: (a) the retention of their respective equity interests (Plan at Section 8.4); and (b) the use of their full distributions of residual equity value to pay their respective obligations (Plan at Section 5.2(l).) Focusing only on the subset of the Obligor Debtors for purposes of this discussion, it seems pretty clear that each Obligor Debtor that holds equity in a subsidiary keeps its equity and gets its full distribution under the Plan.

---

(continued…)
     Debtors also are party to the Global Settlement and the Plan Agreement). Accordingly, the absolute priority rule is indifferent to the effect of the trade and other unsecured creditor "give ups".

NYA 809268.5

Where is the impairment?  The artful convolution of Section 5.2(l) notwithstanding,[39]

that Section does nothing other than to require the Obligor Debtor interest holder to pay its

own creditors.  That the Debtor-equity holder doesn't get to keep the value it receives

does not mean it's impaired.  It just means it has to use the full value it receives for its

equity interests to pay its own just debts under its own plan of reorganization.  Any residue

is its to hold (to pass farther downstream until depleted).  Retention of equity interest?

Receipt of full value?  That's not impairment.  These classes of the Obligor Debtors should

not be permitted to vote for purposes of Section 1129(a)(10).

<blockquote>

C.    The Bank Classes Cannot Be Re-Classified as "Unimpaired"
<u>Without a Change in Treatment Sufficient to Do So.</u>

</blockquote>

The state of "unimpairment" is absolute.  A plan treatment cannot occupy

simultaneously the diametrically opposed states of "impairment" and "unimpairment."  For

the Plan to permit in the indeterminate future the state of impairment to be deemed

changed to a state of unimpairment, is no different than were the Plan now to have

designated the Bank Classes' state of impairment as "to be determined."  Because

Section 1123(a)(2) *mandates* a plan to "specify any class of claims or interests that is not

impaired", this nether state precludes confirmation of the Plan by reason of Section

1129(a)(1).  <u>See also</u> <u>In re Valley Park Group, Inc.</u>, 96 B.R. 16, 22 (Bankr. N.D.N.Y. 1989)

(finding that plan's failure to mention impairment with respect to each class of claims

---

[39]    That Plan provision states: "any distributions that the holders of such Equity Interests otherwise would have received on account of such Equity Interests shall be used to satisfy the obligations of those holders under the Plan."  The sole effect of this provision is mechanical.  It allows the creditors of the equity holder Obligor Debtor to be paid without the unnecessary step of passing it through the legal entity first.  The effect, however, is the same – the equity holder Obligor Debtor receives the full value of its equity interest and uses it in its own plan to satisfy its own creditors.

NYA 809268.5

contravened Section 1123(a)(2) and (3)); In re Barrington Oaks Gen. P'ship, 15 B.R. 952,

970 n.5 (Bankr. D. Utah 1981) (failure to specify whether class is impaired or unimpaired

runs afoul of 1123(a)(2) and (3) and is grounds for denial of confirmation under 1129(a)(1))

(citation omitted).

Assuming it is *ever* appropriate for the Plan Proponents to bait and switch

impairment designations any time after the Plan and Disclosure Statement are distributed

for balloting,[40] it is indisputably illegal to do so unless the *treatment* of the subject class

comparably has been altered in a manner sufficient to justify the change in class

designation. The Plan, however, clearly has other intentions.

The reservation of the "right" to re-designate impairment status is no more than an

artifice to disenfranchise a Non-Accepting Bank Class ex post facto. It is by definition

"bad faith" for the Plan Proponents to derogate the Banks' objections to confirmation on

the ground that they are being "Paid in Full" under the Plan, designate those Bank Classes

as "impaired" and entitled to vote and, upon receipt of a negative class vote, reverse field

in an effort to nullify the balloting the Plan, itself, instigated. For this reason, the Plan also

violates Section 1129(a)(3) and its confirmation must fail.[41]

---

[40]    See BoA Objection at (l), the legal arguments of which the Calyon Parties adopt. The Plan makes no
provision for any, let alone adequate, notice of a flip-flop on designation. There can be no real
doubt, however, that post-ballot re-designation would require new disclosure and new solicitation of
the affected Bank Classes under Sections 1127 and 1125.

[41]    At the time of the filing of this objection, the Debtors have yet to address certain issues with the
balloting of the Bank Classes. Among those issues are: (a) the manner in which a class member
may cast a separate vote in respect of each separate Debtor; and (b) the calculation of votes by
class members as to Debtors in which the Schedules specify the Bank Claims to be unsecured and
Debtors in which the Schedules specify the Bank Claims to be secured. The Calyon Parties reserve
their right to supplement this objection with respect to balloting to the extent these problems are not
remedied prior to the balloting deadline for the Bank Classes.

NYA 809268.5

V

## OBJECTION TO STATEMENT TO MODIFY UNILATERALLY
## THE FRONTIERVISION LITIGATION FUND

Chase, as Administrative Agent to the lenders under the FrontierVision Credit

Facility, in a "statement" dated November 2, 2006 (Docket No. 12408) purportedly

responsive to the Plan, has sought relief (albeit without the benefit of a motion) to alter the

LIF provisions applicable to the FrontierVision Lenders by Section 5.2(c)(iii)(A) of the Plan.

