WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Martin J. Bienenstock, Esq. (MB 3001)
Brian S. Rosen, Esq. (BR 0571)
Sylvia A. Mayer, Esq. (*Pro Hac Vice*)
James T. Grogan, Esq. (*Pro Hac Vice requested*)
Eleanor Heard Gilbane, Esq. (EG 0764)

Counsel to the ACC Bondholder Group

STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12 Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Isaac M. Pachulski (*Pro Hac Vice*)
Stephan M. Ray (*Pro Hac Vice*)

Special Conflicts Counsel[1]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
```
|  |  |  |
|---|---|---|
| **In re** | : |  |
|  | : | **Chapter 11** |
|  | : |  |
| **ADELPHIA COMMUNICATIONS** | : | **Case No 02-41729 (REG)** |
| **CORPORATION, *et al.*,** | : |  |
|  | : | **(Jointly Administered)** |
| **Debtors.** | : |  |
|  | : |  |
```
------------------------------------------------------------x
```

# MEMORANDUM OF LAW IN SUPPORT OF THE ACC BONDHOLDER GROUP'S OBJECTION TO APPROVAL OF THE GLOBAL SETTLEMENT AND CONFIRMATION OF THE FIFTH AMENDED JOINT CHAPTER 11 PLAN FOR ADELPHIA COMMUNICATIONS CORPORATION AND CERTAIN OF ITS AFFILIATED DEBTORS

---

[1] Special Conflicts Counsel has been retained by Aurelius Capital Management, LP, Catalyst Investment Management Co., LLC, Drawbridge Global Macro Advisors LLC, Drawbridge Special Opportunity Advisors LLC, Elliott Associates, LP, Farallon Capital Management, L.L.C., Noonday Asset Management, L.P., Perry Capital LLC, and Viking Global Investors LP.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ......................................................................................................... 13

I.    THE GLOBAL SETTLEMENT EMBEDDED IN THE PLAN FAILS TO
SATISFY TMT TRAILER AND CANNOT BE APPROVED ...................... 13

    A.    Summary of Arguments Regarding TMT Trailer And Impermissibility Of
The Global Settlement Under The Law ............................................. 13

    B.    Arahova Noteholders Committee's Analysis Is Implausible And Cannot
Be Used to Establish The Range Of Reasonable Litigation Outcomes ............... 20

        1.    To Obtain The Recovery Provided under the Plan, the Arahova
Noteholders Committee Must Convince This Court to Abrogate
Existing Law Regarding Treatment of Intercompany Claims ................. 20

        2.    The Arahova Noteholders Committee's Analysis, As Well As The
Plan and Global Settlement, Are Derived From An Improper Form
of Substantive Consolidation in Violation of Applicable Law ............... 22

            a.    Absent Near Hopeless Entanglements, Substantive
Consolidation or Any Hybrid Thereof Is Unwarranted and
Illegal ......................................................................................... 25

            b.    The Global Settlement's End Run Around the Merits of the
Intercompany Claims Parallels the Reversible Error
Committed in Owens Corning ..................................................... 29

        3.    In A Complete Departure From the Law or Facts, the Arahova
Scenarios Disallow or Subordinate the AIH Receivable ........................ 34

        4.    The Arahova Scenarios Are Internally Inconsistent And Patently
Absurd In Other Respects as Well ........................................................ 37

        5.    Neither The Plan Proponents Nor The Arahova Noteholders
Committee Can Overrule This Court's Mandate From The
Supreme Court To Determine Each Debtors' Assets And
Liabilities ............................................................................................. 38

    C.    The Global Settlement is Not Based on the Merits of the Inter-Creditor
Dispute and Falls Outside the Range of Reasonableness .................................. 41

        1.    The Settlement is Divorced from Any Consideration of the Merits ........ 41

        2.    The Arahova Noteholders Committee Failed to Meet Its Burden To
Overcome The Presumption of the Books And Records ........................ 45

        3.    The Arahova Noteholders Committee Challenges Discrete Parts of
Transactions Rather than the Whole ..................................................... 50

D.   Avoidance Of The Costs And Delay Of Potentially Protracted Litigation Does Not Justify Approval of the Global Settlement ........................................... 53

E.   The Global Settlement Is the Result of a Coercive and Tainted Process Designed To Avoid Adjudication on the Merits.................................................... 55

1.   Absence Of Disclosure Of The Putative Settlement's Resolution Of Each Disputed Issue Renders Due Process Impossible ...................... 55

2.   The Global Settlement Is The Result of A Coercive and Tainted Process ................................................................................................ 56

3.   There is No Arms Length, Good Faith Settlement .................................. 57

4.   The Putative Global Settlement In The Plan Cannot Be Legally Approved............................................................................................... 59

F.   Even If the Global Settlement and Plan Were Within the Range of Reasonableness and Could be Approved Under TMT Trailer, The Touted Give-Ups to ACC Creditors are Illusory ............................................................. 64

1.   The Plan is Based on a Faulty Premise and Embedded Fallacies............ 64

2.   The Plan Unjustifiably Imbues Non-Fiduciaries with Material Authority on Behalf of All ACC Creditors............................................. 70

II.   THE PLAN BLATANTLY VIOLATES NUMEROUS PROVISIONS OF THE BANKRUPTCY CODE AND CANNOT BE CONFIRMED UNDER 11 U.S.C. § 1129................................................................................................................................. 70

A.   Summary of Arguments Regarding Violations Of Section 1129 ........................ 70

B.   The Plan Violates Section 1129(a)(7) Of The Bankruptcy Code Because The ACC Bondholder Group Would Receive Greater Recoveries Under Chapter 7 Than Under The Plan ......................................................................... 72

1.   The Administrative Costs Of A Chapter 7 Trustee Are Less Than The Fees And Expenses That ACC Creditors Have To Pay Under The Plan And Any Delay In A Chapter 7 Case Does Not Impose Additional Risk Of Loss ...................................................................... 74

2.   An ACC  Chapter 7 Trustee Would Enhance Recoveries From TWC Stock.......................................................................................... 75

3.   A Chapter 7 Trustee Would Provide Rational Distributions To Creditors Instead Of Gifting Illegal "Give Ups" And Would Limit Interest Payments To The Federal Judgment Rate ................................. 79

4.   The Plan Violates Section 1123(a)(7) and 1129(a)(7) of the Bankruptcy Code by Failing to Appoint a Non-Conflicted Fiduciary for the ACC Estate.................................................................. 83

C.    The Plan Fails To Provide Adequate Means For Its Implementation By Relying On A Distorted Form Of Substantive Consolidation Without Any Recognized Justification ................................................................... 85

D.    The Plan's Treatment Of Intercompany Claims Cannot Be Justified, Contradicts The Debtors' Own Schedules, Combines Dissimilar Claims In A Single Class, Violates The Absolute Priority Rule, And Unfairly Discriminates .......................................................................................... 87

    1.    The Plan Tortures the Treatment and Classification of Intercompany Claims ................................................................ 88

    2.    The Plan Is Not Fair And Equitable With Respect To Intercompany Claims Because It Violates The Absolute Priority Rule ........................................................................................ 90

    3.    The Plan Discriminates Unfairly Against Intercompany Claims ............ 94

E.    The Plan Cannot Require Indenture Trustees To Accept The Global Settlement ........................................................................................... 96

F.    The Plan Provides for Illegal Third-Party Releases, Illegal Third-Party Exculpation, And Illegal Third-Party Injunctions ............................... 97

G.    The Solicitation Process Has Been Irreparably Tainted Because Of (I) The Special Consideration Offered To Accepting Creditors Under The Plan, Including Illegal Release And Exculpation Provisions, and (II) Illegal Provisions Designed To Manufacture Accepting Votes ................................... 103

    1.    The Solicitation Process Has Been Irreparably Tainted By Offers Of Special Consideration To Accepting ACC Creditors In Violation Of Section 1123(a)(4) Of The Bankruptcy Code ................... 104

        a.    Only Accepting ACC Noteholders Receive Exculpation and Releases ........................................................................... 105

        b.    Only Certain, Accepting Creditors Receive Reimbursement of Professional Fees .................................................................. 108

        c.    ACC Noteholders Who Do Not Vote in Favor of the Plan Are Stripped of Their Right to Object to Claims ....................... 109

    2.    The Solicitation Process Has Been Irreparably Tainted By Provisions Designed To Manufacture Accepting Votes In Violation Of Sections 1122 and 1126 Of The Bankruptcy Code And Bankruptcy Rule 3018(c) ............................................................ 110

        a.    No Deemed Acceptance ........................................................... 111

        b.    No Gerrymandering ................................................................ 112

H.    The Plan Was Filed In Bad Faith In Violation Of Section 1129(a)(3) Of
       The Bankruptcy Code ......................................................................................... 114

CONCLUSION ........................................................................................................... 115

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re AOV Industrial Inc.*, 792 F.2d 1140 (D.C. Cir. 1986)..............................104

*Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648 (S.D.N.Y. 1995) ..............97

*In re Adelphia*, 327 B.R. at 160 ...............................................36

*In re Adelphia Commc'ns Corp.*, 336 B.R. 610 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006)...................................................... passim

*In re Ahlswede*, 516 F.2d 784 (9th Cir. 1975) ...................................33

*Alexander v. Compton (In re Bonham)*, 229 F.3d 750 (9th Cir. 2000)..............................26

*In re Allegheny International, Inc.*, 954 F.2d 167 (3d Cir. 1992)......................................46

*Allied Commc'ns Corp. v. Cont'l Cellular Corp.*, 821 F.2d 69 (1st Cir. 1987) ................33

*In re Amatex Corp.*, 97 B.R. 220 (Bankr. E.D. Pa. 1989)...................................33

*American United Mutual Life Insurance Co. v. Avon Park*, 311 U.S. 138 (1940)............94

*In re Andreuccetti*, 975 F.2d 413 (7th Cir. 1992) ..............................................58

*In re Armstrong World Industrial, Inc.*, 320 B.R. 523 (D. Del. 2005), *aff'd* 432 F.3d 507 (3d Cir. 2005)......................................................92, 94

*In re Arrowmill Development Corp.*, 211 B.R. 497 (Bankr. D.N.J. 1997)........................86

*In re BBL Group, Inc.*, 205 B.R. 625 (Bankr. N.D. Ala. 1996).....................................58

*Bank of America National Trust & Sav. Association v. 203 N. LaSalle St.*, 526 U.S. 434 (1999)...................................................79, 82

*In re Barney & Carey Co.*, 170 B.R. 17 (Bankr. D. Mass. 1994)......................................95

*Bell Road Investment Co. v. M. Long Arabians (In re M. Long Arabians)*, 103 B.R. 211 (B.A.P. 9th Cir. 1989)...............................................111

*Boston Post Road L.P. v. FDIC (In re Boston Post Road L.P.)*, 21 F.3d 477 (2d Cir. 1994) ....................................................112

*In re Brentano's Inc.*, 36 B.R. 90 (S.D.N.Y. 1984)..........................................96

*Buffalo Sav. Bank v. Marston Enterprises, Inc. (In re Marston Enterprises, Inc.)*,
    13 B.R. 514 (Bankr. E.D.N.Y. 1981)................................................................88

*In re Bush Industrial, Inc.*, 315 B.R. 292 (Bankr. W.D.N.Y. 2004)..................................78

*In re CGE Shattuck, Inc.*, 254 B.R. 5 (Bankr. N.H. 2000) .................................................31

*In re Caldwell*, 76 B.R. 643 (Bankr. E.D.Tenn. 1987) .......................................................95

*Carolco Television Inc. v. National Broadcasting Co. (In re De Laurentiis*
    *Entertainment Group Inc.)*, 963 F.2d 1269 (9th Cir. 1992)......................................5, 89

*In re Cellular Information Systems, Inc.*, 171 B.R. 926 (Bankr. S.D.N.Y. 1994).......58, 78

*Chemical Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir. 1966).................. 26-27, 33

*In re Chicago, M. S. P. & P. R. Co.*, 791 F.2d 524 (7th Cir. 1986)...................................33

*Clarke v. Rogers*, 228 U.S. 534 (1913)................................................................................94

*Class Five Nev. Claimants (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir.
    2002) ........................................................................................................................89

*In re Cluff*, 313 B.R. 323 (Bankr. D. Utah 2004) ..............................................................46

*Colonial Realty Co.*, 966 F.2d 57 (2d Cir. 1992)...............................................................33

*In re Coltex Loop Central Three Partners, L.P.*, 138 F.3d 39 (2nd Cir. 1998)................91

*Committee of Unsecured Creditors v. Interstate Cigar Distributing, Inc. (In re*
    *Interstate Cigar, Co., Inc.)*, 240 B.R. 816 (Bankr. E.D.N.Y. 1999)................15,43, 44

*Conn. National Bank v. Germain*, 503 U.S. 249 (1992).....................................................82

*Consolidated Rock Products Co. v. Du Bois*, 312 U.S. 510 (1941)........................... passim

*In re Continental Vending Machine*, 517 F.2d 997 (2d Cir. 1975)....................................33

*In re Coram Healthcare, Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) ..............................89

*In re Country Manor of Kenton, Inc.*, 254 B.R. 179 (Bankr. N.D. Ohio 2000)................80

*Defense Services v. U.S. (In re Defense Services)*, 104 B.R. 481 (Bankr. S.D. Fla.
    1989) ....................................................................................................................21, 89

*In re Desert Village Ltd. Partnership*, 337 B.R. 317 (Bankr. N.D. Ohio 2006)................45

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005)................97

*In re Dow Corning Corp.*, 192 B.R. 415 (Bankr. E.D. Mich. 1996) .............. 54, 80-83, 94

*In re Dow Corning ("Dow I")*, 237 B.R. 380 (E.D. Mich. 1999) ....................80

*Drabkin v. Midland-Ross Corp. (In re Automobile-Train Corp., Inc.)*, 810 F.2d 270 (D.C.Cir. 1987) ........................................................28, 33

*In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 714 (Bankr. S.D.N.Y. 1992) ........77

*Id.* at 111 - 112 .....................77

*Eastgroup Properties v. Southern Motel Associate, Ltd.*, 935 F.2d 245 (11th Cir. 1991) ..................26

*In re El Paso Refinery*, 244 B.R. 613 (Bankr. W.D. Tex. 2000) ......................80

*In re Exide Tech.*, 303 B.R. 48 (Bankr. D. Del. 2003)................................. passim

*In re Featherworks Corp.*, 25 B.R. 634 (Bankr. E.D.N.Y. 1982), *aff'd*, 36 B.R. 460 (E.D.N.Y. 1984)................99

*FDIC v. Colonial Realty Co.*, 966 F.2d at 61 (2d Cir. 1992)..............................25

*Fisher v. Outlet Co. (In re Denby Stores)*, 86 B.R. 768 (Bankr. S.D.N.Y. 1988) ..... passim

*Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.)*, 432 F.2d 1060 (2d Cir. 1970)) ..............................................26, 28

*In re Friese*, 103 B.R. 90 (Bankr. S.D.N.Y. 1989) ........................................111

*Galveston, Harrisburg & San Antonio Railway Co. v. Texas*, 210 U.S. 217 (1908).........78

*In re General Teamsters, Warehousemen & Helpers Union*, 225 B.R. 719 (Bankr. N.D. Cal. 1998) ................................................ 114-15

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001)............ 69, 93-94

*In re Great Bay Hotel & Casino, Inc.*, 251 B.R. 213 (Bankr. D.N.J. 2000) ...................94

*In re Grivas*, 105 B.R. 954 (Bankr. S.D. Cal. 1989).......................................58

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 ........................................................52

*Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000)...............................................................................................................111

*In re Higgins Slacks Co.*, 178 B.R. 853 (Bankr. N.D. Ala. 1995)....................111

*In re Hillsborough Holdings Corp.*, 166 B.R. 461 (Bankr. M.D. Fla.) .............36

*Howard Delivery Serv., Inc. v. Zurich America Insurance Co.*, 126 S. Ct. 2105 (2006)......................................................................................................19, 42, 94

*Insinger Machine Co. v. Federal Support Co. (In re Federal Support Co.)*, 859 F.2d 17 (4th Cir. 1988) .................................................................................99

*In re Jim Beck, Inc.*, 207 B.R. 1010 (Bankr. W.D. Va. 1997), *aff'd*, 214 B.R. 305 (W.D. Va. 1997), *aff'd*, 162 F.3d 1155 (4th Cir. 1998) .............................111

*In re Jorczak*, 314 B.R. 474 (Bankr. D. Conn. 2004) ................................. 46-47

*Kane v. Johns-Manville Corp., (In re Johns-Manville Corp.)*, 843 F.2d 636 (2d Cir. 1988) ..........................................................................................................3

*Kirk v. Texaco, Inc.*, 82 B.R. 678 (S.D.N.Y. 1988) ..........................................99

*Kuehner v. Irving Trust Co.*, 299 U.S. 445 (1937) .................... 19, 25-26, 42, 86

*LTV Corp. v. Aetna Casualty & Surety Co. (In re Chateaugay Corp.)*, 167 B.R. 776 (S.D.N.Y. 1994)......................................................................................97

*In re LaFayette Hotel Partnership*, 227 B.R. 445 (S.D.N.Y. 1998)..................36

*Lazarus Burman Associates, L.B. v. National Westminster Bank USA (In re Lazarus Burman Associates, L.B.)*, 161 B.R. 891 (Bankr. E.D.N.Y. 1993).............100

*In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983) (emphasis added) ................54

*Lundell v. Anchor Const. Specialits, (In re Lundell)*, 223 F.3d 1035 (9th Cir. 2000) ...........................................................................................................46

*In re Manchester Gas Storage, Inc.*, 309 B.R. 354 (Bankr. D. Okla. 2004)......................82

*In re MCorp Finance, Inc.*, 160 B.R. 941 (Bankr. S.D. Tex. 1993)...........69, 76

*In re M. & H. Gordon*, 245 F. 905 (S.D.N.Y. 1917) .......................................103

*In re Mahoney Hawkes, LLP*, 289 B.R. 285 (Bankr. D. Mass. 2002) .........................97, 99

*In re Marin Town Ctr.*, 142 B.R. 374 (N.D. Cal. 1992) .......................................................99

*In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994) .......................................................................................................................... 97-98

*Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 964 (4th Cir. 1989)...........99

*In re Miami Trucolor Offset Serv. Co.*, 187 B.R. 767 (Bankr. S.D. Fla. 1995)....... 114-115

*In re Mirant Corp.*, 334 B.R. 800 (Bankr. N.D. Tex. 2005)...............................................78

*Momentum Manufacturing Corp. v. Employee Creditors Committee*, 25 F.3d 1132 (2d Cir. 1994).........................................................................................................39

*In re N.S. Garrott & Sons*, 48 B.R. 13 (Bankr. E.D. Ark. 1984) ........................... 29-33, 90

*In re Ne. Dairy Cooperative Federation, Inc.*, 88 B.R. 21 (Bankr. N.D.N.Y. 1988) ........28

*In re One Times Square Associates Ltd. Partnership*, 159 B.R. 695 (Bankr. S.D.N.Y. 1993) ............................................................................................... 112-113

*Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231 (9th Cir. 2002)...........................80

*In re Owens Corning*, 316 B.R. 168 (Bankr. D. Del. 2004), *rev'd*, 419 F.3d 195 (3d Cir. 2005)....................................................................................................... passim

*In re Polytherm Industrial, Inc.*, 33 B.R. 823 (W.D. Wis. 1983) ......................................88

*Protective Committee for Independent Stockholders for TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968)....................................................................... passim

*In re Pullman Construction Industrial Inc.*, 107 B.R. 909 (Bankr. N.D. Ill. 1989) ..........78

*In re Rally Partners, LP*, 306 B.R. 165 (Bankr. E.D. Tex. 2003) .....................................46

*In re Reilly*, 245 B.R. 768 (2d Cir. BAP 2000)..................................................................46

*In re Resorts International, Inc.*, 145 B.R. 412 (Bankr. D. N.J. 1990).............................54

*Rochelle v. U.S.*, 521 F.2d 844 (5th Cir. 1975)..................................................................21

*SEC v. Central-Ill. Securities Corp.*, 338 U.S. 96 (1949)..................................................64

*S.M. Wilson & Co. v. Smith International, Inc.*, 587 F.2d 1363 (9th Cir. 1978) ..............33

*In re SPM Manufacturing Corp.*, 984 F.2d 1305 (1st Cir. 1993) ......................................69

*Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941) ...................................91

*Schwabacher v. United States*, 334 U.S. 182 (1948) .................................................31, 91

*Sec. and Exch. Commission v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert)*, 960 F.2d 285 (2d Cir. 1992) ...................................97, 100

*Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850 (Bankr. S.D. Tex. 2001) .............. 93-95

*In re Shoen*, 176 F.3d 1150 (9th Cir. 1999) ......................................................80

*In re Silver Eagle Company*, 262 B.R. 534 (Bankr. D. Or. 2001) ...............................22, 89

*Smart World Tech., LLC v. Juno Online Services, Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166 (2d. Cir. 2005) ................................................19, 54, 57

*In re Sound Emporium, Inc.*, 70 B.R. 22 (W.D. Tex. 1987) ........................................89

*In re Specialty Equip. Cos.*, 3 F.3d 1043 (7th Cir. 1993) ...................................98

*In re Sunbeam Corp.*, 284 B.R. 355 (Bankr. S.D.N.Y. 2002) ......................................52

*In re Texaco Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y. 1988).........................................15

*Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.)*, 844 F.2d 1142 (5th Cir. 1988)........................................................58

*In re the Babcock & Wilcox Co.*, 250 F.3d 955 (5th Cir. 2001) ..................................27

*In re The Leslie Fay Cos., Inc.*, 207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..........................72

*Thompson v. Ky. Lumber Co. (In re Ky. Lumber Co.)*, 860 F.2d 674 (6th Cir. 1988) ......................................................................79

*In re Townco Realty, Inc.*, 81 B.R. 707 (Bankr. S.D. Fla. 1987)....................................111

*In re Tucson Self-Storage, Inc.*, 166 B.R. 892 (B.A.P. 9th Cir. 1994) ...........................95

*In re U. S. Brass Corp.*, 255 B.R. 189 (Bankr. E.D. Tex. 2000), *aff'd sub nom. U.S. Brass Corp. v. Travelers Ins. Group, Inc* ...........................................31

*In re U.S. Truck Co.*, 800 F.2d 581 (6th Cir. 1986)......................................113

*U.S. v. Noland*, 517 U.S. at 535 (1966) ...................................................................33

*Union Bank v. Wolas*, 502 U.S. 151 (1991)................................................................82

*United Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restive Baking Co.)*, 860 F.2d 515 (2d. Cir. 1988)......................................................10, 26-28, 33-34

*United States v. Continental Airlines (In re Continental Airlines)*, 134 F.3d 536 (3d Cir. 1998)...........................................................................................5, 89

*In re Valley Park Group, Inc.*, 96 B.R. 16 (Bankr. N.D.N.Y. 1989) .............................1, 39

*In re Walsh Const., Inc.*, 669 F.2d 1325 (9th Cir. 1982) ...........................25, 31-32, 79, 85

*In re Waterways Barge Partnership*, 104 B.R. 776 (Bankr. N.D. Miss. 1989)................88

*In re Weintrob*, 240 F. 532 (E.D.N.C. 1917) ..............................................................103

*In re World Access, Inc.*, 301 B.R. 217 (Bankr. N.D. Ill. 2003).......................3, 26, 28, 91

*Young v. Higbee Co.*, 324 U.S. 204 (1945).........................................................3, 99, 103

*In re Zenith Electric Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) ...................................114

## STATE CASES

*In re Adelphia Commc'ns Corp.*, 04 Civ. 2817  2004 WL. 2186582 (Sept. 27, 2004 S.D.N.Y.) ...................................................................................................96

*In re Airport Lumber, Inc., No. Civ. A. 94-CV-1213*, 1995 WL. 779275 (N.D.N.Y. Dec. 29, 1995) ........................................................................................98

*Costa v. Robotic Vision System, Inc., BAP No.*, N.H. 05-047, 2006 Bankr. LEXIS 531 (April 11, 2006 B.A.P. 1st Cir.)...........................................................31, 91

*Greer v. Gaston & Snow* (*In re Gaston & Snow*), Nos. 93 Civ. 8517 (JGK), 93 Civ. 8628  1996 WL. 694421 (S.D.N.Y. Dec. 4, 1996).............................................100

*In re Worldcom, Inc. Sec. Litigation*, 2005 WL. 375313 (S.D.N.Y. Feb. 17, 2005)...49, 50

## DOCKETED CASES

*In re Adelphia Communications Corp.*, Case No. 02-41729 (REG) ................................45

# FEDERAL STATUTES

11 U.S.C. § 1111(a) ...................................................................................87

11 U.S.C. § 1122 ......................................................................................112

11 U.S.C. § 1122(a) ...................................................................................8

11 U.S.C. § 1123(a)(4) ..........................................................................3, 104

11 U.S.C. § 1123(a)(7) ..............................................................................83

11 U.S.C. § 1123(b)(3)(A) ..........................................................................57

11 U.S.C. § 1126(c) ............................................................................110-111

11 U.S.C. § 1126(d) .................................................................................110

11 U.S.C. § 1126(e) ....................................................................................3

11 U.S.C. § 1126(g) ...............................................................................8, 88

11 U.S.C. § 1129(a)(1) ........................................................................3, 7, 10

11 U.S.C. § 1129(a)(7) .........................................................................72, 81

11 U.S.C. § 1129(a)(9) .......................................................................... passim

11 U.S.C. § 1141 ....................................................................................5, 89

11 U.S.C. § 1141(d)(3) .............................................................................101

11 U.S.C. §§ 362 .......................................................................................5

11 U.S.C. § 506(b)(2) ................................................................................79

11 U.S.C. § 524(e) ...................................................................................96

11 U.S.C. § 553(a) ...............................................................................12, 18

11 U.S.C. § 726(a)(5) ................................................................................80

28 U.S.C. § 1961(a) ..................................................................................80

# MISCELLANEOUS

*Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11,* 72
    Am. Bankr. L.J. 227 (1998) ........................................................................95

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

The ACC Bondholder Group submits this Memorandum of Law ("<u>Confirmation Brief</u>") in Support of their Objection to Approval of the Global Settlement and Confirmation of the Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain Affiliated Debtors (the "<u>Confirmation Objection</u>").[2]

## PRELIMINARY STATEMENT

The Court has recognized, albeit in another context, that "[t]he issues before the Court raise questions of extraordinary importance not only in this case, where there are billions of dollars at stake (and at risk), but in dozens of other multi-debtor chapter 11 cases, in this district and elsewhere."[3]  The issues before the Court regarding approval of the Global Settlement and confirmation of the Plan raise far more significant issues, not only here, but in connection with the fundamental integrity of the bankruptcy process itself.  The question before the Court is whether the improprieties, unfairness, and violations of the statutory confirmation requirements that permeate the Global Settlement and Plan can be outweighed by a desire to end this case, or whether the Court should and will enforce the protections afforded to all creditors under the Bankruptcy Code and the dictates of the Supreme Court and not give up and capitulate

---

[2]  Capitalized terms that are used, but not defined, herein shall have the meanings ascribed to them in the Confirmation Objection.  As of the filing of its Confirmation Objection, other than limited document production from the Debtors, the ACC Bondholder Group has not received discovery in response to its discovery requests, nor has it begun taking depositions regarding the Plan.  Accordingly, the ACC Bondholder Group reserves the right to supplement its Confirmation Objection and this Confirmation Brief prior to the confirmation hearing.  The ACC Bondholder Group also reserves the right to file supplemental briefing regarding the Global Settlement in response to the motion filed by the Plan Proponents seeking approval of the Global Settlement pursuant to Bankruptcy Rule 9019 outside the Plan (the "<u>Approval Motion</u>").  In addition, the ACC Bondholder Group intends to file an addendum to this Confirmation Brief on November 27, 2006, as provided by the Court, addressing in greater detail the specific issues identified by the Court at the end of the hearing on September 26, 2006, including the 14 MIA Issues.

[3]  *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 635-36 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006)

to those who crafted an expedient "compromise" that benefits them at the expense of other creditors.

This Confirmation Brief demonstrates why the proposed Global Settlement embodied in the Plan does not satisfy the *TMT Trailer* factors and should not be approved, and why the Plan fails to satisfy the requirements for confirmation of a plan pursuant to chapter 11 of the Bankruptcy Code and applicable case law. The facts upon which this Confirmation Brief relies are set forth in the Confirmation Objection and are incorporated by reference. Just a cursory review of the following fatal defects embodied in both the Global Settlement and the Plan leads to the inescapable conclusion that neither are entitled to the imprimatur and approval of this Court.

*<u>The Plan Robs ACC Senior Noteholders To Pay Arahova Noteholders</u>*. The Debtors' May 2005 Schedules yield ACC Senior Noteholders a distribution of 96.5% on their prepetition claims and yield Arahova Noteholders 29.8% of their prepetition claims.[4] The Plan, however, inexplicably yields ACC Senior Noteholders 69% (27.5% less), while yielding Arahova Noteholders 99% (332% more).[5] Why? Don't look in the Second Disclosure Statement Supplement. It is silent. The Plan Proponents fail to disclose this stark and unjustified deviation from their sworn schedules. The answer is that: (i) the Plan violates the law; (ii) the solicitation of acceptances likewise violates the law; and (iii) the formulation of the Plan and its

---

[4]      Waterfall distributions are computed from base case analysis assuming TWC Stock value of $5.4 billion, before CVV value, as reflected on the ACC Bondholder Group's Position Statement, attached as Exhibit GG to the Second Supplemental Disclosure Statement.

[5]      If a TWC Stock valuation of $6.48 is used, then the Debtors' May 2005 Schedules yield ACC Senior Noteholders a distribution of 112.9% on their prepetition claims and yield Arahova Noteholders 33.0% of their prepetition claims, whereas the Plan yields ACC Senior Noteholders approximately 87%, while yielding Arahova Noteholders approximately 99%.

underlying putative settlement resulted from the destruction of the level playing field and neutrality ordered by this Court and relied on by District Judge Scheindlin.[6]

The express terms of the Plan render it dead on arrival. The ACC Bondholder Group urges the Court to deny confirmation without requiring an arduous confirmation hearing. Instead, a fair and legal plan should be proposed.

_**Why Is The Plan Dead On Arrival**_? There are many independent reasons, starting with improper payoffs. The Court need go no further than sections 6.2(d)(i), 16.3(a), 16.3(c), 16.3(d), and 16.15 of the Plan. These provisions pay off only creditors who accept with: exculpation, release of estate claims, release of other creditors' claims, and reimbursement of millions in expenses and do not comply with the law on at least five independent grounds:

- 11 U.S.C. § 1123(a)(4) expressly provides that every claim in a class must receive the same distribution.

