HEARING DATE AND TIME: December 7, 2006 at 9:45 a.m. Eastern Time
OBJECTION DATE AND TIME: November 30, 2006 at 4:00 p.m. Eastern Time

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Martin J. Bienenstock, Esq. (MB 3001)
Brian S. Rosen, Esq. (BR 0571)
Melanie Gray (*Pro Hac Vice*)
Sylvia A. Mayer, Esq. (*Pro Hac Vice*)
*Counsel to ACC Bondholder Group*

STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12 Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
Isaac M. Pachulski (*Pro Hac Vice*)
Stephan M. Ray (*Pro Hac Vice*)
*Special Conflicts Counsel*[1]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
| | |
|---|---|
| In re | : |
| | : **Chapter 11** |
| | : |
| **ADELPHIA COMMUNICATIONS** | : **Case No 02-41729 (REG)** |
| **CORPORATION,** *et al.*, | : |
| | : **(Jointly Administered)** |
| Debtors. | : |
| | : |
---------------------------------------------------------------x

**ACC BONDHOLDER GROUP'S OBJECTION TO**
**MOTION OF THE PROPONENTS PURSUANT TO BANKRUPTCY RULE 9019**
**AND SECTION 105 OF THE BANKRUPTCY CODE SEEKING APPROVAL**
**OF GLOBAL SETTLEMENT OF INTER-ESTATE ISSUES**

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] Special Conflicts Counsel has been retained by Aurelius Capital Management, LP, Catalyst Investment Management Co., LLC, Drawbridge Global Macro Advisors LLC, Drawbridge Special Opportunity Advisors LLC, Elliott Associates, LP, Farallon Capital Management, L.L.C., Noonday Asset Management, L.P., Perry Capital LLC, and Viking Global Investors LP.

.urelius Capital Management, LP, Banc of America Securities LLC, Catalyst Investment Management Co., LLC, Drawbridge Global Macro Advisors LLC, Drawbridge Special Opportunities Advisors LLC, Elliott Associates, LP, Farallon Capital Management, L.L.C., Noonday Asset Management, L.P., Perry Capital LLC, Viking Global Investors LP, and Global Principal Strategies Business of Lehman Brothers, Inc. (collectively, the "ACC Bondholder Group"), holders and/or investment advisors to certain holders of notes and debentures issued by Adelphia Communications Corporation ("ACC"), hereby object to the Motion of the Proponents Pursuant to Bankruptcy Rule 9019 and Section 105 of the Bankruptcy Code Seeking Approval of Global Settlement of Inter-Estate Issues (the "Settlement Motion"), and respectfully represents as follows: [2]

## I.    SUMMARY OF ARGUMENT

1. Recognizing the very real risk that the Plan may be rejected by their creditor constituency, the Settlement Motion seeks approval of the Global Settlement outside of the context of the proposed Plan. However, there is no legal basis for approval of the Settlement Motion and it should be denied in all respects. In fact, this Court has previously held as much:

> a. Holding that the proposed Plan containing the Global Settlement should be "put up for a vote" in order to determine whether the Plan "has the requisite support and is confirmable." *See* September 19, 2006 Bench Decision on Motion to Terminate Exclusivity; To Resume Litigation of Interdebtor Issues; and To Unseal Protected Matter at p. 7 (the "Sept. 19, 2006 Bench Decision").

---

[2]    Unless otherwise defined herein, capitalized terms shall have the meanings that are ascribed to such terms in the Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of its Affiliated Debtors, dated as of October 16, 2006 (the "Plan"), the ACC Bondholder Group's Objection to Approval of the Global Settlement and Confirmation of the Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of its Affiliated Debtors (Docket No. 12538, the "Confirmation Objection"), and the Memorandum of Law in Support of the ACC Bondholder Group's Objection to Approval of the Global Settlement and Confirmation of the Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of its Affiliated Debtors, the Global Settlement (Docket No. 12544, the "Confirmation Brief").

  b. Noting the Court's displeasure with a cramdown in this case: "Let me just talk a moment about the cram-down option. Mr. Abrams said in very nearly these exact words: 'The cram-down door remains shut.' That is properly so now, and perhaps also forever. If ever that were to change, I would, indeed, have serious concerns vis-à-vis neutrality, which was a premise under which both I and Judge Scheindlin ruled." Hr'g Tr. 53:14-20, Apr. 6, 2006.

  c. "I think that what they're saying is that if the proposed plan were to garner the necessary votes, that that would constitute the requisite acceptance subject to review by the Court." Hr'g Tr. 81:13-16, Sept. 11, 2006.