The Plan apparently follows precisely the agreement Chase made with the Debtors which

was embodied in the FrontierVision Banks Consent Order (Docket No. 11701). The order

envisions a LIF for the FrontierVision Lenders, not an allocated LIF between Chase and the

FrontierVision Lenders. Although the order embraces a "most favored nations" clause,

that clause bears no relation to the *allocation* of the FrontierVision Litigation Fund among

the FrontierVision Lenders. Calyon, in its capacity as a FrontierVision Lender, considers

the change in its treatment to be material and adverse. If the Plan is going to be amended

after the voting deadline, the votes of the FrontierVision Lenders must be re-solicited.

VI

## LIMTED OBJECTION TO RESOLUTION ORDER

The Calyon Parties assert the following objections to the Resolution Order

proposed by Notice of Filing dated November 17, 2006 (Docket No. 12473).

1.     Proposed Finding D (4):  This finding purports to determine that "all

creditors" of the Debtors are benefited by the Global Settlement. None of the sub-findings

referenced, however, bears any relation, let alone affords a benefit, to the estates of the

Obligor Debtors owing, among other things, to their structural seniority in relation to the

39

NYA 809268.5

proceeds of the Sale.  Specifically, the Calyon Parties are not benefited by the Global

Settlement which, at best, is irrelevant to their interests.

2.      Proposed Finding D (5): This is inappropriate on the same grounds.

3.      Proposed Finding E : This is inappropriate on the same grounds to the

extent it finds the Global Settlement to be "in the best interests of each of the Debtors'

estates."

4.      Decretal Paragraph 6: Inasmuch as the Resolution Order purports to be the

medium for the settlement of the Intercreditor Dispute (and thereby constitutes an

Intercreditor Dispute Resolution), the order should be binding only on the parties to the

Intercreditor Dispute.  The Calyon Parties are not parties to the Intercreditor Dispute.[42]

5.      Decretal Paragraph 7:  The stealth features of this paragraph attempt to

eliminate the legal effects, if any, of the entry of the Resolution Order.  As the Global

Settlement approved by the Resolution Order is integral to the Plan, this paragraph cannot

shield parties from the res judicata and other legal effects of confirmation.  See Sure-Snap

Corp. v. State Street Bank & Trust Co., 948 F.2d 869 (2d Cir. 1991).

---

[42]      Curiously, the Debtors and the Committee, in their Joint Response to First Set of Requests for
Admission dated November 7, 2006 ("Joint Response"), *denied* that the Resolution Order
"constitutes an Intercreditor Dispute Resolution binding on Persons not parties to the Intercreditor
Dispute."  See Joint Response No. 32.  A copy of the Joint Response is annexed hereto as **Exhibit
"G"**.

NYA 809268.5

## VII

## <u>CONCLUSION</u>

The Banks are being hurt in specific and readily cognizable ways by the Plan.  In contrast, the Plan does not tread upon the unsecured creditors of the structurally subordinated Debtors.  Nor do the members of the Subsidiary Debtor Trade and Other Unsecured Classes suffer at the hands of the Plan.  It is insufficient recompense to the most senior creditors in the Adelphia constellation to suggest that, notwithstanding that which they are being forced by the Plan to forgo, the receipt of principal and interest (at least if one is in an Accepting Bank Class) is not so bad.  Section 1129(a) requires that the Banks receive *more than an approximation of their contractual entitlements*.  There is no legal reason to conclude otherwise.  To the extent the Plan derogates those entitlements and to the extent it manipulates the rules of classification, impairment and treatment to do so, confirmation is forbidden.[43]

*[Remainder of Page Intentionally Left Blank]*

---

[43] In addition to prior references to the BoA Objection, the Calyon Parties join in and adopt the legal arguments in the BoA Objection to the extent of objections C, D, F, G, H; J, K, and O (each as applied to the UCA and Olympus credit facilities as well).  Likewise, in addition to prior references to the Kirkland Objection, the Calyon Parties join in and adopt the legal arguments set forth in sections IV(A), (B), (C), (D), (E), (H) and (I) of the Kirkland Objection so far as such arguments pertain to the treatment of the Calyon Parties under the Plan.  The Calyon parties further reserve their rights to incorporate by reference pleadings filed by other creditors.

41

Dated: New York, New York
November 24, 2006

CLIFFORD CHANCE US LLP

By:  /s/  Andrew P. Brozman
     Andrew P. Brozman (AB-2456)
     Jennifer C. DeMarco (JD-9284)
     Wendy Rosenthal (WR 4461)
     31 West 52nd Street
     New York, New York  10019
     Telephone:  (212) 878-8000
     Facsimile:  (212) 878-8375

*Attorneys for Calyon New York Branch, Calyon
Securities (USA) Inc., LCM I L.P. and Indosuez
Capital Funding IIA, Ltd.*

NYA 809268.5