- The United States Supreme Court made clear in _Young v. Higbee_,[7] that it is illegal for a few members of a class to receive better treatment than other members of the class.

- The illegal payoffs in the Plan made the entire solicitation of acceptances illegal, thereby showing the Plan was irreparably proposed in violation of law and not in good faith, the reverse of what is required by 11 U.S.C. § 1129(a)(1), (3).[8]

- Votes are obviously invalid under 11 U.S.C. § 1126(e) when solicited with illegal payoffs as the jurisprudence has long shown.[9]

- The Plan Proponents wrote illegal payoffs into the Plan and have used those payoffs in conjunction with abusive litigation tactics to gain strategic

---

[6]     _In re Adelphia Commc'ns Corp._, 336 B.R. 610, 632, 660, 671, 671 n.163 (Bankr. S.D.N.Y. 2006), _aff'd_, 342 B.R. 122, 125, 127 (S.D.N.Y. 2006).

[7]     _Young v. Higbee Co._, 324 U.S. 204 (1945).

[8]     _Kane v. Johns-Manville Corp., (In re Johns-Manville Corp.)_, 843 F.2d 636, 649 (2d Cir. 1988) (holding that a plan is proposed in good faith if its provisions are lawful).

[9]     _See_ pp. 8-9, _infra_.

leverage in the solicitation process. On June 15, 2006, the attorney for the chair of the Creditors Committee (a Plan Proponent) quoted to Judge Bernstein from a Satellite email to demonstrate Satellite may have liability for making public a letter to the Adelphia board.[10] Thereafter, Satellite became a Settlement Party. On October 30, 2006, the Creditors Committee advised this Court: "we don't have anything on the others," which encompassed Satellite and that now obtains releases and exculpation in the Plan.[11]

**_Confirmation Should Be Denied Due To The Plan's Illegal Terms_**. The ACC Bondholder Group urges the Court to consider the foregoing as a preliminary matter at the outset of the confirmation hearing. The law is crystal clear, and the facts are from the Plan Proponents' own documents and statements. We submit there is no purpose served by conducting a lengthy evidentiary confirmation hearing when the Plan, on its face, is unconfirmable.

**_To Block Fair Judicial Analysis, The Plan's Distributions Are Made The Result Of One Unidentified Permutation And Combination Out Of Five Million Possibilities_**. The Plan is also dead on arrival because neither the Plan nor the Second Disclosure Statement Supplement show how the May 2005 Schedules yielding the ACC Senior Noteholders a 96.5% distribution are changed to yield a 69% distribution, while the Arahova Noteholders' distribution soars from 29.8% to 99%.[12] The Bankruptcy Code and Bankruptcy Rules are premised on distributing an estate's assets fairly to holders of its liabilities. The requirements for doing so cannot be honored if the assets or liabilities are unknown. Here, the Plan Proponents knowingly incorporated a putative settlement that does not show how a single entry in the Debtors' Schedules is changed to produce the results under the Plan. Rather, the ACC estate's assets and

---

[10] Hr'g Tr. 7:11–21, 29:17–30:04, June 15, 2006 (Docket No. 11631).

[11] Hr'g Tr. 37:25, Oct. 30, 2006 (Docket No. 12417).

[12] As noted above, if TWC Stock valuation of $6.48 is used, then the Debtors' May 2005 Schedules yield ACC Senior Noteholders a distribution of 112.9% on their prepetition claims and yield Arahova Noteholders 33.0% of their prepetition claims, whereas the Plan yields ACC Senior Noteholders approximately 87%, while yielding Arahova Noteholders approximately 99%.

liabilities are for the Court to guess by working backwards over millions of permutations to see, for instance, which Intercompany Claims may have been recharacterized, which substantive consolidations may have been effected, which transfers may have been avoided, and how sale proceeds may have been allocated, to arrive at the distributions decreed by the Plan.

The Plan buries in a haystack the resolutions of the legal issues. This makes virtually nil any Court's and party's ability to apply the Bankruptcy Code and to assess the putative settlement. For instance, section 553(a) of the Bankruptcy Code provides that nothing in title 11, except 11 U.S.C. §§ 362 and 363, which are inapplicable here, shall affect setoff rights.[13] As drafted, the Plan conceals whether setoff rights are illegally affected to achieve the distributions the Plan provides. Based on the Plan Proponents' putative settlement, they contend they do not have to allow the Intercompany Claims to vote and can deprive them of setoff rights. If they are correct, it's difficult to understand why they bothered to leave any confirmation requirements outstanding. If their existing proposition about the Intercompany Claims were correct, the Plan Proponents could also write the settlement to provide that the distributions "settle" all the section 1123 and 1129 issues and no voting, best interests, good faith, fair and equitable, or any other confirmation requirements need be satisfied. Clearly, their contention shows the opposite. One can not circumvent confirmation requirements under the label of a Rule 9019 settlement.

_**The Arahova Noteholders' Position Statement Scenarios Show Their Distribution Depends On Illegal Results**_. As it turns out, the Arahova Noteholders Committee's Position Statement, Exhibit BB to the Second Disclosure Statement Supplement, shows they

---

[13] Setoff claims cannot be discharged unless no objection to discharge is made. *United States v. Continental Airlines (In re Continental Airlines)*, 134 F.3d 536 (3d Cir. 1998). Section 553(a) takes precedence over 11 U.S.C. § 1141. *Carolco Television Inc. v. National Broadcasting Co. (In re De Laurentiis Entertainment Group Inc.)*, 963 F.2d 1269 (9th Cir. 1992).

resort to an illegal eradication of setoff rights at the expense of the ACC Senior Noteholders to procure distribution to which they are not entitled under the law. Specifically, the Debtors' May 2005 Schedules provide Arahova a $1.4 billion net receivable from Bank of Adelphia based on properly applied accounting principles. To demonstrate how the Debtors' schedules can be contorted to produce the distributions in the Plan, the Arahova Noteholders Committee posits that the $1.4 billion receivable be "unnetted" into a $2.9 billion receivable and a $1.5 billion payable. Then, the Arahova Noteholders Committee computes their distribution as if the $2.9 billion receivable is allowed, and the $1.5 billion payable is subordinated or extinguished.[14] Indeed, of the seven scenarios the Arahova Noteholders Committee uses to show they can obtain higher returns than those resulting from the May 2005 Schedules, five of them rely on the illegal eradication of Bank of Adelphia's setoff rights. The other two rely on hitting grand slam homeruns on fraudulent conveyances in exchange for fair market value, eliminating Intercompany Claims, and valuation tricks.[15] To add insult to injury, the Arahova Noteholders Committee also assumes their resulting fraudulent transfer claim will be paid in full to Arahova, notwithstanding that Arahova was a mediate transferee in a chain of transfers. Put differently, to attain its exalted Plan distribution, the Arahova Noteholders Committee assumes it can prevail on a fraudulent transfer claim and be paid in full, but that no other Debtor in the chain, such as the original transferor, can prevail on its fraudulent transfer claim against Arahova. When we say the Arahova Noteholders Committee assumes they hit grand slam homeruns, we are understating the case.

---

[14]     DSS2, Ex. BB, Arahova Noteholders Committee's Position Statement (Lazard Model: cases 2, 4, 5, 6, 7).

[15]     *Id*.

***Absence Of Disclosure Of The Putative Settlement's Resolution Of Each***

***Disputed Issue Renders Due Process Impossible***.  It is obvious that due process is being denied to the ACC Bondholder Group.  One cannot object to that which is hidden.  One cannot have notice and a hearing on undisclosed facts.  The putative settlement baked into the Plan does not disclose how the millions of assets and liabilities and prepetition and postpetition transactions are treated to result in the distributions required by the Plan.  Without knowing how these matters are treated, there is no way of determining whether they are legal.  Procuring confirmation by hiding the facts is the opposite of due process.

A corollary to the foregoing is that the Plan fails to provide for legal voting or for any rational application of the best interests test because, among other things, the prepetition and postpetition Intercompany Claims are not separated, identified, and quantified.[16]  The Plan is illegal from the outset because it obfuscates the critical facts – assets and liabilities – the bankruptcy system requires to be disclosed and to be used as the underpinning of the operation of the bankruptcy laws.  We are aware the Court approved the Second Disclosure Statement Supplement.  We nevertheless object to confirmation on the grounds of lack of due process and violations of 11 U.S.C. §§ 1129(a)(1)-(3), because, among other things, the Second Disclosure Statement Supplement fails the elementary requirement of disclosing how each estate's assets and liabilities change from the Schedules to produce the distributions required by the Plan, and the rationale for each change buried and concealed in the putative settlement.

***The Plan Violates The Absolute Priority, Unfair Discrimination, And***

***Classification Rules***.  The third reason for the Plan being dead on arrival is its blatant violations of the absolute priority and classification rules.  Section 3.4 of the Plan classifies all

---

[16]     Plan Ex. A at A-24-25 (the definition of "Intercompany Claims" in the Plan expressly includes Claims and Administrative Claims).

Intercompany Claims for each Debtor in the same class. Thus, the postpetition administrative claims and the prepetition general unsecured claims against each Debtor are classified in the same class, which is illegal on its face because prepetition and postpetition claims are not similar for purposes of 11 U.S.C. § 1122(a). Postpetition claims to sale proceeds can not be classified with prepetition claims for money borrowed.

Then, section 5.3 of the Plan provides that Intercompany Claims obtain no distribution. Aside from the absence of distributions on postpetition administrative claims being illegal under 11 U.S.C. § 1129(a)(9), the class is deemed to reject pursuant to 11 U.S.C. § 1126(g). That rejection invokes 11 U.S.C. § 1129(b)(1), which the Plan violates two ways. First, the Plan unfairly discriminates against ACC's Intercompany Claims by paying them nothing while other claims are paid. Second, the Plan allows each Debtor to retain the equity of each of its subsidiaries on account of its existing equity interests in violation of the absolute priority rule.

Presumably recognizing the Plan violates 11 U.S.C. § 1129(b)(1), the Plan Proponents assert in section 2.3 of the Plan that the Intercompany Claims receive nothing as part of their putative settlement, and holders of Intercompany Claims shall not be entitled to vote.[17] Then, section 7.1 of the Plan provides "all classes of Claims and Equity Interests are entitled to vote on the Plan." In any event, the putative settlement will not be approved nor implemented prior to the Plan's confirmation. Section 8.5(a) of the Plan provides the "Global Settlement" shall take effect as of the Plan's Effective Date. Thus, the Plan, which alleges, as it must, that it is a separate plan for each Debtor, must be voted on in the Debtors' configurations prior to implementation of the putative settlement and while the Intercompany Claims still exist.

---

[17] The Plan proponents appear to be under the misconception that the absence of voting by a class of claims creates an accepting class. It does not.

***The Plan's Version Of Deemed Substantive Consolidation Is Illegal***.  The fourth reason the Plan is dead on arrival is its violation of the law of substantive consolidation. Substantive consolidation is unauthorized unless the determination of each debtor's assets and liabilities would be so expensive that nothing would be left for creditors, or all entities believed all the Adelphia entities were only one entity.  Neither of those allegations has been made. Nevertheless, the putative settlement extinguishes all Intercompany Claims as they would be extinguished in a substantive consolidation.  This is very materially prejudicial to ACC and beneficial for Arahova.  But, in both cases it is unwarranted.

Moreover, while substantive consolidation extinguishes the Debtors' Intercompany Claims by merging the debtors together, substantive consolidation also merges together the Debtors' respective assets.  Here, using a $5.4 billion valuation of TWC Stock, a pure substantive consolidation of the Debtors would yield ACC's creditors a distribution of 96.8%, whereas the Plan yields ACC's creditors at best 69%.[18]  ACC's creditors clearly lose the benefit of ACC's Intercompany Claims, while not obtaining the benefit of sharing other estates' assets.  Thus, the Plan imposes a mutated form of substantive consolidation on ACC's creditors, which yields a worse result than substantive consolidation by itself.  The requirements for a classic substantive consolidation are neither alleged nor satisfied here.  But, the Plan imposes a result much worse than substantive consolidation.  Additionally, by implicitly asking the Court to ignore the Plan's treatment of ACC's Intercompany Claims, the Plan also violates a cardinal principle of the Second and Third Circuits' jurisprudence, namely that substantive consolidation

---

[18]     Clearly, creditor recoveries vary based on the TWC Stock valuation used.  The 69% estimated recovery for the ACC Senior Notes Claims class assumes the $5.4 billion Deemed Value for TWC Stock set forth in the Plan.  By way of comparison, if TWC Stock is valued at $6.48 billion, and as noted above, ACC Senior Noteholders would receive an estimated recovery of approximately 87%.

cannot be used to impose a chapter 11 plan otherwise unattainable.[19]   Moreover, the Plan

imposes an illegal and mutated <u>deemed</u> substantive consolidation,[20] without satisfying the

requirements for any substantive consolidation.  This Plan is totally unwarranted, illegal, and

masked in the Plan Proponents' self-created haystack.[21]

      ***The Creditors Committee's Motion For Approval Of The Putative Settlement Is***

***Fundamentally Flawed***.  The Creditors Committee and Debtors premise their Approval Motion

on a motion filed in the bankruptcy of Enron Corp., which it contends "provided for identical

relief."[22]  Wrong.   In Enron Corp., (a) neither the debtors nor the creditors committee were

ordered to be neutral, (b) the primary issue was whether the settlement was in the zone of

reasonableness, and (c) the disclosure statement and motion contained extensive disclosure and

evidence regarding the specific disputed issues and the resolution of each issue under the

settlement.  There is no such disclosure in either the Approval Motion or the Second Disclosure

Statement Supplement.  Moreover, here, there is no settlement in the first place.  As this Court

already surmised, the instant putative settlement is a proposal being sent to creditors to vote on.[23]

This Court recognized, from simply looking at the various settlement term sheets submitted, that

---

[19]    *In re Owens Corning*, 419 F.3d 195, 216 (3rd Cir. 2005) (rejecting effort to remake substantive consolidation not as a remedy but as a stratagem to 'deem' separate resources reallocated, strip some creditors of their rights, favor other creditors, and trump possible plan objections); *United Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restive Baking Co.)*, 860 F.2d 515, 520 (2d. Cir. 1988) (holding that a proposed plan alone can never justify consolidation and that a creditor cannot be made to sacrifice its claim against the assets of its debtor by fiat).

[20]    Plan section 2.2 provides the Debtor entities continue, while Plan section 2.3 eliminates the rights of intercompany claims to vote or obtain distributions before any settlement is imposed.

[21]    And, having intentionally hidden and not disclosed how the interdebtor issues are resolved under the putative settlement to yield the results they yield, it would be the reverse of equity if the Plan proponents were currently allowed to insist interdebtor issues are resolved in any particular manner to yield the Plan's distributions.

[22]    Approval Motion at 1.

[23]    Hr'g Tr. 82:9-16, Sept. 11, 2006 (Docket No. 12016).

it was not signed by the committee authorized to litigate and settle ACC issues.  It was signed by a few bondholders in their individual capacities.

The Approval Motion then tries to substitute for the absence of a settlement signed by the ACC Senior Noteholders Committee by arguing at length that Tudor and Highfields were the only ACC bondholders to be restricted and to attend all the negotiations. Notably, that is not a defense to the absence of a settlement agreement signed by the committee of which Tudor and Highfields were members.  The Debtors and Creditors Committee, however, omit the material facts that further refute its case.  First, the ACC Noteholders Committee expressly voted down the settlement that Tudor and Highfields later signed with some minor changes.  Second, two other members of the committee, Perry Capital and Elliott Associates, became restricted and attended negotiations before any deal was cut.  They refused to sign the putative settlement.  No where do the Plan Proponents explain how a putative settlement opposed by half the negotiators and the committee for whom they were negotiating can be treated as a settlement.  There is no valid explanation.  It can not be legally done.

Most telling about the Plan Proponents' Approval Motion is its failure to provide any disclosure whatsoever about why the legal issues being settled can reasonably be settled in a manner resulting in the distributions required by the Plan.  Again, there is no rational explanation.  What the Approval Motion does is to show that the scenarios presented in the Arahova Noteholders Committee's Position Statement show that Arahova creditors can do better than they do under the Plan.  Therefore, they reason, the putative settlement must be reasonable. If that is the test, then no settlement will ever be unreasonable as long as its proponent or other litigants write down any scenario under which it can do better.  In actuality, simply considering the 14 MIA Issues identified by the Court, the ACC Noteholders Committee could lose on all but

one of those issues and still get a better recovery than under the Plan. Further, as explained herein, five of the Arahova Noteholders Committee's seven scenarios assume a 100% likelihood that they can (a) overrule the accounting for a $1.4 billion Arahova receivable from Bank of Adelphia, (b) convert the accounting entry into a $2.9 billion receivable and a $1.4 billion payable, and (c) collect on the receivable and subordinate or extinguish the payable and thereby deprive Bank of Adelphia of its setoff rights in violation of 11 U.S.C. § 553(a). The other two scenarios posited by the Arahova Noteholders Committee each assume a 100% likelihood that Arahova will (a) prevail on a fraudulent transfer claim, (b) collect in full, and (c) have no liability to the original transferor of the same fraudulent transfer even though Arahova was simply a mediate transferee in a long chain and any arguments it makes that it should not have transferred the asset can be made against its acquisition of the asset.

In sum, the Approval Motion's failure to deal with the issues and failure to mention the facts exposes its lack of merit.[24]

### *The MIA Litigation Is Not The Monster The Plan Proponents Pretend It Is*.

For two main reasons, the notion that the MIA will never end is categorically false. First, of all the outstanding issues, only two or three have material impacts on the respective returns of the Arahova Noteholders and ACC Senior Noteholders and conclusion of Hearing #2 of the MIA Litigation would have either resolved entirely or significantly narrowed those issues. Second, just as time and expense is bad for one litigant, it is bad for both litigants. Just last month when the Arahova Noteholders Committee saw the ACC Senior Noteholders would reject the Plan, it was renegotiated in a few weeks. Using history as a guide, it will likely be renegotiated again,

---

[24] Consistent with the Court's prior authorization, the ACC Bondholder Group reserves the right to file a supplemental response to the Approval Motion.

but only if the Court stops the Plan either due to its multiple illegalities or because the putative settlement it embodies a blatantly lopsided deal.

## ARGUMENT

## I. THE GLOBAL SETTLEMENT EMBEDDED IN THE PLAN FAILS TO SATISFY *TMT TRAILER* AND CANNOT BE APPROVED

**A. SUMMARY OF ARGUMENTS REGARDING *TMT TRAILER* AND IMPERMISSIBILITY OF THE GLOBAL SETTLEMENT UNDER THE LAW.**

The Plan and Global Settlement indefensibly presume a near absolute win on all aspects of the Inter-Creditor Dispute by the Arahova Noteholders Committee, notwithstanding the Court's recently reiterated view that no one would hit a home run through continued litigation.[25]  The settlement strips holders of ACC Senior Notes of over $1 billion of value to which they would otherwise be entitled under any reasonably likely litigation outcome (i.e. no "home run") of the Inter-Creditor Dispute.  This massive diversion of value cannot be considered a bona fide settlement in any normal sense because the recovery achieved by the holders of Arahova Notes is entirely divorced from the merits of the underlying dispute.[26]

Under the Plan and Global Settlement, all Intercompany Claims are eliminated, all Subsidiary Debtors share in a pool of assets, the ACC creditors obtain their recoveries

---

[25]  Hr'g Tr. 92:22- 93:3, Sept. 11, 2006 (Docket No. 12016); Given the Debtors' court-ordered neutrality, the Arahova Noteholders Committee served as the plaintiff in the Inter-Creditor Dispute, while the ACC Noteholders Committee served in the role of defendant.  The Debtors were ordered to remain neutral, "as a condition to their continued incumbency as debtors in possession," and to "recuse themselves from the Interdebtor Disputes."  *In re Adelphia*, 336 B.R. at 671; *see also*, DSSR-12.  Notably, the Court also held that the Creditors Committee should remain neutral in these inter-Debtor disputes.  *Adelphia*, 336 B.R. at 632 n.34.

[26]  The primary protagonists in the Inter-Creditor Dispute are the holders of Arahova Notes whose claims are classified in Class SD 6 under the Plan, and the holders of ACC Senior Notes whose claims are classified in Class ACC 3 under the Plan.  Creditors in these two classes assert competing claims to a limited pool of assets insufficient to satisfy all their claims in full.  As this Court previously has recognized, the allocation of this limited asset pool between holders of Arahova Notes and holders of ACC Senior Notes is essentially a "zero sum game" -- an increase in the recovery of the Arahova Notes produces a decrease in the recovery of the ACC Senior Notes, and vice versa.  *See Adelphia Commc'ns Corp.*, 336 B.R. at 638.  The Arahova Noteholders Committee and the Creditors' Committee have essentially conceded this point.

13

primarily through alleged "give ups" by other creditors and any residual value.  Because

creditors of Subsidiary Debtors are effectively guaranteed a minimum recovery, the ACC

creditors disproportionately (and in many respects, entirely) bear the costs of these chapter 11

cases including accrual of adequate protection interests payments on the pre-petition bank debt, a

substantial portion of the professionals fees of Settling Parties' counsel, any costs associated with

an initial public offering of the TWC Class A Common Stock, and any additional administrative

expenses or other costs.  Moreover, while nominally receiving the residual value, in actuality,

even that is round tripped to the Arahova Noteholders.  In the Second Supplemental Disclosure

Statement, the Plan Proponents urge ACC Noteholders not to be alarmed at the material erosion

of the original purported "give ups" because any shortfall will be made up through the release of

Identified Sources in excess of amounts necessary to repay the Arahova Initial Advance.[27]

However, the Identified Sources do not provide any security to the ACC Noteholders as they (a)

represent a substantial portion of the residual value, (b) are applied to repay the Arahova Initial

Advance not the shortfall to ACC Noteholders, and (c) include various embedded caps such that

only a portion of these funds flow to creditors of ACC.  Consequently, while ACC creditors bear

all of the burdens of additional costs, they reap few of the rewards of reduction in reserves and

other potential sources of value.  The practical effect of the Plan and Global Settlement is an

illegal form of substantive consolidation whereby all Subsidiary Debtors pool their assets,

subordinate any claims or interests of the ACC Debtors, and obtain all of the benefits of

substantive consolidation without suffering any of the detriments.

        Almost four decades ago, in reversing the approval of a settlement that was part

of a reorganization plan, the Supreme Court made clear that a court faced with a request to

---

[27]        DSS2-117.

confirm a plan that embodies a contested settlement must make an independent determination of whether the settlement is fair and equitable in relation to the underlying merits of the dispute.[28] Factors considered include whether the settlement falls within the range of reasonableness of possible litigation outcomes, the extent to which the settlement is the product of arm's length bargaining and the objections of creditors who stand to lose as a result of the settlement.[29] The putative Global Settlement fails these tests. Moreover, the "settlement" proposed by the Debtors is not a settlement in the first place.

Having failed in their "scorched earth" litigation tactics to "torpedo' the sale to Time Warner and Comcast and avoid adjudication of the Inter-Creditor Dispute, the Arahova Noteholders Committee has instead crafted a smokescreen of complexity and arguments based on mind-numbing minutia to convince this Court that the Inter-Creditor Dispute cannot be resolved through litigation and that any resolution, regardless of the merits, is preferable to a judgment on the merits. Notwithstanding the Arahova Noteholders Committee's efforts to cripple the litigation process, selectively apply internally-inconsistent methodology to engineer favorable results, and challenge discrete parts of transactions, rather than the whole, to enhance their values, the reality of the Inter-Creditor Dispute is deceptively simple. First, there are only two or three MIA issues that materially impact creditor recoveries. Second, at its essence, to resolve the Inter-Creditor Dispute, ultimately, the Court must choose between three options: (a)

---

[28] *Protective Comm. for Indep. Stockholders for TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("The requirements . . . that plans of reorganization be both 'fair and equitable' apply to compromises . . .There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." )

[29] *Comm. of Unsecured Creditors v. Interstate Cigar Distrib., Inc. (In re Interstate Cigar, Co., Inc.)*, 240 B.R. 816, 823 (Bankr. E.D.N.Y. 1999) (noting that "the most critical factors" in approving a settlement are (1) likelihood of success on the merits as compared to benefits of the settlement and (2) the objections of the creditor who stands to lose as a result of the settlement); *In re Texaco Inc.* 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988) (listing factors).

enforce the Intercompany Claims, excluding Historic Entries, and deny fraudulent transfers consistent with the Debtors' restated and audited books and records resulting from the PWC $100 million effort and reflected in the May 2005 Schedules, (b) substantively consolidate all estates, thereby eliminating all Intercompany Claims and fraudulent transfer claims, or (c) further restate the books and records, in a principled and uniform manner, to conform to determinations by the Court that particular types of entries or transactions (and, thus, all such entries or transactions) should be recorded differently.

And, yet, the Global Settlement embodied in the Plan is entirely disembodied from the Inter-Creditor Dispute and, instead, in a complete vacuum without comment or substantiation, simply dictates creditor recoveries. As reflected in the ACC Bondholder Group Position Statement, attached as Exhibit GG to the Second Disclosure Statement Supplement, when the Plan recoveries are simply compared to the results achieved by the polar opposites of the May 2005 Schedules (excluding Historic Entries) versus total substantive consolidation, it is self evident that a material disparity exists between the Plan and any reasonably likely litigation outcome. The following table compares the various pre-CVV recoveries using the $5.4 billion Deemed Value of TWC Stock (which grossly understates the true value of the stock):

| | Estimated Recovery Based on May 2005 Schedules[30] | Estimated Recovery Based on Substantive Consolidation[31] | Estimated Recovery Under Plan[32] |
|---|---|---|---|
| ACC Senior Notes | 96.5% | 96.8% | 69% |
| Arahova Notes | 29.8% | 69.3% | 99% |

In fact, even if all Intercompany Claims were eliminated, which the Court has given a clear indication it will not do, holders of ACC Senior Notes would achieve a better recovery (74.5%) than that offered under the Plan.

The Global Settlement falls below the lowest range of reasonable litigation outcomes for the Inter-Creditor Dispute. During the Inter-Creditor Dispute or MIA Litigation, the challengers threw many darts at the May 2005 Schedules. In the end, the Court took it upon itself to condense the scattered and random challenges into the 14 MIA Issues thereby crystallizing the core of the disputes. Of the 14 MIA Issues, the Arahova Noteholders Committee has no likelihood of success on the merits on many of these issues, including, but not limited to, MIA Issue #12 regarding the AIH $16.8 billion receivable and MIA Issue #13 regarding the disaggregation of the $1.4 billion Arahova net receivable from the Bank of Adelphia. Even if it were assumed that the Arahova Noteholders Committee were to win on the other twelve MIA Issues, which is highly unlikely, ACC creditors would obtain a far better recovery than that provided under the Plan – in fact, this is equally true if it were assumed that the Arahova Noteholders Committee were to win on thirteen of the 14 MIA Issues.

---

[30]     These estimated recoveries are based on the May 2005 Schedules, adjusted to eliminate Historic Entries.

[31]     These estimated recoveries are based on the substantive consolidation of all the estates and $5.4 billion valuation of TWC Stock. *See* ACC Bondholder Group Position Statement, attached as Exhibit GG to Second Disclosure Statement Supplement.

[32]     DSS2-30, 33.

|  | **Assume Lose All 14 MIA Issues Except #12 & 13** | **Assume Lose All 14 MIA Issues Except #12** | **Plan[33]** |
|---|---|---|---|
| ACC | 87.8% | 74.6% | 69% |
| Arahova | 49.0% | 90.0% | 99% |

The complete disconnect between creditor recoveries under the Plan and any possible litigation outcome is further illustrated by the Arahova Noteholders Committee's Position Statement wherein they posited seven scenarios under which their recovery could be equal to or greater than what the Plan provides, but none of which have even a remote likelihood of success. Five of the seven depend on repudiation of the May 2005 Schedules, unnetting of intercompany receivables and payables, and the elimination of Bank of Adelphia's setoff rights in violation of 11 U.S.C. § 553(a). The other two rely on a super, grand slam homerun on an alleged fraudulent transfer repaid as an administrative claim. The Arahova Noteholders Committee's resort to the fraudulent transfer actually proves the ridiculousness of the putative settlement. To obtain the exalted recovery the Arahova Noteholders Committee takes for itself in the Plan, its fraudulent transfer scenarios show that it IGNORES the fact that the asset it recovers for itself was the same asset that it acquired as a fraudulent transfer and would owe back to another debtor outside its silo. Arahova was simply one of several mediate transferees in

---

[33]  These recovery estimates are based on a $5.4 billion value of TWC Stock. If, instead, the TWC Stock is valued at $6.48 billion, then the recovery percentages change to:

|  | **Assume Lose All 14 MIA Issues Except #12 & 13** | **Assume Lose All 14 MIA Issues Except #12** | **Plan[33]** |
|---|---|---|---|
| ACC | 97.1% | 82.6% | 87% |
| Arahova | 75.1% | 119.7% | 99% |

a chain. Thus, its fraudulent transfer scenario assumes a 100% likelihood of prevailing on a fraudulent transfer claim, a 100% likelihood of recovering the fraudulent transfer in full as a postpetition claim, and a 0% likelihood that it has the same fraudulent transfer exposure to other debtors that it claims to have against one debtor. In short, these scenarios are telling. They run afoul of the Court's repeated admonishments that no one will hit a homerun, let alone a homerun premised on nonsense. They require giant leaps of faith and departures from the statute and common sense.

Not only are the terms of the purported settlement unenforceable as a matter of law, but there is no settlement to begin with because the purported settlement was the result of an abusively coercive process and no fiduciary for the ACC estate considered the merits and executed the settlement. Notwithstanding the fact that the Plan Proponents and Settlement Parties exaggerate the cost and delay associated with full adjudication of the Inter-Creditor Dispute, even if true, the Supreme Court has made clear that it remains incumbent on this Court to determine the extent, validity and priority of the Intercompany Claims and ascertain the assets and liabilities of each Debtor. Absent justification for total substantive consolidation, thereby eliminating the Inter-Creditor Dispute, cost and delay alone do not obviate these duties.[34]

The Global Settlement cannot satisfy the requirements dictated by the Supreme Court in *TMT Trailer*. The settlement is avowedly divorced from consideration of the merits of

---

[34] *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 126 S. Ct. 2105, 2109 (2006) ("[W]e are mindful that the Bankruptcy Code aims, in the main, to secure equal distribution among creditors"); *TMT Trailer Ferry*, 390 U.S. at 441 (noting that the "fair and equitable" standard for approving a plan of reorganization "incorporates the absolute priority doctrine"); *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510 (1941); *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 451 (1937) (noting that "the object of bankruptcy laws is the equitable distribution of the debtor's assets amongst [its] creditors"); *Smart World Tech., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 178-80 (2d. Cir. 2005) (reversing lower court's approval of a settlement where it gave no consideration to the underlying merits); *In re Owens Corning* ("*Owens Corning II*"), 419 F.3d 195 (3d Cir. 2005); *In re Exide Tech.*, 303 B.R. 48 (Bankr. D. Del. 2003).