In a case such as this — where the Debtors and Creditors Committee (and their respective counsel) are conflicted and have been ordered to remain neutral as to the very inter-estate litigation being settled — it would be unconscionable to approve a settlement, binding all creditors and materially altering both their economic recoveries and their non-economic rights, outside a confirmed plan. Consistent with the Court's view throughout these chapter 11 cases, this is not a situation in which cramdown is appropriate, including in the guise of a motion pursuant to Rule 9019 of the Bankruptcy Code.

  2. As explained in detail in the ACC Bondholder Group's Confirmation Objection and Confirmation Brief, the purported Global Settlement fails to satisfy any of the requirements of *Protective Comm. for Indep. Stockholders for TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) ("*TMT Trailer*") in the context of approval of the settlement as part of the Plan. The fatal flaws of the Global Settlement are only multiplied when proposed outside of a Plan and in the face of one or more rejecting creditor classes. The Movants — the Debtors and Creditors Committee — have been ordered by this Court to remain neutral with respect to the Inter-Creditor Dispute and have admitted that "[n]either the Debtors nor the Creditors Committee became a Proponent of the Plan based on an evaluation of the merits of the Inter-Creditor Dispute." DSS2-12. Having made this admission, and, in light of their court-

ordered neutrality and presumed failure to garner the requisite creditor support, the Movants cannot urge this Court to approve the Global Settlement based on the merits consistent with the requirements of *TMT Trailer*. Indeed, the Movants do not cite a single case for their preposterous theory that an estate fiduciary can propose a settlement which it admits is not based on the merits of the underlying dispute.

## II.    BACKGROUND

3.    In addition to the background information set forth below, the ACC Bondholder Group incorporates by reference the Summary of Facts and other background information set forth in their Confirmation Objection and Confirmation Brief as if fully set forth herein.

### A.    COURT ORDERED NEUTRALITY

4.    Debtors' Neutrality:  In the context of denying the Arahova Noteholders Committee's request to, *inter alia*, terminate exclusivity and appoint a trustee, the Court ordered the Debtors to recuse themselves from the Inter-Creditor Dispute so as to maintain the Debtors' neutrality and insure that they did not act to the detriment of any particular estate. *See In re Adelphia Commc'ns Corp.,* 336 B.R. 610, 671 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006). This ruling was affirmed on appeal by the district court. Again, in April 2006, the Court reiterated its "serious concerns vis-à-vis neutrality" and noted that "a settlement, by definition, is a two-way street and one can't settle with oneself." Hr'g. Tr. 53:18, 53:21-22, Apr. 6, 2006.

5.    Creditors Committee's Neutrality:  As the Creditors Committee admits in paragraph 20 of the Settlement Motion, "[a]t the hearing to consider the Weiser Application, this Court made clear that the Creditors Committee's role with respect to the Intercreditor Dispute was not to take sides, but rather to, 'keep the lid on, in terms of intercreditor disputes and

facilitating the settlement of intercreditor issues, if at all possible.'" Hr'g. Tr. 95:5-8, May 4, 2005.

**B.     NO CRAMDOWN ALLOWED**

6.     At a hearing in connection with a previously proposed (and withdrawn) plan, the Court made clear its unwillingness to cramdown a plan in this case:

> Let me just talk a moment about the cram-down option. Mr. Abrams said in very nearly these exact words: 'The cram-down door remains shut.' That is properly so now, and perhaps also forever. If ever that were to change, I would, indeed, have serious concerns vis-à-vis neutrality, which was a premise under which both I and Judge Scheindlin ruled. And I'm very sympathetic to the observation that a settlement, by definition, is a two-way street and one can't settle with oneself.

Hr'g. Tr. 53:14-22, Apr. 6, 2006.

**C.     SELF-IMPOSED TIME CONSTRAINTS**

7.     On August 18, 2006, the Debtors and the Creditors' Committee jointly filed a motion seeking, among other things, approval of the Second Disclosure Statement Supplement. On October 17, 2006, the Court approved the Second Disclosure Statement Supplement. In the interim, in its Sept. 19, 2006 Bench Decision, the Court reasoned that it would neither terminate exclusivity nor resume adjudication of the MIA Litigation because it would be known whether the Plan could be confirmed and the Global Settlement approved within four to six weeks. Notwithstanding the Court's reliance on assurances that it would be a short wait, an additional two months have elapsed since that time and nearly three months will have passed before the confirmation hearing begins.