the Inter-Creditor Dispute and there is no correlation between creditor recoveries under the Plan and the merits-based realities of the Inter-Creditor Dispute. Indeed, the Global Settlement is riddled with fatal flaws. To achieve the recovery results in the Plan, the Court is forced to approve a mutated form of substantive consolidation—whereby the holders of Arahova Notes obtain all of the benefits of substantive consolidation, but suffer none of the detriments — in violation of applicable law. The Global Settlement cannot be approved and the Plan cannot be confirmed.

**B.    ARAHOVA NOTEHOLDERS COMMITTEE'S ANALYSIS IS IMPLAUSIBLE AND CANNOT BE USED TO ESTABLISH THE RANGE OF REASONABLE LITIGATION OUTCOMES**

Having failed to extort value through their nuclear war litigation tactics, but having succeeded in sidelining the Debtors, the Arahova Noteholders Committee sought a new path to avoid judicial determination of the Inter-Creditor Dispute — overwhelming the Court with mind-numbing minutia regarding their list of selective and contradictory challenges to the Debtors' May 2005 Schedules and touting impossible and legally unenforceable litigation outcomes. The Arahova Noteholders Committee should not be allowed to fabricate one end of the spectrum of litigation outcomes. Without substantiation in fact or law, their analysis of the results must be disregarded in its entirety.

**1.    *TO OBTAIN THE RECOVERY PROVIDED UNDER THE PLAN, THE ARAHOVA NOTEHOLDERS COMMITTEE MUST CONVINCE THIS COURT TO ABROGATE EXISTING LAW REGARDING TREATMENT OF INTERCOMPANY CLAIMS***

The Arahova Noteholders Committee's analysis of possible litigation outcomes and their recoveries based thereon (attached to the Second Disclosure Statement Supplement as Exhibit BB, the "Arahova Scenarios") cannot be relied upon and certainly cannot be considered when determining the range of reasonable litigation outcomes for purposes of a *TMT Trailer* analysis. It is important to note that the Plan, Global Settlement, Second Disclosure Statement

Supplement and all applicable term sheets are devoid of information regarding how the Inter-Creditor Dispute is being settled. It is only through reviewing the Arahova Scenarios and otherwise reverse engineering from the end result (Plan recoveries) to the starting point (May 2005 Schedules) that it becomes evident that the Global Settlement and the Plan are a home run for the Arahova Noteholders Committee.

The primary underlying premise for the Arahova Scenarios is that all Intercompany Claims that inure to their benefit are respected, while those Intercompany Claims that inure to the benefit of ACC creditors are either eliminated or subordinated. The practical result of this premise is that it shifts value in solvent subsidiary silos, that would otherwise flow up to ACC either through Intercompany Claims or equity interests, to Arahova. The Arahova Noteholders Committee then takes this astounding theory one step further and proposes netting of Intercompany Claims within silos combined with disaggregation of Arahova's net receivable from the Bank of Adelphia. The May 2005 Schedules reflect a $1.4 billion net receivable owed by the Bank of Adelphia to Arahova. The Arahova Noteholders Committee suggests that this net receivable be unnetted or disaggregated into a $2.9 billion receivable and a $1.5 billion payable – with the payable subordinated or otherwise eliminated. To do so would violate fundamental accounting and legal principles and is utterly unsubstantiated. For example, the doctrine of setoff, as preserved by section 553 of the Bankruptcy Code, is not altered in bankruptcy, and does not affect a creditor's right to setoff, even where the creditor's claim is subordinated.[35] Furthermore, even if it made a valid argument for the equitable subordination of its payable,

---

[35] *Fisher v. Outlet Co. (In re Denby Stores)*, 86 B.R. 768, 780 (Bankr. S.D.N.Y. 1988) (citing *Rochelle v. U.S.*, 521 F.2d 844, 855 (5th Cir. 1975) ("We think a subordinated claim can be used to set off a claim by the bankrupt estate against the creditor even though the subordinated claim could not itself share in the dividends."); *see e.g. Defense Servs. v. U.S. (In re Defense Servs.)*, 104 B.R. 481, 485 (Bankr. S.D. Fla. 1989) (finding that "it is irrelevant to the right of setoff whether the claim asserted as a setoff is a subordinated claim").

which it cannot do, "the mere fact of subordination does not by itself provide a basis to deny setoff."[36]   There is no legal basis for such a disaggregation of payables and receivables at the Arahova level.  This is just another example of the Arahova Noteholders Committee's attempt to manipulate the law in its favor, and the Court should not countenance such tactics  The proposed treatment of Intercompany Claims in the Arahova Scenarios abrogates existing law.   This treatment can only be achieved through substantive consolidation, but, if there were substantive consolidation, then it would benefit all creditors, including ACC creditors, rather than only Arahova creditors.  As discussed in detail below, this twisted form of substantive consolidation, which is embedded in the Global Settlement and the Plan, is unwarranted and illegal.

      **2.**      *THE ARAHOVA NOTEHOLDERS COMMITTEE'S ANALYSIS, AS WELL AS THE PLAN AND GLOBAL SETTLEMENT, ARE DERIVED FROM AN IMPROPER FORM OF SUBSTANTIVE CONSOLIDATION IN VIOLATION OF APPLICABLE LAW*

The Plan Proponents purport to "reserve the right to seek to substantively consolidate any two or more Debtors,"[37] but the Plan inconsistently achieves projected recoveries by pooling the assets of every estate and then using those combined assets to first pay claims filed against insolvent subsidiary estates (such as Arahova) without regard to the capital structure or scheduled Intercompany Claims.[38]   This result can only be obtained through acquiescence to an unsanctioned, hybrid form of substantive consolidation, which results in the distribution of ACC's assets to other creditors, while giving ACC creditors nothing in exchange.

Other Debtors clearly owe money to ACC on account of Intercompany Claims— and ACC is entitled to the equity value of all Debtors having equity—but the Plan provides that

---

[36]      *In re Silver Eagle Company*, 262 B.R. 534, 538 (Bankr. D. Or. 2001).

[37]      *See* Plan § 2.2.

[38]      Just by way of example, without this unjustified hybrid of substantive consolidation, it is impossible under the applicable facts and law for the holders of both Arahova Notes and FrontierVision HoldCo Notes to receive distributions near or greater than par.

no distributions will be made on account of those claims or equity interests.[39]  Rather, the Plan

requires the ACC Debtors to pay creditors of other estates what the Plan says they must be

paid.[40]  And while the capital structure vanishes behind the purported veil of the Global

Settlement, creditors of these other estates are magically allocated first priority in the Debtors'

aggregated assets on the Effective Date—and ACC creditors are demoted to second-class

status—without any explanation of why scheduled Intercompany Claims that are worth hundreds

of millions of dollars in value should be subordinated, disallowed or avoided altogether.[41]

Instead, the Plan posits this radical reorientation of rights as a self-fulfilling prophesy; that is,

these provisions "satisfy the obligations of [the Debtors] under the Plan."[42]

       Under the Plan and Global Settlement, all Intercompany Claims are eliminated,

all Subsidiary Debtors share in a pool of assets, the ACC creditors obtain their recoveries solely

through alleged "give ups" by other creditors and any residual value, and the holders of Arahova

Notes obtain a recovery of 99%, far in excess of that available based on either the Debtors' May

2005 Schedules (excluding Historic Entries) (29.8%) or total substantive consolidation (69.3%).

To achieve this result, holders of Arahova Notes (which includes the majority of the Settlement

Party creditors — Huff, members of the Arahova Noteholders Committee and members of the

Crossover Committee) receive the benefits of substantive consolidation (*i.e.,* elimination of

Intercompany Claims without adjudication due to the alleged impossibility or impracticability of

determining Intercompany Claims and the Inter-Creditor Dispute), without suffering the burdens

---

[39]     *See* Plan §§ 2.4, 5.1(k), 5.2(l), 5.3.

[40]     *See* Plan §§ 5.1(k), 5.2.

[41]     *See* Plan § 10.13 (stating that "all Available Cash on the Effective Date shall be allocated pro rata to the [Subsidiary Debtors' unsecured creditors]"); Plan Ex. A ("Available Cash  means the aggregate amount of Cash of the Debtors as of the Effective Date").

[42]     *See* Plan §§ 5.1(k), 5.2(l), 5.3.

of substantive consolidation (*i.e.,* combination of all assets and liabilities, resulting in far greater distributions on the ACC Senior Notes than provided for under the Plan).

Thus, the Plan creates two separate, but unequal, "groups" for confirmation and distribution purposes: (1) the Subsidiary Debtors, a favored and deemed solvent group; and (2) the ACC Debtors, a disfavored and deemed insolvent group.[43]  If the Plan is confirmed, the Court will sanction the Debtors' pooling of all of their assets to guarantee premium recoveries—payment in full plus postpetition interest—to creditors of Subsidiary Debtors, while the Debtors will remain separate and the ACC creditors lose the benefit of their scheduled Intercompany Claims.  This scheme violates fundamental creditor rights because it purports to disregard capital structures, pool assets, and eliminate intercompany claims, without the requisite showing, while at the same time the Plan maintains that creditors' claims against the various estates remain separate – all of which results in a windfall to favored creditor groups at the Subsidiary Debtors.[44]  Notably, this result duplicates the position of the Arahova Noteholders Committee previous position in the Inter-Creditor Dispute.[45]  But this mendacious form of substantive consolidation, whereby ACC creditors lose the benefits of the Intercompany Claims and other assets but do not obtain the benefits of a normalized substantive consolidation, is utterly unwarranted and illegal.

---

[43]     *See* Plan §§ 2.2, 10.13, 5.1(c)-(e), 5.2(d)-(j).

[44]     *See Owens Corning*, 419 F.3d at 199-200, 211 (holding, *inter alia*, that "a 'deemed' consolidation cuts against the grain of all of the principles" regarding substantive consolidation); *In re N.S. Garrott & Sons*, 48 B.R. at 18 (Bankr. E.D. Ark. 1984) (denying confirmation of a plan that treated separate estates as consolidated without seeking an order of substantive consolidation).

[45]     *See Ad Hoc* Committee of Arahova Noteholders Final Issues Statement, dated January 13, 2006, at pp. 22-23 (Docket No. 9326).

a.   *ABSENT NEAR HOPELESS ENTANGLEMENTS, SUBSTANTIVE CONSOLIDATION OR ANY HYBRID THEREOF IS UNWARRANTED AND ILLEGAL*

As a general rule, a debtor cannot use property of its estate to pay claims filed against a different debtor.[46]  Indeed, the Bankruptcy Code presumes that chapter 11 plans will respect existing capital structures in multi-debtor cases and that each debtor will satisfy claims from its own assets.[47]  The Supreme Court mandates that debtors determine the assets available in each estate to satisfy claims and then allocate those assets fairly among its creditors.[48]  A plan that departs from this mandate through "deemed" consolidation tactics misuses the remedy of substantive consolidation "as a sword and not a shield."[49]

In limited and extraordinary circumstances—and only after substantial evidence that debtors abused corporate forms or hopelessly commingled their assets—may a chapter 11 plan "disregard separate corporate entities . . . in order to reach assets for the satisfaction of debts of a related corporation."[50]  This extraordinary remedy of "substantive consolidation"[51] allows a plan to combine several debtors' assets and liabilities, and thereby eliminate any inter-entity claims, so that each affected debtor's liabilities are satisfied from the common pool of assets

---

[46]   *In re Owens Corning*, 419 F.3d at 211, 216 (3rd Cir. 2005) (flatly rejecting a plan to consolidate assets for distribution purposes while leaving the existing corporate structure undisturbed); *Walsh Const., Inc. v. Alaska Nat'l Bank* (*In re Walsh Const., Inc.*), 669 F.2d at 1330 (9th Cir. 1982) (cited with approval in *FDIC v. Colonial Realty Co.*, 966 F.2d at 61 (2d Cir. 1992)); *James Talcott, Inc. v. Wharton* (*In re Continental Vending Mach. Corp.*), 517 F.2d at 1000 (2d Cir. 1975); *see also* 1 Norton Bankruptcy Law and Practice 2d, § 20.9 (2003) ("If the debtors' cases are not substantively consolidated, the plan must treat the debtors' respective assets and liabilities separately").

[47]   *See, e.g.*, *Consol. Rock Prods. Co.*, 312 U.S. at 520 (1941); *Owens Corning*, 419 F.3d at 211; *Flora Mir Candy Corp.*, 432 F.2d at 1062-63 (2d Cir. 1970).

[48]   *Kuehner*, 299 U.S. at 451 (1937); *Consol. Rock*, 312 U.S. at 520, 524-25.

[49]   *Owens Corning*, 419 F.3d at 216.

[50]   *In re Continental Vending Mach. Corp.*, 517 F.2d at 1000.

[51]   *See, e.g., id.*

created by the consolidation.[52]  Despite its "disarmingly innocent sound," courts recognize that its consequences are so severe that a stringent showing must be made before it is ordered:  it "is no mere instrument of procedural convenience."[53]

Substantive consolidation, by definition, abridges the constitutional requirement that a plan provide for a rational distribution of the estate's assets to satisfy the estate's liabilities.[54]  While courts have identified numerous factors to consider in determining when substantive consolidation is appropriate, the Second Circuit has distilled this case law into a two-pronged test: (i) creditor reliance — whether creditors dealt with the entities as a single economic unit or (ii) hopeless entanglement — whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.[55]  "Because of the dangers of forcing creditors of one debtor to share equally with creditors of a less solvent debtor, 'substantive consolidation is no mere instrument of procedural convenience . . . but a measure vitally affecting substantive rights . . .".[56]

---

[52]     *See Colonial Realty Co.*, 966 F.2d at 58-59; *Augie/Restivo,* 860 F.2d at 518 (2d. Cir. 1988); *Kheel*, 369 F.2d at 847 (2d Cir. 1966); *see also Alexander v. Compton* (*In re Bonham*), 229 F.3d 750, 764-767 (9th Cir. 2000); *Eastgroup Properties v. Southern Motel Assoc., Ltd.*, 935 F.2d 245, 248 (11th Cir. 1991).

[53]     *Flora Mir*, 432 F.2d at 1062.

[54]     *Kuehner*, 299 U.S. at 452 ("While [] the Fifth Amendment forbids the destruction of a contract it does not prohibit bankruptcy legislation affecting the creditor's remedy for its enforcement against the debtor's assets, or the measure of the creditor's participation therein, *if the statutory provisions are consonant with a fair, reasonable, and equitable distribution of those assets.*") (emphasis added).

[55]     *Augie/Restivo*, 860 F.2d at 518.

[56]     *In re World Access, Inc.*, 301 B.R. 217, 272 (Bankr. N.D. Ill. 2003) (quoting *Augie/Restivo*, 860 F.2d at 518 (citations omitted)).

Even where certain factors may implicate substantive consolidation, courts recognize that substantive consolidation is a course of last resort.[57]  In words that resonate here, Judge Friendly once remarked:

> I cannot agree that a practice of handling the business of a group of corporations so as to impede or even prevent completely accurate ascertainment of their respective assets and liabilities in their subsequent bankruptcy justifies failure to make every reasonable endeavor to reach the best possible approximation in order to do justice to a creditor who had relied on the credit of one . . . .[58]

Accordingly, substantive consolidation should be invoked sparingly because of the possibility of unfair treatment of creditors, and only after the proponent of consolidation satisfies a heightened standard of judicial scrutiny.[59]  And, substantive consolidation requires, and indeed was intended to ensure, equity and fundamental fairness to *all* creditors of the various debtor estates; if *any* creditor is harmed, the doctrine cannot be properly employed.[60]

Substantive consolidation is unwarranted (and illegal) in this case.[61]  The Debtors each filed separate petitions and separate schedules of assets and liabilities.  There have been no allegations — nor could there be — of creditor reliance on a single economic unit.  Most, if not all, of the bank debt and bond debt was issued based on the separate credit of each issue.  Nor is there any evidence of hopeless entanglement.  In *World Access*, a recent decision denying substantive consolidation on facts extremely similar to those in this case, the court noted that the

---

[57]     *Owens Corning*, 419 F.3d at 200, 211.

[58]     *Kheel*, 369 F.2d at 848.

[59]     *Id.* at 847; *Augie/Restivo*, 860 F.2d at 518; *In re Continental Vending Machine*, 517 F.2d at 1001; *Flora Mir*, 432 F.2d at 1062-63; *see also Clyde Bergemann, Inc. v. Babcock & Wilcox Co.* (*In re Babcock & Wilcox Co.*), 250 F.3d at 958 n.6 (5th Cir. 2001) (substantive consolidation is "subject to heightened judicial scrutiny").

[60]     *Augie/Restivo*, 860 F.2d at 518 ("The *sole* purpose of substantive consolidation is to ensure the *equitable treatment of all creditors*.") (emphasis added)

[61]     *In re the Babcock & Wilcox Co.*, 250 F.3d 955, 958 n.6 (5th Cir. 2001).

control group had no uniform guidelines for the recording of various intercompany transactions nor did the debtors "allocate overhead charges amongst themselves."[62]  Nevertheless, the court concluded that, because "all the relevant accounting data . . . still exist[ed], . . . [a] reasonable review to make any necessary adjustments is all that should be required or authorized."[63]

Before intercompany balances can be wiped out, as they are by substantive consolidation and under the proposed Plan and Global Settlement, there must be a showing that "the time and expense necessary even to attempt to unscramble [the debtor's assets and liabilities] is so substantial as to threaten the realization of any net assets for all the creditors, or where no accurate identification and allocation of assets is possible."[64]  To support substantive consolidation and the attendant elimination of intercompany claims, the evidence of commingling of assets and business functions must approach a "level of 'hopeless obscurity' of 'interrelationships of the group'" that would justify "sacrificing the rights" of certain creditors.[65]

The court in *Flora Mir* and *Augie/Restivo*, for example, declined to substantively consolidate certain entities because, in each case, the debtor's property was traceable and its assets and liabilities were identifiable.[66]  Consequently, the Plan Proponents cannot treat multiple estates as one unless the Court finds sufficient factual and legal basis to order substantive consolidation.[67]  The assets of one Debtor's estate <u>cannot</u> be used to satisfy claims filed against

---

[62]     *In re World Access*, 301 B.R. at 234.

[63]     *Id.* at 279.

[64]     *Augie/Restivo*, 860 F.2d at 519 (internal quotation and citations omitted).

[65]     *Id.* at 519, 521 (quoting *Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.)*, 432 F.2d 1060, 1063 (2d Cir. 1970)).

[66]     *Augie/Restivo*, 860 F.2d at 519; *Flora Mir*, 432 F.2d at 1063.

[67]     *In re Ne. Dairy Coop. Fed'n, Inc.*, 88 B.R. 21, 24 (Bankr. N.D.N.Y. 1988) (citing *Chem. Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966); *Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp., Inc.)*, 810 F.2d 270, 276-277 (D.C.Cir. 1987)).

another Debtor because courts fulfill the expectations of state law and the Bankruptcy Code by respecting the separateness of corporate and other legal entities.[68]  Moreover, failure to allocate value to inter-estate equity interests and inter-estate claims "renders impossible a correct consideration of the absolute priority rule."[69]

Here, as in *Flora Mir*, "the accountants . . . had managed to come up with financial statements of each of the debtors,"[70] and in the instant case, such financial restatements are the product of almost $100 million worth of effort by independent auditors.  The Restatement should not be ignored.  Rather, the Restatement and the May 2005 Schedules are presumptive evidence refuting the necessity of substantive consolidation — or the wholesale elimination of Intercompany Claims without an adjudication on the merits — in these chapter 11 cases.  Indeed, the *World Access* court held that the same types of issues present here — *e.g.*, consolidated financials, unity of ownership, overlapping officers and directors, and centralized cash management — are "quite common in today's corporate groups" and do not, without more, establish a *prima facie* case for consolidation.[71]

        **b.**    ***THE GLOBAL SETTLEMENT'S END RUN AROUND THE MERITS OF THE INTERCOMPANY CLAIMS PARALLELS THE REVERSIBLE ERROR COMMITTED IN OWENS CORNING***

By offering the Court a convenient, but unwarranted and illegal, means to avoid adjudication of the Inter-Creditor Dispute, the Global Settlement invites the Court to commit a

---

[68]    *Owens Corning II*, 419 F.3d at 211, 216 (flatly rejecting a plan to consolidate assets for distribution purposes while leaving the existing corporate structure undisturbed); *see also* 1 Norton Bankruptcy Law and Practice 2d, § 20.9 (2003) ("If the debtors' cases are not substantively consolidated, the plan must treat the debtors' respective assets and liabilities separately").

[69]    *In re N.S. Garrott & Sons*, 48 B.R. 13, 16 (Bankr. E.D. Ark. 1984); *see also In re Exide Techs. Inc.*, 303 B.R. at 60-61 ("A determination of the Debtor's value directly impacts the issues of whether the proposed plan is "fair and equitable," as required by 11 U.S.C. § 1129(b)").

[70]    *In re Flora Mir*, 432 F.2d at 1063.

[71]    *In re World Access*, 301 B.R. at 276.

variant of the reversible error committed by the trial court in *Owens Corning*.[72]  In *Owens Corning I*, a consortium of parties sought substantive consolidation to achieve its chapter 11 plan, against the opposition of an ad hoc group of banks.  The district court granted the plan proponents' motion and concluded:

> It is also clear that substantive consolidation would greatly simplify and expedite the successful completion of this entire bankruptcy proceeding.  More importantly, it would be exceedingly difficult to untangle the financial affairs of the various entities.  While it is true that, as stressed by the Banks, the Debtors have apparently expended large sums of money having accounting experts attempt to sort out, and balance, the financial affairs of each entity, there are still many reasons for challenging the accuracy of the results achieved.[73]

The court justified substantive consolidation because "[i]t would be extremely difficult to sort out the inter-company claims."[74]

The trial court's justifications were soundly rejected by the Third Circuit on appeal, based in large part on jurisprudence from the Second Circuit. [75]  As an initial matter, the Third Circuit saw through the plan proponents' "ploy to deprive one group of creditors of their rights while providing a windfall to other creditors."[76]  The court further recognized the elimination of most financial discrepancies from the Debtors' books, despite some "sloppy bookkeeping," through the examination of such books by the independent auditors Ernst &

---

[72]  *In re Owens Corning*, 316 B.R. 168 (Bankr. D. Del. 2004) ("*Owens Corning I*"), *rev'd*, 419 F.3d 195 (3d Cir. 2005) ("*Owens Corning II*").

[73]  *In re Owens Corning I*, 316 B.R. at 171.

[74]  *Id.* at 172.

[75]  *In re Owens Corning II*, 419 F.3d 195.

[76]  *Id.* at 200.

Young.[77]  The Third Circuit emphasized that the remedy of substantive consolidation should be used "sparingly,"[78] not as a matter of administrative convenience in the manner approved by the district court,[79] and accepted that a debtor's records will often be imprecise and not "perfect."[80] Finally, the Third Circuit ruled that "substantive consolidation should be used defensively to remedy identifiable harms, *not offensively to achieve advantage over one group in the plan negotiation process.*"[81]  Substantive consolidation is not a "free pass" to avoid litigation; if the litigation has been "teed up . . . then the game should be played to the finish in that arena."[82]

Further, any suggestion that the Debtors can avoid their statutory and common law duties by calling this scheme a "settlement" is wrong.[83]  The tactic employed here has been tried and rejected by courts.  In *Walsh Construction*, the trustee for two jointly administered cases—a partnership and corporation, respectively — settled disputes related to a bank's security interest in the corporation's equipment.[84]  Even though the cases had not been substantively consolidated, the settlement agreement provided that the bank would receive its collateral, postpetition interest on its claim, and an additional $50,000 payment *from the partnership* to

---

[77]  *Id.* at 200-01.

[78]  *Id.* at 208-09.

[79]  *Id.* at 214.

[80]  *Id.* at 215.

[81]  *Id.* at 215 (emphasis added).

[82]  *Id.* at 215.

[83]  *Schwabacher v. United States*, 334 U.S. 182, 199 (1948); *In re Walsh Const., Inc.,* 669 F.2d 1325, 1327-28 (9th Cir. 1982); *Costa v. Robotic Vision Sys., Inc.,* BAP No. NH 05-047, 2006 Bankr. LEXIS 531 (April 11, 2006 B.A.P. 1st Cir.); *In re CGE Shattuck, Inc.,* 254 B.R. 5, 11 (Bankr. N.H. 2000); *see also, In re U. S. Brass Corp.*, 255 B.R. 189, 194 (Bankr. E.D. Tex. 2000) (refusing to approve a plan modification "regardless of Movant's attempt to clothe it as a settlement"), *aff'd sub nom. U.S. Brass Corp. v. Travelers Ins. Group, Inc.* (*In re U.S. Brass Corp.*), 301 F.3d 296, 307 (5th Cir. 2002).

[84]  *Walsh Const.*, 669 F.2d at 1327-28.

compensate the bank for collateral depreciation during the case.[85]  Both the bankruptcy court and the district court approved the settlement as reasonable, absent a specific finding that the cases should be substantively consolidated or that the value of the corporation's assets was sufficient to pay principal plus interest.  The Ninth Circuit reversed the lower courts' approval, even though it did not dispute the reasonableness of the settlement, because "[i]n the absence of consolidation, it was improper to use partnership assets to satisfy a corporate debt."[86]

Regardless of the whether the Plan Proponents could ever convince a court that the proposed "Global Settlement" is somehow reasonable in a "rough justice" sense, the Court cannot confirm a settlement that pools several debtors' "aggregated assets" to guarantee premium payments to a group of creditors, while simultaneously reserving the right to seek substantive consolidation at a later date.[87]  As the Third Circuit recently noted, tactics such as this one "remake substantive consolidation not as a remedy, but rather as a stratagem to 'deem' separate resources reallocated to [one estate] to strip [affected creditors] of rights under the Bankruptcy Code, favor other creditors, and yet trump possible Plan objections by [the affected creditors]. . . . It is here a tactic used as a sword and not a shield."[88]

Moreover, by treating the Subsidiary Debtors as substantively consolidated without seeking this Court's approval of that remedy, the proposed settlement "circumvents basic due process."[89]  Courts have steadfastly resisted efforts to cut corners on basic legal

---

[85]     *Id.* at 1329-30.

[86]     *Id.* at 1330 (the court also found that the debtor had a duty to establish the value of its assets before paying postpetition interest).

[87]     *Compare* Plan §§ 2.2, 10.13, Ex. A (definitions of Available Cash and Plan Consideration), *with Owens Corning*, 419 F.3d at 216.

[88]     *In re Owens Corning*, 419 F.3d at 216.

[89]     *In re Garrott & Sons*, 48 B.R. at 18.

principles to facilitate the type of redistribution scheme reflected in this settlement.[90] Courts also reinforce a long-standing policy against risk reallocation in multi-debtor cases by requiring a heightened burden of proof for consolidation plans.[91] These due process protections are particularly important in this case because every entity has different debt-to-asset ratios and, most important, the "liabilities of [the] consolidated entities *inter se* are extinguished by the consolidation."[92]

Because the remedy of substantive consolidation arises in equity rather than law, a bankruptcy judge does not "exercise unrestricted power to contradict statutory or common law when he feels a fairer result may be obtained by application of a different rule."[93] To the contrary, estate consolidation must follow well-established rules that "ensure the equitable treatment of all creditors."[94] Significantly, simplification and expediency are not legitimate reasons for estate consolidation, particularly if, as a result of consolidation, a creditor is deprived

---

[90]     *See, e.g., Colonial Realty Co.*, 966 F.2d at 61 (requiring bankruptcy courts to conduct a "searching review of the record, on a case-by-case basis," to ensure that consolidation effects its sole aim of fairness to all creditors); *In re Chicago, M. S. P. & P. R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986) (stating that "[t]he fact that a proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be"); *In re Amatex Corp.*, 97 B.R. 220, 225-26 (Bankr. E.D. Pa. 1989) (refusing to exercise equitable powers to force redistribution of property in violation of contractual rights); *N.S. Garrott & Sons*, 48 B.R. at 17-19 (denying confirmation of plan premised upon reallocation of assets from solvent estate to insolvent estate because plan proponents failed to move for substantive consolidation or otherwise meet their "substantial" burden of proof).

[91]     *Kheel*, 369 F.2d at 847; *Augie/Restivo*, 860 F.2d at 518; *In re Continental Vending Machine*, 517 F.2d 997, 1001 (2d Cir. 1975); *Flora Mir*, 432 F.2d at 1062-63; *see also Babcock & Wilcox*, 250 F.3d at 958 n.6 (substantive consolidation is "subject to heightened judicial scrutiny"); *Allied Commc'ns Corp. v. Cont'l Cellular Corp.*, 821 F.2d 69, 72 (1st Cir. 1987) (stating that courts should avoid risk reallocation); *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363, 1375 (9th Cir. 1978) ("[r]isk shifting is socially expensive and should not be undertaken in the absence of a good reason").

[92]     *In re Auto-Train Corp.*, 810 F.2d at 276.

[93]     *U.S. v. Noland*, 517 U.S. at 535, 543 (1966) (quoting *In re Ahlswede*, 516 F.2d 784, 787 (9th Cir. 1975)

[94]     *Augie/Restivo*, 860 F.2d at 518; *see also Owens Corning II*, 419 F.3d at 216 ("Substantive consolidation at its core is equity. Its exercise must lead to an equitable result.").

of its rights, such as its fundamental right to share in the assets — including the intercompany claims — held by its debtor.[95]

### 3. IN A COMPLETE DEPARTURE FROM THE LAW OR FACTS, THE ARAHOVA SCENARIOS DISALLOW OR SUBORDINATE THE AIH RECEIVABLE

ACC Investment Holdings, Inc. ("AIH") is a wholly owned subsidiary of ACC and one of the ACC Debtors. AIH served a critical role in the Debtors' pre-petition tax planning and centralized cash management system, thus inuring to the benefit of all Debtors. The evidence presented at trial revealed that the AIH receivable represents contributions from ACC and ACC Operations Inc. ("ACC Ops") as a result acquisitions, investments, and the of issuance of securities, and any interest accumulated thereon.[96] These receivables were transferred to AIH for valid tax-planning purposes which benefited the company overall.[97] As a Delaware holding company, AIH had certain tax advantages, and ACC would contribute, at least once annually, all of its outstanding intercompany receivable balance to AIH.[98] In all events, the transaction was recorded internally with corresponding intercompany obligations and contribution of the acquired business down to subsidiaries through the Bank of Adelphia. The attendant result is that AIH holds a $16.8 billion receivable from the Bank of Adelphia, the lion's share of which resulted from the sale of securities by ACC (approximately $10 billion) or acquisition-related receivables via ACC Ops (approximately $6.8 billion).