8.     Similarly, in September 2006, the ACC Bondholder Group filed a motion asking the Court to authorize immediate distributions to the secured lenders, subject to disgorgement, and, thus, stop the running of interest and adequate protection payments related

thereto for the remainder of the case. On September 26, 2006, the Bankruptcy Court, presumably still under the mistaken belief — engendered by the Movants — that a confirmation hearing was imminent, denied the ACC Bondholder Group's request for expedited consideration and determined that the motion would be considered, to the extent applicable, if the Plan is not confirmed.

### III.  RELIEF REQUESTED

9.  In light of the arguments set forth herein and the arguments set forth at length in the Confirmation Objection, Confirmation Brief and MIA Addendum, incorporated herein by reference, the ACC Bondholder Group respectfully requests that the Court enter an order denying the Settlement Motion and the Global Settlement.

### IV.  OBJECTION

#### A.  THE MOVANTS LACK AUTHORITY TO SEEK APPROVAL OF THE GLOBAL SETTLEMENT OUTSIDE OF A PLAN

10.  Seeking approval of the Global Settlement outside the confines of the Plan is but another attempt by the Movants to violate the mandates of this Court. Both the Debtors and the Creditors Committee have been ordered to remain neutral with respect to the Inter-Creditor Dispute — the litigation purportedly settled by the Global Settlement. While the Court authorized the Proponents to solicit votes on the Plan, the Court did not give them carte blanche to advocate the Global Settlement outside the Plan. Indeed, the Court's mandate of neutrality remains unchanged as does its expressed reluctance to cramdown in this case.

11.  Particularly in light of the court-ordered neutrality of the Debtors and the Creditors Committee, the court's conclusion in *In re Cara Corp.* is instructive. There, the court held that it is improper for a creditors committee to try to cramdown its own constituency: "[w]e consider its [sic] improper, inequitable, and violative of 11 U.S.C. §§ 1129(a)(3), (b)(1), for the

Committee to press on in the face of this pronouncement from its constituency." *In re Cara Corp.*, No. 90-15397S, 1992 Bankr. LEXIS 672, at *5 (Bankr. E.D. Pa. Apr. 27, 1992). Not only would it violate their court-ordered neutrality, but also their fiduciary duties, for the Movants to continue to prosecute their Settlement Motion and seek approval of the Global Settlement outside of the Plan context.

B. **THE SETTLEMENT MOTION EFFECTIVELY SEEKS APPROVAL OF A *SUB ROSA* PLAN**

12. By seeking approval of the Global Settlement, the Movants are attempting to impose a *sub rosa* plan upon creditors under the guise of settlement. Neither the Plan Agreement nor the Plan Support Agreement contemplate that the Global Settlement would be proposed outside of the Plan. Essentially, the Movants are using the Settlement Motion to circumvent the demanding requirements and protections of section 1129 of the Bankruptcy Code.

13. The terms of the Global Settlement have the practical effect of dictating the manner in which estate assets will be distributed, as well as the terms of any future plan of reorganization that may be proposed by the Debtors or any other party-in-interest. In addition, if the Global Settlement is approved, it will be binding on all creditors, not just the parties to the settlement. Consequently, parties who oppose the Global Settlement — like the ACC Bondholder Group — are prevented from later objecting to any future plan. And, unlike cases where a settlement agreement is part of a plan of reorganization, the Settlement Motion is being proposed to short circuit the procedural safeguards provided by the confirmation process. *See e.g., Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935 (5th Cir. 1983) (holding that a sale transaction amounted to a plan *sub rosa* because it (i) specified the terms of any future reorganization plan,(ii) restructured the rights of creditors and (iii) required all parties to release claims against the debtor, its secured creditors, officers and

directors); *cf. Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, No. 01 Civ. 5429 (GBD), 2005 WL 758900, at *8 (S.D.N.Y. Apr. 4, 2005) (holding that a settlement is not a *sub rosa* plan where it (i) does not interfere with the safeguards afforded to creditors under the Bankruptcy Code, (ii) binds only certain parties, (iii) does not prevent creditors from voting on any proposed plan, and (iv) is essential in facilitating a plan of reorganization.)