---

[95] *Augie/Restivo,* 860 F.2d at 521; *Flora Mir*, 432 F.2d at 1062-63.

[96] Donovan Hr'g Tr., Vol. 25; 15: 11-13. Approximately $9.4 billion of the AIH's total receivable is from AIH, and approximately $6.9 billion is from ACC Ops. Arahova Ex. 88, at 2 ("Other Material Disputed Intercompany Balances as per G/L's"); ACC 449, at 7 (showing AIH's balance by transaction type).

[97] *Id.* Hr'g Tr. Vol. 25; 15:11-17, March 2, 2006; Donovan testified it was his understanding that "the reason for ACC being contributed to AIH was a tax-driven strategy."

[98] ACC Ex. 140, WDC 001101366.

As discussed in greater detail below, notwithstanding that all of the Debtors benefited from the efficiencies of the centralized cash management system (a standard tool used by large corporation throughout the country) and prudent tax planning, the Arahova Noteholders Committee seeks to equitably subordinate the $16.8 billion receivable owed to AIH by the Bank of Adelphia. Further, they seek this extraordinary relief without having articulated any valid factual or legal basis. There is simply no basis upon which to equitably subordinate any portion of this receivable.

In its MIA Litigation briefs the Arahova Noteholders Committee attempted to attribute the Rigases' fraud to ACC or the Bank of Adelphia,[99] but the facts show that these entities suffered from the Rigases' inequitable conduct as much, if not more, than did Arahova and the other Adelphia entities. At various times, the Rigases caused Adelphia entities (including an Arahova subsidiary, but not including ACC) to enter into the Co-Borrowing Facilities and then proceeded to use proceeds from those facilities for themselves; they manipulated financial data to create inaccurate financial statements ultimately filed by both ACC and its reporting subsidiaries (including Arahova); and they used parts of the entire Adelphia enterprise to enrich themselves by billions of dollars. As a consequence, none of the required elements for equitable subordination of ACC intercompany claims exist here.

Indeed every single one of the Adelphia entities was under investigation and a "real risk" of indictment prior to the Government Settlement approved by the Court last May. The Debtors themselves vigorously and repeatedly emphasized in the motion to approve the SEC Government Settlement, that *all* of the Debtors could be indicted, imminently, if the settlement

---

[99]  *See* Memorandum of the Ad Hoc Committee of Arahova Noteholders for Hearing 2, ¶¶ 26, 36, 38, 32, 34, respectively.

were not approved.[100]  Following a hotly-contested hearing, the Court approved the settlement (a critical component of which was an agreement by the Government not to prosecute **any** of the Adelphia entities that are debtors in these cases) in part because it "[e]liminate[d] a 'real risk' of criminal indictment of Adelphia [the enterprise]."[101]  The Arahova Noteholders Committee's allegations that ACC should be punished because it alone was responsible for the fraud, are therefore, without merit.

Moreover, the AIH Receivable does not represent an equity contribution.  The Debtors made a conscious decision for tax and accounting purposes to record these obligations as Intercompany Claims.  It is clear that when ACC or other entities intended to book equity investments they did so, and where they chose not to, it was deliberate.[102]  There is nothing inherently wrong about the use of a centralized cash management system and the back and forth movement of cash and consideration among affiliated entities with attendant intercompany debt, rather than capital contributions or dividends.[103]

The evidence during the MIA Litigation revealed that the transfer of receivables was evaluated in the Restatement, and determined to be valid—in fact any intercompany receivables not contributed in 2002 were contributed in the Restatement in order to be consistent

---

[100]    Motion For Order Approving three Related Agreements Between The Debtors And The Securities Exchange Commission, The Department Of Justice, And The Rigas Family (Docket No. # 7366), ¶ 6 (settlement would "relieve the Debtors of the persistent indictment threat"); ¶ 18 ("the Debtors remain a subject of the DoJ investigation regarding matters related to alleged wrongdoing of Rigas Management"), ¶ 51 ("The Government has advised the Debtors' professionals that there is a 'real risk' of an indictment of Adelphia [the enterprise]."), ¶ 53 ("the Government could indict Adelphia [the enterprise] for the imputed criminal conduct of Rigas Management . . . .").

[101]    *In re Adelphia*, 327 B.R. at 160.

[102]    *In re LaFayette Hotel P'ship*, 227 B.R. 445, 454 (S.D.N.Y. 1998) ("inequitable conduct is required to subordinate insider claims to the claims of other creditors").

[103]    *See In re Hillsborough Holdings Corp.*, 166 B.R. 461, 471 (Bankr. M.D. Fla.) ("[i]t has been widely recognized in the corporate world that there is nothing inherently wrong in a parent managing all the cash generated by the subsidiaries through a cash management system").

with past practices.[104]  The auditors examined the transactions and documentation carefully and chose not to restate transactions because they were fairly routine and there was no need to correct them.[105]  The transfers were solely for its stated tax purposes, and if not accomplished or unwound, the $16.8 billion in receivables would lie with ACC.  The Arahova Noteholders Committee introduced no persuasive evidence to the contrary.

4.    *THE ARAHOVA SCENARIOS ARE INTERNALLY INCONSISTENT AND PATENTLY ABSURD IN OTHER RESPECTS AS WELL*

In addition to the illegal treatment of Intercompany Claims and substantive consolidation, the Arahova Scenarios are fraught with other legally deficient and skewed theories.  For example:

- Assumes a $1 billion recovery on its fraudulent conveyance claim in six of its scenarios, a figure that is grossly overstated if there were even any basis for a fraudulent transfer, and that:  (a) fails to treat a series of integrated transfers as one transaction and instead impermissibly isolates one component as if it can stand alone and be unwound separately from the entire transaction; (b) fails to recognize that Arahova received reasonably equivalent (if not greater) value as a result of the overall transfer of assets among entities; (c)  assumes every entity with intercompany payables is solvent, therefore creating solvency at the Bank of Adelphia while inconsistently alleging insolvency at Arahova; (d) fails to acknowledge that certain intercompany scenarios, such as Intercompany C1 and D and their modified form of Intercompany B, reduce the probability of successfully asserting a fraudulent transfer claim by making it more likely that CCHC and Arahova were solvent at the time of the transfer; and (e) materially overstates the value of the "Transferred Out Subsidiaries" by failing to use updated intercompany balances.

- Disregards the Debtors' practice of distinguishing between debt and equity transactions and their deliberate, not accidental, selection of either to reflect the substance of the relevant transaction; and conveniently disregards the postpetition use of the cash management system and the existence of accepted intercompany claims based thereon.

---

[104]    DiBella Hr'g Tr. Vol. 9, 57:18 -25, Feb. 14, 2006.

[105]    DiBella Hr'g Tr., Vol. 9, Feb. 19, 2006); 57:18-58:25. Donovan Hr'g Tr., Vol. 25; 20:8-21:4, March 2, 2006.

- Employs an indefensible valuation for the Los Angeles-based assets in certain scenarios. Both the Debtors' chief executive officer and chief financial officer have indicated that, notwithstanding having received fifteen bids for the Debtors' assets, the Debtors received no bids for what is referred to as "Cluster D", which includes the Los Angeles-based assets related to Arahova and, thus, the asset support for the Debtors' Arahova Notes. The Debtors' possible explanations for the inability to obtain a stand alone offer for those assets included lower margins, issues involving local cable operations, and corporate governance issues. *See* Schleyer Decl. 12 – 13, Dec. 28, 2005. The potential value of the Los Angeles assets has been touted for four years, but that cluster has demonstrated no improvement.

- Distorts the results for ACC creditors under its "No Arahova Recovery Cap" analysis by calculating creditor recoveries irrespective of the requirements of the Bankruptcy Code. Under the Bankruptcy Code, there is no possible outcome whereby an unsecured creditor could recover in excess of par and, for some, accrued interest. Consequently, failure to reapportion any excess to ACC creditors, who under the assumptions made in preparing their scenarios are entitled to the residual, conveys a far bleaker result than could legally occur.

- Obscures the reality of the MIA Litigation process for the Court by asserting that it is overly complicated and would take years to complete, when, as a practical matter, the bulk of the outstanding issues would have been decided at the conclusion of Hearing 2, and the Court had already narrowed its universe into the 14 MIA Issues.

- Projects recoveries out by two years to allow for prosecution of the Inter-Creditor Dispute, whereas, had the litigation continued on earlier this year, it could have been completed over the last six months.[106]

5. ***NEITHER THE PLAN PROPONENTS NOR THE ARAHOVA NOTEHOLDERS COMMITTEE CAN OVERRULE THIS COURT'S MANDATE FROM THE SUPREME COURT TO DETERMINE EACH DEBTORS' ASSETS AND LIABILITIES***

Nowhere in the Original Term Sheet, Plan Agreement, Plan Support Agreement, Second Disclosure Statement Supplement or the Plan have the Plan Proponents or any of the Settlement Parties explained how the Inter-Creditor Dispute is being resolved. Instead, it is

---

[106] It is equally implausible to assume as an absolute that, in two years, the cases would continue to be a chapter 11 reorganization. By December 2008, these liquidating chapter 11 cases may well have been converted to chapter 7, thereby arguably reducing the interest available on unsecured claims.

repeatedly proclaimed that there was this litigation—the Inter-Creditor Dispute—and it is being settled and then sets forth the distributions for each creditor class. No where do the Plan Proponents or any of the other Settlement Parties explain to other creditors or this Court the resolution of the disputed issues and the impact on the assets and liabilities of each Debtor. The Court has an obligation to determine the assets and liabilities of the debtor and it cannot sanction this cavalier disregard for this mandate from the Supreme Court.[107] For a creditor to know whether it is receiving its fair, reasonable, and equitable distribution of its debtor's assets, it must be able to determine, at least roughly, where it stands in the hierarchy of claims, the assets available to satisfy these claims, and the number and amount of claims that must be paid before such creditor is entitled to any distribution.

      The Supreme Court commented on this elementary principle in a case reversing a confirmation order based on the lower court's failure to exercise its informed and independent judgment: "In the first place, there must be a determination of what assets are subject to the payment of the respective claims."[108] Disclosure of financial information is so intrinsic to the bankruptcy process that "[a]nything short of voluntary and honest disclosure obstructs the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties."[109]

      In *Consolidated Rock*, the Supreme Court found the lower court "summarily disposed of" and "made no findings as respects the amount or validity of [a large] intercompany claim;" in so doing, the court failed to exercise its "informed, independent judgment, which

---

[107]     *See TMT Trailer*, 390 U.S. at 424.

[108]     *Consol. Rock Prods. Co.*, 312 U.S. at 520.

[109]     *In re Valley Park Group, Inc.*, 96 B.R. 16, 23 (Bankr. N.D.N.Y. 1989); *accord Momentum Mfg. Corp. v. Employee Creditors Comm.*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("'Full and fair' disclosure is required during the *entire* reorganization process; it begins on day one with the filing of the Chapter 11 petition.").

appraisal of the fairness of a plan of reorganization entails."[110]  Accordingly, the Supreme Court

held that one of the two reasons justifying reversal of confirmation was the lower court's failure

to meet the "obvious requirement" of "determine[ing] what assets are subject to the payment of

the respective claims."[111]  The Supreme Court recognized that, "[i]f that [intercompany] claim is

valid, or even if it were allowed only to the extent of 25% of its face amount," it would

drastically affect the recoveries of creditors of the parent's and its subsidiaries' estates, and

rejected the parent's argument regarding the "difficulty and expense" of such a determination —

an argument which echoes that made by the proponents of the Plan.[112]  The Court stated

categorically that it was the

> *power and duty of the bankruptcy court to require a **full
> accounting** as a condition precedent to approval of any plan of
> reorganization.  **The fact that the claim might be settled**, with the
> approval of the Court *after full disclosure* and notice to interested
> parties, **does not justify the concealed compromise effected here
> through the simple expedient of extinguishing the claim.**[113]*

In the case at bar, the Court made substantial headway toward determining the

"amount or validity" of the Intercompany Claims, but the MIA Process was aborted before the

Court ultimately could "exercise its informed, independent judgment."[114]  As in *Consolidated

Rock*, if even a portion of the Intercompany Claims are determined to be valid, it would

dramatically affect the various noteholders' recoveries, especially the holders of ACC Senior

---

[110]    *Consol. Rock Prods. Co.*, 312 U.S. at 520 (internal quotations and citations omitted).

[111]    *Id.* at 520.

[112]    *Id.* at 521-22.

[113]    *Id.* at 523 (emphasis added).

[114]    *Id.* at 520.

Notes, Arahova Notes and FrontierVision Holdco Notes.[115]    As noted above, the various settlement term sheets, the Plan, and the Second Disclosure Statement Supplement are utterly devoid of any explanation regarding the merits of the Inter-Creditor Dispute, the impact of the dispute on the assets and liabilities of each Debtor, or the necessity of this Court's determination of these issues and, therefore, lack the requisite "full disclosure."[116]    The fact that the Global Settlement and the Plan purport to settle the Intercompany Claims and the Inter-Creditor Dispute "does not justify the concealed compromise effected . . . through the simple expedient of extinguishing the [Intercompany Claims]."[117]    Those claims cannot be extinguished without evaluating them on their merits.    Unlike in *Consolidated Rock*, the Debtors' assets are not "extensively commingl[ed]," and thus there is no excuse for the Court to avoid its mandate.[118] The Plan Proponents and the Settlement Parties cannot do an end run around the requirement that each Debtor's assets and liabilities must be determined-- using a plan as the vehicle to do so in no way remedies the problem or ameliorates the obligation.[119]

## C.    THE GLOBAL SETTLEMENT IS NOT BASED ON THE MERITS OF THE INTER-CREDITOR DISPUTE AND FALLS OUTSIDE THE RANGE OF REASONABLENESS

### 1.    *THE SETTLEMENT IS DIVORCED FROM ANY CONSIDERATION OF THE MERITS*

*TMT Trailer* clearly requires the Court to evaluate the <u>merits</u> of the alleged settlement — something the Plan Proponents have admitted they failed to do when consenting to

---

[115]    *Id.* at 521.

[116]    *Id.* at 523.

[117]    *Id.* at 523.

[118]    *Id.* at 523.

[119]    *Id.* at 523-524.

the settlement and proposing the Plan based thereon.[120]  In black and white "[n]either the Debtors nor the Creditors Committee became a proponent of the Plan based on an evaluation of the merits of the Inter-Creditor Dispute."[121]  Any such analysis of the merits is impossible when the term sheets, Plan, and Second Disclosure Statement Supplement are entirely devoid of any analysis or explanation as to how the distributions under the Global Settlement and Plan reconcile with the merits of the underlying Inter-Creditor Dispute.  The Plan and Global Settlement before the Court are the classic example of a settlement proposed based upon mere boilerplate allegations.  Indeed, the proposed form of Resolution Order, in and of itself, proves this point by containing only conclusory statements regarding the basis for approval of the Global Settlement and failing to explain the terms of the settlement vis-à-vis the litigation or analyze its merits.

In *TMT Trailer*, the Supreme Court reversed confirmation of the *TMT* plan because the "record before us leaves us completely uninformed as to whether the trial court ever evaluated the merits of the causes of actions held by the debtor, the prospects and problems of litigating those claims, or the fairness of the terms of compromise."[122]  The Court remanded the case, noting that "[o]nly after further investigation can it be determined whether, and on what terms, these claims should be compromised."[123]

---

[120]     *TMT Trailer,* 390 U.S. at 434. (finding that, "[i]t is essential . . . that a reviewing court to have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boilerplate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law.")

[121]     DSS2-12.

[122]     *TMT Trailer*, 390 U.S. at 440.

[123]     *Id*. at 441.

The Supreme Court maintains, over decades of review, that the object of bankruptcy laws is to secure equal distributions of a debtor's assets to its creditors.[124] As a predicate to ensuring equitable distributions among creditors, a bankruptcy court must determine the assets and liabilities of each Debtor's estate, including Intercompany Claims. The starting point, is the Debtors' Schedules, which may be adjusted through allowed filed claims, adjudication of claim objections, amendments to the Schedules, or avoidance actions. But in each instance, ultimately, the resolution is to ascertain the assets and liabilities of each debtor.

The Court must "canvass the issues" of the MIA Litigation, to determine if the settlement falls below the lowest range of reasonableness.[125] In this case, the Arahova Noteholders Committee, and other Plaintiffs in the MIA Litigation, have failed to prevail on even a single challenge to the May 2005 Schedules, but through "scorched earth" tactics, has co-opted the Debtors and the Creditors Committee into appeasing them by proposing a Plan premised on their near absolute win on all aspects of the Inter-Creditor Dispute.

Continuing their ardor for unwarranted litigation, through the Inter-Creditor Dispute, the Arahova Noteholders Committee has repeatedly asserted selective and inconsistent challenges to the May 2005 Schedules, as well as certain intercompany transactions, ledger entries and/or procedures, and used tortured analysis —coupled with mind-numbing minutia — to create an appearance of justiciable issues. In reality, however, the Arahova Noteholders Committee would have to succeed on each of the 14 MIA Issues identified by the Court, as well as all other issues in the MIA Litigation—an impossible result—to get the result of in the proposed Global Settlement and the Plan.

---

[124]     *See, e.g., Howard Del. Serv.,* 126 S.Ct. at 2109; *Kuehner,* 299 U.S. at 451.

[125]     *In re Interstate Cigar Co. Inc.,* 240 B.R. at 822 (citing *Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied,* 464 U.S. 822 (1983)).

While the ACC Bondholder Group advocates principled and consistent accounting to prove up the validity of the May 2005 Schedules, the Arahova Noteholders Committee selectively applies internally inconsistent positions with regard to the Debtors' books and records. If the Arahova Noteholders Committee were to be correct on one challenge, then it would be incorrect as to another. For example, if the Arahova Noteholders Committee succeeds on its challenge to the historic entries, then its own Arahova's receivable should be reduced by at least two-thirds. Even if the Arahova Noteholders Committee were to successfully challenge any one of the 14 MIA Issues, which it has not done, such challenge would indicate a need to correct the Intercompany Claims as to that particular error only. It would not mandate a wholesale disregard of the May 2005 Schedules.

By obfuscating the real issues, the Arahova Noteholders Committee has created an illusion of greater entitlement, so much so that the Plan provides less to the ACC Bondholder Group that it would receive under any litigation scenario or under complete substantive consolidation. Because, "the settlement amount," to the ACC Noteholders, "pales in comparison to the potential value of the litigation, and does not appear to even amount to the lowest reasonable settlement, based on the legal issues presented in this case," this Court must deny approval.[126]

*TMT Trailer* clearly requires that any settlement be tested based on the probability of success, among other things. Here, the Inter-Creditor Dispute requires that the Court consider intertwined issues--the probability of one party prevailing on a particular legal issue must be multiplied by the probability of success on another issue to determine the probability of the outcome. For instance, under the Arahova Noteholder Committee's Position Statement

---

[126]     *Interstate Cigar Co. Inc.*, 240 B.R. at 824.

scenarios, Arahova's $1.4 billion receivable is converted into a $2.9 billion receivable and a $1.5 billion payable. In turn, the new receivable is paid while the payable is subordinated or extinguished and obtains nothing from Arahova. Or as an alternative example, the Arahova Noteholders Committee posits it, as a mediate transferee, will prevail on a fraudulent transfer claim and collect full payment, while it will not have fraudulent transfer liability to any other mediate transferor or the original transferor on the same facts. Because the Arahova Noteholders Committee's scenario relies on simultaneous contradictory outcomes, as a result of meticulous and unprincipled cherry picking, the probability of their simultaneous occurrence has to be miniscule. And that should be the probability of the Arahova Noteholders Committee's obtaining the distribution it gets under the Plan—miniscule. Additionally, the required analysis shows that the putative settlement and disclosure that accompanied it is completely insufficient to enable creditors or the Court to evaluate it. It is neither the creditors' job nor the Court's job to guess after combing through the putative settlement's haystack.

## 2. THE ARAHOVA NOTEHOLDERS COMMITTEE FAILED TO MEET ITS BURDEN TO OVERCOME THE PRESUMPTION OF THE BOOKS AND RECORDS

This Court has determined that the "Debtors' schedules start as *prima facie* evidence of the obligations stated therein."[127] This is consistent with the notion that the Debtors' schedules are party admissions under Fed. R. Evid. 801(d)(2) and, "while a debtor is entitled to amend its schedules, statements originally set forth therein carry strong evidentiary weight."[128] This Court further noted, that "[p]arties wishing to challenge schedule entries bear the burden of coming forward," with sufficient evidence to challenge the *prima facie* validity.[129] Because the

---

[127]    *In re Adelphia Communications Corp.*, Case No. 02-41729 (REG), February 6, 2006 Bench Decision at 1.

[128]    *In re Desert Vill. Ltd. P'ship*, 337 B.R. 317, 321 (Bankr. N.D. Ohio 2006).

[129]    *Id.*

Arahova Noteholders Committee, effectively serving as plaintiff, and now the Plan Proponents (who are inherently conflicted in this regard) have failed to articulate a defensible challenge with supporting evidence to the May 2005 Schedules, they have failed to meet their burden of presentment as mandated by this Court and the May 2005 Schedules remain in effect. Perhaps most telling is that the Debtors, who now serve as Plan Proponents backing the Global Settlement neither have admitted that their sworn May 2005 Schedules are erroneous nor filed amended Schedules.

A challenger seeking to overcome the *prima facie* validity of a debtor's schedules, must provide "evidence at least equal in probative force to that offered by" such schedules.[130] Satisfying this burden requires "*specific and detailed allegations* that place the claim into dispute, . . . the presentation of legal arguments based upon the contents of the claim and its *supporting documents*, . . . or . . . the presentation of pretrial pleadings, such as a motion for summary judgment, in which evidence is presented to bring the validity of the claim into question."[131] Specifically, to negate the *prima facie* validity of the schedules, one must

> (1) assert in a writing filed with the Court that there is some reason the claimant does not have a right to payment; (2) sign the objection; (3) if appropriate, assert that the claim is in fact based on a writing and that the documentation attached to claim is

---

[130]   *In re Jorczak*, 314 B.R. 474, 481 (Bankr. D. Conn. 2004) (citing *Lundell v. Anchor Const. Specialits*, (*In re Lundell*), 223 F.3d 1035, 1041 (9th Cir. 2000)). *See also In re Reilly*, 245 B.R. 768, 773 (2d Cir. BAP 2000) ("To overcome this *prima facie* evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim."); *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992) (concluding that, while the claimant always bears the burden of persuasion, "[t]he burden of going forward … shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim…[T]he objector must produce evidence equal in force to the *prima facie* case. ... [T]he objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.").

[131]   *In re Rally Partners, LP*, 306 B.R. 165, 168-69 (Bankr. E.D. Tex. 2003) (emphasis added) (internal citations omitted).

insufficient; and (4) *come forward with some legal reason or some factual evidence to defeat the claim.*[132]

The proponents of the "Global Settlement" must offer "evidence *at least equal* in probative force to that offered by" the Debtors through their sworn May 2005 Schedules.[133]   Examples of probative evidence that would satisfy this requirement, include "an affidavit from a debtor asserting that it is not the obligor on a debt, or an *accounting summary* listing all of a debtor's credit card charges to show that a debt was improperly calculated."[134]

Here, the evidence offered in favor of the validity of the May 2005 Schedules was overwhelming.   Scott MacDonald, Adelphia's Senior Vice President and Chief Accounting Officer, testified that the Debtors' accountants undertook the gargantuan task of reviewing and verifying "seven million lines of intercompany transactions," which took more than 5000 personnel hours to restate.[135]   PWC then reviewed the intercompany databases as part of their overall audit.[136]   Whenever there was a question with regard to the validity of an intercompany transaction, supporting documentation was reviewed to verify the transaction.[137]   The volume of supporting documentation reviewed for both third-party and intercompany accounts was equal to a "gymnasium full of records."[138]

---

[132]   *In re Cluff*, 313 B.R. 323, 337 (Bankr. D. Utah 2004) (emphasis added).

[133]   *Jorczak*, 314 B.R. at 481 (emphasis added).

[134]   *Cluff*, 313 B.R. at 337 n 48 (emphasis added).

[135]   MacDonald Hr'g 1 Tr. Vol. 2, 114:16-24, Jan. 31, 2006; (seven million lines of intercompany transactions); 116:4-10 ("much more" than 5,000 personnel hours devoted to the Restatement); 116:11-20 (at least two-and-half years of work).

[136]   *Id.* Hr'g 1 Tr. Vol. 2, 122:7-10.

[137]   *Id.* Hr'g 1 Tr. Vol. 2, 129:22-130:2.

[138]   *Id.* Hr'g. 1 Tr. Vol. 2, 130:3-7.

Despite the fact that "the creditors have skilled counsel and large amount in controversy to press their respective positions in litigation or settlement,"[139] no party challenging the Intercompany Claims met its burden of presentment to provide evidence "*at least equal* in probative force" to overcome the *prima facie* validity of the May 2005 Schedules.[140] During the litigation, the challengers threw many darts at the May 2005 Schedules. The Court finally took it upon itself to condense the scattered and random challenges into the 14 MIA Issues—but no analysis of these 14 MIA Issues overcomes the May 2005 Schedules' *prima facie* validity. In fact, if anything, an analysis of the 14 Issues reveals the absolute necessity of using the Bank of Adelphia standard (and the Intercompany Claims on the May 2005 Schedules). Without applying the Bank of Adelphia standard, there is no logic to the payables and receivables because there was no real counterparty except the Bank of Adelphia. Any other perspective creates unreliable and invalid claims.[141]

Any objections raised by the Arahova Noteholders Committee, as plaintiff, are not supported by probative evidence, but by displeasure with the results. Moreover, any challenge to alleging that the Debtors' inadvertently failed to record debt as equity should be disregarded—as it is clear that the Debtors knew the difference and distinguished appropriately.

As a further point, there is no basis for presuming that the Debtors' accountants and PWC accountants acted with anything but the utmost care and diligence in conducting the audit and preparing the Restatement. As Scott MacDonald testified the accountants in the

---

[139]    *Adelphia Comm. Corp.*, 336 B.R. at 627.

[140]    *Jorczak*, 314 B.R. at 481 (emphasis added).

[141]    This was shown by the prepetition practice of fixing erroneous entries between A and B with offsetting entries between B and C. Donovan Vol. 24 Tr. 44:22-45:4, March 1, 2006. (Q: "So now there's a correction involved here, . . .Is this modifying the debt entry on Arahova Communications, Inc.'s books?" A: "Yes. It's taking the debt off of Arahova. . .[and] it's booking an inter-company payable with . . .Century Cable Holdings, LLC.").

Restatement "identified all of the transactions that would fit into [his] definition of fraudulent,"[142] and corrected all mathematical errors found in the pre-petition ledgers for Adelphia.[143] Ensuring the accuracy and verifiability of intercompany liabilities was so important that Adelphia drafted and PWC approved not one, but two comprehensive Restatement Issue Summary memos (M-20 (*Concepts for Adjusting Related Party Transactions*) and M-21 (*Intercompany Account Analysis*)) devoted to the procedures employed in the review, verification, and reconciliation of such liabilities.

PWC and the Debtors' accountants undertook and completed this effort in the face of Adelphia's own internal accounting scandal and numerous national accounting scandals. Given the level of public scrutiny and scrutiny by its creditors and the Bankruptcy Court, it is only logical to think that PWC and the Debtors applied even more attention to accuracy.[144] Moreover, as Scott MacDonald testified, verification of the Restatement was of such importance that it came from PWC's national office.[145] MacDonald considered the accountants in PWC's national office to be "expert technical people" focused on providing correct accounting.[146] And, the guideline for the Restatement was to determine whether every transaction was accounted for properly.[147] When viewed as a whole, the weight of the evidence sufficient to prove that the

---

[142] MacDonald Hr'g 1 Tr. Vol. 2, 60:22-25, Jan. 31, 2006.

[143] *Id.* Hr'g 1 Tr. Vol. 2, 137:18-23.

[144] *In re Worldcom, Inc. Sec. Litig.*, 2005 WL 375313, *9 (S.D.N.Y. Feb. 17, 2005) (noting that even the suggestion of a motive to inflate the Restatement adjustments does not create a ground for the exclusion of the Restatement where the company was already under intense scrutiny by the Bankruptcy Court, the SEC, and public attention. Given the number of people who worked on the Restatement "it would have been exceedingly difficult . . . to succeed with any plan of manipulation. In these circumstances, the existence of a motive by the company and its new auditor to inflate the adjustments does not require exclusion").

[145] MacDonald Hr'g 1 Tr. Vol. 2, 100:14-101:3, Jan. 31, 2006.

[146] *Id.* Hr'g 1 Tr. Vol. 2, 102:1-9.

[147] *Id.* Hr'g 1 Tr. Vol. 2, 125:9-17.

accounting was reliable and accurate far exceeds any evidence alleging the inaccuracy of the May 2005 Schedules. When litigating the Inter-Creditor Dispute, the Arahova Noteholders Committee failed to meet their burden of presentment and neither of the Plan Proponents have presented any evidence to overcome this. In fact, the Debtors, who are duty bound to amend their sworn Schedules if they conclude they are inaccurate, have not done so. The Court's inquiry should end with this determination.[148]

### 3. *THE ARAHOVA NOTEHOLDERS COMMITTEE CHALLENGES DISCRETE PARTS OF TRANSACTIONS RATHER THAN THE WHOLE*

The Arahova Noteholders Committee selectively takes issue with a set of credit-related intercompany transfers that it has wrongly characterized as "fraudulent" in further hopes of maximizing its own returns. In April of 2000 and January and September of 2001, the Debtors completed a series of linked transactions that shifted ownership of certain of assets among various entities within its larger organizational structure, while providing capital through credit facilities, which was used to satisfy its past obligations and to perform vital corporate operations. The Arahova Noteholders Committee have now alleged fraud in a single step of a series of ten-step plan to transfer assets, the September 2001 Transaction ("Step 7") without paying heed to its purpose, its context or the actions that accompanied it.

The Arahova Noteholders Committee's attempt to isolate Step 7, without context is unprincipled and without legal basis. Furthermore, Arahova was not the transferring entity. Rather, its subsidiary Century Credit Holdings Corp. ("CCHC") was the last transferor, and thus, any ultimate recovery would thus belong not to Arahova's noteholders but to CCHC's creditors, which include those of ACC Ops.