14. In addition, as the Global Settlement contains provisions that can only be accomplished through a plan of reorganization, the Settlement Motion cannot be used to bypass this process. For example, as discussed more fully in the Confirmation Objection and Confirmation Brief, the Global Settlement gratuitously grants exculpation, releases, injunctions and payment of fees to certain parties in exchange for their votes and support for the Plan. Although it is impermissible (even in a chapter 11 plan) to give such special consideration to creditors in exchange for their votes, this certainly cannot be achieved through the Settlement Motion. The manner in which releases, exculpation and injunctions are granted, as well as payment of fees, is to be determined in the context of approval of a chapter 11 plan.

15. The attempts by the Movants to impose the Global Settlement on rejecting creditors through a Rule 9019 motion are impermissible. As such, the Settlement Motion should be denied in its entirety.

C.  **THE GLOBAL SETTLEMENT IS NOT BASED ON THE MERITS OF THE INTER-CREDITOR DISPUTE AND FALLS OUTSIDE THE RANGE OF REASONABLENESS**

16. The Movants advocate a settlement of the Inter-Creditor Dispute without so much as conducting an evaluation of the merits of such dispute. As set forth in greater detail in the Confirmation Brief and demonstrated in the substantive discussion of the MIA Litigation and Inter-Creditor Dispute in the MIA Addendum, based upon a consideration of the underlying

merits, the Global Settlement — whether or not incorporated into a Plan — does not fall within the range of reasonableness as required by *TMT Trailer*. Importantly, *TMT Trailer* cautions that a settlement cannot be approved based simply on expediency, without an evaluation of the underlying substantive merits of the disputes being settled. *TMT Trailer*, 390 U.S. at 450.

17.     The Debtors and Creditors Committee attempt to justify their actions by suggesting that the relief sought in the Settlement Motion is identical to that which was sought in the *Enron Corp.* chapter 11 case. This rationalization ignores fundamental differences between Enron and these chapter 11 cases. In Enron, neither the debtors nor the creditors committee was ordered to remain neutral. Moreover, the court in Enron appointed an examiner to, among other things, serve as an independent fiduciary for one of the conflicting estates with respect to the global settlement. Consequently, there were *three* parties who owed fiduciary duties to creditors who engaged in the negotiations and ultimate settlement of inter-estate issues in Enron and *who considered the merits of the settlement*, as opposed to here where not one independent fiduciary for the ACC estate was a party to the settlement negotiations and considered the merits of the settlement. The debtors and the creditors committee in Enron evaluated the merits of the underlying disputes and predicated their support for the settlement on that evaluation. By the Movants' own admission, that did not happen here.

18.     Another material distinction between the purported Global Settlement in this case and the global compromise approved by Judge Gonzalez in Enron is disclosure. In Enron, both the disclosure statement and the motion to approve the compromise contained (a) detailed information regarding the investigation undertaken by the debtors and the creditors committee, (b) a description of each of the issues subject to dispute, including an analysis of the strength and weaknesses of each issue, and (c) the specific resolution of each issue based on the

terms of the settlement. In contrast, in this case, the Debtors and Creditors Committee <u>failed</u> to include in their Second Disclosure Statement Supplement or Settlement Motion any information regarding their investigation of the issues being litigated or any substantive analysis of the strengths and weaknesses of each issue (in fact, to the contrary, they successfully opposed discovery of any such information) or any description of how the Global Settlement resolves each issue. Rather than disclose the specific issues and their resolution, the Debtors and Creditors Committee leave it to the Court and the creditors to guess by working backwards through a multitude of permutations to ascertain the underlying determinations regarding the assets and liabilities of ACC and to consider on their own whether there is any correlation between such a result and the merits of the Inter-Creditor Dispute (a correlation that simply does not exist).

D.  **THE CREDITORS COMMITTEE LACKS STANDING TO COMPROMISE ESTATE CLAIMS**

19. Not only is the Creditors Committee breaching its fiduciary duties and disregarding this Court's mandates, but it also lacks standing to pursue the Settlement Motion. Rule 9019 of the Federal Rules of Bankruptcy Procedure provides that "[o]n motion by the *trustee* and after notice and hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019 (emphasis added). Section 1107 of the Bankruptcy Code grants a debtor-in-possession the rights, power and duties of a trustee serving in a chapter 11 case. 11 U.S.C. § 1107. As such, only the trustee or debtor-in-possession has standing to bring a motion for settlement. This is because "[i]t is the debtor-in-possession who controls the estate's property, including its legal claims, and it is the debtor-in-possession who has the legal obligation to pursue claims or to settle them, based upon the best interests of the estate." *In re Smart World Tech., LLC*, 423 F.3d 166, 175 (2d Cir. 2005).