---

[148] *Worldcom, Inc. Sec. Litig.*, 2005 WL 375313 at *6-*9 (finding that the postpetition restatement of the books and records of a debtor beset by prepetition fraud produced reliable and admissible evidence of the debtor's prepetition finances).

The credit-related purposes behind the three transactions show that Adelphia transferred properties through Arahova and its subsidiaries in April 2000 and January 2001 with a clear intent to reacquire assets from Arahova's silo by the end of 2001. The January 2001 transaction consisted of several transfers from ACC Ops. through Arahova to its subsidiaries to provide collateral for a short-term credit facility slated to expire in late 2001. That this credit facility was structured to be due so soon indicates that Adelphia always intended to pay off the debts made possible by the January transactions by retransferring properties out of Arahova's silo within the year to avoid the cross-defaults on billions of dollars of debt that would otherwise result: the April and January transactions necessitated the September transfers.

The other transactions also indicate that Arahova and CCHC received fair consideration for the transfer. As the credit facility created in January was borrowed against assets moved into Arahova Holdings (which was a subsidiary of CCHC before Step 7), the default avoided by the Step 7 would have had catastrophic results for Arahova as well as Adelphia. Step 7 played a key role in preventing severe financial harm to Arahova and to its creditors.

Moreover, the Arahova Noteholders Committee instructed its expert, Michael Henkin, to ignore restated financial data approved by the Court during the Restatement Process and to use outdated figures to arrive at a vastly inflated value of the properties transferred out of Arahova's silo in the September 2001 transfers. The ACC Senior Noteholders' expert, Professor Bradford Cornell, has recalculated this value using the restated data and arrived at a figure far lower than Henkin's. Although Henkin's analysis—using pre-restatement data—values the equity of Arahova Holdings at approximately a billion dollars, Professor Cornell's restated figures show that same equity to be worth somewhere between negative $327 million and $545

million.  The corrected value suggests not only that Arahova received fair consideration for the dividend but also that Arahova probably realized significant financial gains from its transfer.

When viewed together with the other transfers, it is apparent that Step 7 was a necessary component of a larger plan that went beyond merely providing fair value for the equity moved and benefited Arahova as well as Adelphia.  But by conveniently neglecting the April and January transactions as well as the nine other steps of the September transaction, the Arahova Noteholders Committee skirts these key issues and predictably arrives at a result that maximizes its noteholders' financial gain.  Toward this end, the Arahova Noteholders Committee actually instructed Henkin to ignore the steps surrounding Step 7 in the September 2001 Transaction and to consider the dividend's transfer in isolation.[149]  But relevant case law indicates that the Arahova Committee's willful ignorance of Step 7's context is illicit: where, as here, a transfer is only one step in a series of several linked transfers that form a larger plan, the series must be considered as a whole.  *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 ("It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis.").  *See also In re Sunbeam Corp.*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) ("A series of transactions may, under certain circumstances, be 'collapsed' and treated as a single transaction for the purpose of determining whether there has been a fraudulent conveyance…Where a transfer is actually 'only a step in a general plan,' an evaluation is made of the entire plan and its overall implications.").  The Arahova Noteholders Committee's self-aggrandizing and unlawful approach is unwarranted: Step 7 was not a fraudulent conveyance.

---

[149]     Deposition of Michael Henkin, 1/12/06 ("Henkin"), at 60.

## D. AVOIDANCE OF THE COSTS AND DELAY OF POTENTIALLY PROTRACTED LITIGATION DOES NOT JUSTIFY APPROVAL OF THE GLOBAL SETTLEMENT

As their primary, if not sole, justification for stripping holders of ACC Senior Notes of over $1 billion of value to which they would otherwise be entitled under the lowest end of any reasonably likely outcome of litigating those disputes, the Plan Proponents repeatedly urge the avoidance of a purportedly protracted, complex, and costly adjudication of the Inter-Creditor Dispute.

The fiction that the Inter-Creditor Dispute will take many months or even years to reach judgment on the merits has so permeated these proceedings that it is accepted as gospel, but reality is very different. In August 2005, the Court established a streamlined litigation process for the Inter-Creditor Dispute through the MIA Order. Since that time, all discovery has been completed (including thousands of pages of documents and over forty depositions), substantially all of the briefing related to the first four of six MIA hearings has been completed, MIA Hearing #1 has been completed and ruled on, and MIA Hearing #2 was substantially complete. When the process was stayed, the testimony for MIA Hearing #2 was nearly complete and the Court's determination of the issues presented in that hearing would have significantly narrowed the possible recovery outcomes, thus materially limiting the scope of the remaining hearings, and leading to a more focused settlement environment.[150]

The MIA Process was designed to enforce strict adherence to constitutional principles such as due process and fundamental fairness, and the Court has previously held that the parties *must* be afforded due process on the Inter-Creditor Dispute: "the purpose of the Motion in Aid was to put the Inter-Creditor Dispute into a judicially-approved and supervised framework to resolve outstanding issues," and "to give the creditors who would be affected by

---

[150] Many of the 14 MIA Issues are interrelated.

the disputes *a full opportunity to litigate their needs and concerns.*"[151]   Further, the Court implemented the MIA Process itself to safeguard due process and litigate the Inter-Creditor Dispute by designing a procedure "to provide creditors with prompt access to information and discovery, a reasonable but expeditious discovery and litigation schedule, and notice and an opportunity to be heard."[152]   Expediency, in and of itself, does not override these basic concerns!

In *TMT Trailer*, the lower court confirmed a plan that compromised several claims without conducting a detailed, thorough determination as to whether the compromise was fair and equitable under the relevant facts and law.  The lower court simply determined that the compromise was fair and equitable because "[t]he alternative to approval of these compromises is extensive litigation at heavy expense to the debtor and unnecessary delay in reorganization."[153] The Supreme Court, in reversing the lower court's approval of the plan, held that the lower court erred by ignoring due process and approving a plan settlement without addressing the merits of the proposed settlement.[154]   In doing so, the Supreme Court specifically found that the avoidance of protracted and potentially costly litigation is *not* a sufficient basis to approve a plan:  while "[o]ne can easily sympathize with the desire of a court to terminate bankruptcy reorganization proceedings, for they are frequently protracted.  *The need for expedition, however, is not a justification for abandoning proper standards*."[155]   Thus, in a case lasting over ten years, the

---

[151]     Adelphia, 336 B.R. at 633-634 (emphasis added).

[152]     *Id.* at 634; *see also* Order in Aid of Confirmation, dated August 4, 2005 (Docket No. 8044).

[153]     *TMT Trailer Ferry, Inc.*, 390 U.S., at 432-33.

[154]     *Id*. at 434.

[155]     *Id*. at 450 (emphasis added).

Supreme Court made it clear that expense and delay cannot justify a settlement without

independent consideration by the Court of the underlying merits.[156]

Similarly, in *Consolidated Rock*, the Supreme Court rejected the argument that

difficulty and expense of determining intercompany claims justifies a settlement.[157]  Without this

determination, the Court has not exercised its "power and duty . . . to require a full

accounting."[158]  Moreover, the Global Settlement and Plan strip over $1 billion in value from the

ACC estate, which more than dwarfs the expense of adjudicating the Inter-Creditor Dispute.

### E.    THE GLOBAL SETTLEMENT IS THE RESULT OF A COERCIVE AND TAINTED PROCESS DESIGNED TO AVOID ADJUDICATION ON THE MERITS

#### 1.    *ABSENCE OF DISCLOSURE OF THE PUTATIVE SETTLEMENT'S RESOLUTION OF EACH DISPUTED ISSUE RENDERS DUE PROCESS IMPOSSIBLE*

It is obvious that due process is being denied to the ACC Bondholder Group.  One

cannot object to that which is hidden.  One cannot have notice and a hearing on undisclosed

facts.  The putative settlement baked into the Plan does not disclose how the millions of assets

and liabilities and prepetition and postpetition transactions are treated to result in the

---

[156]    *Smart World Techs., LLC*, 423 F.3d at 173, 179 (where lower court approved bankruptcy settlement because it eliminated "the risks, expense and delay that would be posed by further litigation," reversing lower court and finding that "the bankruptcy judge from the beginning repeatedly and frankly expressed his strong preference for settlement over litigation, suggesting that his evaluation of Smart World's claims may have been colored by his own desire to . . . 'eliminate the litigation.'"); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (reversing lower court's approval of bankruptcy settlement and rejecting argument that failure to approve settlement would result in "long delay":  "As the Supreme Court has noted, it is easy to sympathize with the desire of a bankruptcy court to expedite bankruptcy reorganization proceedings for they are frequently protracted.  '*The need for expedition, however, is not a justification for abandoning proper standards.*'") (quoting *TMT Trailer*) (emphasis added); *In re Dow Corning Corp.*, 192 B.R. 415, 422 (Bankr. E.D. Mich. 1996) (stating that "cursory statements such as 'the alternative to settlement was extensive litigation at heavy expense' is *not* sufficient" to approve proposed bankruptcy settlement) (quoting *TMT Trailer*) (emphasis added); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 452 (Bankr. D. N.J. 1990) ("Although we are told that the alternative to settlement was 'extensive litigation at heavy expense and unnecessary delay,' *there is no evidence that this conclusion was based upon an educated estimate of the complexity, expense, and likely duration of the litigation.*") (quoting *TMT Trailer*) (emphasis added).

[157]    *Consol. Rock Prods.*, 312 U.S. at 522.

[158]    *See id.* at 523.

distributions required by the Plan. Without knowing how these matters are treated, there is no way of determining whether they are legal. Procuring confirmation by hiding the facts is the opposite of due process. None of the Plan, the Second Supplemental Disclosure Statement or any of the term sheets satisfy the elementary requirement of disclosing how each estate's assets and liabilities change from the Schedules to produce the distributions required by the Plan, and the rationale for each change buried and concealed in the putative settlement.

## 2. *THE GLOBAL SETTLEMENT IS THE RESULT OF A COERCIVE AND TAINTED PROCESS*

The Global Settlement is the culmination of a settlement process fraught with threats and intimidation and is embodied in a Plan that includes coercive provisions that are designed to stifle opposition to the Plan. At a status conference held before the Bankruptcy Court on July 6, 2006, various parties, including certain counsel in attendance at the settlement conference and counsel for certain banks, advised the Court of the problems they encountered in the settlement process and the coercive environment of such negotiations.[159]

In a similar vein, certain of the Settlement Parties have engaged in intimidation tactics throughout these chapter 11 cases. As the Court noted in the January Opinion, the Arahova Noteholders Committee frequently engaged in scorched earth, nuclear war litigation tactics intended to avoid determination of the Inter-Creditor Dispute on the merits (a goal achieved if the Plan is confirmed). Next Huff picked up the stick and, in April 2006, filed the

---

[159]     *See, e.g.*, Hr'g Tr. 71:20-22, July 6, 2006. ("[W]e were told that the 2004 discovery process was going to continue unless we signed a settlement agreement."); *id.* at 74:9-12 ("[W]e were also told throughout this process that we were going to sign this agreement or Judge Gerber would be told that we had conducted ourselves in the negotiations in bad faith, and, therefore, you better sign."); *id.* at 76:9-12 ("It has been an arm-twisting effort to try to coerce people to sign onto a settlement with all sorts of veiled threats or not-so-veiled threats of dire consequences if you fail to do so."); *id.* at 108:16-22 ("Input to the monitor . . . was only from our adversaries who, apparently, didn't negotiate a resolution of their disputes with each other, but instead carved up the treatment of the lenders and other constituencies, like the Olympus Noteholders . . . and appropriated that value for themselves."); *id.* at 119:15-17 ("So now we're faced with a plan term sheet . . . that affects our rights negotiated without us in the room with our adversaries only [and] the monitor . . . .").

Huff Motion seeking to take 2004 examinations of certain members of the ACC Noteholders Committee. While nominally undertaken in connection with alleged improper solicitation under section 1125(b), it quickly became apparent that the purpose of the discovery was to coerce these parties to settle. In fact, the plain language of the Plan Agreement demonstrates this:

> [T]he related Rule 2004 discovery pertaining to the ACC Committee shall be adjourned so long as the Modified Plan has not been withdrawn, terminated or modified in a manner adverse to a Party absent written consent of such Party; provided, however, *in the event that any party subject to the Rule 2004 order acts in a manner inconsistent with this Agreement (whether by opposing this Agreement, engaging in motion practice, objecting to confirmation of the Modified Plan or otherwise), the 2004 discovery and any and all process relating to the subject matter of the 2004 discovery shall proceed with respect to such party.*

Plan Agreement, p. 18, ¶ 8 (emphasis added). And now the torch has passed to the Creditors Committee, who has sent threatening communications to the ACC Bondholder Group, made spurious allegations against the group, and sought to continue the Rule 2004 Discovery with an eye towards bringing further retaliatory litigation against dissenting ACC Noteholders.

Not only is the atmosphere of the case one based on threats and innuendo, but the Plan itself contains provisions designed to manipulate the voting results and silence opposition to the Plan. These provisions include, without limitation, the exculpation and release provisions which grant exculpation and an illegal third party release to any "holder of ACC Senior Notes that executes the Plan Support Agreement agreeing to vote to accept the Plan and otherwise agrees to be bound by the terms of the Global Settlement." A settlement forged at gun point is not a settlement at all.

### 3. *THERE IS NO ARMS LENGTH, GOOD FAITH SETTLEMENT*

The Plan Proponents fail to recognize that to invoke 11 U.S.C. § 1123(b)(3)(A) which allows a chapter 11 plan to provide for a settlement of a claim belonging to the estate,

there must first be an authorized settlement. That is exactly what is missing here. The Plan Proponents fail to recognize that to invoke 11 U.S.C. § 1123(b)(3)(A), which allows a chapter 11 plan to provide for a settlement of a claim belonging to the estate, there must first be an authorized settlement. That is exactly what is missing here.

The Plan Proponents simply repudiate *In re Smart World Technologies*, 423 F.3d 166 (2d. Cir. 2005). Section 1123(b)(3)(A) is only invoked when: (a) the chapter 11 trustee who controlled the estate's claims settled them subject to bankruptcy court approval;[160] (b) the chapter 11 trustee who controlled the estate's claims supported the settlement embodied in chapter 11 plan proposed by statutory creditors' committee and lawsuit-defendant;[161] (c) to supply an arms' length settlement that was missing, the statutory creditors' committee renegotiated the settlement of the estate's claims against the banks that the banks embodied in their proposed chapter 11 plan in a case where the bankruptcy court had not previously authorized another committee of bondholders to litigate and settle the claims and the committee that renegotiated the settlement did not owe conflicting loyalties to multiple estates and was implicitly authorized to settle;[162] (d) all creditors were paid in full and all supported the plan proponent's settlement of the estate's claims against it, the debtor's principals either took the Fifth Amendment or refused to answer questions about the debtor's financial transactions, the debtor's principles were sanctioned, and the bankruptcy court had not given control of the estates' claim to any other entity, and had concluded success on the estate's claims was very unlikely;[163] and (e) the debtor agreed to the settlement embodied in the bank-defendant's and

---

[160]    *In re Andreuccetti*, 975 F.2d 413 (7th Cir. 1992).

[161]    *Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.)*, 844 F.2d 1142 (5th Cir. 1988).

[162]    *In re Cellular Information Systems, Inc.*, 171 B.R. 926 (Bankr. S.D.N.Y. 1994).

[163]    *In re BBL Group, Inc.*, 205 B.R. 625 (Bankr. N.D. Ala. 1996).

creditors' committee's jointly proposed chapter 11 plan after an advisory jury trial showed the estate's claims were worthless in a case where the court had not earlier authorized a different committee to litigate and settle.[164]

**4.    _THE PUTATIVE GLOBAL SETTLEMENT IN THE PLAN CANNOT BE LEGALLY APPROVED_**

The law in the Second Circuit recognizes two methods to resolve interdebtor disputes. The debtors can litigate or settle subject to court approval. Or, the court can authorize statutory committees or other entities to litigate or settle in the debtors' respective names, subject to court approval. Here, the debtors adopted neutrality and the Court ordered neutrality as part of its justification for denying motions to appoint trustees and disqualify debtors' attorneys, and was affirmed largely based on the maintenance of a level playing field.[165] Similarly, the Court ordered the Creditors' Committee to remain neutral. As the Creditors Committee admits in paragraph 20 of its Approval Motion, dated November 21, 2006, for approval of the putative settlement, "[a]t the hearing to consider the Weiser Application, this Court made clear that the Creditors Committee's role with respect to the Intercreditor Dispute was not to take sides, but rather to, 'keep the lid on, in terms of intercreditor disputes and facilitating the settlement of intercreditor issues, if at all possible.'"[166].

The Court issued its MIA Order in which it authorized different nonstatutory committees to litigate the interdebtor issues. In its January 23, 2006 decision, in which the Court ordered the Debtors to be neutral, the Court also observed that the nonstatutory committees were

---

[164]    _In re Grivas_, 105 B.R. 954 (Bankr. S.D. Cal. 1989).

[165]    _In re Adelphia_, 336 B.R. at 620, 660 n.124, 670-671, 672 n.165.

[166]    Hr'g. Tr. 95:5-8,-95:8, May 4, 2005.

empowered to settle, subject to a Rule 9019 hearing.[167]  To maintain the integrity and fairness of the bankruptcy system in chapter 11 cases where the same management controlled each debtor, the Court listed numerous restrictions on the Debtors and their officers and directors to counterbalance the fact that creditors of each Debtor could not rely on their respective Debtor's management to try to maximize their recoveries:  The Court ruled that:

1.  The Debtors should remain neutral in the controversies and assist or oppose neither party;[168]

2.  A "'level playing field'" is a matter of major concern to the Court;[169]

3.  The Debtors would be put in a much more difficult position "if they were asked [to] or did act in a way that could be argued to be…contrary to the interests of one or another of the creditor groups;[170]

4.  The MIA "was designed to give the creditors who would be affected by the disputes a full opportunity to litigate their needs and concerns."[171]

5.  The Court must provide creditors an opportunity for "judicial resolution," if necessary;[172]

6.  If the Arahova Noteholders Committee's motion to terminate exclusivity were granted, the Court would have to provide its opponents like benefits to preserve a level playing field;[173]

7.  "The court will not permit litigants to have advantages, statutory or otherwise, in the Intercreditor Disputes."[174]

---

[167]   *Id.* at 660 n.125.

[168]   *Id.* at 627.

[169]   *Id.* at 632 n.34.

[170]   *Id.* at 633 n.36 (emphasis added).

[171]   *Id.* at 634.

[172]   *Id.* at 634 n.40.

[173]   *Id.* at 660 n.124.

[174]   *Id.* at 660.

8. Neither the Debtors nor their respective creditors would benefit from the substitution of trustees for creditor litigants;[175]

9. The Debtors' officers and directors must recuse themselves from interdebtor issues;[176]

10. Having the creditors' committees litigate and the Debtors neutral "would be plainly nothing in comparison to the prejudice that might be alleged if anyone on the debtors' side seemingly acted adversely to the interests of a particular debtor or debtor group;"[177]

11. "But, if the Debtors actually took sides in a way that injured one or another of the estates to whom they owed their duties of loyalty, that would result in at least the appearance of impropriety, and, the Court fears, the reality as well;"[178]

12. "If a debtor's taking sides in an intercreditor dispute within a single debtor is in the debtor's best interests, the Court sees no reason why that would be improper."[179]

After the Court's January 23, 2006 decision and its prior direction that the Creditors Committee not take sides, the protections of ACC Senior Noteholders were destroyed, the unfairness the Court earlier prevented took over, and the Plan is the result. Significantly, no one ever requested relief from the Court's January 23, 2006 decision. The destruction of creditor protections was much more subtle. Here, no one knows a rule has changed until someone breaches it and gets away with it. For instance, when the Debtors entered into their Plan Agreement that was only supported by two members of the ACC Senior Noteholders Committee, the Debtors did not know if they were allowed to do so. Therefore, the Plan Agreement provides that a condition to its effectiveness is that the Court allow the Debtors to propose the predecessor

---

[175] *Id.* at 661.

[176] *Id.* at 669.

[177] *Id.* at 670.

[178] *Id.* at 671.

[179] *Id.* at 671 n.163.

to the instant Plan.[180]  Even now, the Debtors admit they do not know what they can do to try to procure confirmation of the Plan over ACC Senior Noteholders' opposition.  Buried in the definition of "Proponents," Exhibit A to the Plan provides "the Debtors shall not be proponents of the Plan in connection with any part of the Plan to the extent to which such proponency is restricted by the Bankruptcy Court."  Remarkably, the Debtors thereby admit they do not know what the rules are.  But, even though the Debtors concede they do not even know how much of the Plan they can propose, and even though the Plan embodies the deal the Arahova Noteholders Committee wants, the Court denied the ACC Bondholder Group's motion to propose a plan with the deal it wants, opting instead to let the Arahova Noteholders Committee run an election having only one candidate.

This is not a level playing field.  The Debtors are not neutral.  The Creditors' Committee is not neutral.  Instead of substituting a trustee for ACC, the Plan Proponents have effectively substituted a small subset of bondholders willing to make the cheapest deal.  Rather than provide a judicial resolution, mob law is prevailing.  Rather than restricting the Debtors or Creditors Committee to taking positions on Inter-Creditor Disputes within one Debtor, the Plan Proponents are taking a position favoring Arahova against ACC.  Rather than preventing one creditor group from having an advantage, the Arahova Noteholders Committee has been granted the right to prosecute its Plan with no competing plan and with the Debtors and Creditors Committee as Plan Proponents.  Rather than avoiding the appearance of impropriety, the reality of impropriety prevails.

After conclusion of the first MIA hearing, and after the second MIA hearing concerning Intercompany Claims was deep in process, the Court directed the litigants to

---

[180]    DSS2 at Ex. HH, ¶ 1, p. 3 (Plan Agreement).

negotiate under the tutelage of Bankruptcy Judge Cecilia Morris, serving as monitor (as in 'hall monitor'). The Court directed Judge Morris not to delve into the merits because it would take too long.[181] The Court obtained each party's consent to its having *ex parte* communications with the monitor about the negotiations.

When no settlement emerged between the primary entities authorized to litigate or settle, the Arahova Noteholders Committee did reach a deal satisfactory to two of the twenty three members of the ACC Senior Noteholders Committee and those two, solely in their individual capacity, signed the proposed settlement. When ACC Senior Notehholders holding over one third of the notes made clear they would reject the Plan, the Arahova Noteholders Committee renegotiated the settlement to provide just enough additional value to convince three more noteholders to sign in their individual capacities.

When the ACC Bondholder Group moved for an order resuming the adjudication of the Inter-Creditor Dispute, the pleadings filed in opposition showed clearly that everyone had a different notion of whether a settlement existed and whether it was authorized. Some argued that Tudor and Highfields had apparent authority to settle for the ACC Senior Noteholder Committee. Some argued they just settled for themselves since their signature blocks made that clear. Ultimately, the Court suggested that maybe the purported settlement was just a proposal worthy of being put into a proposed plan for a vote.[182] The key fact is that no one, even the Court, knew exactly what happened, according to whose authority, and what the procedure and legal standards were. Clearly, the Second Circuit standard that settlements are assessed as to

---

[181]     Hr'g Tr. 173:6-13; 174:17-22; 175:1-3, April 24, 2006.

[182]     Hr'g Tr. 81:9-16, Sept. 11, 2006 (Docket No. 12016).

whether they are inside the zone of reasonableness cannot be applied to a deal cooked up by one side matching the lowest demands of a minority of the other side's members.

When the ACC Bondholder Group tried to even the playing field by returning to the MIA Process and by proposing a different plan, the Court denied their motions, thereby assuring the Arahova Noteholders Committee that it could have its wish — an election with one candidate — its settlement as the only game in town. The Court's January 23, 2006 decision insisted the playing field be maintained absolutely level. That was affirmed. But, there's nothing level about the current playing field.

F.  **EVEN IF THE GLOBAL SETTLEMENT AND PLAN WERE WITHIN THE RANGE OF REASONABLENESS AND COULD BE APPROVED UNDER *TMT TRAILER*, THE TOUTED GIVE-UPS TO ACC CREDITORS ARE ILLUSORY**

The Supreme Court has said that bankruptcy court's have a "duty to determine that a proposed compromise forming part of a reorganization plan is fair and equitable."[183] In addition to other elements discussed above, in order to satisfy this standard, a settlement must preserve "the equitable equivalent of the rights surrendered."[184] To that end, the estate must receive fair consideration in exchange for its agreement to compromise rights. Even a cursory review of the Plan and Global Settlement reveals that ACC has not received the equitable equivalent of the rights it surrendered. A compromise built on false assumptions, illusions and coercion cannot satisfy this standard.

1.  *THE PLAN IS BASED ON A FAULTY PREMISE AND EMBEDDED FALLACIES*

The Global Settlement begins with a false premise – that the Arahova Noteholders are structurally senior to the ACC creditors, not only as to assets within the Arahova silo, but

---

[183]    *TMT Trailer*, 390 U.S. at 424.

[184]    *SEC v. Central-Ill. Secs. Corp.*, 338 U.S. 96, 151 (1949).

also as to assets or equity interests in other subsidiary silos in which Arahova holds no interest. By doing so, the Global Settlement disregards not only the fact that the Arahova Debtors have no right to these assets, but also that these assets belong to separate legal entities that are wholly owned by ACC. Both ACC and Arahova are holdings companies and they derive their value through two sources: Intercompany Claims and Equity Interests in subsidiaries. Absent modification of the Debtors' May 2005 Schedules, which is the subject of pending litigation, Arahova is insolvent and its creditors would receive materially less than provided for under the Plan. But the Global Settlement sweeps the Inter-Creditor Dispute issues under the rug, presumes a near absolute victory for the Arahova Noteholders Committee, and determines the distributions under the Plan. Instead of determining a rational value for ACC and Arahova's assets and then determining distributions, the Plan Agreement posits that, regardless of asset value, "the Debtors and Creditors Committee, as co-Plan Proponents, would file the Plan under which all holders of Allowed Claims against the Subsidiary Debtors would receive payment in full . . . of all principal and accrued interest."[185] In turn, after confiscating ACC's assets (*i.e.* any Intercompany Claims and residual equity), the creditors of those Subsidiary Debtors "give up" their excess to ACC creditors, subject to "give backs" from the CVV.[186] On its face, the terms of the purported "Global Settlement" are a sham.

Notwithstanding that a critical component of the Plan is described as an alleged "transfer" of $1.080 billion in value ($1.130 billion if accepted by the ACC Senior Notes Claims Class) to the holders of ACC Senior Notes, purportedly "from the distributions otherwise

---

[185]    DSS2 – 12.

[186]    DSS2 – 12, DSS2 – 38-45.

payable to the unsecured creditors of the Subsidiary Debtors," DSS2-5, this description is a mischaracterization, and completely illusory.

The alleged "transfer of value to ACC" is premised upon the assumption that ACC would not prevail in the Inter-Creditor Dispute in any respect, and would not otherwise be entitled to such funds. Given that the merits could not be addressed in the Monitor process, and the Plan Proponents avowedly did not consider the merits of the Inter-Creditor Dispute in endorsing the agreement, characterizing the "settlement" as a "transfer" of value to ACC based on the assumption of near total defeat for the ACC Senior Noteholders Committee is wholly unwarranted.

The Plan provides for the creditors of the Subsidiary Debtors to be repaid the so-called "give ups" (plus interest at specified rates) from the CVV and, in certain cases, other sources of value to ACC creditors, thereby offsetting the so-called "give ups" with "give backs."

The Plan includes a $39.2 million "give up" from amounts presumed to be otherwise allocable to Subsidiary Debtor Trade Claims. However, this purported value transfer is not a "give up" at all and, instead, was crafted to utilize reserves for trade claims that the Settling Parties realized would be released upon the anticipated approval of certain large trade claim settlements. In the interim between execution of the Term Sheet and the Plan Support Agreement, settlements resolving large trade claims were approved, thereby reducing the required reserve in excess of $39.2 million. Consequently, as noted in the Second Disclosure Statement Supplement, the Subsidiary Trade Claims Earn Back has already been "earned back." The illusory nature of this purported give up supports the belief of the ACC Bondholder Group that the $1.080 billion settlement is susceptible to further economic deterioration as a function of tactical changes in certain of the reserves specified by the Debtors.

The ability of the Plan Proponents to deliver the value to be purportedly transferred to holders of ACC Senior Notes has gradually eroded while the Plan Proponents negotiated deals with other parties. The Plan Proponents appear unable to deliver the original $1.080 billion (which, itself, is a "give up" only if one assumes that the Arahova Noteholders Committee prevails in the Inter-Creditor Dispute), not to mention the promised $1.130 billion if the ACC Senior Notes Claims Class accepts, but rather only approximately $970 (or $1,020 with an accepting class) or less. Although the Global Settlement originally did not provide a litigation indemnification fund for the Banks, and arguably allocated $175 million formerly reserved for the Banks' claims to ACC, the Plan Proponents subsequently consented to establish various litigation indemnification funds that potentially could be as large as $97 million, thereby substantially reducing the Banks' "give up."[187] Similarly, the Plan Proponents have agreed to reduce the Olympus Notes Give Up and the FPL Give Up from $20 million and $10 million, respectively, to $16 million and $6.2 million, respectively, and such reduced amounts are to be recouped by such noteholders from CVV proceeds.

In addition, the fictional nature of the "$1.080 billion" is further buttressed by the fact that holders of Arahova Notes are entitled to recoup the $125 million "Arahova Initial Advance" out of dollars that would otherwise be available for ACC. For example, the $50 million litigation prosecution fund was to be supplied with $40 million by ACC and $10 million by Arahova (which itself is inequitable, given that such amounts accompanied a 50/50 split of the CVV in the April 2006 plan). The fund has been reduced to $25 million, with the entire $25 million to be counted toward the "give up" by holders of Arahova Notes – that is, this $25

---

[187] The Plan provides that the Banks are to contribute to the litigation indemnification funds their pro rata share of $35 million and the Debtors will fund the remaining portion. In the event certain non-agent Bank classes do not vote to accept the Plan, however, the Debtors have agreed to pay the remaining contributions. *See* DSS2-6, DSS2-15, DSS2-73.

million counts toward the $1.080 billion "settlement" and is immediately recovered by holders of Arahova Notes through the Arahova Initial Advance.

Moreover, creditors of the Subsidiary Debtors will obtain an artificially enhanced recovery resulting from the arbitrary Deemed Value and the 20% cap on adjustments to the Deemed Value of the TWC Class A Common Stock as provided for in the Plan, at the expense of holders of ACC Senior Notes. In the absence of these constraints, the ACC Bondholder Group believes the creditors of the Subsidiary Debtors would receive their full entitlement under the Plan utilizing fewer shares of the TWC Class A Common Stock and thus, more TWC Class A Common Stock would be available to holders of ACC Senior Notes.