20. This Court has not authorized the Creditors Committee to settle the Inter-Creditor Dispute and, therefore, the Creditors Committee lacks standing to seek approval of the Global Settlement through the Settlement Motion. *In re 3DFX Interactive, Inc.*, No. 02-55795 JR, 2006 WL 2010786, at *7 (Bankr. N.D. Cal. June 29, 2006) ("a Creditors Committee does not have standing to compromise an estate's claim); *cf. In re Allied Steel Fabricators, Inc.*, No. 86-886-8P1, 1996 WL 679645, at *2 (Bankr. M.D. Fla. 1996 Aug. 26 1996) (holding that it is appropriate to permit the creditors' committee to negotiate on behalf of the estate where the court has specifically authorized such action). Indeed, this Court expressly authorized the MIA Participants to litigate the Inter-Creditor Dispute on behalf of the Debtors' estates. The Creditors' Committee, however, has not been granted settlement authority.

21. As such, the Creditors Committee cannot now seek approval of the Global Settlement pursuant to the Settlement Motion and, thus, should withdraw the motion.

E. **THE PROPONENTS' ARGUMENT THAT DELAY WILL HAVE NEGATIVE CONSEQUENCES IS MERITLESS**

22. In September 2006, the Court, the ACC Bondholder Group and other creditors were told that a confirmation hearing was imminent. On this basis, the Court denied the ACC Bondholder Group's requests to resume adjudication of the MIA Litigation, terminate exclusivity and pay the secured lenders to discontinue the accrual of postpetition interest. Three months have elapsed and, now, the Movants urge that regardless of the merits, regardless of the vote, regardless of the confirmability of their Plan or propriety of the Global Settlement on the merits, the Court has no choice but to enter an order approving the Global Settlement and, to the extent rejected by the creditors, cramdown this Plan. That is not how this process works. Congress has enacted a statute — the Bankruptcy Code — and the Supreme Court has articulated clear standards with respect to confirmation of a plan, cramdown, and approval of a settlement

(including the *TMT Trailer* standard). No court is at liberty to turn a blind eye to these fundamental precepts.

   23. The factors enumerated by the Movants as grounds to rush to judgment, approve the Global Settlement and cramdown the Plan, do not compel any such a result. By way of example:

   a. The Movants threaten the continued accrual of postpetition interest, but fail to note that there is a motion pending seeking to pay the secured debt, subject to disgorgement, which would alleviate this concern instantaneously.[3]

   b. The Movants warn of negative tax consequences if the TWC Stock is not distributed by year-end — an unwarranted concern that they failed to identify as a risk factor in the Second Disclosure Statement Supplement. First, this is not a year end issue, but instead an issue arising from appreciation of the TWC Stock and distribution of the stock at any time. While it is correct that, prior to distribution, any appreciation of an asset held by a debtor results in a taxable gain, it is also true that the incremental increase in tax liability is materially outweighed by the increase in value. Implicit in the Movants' concern that the TWC Stock be distributed by year-end is a belief that the rapid appreciation in the stock value over the last several months will continue into the next year. However, this concern belies their endorsement of the artificially low Deemed Value under the Plan. Moreover, as noted in the Second Disclosure Statement Supplement, the Debtors have a $10 billion net operating loss, which may be available to offset any such incremental tax liability.

   c. The Movants protest that they must distribute the TWC Stock by year-end or incur up to $750 million in IPO costs. In actuality, however, their statement of the required timing is incorrect, and they use an inflated number to scare the Court. First, as set forth in the Second Disclosure

---

[3] In this context, the Movants also mischaracterize the creditors of ACC as being structurally junior to other unsecured creditors in these chapter 11 cases. The ACC Bondholder Group objects to this mischaracterization as it, *inter alia*, presupposes resolution of the Inter-Creditor Dispute and disallowance of all Intercompany Claims held by any of the ACC Debtors.

>Statement Supplement, the Debtors have until three months after TWC's Registation Statement (which has not been finalized and remains subject to comment by the SEC) is effective to either distribute the stock to creditors or conduct an IPO. *See* DSS2-125. Moreover, the Movants fail to disclose that the IPO costs are, in large part, within the Debtors' control.[4] The IPO costs for issuance of the minimum amount required by the Purchase Agreements (1/3 of the TWC Stock received by the Debtors) should not exceed $85 million if such costs have to be incurred at all.