The Court should look through this charade and see this Global Settlement for what it is—a theft with an offer for the victim to buy back the stolen goods. The bankruptcy court in *Exide Technologies* recently refused to confirm a proposed chapter 11 plan for similar reasons.[188] In *Exide*, the plan was premised on a settlement between prepetition lenders and the debtor. The lenders agreed to "give up" approximately $8.5 million to unsecured creditors in exchange for equity in the reorganized debtor.[189] In turn, unsecured creditors were paid primarily through allocations of the cash "gift" from the lenders. The debtor justified this proposal by arguing that its assets were insufficient to pay the senior lenders in full—in other words, the lenders had an absolute entitlement to all proceeds of the estate and, but for the gift, unsecured creditors were out of the money.[190] The court, however, disagreed.[191] The court began by determining the debtor's value, because estate value "directly impacts the issues of

---

[188] *In re Exide Tech.*, 303 B.R. at 77-78.

[189] *Id.*

[190] *Id.* at 77.

[191] *Id.*

whether the proposed plan is 'fair and equitable.'"[192]   The court concluded that the gift to unsecured creditors was not, in fact, a reallocation of the lenders' own money because the debtor undervalued its assets.[193]   By failing to properly value the assets, the plan (and its embedded settlement) proposed to give the lenders value between $1.4 to $1.6 billion to satisfy loans totaling $900 million, all in exchange for an $8.5 million "gift."   Accordingly, the court concluded that the distribution to unsecured creditors was not, in fact, a reallocation of the lenders' recovery, and further held that the debtor and lenders did not enjoy the unfettered freedom to choose which unsecured creditors they wish to pay.[194]

Like *Exide*, every other authority supporting give ups from one class of creditors to another expressly found that the respective debtor's assets were *insufficient* to pay the gifting creditors in full so as to satisfy the court that any gift was not simply a mechanism for avoiding proper distributions to other creditors.[195]   For example, in *Genesis Health Ventures*, a group of senior lenders made a financial contribution to the debtors in the form of a portion of the equity of the reorganized debtors, which would have otherwise inured to the benefit of the secured lenders, in exchange for a provision in the plan waiving all claims that creditors or equity holders may have against the senior lenders.[196]   The court found the consideration tendered by the senior lenders reasonable because the non-consenting classes, consisting of unsecured creditors and

---

[192]     *Id.* at 60-61.

[193]     *See Id.* at 77-78.

[194]     *Id.*

[195]     *See, e.g., In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993); *Exide Techs.*, 303 B.R. 48; *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001); *In re MCorp Fin., Inc.*, 160 B.R. 941 (Bankr. S.D. Tex. 1993).

[196]     *Genesis Health Ventures*, 266 B.R. at 608.

subordinated noteholders, would have received *nothing* from the estate in the absence of the proposed give ups.[197]  In other words, the non-consenting classes were out of the money.

   2.   *THE PLAN UNJUSTIFIABLY IMBUES NON-FIDUCIARIES WITH MATERIAL AUTHORITY ON BEHALF OF ALL ACC CREDITORS*

   Section 12.3 of the Plan unlawfully authorizes a majority of the five ACC Settling Parties to waive the condition precedent under the Plan that $1.080 billion in value (or $1.130 billion if there is an ACC Senior Notes Claims Accepting Class) be available on the Effective Date for distribution to ACC creditors.   Effectively, the Plan bestows upon these five bondholders the authority of a fiduciary to make material economic decisions for others, but through the exculpation and release provisions, eliminates any of the protections normally afforded to those on whose behalf they act.  What is worse, is that the Plan does not even require that these newly appointed fiduciaries hold an economic interest when they consent to such a waiver nor are they required to provide notice and an opportunity to be heard to the other ACC creditors.

## II.   THE PLAN BLATANTLY VIOLATES NUMEROUS PROVISIONS OF THE BANKRUPTCY CODE AND CANNOT BE CONFIRMED UNDER 11 U.S.C. § 1129

### A.   SUMMARY OF ARGUMENTS REGARDING VIOLATIONS OF SECTION 1129

   In addition to the fatal flaws of the Global Settlement that render it incapable of being approved, the Plan does not comply with the applicable provisions of title 11 and therefore fails to satisfy the threshold requirement for confirmation under 11 U.S.C. § 1129(a)(1).[198]  First,

---

[197]    *See Id.*

[198]    In addition to the arguments set forth below, the ACC Bondholder Group reasserts and incorporates by reference its objections to the Disclosure Statement as if fully set forth herein, to the extent not previously sustained.  Confirmation should be denied because the Plan Proponents have failed to (i) disclose what the distributions to holders of ACC Senior Notes, Arahova Notes and FrontierVision Holdco Notes would be if the Debtors filed a plan that comports with their own schedules of assets and liabilities (including the May 2005 Schedules) and their sworn testimony regarding the appropriate allocation of value from the TW NY / Comcast sale proceeds and (ii) compare those distributions with those proposed under the Plan.  The

the Plan cannot satisfy the best interests of creditors test with respect to ACC creditors, as required by section 1129(a)(7). Second, the Plan has no legal means for its implementation as required by section 1123(a)(5) because it treats the Debtors as if they are consolidated, but then distorts and abuses the remedy of substantive consolidation to the harm of ACC creditors. Third, the convoluted treatment of scheduled Intercompany Claims violates sections 1126(g) and 1129(b) by purporting to deny these claims the right to vote on the Plan, making no distributions on account of such claims, and allowing Debtors to retain equity. Fourth, the Plan contains illegal third party releases and illegal payoffs to certain Settlement Parties in violation of section 1123(a)(4), even though prior findings by this Court and/or actions taken during these chapter 11 cases demonstrate that such parties are not entitled to these payoffs and releases. Fifth, the Plan was not filed in good faith, in violation of section 1129(a)(3).

This illegal Plan would not have emerged but for a pattern of aggressive litigation tactics designed to force a non-merits-based resolution of the Inter-Creditor Dispute that started with the Arahova Noteholders Committee's "scorched earth" litigation designed to hold the Time Warner sale hostage to their demands. After this Court entered scathing findings of fact and conclusions of law against the Arahova Noteholders Committee, Huff, also a Settlement Party, took up the mantle of coercive litigation tactics with its Bankruptcy Rule 2004 discovery of ACC Senior Noteholders. Then, fearing that it would lose a fair vote on the Plan, the Creditors Committee picked up the torch by sending threatening letters to the ACC Bondholder Group and making inflammatory allegations to the Court in the context of vote designation.

At issue, then, is whether the Court should depart from its earlier rulings that sets the appropriate boundaries for the resolution of the Inter-Creditor Dispute or now confirm a plan

---

Debtors have failed to provide a substantive rationale for the radical departure from their prior testimony and court filings, including all schedules of assets and liabilities.

that rewards aggressive litigation tactics designed to avoid a merits-based resolution with an unwarranted financial windfall to which those who have engaged in such tactics would not be entitled if the merits of the Inter-Creditor Dispute were subjected to any level of judicial scrutiny. Unfortunately, this Court's consistent warning that it "will not permit litigants to have advantages, statutory or otherwise, in the Interdebtor Disputes,"[199] has fallen on deaf ears and, in fact been abandoned. Emboldened by their belief that threats of years of litigation will crush any opposition, the Plan Proponents and Arahova Noteholders Committee have designed a construct that pools the assets of every estate (including ACC), confiscates ACC's share of those assets to pay creditors of the Subsidiary Debtors, and abrogates ACC's Intercompany Claims, resulting in the Subsidiary Debtors' creditors being paid in full, plus interest, while ACC creditors get what is left.

The Plan should be viewed in its true light, an effort by the Plan Proponents, Huff and Arahova Noteholders to avoid any judicial determination of the Inter-Creditor Dispute, which this Court has repeatedly ruled would have to be litigated unless all the parties to those disputes agreed to a settlement. The Plan ignores or obfuscates completely the Debtors' capital structure to the sole advantage of Subsidiary Debtor creditors by stripping the ACC estate of its assets. Contrary to this Court's directive, this Plan is proposed to advantage the Subsidiary Debtors' creditors to the detriment of the ACC estate.

## B. THE PLAN VIOLATES SECTION 1129(A)(7) OF THE BANKRUPTCY CODE BECAUSE THE ACC BONDHOLDER GROUP WOULD RECEIVE GREATER RECOVERIES UNDER CHAPTER 7 THAN UNDER THE PLAN

The Plan does not satisfy the "best interests" test of section 1129(a)(7) of the Bankruptcy Code because a chapter 7 trustee for ACC would reject the proposed Global

---

[199] *See Adelphia*, 336 B.R. at 660 n.24.

Settlement in the exercise of its fiduciary duties. In doing so, the trustee would spare the ACC estate from the misappropriation of its assets by the Arahova creditors as sanctioned by the Plan.

The "best interests of creditors" test requires that, with respect to each impaired class of claims or interests, each holder of such a claim or interest has accepted the plan or will receive property of a value not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.[200] The members of the ACC Bondholder Group are voting to reject the Plan. Accordingly, the Plan must pay them at least as much as they would receive in a case under chapter 7.

The Plan Proponents have advanced a liquidation analysis which purports to show that the assumed chapter 7 costs exceed those of remaining in chapter 11 based upon allegations that: (i) the costs and potential discounting in an initial public offering ("IPO") of TWC Class A Common Stock ("TWC Stock") after conversion to chapter 7 could exceed $600 million; (ii) the administrative costs of a chapter 7 trustee will be greater than those contemplated under the Plan; (iii) a chapter 7 trustee will lose the benefit of key personnel in prosecuting the Debtors' Causes of Action; (iv) the delay of a chapter 7 case will reduce distributions due to the time value of money; and (v) a chapter 7 trustee would ultimately adopt similar settlements to those embodied in the Plan, thereby negating any material difference in creditor treatment.[201]

These arguments are based upon false premises and mere conjecture. The fallacy of this cost analysis lies in its bare assumption that an ACC trustee would adopt the Plan Proponents' distribution construct. Under the Plan, the costs of *all* estates, including accrual of Bank interest, the costs of the IPO, and additional administrative expenses, are borne *solely* by

---

[200]     *See* 11 U.S.C. § 1129(a)(7); *see also, Kane*, 843 F.2d at 649; *In re The Leslie Fay Cos., Inc.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997).

[201]     DSS2-113 – 115.

ACC. This is true of generally all risks to estate value; because the base recovery for all other creditor groups is essentially fixed, the Plan forces ACC creditors to bear the entire risk of value degradation. As set forth in more detail below, a chapter 7 trustee would be able to achieve far greater recoveries for the ACC Bondholder Group than those provided in the Plan.

1. ***THE ADMINISTRATIVE COSTS OF A CHAPTER 7 TRUSTEE ARE LESS THAN THE FEES AND EXPENSES THAT ACC CREDITORS HAVE TO PAY UNDER THE PLAN AND ANY DELAY IN A CHAPTER 7 CASE DOES NOT IMPOSE ADDITIONAL RISK OF LOSS***

Regardless of whether an ACC trustee adopted the Plan Proponents' unwarranted program, the costs of these cases in chapter 7 would be born by all creditors of all the Debtors. Moreover, if the ACC creditors were not forced to bear some of the estimated $87 million for the fees and expenses of Settling Parties,[202] that value would offset much of the alleged incremental increase in costs due to the appointment of a trustee.

The Plan Proponents' simplistic argument that a chapter 7 trustee would be entitled to 3% of the distributable value of the estates misapplies section 326 of the Bankruptcy Code. In all cases, the trustee is limited to "*reasonable* compensation not to exceed 3%." However, even if ACC's distributable assets were double those proposed in the Plan, the trustee's maximum fee would be approximately $60 million—$27 million less than ACC creditors are currently being forced to pay for their opponents' professionals under the Plan. In addition, a chapter 7 trustee could reject the proposed $27 million insider reimbursement and indemnification obligations that the Plan seeks to charge to ACC creditors.[203]

Fundamentally, the ACC Bondholder Group will not suffer any additional risk of loss in a chapter 7. The Plan allocates first priority in Available Cash to Subsidiary Debtor

---

[202]   DSS2-64.

[203]   *See* Plan § 16.23.

creditors on the Effective Date.[204]  Accordingly, ACC creditors will recover, if at all, in TWC

Stock and CVV Interests.  These assets already bear the risk of loss, or the prospect of gain, due

to changing conditions over time.

> **2.**   *AN ACC CHAPTER 7 TRUSTEE WOULD ENHANCE RECOVERIES FROM TWC STOCK*

The facts will demonstrate that the Plan intentionally and artificially undervalues

TWC Stock in order to dilute recoveries that the ACC Bondholder Group would otherwise enjoy.

For example, over the first ten months of this year, equity values for comparable enterprises have

risen substantially, including Comcast Corporation, which has increased by 50%, and

Cablevision Systems Corporation, which has increased by 75%.  Based upon a review of TWC's

financial results and these comparable enterprises, and in light of recent transactions by TWC—

TWC reducing its net debt by at least $1.75 billion and certain tax attributes—the ACC

Bondholder Group submits that the Debtors' TWC Stock currently has a market value of $6.3

billion to $7.3 billion.  This value substantially exceeds the alternative Deemed Values under the

Plan of $5.1 billion or $5.4 billion.

Moreover, the Plan imposes a collar on any adjustments to these materially

understated values.  Section 10.12 of the Plan provides for a True -Up Mechanism to adjust the

Deemed Value up or down by no more than 20% based on the volume weighted average trading

price per share during the sixty days following the Effective Date.  By virtue of this mechanism,

the value can be increased or decreased by 20%, which translates into a range of value of $4.08

billion to $6.48 billion.  Because the highest possible valuation falls in the lowest range of any

reasonable valuation analysis, the ACC Bondholder Group bears 100% of the risk of declining

prices in cable stock, but receives none of the benefit from an increase in prices.  By setting the

---

[204]    *See* Plan § 10.13.

Deemed Value far below the current market value, and then applying a collar to restrict the adjustment of that value, the Settling Parties have preserved any upside for themselves. Moreover, given the materially understated valuation used for the Deemed Value, any purported downside protection is entirely fictional. The combination of an artificially low Deemed Value and an arbitrary collar mechanism allows holders of claims against Subsidiary Debtors to recover more than par plus accrued interest by increasing the number of shares they receive while correspondingly reducing the number of shares received by ACC creditors.

The Plan Proponents continuously implore this Court to quickly, and without close judicial scrutiny, confirm the Plan because an IPO of the TWC Stock would cost as much as 10% on the value of the shares issued. This scare tactic has no basis in reality. Cable is a well-performing sector, and in light of the high quality of TWC's assets and investor familiarity with Time Warner, the ACC Bondholder Group submits that the TWC Stock would not need to be priced at a discount to attract investors. In addition, the costs of any IPO are exaggerated. The Debtors control the amount of TWC Stock that would be offered to the public above a threshold of 33 1/3% of the Debtors' holdings. If only the minimum required amount is offered to the public, a 4% underwriters fee (which is the mid-range of the Plan Proponents' estimate) results in IPO costs of approximately $85 million.

These costs are relatively minor when considered against the damage created by the Plan through its "Deemed Value" mechanisms. According to the Plan, TWC Stock will have a deemed value of only $5.1 billion if the ACC Senior Notes Class rejects the Plan, but will increase to $5.4 billion if the ACC Senior Notes Class votes to accept the Plan.[205] Thus, other than the True-Up Mechanism, the Deemed Value will rise or fall, not based on any market

---

[205]    *See* Plan, Ex. A at pp. A-14-15; DSS2-23-24.

fluctuation, but according to an unjustified "death trap" voting provision.[206]  Provisions such as this generally have been approved as an inducement to accept a plan where the affected creditors are otherwise entitled to nothing at all.[207]  By contrast, the death trap employed here manifests the extraordinary effort by the Plan Proponents to dilute ACC's rightful entitlements and avoid proper value allocation through whimsical plan tactics.

The Plan Proponents attempt to validate this capricious methodology by stating that the Deemed Value was an integral component of various compromises embodied in the Plan.[208]  The Plan Proponents admit, however, that the Deemed Value will not be necessarily indicative of the actual equity value of TWC Stock.[209]  Moreover, the Deemed Value ascribed to the TWC Stock under the Plan (whether or not there is an ACC Senior Notes Claims Accepting Class) is based upon an arbitrary valuation inconsistent with both the earnings capacity of TWC and the market prices of comparable enterprises.  Instead of disclosing the methodology used, or better yet, providing adequate financial information, the Plan Proponents urge the Court to accept their arbitrary valuation because "valuation of the TWC Class A Common Stock is an exercise fraught with inherent complexities and is dependent on numerous assumptions, including TWC achieving financial results projected in financial projections prepared by TWC's management."[210]  As a result, the current valuations provided in the Plan derive solely from

---

[206]     *In re MCorp Financial, Inc.*, 137 B.R. at 236 (Bankr. S.D. Tex. 1992).

[207]     *See In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 714, 716-17 (Bankr. S.D.N.Y. 1992).

[208]     *See* DSS2 - 111.

[209]     *See* DSS2 - 23.

[210]     DSS2 - 111.

agreements concocted between the Plan Proponents and those creditors receiving special consideration under the Plan.[211]

This Court should not be so easily dissuaded from insisting on a proper valuation of these material and substantial assets. When a plan proposes to distribute enterprise equity to satisfy claims, proponents of such a plan must base distributions on the value of the enterprise.[212] As Justice Holmes once said, "the commercial value of property consists in the expectation of income from it."[213] To properly determine such values, courts have considered the following evidence: (i) the present value of future cash flows, discounted by an appropriate cost of capital (the discounted cash flow method), and (ii) a sample of ratios (such as the price earnings ratio) of stocks for comparable peer group companies (the comparable method).[214] These are hardly matters of first impression.

In contrast to the numerous harms and inequities perpetrated by this Plan, the ACC Bondholder Group would receive the benefit of market based distributions in a chapter 7 liquidation.

[211]    *Id.* at 111 – 112.

[212]    *See, e.g., Consol. Rock*, 312 U.S. at 525.

[213]    *Galveston, Harrisburg & San Antonio Ry. Co. v. Texas*, 210 U.S. 217, 226 (1908); *see also Consol. Rock*, 312 U.S. at 525 ("Findings as to the earning capacity of an enterprise are essential to a determination of the feasibility as well as the fairness of a plan of reorganization.")

[214]    *In re Mirant Corp.*, 334 B.R. 800, 816 (Bankr. N.D. Tex. 2005) (finding support in numerous opinions for the valuation of a chapter 11 debtor through the use of the discounted cash flow valuation method and the comparable method); *In re Bush Indus., Inc.*, 315 B.R. 292, 299-302 (Bankr. W.D.N.Y. 2004); *In re Exide Techs.*, 303 B.R. at 65; *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 930 (Bankr. S.D.N.Y. 1994); *In re Pullman Constr. Indus. Inc.*, 107 B.R. 909 (Bankr. N.D. Ill. 1989).

**3.** ***A Chapter 7 Trustee Would Provide Rational Distributions To Creditors Instead Of Gifting Illegal "Give Ups" And Would Limit Interest Payments To The Federal Judgment Rate***

A chapter 7 trustee is legally obligated to (i) determine the actual value of the ACC estate, (ii) distribute assets on a *pro rata* basis to creditors, (iii) honor the structural seniority of Intercompany Claims against the Subsidiary Debtor Equity Interests, (iv) pay all proceeds attributable to Intercompany Claims before any funds were upstreamed to such Equity Interests, and (v) determine that an estate is actually solvent before voluntarily agreeing to pay hundreds of millions of dollars in accrued interest to parent company bondholders. If a chapter 7 trustee were appointed and carried out these fiduciary duties, the evidence will establish that the ACC creditors would clearly receive more under chapter 7 than under this lop-sided Plan that favors the Arahova creditors at the expense of the ACC creditors.

Moreover, the Plan fails the best interests standard in light of the protections afforded by section 726(a) of the Bankruptcy Code regarding postpetition interest. Here, the Plan posits that every Subsidiary Debtor is solvent and therefore it proposes to pay accrued interest to unsecured creditors of those estates at their contract rate of interest (or in the case of Subsidiary Trade Claims, Case 8% Interest). Even if such estates were solvent (and many are not after considering Intercompany Claims), payment of interest at the contract rate is impermissible over the ACC Bondholder Group's dissent.[215]

Absent solvency and application of section 726(a)(5) through section 1129(a)(7)(ii) of the Bankruptcy Code, the disallowance of unmatured interest as of the petition date under section 502(b) of the Bankruptcy Code prohibits the payment of any interest

---

[215] *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St.*, 526 U.S. 434, 442 n.13 (1999) (noting "the 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan");

whatsoever to unsecured creditors.[216]  Section 726(a)(5) of the Bankruptcy Code provides, however, that, after payment of all amounts due under sections 726(a)(1) through (a)(4), post-petition interest is payable on all allowed unsecured claims "at the legal rate" from the petition date until the payment of such claims.  Therefore, with regard to solvent debtors, the equitable distribution of a debtors' assets requires that the principal amount of all claims of the types specified in subsections (1) through (4) of section 726(a) be paid in full before interest can be paid under section 726(a)(5) of the Bankruptcy Code on any allowed claims.[217]

There is little disagreement over the rate implicated by the phrase "legal rate of interest;" the majority of courts hold that the federal judgment rate is the appropriate rate for a solvent estate under section 726(a)(5) of the Bankruptcy Code.[218]  This Court has previously agreed with the majority rule that the federal judgment rate applies under section 726(a)(5); but the Court also stated that, at least in the context of a cramdown under 1129(b)(2) of the Bankruptcy Code, it has the discretion to award a higher rate of pendency interest, including the contract rate.[219]

---

[216]     11 U.S.C. § 506(b)(2); *see also Thompson v. Ky. Lumber Co.* (*In re Ky. Lumber Co.*), 860 F.2d 674, 676-77 (6th Cir. 1988) (citing *Walsh Constr.*, 669 F.2d at 1330 (noting award of post-petition interest may be permitted in cases, "(1) where the alleged bankrupt proves solvent; (2) where the collateral produces income after filing of the petition, and (3) where the collateral is sufficient to pay interest as well as the principal of the claim."))

[217]     *See In re Dow Corning* ("*Dow I*"), 237 B.R. 380, 393 (E.D. Mich. 1999) (holding that solvent estate required to pay federal judgment rate to unsecured creditors); *see also In re Country Manor of Kenton, Inc.*, 254 B.R. 179, 180 (Bankr. N.D. Ohio 2000) (holding legal rate of interest paid to unsecured creditors is fifth-level claim); *In re El Paso Refinery*, 244 B.R. 613, 617 (Bankr. W.D. Tex. 2000) (stating additional distribution is made to unsecured creditors if estate still has money after distribution of unsecured claims).

[218]     *See, e.g., Onink v. Cardelucci* (*In re Cardelucci*), 285 F.3d 1231, 1234 (9th Cir. 2002) ("The principles of statutory interpretation lend strong support to the conclusion that Congress intended "interest at the legal rate" in 11 U.S.C. § 726(a)(5) to mean interest at the federal statutory rate pursuant to 28 U.S.C. § 1961(a)); *In re Shoen*, 176 F.3d 1150, 1166 (9th Cir. 1999) (holding same); *Kenton, Inc.*, 254 B.R. at 183 (holding legal rate does not refer to rate in parties' agreement, rather one uniform rate should be applied).

[219]     Hr'g Tr. 12:19 – 14:2, April 27, 2006 (Court Decision on Joint Motion in Aid Rate and Computation of Post-Petition Interest, Docket No. 11149).

In reaching this decision, the Court was primarily guided by two reported decisions. Relying first on the Supreme Court's decision in *Vanston Bondholders*, the Court noted that historically each decision regarding interest in bankruptcy involved "a balance of the equities."[220] The Court also considered Judge Spector's second decision on postpetition interest in *In re Dow Corning* ("*Dow II*")[221] and concluded that the "fair and equitable" standard of section 1129(b) likewise confers wide latitude in matters concerning postpetition interest.[222] While the Court did not make any determination regarding the solvency of a particular estate, the Court ultimately ruled that an adjusted contract rate, rather than the federal judgment rate, was fair and equitable for purposes of 11 U.S.C. § 1129(b).[223]

At issue now is whether the interest payments afforded creditors of Subsidiary Debtors under the Plan satisfy the "best interests" test as to the ACC Bondholder Group for purposes of 11 U.S.C. § 1129(a)(7). There is an obvious tension created between *Dow II*—and this Court's—reading of section 1129(b)(2)(B)(i) in favor of unsecured creditors obtaining the contract rate and the requirements of section 1129(a)(7)(A)(ii) for dissenting unsecured creditors. That was not at issue in *Dow II* or in this Court's earlier decision.[224] As a result, the Court's prior analysis did not take into account the fact that section 1129(a)(7)(A)(ii) also guarantees a *minimum* to dissenting creditors or interest holders with lower priority.[225] Holders of junior

---

[220]     *Id.* at 12:12 – 18 (quoting *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 165 (1946)).

[221]     *In re Dow Corning Corp.*, 244 B.R. 678 (E.D. Mich. 1999).

[222]     *Id.* at 13:4 – 14 (quoting *Dow II*, 244 B.R. at 694-95).

[223]     *Id.* at 14:6 – 10.

[224]     *Id.* at 7:15 – 20 (stating only that either the federal rate or a contract rate "would pass muster under the Best Interests of Creditors Rule, insofar as creditors of Adelphia subsidiaries were concerned.")

[225]     The Court's prior analysis also overlooked that satisfying section 1129(a)(7) is a condition precedent to the invocation of any rights under section 1129(b). 11 U.S.C. § 1129(b)(1) ("if all the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan . . .").

interests in the debtor's estate are entitled to distributions under section 726(a)(6) of the Bankruptcy Code in the event of solvency. Accordingly, in a multi-debtor hierarchy such as this one, structurally junior creditors are entitled to insist that *no more than* the amounts required to be paid under the express terms of sections 726(a)(1) through (a)(5) are paid, with the surplus preserved for distribution to them through operation of section 726(a)(6). By assuring them that unsecured creditors with higher priority will be paid interest at no more than "the legal rate" before distributions are made to the debtor, the Bankruptcy Code strikes a statutory balance that makes reference to the pre-Code practice of "balancing the equities" unnecessary.[226]

Recent Supreme Court precedent compels this conclusion. Indeed, the Court has directed that an analysis of any statute, including the Bankruptcy Code, must not begin with external sources, but with the text itself.[227] The risk of error is compounded in this instance for the following reasons:

> The [Bankruptcy] Code specifically adopted parts of the pre-Code jurisprudence concerning postpetition interest in Sections 502(b) and (b)(2), 506(b) and 726. Congress eliminated the subjectivity of pre-Code discretion and specifically prohibited allowance of postpetition interest by enacting Section 502(b) and specifically mandated allowance of such interest in enacting 506(b) and 726(a)(5).[228]

In circumstances such as this one, the words of Justice Thomas from *203 North LaSalle St. P'shp* are particularly apropos: "it makes little sense to graft onto the Code concepts

---

[226]   *Cf. In re Manchester Gas Storage, Inc.*, 309 B.R. 354, 384-385 (Bankr. D. Okla. 2004) ("The concept that postpetition interest is a matter of the bankruptcy court's equitable discretion has been superseded by statute.")

[227]   *See, e.g., Conn. Nat'l. Bank v. Germain*, 503 U.S. 249, 253-54 (1992); *Union Bank v. Wolas*, 502 U.S. 151, 154 (1991).

[228]   *Manchester Gas*, 309 B.R. at 384-385.

that were developed during a quite different era of bankruptcy practice."[229]  In light of this, the *Dow II* court's methodology raises other concerns as well.  In searching for cases interpreting "fair and equitable" and payment of post-petition interest, the court relied upon pre-Code practice without considering whether section 1129(b)(2)(B)(i) must now be read together with the independent confirmation requirements set forth in sections 726(a)(5), 726(a)(6), and 1129(a)(7)(A)(ii) – sections that did not exist under the Bankruptcy Act.[230]

Section 1129(a)(7)(A)(ii) of the Bankruptcy Code gives the ACC Bondholder Group the absolute entitlement to demand at least as much as they would receive in a chapter 7 liquidation.  In that circumstance, any surplus must revert to the debtor after payment of the federal judgment rate.  Through this statutory entitlement, the ACC Bondholder Group would avoid having the value of the ACC estate further eviscerated by excessive interest payments to the holders of unsecured claims against Subsidiary Debtors.

### 4. *THE PLAN VIOLATES SECTION 1123(A)(7) AND 1129(A)(7) OF THE BANKRUPTCY CODE BY FAILING TO APPOINT A NON-CONFLICTED FIDUCIARY FOR THE ACC ESTATE*

Because of the conflicts between estates in these cases, separate trustees for the Debtors, or at least each Debtor "group," would be necessary in a chapter 7 liquidation.  A trustee for ACC would have the fiduciary duty to maximize value for ACC creditors by, among other things, objecting to and seeking subordination of claims that dilute distributions to the holders of ACC Senior Notes.

Chapter 11 also requires appointment of non-conflicted fiduciaries pursuant to a plan.  Specifically, section 1123(a)(7) of the Bankruptcy Code provides that a plan shall "contain

---

[229]     *203 N. LaSalle St.*, 526 U.S. at 462 (Thomas, J., dissenting).

[230]     *Dow II*, 244 B.R. at 688-91.

only provisions that are consistent with the interests of creditors . . . and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."[231]  Absent compliance with this requirement, the Plan cannot be confirmed under section 1129(a) of the Bankruptcy Code.

The Debtors' Plan fails to appoint an independent, non-conflicted fiduciary to represent the interests of the creditors of ACC.  Instead, there will be one Plan Administrator, designated by the Creditors Committee and approved by the Debtors, to serve as "fiduciary of each of the Estates."[232]  The Plan Administrator "shall make all determinations with respect to employment of any other directors, officers, managers and employees of the Debtors on and after the Effective Date."[233]  Moreover, the Plan Administrator shall be the trustee of the Distribution Trust, which will be created under the Plan to hold Plan Consideration, CVV Interests and any other assets to be distributed pursuant to the Plan, and to which reorganized ACC shall issue a single share of stock.[234]

There is no protection for the holders of ACC Senior Notes under these provisions.  Rather, the Plan proposes to let the Creditors Committee (which is dominated by holders of claims against Subsidiary Debtors) hand pick the Plan Administrator, which creates an inherent conflict of interest.  Moreover, the Plan Administrator has no allegiance to the ACC estate over the Arahova estate.  Indeed, the appointment of one Plan Administrator that has been selected by the parties who seek to diminish value at the ACC estate essentially guarantees that

---

[231]    11 U.S.C. § 1123(a)(7).