24. It is the Movants themselves who created the Hobson's Choice that they are now faced with — propose a Plan and Global Settlement that are neither fair nor equitable or pay the IPO costs — because, in complete disregard for this Court's Plan Procedures Order, they refused to propose a plan with the protective elements that were in the Holdback Plan. Under the Plan and the Global Settlement, ACC creditors receive purported handouts and residual value — albeit, in both instances, other creditors claw back a significant portion for themselves. As a result, it is the ACC creditors — presumably the creditors who have rejected the Plan if the Settlement Motion is to be considered — who bear the brunt of this exposure, at least as crafted under the Plan. Notwithstanding the Hobson's Choice presented to ACC creditors, the justifications enumerated by the Movants and their economic consequences (approximately $100 million or less assuming the secured lenders are paid) pale in comparison to the $1 billion in value unjustifiably stripped from the ACC estate.

**F.    THE GLOBAL SETTLEMENT DOES NOT SATISFY THE *TMT TRAILER* STANDARD**

25. As discussed more fully in the Confirmation Objection, Confirmation Brief and the MIA Addendum, incorporated herein by reference, the Global Settlement does not

---

[4] The Movants' theory that disapproval of the Global Settlement will automatically result in a need to comply with the IPO requirement is incorrect. A registration statement for the TWC Stock still has not gone effective; and once it does, the Debtors will have 90 days to conduct an IPO ***or distribute a minimum amount of TWC stock under a confirmed chapter 11 plan (whether it is the currently proposed Plan or an alternative plan)***.

in any way satisfy the requirements of *TMT Trailer*. Because of its silence and obfuscation as to how the distributions under the Plan correlate with a likely — or even plausible — resolution of the issues in the Inter-Creditor Dispute, and because creditor recoveries under the settlement are completely divorced from the merits of the litigation, as well as the Debtors' own schedules of assets and liabilities, the Settlement Motion cannot be approved. *TMT Trailer*, 390 U.S. at 424 ("The requirements . . . that plans of reorganization be both 'fair and equitable' apply to compromises . . ."). Simply put, the Global Settlement is not a result driven by any demonstrable correlation between the merits of the Inter-Creditor Dispute and the distributions under the Plan. Instead, expediency drives the outcome. And, on this basis, the Settlement Motion cannot be approved.

## V.    CONCLUSION

The ACC Bondholder Group requests that the Court enter an order denying the Settlement Motion and the Global Settlement and granting the ACC Bondholder Group such other and further relief as is just and appropriate.

Dated:  November 30, 2006
        New York, New York

　　　　　　　　　　　　　　　　　　/s/  Sylvia A. Mayer
　　　　　　　　　　　　　　　　Martin J. Bienenstock, Esq. (MB 3001)
　　　　　　　　　　　　　　　　Brian S. Rosen, Esq. (BR 0571)
　　　　　　　　　　　　　　　　Melanie Gray, Esq. (*Pro Hac Vice*)
　　　　　　　　　　　　　　　　Sylvia Mayer, Esq. (*Pro Hac Vice*)

　　　　　　　　　　　　　　　　WEIL, GOTSHAL & MANGES LLP
　　　　　　　　　　　　　　　　767 Fifth Avenue
　　　　　　　　　　　　　　　　New York, New York 10153-0119
　　　　　　　　　　　　　　　　Telephone: (212) 310-8000
　　　　　　　　　　　　　　　　Facsimile: (212) 310-8007

　　　　　　　　　　　　　　　　*Counsel to ACC Bondholder Group*

                */s/ Isaac M. Pachulski*
                Isaac M. Pachulski (*Pro Hac Vice*)
                Stephan M. Ray (*Pro Hac Vice*)
                STUTMAN, TREISTER & GLATT P.C.
                1901 Avenue of the Stars, 12 Floor
                Los Angeles, CA 90067
                Telephone: (310) 228-5600
                Facsimile: (310) 228-5788

                *Special Conflicts Counsel*[5]

---

[5] Special Conflicts Counsel has been retained by Aurelius Capital Management, LP, Catalyst Investment Management Co., LLC, Drawbridge Global Macro Advisors LLC, Drawbridge Special Opportunity Advisors LLC, Elliott Associates, LP, Farallon Capital Management, L.L.C., Noonday Asset Management, L.P., Perry Capital LLC, and Viking Global Investors LP.