[232]    Plan § 13.1(b)(i).  *See also*, Plan § 8.2 (On the Effective Date, the rights, powers and duties of the Debtors' current directors or, to the extent applicable, the governing body of a Debtor entity, shall vest in the Plan Administrator, who "shall be the presiding officer and the sole Governor of each applicable Debtor.").

[233]    Plan § 8.2.

[234]    Plan § 13.2(i) and Ex. A.

the Plan Administrator will take actions opposed to the best interests of the ACC Bondholder Group and other holders of ACC Senior Notes.

Further, there is no incentive whatsoever for such a Plan Administrator to maximize value for the creditors of ACC. Thus, the Plan Administrator has no incentive to aggressively object to claims against ACC, which, if allowed, would dilute the distributions available to creditors of ACC. Similarly, the Plan Administrator would likely settle litigation for amounts that benefit only those creditors with guaranteed recoveries under the Plan, but not creditors of ACC. These prospects are not the product of idle speculation, particularly when the release and injunction provisions contained in the Plan insulate the Plan Administrator from prosecution for breach of fiduciary duties.[235]

The Plan's utter failure to meet the "best interest" standard mandated under section 1129(a)(7) of the Bankruptcy Code is yet another reason why the Plan does not pass muster and confirmation should be denied.

## C. THE PLAN FAILS TO PROVIDE ADEQUATE MEANS FOR ITS IMPLEMENTATION BY RELYING ON A DISTORTED FORM OF SUBSTANTIVE CONSOLIDATION WITHOUT ANY RECOGNIZED JUSTIFICATION

Section 1123(a)(5) of the Bankruptcy Code provides that, "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation," including appropriate mechanisms for the debtor to retain, transfer, or consolidate property of its estate. As a general rule, a debtor cannot use property of its estate to pay claims filed against a different debtor.[236] Indeed, the Bankruptcy Code presumes that

---

[235]     *See* Plan §§ 16.3 and 16.15.

[236]     *In re Owens Corning*, 419 F.3d at 211, 216 (3rd Cir. 2005) (flatly rejecting a plan to consolidate assets for distribution purposes while leaving the existing corporate structure undisturbed); *Walsh Const., Inc. v. Alaska Nat'l Bank* (*In re Walsh Const., Inc.*), 669 F.2d at 1330 (9th Cir. 1982) (cited with approval in *FDIC v. Colonial Realty Co.*, 966 F.2d at 61 (2d Cir. 1992)); *James Talcott, Inc. v. Wharton* (*In re Continental Vending Mach. Corp.*), 517 F.2d at 1000 (2d Cir. 1975); *see also* 1 Norton Bankruptcy Law and Practice

chapter 11 plans will respect existing capital structures in multi-debtor cases and that each debtor will satisfy claims from its own assets.[237] The Supreme Court mandates that debtors determine the assets available in each estate to satisfy claims and then allocate those assets fairly among its creditors.[238] A plan that departs from this mandate through "deemed" consolidation tactics misuses the remedy of substantive consolidation "as a sword and not a shield."[239]

Contrary to the dictates of section 1123(a)(5), the Plan before this Court lacks any legally appropriate means for its implementation. Even though the Plan Proponents purport to "reserve the right to seek to substantively consolidate any two or more Debtors,"[240] the Plan inconsistently achieves projected recoveries by pooling the assets of every estate and then using those combined assets to first pay claims filed against insolvent subsidiary estates (such as Arahova) without regard to the capital structure or scheduled Intercompany Claims.[241] This result can only be obtained through acquiescence to an unsanctioned, hybrid form of substantive consolidation, which results in the distribution of ACC's assets to other creditors, while giving ACC creditors nothing in exchange. As set forth more fully above, there is no basis for substantive consolidation in these cases. Because "the enjoyment of the benefits afforded by the

---

2d, § 20.9 (2003) ("If the debtors' cases are not substantively consolidated, the plan must treat the debtors' respective assets and liabilities separately").

[237]    *See, e.g.*, *Consol. Rock Prods. Co.*, 312 U.S. at 520 (1941); *Owens Corning*, 419 F.3d at 211; *Flora Mir Candy Corp.*, 432 F.2d at 1062-63 (2d Cir. 1970).

[238]    *Kuehner*, 299 U.S. at 451 (1937); *Consol. Rock*, 312 U.S. at 520, 524-25.

[239]    *Owens Corning*, 419 F.3d at 216.

[240]    *See* Plan § 2.2.

[241]    Just by way of example, without this unjustified hybrid of substantive consolidation, it is impossible under the applicable facts and law for the holders of both Arahova Notes and FrontierVision HoldCo Notes to receive distributions near or greater than par.

[Bankruptcy Code] is contingent on the acceptance of its burdens," the Court must deny confirmation of this Plan.[242]

**D. THE PLAN'S TREATMENT OF INTERCOMPANY CLAIMS CANNOT BE JUSTIFIED, CONTRADICTS THE DEBTORS' OWN SCHEDULES, COMBINES DISSIMILAR CLAIMS IN A SINGLE CLASS, VIOLATES THE ABSOLUTE PRIORITY RULE, AND UNFAIRLY DISCRIMINATES**

To maximize returns for claims against the Subsidiary Debtors, the Plan implements an often confusing—and consistently illogical—scheme for all Intercompany Claims. As a result, the Plan's treatment of such claims cannot be justified, it contradicts the Debtors May 2005 Schedules of Assets and Liabilities, and as a result, the Plan violates the absolute priority rule and unfairly discriminates.

The May 2005 Schedules represent the result of a comprehensive effort by the Debtors and their accounting advisors to restate the financial records of these estates. These amended schedules of assets and liabilities were filed in accordance with section 521 of the Bankruptcy Code. Pursuant to section 1111(a) of the Bankruptcy Code, the Intercompany Claims reflected in the Debtors' May 2005 Schedules were not scheduled as disputed, contingent or unliquidated, and are "deemed filed" for purposes of section 501 of the Bankruptcy Code.[243] Under these circumstances, unlike what the Plan proposes, the Intercompany Claims cannot be treated as if they do not exist.

---

[242] *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503 (Bankr. D.N.J. 1997) (quoting JUDITH R. STARR, BANKRUPTCY COURT JURISDICTION TO RELEASE INSIDERS FROM CREDITOR CLAIMS IN CORPORATE REORGANIZATIONS, 9 BANKR. DEV. J. 485, 498 (1993)).

[243] 11 U.S.C. § 1111(a).

1. ***THE PLAN TORTURES THE TREATMENT AND CLASSIFICATION OF INTERCOMPANY CLAIMS***

The Plan defines "Intercompany Claim" as "any Claim, Cause of Action, remedy or Administrative Claim . . . related to or arising under the Inter-Creditor Dispute."[244]  In turn, the term "Inter-Creditor Dispute" is defined as "any and all issues and all disputes . . . including without limitation the resolution of Intercompany Claims."[245]  These circular definitions illustrate how the Plan achieves results in the absence of any legal compass.  This circularity is compounded by the fact that the Intercompany Claims are denied the right to vote based on the fact that they will be eliminated if the Plan is confirmed; in other words, you cannot vote on a plan that proposes to take away your claim, because if the plan is confirmed you will not have a claim.[246]

The Plan cannot simultaneously deny holders of Intercompany Claims the right to vote *and* the right to receive distributions.[247]  According to section 1126(g) of the Bankruptcy Code, "a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests."[248]  And the presumption of rejection under section 1126(g) is conclusive.[249]

---

[244]   Plan Ex. A at A-24-25 (emphasis added).

[245]   Plan Ex. A at A-25 (emphasis added).

[246]   Section 2.3 of the Plan mandates that "Intercompany Claims are deemed resolved as a result of the Global Settlement and, consequently, holders of those Intercompany Claims are not entitled to vote on the Plan or to receive any Plan Distributions or other allocations of value."

[247]   *See* Plan §§ 2.1, 2.3, 5.3.

[248]   11 U.S.C. § 1126(g).

[249]   *See In re Waterways Barge P'ship*, 104 B.R. 776, 783 (Bankr. N.D. Miss. 1989) ("The legislative history pertinent to [section 1126(g)] indicates that it is not even necessary to solicit votes from a class whose members are to receive or retain nothing."); *In re Polytherm Indus., Inc.*, 33 B.R. 823, 832 (W.D. Wis.

Further, Section 3.4 of the Plan, "Intercompany Claims Class," amplifies the mischief of these machinations. According to that provision, all Intercompany Claims against a Debtor are placed into a single class even though, by definition, such claims include administrative priority claims, prepetition unsecured claims, and all remedies (which, according to section 101(5)(b) of the Bankruptcy Code, are not claims at all unless they give rise to a right to payment). This Plan provision violates the express requirement of section 1122(a) that a class contain only "substantially similar" claims. Claims are substantially similar when they share the same "legal attributes."[250] Dissimilar claims—such as claims with a different priority, or equitable remedies like specific performance—may not be classified together.[251]

Further, the Plan implicitly abrogates all rights of setoff regarding Intercompany Claims despite the fact that section 553(a) of the Bankruptcy Code provides that nothing in title 11, except sections 362 and 363 (which are inapplicable here) shall affect setoff rights.[252] As drafted, the Plan conceals whether setoff rights are illegally affected to achieve the distributions the Plan provides. And any argument that Intercompany Claims should be equitably

---

1983) ("[B]oth the Senate and House Reports interpreted 11 U.S.C. §1126(g) as a categorical rule providing that any class denied participation under the plan is conclusively deemed to have rejected the plan."); *Buffalo Sav. Bank v. Marston Enters., Inc. (In re Marston Enters., Inc.)*, 13 B.R. 514, 519 (Bankr. E.D.N.Y. 1981) ("The Senate Report noted that . . . an impaired class which received nothing under the plan was conclusively deemed to have rejected the plan.").

[250] *In re Coram Healthcare, Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004).

[251] *Class Five Nev. Claimants (In re Dow Corning Corp.)*, 280 F.3d 648, 661 (6th Cir. 2002).

[252] Setoff claims cannot be discharged unless no objection to discharge is made. *United States v. Continental Airlines (In re Continental Airlines)*, 134 F.3d 536 (3d Cir. 1998). Section 553(a) takes precedence over 11 U.S.C. § 1141. *Carolco Television Inc. v. National Broadcasting Co. (In re De Laurentiis Entertainment Group Inc.)*, 963 F.2d 1269 (9th Cir. 1992).

subordinated to other kinds of claims does not cure this defect. Courts preserve rights of setoff even when a claim is subordinated.[253]

Moreover, because the Intercompany Claims class has statutorily rejected the Plan, the Plan cannot satisfy the requirements of section 1129(a)(8) and the Plan Proponents must seek confirmation, if at all, under the cram down provisions of section 1129(b) of the Bankruptcy Code. As described below, however, this Plan is not confirmable under those provisions because it is not fair and equitable with respect to the Intercompany Claims class and discriminates unfairly against such claims.

## 2. *THE PLAN IS NOT FAIR AND EQUITABLE WITH RESPECT TO INTERCOMPANY CLAIMS BECAUSE IT VIOLATES THE ABSOLUTE PRIORITY RULE*

Proper allocation of value to inter-estate equity interests and inter-estate claims is essential to "a correct consideration of the absolute priority rule."[254] Instead of starting with this simple predicate (*i.e.* what assets does each estate have available to pay claims), the Plan begins with a decision to distribute all of the assets of these estates first to creditors of the Subsidiary Debtors. The Disclosure Statement explicitly states that: "The Plan Agreement contemplates that the Debtors and Creditors Committee, as co-Plan Proponents, would file the Plan under which all holders of Allowed Claims against the Subsidiary Debtors would receive payment in full . . . of all principal and accrued interest."[255]

---

[253]    *In re Silver Eagle Co.*, 262 B.R. 534 (Bankr. D. Or. 2001); *In re Defense Services, Inc.*, 104 B.R. 481 (Bankr. S.D. Fla. 1989); *In re Denby Stores, Inc.*, 86 B.R. 768 (S.D.N.Y. 1988); *In re Sound Emporium, Inc.*, 70 B.R. 22 (W.D. Tex. 1987).

[254]    *N.S. Garrott & Sons*, 48 B.R. at 17-19; *see also In re Exide Techs. Inc.*, 303 B.R. at 60-61 ("A determination of the Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. § 1129(b)").

[255]    DSS2 – 12.

The mechanism employed to deliver these premium recoveries is found in Section 5.2(l) of the Plan, which provides that "any distributions that the holders of [Subsidiary Debtor Equity Interests] otherwise would have received on account of such Equity Interests shall be used to satisfy the obligations of such holders under the Plan." In other words, each Subsidiary Debtor "gives up" its surplus value to satisfy the obligations of any insolvent Subsidiary Debtors, even if those insolvent Debtors have no claim or interest in their solvent sibling.

Although the Plan's Proponents suggest that accounting for the assets and liabilities of every estate is irrelevant under their Plan, that approach is not only extremely cavalier and legally wrong, it is grossly impractical because it requires this Court to divine solvency—and the resulting payment of millions of dollars in postpetition interest—without resolving the Intercompany Claims that directly impact that conclusion.[256] In this Circuit, that kind of plan is not fair and equitable.[257]

ACC's presumptively valid Intercompany Claims **are structurally senior** to the unsecured claims held by parent-company bondholders like the Arahova Noteholders. The Intercompany Claims against any operating subsidiary are senior to a corporate parent's equity interest in that subsidiary.[258] So the creditors of each ACC Debtor are entitled to share (with other creditors of the subsidiary) in that subsidiary's value before any residual value is passed

---

[256]    *See Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219 (1941) (prohibiting priority recoveries from consolidated assets unless the *creditor* seeking priority proves its entitlements by clear and convincing evidence).

[257]    *See, e.g., In re Coltex Loop Central Three Partners, L.P.*, 138 F.3d 39, 42 (2nd Cir. 1998) (holding that a plan is not fair and equitable if senior creditors are not being paid in full under the plan, but equity holders who are junior creditors receive property under the plan on account of their former interests).

[258]    *R2 Investments LDC v. World Access, Inc.*, 301 B.R. 217, 285-86 (Bankr. N.D. Ill. 2003) (explaining the proper methodology for allocating value to intercompany claims in a liquidation of affiliated estates).

through to the parent and its own creditors.[259]  The Supreme Court long ago recognized that creditors of a corporation are presumptively entitled to recover against corporate assets "prior to any participation by the creditors of the stockholders."[260]

For this reason, debtors are not allowed to avoid the absolute priority rule by contracting around it.[261]  Courts faced with similar efforts to avoid distributing assets to creditors under the absolute priority rule have repeatedly denied confirmation.  In *Armstrong World*, the district court considered confirmation of a plan that purported to contractually redistribute estate assets from a class of asbestos claimants to a class of equity interests.[262]  The debtor in that case argued that the asbestos claimants were automatically waiving their right to a portion of their distributions, causing the equity holders to receive value in the form of warrants in the reorganized company. Unsecured creditors objected to this "give up" under  the "cramdown" requirements of 11 U.S.C. § 1129(b).[263]

The *Armstrong World* court agreed with the unsecured creditors in that case and held "it is clear that (1) the Equity Interest Holders hold a claim junior to the Unsecured Creditors; (2) under the Plan, the Equity Interest Holders will receive property of the Debtor . . . because of their ownership interest in Debtor; and (3) the Unsecured Creditors' allowed claims will not be satisfied in full."[264]  As a result, the court found that the plan was not fair and

---

[259]     *Id.*

[260]     *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219 (1941).

[261]     *Schwabacher v. United States*, 334 U.S. at 199 (U.S. 1948); *Walsh Const.,* 669 F.2d at 1327-28; *Costa v. Robotic Vision Sys.*, Nos. NH 05-047, 04-14151-JMD, 2006 WL 929322, at *3 (B.A.P. 1st Cir. April 11, 2006).

[262]     *In re Armstrong World Indus., Inc.*, 320 B.R. 523, 526 (D. Del. 2005), *aff'd* 432 F.3d 507 (3d Cir. 2005).

[263]     *Id.* at 528.

[264]     *Id.* at 536.

equitable. Moreover, the court held that any decision that does not strictly apply the absolute priority rule is either distinguishable or wrong.[265]

In *Armstrong World*, the debtor tried to support its "give up" plan by relying on the First Circuit's decision in *SPM Manufacturing Corp*,[266] in which the First Circuit permitted a secured lender to "share" a portion of its collateral with general unsecured creditors (to the exclusion of priority unsecured creditors). The *Armstrong World* court distinguished *SPM Manufacturing* because there "the secured lender was entitled to the *entire proceeds of the debtor's assets* under its lien, whether or not there was a sharing agreement."[267] Importantly, the *Armstrong World* court also noted that the sharing agreement in *SPM* had no effect on distributions because the lender shared its proceeds *after* the estate property had been distributed.[268] Dramatically, the *Armstrong World* court "flatly rejected" any contention that parties in a bankruptcy are generally free to do whatever they please with estate assets.[269]

This Court should follow the well-reasoned ruling of *Armstrong World*. Indeed, what the Plan Proponents have proposed in this case inflicts a greater harm on bankruptcy entitlements and equities than the plan in *Armstrong World* ever contemplated, because in that case the asbestos claimants were at least giving up estate assets to the equity holders of the same debtor. In the present case, however, the Plan Proponents intend to distribute Olympus's surplus

---

[265]     *Id.* at 540.

[266]     *Id.* at 537 (citing *Official Unsecured Creditors' Comm. v. Stern* (*In re SPM Mfg. Corp.*), 984 F.2d 1305, 1309 (1st Cir. 1993)).

[267]     *Id.* at 538 (emphasis added). Similarly, in *Genesis Health Ventures*, senior lenders were free to allocate their distribution of stocks and warrants to junior interests because the senior lenders were undersecured— in other words, the *Genesis Health Ventures* court knew that the senior lenders were using their own collateral. *See* 266 B.R. at 617-18.

[268]     *Id.* at 538-39.

[269]     *See id.* at 540.

assets to Arahova on account of Arahova's equity interest in Century. This construct defies all logic and statutory rules. To accept an argument that the Debtors

> can, without any reference to fairness, decide which creditors get paid and how much those creditors get paid, is to reject the historical foundation of equity receiverships and to read the [section] 1129(b) requirements out of the Code. . . . To accept that argument is simply to start down a slippery slope that does great violence to history and to positive law.[270]

Simply put, a plan cannot be confirmed if, as here, it rests on a sharing agreement by one class of creditors to "give up value" to other another class by skipping over an intermediate or co-equal class such as the Intercompany Claims class.[271] When debtors are using estate money, "no amount of legal creativity or counsel's incantation to general notions of equity or to any supposed policy . . . supports judicial rewriting of the Bankruptcy Code."[272]

### 3. *THE PLAN DISCRIMINATES UNFAIRLY AGAINST INTERCOMPANY CLAIMS*

The Plan patently discriminates against Intercompany Claims. The Plan proposes to pay all unsecured claims against Subsidiary Debtors—other than Intercompany Claims—in full.[273] By contrast, Intercompany Claims receive no distributions.[274] A plan that pays one class 100% of its claims while paying a class of equal priority 0% is *presumptively* unfair due to the "materially lower" percentage recovery for the dissenting class.[275]

---

[270]    *Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 865 (Bankr. S.D. Tex. 2001).

[271]    *In re Armstrong World*, 320 B.R. at 540.

[272]    *Id.*

[273]    In addition, Section 16.23 of the Plan does not even classify prepetition corporate indemnification obligations (in violation of section 1123(a)), yet those insider reimbursement claims are allowed and will be allocated $27 million from the Debtors' aggregate assets.

[274]    *See* Plan § 5.3.

[275]    *Sentry Operating Co.*, 264 B.R. at 862-64; *In re Genesis Health Ventures,* 266 B.R. at 611-12; *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000); *In re Dow*, 244 B.R. at 701-03.

The rule of "equality between similarly situated creditors" applies to all bankruptcy proceedings.[276] The Supreme Court has repeatedly emphasized that the underlying objective of the Bankruptcy Code is equal distribution to creditors.[277] In the context of plan confirmation, section 1129(b)(1) promotes this objective by prohibiting unfair discrimination against a non-accepting class of creditors.[278]

Although the concept of "unfair discrimination" is not defined in the Bankruptcy Code, courts reject confirmation on that basis when confronted by plans that propose materially disparate treatment to two classes of creditors even though both are equal under the distribution priorities of the Bankruptcy Code.[279] In other words, the prohibition of unfair discrimination imposes a horizontal test on chapter 11 plans designed to ensure that no class of equal priority or standing to a rejecting class of creditors receives consideration under the plan that is better than the consideration provided for the rejecting class.[280]

Section 1129(b)(1) protects the Intercompany Claims class "against involuntary loss of their equal distribution rights *vis a vis* other creditors of equal rank."[281] The Plan cannot

---

[276]  *American United Mut. Life Ins. Co. v. Avon Park*, 311 U.S. 138, 147-48 (1940) (citing *Clarke v. Rogers*, 228 U.S. 534, 548 (1913)).

[277]  *Howard Delivery Serv. v. Zurich Am. Ins. Co.*, 126 S. Ct. at 2116 (2006) (citations omitted).

[278]  *Sentry Operating Co.*, 264 B.R. at 863.

[279]  *See*, *e.g.*, *In re Tucson Self-Storage, Inc.*, 166 B.R. 892 (B.A.P. 9th Cir. 1994) (providing 100% for unsecured trade creditor and 10% to deficiency claim was unfair discrimination); *Sentry Operating Co.*, 264 B.R. at 862-64 (Bankr. S.D. Tex. 2001) (providing 100% to trade creditors and 1% to other unsecured creditors was unfair discrimination); *In re Barney & Carey Co.*, 170 B.R. 17 (Bankr. D. Mass. 1994) (denying confirmation where deficiency claim was to receive 100% and general unsecured 15%); *In re Caldwell*, 76 B.R. 643, 646 (Bankr. E.D.Tenn. 1987) (confirmation denied where 100% of credit card debt was proposed to be paid but only 22.7% of all other unsecured debt would be paid).

[280]  *Sentry Operating Co.*, 264 B.R. at 863 (adopting the analysis presented in BRUCE A. MARKELL, A NEW PERSPECTIVE ON UNFAIR DISCRIMINATION IN CHAPTER 11, 72 AM. BANKR. L.J. 227 (1998)).

[281]  *Sentry Operating Co.*, 264 B.R. at 865.

be confirmed because the Plan discriminates unfairly against the Intercompany Claims in violation of section 1129(b)(1).

## E. THE PLAN CANNOT REQUIRE INDENTURE TRUSTEES TO ACCEPT THE GLOBAL SETTLEMENT

Section 7.6 of the Plan conflicts with express limitations of the ACC Senior Debt Indenture.[282] That provision purports to make a vote to accept the Plan by a holder of ACC Senior Notes "an instruction and direction by such holder to the Indenture Trustee . . . to take all actions reasonably necessary to accept and effectuate the Global Settlement."

There is no authority under the Bankruptcy Code to use a Plan vote as a direction to an Indenture Trustee, or otherwise use a Plan to rewrite and alter the express terms of the Senior Debt Indenture. Indeed, Section 5.04 of the Indenture expressly prohibits such action because the Indenture Trustee is not authorized to "consent or to accept or adopt of behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such proceedings."

It is well-settled in this District and elsewhere that a bankruptcy court does not have the power to rewrite contracts or alter property rights that exist under non-bankruptcy law.[283] Accordingly, this provision is illegal.

---

[282] For purposes of this discussion, that certain 10 1/4% Senior Debt Indenture between ACC and Bank of Montreal as Indenture Trustee, dated April 28, 1999, is used as an exemplar.

[283] *See, e.g., In re Adelphia Commc'ns Corp.*, 04 Civ. 2817 (GEC), 2004 WL 2186582 at *11-*12 (Sept. 27, 2004 S.D.N.Y.) (holding that a bankruptcy court does not have the equitable power to rewrite contracts or reorder property relations or alter property rights unless such alteration is authorized by the Bankruptcy Code).

**THE PLAN PROVIDES FOR ILLEGAL THIRD-PARTY RELEASES, ILLEGAL THIRD-PARTY EXCULPATION, AND ILLEGAL THIRD-PARTY INJUNCTIONS**

Absent exceptional circumstances, the Bankruptcy Code does not authorize the third-party exculpation, releases, or injunctions proposed in Sections 16.3 and 16.15 of the Plan. Indeed, section 524(e) of the Bankruptcy Code expressly prohibits such releases and injunctions, providing that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Some courts, however, rely on the equitable powers granted by section 105(a) of the Bankruptcy Code to grant third-party releases and injunctions, but only when there are exceptional circumstances.[284]

Courts in the Second Circuit will not grant a third-party release or issue an injunction to prevent a creditor from suing a third party unless such release or injunction plays an important part in the debtor's reorganization plan, confers material benefits on the debtor's estates and their creditors, or is necessary to effectuate the plan of reorganization.[285] In determining whether there are such unusual circumstances to justify enjoining a creditor from suing a non-debtor party, courts will consider whether:

---

[284] *In re Brentano's Inc.*, 36 B.R. 90, 92 (S.D.N.Y. 1984) (although section 105(a) grants the bankruptcy courts broad powers to issue orders that are necessary or appropriate to carry out the provisions of the Bankruptcy Code, "it is an extraordinary exercise of discretion to use that power to stay a third party action not involving a debtor."); *Class Five Nevada Claimants*, 280 F.3d at 658 (holding that section 105(a) gives bankruptcy courts the power to grant injunctions, but enjoining a non-consenting creditor's claim is only appropriate in "unusual circumstances.").

[285] *See, e.g., Sec. and Exch. Comm'n v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert)* 960 F.2d 285, 293 (2d Cir. 1992) (holding that approval of an injunction was proper where it was a key component of a settlement that was unquestionably an essential element of the debtors' reorganization); *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141 (2d Cir. 2005) (holding that non-debtor releases should not be approved absent a finding that "truly unusual circumstances render the terms important to success of the plan"); *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648, 655 (S.D.N.Y. 1995) (approving injunctions where they were "integral to a final resolution of claims and were necessary to give finality to the Plan."); *LTV Corp. v. Aetna Casualty & Sur. Co. (In re Chateaugay Corp.)*, 167 B.R. 776, 780 (S.D.N.Y. 1994) (holding that a bankruptcy court has authority to release a non-debtor from liability to third parties, but only when such a release is essential to confirmation of the debtor's plan).

- there is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

- the non-debtor has contributed substantial assets to the reorganization;

- the injunction is essential to reorganization, and without it, there is little likelihood of success;

- a substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment; and

- the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.[286]

Courts have also considered whether the enjoined party consents to such release.[287] This list of factors is not exclusive, however; nor is it a list of conjunctive requirements.[288]

The sweeping exculpation, releases, and injunctions and provisions found in Sections 16.3 and 16.15 of the Plan fail numerous elements of the multi-factor test utilized by the Second Circuit. For example, there is no identity of interest between the Debtors and the non-debtors being released, such that a suit against those non-debtor parties is essentially a suit against the Debtors. The "Third Party Releasees" include (i) the Debtors' current and former directors, officers and employees, (ii) the Debtors' Professional Persons, (iii) the DIP Agent and the DIP Lenders, (iv) each of the Settlement Parties, the FPL Committee and the Olympus Partners, (v) the Statutory Committees and their members, (vi) the Indenture Trustees that do not

---

[286] *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 297-98 (Bankr. D. Mass. 2002) (citing *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); see also *Class Five Nevada Claimants*, 280 F.23d at 658 (finding that "unusual circumstances" must exist so as to justify enjoining a non-consenting creditor's claims against a third-party in order to facilitate a reorganization plan if the factors set forth in Mahoney Hawkes are satisfied, as well as two additional factors — namely, (i) "The plan provides an opportunity for those claimants who choose not to settle to recover in full and; [(ii)] The bankruptcy court made a record of specific factual findings that support its conclusions.").

[287] *In re Airport Lumber, Inc.*, No. Civ. A. 94-CV-1213, 1995 WL 779275, at *7 (N.D.N.Y. Dec. 29, 1995); *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993).

[288] *Master Mortgage*, 168 B.R. at 935.

file objections to the Plan, and each of the foregoing parties' respective Affiliates, officers, partners, directors, employees, agents, members, shareholder, and advisors, and (vii) Administrative Agents, Non-Administrative Agents and Bank Lenders, their Affiliates and any holders of Bank Claims and their Affiliates.[289]  Unless the Debtors are obligated to indemnify the Third Party Releasees, a suit against any such party cannot be deemed to be a suit against the Debtors.  Moreover, if one of the Third Party Releasees were sued, the outcome of such suit would have no impact on the assets of the Debtors' estates.

Also, in light of the fact that the purported $1.08 billion in "give-ups" by certain of the Settlement Parties are not really "give-ups" at all, those parties are not making a contribution of substantial assets in exchange for the releases.[290]  Rather, the exculpation, releases, and injunctions amount to a gratuitous release of third-parties who have made no contribution to the Plan.  Indeed, granting this type of special consideration to certain members of a class in exchange for a vote in favor of the plan, without providing such consideration to all members of the same class, is a grounds for vote designation under section 1126(e) of the Bankruptcy Code.[291]

---

[289]     Plan, § 16.3(d).

[290]     *See, e.g., Kirk v. Texaco, Inc.*, 82 B.R. 678, 685 (S.D.N.Y. 1988) (creditor's acceptance of $3 billion under the plan in satisfaction of a $10.3 billion judgment, plus interest, represented substantial consideration given by such creditor); *cf. Mahoney Hawkes*, 289 B.R. at 300 (where liability insurer made a significant monetary contribution to the debtor's plan, but was only fulfilling its contractual obligation to the debtor, there was no substantial contribution of assets to the plan.)

[291]     *See, e.g., Higbee,* 324 U.S. at 211 ("The history of [section 203 of the Bankruptcy Act, the predecessor to section 1126(e)] makes clear that it was intended to apply to those [parties] whose selfish purpose was to obstruct a fair and feasible reorganization in the hope that someone would pay them more than the ratable equivalent of their proportionate part of the bankrupt assets."); *Insinger Mach. Co. v. Fed. Support Co. (In re Fed. Support Co.)*, 859 F.2d 17, 19 (4th Cir. 1988) ("One who casts his vote with a purpose of coercing payment to him of more than he might reasonably perceive as his fair share of the debtor's estate, does not cast his vote in good faith."); *see also In re Marin Town Ctr.*, 142 B.R. 374, 378-79 (N.D. Cal. 1992) ("Bad faith [is] to be attributed to . . . those who refus[e] to vote in favor of a plan unless . . . given some particular preferential advantage . . . ."); *cf. In re Featherworks Corp.*, 25 B.R. 634, 641 (Bankr. E.D.N.Y. 1982) (denying leave for a creditor who received special consideration to change its vote and holding that

Moreover, the broad and biased third-party exculpation, releases, and injunctions contained in the Plan are not essential to the Debtors' reorganization — these Debtors are not reorganizing; this is a straight liquidation. No third-party releases are needed to distribute the value of these estates to their rightful creditors except for a judicial determination of factual issues. The "reorganization" does not hinge on the Debtors being free from indirect suits against parties who have indemnity or contribution claims against the Debtors.[292] Courts in the Second Circuit have found third-party release and injunction provisions to be "essential" to the debtor's reorganization where, for example, the releases and injunction were necessary to induce parties to agree to a settlement under which they provide consideration to the estate, or where the debtor's reorganization was threatened.[293] The Debtors have not demonstrated, however, that the Settlement Parties are giving consideration *to* any estate (rather than taking consideration from the ACC estate under the Global Settlement), or that the broad releases are necessary to induce the Settlement Parties to enter into the Global Settlement or to protect the integrity of these chapter 11 proceedings.

---

"if any creditor receives some special consideration peculiar to him, his vote is no longer disinterested and unbiased and the Code's built-in controls are neutralized"), *aff'd*, 36 B.R. 460 (E.D.N.Y. 1984).

[292] *Class Five Nevada Claimants*, 280 F.3d at 658; *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 964, 701 (4th Cir.) (approving release of non-debtor insurers who contributed to a settlement plan because the entire reorganization hinged on the debtor being free from indirect claims brought against the debtors through settling insurers via suits for indemnity or contribution).

[293] *See, e.g., Greer v. Gaston & Snow* (*In re Gaston & Snow*), Nos. 93 Civ. 8517 (JGK), 93 Civ. 8628 (JGK), 1996 WL 694421, at *2, 5 (S.D.N.Y. Dec. 4, 1996) (absent the protections of a permanent injunction, the partners of a debtor general partnership would not have been willing to settle their liability to the debtor's estate); *Drexel Burnham*, 960 F.2d at 293 (the debtors' directors and officers would be less likely to settle if they remained subject to future lawsuits); *Lazarus Burman Assocs., L.B. v. National Westminster Bank USA* (*In re Lazarus Burman Assocs., L.B.*), 161 B.R. 891, 897-98 (Bankr. E.D.N.Y. 1993) (holding that a creditor's action against a non-debtor third party may be enjoined where such action threatens a debtor's reorganization and where it is necessary to "preserve the orderly conduct and integrity of reorganization proceedings.").

Furthermore, the Plan does not provide a means for those holders of ACC Senior Notes who reject the Plan and, thus, are not one of the Settlement Parties, to recover 100% of their claims. Indeed, the estimated total recovery for the holders of ACC Senior Notes is 69% if the class of ACC Senior Notes Claims accepts the Plan and 63% if such class rejects the Plan. Accordingly, the ACC creditors who elect not to support the Plan and the Global Settlement will not recover the full amount of their claims. As described above, this is unfair and unequal treatment among similarly situated creditors in violation of numerous provisions of the Bankruptcy Code.[294]

The Debtors have clearly failed to demonstrate the type of exceptional circumstances that warrant the broad third-party releases and injunctions contained in the Plan. Moreover, the selective release and injunction provisions chill the adjudicative confirmation process by threatening to penalize those parties who reject the Plan and subject them to spurious and vexatious litigation. The only apparent motive for the release, exculpation and injunction provisions, at least as to Settlement Parties, is vote-buying. This point is highlighted by the fact that neither the Debtors nor the Creditors Committee have provided any evidence of an investigation into the potential claims against the parties whom they have agreed to release and exculpate. And if, as the ACC Bondholder Group expects, there has been no such investigation, then it appears that the only distinction between those who are released and those are not released is based solely on which creditors vote for or against the Plan, which, as discussed above, is a clear violation of section 1123(a)(4) of the Bankruptcy Code.[295]

---

[294]  *See* pp. 110-112, *infra*.

[295]  *See* pp. 112-114, *supra*.

Moreover, Section 16.3(d) of the Plan impermissibly provides for a discharge and release of the Debtors in violation of section 1141(d)(3) of the Bankruptcy Code, which provides, in relevant part, that confirmation of a plan will not discharge a debtor if

(A)     the plan provides for the liquidation of all or substantially all of the property of the estate;

(B)     the debtor does not engage in business after consummation of the plan; and

(C)     the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.[296]

In violation of this provision, the Plan provides that on the Effective Date,

all holders of Claims and Equity Interests . . . and each entity that has held, holds or may hold a Claim or Equity Interest . . . will be deemed to forever release, waive and discharge all claims, demands, debts, rights, causes of action or liabilities . . . that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or after the Commencement Date through and including the Effective Date in any way relating to the Debtors and/or the Covered Matters against . . . the Debtor, their estates, the reorganized Debtors . . .[297]

This language proposes that the Debtors and the reorganized Debtors be granted relief that they are not entitled to under the Bankruptcy Code. The Debtors simply are not entitled to a discharge. Effective July 31, 2006, the Debtors completed the sale of substantially all their U.S. assets, including the equity of the JV Debtors, to Time Warner NY Cable LLC and Comcast Corporation.[298] As such, the Plan is a liquidating plan and all that remains will be reconciliation of claims and closing offices. As the Debtors will no longer engage in business following consummation of the Plan and are not individuals, a discharge would not be granted in

---

[296]     11 U.S.C. § 1141(d)(3).

[297]     Plan, 16.3(d).

[298]     DSS2-8 – 9.

these cases under section 727(a) of the Bankruptcy Code.  Therefore, Section 16.3(d) violates section 1143(d)(3) of the Bankruptcy Code.

## G. THE SOLICITATION PROCESS HAS BEEN IRREPARABLY TAINTED BECAUSE OF (I) THE SPECIAL CONSIDERATION OFFERED TO ACCEPTING CREDITORS UNDER THE PLAN, INCLUDING ILLEGAL RELEASE AND EXCULPATION PROVISIONS, AND (II) ILLEGAL PROVISIONS DESIGNED TO MANUFACTURE ACCEPTING VOTES

The Court has repeatedly emphasized its intention to consider the Global Settlement and the Plan based on the merits, and in light of the vote of the economic parties in interest on each side of the disputes proposed to be settled under the Plan, without having that vote distorted by actions serving only to manipulate parties into submitting to settlement and plan terms not in their best interests.[299]  The integrity of the vote is particularly important in a case such as this one, where the proposed compromise has not been evaluated by any fiduciary acting solely on behalf of ACC's estate.

A primary purpose of the Plan is to force ACC creditors to concede defeat in the Inter-Creditor Dispute.  To that end, the Plan Proponents and other supporters of this Plan have constructed a regime designed to favor creditors of the Subsidiary Debtors and others who accede to their demands – coupled with not-so-thinly-veiled threats of litigation against those who do not – with the expectation that they will coerce ACC creditors to vote in favor of the Plan.  As a result of these fatal deficiencies, the solicitation process for this Plan is irreparably tainted.  An *in terrorem* Plan such as this one is patently unconfirmable.

---

[299]  Hr'g Tr. 129:6-11, Sept. 12, 2006 (Gerber, J.) ("I want this plan evaluated on its merits and not on measures for those who have done nothing even arguably wrong for whom it might be perceived as coercive.").

**1.** ***THE SOLICITATION PROCESS HAS BEEN IRREPARABLY TAINTED BY OFFERS OF SPECIAL CONSIDERATION TO ACCEPTING ACC CREDITORS IN VIOLATION OF SECTION 1123(A)(4) OF THE BANKRUPTCY CODE***

The Plan implements an illegal scheme designed to coerce accepting votes—through offers of special consideration to accepting claimants—and not-so-thinly-veiled threats of reprisal against those who reject. The Supreme Court has forbidden efforts by parties in a bankruptcy proceeding to obstruct "a fair and feasible reorganization in the hope that someone would pay them more than the ratable equivalent of their proportionate part of the bankrupt assets."[300] Indeed, offering special consideration to creditors in exchange for an accepting plan vote has been illegal in this District for almost 100 years.[301] That fundamental principle has been codified in section 1123(a)(4) of the Bankruptcy Code which requires a chapter 11 plan to "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[302] While the Bankruptcy Code does not explicitly define the phrase "same treatment," most courts recognize that it prohibits "payment of different percentage settlements to co-class members" as well as "unequal consideration tendered for equal payment."[303] Indeed, the statute expressly prohibits any discriminatory treatment of a particular claimant within a class unless the treatment is voluntary.

---

[300] *Young*, 324 U.S. at 211 (1945).

[301] *In re M. & H. Gordon*, 245 F. 905, 906 (S.D.N.Y. 1917) (confirmation of composition plan denied where debtor agreed to pay the accounting and investigative expenses of a particular creditor in order to obtain that creditor's vote in favor of the plan); *see also In re Weintrob*, 240 F. 532, 534 (E.D.N.C. 1917) (confirmation of twenty-five percent composition plan denied where the favorable vote of one claim, necessary for the confirmation, was obtained by purchasing the claim at face value).

[302] 11 U.S.C. § 1123(a)(4) (emphasis added).

[303] *In re AOV Indus. Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986); *see also Class Five Nevada Claimants*, 280 F.3d at 659-60 (6th Cir. 2002) (finding disparate treatment of claims in a particular class in violation of section 1123(a)(4) where certain claimants were afforded more rights than other claimants in the same class).

The Plan represents a stark and illegal departure from the "same treatment" requirement because it creates a special subclass of "ACC Settling Parties." As defined in the Plan, the term ACC Settling Parties means "Tudor, Highfields, OZ Management, LLC, C.P. Management LLC, and Satellite Asset Management, L.P., . . . and any other holder of ACC Senior Notes that executes the Plan Support Agreement agreeing to vote to accept the Plan and otherwise agreeing to be bound by the terms of the Global Settlement."[304] Members of this subclass receive the following consideration as the "price" for their accepting votes:

- broad releases and exculpation;[305]

- payment of fees and expenses through the Effective Date without any burden to show a substantial contribution to the estate;[306]

- the unilateral ability to approve reduced distributions to the entire ACC Senior Notes Claims class.[307]

a.  *ONLY ACCEPTING ACC NOTEHOLDERS RECEIVE EXCULPATION AND RELEASES*

As part of the Global Settlement, the Settlement Parties who vote in favor of or, in the case of ad hoc committees, support the Plan receive complete asylum by way of the Plan's broad exculpation and release provisions. Included are the ACC Settling Parties, which extract personal benefits not available to all other creditors in their class, in the form of reimbursement, exculpation, and releases. Section 16.3(a) of the Plan provides each of the Settlement Parties, including Huff, the Creditors Committee, and the Crossover Committee, shall not be liable, to the extent permitted by law, for "Covered Matters." "Covered Matters" include:

---

[304]     *See* Plan, Ex. A at A-5.

[305]     *See* Plan §§ 16.3, 16.15.

[306]     *See* Plan § 6.2(d)(i).

[307]     *See* Plan § 12.3.

any Cause of Action arising from and after the applicable Commencement Date from actions or omissions in connection with, relating to, or arising out these Chapter 11 Cases, [the] Plan, the Disclosure Statement, the Sale Transaction Documents and the Sale Transactions, including the solicitation of votes for and in pursuit of confirmation of [the] Plan or the JV Plan, or the implementation of [the] Plan or the JV Plan, the Sale Transaction Documents and the Sale Transactions, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation, confirmation and consummation of [the] Plan . . . .[308]

ACC Settling Parties receive this special consideration as part of the "price" of their Plan vote. Indeed, the Plan Proponents have admitted "the releases of the Settlement Parties were an integral component of the compromise in the Plan Agreement," which demonstrates that they had to provide this special consideration to Huff, the members of the Crossover Committee, and the members of the Arahova Noteholders Committee, among others, to procure the accepting votes of the ACC Senior Notes that such parties hold.[309] In breach of their fiduciary duties, the Plan Proponents were willing to grant broad exculpation and releases despite their admission that they "have not independently investigated whether they hold any claims against the Released Parties."[310] If there has been no investigation, then it is clear that the

---

[308]    Plan § 16.3(a).

[309]    *See* DSS2-105.

[310]    *Id.* The failure to investigate or disclose potential claims is all the more untenable because there still has been no disclosure regarding whether the Plan Proponents or the parties that support the Global Settlement have in the past, or are currently, engaged in short-selling. The ACC Bondholder Group believes that certain individual(s) holding interests in Arahova disclosed confidential trading information about certain holders of ACC Senior Notes, in order to create pressure for a settlement more favorable to Arahova Notes claims. To the extent that confidential trading information has been disclosed and utilized, the ACC Bondholder Group may have a cause of action against the offending parties. Hence, disclosure by the Plan Proponents is critical.

The Court agreed that such disclosure is necessary when it stated that:

the fact that there is short-selling, putting aside the remedy, and the fact that a particular plan proponent's issue might be counter to that of others is something that, at the least, must be known to those who are

only distinction between those who are released and those who are not is based solely on which creditors vote for or against the Plan, which is in clear violation of section 1123(a)(4) of the Bankruptcy Code.

Remarkably, this special consideration of exculpation and releases is not limited to claims of the Debtors. In order to entice accepting votes, the Plan Proponents also purported to give away the claims of other members of the ACC Senior Notes class (who do not receive releases or exculpation) against the Settlement Parties. As discussed below, a debtor does not have the right to eliminate ACC Senior Noteholders' claims against third parties, and for this reason alone, the confirmation of the Plan should be denied.[311]

The pernicious effect of the exculpation and releases granted to the ACC Settling Parties is particularly egregious in light of other Plan provisions. Section 12.3 of the Plan authorizes a majority of the five settling holders of ACC Senior Notes to waive the condition precedent under the Plan that $1.080 billion in value (or $1.130 billion if there is an ACC Senior Notes Claims Accepting Class) be available on the Effective Date for distribution to ACC creditors. Effectively, the Plan bestows upon these five bondholders the authority of a fiduciary to make material economic decisions for others, but through the exculpation and release provisions, eliminates any of the protections normally afforded to those on whose behalf they act. What is worse, the Plan does not even require that these newly appointed fiduciaries hold an economic interest when they consent to such a waiver.

---

asked to vote on a plan, and must be a subject which people are free to argue in soliciting for or against acceptances of plans. So I am going to tell you folks that I am not going to direct discovery in that area now if, but only if the folks who have been accused of short-selling state whether or not it has been there, by whom, which bonds, which estates.

Hr'g Tr. 26:17-27:1, Sept. 5, 2006.

[311]  *See* pp. 116-117, *infra*.

### b. ONLY CERTAIN, ACCEPTING CREDITORS RECEIVE REIMBURSEMENT OF PROFESSIONAL FEES

As discussed above, the Settlement Parties are receiving the special consideration of exculpation and releases that release not only all claims of the Debtors, but also the claims of other members of the ACC Senior Notes class (who do not receive releases or exculpation or any consideration for their coerced third-party releases). In addition, Huff has insisted on receiving payment in full of its individual attorneys' fees, in an as yet undisclosed (but, presumably, substantial) amount, without having to satisfy the requirements under section 503(b)(3) of the Bankruptcy Code.[312] Although the Plan Proponents have not disclosed the magnitude of the fees and expenses for which Huff will seek reimbursement (instead burying that figure in an aggregate amount),[313] it is certainly a multi-million dollar sum. Thus, Huff has used its vote to obtain a non-ratable distribution of millions of dollars. This Plan provision also runs roughshod over the Court's numerous rulings in the January Opinion, including its adoption of District Court Judge Scheindlin's ruling that reimbursement can be requested under section 502(b)(3) when the Court and parties can review as much information as possible.[314]

While Section 6.2(d) of the Plan also provides for the reimbursement of fees incurred by the *ad hoc* committees, they are in a fundamentally different position than the individual creditors the Plan offers to reimburse. The distinction lies in the circumstances surrounding the Inter-Creditor Dispute – because of conflicts of interests held by the Debtors' counsel and management, someone else had to litigate the competing claims of the ACC estate,

---

[312]    If Huff had to satisfy the requirements of section 503(b)(3) of the Code in order to receive the reimbursement of its attorneys' fees and expenses, there would be no need for this Plan provision.

[313]    *See* DSS2 – 63

[314]    *In re Adelphia Commc'ns Corp.*, 336 B.R. at 661-62 & n.130 (discussing reimbursement to members of the Arahova Noteholders Committee).

Arahova estate and FrontierVision estate in the Inter-Creditor Dispute and MIA Process. Thus, if these *ad hoc* committees had not existed or not been willing to undertake that role, the Court would have had to appoint estate-compensated representatives to do so, such as official committees or the like. In contrast, Huff, the Crossover Committee, and ACC Settling Parties were not representing the interests of any estate in that litigation, and were not serving as a substitute for court-appointed and estate-compensated parties. Any special consideration to these parties violates section 1123(a)(4) of the Bankruptcy Code.

### c. *ACC NOTEHOLDERS WHO DO NOT VOTE IN FAVOR OF THE PLAN ARE STRIPPED OF THEIR RIGHT TO OBJECT TO CLAIMS*

In further defiance of the "same treatment" requirement, Section 11.1 of the Plan deprives parties-in-interest of their statutory rights under section 502(a) of the Bankruptcy Code to object to claims if they fail to join the ACC Settling Parties subclass.[315] Specifically, section 11.1 of the Plan prevents dissenting holders of ACC Senior Notes from exercising their statutory right to object to claims under section 502(a) of the Bankruptcy Code, while preserving that right solely for the ACC Settling Parties.[316] Consequently, ACC Noteholders who do not vote to accept the Plan are excluded from the ACC Settling Parties subclass and must give up their legal right to object to claims simply in order to receive the same base distributions that ACC Settling Parties receive.

Despite the express language of section 502(a)—and the mandate of section 1123(a)(4), the Plan takes away a statutory right of dissenting holders of ACC Senior Notes. The intended *in terrorem* effect of this provision is unmistakable because, at the same time, the

---

[315] *See* Plan § 11.1. (reserving the right to object for "Settlement Parties," which is defined in the Plan at Ex. A at A-32 as, "the ACC Settling Parties, Committee II, the Arahova Noteholders Committee, the FrontierVision Committee, Huff, the ACC Trade Committee, the Subsidiary Trade Committee and the Creditors Committee").

[316] *See* Plan § 11.1.

parties who wield this sword also carry the shield of immunity from any legitimate objections that a party in interest may have against their claims.[317]

Accordingly, the Plan violates section 1123(a)(4) of the Bankruptcy Code, and cannot be confirmed; any possible confirmation could only be achieved if the Court ignored its stated desire to evaluate the Plan and the Global Settlement on the merits.

2.  *THE SOLICITATION PROCESS HAS BEEN IRREPARABLY TAINTED BY PROVISIONS DESIGNED TO MANUFACTURE ACCEPTING VOTES IN VIOLATION OF SECTIONS 1122 AND 1126 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3018(C)*

The integrity of the creditor vote is particularly important in a case such as this one, where the proposed compromise of core disputes in these cases has not been evaluated by any fiduciary acting solely on behalf of ACC's estate, or for that matter, any estate. That integrity has been compromised by two Plan voting provisions that are devoid of any principled legal basis. First, Section 7.3 of the Plan violates sections 1126(c) and (d) of the Bankruptcy Code, and Bankruptcy Rule 3018(c), because it improperly deems an impaired class to have accepted the Plan even if no creditors in that class cast a ballot to accept the Plan.[318] Second, Sections 5.1(d) and 5.1(e) of the Plan place substantially similar claims against the same Debtor into separate classes in order to gerrymander an accepting class of impaired claims in violation of section 1122(a) of the Bankruptcy Code. The ACC Bondholder Group therefore objects to these provisions.

---

[317]    Given the history in this case that Plan Proponents, the Arahova Noteholders Committee, and the ACC Settling Parties have with releasing uninvestigated claims and causes of action, entering into unjustified and unreasonable settlements, and rewarding wrongdoers if they accede to their demands, it is critically important that the section 502(a) right to object to claims be preserved for all creditors, regardless of how they vote.

[318]    Plan § 7.3 ("If no holders of Claims or Equity Interests eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Equity Interests in such Class.").

a.    *No Deemed Acceptance*

Voting classes in which no votes are cast must be deemed to reject a chapter 11 plan.  The requirements of section 1126(c) of the Bankruptcy Code are clear:  "A class of claims has accepted a plan *if* such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of allowed claims . . . ."[319]  Similarly, section 1126(d) provides that:  "A class of interests has accepted the plan *if* such plan has been accepted by holders of such interests . . . that hold at least two-thirds in amount of the allowed interests . . . ."[320]

Section 1126 of the Bankruptcy Code expressly requires sufficient votes to be cast in order for a class to accept the Plan.  As the legislative history to section 1126(c) of the Bankruptcy Code explains, a class is considered to have accepted a plan only if the plan has been accepted by the requisite number and amount of the claims in the class "'computed on the *basis of claims actually voted for or against the plan*.'"[321]  When the language of a statute is clear and unambiguous on its face, it must be enforced by the Court.[322]  Congress established precise requirements for class acceptance and they cannot be ignored.[323]  The express language of Bankruptcy Rule 3018(c) likewise requires a ballot to be cast in order for the vote to be

---

[319]    11 U.S.C. § 1126(c) (emphasis added).

[320]    11 U.S.C. § 1126(d) (emphasis added).

[321]    *In re Townco Realty, Inc.*, 81 B.R. 707, 708 (Bankr. S.D. Fla. 1987) (quoting S. Rep. No. 95-989, at 123 (1978)).

[322]    *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).

[323]    *See In re Higgins Slacks Co.*, 178 B.R. 853, 857 (Bankr. N.D. Ala. 1995) (emphasizing that the Congressional requirements set forth in section 1126(c) of the Bankruptcy Code must be followed); *Townco Realty, Inc.*, 81 B.R. at 708 ("There is no predicate in the statute or the rules for [the] conclusion [that the failure to vote constitutes acceptance]."); *see also* 11 U.S.C. §§ 1126(c), (d); Fed. R. Bankr. P. 3018(c).

counted.[324]  If no ballots are cast by a creditor or interest holder, such party's failure to cast a ballot cannot be deemed an acceptance.

A court in this district have held that a "court cannot deem an impaired class to have accepted a plan if no creditors in that class have voted."[325]  As stated by the *Friese* court, deeming a class's apparent lack of interest to mean acceptance is contrary to statutory provisions governing voting and "subvert[s] the plan confirmation process."[326]  This conclusion is widely accepted in other jurisdictions.[327]

Based on the foregoing, it is clear that Section 7.3 of the Plan violates the express provisions of sections 1126(c) and (d) of the Bankruptcy Code, and Bankruptcy Rule 3018(c). As a result, Section 7.3 must be stricken from the Plan and cannot be relied upon by the Debtors to support confirmation.

### b. *No Gerrymandering*

Pursuant to section 1122(a), a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[328]  Although this provision does not require that all similarly-situated claims be classified

---

[324]    Bankruptcy Rule 3018(c) provides that "[a]n acceptance or rejection shall be in writing . . . signed by the creditor or equity security holder . . . ." FED. R. BANKR. P. 3018(c).

[325]    *In re Friese*, 103 B.R. 90, 92 (Bankr. S.D.N.Y. 1989).

[326]    *Id*.

[327]    *See, e.g. Bell Road Inv. Co. v. M. Long Arabians (In re M. Long Arabians)*, 103 B.R. 211, 215 (B.A.P. 9th Cir. 1989) (holding that where a creditor was not entitled to vote on a plan because it failed to obtain temporary allowance of its claim, and such creditor was the only claimant in its class, such class could not be deemed to accept the plan); *In re Jim Beck, Inc.*, 207 B.R. 1010, 1015 (Bankr. W.D. Va. 1997) (finding the line of cases that hold that the failure of a creditor or class to vote does not result in a default acceptance as well reasoned and persuasive, and thus, holding that the failure of a creditor to cast a ballot did not result in its acceptance of the plan), *aff'd*, 214 B.R. 305 (W.D. Va. 1997), *aff'd*, 162 F.3d 1155 (4th Cir. 1998) ; *Higgins Slacks Co.*, 178 B.R. at 854 (finding a plan failed to satisfy section 1129(a)(8) where several classes failed to vote either for or against the plan).

[328]    11 U.S.C. § 1122.

together, separate classification of substantially similar unsecured claims is permissible only when there is a reasonable basis for doing so or when the decision to separately classify "does not offend one's sensibility of due process and fair play."[329]  Specifically, classification of 'substantially similar' claims in different classes may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims.[330]

Generally, unsecured creditors are claimants of equal rank, entitled to share, pro rata, in the values remaining after the payment of secured and priority claims.[331]  Nevertheless, the Plan segregates holders of Allowed ACC Trade Claims from the holders of Allowed Other Unsecured Claims by arbitrarily placing them in separate classes pursuant to Plan sections 5.1(d) and 5.1(e), respectively.  Creditors that comprise either the Allowed ACC Trade Claims class or the Allowed Other Unsecured Claims class are general unsecured creditors of equal rank and priority.  The Plan Proponents have not offered — and cannot offer — any reasonable grounds or legitimate reason why Allowed ACC Trade Claims and Allowed Other Unsecured Claims, which are substantially similar, must be placed in different classes.  The only reasonable conclusion for segregating these substantially similar claims into two classes is the Plan Proponent's desire to gerrymander an accepting impaired class of ACC claims.

---

[329]  *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993).

[330]  *Id*. (quoting *In re Greystone III Joint Venture*, 995 F.2d 1274, 1979 (5th Cir. 1991)); *see also Boston Post Road L.P. v. FDIC (In re Boston Post Road L.P.)*, 21 F.3d 477, 483 (2d Cir. 1994) ("the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes. . . . A debtor could then construct a classification scheme designed to secure approval by an arbitrarily designed class of impaired claims even though the overwhelming sentiment of the impaired creditors was that the proposed reorganization of the debtor would not serve any legitimate purpose.").

[331]  *One Times Square Assocs.,* 159 B.R. at 703.

Although the court may approve a classification scheme whereby the uniqueness of the underlying legal nature of an unsecured creditor's claim as it relates to the assets of a debtor justifies separate classification, this exception to the rule is not present with regard to the Allowed ACC Trade Claims and the Allowed Other Unsecured Claims.[332] Where neither the nature of the creditor's business, the nature of the debtor's assets or the mechanics of the creditor's claims justifies separate classification, general unsecured claims *must* be placed in the same class.[333] There is nothing unique to the Allowed ACC Trade Claims or the Allowed Other Unsecured Claims that justifies separate classification. Accordingly, these classifications violate section 1122 of the Bankruptcy Code and, thus section 1122 of the Bankruptcy Code.

## H. THE PLAN WAS FILED IN BAD FAITH IN VIOLATION OF SECTION 1129(A)(3) OF THE BANKRUPTCY CODE

The Plan cannot satisfy the requirement under section 1129(a)(3) of the Bankruptcy Code that it be proposed in good faith and not by any means forbidden by law. To satisfy this standard, a plan must be proposed "with honesty and good intentions and with a basis for expecting that a reorganization can be effected."[334] A chapter 11 plan that is penal in nature – as evidenced by the invidious release and exculpation provisions in the Plan and the inherent impact of these provisions on the integrity of any vote – is the very definition of a plan not proposed in good faith.[335]

---

[332]   *See, e.g. In re U.S. Truck Co.*, 800 F.2d 581, 587 (6th Cir. 1986) (separate classification scheme approved because the unsecured claim of union was unique in that the union had a "noncreditor interest" in the ongoing employment relationship with the debtors rather than on the plan's treatment of it as a creditor).

[333]   *One Times Square Assocs.*, 159 B.R. at 703 (emphasis added).

[334]   *See Kane*, 843 F.2d at 649 (citations omitted).

[335]   *See, e.g., In re Gen. Teamsters, Warehousemen & Helpers Union*, 225 B.R. 719, 730 (Bankr. N.D. Cal. 1998) (finding that a plan proponent had acted in good faith under section 1129(a)(3) where, among other things, there was no evidence that he "was guided by some ulterior motive such as a bad faith desire to punish his creditors"); *In re Miami Trucolor Offset Serv. Co.*, 187 B.R. 767, 770 n.9 (Bankr. S.D. Fla.

Moreover, soliciting acceptances of a plan through offers of special consideration to those creditors within a class who vote for the plan improperly skews the vote and is illegal.[336] The overt coercive conduct, present during the sealed negotiation process, continues to this day by rewarding those who vote in favor of the Plan with a broad release and exculpation and punishing those who vote against the Plan by continuing to threaten spurious and vexatious litigation.

While it was to be expected from their prior conduct that Huff and the Arahova Noteholders' Committee would craft such a coercive and invidious voting process, it is disappointing – if not appalling – to find that fiduciaries for the estate and creditors – the Debtors and the Creditors Committee – have signed on to a program that offers special consideration to solicit votes and threatens litigation to stifle any dissent. Undeniably, a chapter 11 plan that is penal in nature and subverts the fundamental democratic process ingrained in chapter 11 is not proposed in good faith.[337] These provisions render the Plan patently unconfirmable and irreversibly taint the plan process.

## CONCLUSION

The Global Settlement cannot be approved, and the Plan is not confirmable. For all of the foregoing reasons, the ACC Bondholder Group requests that the Court reject the Global

---

1995) (noting that a debtor had acted in good faith because that there was "nothing improper in the form of Debtor's proposed Plan," as it "has not been formulated to disadvantage" the debtor's creditors).

[336] *Cf. In re Feathworks Corp.*, 36 B.R. at 641 (Bankr. E.D.N.Y.) (denying leave for a creditor who received special consideration to change its vote and holding that "if any creditor receives some special consideration peculiar to him, the vote is no longer disinterested and unbiased and the Code's built-in controls are neutralized"), *aff'd*, 36 B.R. 460 (E.D.N.Y. 1984); *see also In re Zenith Elec. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (distinguishing between "a plan proponent offering different treatment to a class depending on whether it votes to accept or reject the plan" from a plan which provides unequal treatment to creditors within the same class).

[337] *See, e.g.*, *In re Gen. Teamster*, 225 B.R. at 730; *In re Miami Trucolor Offset Serv. Co.*, 187 B.R. at 770 n.9.

Settlement, deny confirmation of the Plan, and grant the ACC Bondholder Group such other and

further relief as is just and appropriate.

Dated: November 24, 2006
New York, New York

*/s/* Martin J. Bienenstock
Martin J. Bienenstock (MB 3001)
Brian S. Rosen, Esq. (BR 0571)
Sylvia Mayer (*Pro Hac Vice*)
James T. Grogan (*Pro Hac Vice requested*)
Eleanor H. Gilbane (EG 0764)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Counsel to ACC Bondholder Group


/s/ Isaac M. Pachulski
Isaac M. Pachulski (*Pro Hac Vice*)
Stephan M. Ray (*Pro Hac Vice*)
STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12 Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788

Special Conflicts Counsel
