WILLKIE FARR & GALLAGHER LLP
Attorneys for the Debtors and Debtors in Possession
Marc Abrams (MA-0735)
Paul V. Shalhoub (PS-2133)
Rachel C. Strickland (RS-3787)
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Attorneys for the Official Committee of Unsecured Creditors
David Friedman (DF-4278)
Adam L. Shiff (AS-7571)
1633 Broadway
New York, New York 10019-6708
(212) 506-1700

UNITED STATES BANKRUPTCY COURT   Hearing Date: December 7, 2006 @ 9:45 a.m.
SOUTHERN DISTRICT OF NEW YORK   Objection Deadline: November 24, 2006 @ 4:00 p.m.

| | |
|---|---|
| In re | ) Chapter 11 Cases |
| | ) |
| Adelphia Communications Corporation, et al., | ) Case No. 02-41729 (REG) |
| | ) |
| Debtors. | ) Jointly Administered |

## MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF FIFTH AMENDED JOINT CHAPTER 11 PLAN FOR ADELPHIA COMMUNICATIONS CORPORATION AND CERTAIN AFFILIATED DEBTORS AND IN RESPONSE TO CERTAIN OBJECTIONS THERETO

Dated: December 4, 2006

WILLKIE FARR & GALLAGHER LLP
  Attorneys for the Debtors and Debtors in Possession
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
  Attorneys for the Official Committee of Unsecured Creditors
1633 Broadway
New York, New York 10019-6708
(212) 506-1700

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ..............................................................................................................15

I.   APPROVAL OF GLOBAL SETTLEMENT .................................................15

II.  THE PLAN COMPLIES WITH THE CONFIRMATION STANDARDS SET FORTH
     IN SECTION 1129(a) OF THE BANKRUPTCY CODE. ................................15

     A.  The Plan Satisfies The Requirements Of
         Section 1129(a)(1) Because The Plan Complies With The Applicable
         Provisions Of The Bankruptcy Code, Including Sections 1122 And 1123. ...............18

         i.    The Plan Satisfies The Classification Requirements
               Of Section 1122 Because The Claims Or Interests Of Each Class Are
               Substantially Similar To The Other Claims Or Interests Of Such Class. ...........18

         ii.   The Plan's Classification Of Bank Claims Is Permissible And Appropriate.......20

         iii.  The "Give-Up" Provisions of the Plan Are Not
               Inconsistent with Any Section Of The Bankruptcy Code...................................28

         iv.   The Plan Does Not Violate Section 502(a) Of The Bankruptcy Code. ..............32

     B.  The Plan Satisfies The Requirements
         Of Section 1123(a) Of The Bankruptcy Code. ..........................................................33

         i.    The Plan Designates Classes Of Claims — 11 U.S.C. § 1123(a)(1). .................33

         ii.   The Plan Specifies Unimpaired Classes — 11 U.S.C. § 1123(a)(2)...................34

         iii.  The Plan Adequately Specifies The Treatment
               Of Impaired Classes  —  11 U.S.C. § 1123(a)(3). ...............................................34

         iv.   The Plan Provides The Same Treatment For Claims
               Or Equity Interests Within Each Class  —  11 U.S.C. § 1123(a)(4)...................34

         v.    The Plan Provides Adequate Means For Its
               Implementation  —  11 U.S.C. § 1123(a)(5). ......................................................40

         vi.   The Plan Does Not Provide For The Issuance
               Of Non-Voting Equity Securities  —  11 U.S.C. § 1123(a)(6)...........................41

vii.   The Plan Contains Appropriate Provisions Respecting The Selection Of
       Postconfirmation Directors And Officers — 11 U.S.C. § 1123(a)(7). ...............42

C.   The Plan Complies With Section 1123(b) Of The Bankruptcy Code..........................43

D.   The Proponents Have Complied With The Provisions Of
     Title 11 Required By Section 1129(a)(2) Of The Bankruptcy Code. ..........................44

E.   Section 1129(a)(3) Has Been Satisfied Because The Plan Has
     Been Proposed In Good Faith And Not By Any Means Forbidden By Law...............46

F.   The Plan Provides For Bankruptcy Court Approval
     Of Payment For Services And Expenses — 11 U.S.C. § 1129(a)(4). ........................49

G.   The Debtors Have Complied With Section 1129(a)(5) By Disclosing All Necessary
     Information Regarding Directors And Officers Of The Reorganized Debtors............52

H.   The Plan Does Not Contain Rate Changes Subject To The Jurisdiction
     Of Any Governmental Regulatory Commission — 11 U.S.C. § 1129(a)(6)..............53

I.   The Plan Is In The Best Interests Of Creditors — 11 U.S.C. § 1129(a)(7). ................54

     i.    The Proponents' Assumption That A Chapter 7 Trustee
           Would Adopt The Global Settlement Is Reasonable And Appropriate. ..............56

     ii.   The Payment Of Interest To Certain
           Creditors Does Not Violate The Best Interests Test. ...........................................59

     iii.  The Plan's Provisions For The Treatment Of
           Bank Claims Does Not Violate The Best Interests Test. ....................................63

J.   The Plan Satisfies Section 1129(a)(8) With  Respect
     To All Classes Except The Presently Rejecting Classes. ...........................................67

K.   The Plan Provides For Payment In Full Of All
     Allowed Priority Claims  — 11 U.S.C. § 1129(a)(9). ...............................................71

L.   The Plan Has Been Accepted By At Least One Impaired
     Class Of Claims That Is Entitled To Vote  — 11 U.S.C. § 1129(a)(10). ..................72

     i.    The Debtors Possess a Sound Business
           Justification For The Plan's Treatment of Claims —
           No Class of Claims or Equity Interests Has Been "Artificially" Impaired..........72

     ii.   The Bankruptcy Code Only Requires That A Single Impaired
           Class Of Claims Accept The Plan, Not An Impaired Class For Each Debtor. ....75

iii.    The Subsidiary Debtor Equity Interests Are Impaired. .......................................77

iv.    The Fact That The Treatment of Trade Claims Is
Governed In Part By The Global Settlement Is Of No Significance. ..................78

M. The Plan Is Feasible  —  11 U.S.C. § 1129(a)(11). ....................................................80

i.    The Proponents Have Demonstrated The Feasibility Of The Plan....................81

ii.    Disney/ESPN's and Rembrandt's
Feasibility Objections Are Wholly Without Merit. .............................................83

iii.    ESPN's Administrative Expense Claims Are Deficient As A Matter of Law
Because the ACC/ESPN Contract Was Essentially A Requirements Contract,
And ACC Did Not Breach the Contract By Eliminating Its Requirements, So
Long As It Acted In Good Faith. .......................................................................84

iv.    The ACC Bondholder Group's Objections
As To Feasibility Of The Plan Also Are Without Merit.....................................89

v.    The Banks' Feasibility Objections Are Meritless. ..............................................90

N. The Plan Provides For Full Payment Of All
Statutory Fees — 11 U.S.C. § 1129(a)(12)....................................................................92

O. The Plan Provides For The Continuance Of
Retiree Benefit Obligations — 11 U.S.C.§ 1129(a)(13).............................................92

III. THE PLAN MEETS THE REQUIREMENTS FOR
CRAMDOWN UNDER SECTION 1129 OF THE BANKRUPTCY CODE...................93

IV. THE POST-EFFECTIVE DATE PROTECTIONS AFFORDED TO THE DEBTORS
AND CERTAIN CONTRIBUTING THIRD PARTIES BY THE PLAN ARE
APPROPRIATE AND CONSISTENT WITH ESTABLISHED PRECEDENT. .............94

A. The Exculpations and Debtor Releases Set Forth In The Plan Are Appropriate.........96

B. The Unique Circumstances Of The Debtors' Cases
Justify The Granting Of The Non-Debtor Releases.....................................................99

i.    The Plan Releases Are Important To The Debtors' Emergence Strategy..........100

ii.    The Released Parties Have Made
Significant Contributions To The Plan Process. ................................................101

iii.    Certain Of The Releases Protect The Estates
From Indemnification Claims And Other Loss Of Value.................................102

V.  THE OTHER OBJECTIONS SHOULD BE OVERRULED  AND DO NOT BAR
    CONFIRMATION OF THE PLAN..................................................................................103

   A.  The Arguments Of The Objecting Banks
       Are Without Merit And Should Be Overruled.........................................................103

      i.  The Plan Does Not Impermissibly Grant a Discharge to the Debtors ..............103

      ii.  The Plan Will Implement the FrontierVision Stipulation ...................................105

   B.  The Resolution Of Disputes Regarding Intercompany Claims Is Not
       Some Covert and Maniacally Mutant Form Of Substantive Consolidation. .............105

   C.  Deemed Value of the TWC Class A Common Stock .................................................109

   D.  The Provisions For The Creation, Funding And Governance Of The CVV
       Are Consistent With The Bankruptcy Code And Applicable Case Law. ..................115

      i.  The Equity Committee Does Not Own The Additional
         Bank Claims; Nor Must The Proponents Obtain The
         Equity Committee's Consent To Transfer Those Claims To The CVV. ...........115

      ii.  The Equity Committee Cannot Retain The Benefits Of
         The ACC Estate Without Sharing In Its Burdens. .............................................120

      iii.  The Plan Does Not Violate The Absolute Priority Rule
         With Respect To The Distribution Mechanics Of The CVV............................122

VI. MODIFICATION OF THE PLAN IS PERMISSIBLE
    UNDER SECTION 1127 OF THE BANKRUPTCY CODE .........................................127

CONCLUSION...................................................................................................................132

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re AG Consultants Grain Division*, 77 B.R. 665 (Bankr. N.D. Ind. 1987) .............19, 20

*In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986)..............................................36, 37

*Acequia v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352 (9th Cir. 1986) ...................41, 78

*In re Adelphia Bus. Solutions*, 341 B.R. 415 (Bankr. S.D.N.Y. 2003) .............................92

*Adelphia Commc'ns Corp. v. Bank of America (In re Adelphia Commc'ns. Corp.)*,
    330 B.R. 364 (Bankr. S.D.N.Y. 2005) ...............................................................118, 119

*Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns. Corp.)*, 285 B.R.
    848 (Bankr. S.D.N.Y. 2002) ...............................................................................117

*In re Affiliated Foods, Inc.*, 249 B.R. 770 (Bankr. W.D. Mo. 2000)................................56

*In re Allegheny International, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990) ..................126

*In re American Solar King Corp.*, 90 B.R. 808 (Bankr. W.D. Tex. 1988)............. 128-131

*In re Armstrong World Industries, Inc.*, 320 B.R. 523 (D. Del. 2005), *aff'd,* 432
    F.3d 507 (3d Cir. 2005)...........................................................................................76

*In re Armstrong World Industries, Inc.*, 432 F.3d 507 (3d Cir. 2005)..............................31

*Atlantic Track & Turnout Co. v. Perini Corp.*, 989 F.2d 541 (1st Cir. 1993) ..................87

*Barry v. American Financial. Enterprises, Inc.*, 449 U.S. 1062 (1980) .........................107

*Barry v. Smith (In re New York, New Haven and Hartford R.R.Co.)*, 632 F.2d 955
    (2d Cir. 1980)........................................................................................................107

*Beguelin v. Volcano Vision, Inc. (In re Beguelin)*, 220 B.R. 94 (9th Cir. B.A.P.
    1998) .....................................................................................................................61

*Bell Road Investment Co. v. M. Long Arabians (In re M. Long Arabians)*, 103
    B.R. 211 (9th Cir. 1989) ........................................................................................69

*In re Best Products Co.*, 168 B.R. 35 (Bankr. S.D.N.Y. 1994), *appeal dismissed*,
    177 B.R. 791 (S.D.N.Y.), *aff'd,* 68 F. 3d 26 (2d Cir. 1995).........................................46

*Boston Post Rd. Ltd. Partnership v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21
    F.3d 477 (2d Cir. 1994)...................................................................................... 18-19

*Boyer v. Bernstein (In re Boyer)*, 90 B.R. 200 (Bankr. D.S.C. 1988) ..............................61

*In re Broad Assoc. Ltd.*, 110 B.R. 632 (Bankr. D.Conn. 1990)..................................69, 70

*In re Cajun Electric Power Coop., Inc.*, 150 F.3d 503 (5th Cir. 1998) ...........................94

*In re Campbell*, 89 B.R. 187 (Bankr. N.D. Fla. 1988)........................................................68

*Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939) ..................................107

*In re Cellular Information System Inc.*, 171 B.R. 926 (Bankr. S.D.N.Y. 1994)...............81

*Citicorp Acceptance Co., Inc., v. Ruti-Sweetwater (In re Ruti-Sweetwater)*, 57
   B.R. 354 (D. Utah 1985) ...............................................................................................128

*Commissioner v. Adcom (In re Adcom, Inc.)*, 89 B.R. 2 (D. Mass 1988).........................61

*Commodore Int'l, Ltd. v. Gould (In re Commodore Int'l, Ltd.)*, 262 F.3d 96 (2d
   Cir. 2001) .......................................................................................................................115

*In re Corley*, 83 B.R. 848 (Bankr. S.D. Ga. 1988) ...........................................................65

*In re Crosscreek Apts., Ltd.*, 213 B.R. 521 (Bankr. E.D. Tenn. 1997) .............................72

*In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279 (Bankr. S.D.N.Y. 1990) ................56

*In re David Green Prop. Management*, 164 B.R. 92 (Bankr. W.D. Mo. 1994) ...............60

*Debentureholders Protective Committee of Cont'l Investment Corp. v. Cont'l
   Investment Corp.*, 679 F.2d 264 (1st Cir. 1982) ...........................................................61

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber
   Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005).....................................................99, 100

*DiPierro v. Taddeo (In re Taddeo)*, 685 F.2d 24 (2d Cir. 1982)......................................73

*Dienes Corp. v. Long Island Rail Road Co.*, 2002 U.S. Dist. LEXIS 6824
   (E.D.N.Y. March 19, 2002) ...........................................................................................85

*Dodd v. U.S.*, 125 S.Ct. 2478 (2005) ...............................................................................76

*In re Dow Corning Corp.*, 227 B.R. 111 (Bankr. E.D. Mich. 1998) ...............................46

*In re Dow Corning Corp.*, 244 B.R. 634 (Bankr. E.D. Mich. 1999) ...................36, 37, 61

*In re Dow Corning Corp.*, 255 B.R. 445 (E.D. Mich. 2000)............................................30

*Downtown Ath. Club of N.Y. City v. Caspi Development Corp. (In re Downtown
   Ath. Club of N.Y. City)*, 1998 Bankr. LEXIS 1642 (Bankr. S.D.N.Y. 1998)..............73

*In re Drexel Burnham Lambert Group*, 130 B.R. 910 (S.D.N.Y. 1991) .........................80

*In re Drexel Burnham Lambert Group*, 138 B.R. 714 (Bankr. S.D.N.Y. 1992), *aff'd*, 140 B.R. 347 (S.D.N.Y. 1992) .................................................................35, 126

*In re Duval Manor Associates*, 191 B.R. 622 (Bankr. E.D. Pa. 1996) .............................72

*In re Enron Corp.*, 326 B.R. 497 (S.D.N.Y. 2005).................................................101, 103

*Enron Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113 (11th Cir. 2006) .............................................................................................................129

*Equitable Life Insurance Co. of Iowa v. Atlanta-Stewart Partners (In re Atlanta-Stewart Partners)*, 193 B.R. 79 (Bankr. N.D. Ga. 1996).............................................72

*Executive Airlines v. Electric Boat Corp.*, 271 F. Supp. 2d 392 (D. Conn. 2003) ...........87

*In re Featherworks Corp.*, 25 B.R. 634 (Bankr. E.D.N.Y. 1982)......................................56

*Federal Land Bank of Louisville v. Gene Dunavant & Son Dairy (In re Gene Dunavant & Son Dairy)*, 75 B.R. 328 (Bankr. M.D. Tenn. 1987).........................64, 65

*Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.*, 130 F.2d 471 (3d Cir. 1942)...........................................................................................85, 87, 88

*In re Friese*, 103 B.R. 90 (Bankr. S.D.N.Y. 1989) ...........................................................69

*In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754 (Bankr. S.D.N.Y. 1995).................74

*General Motors Acceptance Corp. v. Valenti (In re Valenti)*, 105 F.3d 55 (2d Cir. 1997) ..............................................................................................................66

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001).......................31

*In re Glados, Inc.*, 83 F.3d 1360 (M.D. Fla. 1995)..........................................................62

*In re Godsey*, 134 B.R. 865 (Bankr. M.D. Tenn. 1991) ...................................................61

*In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213 (Bankr. D.N.J. 2000)...................72

*Greer v. Gaston & Snow (In re Gaston & Snow)*, 1996 WL 694421 (S.D.N.Y. 1996) ............................................................................................................46

*In re Guilford Telecasters, Inc.*, 128 B.R. 622 (Bankr. M.D.N.C. 1991).......................123

*HML Corp. v. General Foods Corp.*, 365 F.2d 77 (3d Cir. 1966), *aff'd*, 365 F.2d 77 (3d Cir. 1966)...........................................................................................86

*Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.)*, 836 F.2d 1263 (10th Cir. 1988) ..............................................................................................68, 70

*In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660 (Bankr. D.D.C. 1992) ....38, 39

*In re Higgins Slacks Co.*, 178 B.R. 853 (N.D. Ala. 1995)................................................69

*In re Housecraft Industrial USA, Inc.*, 310 F.3d 64 (2d Cir. 2002)................................115

*John Hancock Mutual Life Insurance Co. v. Route 37 Bus. Park Associates*, 987 F.2d 154 (3d Cir. 1993).........................................................................................94

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in relevant part*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988)..............................................................44

*Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) .....................................44, 46

*In re Kellogg Square Partnership*, 160 B.R. 336 (Bankr. D. Minn. 1993) ......................46

*Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137 (2d Cir. 1984) .......................................46

*In re Kuljis Seafood Co.*, 73 B.R. 659 (Bankr. S.D. Miss. 1986)................................65, 66

*L&J Anaheim Associates v. Kawasaki Leasing International (In re L&J Anaheim Assocs.)*, 995 F.2d 940 (9th Cir. 1993) ...............................................................72, 73

*Legend Radio Group, Inc. v. Sutherland*, 2000 U.S.App. LEXIS 6422 (4th Cir. 2000) ................................................................................................................129

*In re Leslie Fay Companies, Inc.*, 207 B.R. 764  (Bankr. S.D.N.Y. 1997) ......................46

*In re MCorp Financial, Inc.*, 137 B.R. 219 (Bankr. S.D. Tex. 1992) ............................126

*In re MCorp. Financial, Inc.*, 160 B.R. 941 (S.D. Tex. 1993) ............................30, 58, 59

*Manati Sugar Co. v. Mock*, 75 F.2d 284 (2d Cir. 1935) ..................................................46

*In re Manchester Gas Storage, Inc.*, 309 B.R. 354 (Bankr. N.D. Okla. 2004)........124, 125

*In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994) .................................................................................................................102, 103

*In re Melenyzer*, 143 B.R. 829 (Bankr. W.D. Tex. 1992)................................................61

*Officia Unsecured Creditors' Committee v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305 (1st Cir. 1993).........................................................................................30

*Oregon Plywood Sales Corp. v. Sutherlin Plywood Corp.*, 246 F.2d 466 (9th Cir. 1957) ............................................................................................................88, 89

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), *cert. denied, McMonagle v. Credit Suisse First Boston*, 126 S. Ct. 1910 (2006)................................................108

*In re Palmer*, 224 B.R. 681 (Bankr. S.D. Ill. 1998)........................................................65

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) ..............................................................................107

*R.A. Weaver & Associates, Inc. v. Asphalt Construction, Inc.*, 587 F.2d 1315 (D.C. Cir. 1978) ..........................................................................................88, 87, 88

*Rake v. Wade*, 508 U.S. 464, 113 S.Ct. 2187 (1993)...................................................64

*In re Rath Packing Co.*, 55 B.R. 528  (Bankr. N.D. Iowa 1985) ..................................104

*In re Resorts International, Inc.*, 145 B.R. 412 (Bankr. D.N.J. 1990)............................76

*In re Revere Copper and Brass*, 60 B.R. 892 (Bankr. S.D.N.Y. 1986) ..........................51

*In re Ridgewood Apartments of Dekalb County, Ltd.*, 183 B.R. 784 (Bankr. S.D. Ohio 1995) .............................................................................................................74

*Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns., Inc.)*, 330 B.R. 394 (Bankr. S.D.N.Y. 2005) ...........................................................................101, 102

*Rupp v. U.S. (In re Rocky Mountain Refractories)*, 208 B.R. 709 (10th Cir. 1997)..........62

*SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285 (2d Cir. 1992)..............................................................100

*S &P, Inc. v. Pfeifer (In re S & P, Inc.)*, 18 B.R. 159 (Bankr. N.D. Ind. 1995) ..........64, 65

*In re Schoeneberg*, 156 B.R. 963 (Bankr. W.D. Tex. 1993)....................................60, 61

*In re Shaffer Furniture Co.*, 68 B.R. 827 (Bankr. E.D. Pa. 1987) ..................................61

*Smart World Techs., LLC v. Juno Online Services, Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166 (2d Cir. 2005)................................................................117

*In re Snider Farms, Inc.*, 83 B.R. 977 (Bankr. N.D. Ind. 1988) ....................................64

*Solow v. PPI Enterprises(U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.)*, 324 F.3d 197 (3d Cir. 2003)............................................................................................72

*Technical Assistance International, Inc. v. United States*, 150 F.3d 1369 (Fed. Cir. 1998) ........................................................................................85, 86, 88

*Thompson v. Ky. Lumber Co. (In re Kentucky Lumber Co.)*, 860 F.2d 674  (6th Cir. 1988) ...................................................................................................124

*In re Townco Realty, Inc.*, 81 B.R. 707 (Bankr. S.D. Fla. 1987) ...................................69

*Troy Sav. Bank v. Travelers Motor Inn, Inc.*, 215 B.R. 485 (N.D.N.Y. 1997).................19

*In re UNR Industrial, Inc.*, 143 B.R. 506 (Bankr. N.D. Ill. 1992), *rev'd on other grounds*, 173 B.R. 149 (N.D.Ill. 1994) ...................................................................40

*In re United Cigar Co.*, 72 F.2d 673 (2d Cir. 1934) ..........................................87

*In re United Merchants and Manufacturers, Inc.*, 674 F.2d 134 (2d Cir. 1982)..............51

*Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes* (In re STN Enters.), 779 F.2d 901 (2d Cir. 1985) ............................................115

*WHBA Real Estate Ltd. Partnership v. Lafayette Hotel Partnership (In re Lafayette Hotel Partnership)*, 227 B.R. 445 (S.D.N.Y. 1998) ...................................19

*In re W.T. Grant Co.*, 119 B.R. 898 (S.D.N.Y 1990) .......................................51

*In re Wabash Valley Power Association*, 72 F.3d 1305 (7th Cir. 1995)...............78, 79, 80

*In re 499 W. Warren St. Assoc. Ltd.*, 151 B.R. 307 (Bankr. N.D.N.Y. 1992) .................69

*Walton v. Kleinfeld (In re Glados Inc.)*, 197 B.R. 357  (M.D. Fla. 1995) ........................62

*In re Willow Creek Apts.*, No. 94-11161C-11D, 1996 Bankr. LEXIS 1888 (Bankr. M.D.N.C. 1996) ...............................................................130

*In re Woodmere Investors Ltd. Partnership*, 178 B.R. 346 (Bankr. S.D.N.Y. 1995) .......................................................................27, 29

*In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. 2003)...........24, 26, 92

*In re WorldCom, Inc.*, 2003 WL 23861928 (S.D.N.Y. 2003) ...........................................44

*In re World Health Alternatives, Inc.*, 344 B.R. 291 (Bankr. D. Del. 2006) ....................31

*In re ZRM-Oklahoma Partnership*, 156 B.R. 67 (Bankr. W.D. Okla. 1993)....................19

*In re Zenith Electrics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999)................35, 93, 126, 127

*Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671 (2d Cir. 1983) ..................................................86

## STATE CASES

*Benvenuti Oil Co. v. Foss Consultants, Inc.*, 781 A.2d 435 (Conn. App. 2001) ..............87

*Tallmadge Brothers Inc. v. Iroquois Gas Transmission System, L.P.*, 746 A.2d 1277 (Conn. 2000). ......................................................................87

## DOCKETED CASES

*In re Adelphia Bus. Solutions Inc.,* Case No. 02-11389 (REG), Docket No. 1398 ..........97

*In re Adelphia Bus. Solutions Inc.,* Case No. 02-11389 (REG), Docket No. 1607 ..........33

*In re Adelphia Communications Corporation,* Case No. 02-41729 (REG), Docket
No. 11412 ........................................................................................................32

*In re Big V Holdings Corp.*, Case No. 00-04372 (RTL), Docket No. 1459 ....................36

*In re Enron Corp.,* Case No. 01-16034 (AJG), Docket No. 19475 ................................97

*In re Enron Corp., et al.*, Case No. 01-16034, Docket No. 15414 ................................57

*In re Global Crossings, Ltd.,* Case No. 02-40188 (REG), Docket No. 1994 ..................33

*In re SPGA, Inc., et al.*, Case No. 1-01-02609 ...........................................................76

*In re Silicon Graphics, Inc.,* Case No. 06-10977, Docket No. 607 ..............................109

*In re Silicon Graphics, Inc.,* Case No. 06-10977, Docket No. 632 ..............................108

*In re WorldCom, Inc.*, Case No.. 02-13533 (AJG), 2003 WL 23861928 ........................30

*In re Worldcom Inc.,* Case No. 02-13533 (AJG), Docket No. 9525 ..............................33

## FEDERAL STATUTES

11 U.S.C. § 105 ...........................................................................................................53

11 U.S.C. § 1123(a) ..........................................................23, 33, 34, 40, 41, 42, 44

11 U.S.C. §1124 ..........................................................................................................73

11 U.S.C. §1127 ........................................................................................................128

11 U.S.C. § 1129 ...............17, 44, 46, 49, 50, 52, 53, 54, 60, 61, 66, 67, 71, 72, 75, 80, 93

11 U.S.C. § 502 ...........................................................................................................32

11 U.S.C. § 506 ...........................................................................................................64

11 U.S.C. § 726(a) ................................................................................................60, 61

28 U.S.C. § 1930 ..................................................................................................17, 92

## FEDERAL RULES

Fed. R. Bankr. Pro. 3019 ....................................................................................126-127

**MISCELLANEOUS**

H.R. Rep. No. 95-595, at 412 (1977), S.Rep. No. 989, 95-989, at 126 (1978),
    <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5912 (section 1129(a)............................45, 128

S. Rep. No. 95-989, at 123 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5910 ...........130

## PRELIMINARY STATEMENT

1.      Adelphia Communications Corporation ("**ACC**") and certain of its affiliates (collectively, the "**Debtors**")[1] and the Official Committee of Unsecured Creditors appointed in the Debtors' cases (the "**Creditors Committee**" and, together with the Debtors, the "**Movants**") respectfully submit this memorandum of law (the "**Confirmation Brief**") in support of confirmation of the Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain Affiliated Debtors, dated October 16, 2006 (as may be modified and/or amended, the "**Plan**"), and in response to certain objections thereto.[2]

2.      As a consequence of the financial mismanagement and rampant corporate fraud engaged in by the ACC/JV Debtors' former management, on June 25, 2002,[3] substantially all of the ACC/JV Debtors commenced cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  Once the ACC/JV Debtors stabilized their operations, reconstituted ACC's Board of Directors (the "**Board**"), and hired new and experienced senior

---

[1]     The term Debtors as used herein excludes the JV Debtors (as defined below).  The Debtors and JV Debtors shall collectively be referred to as the "**ACC/JV Debtors**."

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan and/or the Second Disclosure Statement Supplement (as defined below), as applicable.  The Plan was proposed jointly by the Debtors, the Creditors Committee, Wachovia Bank, National Association, as Administrative Agent under the UCA Credit Agreement, and Bank of Montreal, as Administrative Agent under the Olympus Credit Agreement (collectively, solely to the extent provided in the Plan, the "**Proponents**").  Objections to confirmation of the Plan (the "**Objections**") were filed by the parties identified on Exhibit A hereto (the "**Objectors**").

[3]     Century Communications Corporation filed its petition on June 10, 2002.  The following Debtors filed petitions for relief on October 6, 2005: ACC Properties 1, LLC; ACC Properties 103, LLC; ACC Properties 105, LLC; ACC Properties 109, LLC; ACC Properties 121, LLC; ACC Properties 122, LLC; ACC Properties 123, LLC; ACC Properties 130, LLC; ACC Properties 146, LLC; ACC Properties 154, LLC; ACC Properties 156, LLC; and ACC Properties Holdings, LLC.  On such date, Century-TCI Distribution Company, LLC; Parnassos Distribution Company I, LLC; and Parnassos Distribution Company II, LLC, also filed petitions.  Subsequently, on November 15, 2005, Palm Beach Group Cable, Inc. filed a petition for relief.  The RME Debtors filed petitions for relief on March 31, 2006.  (The date of the relevant chapter 11 filing for a particular Debtor shall be referred to herein as the "**Commencement Date**").  The Debtors' cases are being jointly administered pursuant to orders of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") dated June 26, 2002, October 11, 2005, November 16, 2005 and March 31, 2006.

3512096.2

management, they undertook a lengthy restatement of their historical books and records and a

review of intercompany transactions.  On February 25, 2004, the ACC/JV Debtors filed an initial

stand-alone plan of reorganization and related disclosure statement.

3.      In April of 2004, however, with significant input from the ACC/JV

Debtors' constituents, including the Creditors Committee and the Official Committee of Equity

Security Holders (the "**Equity Committee**"), the ACC/JV Debtors changed course and

announced their intention to proceed on a dual-track process and simultaneously pursue a sale of

the company as well as a stand-alone plan of reorganization.

4.      On April 20, 2005, ACC entered into definitive sale agreements (as

amended, the "**Purchase Agreements**") with Time Warner NY Cable LLC ("**Time Warner**")

and Comcast Corporation ("**Comcast**" and, together with Time Warner, the "**Buyers**") pursuant

to which the Buyers agreed to purchase substantially all of the ACC/JV Debtors' assets (the

"**Sale Transaction**") for approximately $12.7 billion in cash and a 16% interest in Time Warner

Cable, Inc. ("**TWC**"), for total consideration valued at such time at approximately $17.6 billion.

5.      On November 21, 2005, after several previous iterations of a plan of

reorganization had been filed with the Bankruptcy Court, the ACC/JV Debtors filed the Fourth

Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, which

provided for, among other things, the consummation of the Sale Transaction (the "**November**

**Plan**").  On November 23, 2005, the Bankruptcy Court entered an order (the "**Disclosure**

**Statement Order**"; Docket No. 8993) approving the disclosure statement related to the

November Plan (the "**Disclosure Statement**"; Docket No. 8973) as containing "adequate

information" in accordance with section 1125 of the Bankruptcy Code.

- 2 -

3512096.2

6.      Active creditor groups took issue with various aspects of the November

Plan — over 50 objections to the confirmation of the November Plan were filed, including

objections by all of the formal and *ad hoc* committees in these cases.  Further complicating

matters, a number of the objections asserted diametrically opposed positions, demonstrating a

lack of common ground among the ACC/JV Debtors' stakeholders.  As a result, in many cases,

the ACC/JV Debtors could not amend the November Plan to assuage the concerns of one

creditor faction without further alienating another.  Once the ACC/JV Debtors submitted the

November Plan to creditors for a vote, it became clear it was at risk of being rejected by one or

more classes of creditors.

7.      In light of these difficulties, in April of 2006, the ACC/JV Debtors sought

and obtained an order of the Bankruptcy Court (the "**April 6th Order**"; Docket No. 10359)

authorizing the ACC/JV Debtors to propose amendments to the November Plan to provide

certain creditors with a choice between (a) several potential settlements (each, a "**Potential

Settlement**") of the disputes among the ACC/JV Debtors' largest creditors (collectively, the

"**Inter-Creditor Dispute**"), or (b) a holdback of distributions pending the completion of the

judicially-supervised framework designed to resolve the Inter-Creditor Dispute (the "**Resolution

Process**").  The ACC/JV Debtors hoped that this approach would enable them to close the Sale

Transaction prior to the Outside Date and convince creditors to retreat from their previously

entrenched positions and forge a consensus.

8.      Thereafter, on April 28, 2006, the Bankruptcy Court entered an order (the

"**First Supplemental DS Order**"; Docket No. 10634) approving a supplement to the Disclosure

Statement (the "**First DS Supplement**"; Docket No. 10637) with respect to the ACC/JV

Debtors' Modified Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the

- 3 -

3512096.2

Bankruptcy Code, dated April 28, 2005 (the "**April Plan**"; Docket No. 10637).  The First DS

Supplement described the Potential Settlements embodied within the April Plan and contained

additional disclosure necessary to allow creditors and holders of Equity Interests to make an

informed voting judgment with respect to the April Plan.

9.    The April Plan did not enable the ACC/JV Debtors to realize their goal of

achieving consensus among divergent parties in interest.  Instead, the ACC Senior Noteholders

Committee (as defined below) declared the Potential Settlements "dead on arrival,"[4] and

announced (both publicly and privately) its intent to reject any version of the April Plan

embodying the Potential Settlements.

10.    As the Inter-Creditor Dispute progressed and the parties prepared for

litigation, there were several attempts to negotiate a settlement.  Settlement meetings began in

the Summer of 2005.  Meetings initially were sporadic and generally held with counsel for all

parties present.  See Schall Decl. ¶ 13.  In February 2006, the Bankruptcy Court directed the

parties to the Resolution Process to attend weekly, mandatory negotiation sessions:  one day per

week with lawyers and principals, and one day per week with principals only.

11.    As months of court-imposed settlement negotiations among the

participants in the Resolution Process did not yield an agreed-upon emergence strategy, the day

before the April Plan was filed, the Bankruptcy Court directed that the participants in the

Resolution Process submit to a monitoring process under the supervision of the Honorable Judge

---

[4]    See *Ad Hoc* Committee of ACC Senior Noteholders' Objection to Debtors' Proposed Supplement to
Disclosure Statement and Related Solicitation Materials and Procedures, at 1 (Docket No. 10545) ("The
members of the ACC Committee, who now hold over $2 billion of ACC Senior Notes and thereby firmly
control the largest class of creditors in these cases, unequivocally reject the Debtors' proposed package of
'settlements' and the 'settlement plan' option therefore is dead on arrival").

3512096.2

Cecelia Morris of the United States Bankruptcy Court for the Southern District of New York (the "**Monitor**").[5]

12.     Despite considerable efforts on the part of the Monitor, a settlement among the major parties did not materialize at that time, significant stakeholder opposition to a plan remained and implementation of the Sale Transaction prior to July 31, 2006 was at risk.

13.     Ultimately, with the agreement of the Buyers, the ACC/JV Debtors implemented the Sale Transaction through a combination of a sale pursuant to section 363 of the Bankruptcy Code for most of the Debtors' assets and a simplified plan for certain of the ACC/JV Debtors that were parties to joint ventures with Comcast (the "**JV Debtors**").  The ACC/JV Debtors pursued this approach with the same goal as the November Plan and the April Plan — closing the Sale Transaction prior to the Outside Date to lock in a substantial premium and maximize value for all stakeholders.  Accordingly, on May 26, 2006, the ACC/JV Debtors filed a motion (the "**363 Motion**"; Docket No. 11022) seeking authority to, among other things, (a) consummate the Sale Transaction for substantially all assets of the Debtors (i.e., excluding assets of the JV Debtors) pursuant to section 363 of the Bankruptcy Code, and (b) take certain steps necessary to consummate the sale of the Debtors' equity interests in the JV Debtors to Comcast pursuant to a simplified plan of reorganization.

14.     On June 6, 2006, the ACC/JV Debtors filed a modified plan of reorganization (as confirmed by the JV Confirmation Order, the "**JV Plan**"; Docket No. 11093) solely for the JV Debtors.  The JV Plan included certain changes to reflect, among other things, the revised Sale Transaction and certain clarifications.  In general, the JV Plan provides that all creditors of the JV Debtors will receive full payment, in Cash, of their Allowed Claims.

---

[5]     See April 27, 2006 Hr'g Tr., at 32.

3512096.2

15.    Prior to the hearing to consider confirmation of the JV Plan (the "**JV Confirmation Hearing**"), the ACC/JV Debtors entered into a stipulation with various parties that preserved the parties' rights in connection with the Inter-Creditor Dispute while also ensuring the ability of the JV Debtors to make all distributions required under the JV Plan.  On June 28, 2006, the Bankruptcy Court entered an order granting the 363 Motion (Docket No. 11500) and on June 29, 2006, the Bankruptcy Court entered the JV Confirmation Order (Docket No. 11524).  The Sale Transaction and the JV Plan were consummated on July 31, 2006.[6]

16.    During the period leading up to the consummation of the Sale Transaction and JV Plan, settlement negotiations continued among the active participants in the Inter-Creditor Dispute and significant progress was being made towards the achievement of consensus.  In this regard, on June 21, 2006, prior to the JV Confirmation Hearing, the Monitor issued a report that attached as an exhibit a term sheet styled as an Agreement Concerning Terms and Conditions of a Modified Chapter 11 Plan (the "**Original Term Sheet**") that had been executed by many (although not all) of the creditor parties to the negotiations directed by the Bankruptcy Court.  See Docket No. 11384.  The Original Term Sheet was executed by W.R. Huff Asset Management Co., L.L.C. ("**Huff**"), Huff's counsel, certain members of the *Ad Hoc* Committee of Arahova Noteholders (the "**Arahova Noteholders Committee**"), counsel to the Arahova Noteholders Committee, certain members of the *Ad Hoc* Committee of Arahova Noteholders and ACC Senior Noteholders ("**Committee II**"), counsel to Committee II, certain

---

[6]    See ACC's Form 10-Q for the quarter ended June 30, 2006, at 2.

3512096.2

members of the *Ad Hoc* Committee of FrontierVision Noteholders (the "**FV Noteholders**

**Committee**"), and counsel to the FV Noteholders Committee.[7]

17.    Following execution of the Original Term Sheet, members and/or

representatives of the Creditors Committee, the Olympus Parent Noteholders, the FPL

Noteholders, and the Subsidiary Trade Committee participated in discussions with the Monitor

and/or the creditor parties to the Original Term Sheet in an effort to reach further consensus.

Thereafter, on June 29, 2006, certain members of the ACC Senior Noteholders Committee (i.e.,

Tudor and Highfields), and the Subsidiary Trade Committee agreed to the terms of an amended

plan term sheet (styled as the Amended and Restated Agreement Concerning Terms and

Conditions of a Modified Chapter 11 Plan) and agreed to recommend support of the terms set

forth therein to their constituents.  See Schall Decl. ¶ 24.  A modified term sheet was executed by

the Original Term Sheet parties and these additional creditor parties on July 7, 2006.  See Schall

Decl. ¶ 25.

18.    On July 6, 2006, the Bankruptcy Court held a conference to discuss,

among other things, the plan term sheet and the process, negotiations and discussions leading to

its execution.  See July 6, 2006 Hr'g Tr., Docket No. 11870.  At that conference, the Debtors

indicated that while they were encouraged by and supportive of the attempts to achieve

compromise, certain changes would be necessary before they would be in a position to support or

execute the term sheet.  Id. at 121-123.  The Debtors also indicated that they believed further

---

[7]    The Original Term Sheet was not executed by any member of or counsel for the *ad hoc* committees of (a)
ACC senior noteholders (the "**ACC Senior Noteholders Committee**"), (b) Olympus Parent noteholders
(the "**Olympus Noteholders Committee**"), (c) FPL noteholders (the "**FPL Noteholders Committee**"), or
(d) representatives of holders of trade claims against the Subsidiary Debtors (the "**Subsidiary Trade
Committee**") or holding company Debtors (the "**Parent Trade Committee**"). In addition, neither the
Administrative Agents, Bank Lenders, Debtors, nor the Creditors Committee executed the Original Term
Sheet.

3512096.2

discussions were needed to determine if additional plan consensus could be achieved.  Id. at 126-128.  Recognizing the tremendous consensus among unsecured creditor parties across the capital structure, at that conference, the Creditors Committee stated it was supportive of the Original Term Sheet.  Id. at 19.

19.    Approximately two weeks later, on July 21, 2006, following discussions and negotiations with various parties, the Debtors and the Creditors Committee signed a further amended version of the plan term sheet, which was styled as the Second Amended and Restated Agreement Concerning Terms and Conditions of a Modified Chapter 11 Plan (the "**Amended Term Sheet**").  A copy of the Amended Term Sheet was publicly filed with the SEC on July 24, 2006.  See Form 8-K of Adelphia Communications Corporation, dated July 24, 2006.   The Amended Term Sheet was the product of arm's length negotiations among sophisticated parties and their counsel, including Tudor and Highfields (together, the "**Initial ACC Settling Parties**"), who executed the Amended Term Sheet in their individual capacities,[8] and were the only designated members of the ACC Senior Noteholders Committee to have attended all of the negotiation sessions.[9]

---

[8]    The Initial ACC Settling Parties are also members of the Creditors Committee, and supported that body's decision to enter into the Amended Term Sheet and to co-propose the Plan.  See Second Disclosure Statement Supplement, at DSS2-101.

[9]    Tudor and Highfields' economic interests in these cases are fully aligned with the creditors of ACC.  As set forth in the Statement of Highfields Capital Management and Tudor Investment Corporation (1) In Support of Second Supplemental Disclosure Statement and Joint Motion of Debtors and Creditors Committee Seeking Approval Thereof and (2) In Opposition to Motion of Senior Noteholders to Terminate Exclusivity Pursuant to Section 1121(d) of the Bankruptcy Code filed by Brian W. Harvey on behalf of Tudor Investment Corporation, Highfields Capital Management, dated September 8, 2006 (Docket No. 11959) ¶ 2, "Neither Highfields nor Tudor hold any bonds or debentures in any estate other than ACC, and neither Highfields nor Tudor holds any "short" position in any debt or other securities of either ACC or of any other estate."  Such parties executed both the Amended Term Sheet and the Plan Support Agreement.  See Schall Decl. ¶ 25.

- 8 -

3512096.2

20.     After the execution of the Amended Term Sheet, on September 11, 2006, the Debtors, the Creditors Committee, and the Bank Proponents, announced the terms of a settlement which, if implemented, would fully and finally resolve numerous issues relating to the treatment afforded Bank Claims under the Plan.  See Sept. 11, 2006 Hr'g Tr., at 12-13.  This compromise, which was reached only after extensive and significant negotiations between and among the Movants and the Banks, including the Agent Banks, results in a different treatment of the Bank Claims under the Plan than originally contemplated in the Amended Term Sheet.  See Second Disclosure Statement Supplement, at DSS2-13.  On that date, agreements in principle with the FPL Noteholders Committee and the Olympus Noteholders Committee concerning the terms of consensual plan treatment were also announced.  See Sept. 11, 2006 Hr'g Tr., at 21.

21.     The parties that initially supported the Plan therefore continued to seek to broaden consensus among other previously warring creditors.  To that end, after additional rounds of discussions, on October 11, 2006, an agreement (the "**Plan Support Agreement**") was reached on the terms of a global compromise that is now embedded in the Plan.[10]  The Plan Support Agreement was executed by the Proponents, Committee II, Huff, the Arahova Noteholders Committee, Appaloosa Management LP, Deutsche Bank Securities, Inc., the Initial ACC Settling Parties and the Additional ACC Settling Parties.[11]  Among other terms, the Plan Support Agreement generally provides that at least approximately $1.08 billion in value will be transferred from certain unsecured creditors of various Subsidiary Debtors to certain unsecured

---

[10]     A copy of the Plan Support Agreement is annexed to the Second Disclosure Statement Supplement as Exhibit JJ.

[11]     The Additional ACC Settling Parties are comprised of OZ Management, L.L.C., C.P. Management, LLC and Satellite Asset Management, L.P., who also are members and/or affiliates of members of the ACC Senior Noteholders Committee.  See Amended Verified Statement Pursuant to Bankruptcy Rule 2019 of Hennigan, Bennett & Dorman, LLP, dated April 25, 2006 (Docket No. 10568).

- 9 -

3512096.2

senior, trade and other unsecured creditors of the ACC Debtors, subject, in some cases, to

repayment from contingent sources of value, including the proceeds of a litigation trust to be

established under the Plan to pursue certain of the Estates' claims against third-parties (the

"**CVV**").  Indeed, because the ACC Senior Notes Claims Class has voted to accept the Plan, the

$1.08 billion in value has been increased by $50 million in accordance with the Plan to $1.13

billion (the "**ACC Effective Date Settlement Distribution**").[12]

        22.     On August 18, 2006, the Movants filed the first version of the current

iteration of the Plan (Docket No. 11832), which reflected the understanding reached in the

Amended Term Sheet, and the disclosure statement related thereto (the "**Second Disclosure**

**Statement Supplement**").  Thereafter, subsequent iterations of these documents, reflecting the

additional agreements reached and the added disclosure requirements from the disclosure

approval process, were filed.[13]  On October 17, 2006, the Bankruptcy Court entered an order (the

"**Second Supplemental DS Order**"; Docket No. 12202) approving the Second Disclosure

Statement Supplement as containing "adequate information" in accordance with section 1125 of

the Bankruptcy Code.

        23.     Having now successfully completed the solicitation process, the Movants

submit this Confirmation Brief in support of confirmation of the Plan and in response to the

outstanding objections.  Section I hereof addresses certain issues in connection with the Global

---

[12]    In addition to increasing the ACC Effective Date Settlement Distribution to $1.13 billion, because the ACC Senior Notes Claims Class has voted to accept the Plan, the Deemed Value has increased from $5.1 to $5.4 billion and the allocations of CVV Distributions in excess of $1.165 billion will be changed to increase the percentage allocated to CVV Series ACC-1, ACC-2, and ACC-3.  See Plan, § 5.1(c)(ii)(A).

[13]    Revised versions of the Plan and/or the Second Disclosure Statement Supplement were filed on August 18, 2006 (Docket No. 11832), September 18, 2006 (Docket No. 12024), October 11, 2006 (Docket No. 12163), and  October 12, 2006 (Docket No. 12173).  Following the hearing to consider approval of the Second Disclosure Statement Supplement, on October 16, 2006, further revised versions of the Plan and the Second Disclosure Statement Supplement were filed with the Bankruptcy Court (Docket No. 12198).

3512096.2

Settlement, Sections II and III detail the Plan's compliance with the general confirmation

requirements under section 1129 of the Bankruptcy Code, Section IV addresses the post-

Effective Date provisions in the Plan, Section V discusses objections to confirmation of the Plan,

to the extent not addressed in the preceding sections, and Section VI sets forth the standards for

approving plan modifications under section 1127 of the Bankruptcy Code.  Responses to the

objections to the Plan and certain proposed Plan modifications, to the extent not addressed

herein, are set forth on <u>Exhibit B</u> annexed hereto.  Furthermore, in support of confirmation of the

Plan and/or approval of the Global Settlement, the Movants also have submitted the 9019

Addendum (as defined below), and the declarations of Vanessa Wittman (the "**Wittman**

**Declaration**"), Daniel Aronson (the "**Aronson Declaration**"), Thomas J. Kuhn (the "**Kuhn**

**Declaration**"), Angharad Bowdler, Jane Sullivan, and Brian P. Guiney (collectively, the "**Voting**

**Certification**"; Docket Nos. 12624, 12625, and 12626); Darryl Schall (the "**Schall**

**Declaration**"); and Brad Robins (the "**Robins Declaration**").  The Wittman Declaration, the

Aronson Declaration, the Kuhn Declaration, the Schall Declaration, and the Robins Declaration

are being filed contemporaneously.

24.    As set forth in the Voting Certification, the Plan has been overwhelmingly

accepted by holders of Claims and Equity Interests throughout the Debtors' capital structure,

including those at ACC, where every single Class (creditors and shareholders alike) voted to

accept the Plan.  As evidenced by the summary below, there is tremendous noteholder and

shareholder support for the Plan and Global Settlement:

3512096.2

| **ACC Securities** | **Acceptances** | **Rejections** |
|---|---|---|
| ACC Senior Notes[14] | 71.84% ($3,097,479,154) in dollar<br>72.99% (727) in number | 28.16% ($1,214,146,917) in dollar<br>27.01% (269) in number |
| ACC Subordinated Notes | 76.65% ($564,449,865) in dollar<br>70.97% (110) in number | 23.35% ($171,940,000) in dollar<br>29.03% (45) in number |
| ACC Preferred Stock Interests | 93.52% (18,777,867) of shares | 6.48% ($1,301,038) of shares |
| ACC Common Stock Interests | 91.17% (47,360,327) of shares | 8.83% ($4,585,438) of shares |
| **Subsidiary Debtor Securities** | | |
| Arahova Notes | 99.38% ($1,748,704,671) in dollar<br>96.48% (329) in number | 0.62% ($10,898,000) in dollar<br>3.52% (12) in number |
| FPL Note Claims | 100$ ($108,000,000) in dollar<br>100% (1) in number | No rejections |
| FrontierVision Holdco Notes | 63.86% ($147,012,624) in dollar[15]<br>81.82% (54) in number | 36.14% ($83,208,000) in amount<br>18.18% (12) in number |
| FrontierVision Opco Notes | 99.89% ($142,077,000) in dollar<br>97.96% (48) in number | 0.11% ($155,000) in dollar<br>2.04% in (1) in number |
| Olympus Notes | 96.99% ($187,357,500) in dollar<br>96.67% (29) in number | 3.01% ($5,812,500) in dollar<br>3.33% (1) in number |

25.    As summarized below, the Plan also has been overwhelmingly accepted by holders of Trade Claims against both the ACC Debtors and the Subsidiary Debtors:

---

[14]    Tellingly, assuming that the $1.120 billion in ACC Senior Notes held by members of the ACC Bondholder Group (see Fourth Supplemental Verified Statement of Weil, Gotshal & Manges LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019, docket no. 12182) voted to reject the Plan, **over 97%** of all other holders of ACC Senior Notes who submitted timely and properly completed ballots voted to accept the Plan and Global Settlement.

[15]    Although over 81% of the holders of claims in Class SD 8 (FrontierVision Holdco Notes) voted to accept the Plan for purposes of numerosity, acceptance at that Class fell just short in terms of dollar amount (63.86%). The Debtors and the Creditors Committee have been in discussions with the FrontierVision Noteholders Committee with respect to this issue, and expect to announce the status of those discussions at the Confirmation Hearing.

3512096.2

| ACC Debtors | Acceptances | Rejections |
|---|---|---|
| ACC Trade Claims | 99.88% ($218,462,838.55) in dollar<br>98.00% (98) in number | 0.12% ($257,872.42) in dollar<br>2.00% (2) in number |
| ACC Other Unsecured Claims | 99.04% ($46,384,795.48) in dollar<br>81.82% (9) in number | 0.96% ($450,001.00) in dollar<br>18.18% (2) in number |
| **Subsidiary Debtors** | | |
| Subsidiary Debtor Trade Claims | 99.97% ($308,322,338.44) in dollar<br>99.57% (1,626) in number | 0.03% ($78,662.51) in dollar<br>0.43% (7) in number |
| Subsidiary Debtor Other Unsecured Claims | 99.99% (74,816,672.40) in dollar<br>96.77% (30) in number | 0.01% ($5,058.56) in dollar<br>3.23% (1) in number |

26.    Significantly, as reflected below, the Plan also has garnered substantial support from the holders of Bank Claims:

| Bank Classes | Acceptances | Rejections |
|---|---|---|
| SD 3CA (Century Admin) | N/A[16] | N/A |
| SD 3CN (Century Non-Admin) | 82.42% ($320,215,718.85) in dollar<br>80.00% (12) in number | 17.58% ($68,311,428.22) in dollar<br>20.00% (3) in number |
| SD 3CS (Century Syndicate) | 30.42% ($505,413,808.53) in dollar<br>20.54% (38) in number | 69.58% ($1,155,770,539.57) in dollar<br>79.46% (147) in number |
| SD 3CWach (Century Wachovia) | 100% ($1.00) in dollar<br>100% (1) in number | No rejections |
| SD 3CBMO (Century BMO) | 100% ($1.00) in dollar<br>100% (1) in number | No rejections |
| SD 3OA (Olympus Admin) | 100% ($60,750,000.00) in dollar<br>100% (1) in number | No rejections |
| SD 3ON (Olympus Non-Admin) | 81.90% ($192,250,003.00) in dollar<br>80.00% (8) in number | 18.10% ($42,500,00.00) in dollar<br>20.00% (2) in number |
| SD 3OS (Olympus Syndicate) | 15.80% ($127,103,685.91) in dollar<br>9.00% (9) in number | 84.20% ($677,103,037.21) in dollar<br>91.00% (91) in number |

---

[16]    Bank of America, N.A. ("**BOFA**"), the holder of claims in the Century Bank Administrative Agent Class, was given an extension until Monday, December 4, 2006 to vote on the Plan with respect to all of its Claims. As described below, BOFA has voted its Claims to accept the Plan as a result of certain modifications to the Plan that have been agreed to by the Proponents, and such votes will be reflected in an updated Voting Certification. The Proponents will request that the Bankruptcy Court approve these and other proposed modifications to the Plan, pursuant and subject to section 1127 of the Bankruptcy Code, at the Confirmation Hearing.

3512096.2

| | | |
|---|---|---|
| SD 3OWach (Olympus Wachovia) | 100% ($1.00) in dollar<br>100% (1) in number | No rejections |
| SD 3OBOFA (Olympus BOFA) | N/A | N/A |
| SD 3 (FV) | 71.19% ($337,101,186.00) in dollar<br>63.16% (36) in number | 28.81% ($136,401,987.00) in dollar<br>36.84% (21) in number |
| SD 3UA (UCA Admin) | 100% ($22,285,000.00) in dollar<br>100% (1) in number | No rejections |
| SD 3UN (UCA Non-Admin) | 83.89% ($177,609,377.00) in dollar<br>84.62% (11) in number | 16.11% ($34,100,000.00) in dollar<br>15.38% (2) in number |
| SD 3US (UCA Syndicate) | 34.62% ($165,924,433.00) in dollar<br>17.39% (8) in number | 65.38% ($313,369,208.00) in dollar<br>82.61% (38) in number |
| SD 3UBMO (UCA BMO) | 100% ($32,010,000.00) in dollar<br>100% (1) in number | No rejections |
| SD 3UBOFA (UCA BOFA) | N/A | N/A |

27.     Although holders of Bank Claims in the three co-borrowing Bank Syndicate Claims Classes have voted to reject the Plan, the Creditors Committee is in the midst of discussions with representatives of the *ad hoc* committee of non-agent lenders (the "**Non-Agent Lender Committee**"), whose members make up the majority of the Bank Syndicate Lenders Classes, in an effort to reach consensus over Plan terms.  (In the event any such agreement is not reached or approved by the Bankruptcy Court, the Creditors Committee reserves its rights to oppose the Non-Agent Committee's objections and establish that the Plan complies with the requirements of the Bankruptcy Code.)  Moreover, the Creditors Committee has reached an agreement with BOFA, the administrative agent for the Century bank facility, regarding its Plan treatment that has resulted in its acceptance of the Plan and, accordingly, the acceptance of the Plan by the Century Bank Administrative Agent Claims Class.

28.     It is clear that the vast majority of stakeholders have delivered their mandate to the Proponents:  proceed to confirmation with all deliberate speed, and brook no

3512096.2

opposition along the way.  To this end, and as set forth below, the Plan satisfies each of the

requirements for confirmation set forth in section 1129 of the Bankruptcy Code and other

applicable provisions of the Bankruptcy Code.  In particular, the Plan has been proposed in good

faith, is feasible, serves the best interests of the Debtors' creditors, and is fair and equitable.

Although a small subset of the Debtors' creditors oppose the Plan and/or certain of its provisions,

given the tumultuous history of these cases this was inevitable, and the Movants believe that the

Plan represents the best outcome for all of the Debtors' creditors.  Moreover, notwithstanding the

multiple collateral attacks launched on the Global Settlement by a vocal minority, if such parties'

true goal is to receive maximum recoveries in the near term (rather than delay the process to

exact more leverage), it is beyond rational dispute that the proposed resolution of the Inter-

Creditor Dispute (the "**Global Settlement**") is a far superior means of achieving that goal than

any other alternative.  Accordingly, the Global Settlement should be approved and the Plan

should be confirmed by the Bankruptcy Court.

## **ARGUMENT**

I.      APPROVAL OF GLOBAL SETTLEMENT
        PURSUANT TO BANKRUPTCY RULE 9019

        29.    Contemporaneously herewith, the Debtors and the Creditors Committee

are filing an addendum (the "**9019 Addendum**") to this Confirmation Brief establishing why the

Global Settlement satisfies the standards for the approval of compromises in chapter 11 and

should be approved by the Bankruptcy Court.  The 9019 Addendum is hereby incorporated

herein by reference.

II.     THE PLAN COMPLIES WITH THE CONFIRMATION STANDARDS
        SET FORTH IN SECTION 1129(a) OF THE BANKRUPTCY CODE.

        30.    Section 1129 of the Bankruptcy Code governs confirmation of a plan of

reorganization and sets forth the requirements that must be satisfied in order for a plan to be

- 15 -

3512096.2

confirmed.  Pursuant to section 1129(a) of the Bankruptcy Code, a bankruptcy court shall

confirm a plan of reorganization only if all of the following requirements are met:

(a)     The plan complies with the applicable provisions of title 11 (section 1129(a)(1));

(b)     The proponent of the plan complies with the applicable provisions of title 11 (section 1129(a)(2));

(c)     The plan has been proposed in good faith and not by any means forbidden by law (section 1129(a)(3));

(d)     Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable (section 1129(a)(4));

(e)     The proponent of the plan has (i)(A) disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and (B) the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy; and (ii) the proponent has disclosed the identity of any insider that will be employed or retained by the reorganized debtor and the nature of any compensation for such insider (section 1129(a)(5));

(f)     To the extent that the debtor is subject to the jurisdiction of any regulatory commission, any rate change provided for in the plan has been approved by, or is subject to the approval of, such regulatory commission (section 1129(a)(6));

(g)     With respect to each impaired class of claims or interests, each holder of a claim or interest of such class has either accepted the plan or will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date (section 1129(a)(7));

(h)     Each class of claims or interests has either accepted the plan or is not impaired under the plan (section 1129(a)(8));

- 16 -

3512096.2

    (i)      The treatment of administrative expense and priority claims under the plan complies with the provisions of section 1129(a)(9);

    (j)      If a class of claims is impaired under the plan, at least one impaired class of claims has accepted the plan, determined without including the acceptances by any insiders holding claims in such class (section 1129(a)(10));

    (k)      Confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor or any successor to the debtor, unless such liquidation or reorganization is proposed in the plan (section 1129(a)(11));

    (l)      The plan provides for payment on the effective date of all fees payable under 28 U.S.C. § 1930 (section 1129(a)(12)); and

    (m)    The plan provides, if applicable, for the continued payment of certain retiree benefits for the duration of the period that the debtor has obligated itself to provide such benefits (section 1129(a)(13)).

11 U.S.C. § 1129(a).

        31.     As demonstrated herein, the Plan satisfies each of these requirements, with the possible exception of section 1129(a)(8) of the Bankruptcy Code. As set forth above, although the members of the Century Bank Syndicate Claims Class, the UCA Bank Syndicate Claims Class and the Olympus Bank Syndicate Claims Classes (the "**Bank Syndicate Lenders Classes**") have voted to reject the Plan, the Creditors Committee is in ongoing discussions with the Non-Agent Lender Committee and is hopeful that an agreement can be reached that will be accepted by the Bank Syndicate Lenders Classes and approved by the Bankruptcy Court. Moreover, although the FrontierVision Holdco Notes Claims Class (collectively with the Bank Syndicate Lenders Classes, the "**Rejecting Classes**") presently is voting to reject the Plan, the Debtors and the Creditors Committee are engaged in discussions with counsel to the FrontierVision Noteholders Committee, who did not object to confirmation of the Plan, to determine what changes (if any) are necessary to secure the acceptance of that Class. Thus, although there presently exist Rejecting Classes and the requirements of section 1129(a)(8)

- 17 -

3512096.2

therefore presently are not satisfied with respect to such Classes, the Debtors and the Creditors

Committee are hopeful that they will be able to resolve these issues prior to the conclusion of the

Confirmation Hearing.  Nevertheless, in the event one or more of these Classes does not vote to

accept the Plan, the Plan still may be confirmed because it satisfies the requirements of section

1129(b) of the Bankruptcy Code.  If necessary, the Movants therefore reserve the right to seek to

invoke the cramdown provisions of section 1129(b) of the Bankruptcy Code with respect to the

Rejecting Classes.

> A.    The Plan Satisfies The Requirements Of Section 1129(a)(1)
>        Because The Plan Complies With The Applicable Provisions
>        Of The Bankruptcy Code, Including Sections 1122 And 1123.
>
> > i.    The Plan Satisfies The Classification Requirements
> >        Of Section 1122 Because The Claims Or
> >        Interests Of Each Class Are Substantially Similar
> >        To The Other Claims Or Interests Of Such Class.

32.    Certain parties, including BOFA (As Administrative Agent Objection, ¶¶

29-31; As Holder of Bank Claims, ¶¶ 44-47), the Calyon Parties (Objection, at pp. 9-21), and the

Non-Agent Lender Committee (Objection, at pp. 31-33), have objected to the Plan's

classification scheme, suggesting that substantially similar claims are classified separately for

what they allege to be no reasonable purpose, but rather to engineer accepting Classes.  For the

reasons set forth below, these allegations of "gerrymandering" are without merit and such

objections should be overruled.

33.    When considering assertions of gerrymandering, courts in the Second

Circuit have inquired whether a plan proponent has classified substantially similar claims in

separate classes for the sole purpose of obtaining at least one impaired assenting class.  See

Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship), 21 F.3d 477, 483 (2d

Cir. 1994) ("separate classification of unsecured claims solely to create an impaired assenting

- 18 -

3512096.2

class will not be permitted"); <u>WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship)</u>, 227 B.R. 445, 449 (S.D.N.Y. 1998) (same); <u>Troy Sav. Bank v. Travelers Motor Inn, Inc.</u>, 215 B.R. 485, 490 (N.D.N.Y. 1997) (same).[17]  Claims and Equity Interests were not classified separately by the Proponents "solely to create an impaired assenting class," as prohibited by <u>Boston Post Rd.</u>; rather, the Plan's classification structure was created with a view towards recognizing and respecting legal rights and obligations, and maximizing and protecting value for all creditors of each of the Debtors.  Accordingly, the dissenters' allegations of gerrymandering should be rejected.

(a)    The Plan's Classification Of Notes, Trade And Other
Unsecured Claims Has A Legitimate Purpose.

34.    The classification structure in the Plan is based on the requirement that the Proponents recognize the similar legal character of the Claims and Equity Interests grouped together, and the different legal character of those Claims and Equity Interests that are classified separately.[18]  For example, Notes Claims are classified separately from Trade Claims and Other Unsecured Claims because the amount of each Note Claim is fixed, and does not require the establishment of reserves.  <u>See</u> Wittman Decl. ¶ 41.  The Proponents possess an equally

---

[17]    The Second Circuit's choice of language in <u>Boston Post Rd.</u> is noteworthy.  Perhaps recognizing that one of the primary goals of any plan proponent is necessarily to secure an impaired assenting class, the Second Circuit prohibited separate classification *solely* for the purposes of creating an impaired assenting class.  <u>Boston Post Rd.</u>, 21 F.3d at 483.  The Second Circuit's decision in <u>Boston Post Rd.</u> suggests that a plan proponent may classify claims in a manner reasonably calculated to secure an impaired assenting class, so long as the proponent has a legitimate business reason for such classification – which, as set forth below, the Proponents undoubtedly possess.

[18]    It should be noted that some courts have recognized that while different claims may not be classified together, there is no prohibition in the Bankruptcy Code of classifying substantially similar claims in different classes.  <u>See</u> <u>In re ZRM-Oklahoma P'ship</u>, 156 B.R. 67, 70 (Bankr. W.D. Okla. 1993) ("[The code] prohibits single classification of dissimilar claims. The plain language of this statute does not alone support any other restriction.");  <u>In re AG Consultants Grain Div.</u>, 77 B.R. 665, 674 (Bankr. N.D. Ind. 1987) ("We find no ambiguity in 11 U.S.C. § 1122. Section 1122 allows a claim or interest to be placed in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. It does not require that similar classes be grouped together but merely that any group be homogenous.").

3512096.2

objective basis for the separate classification of Trade Claims and Other Unsecured Claims.  See id.  The Trade Claims are generally liquidated Claims, as opposed to the Other Unsecured Claims, which are primarily unliquidated litigation and rejection damage Claims.  See id.  While Classes containing both types of Claims require reserves, the reserves for the Other Unsecured Claims may be subject to significant fluctuation based on the outcome of certain litigations.  See id.  Classifying Trade Claims apart from Other Unsecured Claims insulates the former against the risk that the reserves for the latter are not capable of precise estimation.[19]  See id.  Such motivation is a legitimate reason for the classification structure embodied in the Plan, and demonstrates that the classification structure was not established solely (if at all) to gerrymander an impaired assenting class.  Accordingly, the Plan complies with section 1122 of the Bankruptcy Code and relevant Second Circuit case law.

ii.     The Plan's Classification Of Bank
        Claims Is Permissible And Appropriate.

35.     The classification of the Bank Claims is not only permissible, it is essential.  The Plan separates the holders of Bank Claims under the Co-Borrowing Credit Agreements into one of three primary Classes, depending upon the Bank Lender's role under the applicable Co-Borrowing Credit Agreement:

---

[19]     In the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated February 25, 2004 (the "**February 2004 Plan**"), Trade Claims and Other Unsecured Claims were classified together under the collective heading of "General Unsecured Claims."  Subsequent to the filing of the February 2004 Plan, however, the Subsidiary Trade Committee requested that the Debtors classify Trade Claims separately from Other Unsecured Claims.  This request was made long before the current iteration of the Plan was filed, and before the Proponents had any idea of how particular creditors might vote on the Plan.  In fact, the separate classification of Notes, Trade and Other Unsecured Claims has been a feature of every proposed plan for the ACC/JV Debtors that has been filed with the Bankruptcy Court since the February 2004 Plan was filed over two and a half years ago.  It cannot seriously be alleged that the Subsidiary Trade Committee's request, nor the Proponents' responsiveness to it, was motivated by a desire to gerrymander this Plan's Classes.  Moreover, the fact that those prior plans (except for the JV Plan) were vigorously opposed, while the current Plan is greatly supported, with the exact same classification structure for Notes, Trade and Other Unsecured Claims further buttresses the Proponents' claim that the structure was not created to gerrymander accepting Classes.

- 20 -

3512096.2

(a)    The Administrative Agent Claims Classes consist of the Administrative
       Agents under the Century Credit Agreement, the Olympus Credit
       Agreement and the UCA Credit Agreement, see Plan, §§ 3.3(c)(i)(A),
       3.3(c)(iii)(A), and 3.3(c)(iv)(A));[20]

(b)    The Non-Administrative Agent Claims Classes consist of the Non-
       Administrative Agents with respect to any of the Co-Borrowing Credit
       Agreements, see Plan, §§ 3.3(c)(i)(B), 3.3(c)(iii)(B), and 3.3(c)(iv)(B));
       and

(c)    The Syndicate Claims Classes consist of Non-Administrative Agents with
       respect to the Co-Borrowing Credit Agreements (i.e., Bank Lenders who
       are not Non-Administrative Agents with respect to any of the Co-
       Borrowing Credit Agreements), see Plan, §§ 3.3(c)(i)(C), 3.3(c)(iii)(C),
       and 3.3(c)(iv)(C)).

36.    The parties who claim that certain Bank Claims should not be classified
separately from each other because they have similar contractual rights to payment and collateral
have failed to observe that there are not less than four vast differences that actually require
separate classification of the Claims held by the Administrative Agent Claims, the Non-
Administrative Agent Claims and holders of the Bank Syndicate Claims ("**Syndicate Lenders**")
related to each of the Prepetition Credit Agreements.

37.    The first distinction is the respective roles the different tiers of Banks have
assumed, or have been required to assume by their credit documents, in representing the interests
of the Bank Claims.  The Court can easily observe from the record in these proceedings that the
Administrative Agents have assumed the laboring oars on behalf of all the Bank Lenders.  They
can accordingly be expected to accrue substantially greater legal and defense costs, and the past
four years of history has demonstrated that this has been precisely what has occurred.  Thus, as

---

[20]    The Administrative Agents are also separately classified as to the Co-Borrowing Credit Agreements under
which they do not serve as Administrative Agents.  See, e.g., Plan § 3.3(c)(i)(D), (E).  This classification
was designed to make clear that the Administrative Agents may use the funds in their respective LIFs to
defend against Bank Actions brought against them in any capacity, under any of the Co-Borrowing Credit
Agreements.

3512096.2

discussed in the Estimation Motion, the Administrative Agents have greater indemnification

claims against the Debtors (subject to the results of the Bank Litigation) than do the Non-

Administrative Agents and Syndicate Lenders.  Likewise, the Non-Administrative Agents who

have greater contractual responsibilities and are fewer in number than the hundreds of Syndicate

Lenders can reasonably be expected to play, as they already have, a somewhat greater role than

the Syndicate Lenders, but also not the lead role that the Administrative Agents plan.

38.    Thus, the Plan separately classifies the Administrative Agents, Non-

Administrative Agents and Syndicate Lenders separately in order to provide them with LIF

allocations that are appropriate to their respective roles in these cases.

The Administrative Agents.  Each of the Administrative Agents receives a LIF in the amount of $21 million, for an aggregate Administrative Agents' LIF of $63 million.  See Plan § 5.2(c)(iii)(B).  The Administrative Agents' LIFs will be funded by a $20 million contribution from the Non-Administrative Agents in Accepting Classes and a $43 million contribution from the Estates.  In addition, each Administrative Agent in an Accepting Class agrees not to withhold Plan distributions from Bank Lenders in any Accepting Class of Bank Claims, despite the rights claimed by the Administrative Agents under the Co-Borrowing Credit Agreements to "latch-on" to the Bank Lenders' distributions.  In addition, in exchange for the Non-Agent Banks' partial funding of the Administrative Agents' LIFs, each Administrative Agent in an Accepting Class agrees to release the Non-Agent Banks in any Accepting Class of Bank Claims from any further obligation under the Co-Borrowing Credit Agreements to reimburse and indemnify the Administrative Agents in respect of legal fees in excess of the amounts in the their LIFs (the "**Bank Fee Release**").  See Plan, § 5.2(c)(ii)(C).

The Non-Administrative Agents.  The three Non-Administrative Agent Classes under the Co-Borrowing Credit Agreements will receive a LIF aggregating $12 million, if each Non-Administrative Agent Class is an Accepting Class (e.g., if only two of the three Non-Administrative Agent Classes accept the Plan, then the NAG LIF will total $8 million).  See Plan, § 5.2(c)(iii)(B).  The Non-Administrative Agents will not make any contribution to the Administrative Agents' LIFs, but they will also not be the beneficiaries of the Bank Fee Release. In other words, if the Administrative Agents' LIFs are not sufficient to cover their post-Effective Date legal fees, then the Administrative Agents can enforce the fee reimbursement and indemnification provisions of the Co-Borrowing Credit Agreements to collect any such excess amount from the Non-Administrative Agents.

- 22 -

3512096.2

The Non-Agent Banks.  The three Classes of Non-Agent Banks under the Co-Borrowing Credit Agreements will receive an aggregate LIF of $3 million, if each Class of Non-Agent Banks votes to accept the Plan (e.g., if two out of the three Classes of Non-Agent Banks vote to accept the Plan, the Non-Agent Banks' LIF will total $2 million).  See Plan, § 5.2(c)(iii)(B).  The Non-Agent Banks in Accepting Classes are required to contribute their *pro rata* share of $20 million towards the Administrative Agents' LIF.  In exchange for this up-front contribution, the Non-Agent Banks are granted a Bank Fee Release.  The Bank Fee Release was a very important point to the Non-Agent Banks, and the result of the release is that if the Administrative Agents' post-Effective Date legal fees exceed $63 million, the Administrative Agents will not be able to seek reimbursement of such excess amounts from the Non-Agent Banks.

39.    Even the Banks' own putative fee expert, James W. Quinn of Weil, Gotchal & Manges LLP, estimated that the Agents' aggregate legal expenses would be approximately six times higher than the Syndicate Lenders' aggregate expenses, although the latter group has many more members than the former.  Were all of these Claims classified together, even on a Debtor-by-Debtor basis, the Proponents would have to make the Hobson's Choice between providing them all with identical LIF rights, which would not be consistent with the real value of their differing rights and roles, or attempt to allocate LIF shares disparately to creditors in a single class, which may violate section 1123(a)(4) of the Bankruptcy Code.[21]

40.    Second, and relatedly, the Banks have different rights vis-à-vis each other with respect to the Prepetition Credit Agreements, the Debtors and the Bank Litigation:  the Administrative Agents have rights of indemnification against the Syndicate Lenders.  See e.g., Century Credit Agreement § 11.12 (cost indemnification and liability indemnification).  The

---

[21]    Section 1123(a)(4) of the Bankruptcy Code provides that:

(a)    Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall —

(4)    provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

11 U.S.C. § 1123(a)(4).

- 23 -

3512096.2

Non-Administrative Agents are expected to assert tens of millions of dollars in Pre-Effective

Date indemnification Claims, whereas the Syndicate Lenders do not have such rights.   For

example, BOFA has asserted that "the cost-indemnification obligations are critical because the

Century Lenders have incurred, and likely will continue to incur, multiple millions of dollars in

fees and expenses to defend against the Bank Actions."  BOFA (As Administrative Agent)

Objection, ¶ 8(c).  Given that the Banks have alleged Claims for more than $200 million of fees

in these case, and the claims asserted in the Bank Litigation exceed $5 billion, Bank Claims that

include rights of inter-Bank Lender indemnity are materially distinct from those that do not have

such rights.

41.      Third, the Administrative Agents', Non-Administrative Agents' and

Syndicate Lenders' Claims are distinct from each other on the basis of the degree to which their

Claims are infected by the allegations of prepetition misconduct contained in the Bank Lender

Avoidance Complaint (among other places).  On one hand, the Syndicate Lenders do not forego

any opportunity to point out that the Creditors Committee has not alleged any misconduct by the

Syndicate Lenders in such capacities.  Rather, the only issue specific to the Syndicate Lenders is

whether as "after-market" holders of Bank Claims under the Prepetition Credit Agreements, their

debt may be "tainted" by the torts and other wrongful conduct of the Banks from whom they

purchased that debt.  That stands in contradistinction to the so-called "Co-Bo" Agents who are

alleged to have had the most direct roles in facilitating prepetition fraud and misconduct.

Accordingly, while the contractual rights of Administrative Agents, Non-Administrative Agents

and Syndicate Lenders may be similar, the reasonable value of their Claims varies widely as a

result of the differing legal and equitable defenses to payment that exist.  Such distinctions

provide an independent legitimate basis for separate classification.  See In re WorldCom, Inc.,

- 24 -

3512096.2

2003 Bankr. LEXIS 1401, at *137-39 (Bankr. S.D.N.Y. Oct. 31, 2003) (authorizing division of

unsecured claims into classes of WorldCom General Unsecured Claims, MCI Pre-merger

Claims, and Ad Hoc MCI Trade Claims Committee Claims where respective creditors relied to

different degrees on pre-merger credit of MCI).

        42.      Fourth, the LIF treatment embodied in the Plan is based not only upon the

Banks' relative roles and rights, but also upon many months of arm's-length negotiations among

counsel to the Creditors Committee, the Debtors, and certain Bank Lenders (including

Administrative Agents, Non-Administrative Agents and Non-Agent Banks), in which the various

issues addressed (latch-on rights of the Administrative Agents, releases for future legal fees and

allocations of LIFs) were part of a broader negotiation over the Plan's treatment of the Bank

Claims. Such negotiations have resulted in the settling Bank Lenders dropping substantial and

complex objections to confirmation of the Plan and in many cases supporting the Plan. Separate

classification is necessary to provide the agreed-upon treatment, and therefore has a clear

business purpose and is necessary to confirmation. Any claim that such treatment was fabricated

for purposes of gerrymandering an affirmative vote on the Plan is frivolous.

        43.      The Calyon Parties' own expert, Charles B. Rosenberg, summarized the

situation well in his report dated December 1, 2006 (the "**Rosenberg Report**"), filed with the

Bankruptcy Court on December 4, 2006 as an exhibit to his Declaration (Docket No. 12637),

wherein he stated that "*the three overall classes of defendants -- Administrative Agent Banks,*

*Nominal Agent Banks and Non-Agent Lenders -- have sufficiently different interests, different*

*potential fact patterns and different legal arguments among them* [and each is likely to want

separate representation]." Rosenberg Report at 4. Mr. Rosenberg identifies one of the sources of

the foregoing assumption as "interviews with attorneys from . . . Clifford Chance, which

3512096.2

represents the Calyon defendants, . . ." Id. at 4.  Accordingly, any claim that Bank Claim

classification system was fabrication for purposes of gerrymandering an affirmative vote on the

Plan is wholly without support and belied by these Objectors' own expert.

44.    Separately, the Calyon Parties have raised a somewhat oblique additional

objection to the Plan's classification system on the grounds that the Plan supposedly "disregards

the nature of the Bank Claims as secured against certain of the obligor Debtors and unsecured

against others."  The Calyon Parties further claim that "to the extent unsecured by a legal entity,

the Bank Claims cannot properly be classified separately from the unsecured Subsidiary Debtor

Trade and Other Unsecured Claims."  It is hard to understand what the Calyon Parties are

complaining about.  The Objectors that are Banks (the "**Objecting Banks**"), the Creditors

Committee and the Debtors have stipulated that each of the Bank Clams (subject to the

allowance thereof and the allegations asserted in the Bank Litigation) is oversecured under the

Plan, as well as under a hypothetical liquidation under Chapter 7, as of the Effective Date.  See

Stipulation, dated November 21, 2006 at ¶ 1.

45.    Although some authorities have prohibited, under specific circumstances,

the separate classification of a partially secured creditor's unsecured *deficiency* claim from other

general unsecured creditors, the Calyon Parties' Claims are oversecured.  The Calyon Parties

obviously are not entitled to more than one recovery.  Thus, the Calyon Parties cannot claim to

have an unsecured claim that is substantially or even remotely similar to Claims in the

Subsidiary Debtor Trade or Other Unsecured Claims Classes, since any unsecured claim of the

Calyon Parties would be duplicative and subsumed by its oversecured claim and would not share

in distributions to unsecured creditors.

- 26 -

3512096.2

46.    If the Calyon Parties' theoretical unsecured claim were to be classified together with Subsidiary Debtor Trade or Other Unsecured Claims, it would have to be estimated for voting purposes at zero because it will be paid in full as a Secured Claim and therefore will not share in those Classes' recoveries.  Thus, to the extent the Calyon Parties have interposed this objection upon the supposition that they could alter the voting results of the Subsidiary Debtor Trade or Other Unsecured Claims Classes (which overwhelmingly accepted the Plan) by infiltrating those Classes, they are mistaken.  Thus, their objection is not only unfounded, it is moot in relation to the confirmability of the Plan.  Accordingly, for these and additional reasons that the Proponents intend to demonstrate at the Confirmation Hearing, the classification scheme contained in the Plan is proper under sections 1122 and 1129 of the Bankruptcy Code.

47.    Finally, the Proponents observe that this classification issue will almost certainly be denied as moot.  It has subsequently become clear that the Plan has been accepted by at least one — in fact seven — impaired Classes of Claims that are not subject to any claim of improper classification including Arahova Notes Claims (Class SD 6), FPL Note Claims (Class SD 7), FrontierVision Opco Notes Claims (Class SD 9), Olympus Notes Claims (Class SD 10), ACC Senior Notes Claims (Class ACC 3), ACC Trade Claims (Class ACC 4), and ACC Subordinated Notes Claims (Class ACC 6).   As discussed at greater length below, section 1129(a)(10) of the Bankruptcy Code requires only the acceptance of "at least one class of claims that is impaired under the plan" excluding insiders.  Thus, the Objecting Banks' gerrymandering arguments are academic and not outcome determinative, because section 1129(a)(10) will be satisfied by any of the accepting classes that are not subject to challenge.  Indeed, under the facts and circumstances present here, there is no reason for the Bankruptcy Court to even consider the Bank Objectors' classification objections.  See  In re Woodmere Investors Ltd. P'ship, 178 B.R.

3512096.2

346, 361 (Bankr. S.D.N.Y. 1995) (improper classification is a moot issue because an impaired,

non-insider class accepted the plan).

> iii.     The "Give-Up" Provisions of the Plan Are Not Inconsistent with
>          Any Section Of The Bankruptcy Code.

48.     The ACC Bondholder Group has alleged that "ACC's presumptively valid

Intercompany Claims *are structurally senior* to the unsecured claims held by parent-company

bondholders like the Arahova Noteholders.  The Intercompany Claims against any operating

subsidiary are senior to a corporate parent's equity interest in that subsidiary," and that "the

debtors are not allowed to avoid the absolute priority rule by contracting around it."  ACC

Bondholder Opposition Brief at 91-92.

49.     This argument is laden with error.  As an initial matter, the premise upon

which this objection is based, i.e., that Intercompany Claims are "presumptively valid claims"

has not been established.  The ACC Bondholder Group's reliance upon the filing of the ACC/JV

Debtors' May 2005 Schedules and select excerpts of the Bankruptcy Court's Bench Decision in

Hearing 1 from the Resolution Process is misplaced.  First, the May 2005 Schedules were

qualified in their entirety by the Global Notes thereto.  These notes included the following

significant qualifications:

> (a)     The Debtors reserve all rights with respect to the intercompany balances,
>         including, without limitation, the appropriate characterization of
>         intercompany balances in the Plan.

> (b)     Although none of the balances on the Intercompany Schedule is listed as
>         contingent, disputed or unliquidated, the Debtors reserve the right to seek
>         alternative treatment of such balances, including, but not limited to,
>         equitable subordination or disallowance.

50.     Moreover, in the Hearing 1 Bench Decision, the Bankruptcy Court did not

hold that ACC's Intercompany Claims are presumptively valid as misleadingly asserted by the

ACC Bondholder Group.  Rather, although the Bankruptcy Court did state that "[T]he Debtors'

- 28 -

3512096.2

schedules start as prima facie evidence of the obligations stated therein," the Bankruptcy Court

went on to note that ". . . schedules can be challenged . . . and if challenged (as they have been

here), the schedules no longer have a presumption of validity . . . once the schedules are

challenged, the [Bankruptcy] Court must then consider issues relating to the existence, amount

and priority of the underlying intercompany liabilities on the merits." Bench Decision on

Intercreditor Issues with Respect to Manner of Treatment of Debtors' Schedules; Admissibility

of Debtors' Accounting Records; Burdens of Coming Forward and Proof with Respect to Them;

and Propriety Under Bankruptcy Law of Postpetition Restatement of Financial Statements, dated

February 6, 2006, at 1-2. Furthermore, the Bankruptcy Court noted that:

> with the schedules having been challenged, *the schedules themselves are no
> longer sufficient by themselves to establish the existence or amount of
> intercompany claims* . . . but the ["Business Records"] underlying the schedules
> may be used to establish the intercompany receivables or payables that the
> schedules show . . . But to say that the Business Records may be used for that
> purpose is not to say that the Business Records conclusively establish such
> claims, or that they presumptively do. To the contrary, no presumptions that
> would alter usual burdens of proof would attach to the Business Records.

Id., at 1-3 (emphasis added). It is thus clear that such decision did not in any way hold or

determine that the Intercompany Claims reflected in the May 2005 Schedules are presumptively

valid starting points. Indeed, the opposite may be true.[22]

---

[22]   The Debtors submit that while the Restatement was conducted with care and diligence, such attention does
not cure the inherent limitations of such process. These efforts identified accounting errors that generally
arose in connection with the misinterpretation or misapplication of GAAP and the failure to maintain
adequate internal controls and appropriate books and records. See Declaration Of Vanessa Wittman In
Support Of Debtors' Reply In Opposition To Emergency Motions Of *Ad Hoc* Committee Of Arahova
Noteholders, ¶ 6 (Docket No. 9183). As part of the Restatement, intercompany transactions were generally
only adjusted when they were (a) not compliant with GAAP, or (b) otherwise erroneous. Other issues,
including the treatment and priority of Intercompany Claims, and the eradication of fraud, were not
determined and instead reserved for the Inter-Creditor Dispute, which the Global Settlement fully and
finally settles. See Wittman Declaration, ¶ 14.

- 29 -

3512096.2

51.     Moreover, the Plan is premised upon the Global Settlement, which

resolves, among other issues, disputes relating to the allowance, priority, characterization and

treatment of Intercompany Claims.  The ACC Bondholder Group's *ipse dixit* that the

Intercompany Claims are senior and completely valid, and can't be "contracted around," grossly

oversimplifies, if not ignores, the disputes that have embroiled the Debtors and their stakeholders

in massive litigation.  As complex as it may appear, the Global Settlement simply is a settlement

of such disputes and issues — not an attempt to maneuver around substantive consolidation

requirements (discussed in Section V.B. below) or the absolute priority rule.[23]

52.     In any case, deemed give-ups from structurally senior creditors to more

junior creditors do not offend the Bankruptcy Code and are supported by applicable case law.

"Gifting," whereby structurally senior creditors offer a portion of their statutory entitlement to

junior creditors in the interests of facilitating resolution of a debtor's case, is premised on the

common sense principle that "creditors are generally free to do whatever they wish with the

bankruptcy dividends they receive, including to share them with other creditors."  Official,

Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305, 1313 (1st Cir.

1993).  This practice has been approved in other large chapter 11 cases in this circuit.  See In re

WorldCom, Inc., No. 02-13533 (AJG), 2003 WL 23861928 at *62 (S.D.N.Y. 2003) (where class

voted to accept plan, reduction in recovery to such accepting class in favor of structurally junior

creditors was voluntary and did not run afoul of the Bankruptcy Code).  See also In re MCorp.

Fin. Inc., 160 B.R. 941 (S.D. Tex. 1993) (senior creditor entitled to share recovery with junior

---

[23]     It is axiomatic that the cram down requirements of section 1129(b) of the Bankruptcy Code do not apply to
an accepting class for which confirmation is sought pursuant to section 1129(a) of the Bankruptcy Code.
See In re Dow Corning Corp., 255 B.R. 445, 509 (E.D. Mich. 2000) (objection under section 1129(b)(1)
was without merit where objecting party's class had voted to accept plan).  Counsel to the ACC
Bondholder Group has conceded as much.  See n. 126, *infra*.

- 30 -

3512096.2

creditor); In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001) (senior

creditors are free to give up a portion of their recovery as an incentive to junior creditors to

facilitate reorganization).  Here, while a dispute exists as to which creditor group is the

structurally senior "donor," such dispute is of no moment.  Both sets of creditors have accepted

the Plan and their Class' role as a party that is either making or accepting a contribution, as the

case may be.

      53.    The ACC Bondholder Group has called the Bankruptcy Court's attention

to In re Armstrong World Industries, Inc., 432 F.3d 507 (3d. Cir 2005) (ACC Bondholder Group

Opposition Brief, at pp. 92-94), in which the Third Circuit rejected a debtor's proposal to deem

senior recoveries gifted to junior creditors.  Armstrong is wholly inapposite to these cases,

however, because in that case the class from which the "gift" was to be drawn rejected the plan.

The Proponents have never advanced the theory that funds can be re-allocated by the Debtors

outside of the existing statutory scheme set forth in the Bankruptcy Code; rather, the "gifting"

creditors (whether ACC Senior Noteholders or Arahova Noteholders) themselves can re-allocate

Plan Consideration by consent (as evidenced by their acceptance of the Plan).  Indeed, because

the ACC Senior Notes Class has accepted the Plan, effectively endorsing the Plan's distribution

mechanics, whether the ACC Bondholder Group is right that it would "win," or the Subsidiary

Debtors' creditors are right that they would win the Inter-Creditor Dispute, by virtue of the

overwhelming acceptance of the Plan at all levels of the Debtors' capital structure, whoever the

gifting (or receiving) party is has agreed to and accepted such treatment.

      54.    Moreover, recent pronouncements from courts in the Third Circuit appear

to chip away at the continuing validity of Armstrong.  See, e.g., In re World Health Alternatives,

Inc., 344 B.R. 291, 299 (Bankr. D. Del. 2006) (commenting that Armstrong "distinguished, but

3512096.2

02-41729-shl    Doc 12662    Filed 12/05/06    Entered 12/05/06 05:00:06    Main Document
Pg 45 of 146

did not disapprove of" case law endorsing right of structurally senior creditors to give up a

portion of their recovery to junior creditors without offending absolute priority rule).

Accordingly, a Plan mechanic providing for a voluntary transfer by one accepting class to

another in the interests of facilitating reorganization of the Debtors' Estates is harmonious with

the Bankruptcy Code and applicable case law.

> iv.     The Plan Does Not Violate
>         Section 502(a) Of The Bankruptcy Code.

55.     The ACC Bondholder Group argues that Section 11.1 of the Plan[24] renders

the Plan unconfirmable by depriving parties in interest of their statutory right to object to Claims

in violation of section 502(a) of the Bankruptcy Code.[25]  See ACC Bondholder Group

Opposition Brief, at pp. 109-110.  This objection is without merit and should be overruled.

56.     As an initial matter, provisions similar to Section 11.1 of the Plan are

commonplace in other plans of reorganization confirmed by the Bankruptcy Court.  For example,

the JV Plan provided that "only the Plan Administrator shall be entitled to object to" claims after

the effective date.[26]  Similarly, the plan confirmed in Global Crossings, Ltd. provided that "the

---

[24]     Section 11.1 of the Plan provides as follows:

> From and after the Effective Date, unless otherwise ordered by the Bankruptcy Court or Allowed
> under this Plan, agreed to by the Plan Administrator (or the CVV Trustee, as applicable) or
> Allowed by Final Order of the Bankruptcy Court, the Plan Administrator, and each of the
> Settlement Parties shall be entitled to object to Administrative Claims, Claims and Equity
> Interests.  Any objections to Claims or Equity Interests shall be filed and served on or before the
> Claims Objection Deadline.

Plan, § 11.1.

[25]     Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under
section 501 of this title, is deemed allowed, unless a party in interest … objects."  11 U.S.C. § 502(a).

[26]     See Third Modified Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy
Code for Century-TCI Debtors and Parnassos Debtors at § 9.01(c), In re Adelphia Communications
Corporation, Case No. 02-41729 (REG), Docket No. 11412 (Bankr. S.D.N.Y. June 22, 2006).

- 32 -

3512096.2

Estate Representative, acting on behalf of the Debtors, shall be entitled to object to Claims."[27]

Comparable provisions were also included in the confirmed plans for debtors in Adelphia

Business Solutions,[28] and Worldcom, Inc.[29]  Furthermore, such Plan provision cannot render the

Plan unconfirmable because it specifically provides that the Bankruptcy Court may order

otherwise.  See Plan, § 11.1.  Therefore, in the event that the Bankruptcy Court finds the

provision to be improper in its post-Effective Date implementation, Section 11.1 will self-

correct.[30]

> B.     The Plan Satisfies The Requirements Of
>        Section 1123(a) Of The Bankruptcy Code.

57.     Section 1123(a) of the Bankruptcy Code sets forth seven mandatory

requirements for every chapter 11 plan.  As set forth below, the Plan complies with each such

requirement.

> i.     The Plan Designates Classes Of
>        Claims — 11 U.S.C. § 1123(a)(1).

58.     Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate

classes of claims and interests, other than claims of the kinds specified in sections 507(a)(1)

(administrative expense claims), 507(a)(2) (claims arising during the "gap" period in an

involuntary case), and 507(a)(8) of the Bankruptcy Code (unsecured tax claims).  See 11 U.S.C.

---

[27]   See Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code at § 7.2, In re Global Crossings, Ltd., Case No. 02-40188 (REG), Docket No. 1994 (Bankr. S.D.N.Y. October 28, 2002).

[28]   See Debtors' Modified Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code at § 6.3, In re Adelphia Business Solutions Inc., Case No. 02-11389 (REG), Docket No. 1607 (Bankr. S.D.N.Y. December 18, 2003) (providing that only "Reorganized ABIZ" could object to claims).

[29]   See Debtors' Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code at  § 7.01, In re Worldcom Inc., Case No. 02-13533 (AJG), Docket No. 9525 (Bankr. S.D.N.Y. October 21, 2003) (providing that "the Reorganized Debtors shall be entitled to object" to claims).

[30]   Finally, the Proponents note that other parties in interest have had over four years to object to Claims, but have not done so.  In light of the inactivity on this front, no party has a basis to complain at this late stage.

- 33 -

3512096.2

§ 1123(a)(1).  Article III of the Plan designates 37 Classes of Claims and Equity Interests, not

including Claims of the kinds specified in sections 507(a)(1), (2) and (8) of the Bankruptcy

Code.  Thus, the Plan complies with the requirements of section 1123(a)(1) of the Bankruptcy

Code.

> ii.    The Plan Specifies Unimpaired
>        Classes — 11 U.S.C. § 1123(a)(2).

59.    Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify

any class of claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(2).

Section 4.1 of the Plan specifies the Classes of Claims that are unimpaired under the Plan.[31]

Therefore, the Plan complies with the requirements of section 1123(a)(2) of the Bankruptcy

Code.

> iii.   The Plan Adequately Specifies The Treatment
>        Of Impaired Classes  — 11 U.S.C. § 1123(a)(3).

60.    Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify

the treatment of any class of claims or interests that is impaired under the plan."  11 U.S.C.

§ 1123(a)(3).  Article V of the Plan specifies the treatment of Claims and Equity Interests that are

impaired under the Plan.  Thus, the Plan satisfies the requirements of section 1123(a)(3) of the

Bankruptcy Code.

> iv.    The Plan Provides The Same Treatment For
>        Claims Or Equity Interests Within Each
>        Class  — 11 U.S.C. § 1123(a)(4).

---

[31]    Pursuant to Section 5.2(c)(vii) of the Plan, the Creditors Committee reserved the right to seek a determination that any Non-Accepting Bank Class is unimpaired pursuant to section 1124 of the Bankruptcy Code.  Plan, § 5.2(c)(vii).  In accordance with Section 4.3 of the Plan, if the Creditors Committee does seek such a determination appropriate notice will be provided and a hearing before the Bankruptcy Court will be scheduled.  Accordingly, the Movants submit that such reservation of rights does not violate section 1123(a)(2) of the Bankruptcy Code, as BOFA contends in its Objection.  See BOFA (As Administrative Agent) Objection, ¶¶ 50-51; BOFA (As Holder of Bank Claims) Objection, ¶¶ 39-40.

3512096.2

61.    Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide

the "same treatment for each claim or interest of a particular class." The Movants submit that the

Plan does so provide, and thus complies with section 1123(a)(4) of the Bankruptcy Code.

Nevertheless, the ACC Bondholder Group has argued that the exculpation and release provisions

of Sections 16.3(a), (c), and (d) of the Plan violate this requirement because releases and

exculpation are extended only, they argue, to those members of a Class who vote in favor of the

Plan. See ACC Bondholder Group Opposition Brief, at pp. 104-105.

62.    Notably, all holders of ACC Senior Notes — including members of the

ACC Bondholder Group — were entitled to avail themselves of the protection afforded by the

release and exculpation provisions of Section 16.3 of the Plan.[32] While they were free to decline

the protection afforded by that section of the Plan, such creditors can hardly allege unfair

discrimination when the exact same choice that was presented to all other members of Class

ACC 3 is also presented to them: execute the Plan Support Agreement, accept the Plan and

receive a release, or reject the Plan and decline a release.[33] It is reasonable to provide protection

---

[32]    Section 16.3(c)(iv) of the Plan includes in the definition of Released Parties "(iv) to the fullest extent permitted under applicable law, each of the Settlement Parties, the FPL Committee and the Olympus Parties (and in the case of parties in this subsection (iv) that are *ad hoc* committees, each of their members, solely in their capacity as such) which vote in favor of the Plan, or in the case of parties in this subsection (iv) that are *ad hoc* committees which support the Plan." Plan, § 16.3(c)(iv).

"Settlement Parties" is defined in the Plan to mean "the ACC Settling Parties, Committee II, the Arahova Noteholders Committee, the FrontierVision Committee, Huff, the ACC Trade Committee, the Subsidiary Trade Committee and the Creditors Committee."

"ACC Settling Parties" is defined in the Plan to mean "Tudor, Highfields, OZ Management, L.L.C., C.P. Management LLC, and Satellite Asset Management, L.P. (and their respective affiliates and separate accounts thereof holding Claims against the Debtors) *and any other holder of ACC Senior Notes that executes the Plan Support Agreement agreeing to vote to accept the Plan and otherwise agreeing to be bound by the terms of the Global Settlement.*" (emphasis added).

[33]    These provisions are a variant of the tried and true "carrot and stick" approach utilized to provide classes of creditors with an inducement to vote on a plan of reorganization. See In re Drexel Burnham Lambert Group, 138 B.R. 714, 717 (Bankr. S.D.N.Y. 1992), aff'd, 140 B.R. 347 (S.D.N.Y. 1992); see also In re Zenith Elecs. Corp., 241 B.R. 92, 105 (Bankr. D. Del. 1999) ("There is no prohibition in the Code against a

- 35 -

3512096.2

to those who take the time and effort to participate and accept responsibility and scrutiny for

negotiated concessions.  Moreover, the Bankruptcy Court has already noted its general approval

of offering incentives to creditors to accept a plan.  See September 12, 2006 Hr'g Tr., at 124,.

("It also is proper, in my view, as a general matter, to provide enhanced plan treatment for those

who vote to accept a plan.").  Regardless of the election made by a creditor holding an ACC

Senior Notes Claim, the treatment afforded to Claims in that Class is unchanged, and the process

for granting releases and exculpation is exactly the same for all holders of ACC Senior Notes.[34,]

[35]

      63.     In support of its argument, the ACC Bondholder Group cites In re AOV

Indus., Inc., 792 F.2d 1140 (D.C. Cir. 1986), a decision characterized by its author as one of

"unusual circumstances."  Id. at 1141.  In AOV, a creditor's financial recovery on account of its

claim was tied to its execution of a release in favor of a third party.  A refusal to execute the

---

Plan proponent offering different treatment to a class depending on whether it votes to accept or reject the
Plan.") (See infra, ¶¶ 217-219 which also includes a discussion of Drexel Burnham and Zenith).

[34]    The Dow court held that the "equal treatment requirement of § 1123(a)(4) is satisfied when class members
are subject 'to the same process for claim satisfaction,' even though that process may lead to a different
pecuniary result for certain individual creditors."  Dow, 244 B.R. 634, 669 (Bankr. E.D. Mich. 1999)
(citing In re Cent. Med. Ctr., Inc., 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990)) (emphasis added).  In the event confirming the
pecuniary result
is the same for all creditors, the only difference for creditors is whether or not they receive a release.  The
process for granting such releases, however, is the same for all members of the Class, as is the underlying
motivation — global peace.

[35]    A similar provision was contained in a plan confirmed by the Bankruptcy Court for the District of
Delaware.  The plan for Big V Holding Corp. provided releases to several parties, including, "the Holders
of Senior Subordinated Notes Claims that have voted to accept the Plan."  First Amended Joint
Consolidated Liquidating Plan of Reorganization at § 9.3(b), In re Big V Holdings Corp., Case No. 00-
04372 (RTL), Docket No. 1459 (Bankr. D.Del. May 10, 2002) (emphasis added).  In the order confirming
the plan, the court found it to be "fair and equitable" and also stated that it did "not discriminate unfairly."
Order Confirming First Amended Joint Consolidated Liquidating Plan of Reorganization at ¶ II, In re Big V
Holdings Corp., Case No. 00-04372 (RTL), Docket No. 1647 (Bankr. D.Del. June 28, 2002).

3512096.2

release resulted in a smaller financial recovery for the creditor on account of its claim (because

such non-releasing creditor was not entitled to share *pro rata* in an additional $3 million fund).[36]

      64.    The <u>AOV</u> decision has been the subject of criticism; even the <u>AOV</u> court

itself was split on whether such an expansive reading of section 1123(a)(4) was appropriate.[37]

Moreover, at least one bankruptcy court has questioned both the reasoning of <u>AOV</u> and the

feasibility of implementing its interpretation of section 1123(a)(4).[38]  Even if <u>AOV</u> were well-

reasoned and well-accepted, however, it would nevertheless be inapplicable to the present

facts.[39]

---

[36]    The objecting creditor's claim also was considered to be substantially more valuable than those of other creditors in its class, such that the release it was required to give was deemed to be a larger concession than that of fellow class members.  It was considered more valuable because the objecting creditor was releasing a direct claim against creditor-guarantors whereas such creditor's fellow class members were only required to release indirect claims against the creditor guarantor.  <u>AOV Indus.</u>, 792 F.2d at 1152.

[37]    <u>See</u> <u>AOV</u>, 792 F.2d at 1156 (Starr, J., dissenting) ("The court, however, misguidedly assumes that the general statutory requirement of equality is also violated whenever 'members of a common class are required to tender more valuable consideration . . . in exchange for the same percentage of recovery.' Maj. Op. at 1152.  The court cites no authorities and offers scarcely any explanation for this novel holding, which may, alas, have unknown and far-reaching effects on bankruptcy practice.  I for one am loathe to extend the equality principle so as to require the analysis of the specific circumstances of each creditor properly within a single class to determine whether, like privileged characters on Orwellian farms, he is more equal than others in his class.")

[38]    <u>See</u> <u>In re Dow Corning Corp.</u>, 244 B.R. at 667-68, 669 n.26 ("[W]e reject the reasoning of AOV . . . . Any attempt to practically apply the rule of AOV, then, would be unduly burdensome and would severely inhibit, if not eliminate the estate's ability to settle disputed and unliquidated claims. . . .  [Moreover], [a] fundamental problem with the court's reasoning in [AOV] is its inappropriate attempt to address classification concerns in the context of § 1123(a)(4)").

The <u>Dow</u> court's latter point is particularly important.  The <u>AOV</u> court's primary concern appears to have been that the objecting creditor's claim was not "substantially similar" to the rest of the claims in the subject class.  If that was the case, the appropriate remedy of course would have been to deny confirmation on grounds of gerrymandering.  Such relief was not possible in <u>AOV</u>, however, because the plan had already been substantially consummated (in fact, the District Court dismissed the appeal on mootness grounds).  <u>AOV</u>, 792 F.2d at 1144.  It is not unreasonable to infer, therefore, that the Court of Appeals granted the relief the objecting creditor was seeking in the context of section 1123(a)(4) because such relief would have been more difficult, if not impossible, to grant by requiring the debtor to re-classify the objecting creditor's claim.

[39]    The Fourth Circuit Court of Appeals went out of its way to limit the extension of <u>AOV</u> to facts other than those before the court, noting, "We do not create a sweeping new rule in this case.  We do not hold that all

- 37 -

3512096.2

65.    First, under the Plan, all members of the ACC Senior Notes Class are

entitled to the exact same treatment of their Claim, as required by section 1123(a)(4), and will

share *pro rata* from one single pool of funds.  Plan, § 5.1(c).[40]  The Plan's treatment of ACC

Senior Notes Claims is entirely without regard to a particular claimant's granting of a release,

and entirely without regard to how a particular claimant votes on the Plan.  Moreover, the

problem of differentiating among the value of different creditors' claims is not present here.  The

value of ACC Senior Notes is the same for all holders of ACC Senior Notes Claims, and the *pro

rata* distribution on account of that value is not dependent upon whether a creditor gives or gets a

release, nor upon whether or not such creditor votes to accept or reject the plan.[41]

66.    Unable to argue that the Plan provides different treatment for Claims

within the ACC Senior Notes Class, the ACC Bondholder Group misconstrues section

1123(a)(4) as requiring the same treatment of every claimant (as opposed to every claim) who

happens to be in the same class.  This is not required by section 1123(a)(4), and, in any event,

even if it were, the Plan likely would meet even such an enhanced requirement.  In In re Heron,

Burchette, Ruckert & Rothwell, 148 B.R. 660, 663 (Bankr. D.D.C. 1992), the court considered

an 1123(a)(4) objection to a plan of reorganization that provided for the same treatment to

---

class members must be treated precisely the same in all respects. . . . We simply find that on these facts, it
is unfair to require a creditor to pay a higher price for the same benefit."  Id. at 1154.

[40]    Section 5.1(c) of the Plan provides, in pertinent part, "Subject to Section 16.21, the ACC Senior Notes
Claims shall be deemed Allowed in the aggregate amount of $5,109,693,748, of which $4,936,847,118
represents principal and $172,846,630 represents interest accrued through the Commencement Date.  Each
holder of an Allowed ACC Senior Notes Claim shall receive on the Initial Distribution Date and/or on a
Subsequent Distribution Date thereafter in full satisfaction of such holder's Allowed ACC Senior Notes
Claim a Pro Rata Share of (i) the ACC Senior Notes Allocable Portion plus the ACC Subordinated Notes
Allocable Portion of:  (a) the Initial ACC Settlement Consideration; plus (b) the Incremental ACC
Settlement Consideration; plus (c) any Remaining Assets; plus (d) if applicable, the Additional Incremental
ACC Settlement Consideration, and (ii) CVV Series ACC-1 Interests."  Plan, § 5.1(c).

[41]    That is, if the Plan is confirmed, the treatment of each ACC Senior Note Claim under the Plan will be the
same whether the holder of such claim voted to accept the Plan or to reject the Plan.

- 38 -

3512096.2

creditors in the class designated as Class IV(A), notwithstanding the fact that releases sought

from creditors in that class were of different value.[42]

67.    The <u>Heron</u> court rejected this objection for two reasons, both instructive

here.  First, the <u>Heron</u> court noted that "[u]nlike the plan to which the creditor objected in <u>AOV</u>,

the instant plan provides recovery to Class IV(A) members without regard to whether they

release their claims against the plan funders -- in this case, the participating partners.  Therefore,

for purposes of § 1123(a)(4), Class IV(A) members receive the same treatment under the plan."

<u>Id.</u> at 671.  Moreover, the <u>Heron</u> court reasoned that:

> The objectors fail to distinguish between a partner's treatment under the plan on account of a claim or interest and treatment for other reasons. Only the former is governed by § 1123(a)(4). . . . The plan's provisions dealing with partner contributions, releases, and the permanent injunction have no connection to a partner's status as a claim or interest holder within a particular class. These provisions constitute a separate feature of the plan, designed to allow adequate funding of the plan. Every partner who wants to receive the protection of the permanent injunction must agree to contribute to the plan and to release any claims against the other partners and creditors. This policy is applied to every partner without regard to his status as a claim or interest holder. As such, it does not constitute treatment of a claim of a particular class for purposes of § 1123(a)(4).

<u>Id.</u> at 672.

68.    The Plan proposed here, just as in <u>Heron</u>, provides the exact same

treatment to the Claims classified in Class ACC 3.  The exculpation and release provisions of

Section 16.3 are separate and independent provisions negotiated and agreed to as but one piece

---

[42]    The releases were of a different value because, "after withdrawing from a partnership, a former partner is liable only as a surety for partnership debt. As such, the withdrawn partner will be able to obtain reimbursement or indemnification from the partnership for any partnership debt the withdrawn partner is required to pay. . . . [Accordingly,] the value of [a partner's] reimbursement or indemnification claims against the debtor varies according to when they left the debtor." <u>Id.</u> at 670.

- 39 -

3512096.2

of the larger Global Settlement — they have no bearing on the Plan's treatment of Claims.[43]

Equal treatment of claims is all that is required by section 1123(a)(4) of the Bankruptcy Code.

Releases granted to the Released Parties are not granted on account of their status as members of

Class ACC 3, nor should such releases be construed as part of the treatment afforded to a Claim

in Class ACC 3 (or any other Class for that matter). [44]

> v.    The Plan Provides Adequate Means For
>         Its Implementation  —  11 U.S.C. § 1123(a)(5).

69.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan "provide

adequate means for the plan's implementation."  11 U.S.C. § 1123(a)(5).  Article VIII of the Plan

sets forth the means for implementation of the Plan, which the Movants submit are more than

adequate.  Certain of these implementation mechanisms correspond to those specified in section

1123(a)(5) of the Bankruptcy Code and include, for example, procedures for or respecting:

(a)    Implementation of the Global Settlement,[45] the Government Settlement,[46] and other compromises,[47] pursuant to section 1123(a)(5)(B) of the Bankruptcy Code;

(b)    Distributions of property of the Estates to stakeholders,[48] pursuant to section 1123(a)(5)(B) of the Bankruptcy Code;

---

[43]    See n. 32, *supra*.  Even a party who chooses not to support the Plan, and declines to receive the protection of the exculpation and release provisions laid out in Section 16.3 of the Plan, will be entitled to the exact same treatment of their Claim (i.e., the treatment set forth in Section 5.1(c)) as those who do support the Plan.

[44]    To put it another way, "Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'"  7 Collier on Bankruptcy ¶ 1123.01[4][b] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) citing In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill 1992), rev'd on other grounds, 173 B.R. 149 (N.D. Ill. 1994).

[45]    See Plan, § 8.5(a).

[46]    See Plan,  § 8.5(c).

[47]    See, e.g., Plan, § 8.5(b).

[48]    See Plan, §§ 8.7 and 8.10.

- 40 -

3512096.2

(c)    Cancellation of certain Existing Securities, Indentures, and Prepetition Credit Agreements,[49] pursuant to section 1123(a)(5)(F) of the Bankruptcy Code;

(d)    Retention and transfer of assets of the Estate, including TWC Class A Common Stock, by the Debtors on and after the Effective Date,[50] pursuant to sections 1123(a)(5)(A), 1123(a)(5)(B) and 1123(a)(5)(J) of the Bankruptcy Code; and

(e)    Establishment and funding of the CVV.[51]

70.    Based upon the foregoing, the Movants respectfully submit that the Plan contains appropriate implementation provisions and complies with the requirements of section 1123(a)(5) of the Bankruptcy Code.[52]

vi.    The Plan Does Not Provide For The Issuance Of Non-Voting Equity Securities — 11 U.S.C. § 1123(a)(6).

71.    Section 1123(a)(6) of the Bankruptcy Code provides that a plan must:

provide for the inclusion in the charter of the debtor, if the debtor is a corporation, . . . of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.

11 U.S.C. § 1123(a)(6).[53]   Accordingly, the holders of new stock issued under a plan of reorganization must have voting rights.  See Acequia v. Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1361 (9th Cir. 1986).

---

[49]    See Plan, § 8.6.

[50]    See Plan, §§ 8.7. and 8.10.

[51]    See, Plan, Art. IX.

[52]    Certain creditors have argued that the Plan is not feasible, in spite of the Proponents' provision of adequate means for its implementation.  See Section II.M, infra, for a detailed explanation of the Plan's compliance with section 1129(a)(11)'s requirement that a Plan be feasible.

- 41 -

3512096.2

72.     Each Debtor that is a corporation is amending its corporate charter to provide that "[p]ursuant to Section 1123 of title 11 of the United States Code, notwithstanding any other provision contained herein to the contrary, to the extent prohibited by Section 1123 of title 11 of the United States Code, the Corporation shall not issue non-voting equity securities." Hence, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.[54]

vii.    The Plan Contains Appropriate Provisions
        Respecting The Selection Of Postconfirmation
        Directors And Officers — 11 U.S.C. § 1123(a)(7).

73.     Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director or trustee."  11 U.S.C. § 1123(a)(7).

74.     As disclosed in the Second Disclosure Statement Supplement, the Creditors Committee has designated Quest Turnaround Advisors, LLC ("**Quest**") as the candidate for the Person who will serve initially as the Plan Administrator.[55]  See Second Disclosure Statement Supplement, at DSS2-96.  Pursuant to Section 13.1(a) of the Plan, the Creditors Committee and the Bankruptcy Court retain the right to remove the Plan Administrator for cause, and the CVV Trustees have the right to remove the Plan Administrator in accordance

---

[53]    The purpose of section 1123(a)(6) is to "assure that creditors who are forced to take stock in a reorganized company will be entitled to exercise full voting control and have a voice in the selection of management that will protect their interests."  Ronald W. Goss, Chapter 11 of the Bankruptcy Code:  An Overview for the General Practitioner, Utah B.J., Nov. 4, 1991, at 6, 10.

[54]    The Debtors that are not corporations are limited liability companies or limited partnerships and do not issue stock.  Thus, the requirements of section 1123(a)(6) of the Bankruptcy Code are inapplicable to such Debtors.

[55]    In accordance with Section 13.1(a) of the Plan, a form of Plan Administrator Agreement indicating that the services of Mr. Jeffrey Brodsky of Quest will be provided in connection with the Plan Administrator's duties was filed with the Bankruptcy Court on November 27, 2006 (Docket No. 12573) (the "**Plan Administrator Notice**").

- 42 -

3512096.2

with the Plan Documents.  Plan, § 13.1(a).  <u>See</u> Wittman Decl. ¶ 44.  Pursuant to Section 9.1 of

the Plan, the five CVV Trustees will be identified by the Creditors Committee at or before the

Confirmation Hearing, and such CVV Trustees shall be appointed in accordance with the terms

of the CVV Declaration.  Plan, § 9.1.[56]

75.    The provisions of Sections 9.1(b) and 13.1(a) of the Plan, among others,

are consistent with the interests of creditors and with public policy.  First, the individuals

selected to serve in these roles were selected by the Creditors Committee, which represents and

owes a fiduciary duty to all holders of Claims receiving CVV Interests, rather than parochial

agendas.  Second, the method for appointing the Plan Administrator and the CVV Trustees not

only was overwhelmingly ratified by a vast majority of creditors at all levels of the Debtors'

capital structure that voted on the Plan, *but also by ACC's shareholders*.  Lastly, the Plan

provides that the Plan Administrator will serve as a fiduciary and, as trustees for all their

beneficiaries, the CVV Trustees also will owe fiduciary duties to the Estates and all holders of

CVV Interests.  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the

Bankruptcy Code, and consequently all seven requirements of section 1123(a) of the Bankruptcy

Code.

C.    The Plan Complies With
      Section 1123(b) Of The Bankruptcy Code.

76.    Section 1123(b) of the Bankruptcy Code specifies certain provisions that

may be included in a plan of reorganization.  The Plan contains certain of the provisions

specifically contemplated by section 1123(b) of the Bankruptcy Code, including provisions

regarding (a) the impairment and unimpairment of Classes of Allowed Claims and Equity

---

[56]    The form of the CVV Declaration was filed with the Bankruptcy Court on November 27, 2006 (Docket No. 12572).

3512096.2

Interests (section 1123(b)(1) of the Bankruptcy Code), (b) the assumption or rejection of

executory contracts and unexpired leases (section 1123(b)(2) of the Bankruptcy Code), (c) the

formation of the CVV (section 1123(b)(3) of the Bankruptcy Code), and (d) the entry into and

ratification of the Global Settlement (section 1123(b)(3)(A) of the Bankruptcy Code).[57]

77.    Other provisions of the Plan are permissible pursuant to the authority

granted in section 1123(b)(6) of the Bankruptcy Code, which permits a plan to include other

provisions not inconsistent with the applicable provisions of the Bankruptcy Code. See 11

U.S.C. § 1123(b)(6). These include the Bankruptcy Court's retention of jurisdiction as to

specified issues,[58] as well as the Bankruptcy Court's power to enjoin actions against non-Debtor

third parties when such action is integral to the confirmation of the Plan.[59]

D.    The Proponents Have Complied With The Provisions Of
Title 11 As Required By Section 1129(a)(2) Of The Bankruptcy Code.

78.    Section 1129(a)(2) of the Bankruptcy Code requires that a plan proponent

"compl[y] with the applicable provisions of [title 11]." 11 U.S.C. § 1129(a)(2). Generally, the

inquiry under section 1129(a)(2) of the Bankruptcy Code focuses on whether the plan proponent

has complied with the disclosure and solicitation requirements of sections 1125 and 1126 of the

Bankruptcy Code. See In re WorldCom, Inc., 2003 WL 23861928, at 25-26 (Bankr. S.D.N.Y.

2003); In re Johns-Manville Corp., 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), aff'd in relevant

part, 78 B.R. 407 (S.D.N.Y. 1987), aff'd sub nom., Kane v. Johns-Manville Corp., 843 F.2d 636

(2d Cir. 1988) ("Objections to confirmation raised under § 1129(a)(2) generally involve the

alleged failure of the plan proponent to comply with § 1125 and § 1126 of the Code. These

---

[57]    See 9019 Addendum for a discussion of the reasonableness of the Global Settlement.

[58]    See Plan, Art. XV (providing for the Bankruptcy Court's jurisdiction as to certain matters).

[59]    See Section IV.B, *infra*, for a discussion of the non-Debtor releases provided in the Plan.

- 44 -

3512096.2

sections provide for the appropriate manner of disclosure and solicitation of plan votes.")

(internal citations omitted); H.R. REP. NO. 95-595, at 412 (1977), S. REP. NO. 989, 95-989, at 126

(1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912 (section 1129(a)(2) of the Bankruptcy Code

"requires that the proponent of the plan comply with the applicable provisions of chapter 11,

such as § 1125 regarding disclosure").

79.    The Proponents have complied fully with the applicable provisions of the

Bankruptcy Code, including the provisions of sections 1125 and 1126 of the Bankruptcy Code

and the applicable Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") regarding

Plan disclosure and solicitation.  The Second Supplemental DS Order approved, *inter alia*, the

procedures to be used in soliciting and tabulating votes regarding the Plan.[60]  In accordance with

the Second Supplemental DS Order, the Proponents served the Second Disclosure Statement

Supplement, the Plan, appropriate ballots, notices, and all other related documents, as applicable,

on all required parties.  In addition, notice respecting the Plan, the Voting Deadline and the

Confirmation Hearing was published timely in the national editions of The New York Times,

The Wall Street Journal, and USA Today, as well as in The Boston Globe, The Denver

Post/Rocky Mountain News, The Palm Beach Post, The Cleveland Plain Dealer, and The Los

Angeles Times on November 1, 2006.  Additionally, the Debtors have published the

---

[60]    The Second Supplemental DS Order established November 27, 2006 (the "**Voting Deadline**"), as the deadline for the submission of ballots and master ballots to accept or reject the Plan, and November 24, 2006, as the last day on which objections to confirmation of the Plan were required to be filed with the Bankruptcy Court.  Pursuant to the Second Supplemental DS Order, and the prior disclosure orders incorporated therein, the Debtors may extend the Voting Deadline, before or after such date, in their discretion.

- 45 -

3512096.2

Confirmation Hearing Notice electronically on their informational website,

www.adelphiarestructuring.com.[61]

      E.      Section 1129(a)(3) Has Been Satisfied Because The Plan Has
              Been Proposed In Good Faith And Not By Any Means Forbidden By Law.

      80.      Section 1129(a)(3) of the Bankruptcy Code requires that the Plan be

"proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

Although the term "good faith" is not defined in the Bankruptcy Code, courts in the Second

Circuit and elsewhere have interpreted this provision as requiring a showing "that the plan was

proposed with 'honesty and good intentions' and with 'a basis for expecting that reorganization

can be effected.'" Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988) (citing

Koelbl v. Glessing (In re Koelbl), 751 F.2d 137, 139 (2d Cir. 1984) (quoting Manati Sugar Co. v.

Mock, 75 F.2d 284, 285 (2d Cir. 1935))); In re Best Prods. Co., 168 B.R. 35, 72 (Bankr.

S.D.N.Y. 1994), appeal dismissed, 177 B.R. 791 (S.D.N.Y.), aff'd, 68 F 3d 26 (2d Cir. 1995)

(same); In re Leslie Fay Companies, Inc., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) ("a plan is

proposed in good faith 'if there is a likelihood that the plan will achieve a result consistent with

the standards prescribed under the [Bankruptcy] Code'") (citing In re Texaco, 84 B.R. 893, 907

(Bankr. S.D.N.Y. 1988) (quotations omitted)); Greer v. Gaston & Snow (In re Gaston & Snow),

1996 WL 694421, at *9 (S.D.N.Y. 1996) ("failure to propose a plan in good faith occurs when

the Plan is not proposed with honesty, good intentions, and to effectuate the reorganization of the

enterprise, but rather for some other motive") (citing Kane, 843 F.2d at 649); In re Drexel

---

[61]    Notwithstanding that throughout the settlement discussions that served as the basis for the Plan Support
Agreement, information was exchanged and compromises were struck that led to the development of a
largely consensual plan of reorganization, the Proponents did not solicit votes on the Plan in violation of
section 1125(b) of the Bankruptcy Code. See In re Dow Corning Corp., 227 B.R. 111, 118 (Bankr. E.D.
Mich. 1998); In re Kellogg Square P'ship, 160 B.R. 336, 340 (Bankr. D. Minn. 1993) ("Limiting the bar of
§1125 . . . avoids a chill on debtors' post-petition negotiations with their creditors, one which otherwise
might prove devastating to the reorganization process.").

3512096.2

Burnham Lambert Group, Inc., 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).  As set forth in the

Wittman Declaration, the Plan has been proposed in "good faith."  See Wittman Decl. ¶¶ 51-56.

Further, the Plan has been proposed in compliance with all applicable laws, rules and

regulations.

81.    Throughout these cases, both the Debtors and their management and the

Creditors Committee have honored and upheld their fiduciary duties to all stakeholders, and have

protected the interests of all constituents with an even hand.  In some cases, in which the

interests of the Debtors were not in conflict (e.g., the decisions to sell the Debtors' assets and

commence a lawsuit against Deloitte & Touche LLP), the Debtors' primary focus was to

maximize value for all interested parties.  Conversely, when certain Debtors might differ in their

preferred approach (e.g., the allocation of Sale Transaction proceeds), management disclosed the

potential conflict to all interested parties, and refrained from taking action which might risk

preferring one constituency over another.  Indeed, the Bankruptcy Court has previously ruled:

> After hearing all of the evidence, most of it set forth in detail
> above, the Court finds that the Debtors intended to and did
> maintain their neutrality with respect to the Interdebtor Disputes,
> and limited their activities, exactly as they should have, to
> constituencies affected by the Intercreditor Disputes, each with the
> purpose to facilitate a settlement and mediate a resolution.

Decision on Motions by *Ad Hoc* Committee of Arahova Noteholders to Appoint Trustee or

Nonstatutory Fiduciary; to Disqualify Counsel; and to Terminate Exclusivity, at 34-35.

82.    Rather than favoring one Estate (or group of Estates) or constituency over

another in these cases, the Debtors, their management, and the other Proponents have worked

diligently to facilitate a successful reorganization that is in the best interests of all creditors.  See

Wittman Decl. ¶¶ 51-56.  Accordingly, the Plan has been proposed in "good faith" and not by

3512096.2

any means forbidden by law, and satisfies the requirements of section 1129(a)(3) of the

Bankruptcy Code.

83.     Notwithstanding the foregoing, the ACC Bondholder Group once again

has invoked now tired and worn (and explicitly repudiated) allegations that the proposal of the

Plan by the Debtors is a violation of court-ordered neutrality.  See ACC Bondholder Group

Opposition Brief, at pp. 59-64.  In fact, only a few months ago, the Bankruptcy Court ruled that

the Debtors' election to advance the Plan at this time was not a violation of court-ordered

neutrality:

> Specifically, I'm going to rule as follows: That the debtors putting
> a plan of this character up for a creditor vote and soliciting
> acceptances to a plan, which creditors and other stakeholders will
> be free to accept or reject, does not violate the undertakings of
> neutrality or the directions as to neutrality that I expressed and that
> the debtors undertook earlier in this case.[62]

Sept. 12, 2006 Hr'g Tr. (J.Gerber), at 19.  The Movants request that the Bankruptcy Court

continue to overrule objections of this character posed by the ACC Bondholder Group and find

that the Plan was proposed in good faith.

84.     The ACC Bondholder Group has also dredged up (once again) its *ad
hominem* commentary about the Monitor, and the alleged flaws in the negotiation process

leading up to the execution of the Plan Agreement and the proposal of the Plan.  This objection

also already has been addressed by the Bankruptcy Court:

> While I understand and respect the sincere substantive objections
> to the compromise embodied in this plan, I do not regard it as
> illegally proposed, and certainly not illegally proposed in any way
> that prohibits it from being solicited.

---

[62]    Obviously, if it was permissible for the Debtors to solicit votes on the Plan within the constraints of their
neutrality, it was equally permissible for the Creditors Committee to do so as well.

3512096.2

Id. at 20.  Moreover, the Additional ACC Settling Parties (as well as the Olympus Noteholders

Committee, the FPL Noteholders Committee, and the Bank Proponents) all determined to

support the Plan after the Monitor's involvement in these cases had concluded.  The ACC

Bondholder Group's objection should be (once again) overruled.

F.   The Plan Provides For Bankruptcy Court Approval Of
     Payment For Services And Expenses — 11 U.S.C. § 1129(a)(4).

85.   Section 1129(a)(4) of the Bankruptcy Code requires that payments for

services or costs and expenses incurred in or in connection with a chapter 11 case, or in

connection with a plan and incident to the case, either be approved by or be subject to approval

of the court as reasonable.  See 11 U.S.C. § 1129(a)(4).  Section 6.2(b) of the Plan sets forth

procedures for filing Fee Claims.  Moreover, the proposed Confirmation Order contains

additional provisions regarding applications of Professional Persons for final approval of fees

and expenses in these cases.  In addition, Article XV(c)(vi) of the Plan provides for the

Bankruptcy Court's retention of jurisdiction to hear and determine all applications for

compensation and reimbursement of expenses of professionals.

86.   As part of the Global Settlement, Section 6.2(d) of the Plan provides that

certain fees and expenses incurred by the Proponents, or other Plan supporters, including certain

reasonable fees and expenses of the Olympus Parties, the FPL Committee, the Settlement Parties,

the ACC Committee, the ACC Settling Parties and the Creditors Committee, shall be reimbursed

as Administrative Claims upon notice and appropriate review.  See Plan, § 6.2(d).  The United

States Trustee for the Southern District of New York (the "**U.S. Trustee**") has asserted that such

fees and expenses should be reimbursed only upon application to, and a hearing before, the

Bankruptcy Court, and that the Plan reimbursement mechanism violates section 503(b) of the

Bankruptcy Code.  First, aside from its literal compliance with the dictates of the Bankruptcy

- 49 -

3512096.2

Code (as explained below), the Proponents respectfully submit that the Bankruptcy Court may

approve the procedures that already are contained in the Plan with respect to the review and

payment of such fees and expenses.  Section 6.2(d)(ii) of the Plan provides for the cost of such

payments to be allocated, generally, either to their relevant Classes and paid out of the

distributions to those Classes or first to ACC (up to specified caps) then to the relevant Classes.[63]

This was an integral component of the Global Settlement, as the settling parties presumably

determined it was appropriate that other creditors receiving the benefit of the compromise should

shoulder their fair share of the cost.  Moreover, the Plan provides for a review of requested fees

and costs by, among others, the Plan Administrator, who is a fiduciary of the Estates.

                87.        Second, contrary to the U.S. Trustee's contention, the Plan does not seek

to abrogate the Bankruptcy Court's authority to oversee payment of fees.  The Plan expressly

provides that "the Settlement Parties, the FPL Committee and the Olympus Parties shall comply

with *any procedures required by the Bankruptcy Court* in connection with seeking

reimbursement of Settlement Party Fee Claims, FPL Fee Claims or Olympus Fee Claims."  Plan,

§ 6.2(d) (emphasis added).[64]  If the Bankruptcy Court, as the U.S. Trustee urges, requires

professionals for such parties to file fee applications, such parties will comply.

---

[63]    With respect to the FPL Fee Claims, the Plan provides that such fees and expenses are to be paid out of the
ACC Debtors' Estates.  This is appropriate because, absent the FPL Note Claim holders agreement to
accept payment as provided in the Plan, such Claim is a Secured Claim and otherwise entitled to the
protections of section 506(b) of the Bankruptcy Code.  With respect to Huff's reasonable Settlement Party
Fee Claims, the Plan provides that the Arahova Notes Claims Class shall be allocated the percentage of
such fees based upon Huff's holdings of Arahova Notes on the Confirmation Date relative to its holdings of
ACC Senior Notes on the Confirmation Date.  See Plan, § 6.2(d)(ii)(A)(1).  The remainder of Huff's
reasonable Settlement Party Fee Claims shall be paid as Administrative Claims pursuant to the Global
Settlement.  Id., § 6.2(d)(ii)(A)(5).

[64]    The Proponents expect that the Bankruptcy Court will establish such additional procedures (if any are
deemed necessary) at or in connection with the Confirmation Hearing.

3512096.2

88.    The U.S. Trustee's objection also asserts that the payment of the fees and

expenses of the Indenture Trustees (which is governed by Section 8.11 of the Plan) is inadequate

because it does not limit the Indenture Trustees' fees and expenses according to the "substantial

contribution" standard embodied in section 503(b) of the Bankruptcy Code and does not require

the Indenture Trustees to file  fee applications setting forth any such "substantial contribution."

However, Section 8.11 of the Plan deals with the Indenture Trustee's *contractual* claims under

their Indentures, not *administrative* claims for substantial contribution.  An indenture trustee, like

any other creditor, is entitled to the fees provided in its indenture as part of its contract claim, and

there is no requirement to show that the services benefited the estate.  In re W.T. Grant Co., 119

B.R. 898, 900-01 (S.D.N.Y 1990) ("However, where fees are sought pursuant to a *contractual*

right to payment, compensation is to be determined in accordance with the *contractual provision*.

…[a]n indenture trustee is *contractually* entitled to payment for performance of its duties

*regardless of whether its efforts benefited the estate*.") (emphasis added); In re Revere Copper

and Brass, 60 B.R. 892, 895 (Bankr. S.D.N.Y. 1986) ("In contrast, a party's ability to recover

compensation under any *contractual agreement* is determined by the *applicable terms of the*

*contract* subject to any court-imposed limitation of reasonableness.") (emphasis added);  see also

In re United Merchants and Manufacturers, Inc., 674 F.2d 134 (2d Cir. 1982) (creditor entitled to

claim for post-petition collection costs provided for in contract).  In addition to the Indenture

Trustees' *contractual* claims under their Indentures for payment of their fees and expenses, the

Indenture Trustees also have a *contractual* right under their Indentures to exercise their charging

liens against the distributions made in respect of the amounts due to their holders under the

various Indentures.  Thus, Section 8.11 of the Plan provides for payment of the Indenture

Trustees' fees and expenses solely as a *contractual* matter and not as an administrative claim.

- 51 -

3512096.2

As a result, there need not be a 503(b)-based limitation on such fees.  And, although no fee

application is required for a contract claim merely because it includes fees, Section 8.11 of the

Plan contains a mechanism for review by the Creditors Committee and by the Settlement Parties,

and precludes payment of any unresolved disputed portion unless the Indenture Trustee submits

the same to the Bankruptcy Court for resolution.  Therefore, the Movants submit that the Plan

satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code.

> G.    The Debtors Have Complied With Section 1129(a)(5)
>        By Disclosing All Necessary Information Regarding
>        Directors And Officers Of The Reorganized Debtors.

89.    Section 1129(a)(5)(A) of the Bankruptcy Code requires that the plan

proponent disclose the "identity and affiliations of any individual proposed to serve, after

confirmation of the plan, as a director, officer, or voting trustee of the debtor . . . or a successor

to the debtor under the plan," and requires a finding that "the appointment to, or continuance in,

such office of such individual, is consistent with the interests of creditors and equity security

holders and with public policy."  11 U.S.C. § 1129(a)(5)(A)(i) & (ii).  As previously noted, the

Plan Administrator Notice disclosed and the CVV Notice will disclose the identities and

affiliations of the Plan Administrator and CVV Trustees, respectively.  As set forth below, the

appointment of such individuals is consistent with the interests of creditors and with public

policy.  Thus, the Plan complies with section 1129(a)(5)(A) of the Bankruptcy Code.

90.    Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent

to also disclose the "identity of any insider that will be employed or retained by the reorganized

debtor, and the nature of any compensation for such insider."  11 U.S.C. § 1129(a)(5)(B).

Section 8.2 of the Plan provides:

> On the Effective Date, (a) the current directors, or in the case of a
> governing body created by a partnership agreement, limited
> liability company agreement or similar agreement, the members of

- 52 -

3512096.2

> such governing body (such persons and the corporate directors
> collectively, the "Governors") of each Debtor shall be deemed to
> have been removed (without the necessity of further action), and
> (b) to the fullest extent permitted by applicable law, the rights,
> powers, and duties of the Governors of each Debtor that has a
> Governor shall vest in the Plan Administrator and the Plan
> Administrator or its designee shall be the presiding officer and the
> sole Governor of each applicable Debtor.

Plan, § 8.2.

91.    Section 8.2 of the Plan also provides that "[t]he Plan Administrator shall make all determinations with respect to employment of any other directors, officers, managers and employees of the Debtors on and after the Effective Date." Id.  Pursuant to post-closing incentive programs approved by the Bankruptcy Court, under certain circumstances, Mr. Schleyer, Ms. Wittman, and Mr. Sonnenberg may be employed as consultants of the Estates until March 31, 2007, and such information has been disclosed to all parties in interest.[65] Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(5)(B).[66]

H.    The Plan Does Not Contain Rate Changes Subject To The Jurisdiction
      Of Any Governmental Regulatory Commission — 11 U.S.C. § 1129(a)(6).

92.    Section 1129(a)(6) of the Bankruptcy Code requires that any governmental regulatory commission having jurisdiction over the rates charged by the post-confirmation debtor in the operation of its business approve any rate change provided for in the

---

[65]    See Order Granting Motion Authorizing and Approving: (I) Certain Amendments to Debtors' Existing Employment Agreement With William Schleyer as Chairman and Chief Executive Officer of Adelphia Communications Corporation; (II) Implementation of Extended EVP Post-Closing Incentive Program; and (III) Implementation of Extended Employee Post-Closing Incentive Program, dated September 21, 2006 (Docket No. 12051).

[66]    Pursuant to Section 8.2 of the Plan, the Plan Administrator may determine to retain the services of an individual that is an "insider" of the Debtors (as defined in 11 U.S.C. § 105(31)(B)) — however, final post-Effective Date determinations have not yet been made.

- 53 -

3512096.2

plan.  Because the Plan does not propose any such rate changes, section 1129(a)(6) of the

Bankruptcy Code is not applicable to the Plan and should be deemed satisfied.

> I.        The Plan Is In The Best Interests Of Creditors — 11 U.S.C. § 1129(a)(7).

93.       The "best interests" test embodied in section 1129(a)(7) of the Bankruptcy

Code requires that, with respect to an impaired class of claims or interests, each holder that

rejects a plan receive or retain under such plan property of a value, as of the effective date, that is

no less than such holder would receive in a hypothetical chapter 7 liquidation of the debtor on

such date.[67, 68]

94.       With respect to Impaired Classes, the Second Disclosure Statement

Supplement contains an appropriate liquidation analysis (the "**Liquidation Analysis**") that

establishes that the best interests test is satisfied.  <u>See</u> Second Disclosure Statement Supplement,

---

[67]       Section 1129(a)(7)(A) of the Bankruptcy Code provides, in pertinent part, that:

> With respect to each <u>impaired</u> class of claims or interests —
>
> > (A)        each holder of a claim or interest of such class —
> >
> > > (i)        has accepted the plan; or
> > >
> > > (ii)       will receive or retain under the plan on account of such claim or interest
> > > property of a value, as of the effective date of the plan, that is not less than the
> > > amount that such holder would so receive or retain if the debtor were liquidated
> > > under chapter 7 of this title on such date;
>
> 11 U.S.C. § 1129(a)(7)(A) (emphasis added).

[68]       By its terms, the "best interests" test applies only to impaired classes.  11 U.S.C. § 1129(a)(7).  Pursuant to
section 1126(f) of the Bankruptcy Code, each holder of a Claim in a Class that is not Impaired is
conclusively presumed to have accepted the Plan.  Under the Plan, Class ACC 1 (ACC Priority Claims),
Class ACC 2 (ACC Secured Claims), Class SD 1 (Subsidiary Debtor Priority Claims), and Class SD 2
(Subsidiary Debtor Secured Claims) (the "**Deemed Accepting Classes**") are unimpaired and conclusively
presumed to have accepted the Plan.  The holders of Claims in the Deemed Accepting Classes either will
retain their property or will have their claims reinstated or satisfied in full, and therefore such Claims are
not impaired under section 1124 of the Bankruptcy Code.  Accordingly, section 1129(a)(7) of the
Bankruptcy Code is not applicable to holders of Claims and Equity Interests in the Deemed Accepting
Classes.

3512096.2

at DSS2-113–DSS2-115; Aronson Declaration at ¶ 8-15.  The Liquidation Analysis demonstrates

that in a hypothetical liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code,

the Estates' assets, which consist primarily of Cash, TWC Class A Common Stock and

recoveries available from the CVV, would be diminished by various costs attendant to a

liquidation, leaving far less to be distributed to creditors.  Such costs include:  (a) the costs and

discounts associated with a public sale of the TWC Class A Common Stock; (b) the additional

administrative expense costs of having one or more chapter 7 trustees appointed to liquidate the

Estates; (c) the loss of value associated with losing the expertise of the Debtors' remaining

employees and professionals; (d) increased claims against the Debtors; and (e) the costs of

litigation and delay that would befall the Estates if the Global Settlement were abandoned.  See

Wittman Decl. ¶ 85-92; Aronson Decl. ¶ 8-15.

95.    Given that these and other costs would inure to the detriment of creditors

in a liquidation scenario, yet need not be borne by the Estates under the Plan, the Liquidation

Analysis demonstrates that the recoveries under the Plan for each impaired Class exceed the

estimated recoveries that would result for such Classes in a chapter 7 liquidation. Thus, the Plan

satisfies the best interests test as to each impaired Class of Claims and Equity Interests.  See

Second Disclosure Statement Supplement, at DSS2-113–DSS2-115; Aronson Decl. ¶ 10.

96.    While a number of parties have objected to the Plan on the grounds that

the Liquidation Analysis fails to demonstrate that the Plan meets the best interests test, these

objections are flawed and, in certain instances, grounded in a mischaracterization of applicable

law.

3512096.2

i.    The Proponents' Assumption That A Chapter 7 Trustee Would
Adopt The Global Settlement Is Reasonable And Appropriate.

97.    The Liquidation Analysis properly assumes that each chapter 7 trustee (if

more than one) appointed for the Estates would adopt the Global Settlement as a means of

resolving the Inter-Creditor Dispute.  The ACC Bondholder Group (Opposition Brief, at pp. 72-

74) asserts that this assumption is inappropriate, and therefore concludes that the Plan's

compliance with section 1129(a)(7) of the Bankruptcy Code has not been demonstrated.  While

the Movants acknowledge that "[t]he plan proponent bears the burden of proof to establish by a

preponderance of the evidence that its plan meets the best interests test,"[69] the chapter 7

liquidation addressed in a best interests liquidation analysis is hypothetical and must necessarily

rest on certain assumptions.  See In re Crowthers McCall Pattern, Inc., 120 B.R. 279 (Bankr.

S.D.N.Y. 1990) (in response to objection that competitors of debtor should have been contacted

to ascertain potential offers in case of liquidation, court noted that "[s]ection 1129(a)(7)(A)(ii), in

charging the Court with making the determination that non-assenting creditors will receive the

same or more under a plan than they would in a Chapter 7 liquidation, does not require the

hypothesis to become a possible reality.").  Id. at 298.

98.    The methodology employed in the Liquidation Analysis is supported by

applicable precedent.  The Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter

11 of the United States Bankruptcy Code (the "**Enron Plan**") in In re Enron Corp., et al.

incorporated a global compromise between the Enron debtors and their creditors' committee (the

"**Enron Compromise**") designed to resolve significant disputed issues in those cases.  Similar to

---

[69]    In re Affiliated Foods, Inc., 249 B.R. 770, 787 (Bankr. W.D. Mo. 2000); see also In re Featherworks Corp.,
25 B.R. 634, 642 (Bankr. E.D.N.Y. 1982) ("As the proponent of the plan, the debtor had the burden of
establishing that it met the requirements of the Code.").

- 56 -

3512096.2

the Liquidation Analysis, the Enron debtors' liquidation analysis assumed that a trustee would

implement the Enron Compromise in a hypothetical chapter 7.  See Disclosure Statement for

Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States

Bankruptcy Code (In re Enron Corp., et al., Case No. 01-16034, Docket No. 15414 (Bankr.

S.D.N.Y. January 9, 2004)), Appendix L, p. L-1 ("The Liquidation Analysis assumes that, in the

chapter 7 cases, the Bankruptcy Court will approve the settlements and compromises embodied

in the Plan and described in the Disclosure Statement . . . as fair and reasonable and will

determine that the compromise represents the best estimate, short of a final determination on the

merits, of how these issues would be resolved.").

        99.     Certain parties in interest in Enron objected to the propriety of assuming

that a chapter 7 trustee would adopt the Enron Compromise.  See, e.g., In re Enron Corp., et al.,

Jan. 6, 2004 Hr'g. Tr., at 141, ("[W]e have no idea whether the present value of the plan's

recovery exceeds the liquidating recovery and whether the liquidating recovery is greater in the

absence of the compromise proposed in the amended plan.").  Counsel for the Enron debtors

countered that section 1129(a)(7) requires an "apples to apples" analysis, meaning that the

chapter 7 analysis must be under the same terms and conditions as the Enron Plan:

> In order to provide a liquidation analysis that allowed creditors to
> compare their recoveries under the plan versus in a chapter 7, we
> prepared a liquidating analysis which I refer to as an apples to
> apples liquidation analysis.  It uses many of the same assumptions,
> including an assumption that a chapter 7 trustee would adopt a
> compromise substantially similar to the [Enron Compromise] in
> the plan in order to efficiently resolve the liquidation of the chapter
> 7 estate.

Id. at 143:10-21.  Judge Gonzalez agreed with the Enron debtors as to the propriety of assuming

the Enron Compromise would be adopted in a chapter 7.  Id. at 145:14-15 ("I don't believe

further disclosure is necessary.").

3512096.2

100.    In an attempt to distinguish the Enron ruling from the position advanced

by the Movants, the ACC Bondholder Group has argued that the Proponents' failure to analyze

the underlying merits of the Inter-Creditor Dispute renders the assumptions in the Liquidation

Analysis inappropriate.  See, e.g., ACC Bondholder Group Opposition Brief, at p. 29.  The ACC

Bondholder Group then attempts to leap from this assertion to the conclusion that the Proponents

have, therefore, not proven that the best interests test is satisfied by the Plan.  Id., at pp. 72-74.

This argument is a red herring and merely another collateral attack upon the merits of the Global

Settlement; it provides no meaningful distinction between the assumption endorsed in Enron and

the one made by the Movants here.  An objection challenging the merits of the Global Settlement

should be addressed — and, as set forth in the 9019 Addendum, overruled — in the context of

the standards applicable to settlements generally, not revisited in the unrelated context of a best

interests analysis.  In any event, as has been demonstrated in the 9019 Addendum, the Global

Settlement meets the relevant standards found in Bankruptcy Rule 9019 and applicable case law.

It also has been overwhelmingly accepted by the Debtors' creditors and shareholders.

Accordingly, for the purposes of the Liquidation Analysis, it is reasonable for the Movants and

the Bankruptcy Court to presume that a chapter 7 trustee would reach a similar conclusion, and

adopt the Global Settlement.

101.    The decision of the court in In re MCorp Fin., Inc., 160 B.R. 941 (D. S.D.

Tex. 1993), is instructive.  At a confirmation hearing, the MCorp. court was faced with "debtors'

estates [that were] mere shells holding assets to distribute to their creditors," id. at 944, and a

plan in which the linchpin was "a settlement between the senior bondholders and the Federal

Deposit Insurance Corporation that resolve[d] all of the claims and counterclaims among the

regulatory agency, debtors, and related entities."  First, the MCorp. court considered the

- 58 -

3512096.2

propriety of the settlement, and dismissed the objections thereto. Id. at 949-959. Within the

same proceeding, such court then analyzed whether the plan met the requirements for

confirmation, and also considered the objections of certain creditors that alleged that a settlement

plan failed the best interests test. Overruling such objection, the Court held that "to the extent

that the objections go to the settlement, under a liquidation the liquidating trustee would have to

make an analysis whether to pursue the litigation similar to the one that the proponents

established in court; however, because the court has approved of the settlement, the settlement

would remain to affect a liquidation. These creditors would get no more from a liquidation than

they do under the plans.") Id. at 961. Consistent with this and other applicable precedent, the

assumptions underlying the Liquidation Analysis are entirely reasonable and appropriate.

ii.      The Payment Of Interest To Certain
Creditors Does Not Violate The Best Interests Test.

102.    In another effort to discredit the Plan, the ACC Bondholder Group asserts

that ACC Senior Noteholders would receive a greater recovery in a chapter 7 liquidation than

under the Plan, because the Plan as part of the Global Settlement proposes to pay postpetition

interest on Subsidiary Trade Claims and Other Unsecured Claims at the Case 8% Interest,[70] and

various other unsecured Claims (such as Notes) at the applicable contract rate, rather than the

federal judgment rate. ACC Bondholder Group Opposition Brief, at pp. 79-83. In short, the

ACC Bondholder Group imagines that recoveries that would otherwise go to ACC Senior

---

[70]    Sections 5.1(d)(i) and 5.1(e)(i) of the Plan provide that Allowed Subsidiary Debtor Trade Claims and
Allowed Subsidiary Debtor Other Unsecured Claims will accrue Case 8% Interest (i.e., simple interest on a
Claim or Claims at 8% per annum from the Commencement Date up to but not including the Effective
Date). Plan, §§ 5.1(d)(i) and 5.1(e)(i).

- 59 -

3512096.2

Noteholders are being diverted to provide an improperly high interest rate to certain unsecured

creditors.

103.    As an initial matter, this objection also is based on the unreasonable

assumption that a chapter 7 trustee would not adopt, and the Bankruptcy Court would not

approve, the Global Settlement.  Given the inherent reasonableness of the settlement, as borne

out by the overwhelming creditor acceptance of the Plan and as demonstrated in the 9019

Addendum, this is a very bad, self-indulgent assumption.  Further, this objection also is an

attempt by the ACC Bondholder Group to elevate the unsettled law on this issue into a bright

line rule.  Pursuant to section 726(a)(5) of the Bankruptcy Code, in a chapter 7 liquidation of a

solvent debtor, a creditor must receive pendency interest on its claim "at the legal rate from the

date of the filing of the petition."  See 11 U.S.C. § 726(a)(5).  Because section 1129(a)(7) of the

Bankruptcy Code requires that a chapter 11 plan of reorganization provide non-consenting

impaired creditors, as of the effective date of the such plan, with at least as much as they would

receive in a hypothetical chapter 7 liquidation on such date, the requirements of section 726(a)

are imported into a chapter 11 case.  See 11 U.S.C. § 1129(a)(7); see also In re Schoeneberg, 156

B.R. 963, 969 (Bankr. W.D. Tex. 1993) (reference to the "legal rate" in section 726(a)(5) of the

Bankruptcy Code is made applicable to chapter 11 through section 1129(a)(7) of the Bankruptcy

Code); In re David Green Prop. Mgmt., 164 B.R. 92, 98-99 (Bankr. W.D. Mo. 1994) ("A

requirement for confirmation of a plan is that creditors receive under the plan property of a value

that is not less than the amount that such creditor would receive if Debtor was liquidated under

Chapter 7 of the Bankruptcy Code.  In order for unsecured creditors to be paid as much in this

liquidating Chapter 11 proceeding as they would be paid under Section 726(a)(5), post-petition

interest on allowed unsecured claims should be permitted . . .") (citations omitted).

3512096.2

104.    While certain courts have held that the appropriate rate of pendency

interest in a *chapter 7* is the federal judgment rate,[71] still others have found that the state

statutory rate (or that provided in a contract) is appropriate.[72]  The Second Circuit has not yet

ruled on this issue, and therefore, the Plan does not run afoul of controlling law with respect to

section 726(a)(5) or the calculation of pendency interest in its liquidation analysis for the limited

purposes of the "best interests" test.

105.    Moreover, although section 726(a)(5) requires the payment of interest at

the legal rate from "the date of filing of the petition,"[73] section 1129(a)(7) of the Bankruptcy

Code provides that the hypothetical liquidation analysis should be conducted as of the effective

date of the plan.  See 11 U.S.C. § 1129(a)(7) (providing that each dissenting holder of an

impaired claim or interest must "receive or retain under the plan on account of such claim or

interest property of a value, *as of the effective date of the plan*, that is not less than the amount

---

[71]    See, e.g., In re Godsey, 134 B.R. 865, 867 (Bankr. M.D. Tenn. 1991) ("[w]ithout a clear statutory definition of 'the legal rate' . . . this court will look to the federal statutory interest rate that is most closely related to the bankruptcy context, . . . the interest rate applied to judgments rendered in federal district courts."); Beguelin v. Volcano Vision, Inc. (In re Beguelin), 220 B.R. 94, 100 (9th Cir. B.A.P. 1998) (citing In re Melenyzer, 143 B.R. 829 (Bankr. W.D. Tex. 1992)) ("[U]se of the federal judgment rate not only assures a ratable distribution, but it also meets the requirement that federal law decide a federal issue.").

[72]    See Schoeneberg, 156 B.R. at 972 ("the weight of prior case law cited hereinabove convinces this Court that, when there was a prepetition contract between the parties that provided for interest, it is that contract rate which should be applied in situations such as these."); Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp., 679 F.2d 264, 269 (1st Cir. 1982) ("where there is a contractual provision, valid under state law, providing for interest . . . the bankruptcy court will enforce the contractual provision. . ."); In re Dow Corning Corp., 244 B.R. at 695 ("[a] debtor with the financial wherewithal to honor its contractual commitments should be required to do so").  Absent a contract, certain courts have held that the "legal rate" is defined by the applicable state statute that establishes a rate of interest for a creditor, such as a state judgment rate.  In re Shaffer Furniture Co., 68 B.R. 827, 831 (Bankr. E.D. Pa. 1987) ("in this area, we are governed by [Pennsylvania] state law, absent an overruling federal law. . . . The creditors are therefore entitled to post-petition interest on their claims at the rate of six (6%) percent per annum")(citations omitted).  See also Comm'r v. Adcom (In re Adcom, Inc.), 89 B.R. 2 (D. Mass. 1988) ("This Court is of the opinion that, in the context of this particular case, the phrase 'interest at the legal rate' in section 726(a)(5) refers directly to the rate of interest set by state law"); Boyer v. Bernstein (In re Boyer), 90 B.R. 200, 201 (Bankr. D.S.C. 1988) (holding that the "legal rate" should be determined in accordance with South Carolina statutory law).

[73]    See 11 U.S.C. § 726(a)(5).

- 61 -

3512096.2

that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this

title *on such date*") (emphasis added).  Thus, it is appropriate for the liquidation analysis to

assume a chapter 7 petition as of such date as well, not to reach back over four and a half years to

an earlier petition date and eviscerate legitimate creditor expectations (often accompanied by

detrimental reliance on underlying settlements) that they would receive, generally, state contract

rate interest in a pending chapter 11 case.  See Walton v. Kleinfeld (In re Glados Inc.), 197 B.R.

357, 363 (M.D. Fla. 1995) (noting that the court did "not believe that Congress intended for

interest distributions in Chapter 7 cases to be calculated at a rate in effect before the case ever

became one under Chapter 7");[74] see also Rupp v. U.S. (In re Rocky Mountain Refractories), 208

B.R. 709, 713 (10th Cir. 1997) (holding that the "[t]he Chapter 7 priority scheme should not

affect Chapter 11 claims, which were fixed at the time of conversion").

106.    Further, the issue of whether contract rate interest and Case 8% Interest[75]

is appropriate already has been submitted to and vetted by the Bankruptcy Court, which

previously approved such rates.  See April 27, 2006 Hr'g Tr., at 31, ("I believe that on the facts

here, the adjusted contract rate, and not the default and/or compounded rate on the one hand, or

the federal judgment interest rate, on the other, is the rate that is fair and equitable. . . . I find that

the eight percent rate to be provided under the settlement is fair and equitable, and it is

approved.").  Given that the payment of Case 8% Interest or contract rate, as applicable, was

---

[74]    While Glados was reversed and remanded on other grounds on appeal, this premise was not addressed by
the Eleventh Circuit.  See In re Glados, Inc., 83 F.3d 1360 (11th Cir. 1996).

[75]    The Subsidiary Trade Committee proposed a blended state statutory rate in excess of the 8% ultimately
accepted, based on its analysis of weighted averages of the states with the highest number of the Debtors'
subscribers, in order to eliminate the burdensome task of requiring the Debtors to examine the state law of
each of the 31 states in which the Debtors do business, or many underlying contractual entitlements that
purport to override state law, in order to determine the state judgment rate of interest that may be payable
on such claims.

- 62 -

3512096.2

already deemed appropriate by the Bankruptcy Court for the pending chapter 11 cases, the

Proponents' assumption that such interest rates would apply in a chapter 7 liquidation retroactive

to the Commencement Date is proper.  Furthermore, the Movants submit that any potential

interest savings by virtue of the application of the federal judgment rate in a chapter 7 would be

outweighed by other detrimental effects of a chapter 7 liquidation of the Estates.[76]  Accordingly,

the ACC Bondholder Group's objection should be overruled.[77]

> iii.    The Plan's Provisions For The Treatment Of Bank Claims Does
>         Not Violate The Best Interests Test.

107.    Contrary to the Objecting Banks' insistence, if the Holdback Motion is

granted, the Bank Lenders are not entitled to accrue interest at their contract rates after the

Effective Date, under the best interests test or any other authority.  Rather, courts have repeatedly

and consistently ruled that the Bankruptcy Code, including sections 506(b) and 1129(a)(7), does

not provide creditors with a basis to receive interest at contract rates after the effective date of a

plan, but only present-value compensation for the time that elapses from the effective date to the

date of payment.

108.    As an initial matter, it appears that this long-running dispute may be moot.

Assuming that the agreement that the Creditors Committee has reached with BOFA is approved

---

[76]    The Proponents acknowledge that the Bankruptcy Court, in dicta, has previously commented that the
federal judgment rate may be the appropriate interest rate for purposes of a best interests analysis, April 27,
2006, Hr'g. Tr., p. 7 (J. Gerber), but such matter has not yet been adjudicated.  Even if the Bankruptcy
Court were to find that the federal judgment rate is the appropriate rate, the Proponents submit that the Plan
still satisfies the best interests test for the reasons set forth above.  Indeed, the Proponents believe that any
such potential savings in a chapter 7 case that did not involve a global settlement like that embodied in the
Plan would quickly be swallowed by the costs attendant to a chapter 7 liquidation of the Estates,
particularly under the scenario hypothesized by the ACC Bondholder Group that envisions a multi-trustee
continuation of the Resolution Process and no settlement.  See also Second Disclosure Statement
Supplement, at DSS2-114.

[77]    Notably, even if the Bankruptcy Court were to determine that the interest rate applicable to a chapter 7
should be lower than that which is presently assumed, it is likely that, in the event of a conversion to
chapter 7, the period in which interest would accrue would be longer.

3512096.2

by the Bankruptcy Court, and assuming that the Creditors Committee is able to successfully

conclude its negotiations with the Non-Agent Committee and its members vote to accept any

agreed-upon changes, none of Bank Claims Classes will be subject to the Holdback Motion.

However, if any Class remains subject to the Holdback Motion, the Plan nonetheless would

comply with section 1129(a)(7) of the Bankruptcy Code.

        109.    Under ordinary circumstances, the accumulation of interest on a creditor's

claim ceases when the bankruptcy petition is filed.  Section 506(b) of the Bankruptcy Code

presents an exception to that rule where a creditor is oversecured.  However, although section

506(b) of the Bankruptcy Code generally allows the contract rate of interest for a fully secured

creditor up to the effective date of a plan, it has no application to the analysis required by section

1129 of the Bankruptcy Code or to the interest payable on claims after the plan's effective date.

See Rake v. Wade, 508 U.S. 464, 113 S. Ct. 2187 (1993) (postpetition interest under 506(b)

accrues as part of the allowed claim from the petition date until the confirmation or effective date

of the plan); S &P, Inc. v. Pfeifer (In re S & P, Inc.), 18 B.R. 159, 170-71 (Bankr. N.D. Ind.

1995); In re Snider Farms, Inc., 83 B.R. 977, 989 (Bankr. N.D. Ind. 1988); Fed. Land Bank of

Louisville v. Gene Dunavant & Son Dairy (In re Gene Dunavant & Son Dairy), 75 B.R. 328, 366

(Bankr. M.D. Tenn. 1987); 3 Collier on Bankruptcy ¶ 506.04 (15th ed. rev. 2006).  As the

Dunavant court explained:

> Section 1129(a)(7)(A)(ii) and 1129(b)(2)(A)(1) require the
> Bankruptcy Court to analyze the present value of the stream of
> payments or other consideration provided by a plan.  This concept
> of present value assumes the use of *market* rates of interest (as
> distinguished from the rate specified in the contract) for loans of
> similar duration, with similar security, and with similar risks.
>
> In determining the allowed amount of the claim of a fully secured
> creditor, the creditor is entitled to his contract rate of interest up to
> the effective date of the plan by virtue of 11 U.S.C. § 506(b) . . . .
> *But this rule has no application to the present value analysis*

- 64 -

3512096.2

> required by § 1129, or to the interest payable on claims after the
> effective date of a plan.

Gene Dunavant & Son Dairy, 75 B.R. at 335-36 (emphasis added) (citations omitted); see also S

& P, Inc., 189 B.R. at 171 ("Although the contract rate of interest is allowed for a fully secured

creditor up to the effective date of the plan under § 506(b), this rule has no application to the

present analysis required by § 1129, or to the interest payable on claims after effective date of the

plan."); In re Palmer, 224 B.R. 681, 682 (Bankr. S.D. Ill. 1998) ("[V]alue, as of the effective date

of the plan" as used in section 1325(a)(5)(B)(ii) "allows a debtor to keep property over the

objection of a secured creditor so long as the debtor's plan provides for the creditor to receive the

present value of its collateral in distributions under the plan.  Because payment is made over a

period of time rather than immediately, the plan must include interest at a rate that will give the

creditor 'present value.'"); 3 Collier on Bankruptcy ¶ 506.04 (15th ed. rev. 2006) (same).[78]

110.    "The operative language in § 1129(a)(7)(A)(ii) requires that the property

to be received by the creditor be determined at a value 'as of the effective date of the plan'."  See

In re Kuljis Seafood Co., 73 B.R. 659, 661 (Bankr. S.D. Miss. 1986).  "The identical language is

tracked in § 1129(b)(2)(A)(i)(II) as the requirement where the creditor is to receive deferred cash

payments.  Therefore, if it is determined that the requirements for confirmation delineated in §

---

[78]    See In re Corley, 83 B.R. 848, 851 (Bankr. S.D. Ga. 1988) (holding that:

> A reading of Sections 1129, 1225 and 1325 reveals that each section pertaining
> to secured creditors uses this same term, and there is no sound reason for
> construing this term differently in a Chapter 11, Chapter 12 or Chapter 13
> proceeding.  Whatever "value, as of the effective date of plan" means, it means
> the same in Chapter 11, Chapter 12, and Chapter 13 proceedings.  The factors to
> be applied in determining prevailing market rates of interest are (1) the length of
> the payout, (2) the quality of the security and (3) the risk of subsequent default.).

3512096.2

1129(b)(2)(A)(i)(II) have been met . . . then so will the requirements of § 1129(a)(7)(A)(ii) be

met.'" Id.

   111. A theoretical creditor "who receives the 'present value' of its allowed

claim is placed in the same economic position that it would have been in had it received the

value of its allowed claim on the date the reorganization plan was confirmed." Gen. Motors

Acceptance Corp. v. Valenti (In re Valenti), 105 F.3d 55, 63 (2d Cir. 1997).  The interest rate

used to provide "value, as of the effective date," is not supposed to provide any degree of profit

to the creditor.  Id. at 59.  Thus, the Holdback Motion correctly explained that utilizing contract

rates to calculate interest on the Bank Lenders' reserve violated, rather than complied with,

chapter 11 confirmation requirements.  The Bank Lenders simply ignore all of the authorities

that hold that the proper measure of "value, as of the effective date" under sections 1129(a)(7)

and 1129(b)(2) is not the contract rate of interest but a present value factor.

   112. The Objecting Banks apparently had reached the conclusion that they

would be entitled to contract rate interest after the Effective Date by deleting the phrase "*on such

date*" from the statute.  See BOFA (As Administrative Agent) Objection, ¶ 27; BOFA (As

Holder of Olympus Bank Claims) Objection, ¶ 26.  Section 1129(a)(7), however, says "as of the

Effective Date" and "on such date"; it does not say "sometime long after the effective date."  See

11 U.S.C. § 1129(a)(7).  Finally, certain Objecting Banks complained that they would not

receive the present value of their Claims if their distributions were subject to the Holdback

Motion because the interest earned may be taxable and subject to fees.  That objection was

frivolous because (a) there is no record or evidentiary basis for the assumption that the interest

earned will be subject to taxation, (b) the possible cost of taxes is factored into taxable securities

by providing a higher rate of interest then government securities that provide tax-exempt interest,

- 66 -

3512096.2

and accordingly there is no credible evidence that the rate of interest provided for under the Plan

will not allow such claimants to receive the present value of their Claims, (c) if the Banks subject

to the Holdback Motion desire, the Proponents would not object to the escrow funds being

invested in tax-exempt government securities, and (d) any possible incidental fees associated

with purchasing large sums of United States Treasury securities, which at this point are only

hypothetical, would be too *de minimis* to warrant discussion.

J.      The Plan Satisfies Section 1129(a)(8) With
        Respect To All Classes Except The Presently Rejecting Classes.[79]

113.    Pursuant to section 1129(a)(8), each class of claims and interests under a

plan must either (a) have accepted the plan, or (b) be rendered unimpaired under the plan.  11

U.S.C. § 1129(a)(8).  Except with respect to the presently Rejecting Classes, the Movants submit

that the requirements of section 1129(a)(8) are met with respect to all Classes under the Plan.

114.    As set forth in the Voting Certification, except for the Rejecting Classes,

the Plan has been overwhelming accepted at each Debtor for which votes were cast.  The

Proponents note that there are 42 Debtors for whom there were no creditors.  Inasmuch as there

are no impaired classes of claims with creditors against these Debtors, the Proponents

respectfully submit that section 1128(a)(8) is not applicable to such Debtors.[80]  In addition, the

Proponents note that there were six Debtors for which there were creditors eligible to vote but

---

[79]    See ¶ 27, *supra*.

[80]    In this regard, the Proponents also note that Section 7.3 of the Plan provides that "[a]ny Class of Claims or Equity Interests that does not have a holder of an Allowed Claim or Equity Interest or a Claim or Equity Interest temporarily allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code."  No party in interest objected to this provision.  This section applies with respect to the 42 Debtors with no creditors, as well as two Debtors with no creditors eligible to vote and Class SD 11 (Subsidiary Debtor Existing Securities Law Claims), whose sole creditor (W.R. Huff Asset Management Co., L.L.C.), was not eligible to vote because its claim is subject to an objection.

- 67 -

3512096.2

did not.  Section 7.3 of the Plan adopts a presumption that if no holder of a Claim or Equity

Interest eligible to vote in a particular Class timely votes to accept or reject the Plan, the Plan

will be deemed accepted by the holders of such Claims or Equity Interests in such Class.  Plan, §

7.3.  The ACC Bondholder Group has asserted that this presumption is improper.  See ACC

Bondholder Group Opposition Brief, at pp. 110-112.  This objection is without merit and should

be overruled.

115.    First, persuasive case law exists to support the presumption.  Indeed, the

only Circuit Court of Appeals to have considered the issue held that it is reasonable to adopt such

a presumption.  See Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.), 836 F.2d 1263,

1267-68 (10th Cir. 1988).  The debtors in Ruti-Sweetwater, not unlike the Debtors, comprised a

large multi-entity conglomerate with a sophisticated capital structure and various levels of

indebtedness.[81]  Refusing to "endorse the proposition that a creditor may sit idly by, not

participate in any manner in the formulation and adoption of a plan in reorganization and

thereafter, subsequent to the adoption of the plan, raise a challenge to the plan for the first time,"

the Tenth Circuit approved a presumption similar to the one contained in Section 7.3 of the Plan,

id. at 1266, and held that "non-voting, non-objecting creditors, should be deemed to have

accepted the plan for purposes of § 1129(b)."  Id.  See also In re Campbell, 89 B.R. 187, 188

(Bankr. N.D. Fla. 1988) (approving presumption and noting that "[a] single creditor or class of

creditors should not, by their total inaction, be able to force a debtor to have to resort to the cram

down process to obtain confirmation of a plan when all of the other confirmation requirements,

---

[81]    "At the time of their filings, the debtors faced demands from secured and unsecured creditors holding
claims of millions of dollars in addition to the obligations owed to thousands of timeshare owners.
Following their filings, the debtors prepared a complicated (120 pages) Plan of Reorganization which
included treatment of eighty-three separate classes of secured creditors and forty separate classes of time
share owners."  Id. at 1263-1264.

3512096.2

including the affirmative acceptance of the plan by at least one impaired class, have been

met.").[82]

116.    The Proponents do not dispute that some courts have rejected the premise

that non-voting classes should be deemed to have accepted a plan.  For example, in In re Townco

Realty, Inc., 81 B.R. 707, 708 (Bankr. S.D. Fla. 1987), the court refused to allow a debtor to

characterize a non-voting class as an accepting class. (finding no "predicate in the statute or the

rules for [such a] conclusion.").[83]  See also In re Friese, 103 B.R. 90 (Bankr. S.D.N.Y. 1989).

117.    Notwithstanding the split of authority outlined above, the cases that

rejected a similar presumption are distinguishable from the case at bar.  In each of those cases,

neither the plan nor the disclosure statement contained a provision notifying creditors and parties

in interest of the proposed presumption.  Rather, those cases assessed the merits of deemed

acceptance sought by debtors that failed to disclose or give notice of the presumption until the

confirmation hearing or later.[84]  Moreover, none of those situations were as complicated as either

the Debtors' cases or the facts in Ruti-Sweetwater.  For example, Friese involved a plan with

only 3 classes, see 103 B.R. at 91, 499 W. Warren confronted a plan with only 7, and a small

---

[82]    It should also be noted that an important concern of the court expressed in Campbell, which adopted the
holding of Ruti-Sweetwater, is present in these cases:  the issue of whether a single creditor or class should
be able to force a cramdown by their inaction.  The court must consider whether "a jointly administered
bankruptcy case that has dozens or more of assenting creditors can be thwarted in the confirmation of a
plan because in one class which sometimes, not infrequently, happens, nobody bothers to vote and
everybody's will is paralyzed."  Sept. 12, 2006 Hr'g Tr., (J. Gerber), at 195-96.  In light of the vast
complexity of the present cases, and the overwhelming acceptance of the Global Settlement and the Plan
despite its intricacy, it would go against the interests of all to force a cramdown simply because the
members one or more Classes neglected to cast a vote.

[83]    See also In re 499 W. Warren St. Assoc. Ltd., 151 B.R. 307 (Bankr. N.D.N.Y. 1992); Bell Rd. Inv. Co. v.
M. Long Arabians (In re M. Long Arabians), 103 B.R. 211 (9th Cir. 1989); In re Higgins Slacks Co., 178
B.R. 853 (N.D. Ala. 1995); In re Broad Assoc. Ltd., 110 B.R. 632 (Bankr. D.Conn. 1990).

[84]    For example, in Townco the Debtor did not attempt to count non-voting classes as accepting classes until
after the voting deadline had passed and the confirmation hearing had concluded.  Townco, 81 B.R. at 708.

3512096.2

number of creditors, see 151 B.R. at 311, and the plan reviewed in Broad dealt with only 5

classes in total, see 110 B.R. at 634.

118.    In sharp contrast to those cases, the Debtors' cases are exceedingly

complex;  the Debtors are comprised of over 200 legal entities, have 37 Classes under the Plan,

dozens of public debt issuances, and thousands of creditors.  Moreover, unlike the cases cited by

the Objectors, here there is an explicit provision in the Plan and the ballots that informs parties in

interest of the presumption, and a detailed discussion of the risks attendant to a failure to vote in

the Second Disclosure Statement Supplement that explains the presumption proposed to be

applied to non-voting Classes.[85]  Pursuant to section 1123(b)(6) of the Bankruptcy Code, "a plan

may include any other appropriate provision not inconsistent with the applicable provisions of

this title."[86]  Thus, creditors have been given ample notice with respect to the presumption

applicable to non-voting Classes, and such presumption is not inconsistent with any provision of

the Bankruptcy Code.  Accordingly, the ACC Bondholder Group's objection should be

overruled.

---

[85]    In addition to the text of Section 7.3 of the Plan, the Second Disclosure Statement Supplement discloses
this presumption at two different locations.  See Second Disclosure Statement Supplement, at DSS2-4,
DSS2-100.  Finally, each ballot delivered to a holder of a Claim or Equity Interest entitled to vote on the
Plan included the following notation in **bold** text:

**The Proponents have requested that the Bankruptcy Court adopt a presumption that if no
holder of a Claim or Equity Interest in a Class of Claims or Equity Interests eligible to vote in a
particular Class timely submits a ballot to accept or reject the Plan, then the applicable Class
will be deemed to have accepted the Plan.  Accordingly, if you do not wish such a presumption
with respect to any Class for which you hold Claims or Equity Interests to become effective, you
should timely submit a ballot accepting or rejecting the Plan for any such Class.**

[86]    Furthermore, under the Bankruptcy Act there existed a provision deeming non-voting classes to have
rejected a plan.  See Ruti-Sweetwater, 836 F.2d at 1267 (citing H.R.Rep. No. 95-595, 95th Cong. 1st Sess.
410 (1977)).  Under the Bankruptcy Code, no such provision exists.  Accordingly, absent an express
prohibition on the presumption, section 1123(b)(6) operates to allow the inclusion of the presumption in a
plan.

- 70 -

3512096.2

K.    The Plan Provides For Payment In Full Of All
      Allowed Priority Claims — 11 U.S.C. § 1129(a)(9).

119.    Section 1129(a)(9) of the Bankruptcy Code requires that, except to the

extent that the holder of a particular claim agrees to a different treatment of such claim:

(a)    holders of claims entitled to priority under section
       507(a)(1) or (2) must receive cash in the allowed amounts
       of such claims on the effective date of the Plan;

(b)    holders of claims entitled to priority under section
       507(a)(3), (4), (5), (6) or (7) must receive cash in the
       allowed amounts of such claims on the effective date of
       the Plan or (if such class had accepted the plan) deferred
       cash payment of a value, as of the effective date of the
       Plan, equal to the allowed amounts of such claims; and

(c)    holders of tax claims entitled to priority under section
       507(a)(8) must receive on account of such claims deferred
       cash payments, over a period not exceeding six years
       from the respective dates of assessment of such claims, of
       a value, as of the effective date of the Plan, equal to the
       allowed amounts of such claims.

See 11 U.S.C. § 1129(a)(9).

120.    Pursuant to Sections 5.1(a), 5.2(a), 6.1, 6.2(d), 6.2(e) and 6.3 of the Plan,

ACC Priority Claims (claims entitled to priority under section 507(a) of the Bankruptcy Code,

other than subsections (a)(1) and (a)(8)), Subsidiary Debtor Priority Claims (claims entitled to

priority under section 507(a) of the Bankruptcy Code, other than subsections (a)(1) and (a)(8)),

Administrative Expense Claims, Tax Claims (claims entitled to priority under section 507(a)(8)

of the Bankruptcy Code), and Fee Claims (claims entitled to priority under subsection 507(a)(1)

of the Bankruptcy Code), respectively, will be afforded treatment in accordance with section

1129(a)(9) of the Bankruptcy Code.  Therefore, the Plan satisfies section 1129(a)(9) of the

Bankruptcy Code.

- 71 -

3512096.2

L.     The Plan Has Been Accepted By At Least One Impaired Class
       Of Claims That Is Entitled To Vote — 11 U.S.C. § 1129(a)(10).

121.    Section 1129(a)(10) of the Bankruptcy Code requires that, if a class of

claims is impaired under a plan, at least one class of impaired claims must have voted to accept

the plan, as determined without including any acceptance of the plan by any insider.  11 U.S.C.

§ 1129(a)(10).

122.    As set forth in the Voting Certification, the holders of Claims in each of

the Voting Accepting Classes (as defined below), as determined without including any

acceptance by any insider in such Class, have voted to accept the Plan, including an impaired

Voting Class at each Debtor for which there were creditors entitled to vote.  Accordingly, the

requirements of section 1129(a)(10) of the Bankruptcy Code have been satisfied.

i.     The Debtors Possess a Sound Business Justification For The Plan's
       Treatment of Claims — No Class of Claims or Equity Interests
       Has Been "Artificially" Impaired.

123.    Certain Objecting Banks have asserted that the Proponents cannot satisfy

section 1129(a)(10) of the Bankruptcy Code because no genuinely impaired Class of Claims or

Equity Interests has voted to accept the Plan.  See BOFA (As Administrative Agent) Objection,

¶¶ 60-71; BOFA (As Holder of Bank Claims) Objection, ¶¶ 48-59; Calyon Parties' Objection, at

pp. 36-37.  BOFA asserts that the Trade and Other Unsecured Classes have been "artificially"

impaired, while the Calyon Parties assert that the Subsidiary Debtor Equity Interests have been

similarly "artificially impaired."  In light of the sound business purposes that the Proponents

possess for the Plan's treatment of Claims and Equity Interests, challenges of artificial

impairment — even if properly before the Bankruptcy Court[87] — must be overruled.

---

[87]    Finding that the plain language of the Bankruptcy Code does not limit application of 1129(a)(10) to classes
        of claims that meet any particular level or type of impairment, a number of courts have rejected charges of

- 72 -

3512096.2

124.    Section 1124(1) of the Bankruptcy Code provides that "[e]xcept as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan — (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. §1124(1). Indeed, the Second Circuit has noted that Congress meant to define impairment in the "broadest possible terms." DiPierro v. Taddeo (In re Taddeo), 685 F.2d 24, 28 (2d Cir. 1982).[88]

---

artificial impairment simply as a matter of statutory construction. See, e.g., In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 240 (Bankr. D.N.J. 2000) ("Under the statutory scheme for the classification and treatment of claims, a plan proponent may impair a class of claims. If an impaired class accepts the plan, the requirement of section 1129(a)(10) is satisfied."); In re Duval Manor Assocs., 191 B.R. 622, 628 (Bankr. E.D. Pa. 1996) (concluding that artificial impairment is "clearly permitted under the plain meaning of the statute"); see also L&J Anaheim Assocs. v. Kawasaki Leasing Int'l (In re L&J Anaheim Assocs.), 995 F.2d 940, 943 (9th Cir. 1993) (holding that § 1124 does not differentiate between artificial and actual impairment of claims). See also Equitable Life Ins. Co. of Iowa v. Atlanta-Stewart Partners (In re Atlanta-Stewart Partners), 193 B.R. 79, 82 (Bankr. N.D. Ga. 1996) (1994 amendments to the Bankruptcy Code removed concept of artificial impairment from plan confirmation landscape). The Atlanta-Stewart court analyzed the 1994 amendments to the Bankruptcy Code, and concluded that Congress had written the "cash-out" option of the former section 1124(3) out of the Bankruptcy Code. Specifically, section 1124 formerly provided that a class of claims is not impaired if: "on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to — (A) with respect to a claim, the allowed amount of such claim." As a result of the deletion of 1124(3), under the revised version of section 1124, "a class of creditors which will receive payment in full upon the effective date of the plan is impaired within the meaning of the Bankruptcy Code." Atlanta-Stewart, 193 B.R. at 82. See also Greate Bay Hotel & Casino, 251 B.R. at 240 (same); In re Crosscreek Apts., Ltd., 213 B.R. 521, 536 (Bankr. E.D. Tenn. 1997) (same). But see Solow v. PPI Enters.(U.S.), Inc. (In re PPI Enters.(U.S.), Inc.), 324 F.3d 197, 207 (3d Cir. 2003) (criticizing the conclusion in Atlanta-Stewart).

The line of cases following Atlanta-Stewart represent a relatively recent trend in the jurisprudence, and as a general proposition, those cases that engage in a detailed artificial impairment inquiry are more dated and, significantly, generally pre-date or are contemporaneous with the enactment of the 1994 amendments. The benefits of this more modern approach to impairment are borne out by the facts presently at bar. As the Atlanta-Stewart court noted, "litigation over artificial impairment will now be avoided," and the fight over confirmation will now focus on the heart of the plan and whether the plan is "'fair and equitable' and in the 'best interest of creditors.'" Id. at 82. Given the myriad of complex and significant issues now pending before this Court, the benefits of embracing the logic of Atlanta-Stewart and its progeny are plainly evident.

[88]    In light of the foregoing, certain courts considering the issue have held that even in a situation in which a plan enhances a creditor's legal, equitable or contractual rights, such creditor's claim meets the Bankruptcy Code's test for impairment. Downtown Ath. Club of N.Y. City v. Caspi Dev. Corp. (In re Downtown Ath. Club of N.Y. City), 1998 Bankr. LEXIS 1642, at *17 (Bankr. S.D.N.Y. 1998) ("Because [section 1124(1)] focuses on whether a proposed plan of reorganization changes a creditor's rights, any alteration, even one that enhances those rights, constitutes impairment"). See also L & J Anaheim Assocs., 995 F.2d at 942

- 73 -

3512096.2

125.    Accordingly, even if "artificial" impairment is prohibited by the

Bankruptcy Code, any such objection is without merit here.  Even those courts that prohibit an

artificially impaired class from serving as the impaired assenting class under section 1129(a)(10)

will consider whether "the proposed impairment is necessary for economical or other justifiable

reasons ___and not just___ to achieve a 'cram down.'"  In re Fur Creations by Varriale, Ltd., 188 B.R.

754, 760 (Bankr. S.D.N.Y. 1995) (emphasis added).  Stated differently, where a debtor has a

legitimate economic reason for its treatment of a particular class of claims, and such treatment

results in impairment, challenges to the validity of such impairment will not be sustained.  In re

Ridgewood Apartments of Dekalb County, Ltd., 183 B.R. 784, 789 (Bankr. S.D. Ohio 1995) ("If

plan proponents have valid, credible reasons for impairing a class of claims, another class cannot

argue that it has been deprived of veto power over a plan.").

126.    As set forth in the table below, the Proponents possess ample justification,

wholly apart from any need to procure at least one impaired assenting class, for the treatment

afforded to the holders of Subsidiary Trade and Other Unsecured Claims.

| Nature of the Impairment | Debtors' Business Justification |
|---|---|
| a)  It is estimated that holders of Subsidiary Trade and Other Unsecured Claims will receive 94% of their distribution in TWC Class A Common Stock, and only 40% in Cash.[89]  Paying creditors in stock rather than in cash is plainly an alteration of their rights under section 1124(1). | a)  Allocation of particular currency is a term of the Global Settlement.  The Plan preserves Cash for Priority and Administrative Claims and requires each settling party to bear some element of market risk. |

---

("under this broad definition, 'any alteration of the rights constitutes impairment even if the value of the
rights is enhanced.'") quoting In re Acequia, Inc., 787 F.2d 1352, 1363 (9th Cir. 1986).  See generally 7
Collier on Bankruptcy ¶ 1124.02 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) ("Section
1124(1) states that a class is not impaired if the plan 'leaves unaltered the legal, equitable, and contractual
rights to which such claim or interest entitles the holder of such claim or interest.' Any alteration of these
rights constitutes impairment, even if the value of the rights is enhanced.").

[89]    See Second Disclosure Statement Supplement, at DSS2-31.

- 74 -

3512096.2

| | |
|---|---|
| b) Moreover, subject to the True-Up provision of section 10.12 of the Plan, the distribution of TWC Class A Common Stock to certain holders of Trade and Other Unsecured Claims will be delayed by 60 days. Such delay is plainly an alteration of rights under section 1124(1). | b) Same. |
| c) Such holders also agreed to give up a certain portion of their distribution. Even if a portion of such "give up" has already been earned back, this was a risk and an alteration of such holders' rights. | c) Same. |

127.    Assertions of artificial impairment, even if properly brought before the

Court, are without merit, as the Proponents have multiple, sound business justifications for the

impairment of Trade and Other Unsecured Claims that go beyond the need for an impaired

assenting class.

> ii.    The Bankruptcy Code Only Requires That A Single Impaired
>          Class Of Claims Accept The Plan, Not An Impaired Class For
>          Each Debtor.

128.    The Plan may be confirmed by the Bankruptcy Court notwithstanding the

fact that no Class of impaired Claims with respect to FrontierVision Holdings Capital

Corporation, FrontierVision Holdings Capital II Corporation, and FrontierVision Holdings, L.P.

voted to accept the Plan.

129.    Section 1129 of the Bankruptcy Code provides, in pertinent part:

(a)    The court shall confirm a plan only if the following requirements are met
         …

(10)    If a class of claims is impaired under the plan, at least one class of
           claims that is impaired **_under the plan_** has accepted the plan,
           determined without including any acceptance of the plan by any
           insider.

130.    11 U.S.C. § 1129(a)(10) (emphasis added).  Here, all impaired Classes of

Claims, other than the Rejecting Classes (collectively, the "**Voting Accepting Classes**"), have

3512096.2

voted to accept the Plan.  These Voting Accepting Classes are sufficient to satisfy the plain and

unambiguous language of section 1129(a)(10) of the Bankruptcy Code.  Thus, the inquiry must

stop there.  As the Supreme Court has made clear on numerous occasions, "when the statute's

language is plain, the sole function of the courts — at least where the disposition required by the

text is not absurd — is to enforce it according to its terms." Dodd v. U.S., 125 S.Ct. 2478, 2483

(2005) (citations omitted); see also Loral Stockholders Protective Comm. v. Loral Space &

Commc'ns Ltd. (In re Loral Space & Commc'ns Ltd.), 2004 WL 2979785, *5 (S.D.N.Y. Dec.

23, 2004) (reversing bankruptcy court's denial of motion for appointment of examiner where

statute, on its face, mandated such appointment).  Moreover, "[t]he plain meaning rule has even

greater force when applied to the text of the Bankruptcy Code." In re Armstrong World Indus.,

Inc., 320 B.R. 523, 535 (D.Del. 2005), aff'd, 432 F.3d 507 (3d. Cir. 2005).

131.    Other courts presiding over large, multi-debtor cases have taken a similar

approach.  See In re Resorts Int'l, Inc., 145 B.R. 412, 479 (Bankr. D.N.J. 1990) (court found

section 1129(a)(10) satisfied where accepting impaired classes were creditors of some, but not

all, of the Debtors); See Memorandum in Support of the Order Confirming Plan of

Reorganization, In re SPGA, Inc., et al., Case No. 1-01-02609, Docket No. 445 (JJT) (Bankr.

M.D.Pa. September 28, 2001).[90]  As successfully argued by the SPGA debtors, "an overly broad

reading of [section 1129(a)(10)] — arguably barred and certainly not supported by its plain

---

[90]    Importantly, the finding that one accepting impaired class was sufficient for purposes of confirmation of a
plan for jointly administered debtors was not premised on the substantive consolidation of such debtors'
estates.  Neither the Resorts International debtors nor the SGPA debtors sought substantive consolidation of
their estates.  A copy of the SPGA court's Memorandum Decision (the "SPGA Memorandum Decision")
will be included with the trial exhibits submitted by the Proponents.

3512096.2

language — would inappropriately complicate multi-debtor cases by exalting form over

substance and would, in some cases, potentially make a negotiated plan unworkable."[91]

132.    In light of this precedent and the plain reading of the statute, the Plan

comports with section 1129(a)(10) of the Bankruptcy Code.

> iii.    The Subsidiary Debtor
>         Equity Interests Are Impaired.

133.    The Calyon Parties have contended that the Plan's designation of the

Subsidiary Debtor Equity Interests Class as impaired is inappropriate because such holders will

retain their Equity Interests in the Subsidiary Debtors under the Plan.  While the Proponents

believe that their designation of Subsidiary Debtor Equity Interests as impaired is appropriate,

they also question the import of this objection, as the votes of Subsidiary Debtor Equity Interest

holders (as "insiders") cannot be counted for purposes of confirming the Plan pursuant to section

1129(a)(10) and/or section 1129(b).  Moreover, and in any case, the Calyon Parties' Objection

fails to acknowledge that the holders of Subsidiary Debtor Equity Interests will forgo certain of

their rights, leaving them impaired under the constraints of section 1124 of the Bankruptcy Code.

Specifically, although the Subsidiary Debtors will continue to exist post-Effective Date, no

distribution to the equity holders is to be made under the Plan on account of retained Equity

Interests in such Subsidiary Debtors.[92]  Rather, any value that would have been distributed

---

[91]    SGPA Memorandum Decision, at 16.

[92]    The ACC Bondholder Group has asserted that the Plan simultaneously denies holders of Intercompany
Claims the right to vote and the right to receive distributions in violation of section 1126(g) of the
Bankruptcy Code.  The ACC Bondholder Group rests this collateral attack on the merits of the Global
Settlement on a flawed reading of Section 5.3 of the Plan.  Such provision only provides that Intercompany
Claims will not receive a "Plan Distribution" (i.e., Cash and/or TWC Class A Common Stock) under the
Plan.  Such section does not provide that Intercompany Claims will receive "no distribution" such that they
are deemed to reject the Plan pursuant to section 1126(g).  Instead, holders of Intercompany Claims will
receive all of the benefits of the Global Settlement, including the benefit of forgiveness of any payables
alleged to be owed to other holders of Intercompany Claims, as well as the benefit of a full and final

- 77 -

3512096.2

directly to the Subsidiary Debtors' shareholders outside of the bankruptcy arena will instead be

allocated in accordance with the treatment provisions of the Plan,[93] not in accordance with

nonbankruptcy law that would ordinarily govern such shareholders' rights.  See Acequia, Inc.,

787 F.2d at 1363 (finding that equity holder's interest was impaired even though interest in

debtor was retained, because the plan significantly altered his power to exercise his shareholder

vote).[94]

> iv.    The Fact That The Treatment of Trade Claims Is Governed In Part
>        By The Global Settlement Is Of No Significance.

134.    The Calyon Parties and the Non-Agent Lender Committee have intimated

that by reaching a settlement with the Debtors, the Claims of the members of the Subisidiary

Trade Committee cannot be impaired, because any give-up is a matter of "negotiated choice."

See Calyon Parties' Objection, at p. 36.  This objection ignores not only the flexible definition of

"impairment" under the Bankruptcy Code, but also the inter-relationship between the Plan and

the Global Settlement.

135.    The Seventh Circuit has considered this question in a similar context.  In

In re Wabash Valley Power Ass'n, 72 F.3d 1305, 1310 (7th Cir. 1995), a debtor electric

---

resolution of the Inter-Creditor Dispute.  Accordingly, the ACC Bondholder Group's objection should be
overruled.

[93]    Section 5.2(l) of the Plan provides, in pertinent part:

> Subsidiary Debtor Equity Interests shall be impaired under the Plan, and any
> distributions that the holders of such Equity Interests otherwise would have
> received on account of such Equity Interests shall be used to satisfy the
> obligations of such holders under the Plan.

Plan, § 5.2(l).

[94]    Although the Proponents' believe the Subsidiary Debtor Equity Interests are impaired under the Plan, such
designation is of no particular import.  Accordingly, even if the Bankruptcy Court were to hold that the
Subsidiary Debtor Equity Interests are unimpaired as a matter of law, the Plan could still be confirmed.

- 78 -

3512096.2

cooperative reached a settlement agreement with PSI, the financier of a subsequently defunct

nuclear power project in which the debtor had invested.  The settlement provided for, among

other things, payments by PSI to the lenders who had financed the debtor's participation in the

project, a cap on PSI's indemnification claim in the debtor's bankruptcy case, and it provided for

PSI to forego any other claims it may have against the debtor.  Id. at 1310.   The settlement

agreement was contingent upon "confirmation of the [debtor's] Plan (or some other consensual

resolution of the bankruptcy case)."  Id.  PSI, identified in the Plan as an impaired creditor, voted

to accept.  Id. at 1312.

136.    Challenging confirmation of the plan, REA, one of the debtor's lenders,

argued that "because PSI agreed to the terms of the PSI Settlement, it cannot remain impaired

under the Wabash Plan which is, after all, in accordance with those terms."  Id. at 1321.

Rejecting this argument, the Seventh Circuit (the only Circuit Court of Appeals to consider this

question, and the only court that dedicated any substantive analysis to the question) held instead

that:

> The PSI Settlement, however, is not a separate agreement entered
> into by the debtor prior to filing a reorganization plan. Instead, it is
> inextricably intertwined with and dependent on the reorganization
> plan. PSI's recovery under the settlement will depend on whether
> the Wabash Plan is approved. Thus, this is not a situation in which
> a claim has been settled prior to confirmation of a reorganization
> plan and confirmation therefore leaves the parties' rights
> unaffected.  The standard for impairment is very lenient and 'any
> alteration of the rights constitutes impairment even if the value of
> the rights is enhanced.'  PSI's rights are certainly affected by the
> confirmation of the Wabash Plan. There is thus no clear error in
> the bankruptcy court's determination that PSI is an impaired
> creditor whose acceptance of the Plan fulfills the requirements of
> section 1129(a)(10).

3512096.2

Id. (citations omitted)[95]

137.    Just like the settling creditor in Wabash, the holders of Trade Claims have

elected to submit to an alteration of their contractual rights in order to support the Plan.  Also

like the facts described in Wabash, this is not a case in which a claim was settled prior to

confirmation of a plan and confirmation would therefore leave the parties' rights unaltered.

Rather, in this case, the holders of Trade Claims, contractually entitled to certain amounts, have

accepted alterations to their contractual entitlements in order to facilitate and support the Plan

and Global Settlement.  Therefore, any objection asserting that Trade Claims are not impaired

simply by virtue of the Subsidiary Trade Committee's support for the Global Settlement must be

dismissed.

M.    The Plan Is Feasible  —  11 U.S.C. § 1129(a)(11).

138.    Section 1129(a)(11) of the Bankruptcy Code requires the Court to

determine that:

> Confirmation of the plan is not likely to be followed by the
> liquidation, or the need for further financial reorganization, of the
> debtor or any successor to the debtor under the plan, unless such
> liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  This requirement, commonly known as the "feasibility" standard,

requires that "the Plan is workable and has a reasonable likelihood of success."  In re Drexel

Burnham Lambert Group, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).  "It is not necessary that

---

[95]    But see In re Drexel Burnham Lambert Group, 130 B.R. 910 (S.D.N.Y. 1991).  The court in Drexel, in
approving a settlement agreement, found (with little to no analysis) that certain securities litigation
claimants were not impaired by the Plan, because it gave them precisely what they were entitled to under
the terms of the settlement agreement.  However, Drexel is distinguishable from the present case.  Aside
from its class action overlay, the purpose of the Drexel settlement was to reach a consensus as to the
estimated value of the securities claims, and therefore there was no point of comparison other than the
settlement agreement with respect to the value of the claims.  That is not the case here, where the holders
of the Trade Claims are entitled to specific contractual amounts which they are agreeing to alter under the
Global Settlement in order to support and facilitate the Plan.

3512096.2

success be guaranteed, but only that the plan present a workable scheme of organization and

operation from which there may be a reasonable expectation of success." Id. (quoting 5 Collier

on Bankruptcy ¶ 1129.02[11], at 1129-54 (15th ed. 1991)); see also In re Cellular Info. Sys. Inc.,

171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) ("the plan proponent need only demonstrate that there

exists the reasonable probability that the provisions of the Plan can be performed.") (internal

citation omitted).

       i.     The Proponents Have Demonstrated The Feasibility Of The Plan.

     139.    As an initial matter, the Plan is a liquidating plan.  All of the Debtors'

principal assets have been sold, and the Plan provides for the distribution of the proceeds

received in connection with the Sale Transaction (and from the CVV).  Thus, the first prong of

the feasibility test is readily satisfied, as there is no risk of liquidation (other than that which is

expressly proposed in the Plan) or need for further financial reorganization.  Moreover, the

question of whether a plan is feasible (i.e., capable of being carried out once consummated)

logically turns on whether it will fail once it goes effective.  Accordingly, it is axiomatic that

questions of "feasibility" do not analyze whether conditions precedent to confirmation can be

satisfied.

     140.    However, even if the Bankruptcy Court were to focus its inquiry on the

pre-Effective Date period (which the Proponents submit misconstrues the concerns to be

addressed by the feasibility test of section 1129), the Plan and the circumstances of these cases

still assuage any concerns as to the Plan's feasibility.  Section 12.2(d) provides that the Plan

cannot go effective unless the Plan Administrator is in the position, as of the Effective Date or

immediately thereafter, to distribute to the holders of Claims against the ACC Debtors, the ACC

02-41729-shl   Doc 12662   Filed 12/05/06   Entered 12/05/06 05:00:06   Main Document
Pg 95 of 146

3512096.2

Effective Date Settlement Distribution.  See Plan, § 12.2(d).[96]  Accordingly, provided that such

condition is satisfied, the Plan will go effective (assuming the other conditions are similarly

satisfied or waived).  In determining whether the Plan can be implemented successfully,[97] the

Proponents have carefully examined the funds currently available to the Estates as a result of the

consummation of the Sale Transaction and the contributions that will be provided by certain

creditor constituencies pursuant to the Global Settlement.  Pursuant to Section 13.2(b) of the

Plan, the Plan Administrator is charged with the sole and exclusive responsibility for establishing

and releasing reserves.  Plan, § 13.2(b).  In preparation for the establishment and release of

reserves by the Plan Administrator and to ensure that the Plan meets the requirements of section

1129(a)(11) of the Bankruptcy Code, the Proponents are working closely with the Plan

Administrator to ensure that he has the requisite knowledge to determine and establish

appropriate reserves (consistent with prior orders of the Bankruptcy Court and reserve notices

filed or to be filed by the Debtors) for all (a) Allowed Claims and (b) Disputed Claims in each of

the Classes under the Plan.  The Proponents believe that sufficient consideration will exist to

make the required Plan Distributions.  See Wittman Decl. ¶ 73.

---

[96]     This condition to effectiveness of the Plan may be waived in writing by a majority (determined by
         aggregate holdings of principal amount of ACC Senior Notes) of the ACC Settling Parties.  Plan, § 12.3.

[97]     For a discussion of the proposed means of implementing the Plan, please refer to Section II.B.v, *supra*.  See
         Plan, Art. VIII.

3512096.2

        ii.      Disney/ESPN's and Rembrandt's[98] Feasibility Objections Are
Wholly Without Merit.

       141.    The Debtors dispute the assertions of Disney/ESPN and Rembrandt that

sufficient Cash may not be available to pay Allowed Administrative Claims as of the Effective

Date.  As set forth in the Wittman Declaration, the Debtors have timely paid all undisputed

ordinary course administrative claims throughout the duration of these cases.  See Wittman Decl.

¶ 69.  Further, as indicated in the Second Disclosure Statement Supplement, the Debtors

currently estimate that they must reserve a total of $891 million to pay Administrative Claims as

of the Effective Date.  Such amount is based on the Debtors' estimate of all known

Administrative Claims as of the filing of the Second Disclosure Statement Supplement.[99]  See

Wittman Decl. at ¶ 71.  Should the amount of known Administrative Claims increase prior to the

Effective Date, the Debtors will reserve more Cash.  In particular, the Debtors dispute the legal

merits of the Administrative Claims recently filed by Disney/ESPN and annexed to the

Disney/ESPN Objection as Exhibits A-C, to the extent reserves are necessary, the Debtors intend

to establish appropriate reserves for such Claims in order to ensure that their obligations under

the Plan will be met.  Similarly, the Debtors intend to reserve for the claim filed by Rembrandt in

---

[98]     The Proponents have reached an agreement in principle with Rembrandt as to the establishment of an
appropriate reserve for its Disputed Administrative Claim.  Accordingly, the Proponents anticipate that
Rembrandt's Objection may be resolved prior to, or during, the Confirmation Hearing.  In the event that
such Objection is not resolved, the Proponents reserve the right to supplement the Confirmation Brief in
response to such Objection.

[99]     Disney/ESPN points to the potential $55 million shortfall discussed in the Second Disclosure Statement
Supplement (DSS2-92 – 93, DSS2 116-117) to claim that this amount may be even greater as it does not
taken into account the obligation to pay or reserve for Disney/ESPN's Administrative Claims.  This
argument reflects a misunderstanding of the Identified Sources available to fund such estimated shortfall.
Increasing the reserve for Administrative Claims such as Disney/ESPN's does not affect the calculation for
purposes of determining whether the condition that the Plan Administrator have sufficient funds for certain
Plan Distributions has been met.

3512096.2

an amount either mutually agreed upon or approved by the Bankruptcy Court at an estimation

hearing to be held prior to the Effective Date.

        iii.    ESPN's Administrative Expense Claims Are Deficient As A
              Matter Of Law Because The ACC/ESPN Contract Was Essentially
              A Requirements Contract, And ACC Did Not Breach The Contract
              By Eliminating Its Requirements, So Long As It Acted In Good
              Faith.

142.    On December 31, 2004, ACC and ESPN, Inc. ("**ESPN**") executed a post-

petition contract granting ACC the right to distribute ESPN programming to its customers in

exchange for a variable monthly fee determined by the number of ACC customers who received

the programming (the "**ACC/ESPN Contract,**" and, together with other related contracts

between ACC and Disney/ESPN, (the "**ACC/ESPN Contracts**")).  See ACC/ESPN Contract §§

1.1, 4.2.  The contract term extended from January 1, 2004 through July 31, 2014, and set no

minimum monthly payment or customer threshold.  ACC/ESPN Contract § 1.2.

143.    ESPN now claims that ACC breached the ACC/ESPN Contracts when

ACC sold its assets to Time Warner and Comcast, and has filed Administrative Claims totaling

more than $200 million dollars based on this alleged breach.  ESPN calculates the alleged

damages as the difference between the projected revenue that the ACC/ESPN Contracts would

have generated without the sale and the projected revenue that Disney/ESPN's existing contracts

with Time Warner and Comcast, which provide for higher volume discounts, would generate

during the life of the ACC/ESPN Contracts.  Disney/ESPN has filed a limited objection to the

Plan on the grounds that the Plan does not include reserves sufficient to cover its Administrative

Claims.

144.    Disney/ESPN's Administrative Claims are deficient as a matter of law

because ACC did not breach the ACC/ESPN Contracts.  Under the ACC/ESPN Contract, ACC

- 84 -

3512096.2

had the right to eliminate its monthly requirements for ESPN programming without breaching, so

long as it did so in good faith.  Accordingly, ESPN's Limited Objection should be overruled.

(a)     The ACC/ESPN Contract Was A Requirements Contract.

145.    "Normally a requirements contract is based on a seller's obligation to

supply the designated commodity to the buyer to the extent of the latter's needs during a

specified period of time." R.A. Weaver & Assocs., Inc. v. Asphalt Constr., Inc., 587 F. 2d 1315,

1319 (D.C. Cir. 1978) (requirements contract existed where the "agreement specified a unit

price, a method of delivery, and a method of payment" and a promise "to buy" regardless of the

quantity) (footnote omitted).  "The buyer is likely to enter into such a contract when … it wishes

to preserve for itself the freedom to determine its level of consumption and to conduct its

operations according to its best business judgment." Technical Assistance Int'l, Inc. v. United

States, 150 F.3d 1369, 1371-72 (Fed. Cir. 1998).  See also Fort Wayne Corrugated Paper Co. v.

Anchor Hocking Glass Corp., 130 F.2d 471, 472 (3rd Cir. 1942) (requirements contract existed

where quantity term was based on percentage of buyer's needs); Dienes Corp. v. Long Island

Rail Road Co., 2002 U.S. Dist. Lexis 6824 at *1 (E.D.N.Y. March 19, 2002) (requirements

contract existed where the contract "did not obligate the LIRR to purchase specified amounts").

146.    The ACC/ESPN Contract was, essentially, a requirements contract.  ACC

contracted for an ongoing supply of ESPN programming.  ACC/ESPN Contract at § 4.1.  ESPN

supplied only as much programming as ACC's customer base required, as determined on a

monthly basis under the contract, and ACC paid $3.0195 for each customer that received ESPN

programming in a given month.  ACC/ESPN Contract § 4.2.  The ACC/ESPN contract only

obligated ACC to pay for the amount of programming that it required, with no minimum

payment or customer threshold.  Id.

- 85 -

3512096.2

147.    In its November 22, 2006 Motion For Entry Of An Order For Allowance And Payment Of Administrative Expense Claims Pursuant To Section 503 Of The Bankruptcy Code (the "**ESPN Motion**"), which underlies its limited objection to the Plan, ESPN incorrectly characterizes this requirements contract as a royalty contract, and ACC's monthly payments as royalty fees.  See, e.g., ESPN Motion, ¶ 28.  In a royalty contract, however, the licensor ceases to bear any costs or increased risk after licensing his proprietary good.  Indeed, he has sold the right to bear that risk and those costs to the licensee.  See, e.g., Zilg v. Prentice-Hall, Inc., 717 F.2d 671, 679 (2d Cir. 1983) ("[P]ublishing firms print, advertise and distribute books at their own expense. In return for performing these tasks and for bearing the risk of a book's failure to sell, the author gives a publisher exclusive rights to the book . . . . ").  However, in a typical requirements contract, as well as in the ACC/ESPN Contract, the seller bears the ongoing costs of production, and the risk of market failure is born by both the seller and the buyer.  Here, ESPN supplied its own product at its own expense on an ongoing basis.  See ACC/ESPN Contract § 3.1(a).  ESPN also bore the cost of, and responsibility for, continually creating and adjusting its content.  See id. § 2.1(a).  As in any requirements contract, and unlike in a royalty contract, the ACC/ESPN Contract allocated significant risk and costs to both ESPN and ACC throughout the life of the contract.  Accordingly, the ACC/ESPN Contract should be treated as a requirements contract, and not a royalty contract.

(b)    The ACC/ESPN Contract Permitted ACC to
Eliminate its Requirements If ACC Acted In Good Faith.

148.    In a requirements contract, "the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business."  HML Corp. v. General Foods Corp., 365 F.2d 77, 81 n.5 (3d Cir. 1966), aff'd, 365 F.2d 77 (3d Cir. 1966).  See also Technical, 150 F.3d at 1373 (holding that the

3512096.2

<u>only</u> limitation on a buyer's ability to vary its requirements "is that it must do so in good faith");

<u>Atlantic Track & Turnout Co. v. Perini Corp.</u>, 989 F.2d 541, 544-45 (1st Cir. 1993) ("the point of

entering a requirements contract was to engage suppliers without binding themselves to buy

more goods than they need"); <u>In re United Cigar Co.</u>, 72 F.2d 673, 674 (2d Cir. 1934) ("there can

be no rational distinction between decreases stopping short of total extinction and those which do

not"); <u>Fort Wayne</u>, 130 F.2d at 473 ("the buyer in a requirements contract has no duty to have

any requirements and a seller under an output contract has no duty to have any output").

149.    The ACC/ESPN Contract provides ACC with a mechanism for varying its

requirements.  "Any System that is divested shall cease to be a System hereunder."  ACC/ESPN

Contract § 1.2.  ACC's customer base is divided into "Systems" under the contract, and each

customer who receives ESPN programming (and for whom ACC must therefore pay) is part of a

System.  <u>Id.</u> § 1.2.  Under § 1.2, ACC may divest Systems, thereby varying its requirements.  No

limits are placed on its discretion to do so.[100]  ACC has the right to purchase ESPN programming

for its customers, but the Contract does not mandate that ACC do so, and therefore ACC can

reduce its requirements to zero, so long as it acts in good faith.  <u>See</u> <u>R.A. Weaver</u>, 587 F.2d at

1321 ("It is not true that buyers may never decrease or cease their requirements") (internal

quotations & citations omitted).

---

[100]    In the ESPN Motion, ESPN incorrectly suggests that this provision is limited.  No language limiting ACC's divestiture power under § 1.2 appears anywhere in the contract. The language is unambiguous, and the contract contains a merger clause in § 8.1.  Under Connecticut law, which governs the ACC/ESPN contract under § 8.2, "the unambiguous terms of a written contract containing a merger clause may not be varied or contradicted by extrinsic evidence."  <u>Tallmadge Bros. Inc. v. Iroquois Gas Transmission System, L.P.</u>, 746 A.2d 1277, 1290-91 (Conn. 2000).  <u>See also</u> <u>Benvenuti Oil Co. v. Foss Consultants, Inc.</u>, 781 A.2d 435, 439 (Conn. App. 2001) ("a merger clause inserted into an agreement establishes conclusive proof of the parties' intent to create a completely integrated contract, and the court is forbidden from considering extrinsic evidence on the matter unless there was unequal bargaining power between the parties"); <u>Executive Airlines v. Electric Boat Corp.</u>, 271 F. Supp. 2d 392 (D. Conn. 2003) (integration clause in contract with unambiguous terms barred the consideration of parol evidence).

3512096.2

(c)    ACC Divested its Systems for Valid
Business Reasons and Therefore Acted in Good Faith.

150.    "A buyer acts in good faith if it has a valid business reason for varying its

requirements other than dissatisfaction with the contract. … The good faith standard has often

been expressed in terms of its relationship to the buyer's business judgment." Technical, 150

F.3d at 1372 (internal quotations omitted). See also Fort Wayne, 130 F.2d at 473-74 (no breach

occurred where the reduction of requirements to zero "was decided upon by the Board of

Directors for what it believed to be valid business reasons" and "neither the company nor its

manager was moved by any purpose to avoid any obligation" to the other party); R.A. Weaver,

587 F.2d at 1316-17 (no breach of contract where buyer's requirements for limestone were

reduced to zero when buyer's contract with third party, for which he needed the limestone, had

its limestone requirement terminated); Oregon Plywood Sales Corp. v. Sutherlin Plywood Corp.,

246 F.2d 466 (9th Cir. 1957) (holding no breach of contract where supplier in output contract

discontinued operations for valid business reasons).

151.    ACC divested itself of its Systems in good faith, as a result of the sale of

substantially all its assets to Time Warner and Comcast.  As described above, ACC's sale of its

assets, including those cable distribution systems that qualify as Systems under the ACC/ESPN

Contract, came only after earnest and grueling efforts to reorganize.  Only when it became

apparent that there existed a widespread desire among the creditors and interest holders alike that

the Debtors put the Company up for sale did the Debtors proceed on a dual-track sale/stand-

alone reorganization process.  After an extensive marketing effort, it became apparent to all that

a sale of the Debtors' assets would produce the highest recovery for all stakeholders.  At that

point, the Debtors, with nearly unanimous creditor and interest holder support, elected to proceed

with the sale to Time Warner and Comcast.  ACC's actions to divest its Systems, through the

3512096.2

sale of its assets to Time Warner and Comcast, were taken in good faith, for valid business

reasons, and do not constitute a breach of its contract with ESPN.

> iv.    The ACC Bondholder Group's Objections
>        As To Feasibility Of The Plan Also Are Without Merit.

152.    In terming the funds to be transferred to ACC Senior Noteholders as

"illusory," the ACC Bondholder Group has questioned the Plan's feasibility by contending that

the transfer of $1.08 billion (or, since there is an ACC Senior Notes Claims Accepting Class,

$1.13 billion) in value to the unsecured creditors of ACC from the distributions otherwise

payable to the unsecured creditors of the Subsidiary Debtors, upon which the Global Settlement

is premised, can be waived by the ACC Settling Parties.  See ACC Bondholder Group

Opposition Brief, at p. 70.[101]  However, upon closer examination of this aspect of its grievances,

it is simply a rehash of its attack upon the compromise that has been vetted and accepted as part

of the Plan by the vast majority of their fellow ACC Senior Noteholders.  Id.  That certain

conditions can be modified pursuant to the Plan's own terms does not render the Debtors' exit

strategy infeasible. [102]  It simply means that the ACC Bondholder Group does not like the terms

---

[101]    The ACC Bondholder Group has also argued that Section 12.3 of the Plan unlawfully authorizes a majority of the five ACC Settling Parties to waive the condition precedent under the Plan that $1.080 billion in value (actually $1.130 billion because there is an ACC Senior Notes Claims Accepting Class) be available on the Effective Date for distribution to ACC's creditors.  The Proponents contend that this objection is similarly unfounded.

[102]    The potential for the waiver was prominently disclosed in the Second Disclosure Statement Supplement. Section III.K.5.b of the Second Disclosure Statement Supplement provides, in pertinent part:

> "The following are conditions precedent to the occurrence of the Effective Date . . .
>
> (d)    The Plan Administrator, as of the Effective Date or immediately thereafter, will be in a position to distribute to the holders of Claims against the ACC Debtors the ACC Effective Date Settlement Distribution of at least $1.08 billion (or if there is an ACC Senior Notes Claims Accepting Class, $1.13 billion). . .

Section III.K.5.c of the Second Disclosure Statement Supplement provides, in pertinent part:

3512096.2

of the Plan and Global Settlement.  However, such terms have been overwhelmingly accepted by

the vast majority of the Debtors' creditors, including holders of ACC Senior Notes Claims.[103]

153.    The ACC Bondholder Group also has suggested that a portion of the value

to be transferred to creditors of the ACC Debtors would only be available for transfer if the

Arahova Estate were to prevail in the Inter-Creditor Dispute.  Even if this assertion were true,

that would simply be a basis for dissatisfaction with the Global Settlement that has been accepted

by the requisite majorities as part of the Plan.

v.    The Banks' Feasibility Objections Are Meritless.

154.    The Objecting Banks raise three objections to the feasibility of the Plan,

each of which is meritless.  The first is that the Plan is not feasible because it does not reserve

enough Cash to provide the Bank Lenders with post-Effective Date interest at the contract rate to

which they claim entitlement under section 1129(a)(7).  BOFA (As Administrative Agent)

Objection, ¶¶ 32-33; BOFA (As Holder of Bank Claims) Objection, ¶¶ 31-32; Non-Agent

Lender Committee Objection, at pp. 33-35.  Aside from likely becoming moot, as the Proponents

do not believe there will be a rejecting Bank Class that could be subject to the Holdback Motion,

this objection is also baseless because, as discussed at Section II.B.i.ii above, the Banks are not

entitled to interest at their respective contract rates after the Effective Date as a matter of law.

Moreover, even if the Banks were correct that they are entitled to a higher interest rate (in which

case section 1129(a)(7) would have to say something other different than what Congress

---

"... The condition relating to the ACC Effective Date Minimum Distribution may only
be waived in writing by a majority (determined by aggregate holdings of principal
amount of ACC Senior Notes) of the ACC Settling Parties."

Second Disclosure Statement Supplement, at DSS2-103—DSS2-104.

[103]    Indeed, apart from the bonds listed in the ACC Bondholder Group's 2019 statement, a staggering 97.5% of
ACC Bondholders who submitted properly completed ballots voted to support the Plan.  See n. 14, supra.

3512096.2

drafted), this would not constitute an objection to the *feasibility* of the Plan because such a

determination will be reached at the Confirmation Hearing.

155.    Second, any claim that the Plan is not feasible because there is a

possibility that the LIF will not be sufficient to pay for all of the defense costs the Banks may

incur must also fail.  Such an objection is mistaken on two grounds.  First, the Plan does not

contemplate paying limitless fees but only up to the amount of the LIF.  Thus, the Plan can be

performed even if the Banks' fees exceed the LIF, because the Plan terms do not provide for any

further amounts to be paid above the LIF.  Furthermore, to the extent it remains at issue, the

appropriate size of the LIF will be determined at the Confirmation Hearing in connection with

the Estimation Motion.  The merits of any Objecting Bank's dissatisfaction with the size of the

LIF will determined before the Plan is consummated, so there is no issue of feasibility.

156.    Finally, the Plan does not need to reserve any Cash to pay the Bank

Lenders Grid Interest in order to be feasible.  First, this issue has already been resolved in favor

of the Proponents, as the Bankruptcy Court already ruled that Plan need not reserve for Grid

Interest.  See Decision on Bank Lenders' Claims to Additional Interest, entered May 15, 2006 at

26 ("The Debtors do not have to reserve sums under their reorganization plan to satisfy bank

lender claims for the 'Grid Interest.'").

157.    Second, the Plan does not provide for the payment of Grid Interest.

Feasibility turns on whether there is a reasonable likelihood that *the provisions of the plan* can be

performed.  See In re Cellular Info. Sys. at 945.  The Plan cannot be infeasible for failing to

provide for the implementation of a provision that does not exist in the Plan.

158.    Third, even if the payment of Grid Interest under the Plan was subject to

the Grid Interest Appeal, that still would not create a valid feasibility objection because

3512096.2

"speculative prospects of failure cannot defeat feasibility." In re Adelphia Bus. Solutions, 341

B.R. 415, 421 (Bankr. S.D.N.Y. 2003); In re WorldCom, Inc., 2003 Bankr. LEXIS 1401 at *171

(Bankr. S.D.N.Y. 2003). The Banks have already had a full and fair opportunity to litigate Grid

Interest before the Bankruptcy Court, and Grid Interest was properly denied. Thus, the prospect

that such a payment will ever be required is speculative, at best.

159.    Fourth, every Bank has known for five months that the Proponents would

be seeking to confirm a plan that does not provide for Grid Interest. If an Objecting Bank did

nothing to obtain a ruling on the Grid Interest Appeal after having lost on the issue at the trial

level, it should not be permitted to use its own neglect as an impediment to confirmation. Upon

consummation of the Plan, the Grid Interest Appeal will be equitably moot, such that the

feasibility of the Debtors paying Grid Interest will never become a question.

N.    The Plan Provides For Full Payment Of
       All Statutory Fees — 11 U.S.C. § 1129(a)(12).

160.    Section 1129(a)(12) of the Bankruptcy Code requires that fees payable

under 28 U.S.C. § 1930 have been paid or are provided under the plan to be paid on its effective

date. Section 15.04 of the Plan provides that, on the Effective Date, and thereafter as required,

the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the

United States Code. Plan, § 15.04. Thus, the Plan complies with the requirements of section

1129(a)(12) of the Bankruptcy Code.

O.    The Plan Provides For The Continuance Of
       Retiree Benefit Obligations — 11 U.S.C.§ 1129(a)(13).

161.    Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for

the continuation of retiree benefits at levels established pursuant to section 1114 of the

Bankruptcy Code. Pursuant to Section 14.3 of the Plan, all retiree benefits of the Debtors (within

the meaning of section 1114 of the Bankruptcy Code), if any, shall continue to be paid in

- 92 -

02-41729-shl   Doc 12662   Filed 12/05/06   Entered 12/05/06 05:00:06   Main Document
Pg 106 of 146

3512096.2

accordance with applicable law, for the duration of the period for which the Debtors are

obligated to provide such benefits.  Plan, § 14.3.  Thus, the Plan satisfies section 1129(a)(13) of

the Bankruptcy Code.

III.    THE PLAN MEETS THE REQUIREMENTS FOR CRAMDOWN
        UNDER SECTION 1129 OF THE BANKRUPTCY CODE.

        162.    Section 1129(b) of the Bankruptcy Code provides a mechanism (known

colloquially as "cramdown") for confirmation of a plan in circumstances where the plan is not

accepted by all impaired classes of claims.  Section 1129(b) provides in pertinent part:

> Notwithstanding section 510(a) of [the Bankruptcy Code], if all of
> the applicable requirements of [section 1129(a) of the Bankruptcy
> Code] other than [the requirement contained in section 1129(a)(8)
> that a plan must be accepted by all impaired classes] are met with
> respect to a plan, the court, on request of the proponent of the plan,
> shall confirm the plan notwithstanding the requirements of such
> paragraph <u>if the plan does not discriminate unfairly, and is fair and
> equitable, with respect to each class of claims or interests that is
> impaired under, and has not accepted, the plan.</u>

11 U.S.C. § 1129(b)(1) (emphasis added).

        163.    Thus, under section 1129(b), a bankruptcy court may cramdown a plan

over the dissenting vote of an impaired class or classes of claims as long as the plan does not

"discriminate unfairly" and is "fair and equitable" with respect to the non-accepting class.[104]  <u>See</u>

<u>In re Zenith Elecs. Corp.</u>, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (explaining that "[w]here a

class of creditors or shareholders has not accepted a plan of reorganization, the court shall

nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'"); <u>see</u>

---

[104]   The Proponents readily satisfy the cramdown requirement of section 1129(a)(10) that provides that "If a
class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has
accepted the plan, determined without including any acceptance of the plan by any insider."  11 U.S.C. §
1129(a)(10).  <u>See</u> ¶¶ 24-26, <u>supra,</u> for a list of those Classes that have accepted the Plan; <u>see also</u> Section
II.L.ii, <u>supra</u>, for a discussion regarding satisfaction of requirements of section 1129(a)(10) by a single
impaired accepting class in jointly administered cases.

- 93 -

3512096.2

also In re Cajun Elec. Power Coop., Inc., 150 F.3d 503, 519 (5th Cir. 1998); John Hancock Mut.

Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 157 n.5 (3d Cir. 1993).

164.    As set forth above, the Creditors Committee is in ongoing discussions with

the Non-Agent Lender Committee concerning Plan terms that, if acceptable to the holders of

claims in the Bank Syndicate Lenders Classes, will result in their acceptance of the Plan once

documented and implemented.  In addition, as set forth above, the Debtors and the Creditors

Committee are engaged in discussions with counsel to the FrontierVision Noteholders

Committee, who did not object to confirmation of the Plan, to determine what changes (if any)

are necessary to secure the acceptance of that Class.  Accordingly, cramdown with respect to

such parties is not addressed herein.  In the event, however, that settlements are not achieved

and/or not approved by the Bankruptcy Court, and/or such Classes ultimately do not vote to

accept the Plan, the Proponents reserve the right and intend to seek to invoke section 1129(b) of

the Bankruptcy Code with respect to such Classes.  Absent authorization of the Bankruptcy

Court for the Debtors to seek cramdown of Class SD 8, only the Creditors Committee shall seek

invocation of section 1129(b) of the Bankruptcy Code with respect to such Class.  If necessary,

appropriate pleadings in support of cramdown will be filed at that time.

IV.    THE POST-EFFECTIVE DATE PROTECTIONS AFFORDED TO THE DEBTORS
AND CERTAIN CONTRIBUTING THIRD PARTIES BY THE PLAN ARE
APPROPRIATE AND CONSISTENT WITH ESTABLISHED PRECEDENT.

165.    Pursuant to Sections 16.3(a)-(d) of the Plan, certain parties are granted

exculpations and releases from certain liability under the Plan.  Section 16.3(a) contains the

Plan's exculpation provisions and provides generally that the Exculpated Parties identified

therein shall not be liable for any cause of action arising out of the Covered Matters identified in

3512096.2

the Plan.[105]  Section 16.3(c) of the Plan contains releases from certain claims held by the Debtors

and provides generally that the Debtors will release, among other things, any claims and suits

against the Released Parties.  And Section 16.3(d) of the Plan provides for certain third party

releases by the holders of Claims and Equity Interests.  Certain parties have challenged the

propriety of the exculpations and releases set forth in the Plan.  Nevertheless, a review of

applicable case law, as well as the unique facts surrounding the Debtors' cases, dispels any

suggestion that the Plan's exculpation and release provisions are improper.

---

[105]    The Covered Matters include:

"any Cause of Action *arising from and after the applicable Commencement Date* from actions or omissions in connection with, relating to, or arising out of these Chapter 11 Cases, the Plan, the Disclosure Statement, the Sale Transaction Documents and the Sale Transactions, including the solicitation of votes for and in pursuit of confirmation of the Plan or the JV Plan, or the implementation of the Plan or the JV Plan, the Sale Transaction Documents and the Sale Transactions, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation, confirmation and consummation of the Plan."

Plan, § 16.3(a) (emphasis added).

Section 16.3(b) of the Plan provides limitations on the preceding provision, excluding (among other things) the release of any entity's fraud, gross negligence or willful misconduct from the scope of the exculpations.

Specifically, Section 16.3(b) of the Plan provides:

Notwithstanding anything contained in this Section, (i) pursuant to the Global Settlement, none of the above exculpations in Section 16.3(a) *shall in no event (a) be construed as a release of any entity's fraud, gross negligence or willful misconduct with respect to matters set forth in Section 16.3(a)*, (b) limit the liability of attorneys for the Exculpated Parties to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility, (c) limit or abrogate the obligations of the Debtors or the Buyers and any of their respective Affiliates to one another under the Sale Transaction Documents and the Ancillary Documents (as defined in the Purchase Agreements or under applicable law arising out of or in connection with the transactions contemplated by such documents), or (d) limit or abrogate the obligations of the Debtors, reorganized Debtors, Plan Administrator or Contingent Value Vehicle under the Plan.

Plan, § 16.3(b) (emphasis added).

3512096.2

A.    The Exculpations and Debtor Releases Set Forth In The Plan Are Appropriate.

166.    Pursuant to Section 16.3(a), certain parties are released from liability, to the extent permitted by applicable law, from Causes of Action relating to certain postpetition transactions in these chapter 11 cases.  The exculpations are provided to a limited set of parties[106] and are limited, in each case, both to the extent permitted by applicable law and to postpetition Covered Matters.  Such exculpations also expressly exclude under Section 16.3(b), fraud, gross negligence, and willful misconduct.  Although the ACC Bondholder Group attacks the exculpations of the Settlement Parties, such exculpations are appropriate for the same reasons the Debtor releases and the third party releases are appropriate with respect to such persons, as explained below.

167.    Pursuant to Section 16.3(c) of the Plan, the Debtors are providing certain releases and waiving certain claims they hold against the Released Parties.  The releases by the Debtors are both consensual and appropriately limited in scope.  As set forth more fully in the Plan, the releases with respect to the Debtors' directors, officers and employees are limited to (a) current officers and employees, and (b) current and former officers and directors appointed after the Commencement Date.  See Plan, § 16.3(c).  Moreover, the release provisions expressly carve

---

[106]    Section 16.3(a) of the Plan defines the Exculpated Parties as "(i) the Debtors (including their management and board of directors, both current and former (but in the case of former, first appointed after the Commencement Date)), (ii) the Buyers, (iii) the Indenture Trustees that do not file objections to the Plan, (iv) the Statutory Committees, (v) to the fullest extent permitted under applicable law, each of the Settlement Parties, the FPL Committee and the Olympus Parties (and in the case of parties in this subsection (v) that are ad hoc committees, each of their members, solely in their capacity as such) which vote in favor of the Plan, or in the case of parties in this subsection (v) that are ad hoc committees, support the Plan, (vi) the Plan Administrator, (vii) Administrative Agents, Non-Administrative Agents and Bank Lenders, in each case in Accepting Bank Classes, **provided** **however**, that this Section 16.3(a) does not limit or prejudice the prosecution or defense of the Bank Actions, and (viii) the CVV Trustee (and in each case their respective Affiliates, officers, partners, directors, employees, agents, members, shareholders, advisors (including any attorneys, financial advisors, investment bankers and other professionals retained by such Persons in their capacities as such), and professionals of the foregoing."  Plan, § 16.3(a).

3512096.2

out the Excluded Individuals[107] as well as claims for fraud and willful misconduct.  Also, Section

16.3(e) expressly provides that the releases (both the Debtor releases and the third party releases

discussed below) shall not release any non-Debtor entity from, among other liabilities, any

securities law violations.[108]  Finally, the Plan's release provisions are consistent with those

provided by debtors in other large chapter 11 cases.[109]

168.    Among others, the Released Parties include the Settlement Parties.  The

Debtors' election to grant releases to the Settlement Parties is a sound exercise of business

judgment, and warranted by the facts and circumstances of these cases.  First, the inclusion of the

---

[107]    The "Excluded Individuals" are set forth in Schedule C to the Plan and include James R. Brown, Julian Eidson, Wallace Haislip, Daniel R. Milliard, Michael C. Mulcahey, James J. Rigas, John J. Rigas, Michael J. Rigas, Timothy J. Rigas, Peter L. Venetis, Buchanan Ingersoll Professional Corporation, Deloitte & Touche LLP, Motorola, Inc., and Scientific Atlanta Inc.  See Plan, Schedule C.

[108]    Section 16.3(e) of the Plan provides:

Notwithstanding anything to the contrary, (i) except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, the releases provided for in this Section shall not release any non-Debtor entity from any liability arising under:  (x) the Tax Code or any state, city or municipal tax code; (y) the environmental laws of the United States or any state, city or municipality; or (z) any criminal laws of the United States or any state, city or municipality; and (ii) the releases provided in this Section shall not release:  (x) any non-Debtor entity from any liability to any Governmental Authority arising under the securities laws of the United States; (y) any Excluded Individual from any liability whatsoever; or (z) any prior or existing defendant in Causes of Action in Items 1–8 of Schedule Y defining Designated Litigation from any liability in connection therewith.  Nothing in the Plan or the Confirmation Order approving the Plan shall release, discharge, enjoin, or preclude the enforcement of any environmental liability arising post-Effective Date or arising from an event that occurred prior to the Effective Date where the liability continues post-Effective Date to a Governmental Authority and such liability to a Governmental Authority is a liability to which the relevant entity is subject as the owner or operator of property after the Effective Date.

Plan, § 16.3(e).

[109]    In both Enron and Adelphia Bus. Solutions the court confirmed plans containing release provisions similar to Section 16.3(c) of the Plan.  See Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code at § 42.6, In re Enron Corp., Case No. 01-16034 (AJG), Docket No. 19475 (Bankr. S.D.N.Y. July 2, 2004);  See Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code at § 10.7, In re Adelphia Bus. Solutions Inc., Case No. 02-11389 (REG), Docket No. 1398 (Bankr. S.D.N.Y. October 22, 2003).

- 97 -

3512096.2

Settlement Parties among the Released Parties is a condition of the Global Settlement.  The

merits of the Global Settlement are set forth in the 9019 Addendum.  The Settlement Parties

bargained for this condition, and while they have not conducted an investigation as to any claims

they may hold that are being released, the Debtors, who have spent over four years shepherding

these cases through chapter 11,  are unaware of any claims and, in any case, have determined that

the releases are a reasonable cost of earning the benefits of the Global Settlement for all

creditors.[110]  Moreover, the Settlement Parties have agreed to support the Plan, and the releases

provided by the Debtors represent a valid inducement for such support.[111]

169.    Notwithstanding the ACC Bondholder Group's arguments that the releases

are coercive and designed to stifle dissent and serve as a scare tactic, the very opposite is true.[112]

As noted by counsel to Huff when discussing this topic:

> "I think there's a little bit of perspective that's needed here as to
> these provisions and how they got into the plan. It's no secret that
> before this plan was filed, there was litigation about whether or not
> there are going to be claims that may be subordinated or subject to

---

[110]    The ACC Bondholder Group makes much of the fact that neither the Debtors nor the Creditors Committee
has conducted such an investigation.  See ACC Bondholder Group Opposition Brief, at p. 101.  The
releases granted pursuant to section 16.3(c) and (d) of the Plan, however, are temporally limited to acts or
omissions occurring between the Commencement Date and the Effective Date.  See Plan, §16.3.  Given
that these cases have been conducted in a fishbowl for the last four and a half years, the Debtors and the
other Proponents have reasonably concluded that no such investigation is necessary.  The contentious
disputes between warring creditor factions, the significant financial ramifications of Bankruptcy Court
determinations, the intense governmental scrutiny, and the major media coverage of these cases has given
rise to constant and careful scrutiny of the behavior of interested parties at every step of the way.  The
Proponents submit that the transparency that has resulted from this close scrutiny is an adequate proxy for
any investigation that could have been conducted for acts or omissions arising during the lifespan of these
cases.

[111]    See ¶ 62, *supra*, and corresponding note 33, *supra*, which discuss the reasonableness of incentives of this
type.

[112]    The Bankruptcy Court has already considered the ACC Bondholder Group's allegation that the Plan is
coercive and, after additional language was inserted at the direction of the Bankruptcy Court, the Second
Disclosure Statement Supplement was approved as containing "adequate information" within the meaning
of section 1125 of the Bankruptcy Code.  Moreover, the ACC Bondholder Group has not submitted any
evidence to indicate that any party voted to accept the Plan as a result of fear or pressure.

3512096.2

subordination. Well, that was in the early stages. There were -- there was discovery that was being undertaken. There was, you know, threats of more and we were, while this was being negotiated literally, smack in the middle of discovery.  One of the topics, not surprisingly, in the negotiation was if we're settling everything -- Highfields and Tudor said, if we're settling things, I'm not going to settle with you on plan treatment but tomorrow show up at your offices with my lawyer for a deposition. As would any settling party, they said, if we're settling, we're not litigating. To their credit, what they said also was, look, today we're signing on, we're sure that once other ACC holders end up seeing this and understanding it, there are going to be others who are going to end up saying this is a good deal, this makes  sense. To Tudor and Highfields' credit, they said, I don't want to leave those guys out there exposed and say because I was the guy deputized to sit in the conference room with you guys for the last six months and I'm the one who had the opportunity to sign along while nobody else did, that I'm the only one who should get the benefit of this.  . . .  But as part of the deal that Tudor and Highfields negotiated for other ACC parties, they said, look, we're all releasing each other, we're all getting exculpated, but I want to make sure that I'm not leaving behind my other clients (sic) when I sit there and get on a committee call and when I talk to the, you know, twenty, fifteen, whatever the number is; when I speak to those people, I don't want them to all look at me and say, hey, you guys sold us out, it's great that you guys got released and exculpated, you know, we think it's a good deal, too, but we don't get the release."

Sept. 12, 2006 Hr'g Tr., at 106-109 (G. Kaplan).[113]

   B.    The Unique Circumstances Of The Debtors' Cases
         Justify The Granting Of The Non-Debtor Releases.

   170.    Section 16.3(d) of the Plan provides that all holders of Claims and Equity

Interests will be deemed to have granted certain releases to the Third Party Releasees identified

in the Plan.  The Second Circuit has allowed non-debtor releases to be included in a plan, under

"unique" circumstances.   See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re

Metromedia Fiber Network, Inc.), 416 F.3d 136, 142 (2d Cir. 2005).

---

[113]      See also Schall Decl., ¶ 31.

3512096.2

i.    The Plan Releases Are Important
To The Debtors' Emergence Strategy.

171.    When determining whether the circumstances of a case warrant non-

debtor releases, the Second Circuit has held that such releases must be important to the plan.  See

SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 960

F.2d 285, 293 (2d Cir. 1992) ("In bankruptcy cases, a court may enjoin a creditor from suing a

third party, provided the injunction plays an important part in the debtor's reorganization plan.").

For the Metromedia court, "importance" hinged on whether the estate received substantial

consideration from the released parties, the overall treatment of the enjoined claims, and whether

an identity of interest exists between the debtor and the released parties.  Metromedia, 416 F.3d at

142.  In Drexel, the court specifically recognized that where a debtor's plan requires the

settlement of numerous, complex issues, protection of third parties against legal exposure may be

a key component of such settlement.  Drexel, 960 F.2d at 293 (finding an injunction to be

appropriate and valid, when it was a key aspect of a settlement agreement).

172.    As discussed in detail herein, here, many of the Third Party Releasees

have expended considerable time, energy and expense in the process of negotiating the complex

issues underlying these cases — a commitment that resulted in a Plan that is based on the Global

Settlement.  An aspect of the Global Settlement, and by extension the Plan, is the participating

parties' protection from liability in connection with their postpetition efforts and, with respect to

holders of ACC Senior Notes, the opportunity for the extension of that protection to the entire

constituency.[114]  Without such protection, the Global Settlement and the Plan may never have

---

[114]    See ¶169, infra.  Not only were holders of ACC Senior Notes concerned with protecting themselves from liability, they were equally concerned with ensuring that such protection was afforded to their entire constituency.

3512096.2

garnered such widespread support, and would not serve as the foundation for the Debtors' near-term emergence from chapter 11.

ii.    The Released Parties Have Made
Significant Contributions To The Plan Process.

173.    In the present case, many of the Third Party Releasees have made significant non-monetary contributions to the Plan and the Plan process, a fact that supports the Debtors' decision to grant third-party releases.[115]  Absent the tireless efforts of the various constituencies who came together to work out a global compromise aimed at resolving these cases, the Debtors and certain of their largest creditors would likely remain mired in complex and contentious litigation for years to come, threatening to materially delay and reduce distributions to all creditors.[116]  Moreover, in the present case, pursuant to the Plan, several released parties are contributing funds derived from amounts that they assert they would otherwise be allocated, consisting of over $1 billion.  While parties who have ceded portions of their distributions to other creditors may ultimately be able to recoup those diverted assets through CVV recoveries, the speculative nature of any recovery from the CVV creates an obvious risk, as the Bank Lenders and other defendants in CVV litigation have articulated clearly in other contexts.  The willingness of these creditors to take that risk is a substantial contribution to the Plan and to these cases; absent such willingness, the Plan would not have been possible,

---

[115]    While contributions of released parties are often measured monetarily, courts also have approved non-debtor releases upon a finding that non-monetary contributions were sufficiently important to a plan.  See Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns., Inc.), 330 B.R. 394, 437-38 (Bankr. S.D.N.Y. 2005) (finding that consent to a stipulation that resolved pending action against debtor was a "contribution" under the Metromedia analysis).

[116]    The Enron court endorsed the consideration of this kind of negotiation process with respect to non-debtor releases, expressing as a major factor in upholding the non-debtor releases that the "[p]arties participated in the creation of the Plan under the guarantee that they would receive some limited protection for participating in one of the largest and most complex bankruptcy filings in history." In re Enron Corp., 326 B.R. 497, 503 (S.D.N.Y. 2005).

- 101 -

3512096.2

and the Debtors' cases would likely remain stalled.  The substantial and extensive contributions

by the Third Party Releasees — both monetary and non-monetary — further justify the non-

Debtor releases set forth in the Plan.[117]

174.    In addition to the contribution of funds and time spent in negotiation and

formation of the Global Settlement, certain of the Third Party Releasees agreed to become

"restricted," i.e., agreed to refrain from trading in the Debtors' debt and equity securities.  This

agreement enabled the Debtors to share confidential information with certain Settlement Parties,

further facilitating settlement discussions.

iii.    Certain Of The Releases Protect The Estates From Indemnification
Claims And Other Loss Of Value.

175.    An additional factor for determining the importance of non-debtor releases

is whether an identity of interest exists between the debtor and non-debtor released parties.  In

many cases the identity of interest is based on indemnification agreements among the parties.

See XO Commc'ns., Inc., 330 B.R. at 441 (citing In re Master Mortgage Inv. Fund, Inc., 168

B.R. 930, 935 (Bankr. W.D. Mo. 1994) ("There is an identity of interest between the debtor and

the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in

essence, a suit against the debtor or will deplete assets of the estate.")).  In the present case, the

Debtors' directors and officers are parties to postpetition court-approved indemnification

---

[117]    Although the Settlement Parties have made substantial contributions to the Debtors' Plan process, a creditor
who has not previously became a party to the Plan Support Agreement, and who even exerted to date a
negative influence in these cases, can decide to become a Settlement Party and receive a release under the
Plan.  Despite these parties' lack of participation in the negotiation process, however, such a party would
still be contributing, albeit to a lesser extent, to the overall Global Settlement embodied in the Plan, which
itself is a concession made by the Third Party Releasees.  Furthermore, as discussed above, the ability of
others to opt in and receive the same treatment demonstrates the overarching fairness of the Plan and the
lack of discrimination, fair or otherwise.  See Section II.B.iv, supra.

3512096.2

agreements, whereby the Debtors are obligated to indemnify them.[118]  See Wittman Decl. ¶ 81 .

Under these agreements, any claim asserted against a released party who the Debtors are

obligated to indemnify would essentially be a claim against the Debtors.  Any such claim, even if

ultimately unsuccessful, would further deplete finite Estate resources.

176.    Moreover, certain of the non-Debtor releases are important in order to

ensure the retention of remaining key personnel during the post-confirmation process.  Without

protection from liability, the Debtors' remaining key employees might not stay with the

Reorganized Debtors to oversee implementation of the Plan.  See id. The need to protect and

retain such personnel has served, at least in part, as a basis for the approval of releases in similar

cases.  See, e.g., Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.), 326 B.R. 497, 503

(S.D.N.Y. 2005) (noting that "[w]ithout such protection from liability, key personnel might

abandon efforts to help the reorganized debtor entities follow through on the Plan and wind up its

affairs.").

V.    THE OTHER OBJECTIONS SHOULD BE OVERRULED
      AND DO NOT BAR CONFIRMATION OF THE PLAN.

      A.    The Arguments Of The Objecting Banks
            Are Without Merit And Should Be Overruled.

                  i.    The Plan Does Not Impermissibly Grant a Discharge to the
                        Debtors

177.    The Plan does not provide the Debtors with a discharge as such term is

used in sections 727(a) and 1141(d)(3)(C) of the Bankruptcy Code.  Rather, it "discharges" the

Banks' Claims and liens—using such term in its common English usage, not as a bankruptcy

term of art—by providing the Banks with payment in full, and the Objecting Banks are simply

---

[118]    A form of the indemnification agreements executed by ACC and its directors will be included with the trial
exhibits submitted by the Proponents.  Such form was originally publicly disclosed as Exhibit 10.44.3 to
ACC's 2003 10-K.

3512096.2

trying to avoid the relief requested.  Once the Bank Claims have received payment in full, in

accordance with any ruling by the Bankruptcy Court as to what treatment is necessary to provide

payment in full, there will be no more Bank Claims.  The Plan says nothing more than that.

178.    The legislative history behind section 727(a)(1), which by cross-reference

of section 1141(d)(3)(C) denies a discharge of a liquidated corporation, demonstrates that the

Objecting Bank have completely misconstrued the Plan and/or the Bankruptcy Code to

manufacture this objection.  Section 727(a)(1)of the Bankruptcy Code:

> is the heart of the fresh start provisions of the bankruptcy law.
> Subsection (a) requires the court to grant a debtor a discharge
> unless one of eight conditions is met. The first condition is that the
> debtor is not an individual. This is a change from present law,
> under which corporations and partnerships may be discharged in
> liquidation cases, though they rarely are. The change in policy will
> avoid trafficking in corporate shells and in bankrupt partnerships.

In re Rath Packing Co., 55 B.R. 528, 537 n.12 (Bankr. N.D. Iowa 1985) (quoting from House

Report; quotations omitted).  The Plan clearly does not provide any Debtor with a discharge in

the sense of section 727(a)(1).

179.    What the Plan does do is prohibit parties whose claims have been paid in

full, but who may not wish to accept that, from harassing the Century Debtors with efforts to

collect payments above and beyond those that the Bankruptcy Court shall have determined to

constitute payment in full under the Plan.  The putative "discharge" provisions of the Plan

merely prevent the holders of Bank Claims from continuing to seek benefits that the Court will

have ruled they are not entitled to.  Put differently, the provisions complained of are designed to

channel all creditors to their plan entitlements, and are intended solely to prevent end-runs by

those who might otherwise engage in self-help or frivolous motion practice.  If the Bankruptcy

Court determines that the Plan provides the Objecting Banks with payment in full, their Claims

3512096.2

will have been *satisfied*, and the Plan provisions asserted to be an impermissible discharge merely assure that parties will not improperly assert rights after they have received a satisfaction.

           ii.      The Plan Will Implement the FrontierVision Stipulation

        180.    JPMC has filed a protective objection that raises several issues concerning whether the Plan implements the Stipulation and Consent Order Among JPMorgan Chase Bank, N.A.; Adelphia Communications Corp. and its Affiliated Debtors and Debtors in Possession; and Official Committee of Unsecured Creditors Providing Terms and Conditions for Withdrawal of Appeal of JPMorgan Chase Bank, N.A. from Sale Order, entered by the Bankruptcy Court on July 27, 2006 (the "**FrontierVision Stipulation**").

        181.    The Proponents have always intended for the Plan to implement the FrontierVision Stipulation. JPMC's reservations pertain primarily to the LIF allocations to which JPMC is entitled under the terms of the FrontierVision Stipulation. The facts underlying JPMC's LIF allocation rights have been fluid, since they depend on other Bank parties' acceptance or rejection or the Plan, among other things. As they become clear, the Proponents hope to be able to resolve JPMC's objections prior to or during the Confirmation Hearing. However, to the extent there remain any unresolved ambiguities about the terms of the FrontierVision Stipulation, they will be presented to the Bankruptcy Court for resolution. The Plan will effectuate and implement the FrontierVision Stipulation in accordance with the resolution of such ambiguities.

     B.      The Resolution Of Disputes Regarding Intercompany Claims Is Not Some Covert and Maniacally Mutant Form Of Substantive Consolidation.

        182.    By sheer force of will (and significant amounts of paper), the ACC Bondholder Group attempts to convince the Bankruptcy Court that the Global Settlement is a "twisted," "unsanctioned," and "hybrid" form of substantive consolidation, whereby the

- 105 -

3512096.2

Settlement Parties seek to obtain the benefits of substantive consolidation (i.e., the elimination of

Intercompany Claims), without suffering the burdens of substantive consolidation.  See ACC

Bondholder Group Opposition Brief, at p. 21.  There is no such new breed of substantive

consolidation populating the Plan here.  Rather, the effects of which the ACC Bondholder Group

complains are not the result of concealed substantive consolidation, but integral aspects of the

settlement of the Inter-Creditor Dispute.[119]  One of the central issues to be resolved in the Inter-

Creditor Dispute is the extent, validity and priority of certain Intercompany Claims, and the

characterization of all such Intercompany Claims.  It is manifest that a settlement of the Inter-

Creditor Dispute must address such Intercompany Claims in some manner.  The creditors,

through their overwhelming acceptance of the Plan, have voiced their opinion that the Global

Settlement is a fair and reasonable compromise of all issues comprising the Inter-Creditor

Dispute, not just the treatment of Intercompany Claims, which preoccupies the ACC Bondholder

Group.[120]

---

[119]   No aspect of the Plan can legitimately be dubbed "concealed."  The ACC Bondholder Group can hardly
complain of being denied due process with respect to the approval of the Global Settlement as such
compromise has been adequately described in the Second Disclosure Statement Supplement (and this Court
has already approved such document as containing "adequate information" under section 1125 of the
Bankruptcy Code) and the Plan (to which the ACC Bondholder Group objected).  Furthermore, the
Proponents have filed a motion pursuant to Bankruptcy Rule 9019 seeking approval of the Global
Settlement (the "**9019 Motion**"; Docket No. 12505), and separately are filing a detailed 9019 Addendum
establishing the reasonableness of the Global Settlement.  The ACC Bondholder Group has objected to that
motion.  In addition, following a judicially-approved solicitation process (in which all parties that desired to
take discovery have done so), the merits of the Global Settlement will be considered and determined by the
Bankruptcy Court at the Confirmation Hearing.  This is more than adequate due process.

[120]   The ACC Bondholder Group also contends that the classification of all Intercompany Claims together
violates section 1122 of the Bankruptcy Code.  This is a red herring.  Whether entitled to administrative
priority or otherwise, given the disputes over the validity and priority of Intercompany Claims, such claims
(if they are claims) are substantially similar in any case.  Moreover, this objection represents a classic
example of exalting form over substance.  The Proponents could easily have structured the Plan without
classifying Intercompany Claims, and instead to have them treated as resolved as provided in the Global
Settlement (indeed, such modification could be made even today without materially and adversely affecting
any stakeholder's rights).

3512096.2

183.    The ACC Bondholder Group's argument rests upon the unproven premise that the Intercompany Claims are eliminated; in reality, Section 5.3 of the Plan provides solely that the Intercompany Claims are not entitled to Plan Distributions (as distinguished from the elimination of such "entitlements").[121]    That the outcome of substantive consolidation and the effects of the Global Settlement may appear identical to the holder of the Intercompany Claims does not magically transform the Global Settlement into substantive consolidation.    In other words, the fact that certain elements of the Global Settlement, when viewed improperly in isolation, may mimic certain effects that may result from the substantive consolidation of estates, in these Cases the Plan's effect on Intercompany Claims is the result of compromise — not substantive consolidation.    The Proponents recognize that substantive consolidation is only available in cases that meet the stringent standards for application of such equitable remedy. However, parties may, and often do, enter into settlements in which they forego payment on certain disputed claims for the other benefits bestowed under such compromise.    This is such an instance.[122]

184.    In a characteristic attempt to obfuscate the real issue — that the overwhelming majority of creditors have accepted the Plan and the Global Settlement embodied

---

[121]    It is worth noting that the ACC Bondholder Group's objections are based upon the dubious assumption that the Intercompany Claims actually constitute valid Claims.  The Proponents submit that this assumption is unwarranted as it was a central area of debate in the Resolution Process.  Rather than litigating such issue, creditor constituencies determined to resolve these and other issues, through the implementation of the Global Settlement.

[122]    Indeed, as the Bankruptcy Court is well aware, the whole chapter 11 process is a process designed to foster and encourage compromise.  The general rule is that settlements or compromises are favored in bankruptcy and, in fact, encouraged.  Barry v. Am. Fin. Enters., Inc., 449 U.S. 1062 (1980); Barry v. Smith (In re New York, New Haven and Hartford R.R.Co.), 632 F.2d 955, 959 (2d Cir. 1980) (courts generally favor compromises, as compromises are "a normal part of the process or reorganization," citing Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130 (1939)).  "In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).

- 107 -

3512096.2

therein — the ACC Bondholder Group has likened the Debtors' situation to the doomed

consolidation scheme confronted in In re Owens Corning, 419 F.3d 195 (3d Cir. 2005), cert.

denied, McMonagle v. Credit Suisse First Boston, 126 S. Ct. 1910 (2006).  See ACC Bondholder

Group Opposition Brief, at pp. 30-31.  The ACC Bondholder Group is correct in that in Owens

Corning "the appellate court reversed an attempt by the debtors, certain creditors, and

bondholders to propose a plan under which they took for themselves the benefits of subsidiary

loan guaranties given to the banks."  ACC Bondholder Group Position Statement, Exhibit GG to

the Second Disclosure Statement Supplement, at GG-14.  What is not immediately apparent,

however, is how this decision bolsters the ACC Bondholder Group's objection.  There was no

settlement proposed in Owens Corning.  In such case, the debtors proposed a hybrid form of

substantive consolidation in order to eliminate certain guaranties provided to third-party

creditors.  On the other hand, the Global Settlement is a settlement of Claims and multi-faceted

disputes running between Estates that has been acceded to by a variety of creditor constituencies.

Owens Corning's fit to these facts can only be accomplished through the use of Procustes' bed.

The case is simply inapposite in reviewing the effects of the Global Settlement.

185.    Moreover, the treatment of Intercompany Claims in other large chapter 11

cases is instructive.  In In re Silicon Graphics, Inc., the Plan "constitute[d] a good-faith

compromise and settlement of all Claims or controversies resolved pursuant to the Plan and the

Global Settlement."[123]  In that case, the debtors did not seek to substantively consolidate their

estates.  Nevertheless, the SGI Plan provided that "Intercompany Claims will be adjusted,

continued or discharged to the extent determined appropriate by the Debtors or the Reorganized

---

[123]     Order Confirming Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the
Bankruptcy Code at ¶ 7, In re Silicon Graphics, Inc., Case No. 06-10977, Docket No. 632 (Bankr. S.D.N.Y.
September 19, 2006) (J. Lifland).

3512096.2

Debtors, in their sole discretion."[124]   The Bankruptcy Court confirmed the SGI Plan.  Plainly,

the elimination of intercompany claims is not necessarily an indicia of the pursuit of substantive

consolidation; rather, it can be (as in this instance) one premise for settlement of litigation that is

destructive to the debtors' estates and creditors' recoveries.

186.    Indeed, the ACC Bondholder Group has conveniently chosen to ignore the

very provision of the Plan that demonstrates that the Proponents are not attempting to usurp

inappropriately the "benefits" of substantive consolidation.  Specifically, Section 7.3 of the Plan

provides that "[a]ll votes on the Plan shall be tabulated on a non-consolidated basis by Class and

by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or

(10) of the Bankruptcy Code."  Plan, § 7.3.  Plainly, the Proponents are delineating between

Debtors in the arena in which it would be most advantageous to forego such distinctions.

C.    Deemed Value of the TWC Class A Common Stock

187.    In yet another objection that merely constitutes a collateral attack on the

merits of the Global Settlement, the ACC Bondholder Group takes issue with the proposed

"Deemed Value" of the TWC Class A Common Stock to be distributed under the Plan.  See

ACC Bondholder Group Opposition Brief, at pp. 67-68.  Pursuant to the Global Settlement and

in resolution of those aspects of the Inter-Creditor Dispute relating to valuation of Plan

consideration, the TWC Class A Common Stock has a "Deemed Value" of $5.4 billion for

purposes of initial Plan distributions.[125]

---

[124]    Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, as
Modified at § 5.2 (the "SGI Plan"), In re Silicon Graphics, Inc., Case No. 06-10977, Docket No. 607
(Bankr. S.D.N.Y. September 15, 2006).

[125]    The Deemed Value of the TWC Class A Common Stock increased to $5.4 billion from $5.1 billion since
there is an ACC Senior Notes Claims Accepting Class.

3512096.2

188.    The ACC Bondholder Group has objected to the proposed Deemed Value

of the TWC Class A Common Stock, labeling it an "arbitrary valuation" and "inconsistent with

current market prices of comparable enterprises."  As an initial matter, there is simply no need to

engage in a protracted and costly valuation dispute over the Plan.  All Classes of Claims against

and Equity Interests in ACC, including the ACC Senior Notes Class, have voted to accept the

Plan.  Where, as here, a plan has been accepted, valuation issues that arise only in the context of

section 1129(b) are not implicated.[126]

189.    In any case, were the Bankruptcy Court required, which (assuming

agreements over consensual Plan treatment with the presently Rejecting Classes are reached) it is

not, to analyze Deemed Value, such value, when coupled with the True-Up Mechanism in the

Plan, is reasonable.  Indeed, the Deemed Value of the TWC Class A Common Stock, with other

provisions of the Plan, is designed to capture the actual market value of the stock within a

discrete period of time following the Effective Date.

190.    On April 20, 2005, in connection with the Purchase Agreements, the

Debtors' M&A Advisors advised the Board that their view was that the midpoint of the range of

estimated equity values for the Debtors' TWC Class A Common Stock was $4.802 billion (as of

April 19, 2005).  The $4.96 billion valuation midpoint for such stock set forth in the TW

Purchase Agreement reflected an agreement between the parties to such agreement as to the

---

[126]    See n. 23, *supra* (citing cases concluding that the cramdown requirements, including that a plan be "fair
and equitable" are not applicable if all classes accept a plan).  Counsel for the ACC Bondholder Group has
conceded the inapplicability of the 1129(b) requirements to an accepting class of creditors.  See Nov. 27,
2006 Hr'g. Tr., at 30-31 (I. Pachulski) ("First, the vote will determine whether the ACC senior notes class
is entitled to the benefit of the fair and applicable [sic] rule. As we pointed out in our papers . . .  we don't
have the benefit of the fair and equitable rule if our group is outvoted. . . .  One of the arguments in our
confirmation objection . . . is that because of the value of the Time Warner stock, it is possible that
subsidiary creditors will receive more than par plus interest at the rate that Your Honor authorized.  Well, if
we lose the benefit of the fair and equitable test, we can't make that argument.").

3512096.2

midpoint of the range of estimated values, which midpoint ultimately was included in the

Disclosure Statement filed in November 2005.  See Disclosure Statement, at 365.

191.    Approximately four months after the filing of the Disclosure Statement,

values had declined and the M&A Advisors advised the Board that, based upon their review and

analysis and subject to certain assumptions, limitations and qualifications, the M&A Advisors'

view was that the midpoint of the estimated equity values for the TWC Class A Common Stock

was $4.25 billion (as of March 17, 2006).  See First Disclosure Statement Supplement, at DSS-

96.  As discussed in the First Disclosure Statement Supplement, this value was based on, *inter*

*alia*, a review of: (a) certain publicly available business and historical financial information

relating to TWC, the ACC/JV Debtors and Comcast; (b) certain internal financial information

and other data relating to the business and financial prospects of TWC, the Debtors and Comcast;

(c) Financial Projections prepared by management of TWC; and (d) publicly available financial

and stock market data with respect to certain other publicly traded companies in lines of business

the M&A Advisors believe to be comparable in certain respects to Pro Forma TWC's businesses.

See First Disclosure Statement Supplement, at DSS-96.

192.    Recognizing the inherently complex, difficult and uncertain litigation that

would be entailed in any determination of the value of the TWC Class A Common Stock by the

Bankruptcy Court, on July 21, 2006, the parties to the Amended Term Sheet, as part of the

compromises set forth therein, determined and agreed that the Deemed Value of such stock

would be $4.85 billion reflecting the parties' recognition of the increase in value from March

2006.[127]  The parties to such agreement also agreed upon the implementation of the True-Up

---

[127]    Upon the closing of the Sale Transaction, the Debtors estimated that the fair value as of July 31, 2006 of
the TW Class A Common Stock was $4.9 billion.  See Second Disclosure Statement Supplement, at DSS2-
111.

3512096.2

Mechanism, whereby a True-Up Reserve (originally based on a 15% differential) will be created

and withheld from initial distributions under the Plan pending the determination of the Market

Value of the TWC Class A Common Stock.  See Plan, §10.12.  The True-Up Mechanism is

designed to afford creditors even greater protection than that typically found in other plan

scenarios, as the creditors can reap the benefits, or be protected, in the event that the market

value of the stock differs materially from the Deemed Value.

193.    Thereafter, in connection with the negotiation and execution of the Plan

Support Agreement, the parties agreed that the Deemed Value would be increased from $4.85

billion to at least $5.1 billion (and $5.4 billion if the Plan were to be accepted by the ACC Senior

Noteholders — which has occurred), with a 20% True-Up differential.  This provides the ability

to capture a market value of $4.08 billion to $6.48 billion.  As set forth in the Kuhn Declaration,

as of November 17, 2006, the midpoint of the range of estimated equity values for 16% of the

TWC Class A Common Stock is $6 billion.[128]  See Kuhn Decl. ¶ 10.  This midpoint value falls

well within the True-Up range.  While the Proponents and their advisors cannot predict the post-

Effective Date market pricing of the TWC Class A Common Stock, if the market values such

stock in accordance with the proposed Deemed Value and within the 20% True-up Range, then

ACC Senior Noteholders will capture that value (with a substantial cushion of over $400 million

on the upside).  Indeed, not even the parties who have objected to the Plan oppose the concept

that undergirds the True-Up and permits market forces to dictate the endpoint for the Deemed

Value; rather, they quarrel only with the starting point.

---

[128]    The unaudited consolidated financial statements included in ACC's Form 10-Q for the quarter ended
September 30, 2006, dated November 14, 2006, reflected a value of the TWC Class A Common Stock of
$5.475 billion.

3512096.2

194.    On the other hand, if the Proponents and the Plan detractors were permitted to engage in a protracted valuation dispute, it would undercut exponentially the value to be retained from the near-term and final resolution of the Inter-Creditor Dispute.  The benefit of the Global Settlement for all Estates (and by extension, their creditors) has been demonstrated herein; accusations of "arbitrariness" in the detailed analysis that underlies the Deemed Value are factually inaccurate, unsupported by expert testimony, and devoid of any legal foundation. Indeed, the ACC Bondholder Group has offered no evidence — persuasive, unpersuasive, expert or otherwise — to support its conclusory assertions regarding the Deemed Value.  Instead, the ACC Bondholder Group made a deliberate strategic decision not to undertake any valuation of the TWC Class A Common Stock.  The ACC Bondholder Group's objections to the Deemed Value of the TWC Class A Common Stock should be overruled on this ground alone.

195.    The ACC Bondholder Group's objections that it would receive the benefit of an unlimited marked based distribution in a chapter 7 liquidation also is completely without merit.  As discussed, section 1129(a)(7) of the Bankruptcy Code requires a comparison to a hypothetical liquidation under Chapter 7 as of the Effective Date of the Plan.  In a chapter 7 proceeding, the Debtors would not be able to distribute the TWC Class A Common Stock without registration under the Securities Act of 1933, as amended, because section 1145 of the Bankruptcy Code is not applicable in a chapter 7.  Therefore, the TWC Class A Common Stock would either have to (1) be sold in the public market pursuant to an offering registered under the Securities Act of 1933, as amended (the "**Securities Act**"), and the proceeds distributed, or (2) the distribution of the TWC Class A Common Stock would have to be registered under the Securities Act of 1933.  Either one of those options entails substantial costs.

3512096.2

196.    Under the terms of the Registration Rights Agreement, after the Initial

Registration, the Debtors only have the right to demand one additional registration covering a

public offering of the TWC Class A Common Stock (Registration Rights Agreement, Section

4.2(a)).  Under the terms of the lock-up obligation contained in Section 6.7 of the Registration

Rights Agreement, TWC would potentially not be obligated to file a registration statement with

respect to such a Demand Registration until 180 days (subject to extension for any intervening

events as detailed in the Registration Rights Agreement) after the sale of shares pursuant to the

Initial Registration, subjecting the stakeholders to delay and a substantial risk of market

fluctuation.  In addition, in such a circumstance, the Debtors would have to pay an underwriting

fee on the entire stock offering ($216 million assuming a 4% IPO discount and a $5.4 billion

value).  Moreover, in connection with at least the Initial Registration, the pricing of the offering

is likely to be subject to the IPO Discount described in Section VI. of the Disclosure Statement

Supplement.  In addition, the size of such offerings ($2.7 billion assuming a $5.4 billion value

split between two offerings) would potentially create a supply and demand imbalance that could

lead the offerings to fail (resulting in the Debtors being forced to hold substantially all the

restricted securities for two years until the exemption provided by Rule 144(k) was available or

the Debtors were able to exercise their "Final Registration" rights described below).

Alternatively, if the offering were to succeed, the size of such offerings could adversely affect

the price received.  See Wittman Declaration, ¶ 82-86; Aronson Declaration, ¶ 11.

197.    Under the terms of the Registration Rights Agreement, after the Initial

Registration, in the absence of a chapter 11 plan the only manner in which the TWC Class A

Common Stock could be registered without the expense of an underwriting, subject to any then

existing lock-up, is if TWC requires that the Debtors distribute the balance of the TWC Class A

- 114 -

02-41729-shl   Doc 12662   Filed 12/05/06   Entered 12/05/06 05:00:06   Main Document
Pg 128 of 146

3512096.2

Common Stock to the stakeholders pursuant to a registered distribution that is not underwritten.

In addition, in connection with at least the Initial Registration, the pricing of the offering would

be subject to the IPO Discount described in Section VI. of the Disclosure Statement Supplement.

These are substantial costs that would be avoided if the Plan is implemented.

        D.      The Provisions For The Creation, Funding And Governance Of The CVV Are
                 Consistent With The Bankruptcy Code And Applicable Case Law.

               i.       The Equity Committee Does Not Own The Additional Bank
                      Claims; Nor Must The Proponents Obtain The Equity Committee's
                      Consent To Transfer Those Claims To The CVV.

       198.    The Equity Committee has asserted that when the Bankruptcy Court

granted the Equity Committee standing under the STN-Commodore-Housecraft line of cases to

assert the Estates' claims set forth in its intervenor complaint against numerous Bank defendants

(collectively, the "**Additional Bank Claims**"), "it vested ownership and control over those

claims in the Equity Committee. As a consequence, neither the Debtors nor other parties in

interest have the right to control that litigation." See Equity Committee's objection to the Plan

(the "**Equity Committee Objection**") ¶ 57.[129] Based on this flawed and unsupported assertion,

the Equity Committee concludes that "neither the Debtors, the Creditors' Committee, nor the

CVV Trustees acting on their behalf can prosecute or settle those claims." Equity Committee

Objection, ¶ 3. As set forth below, this objection should be overruled.[130]

---

[129]    The so-called "trilogy" of committee standing cases in this Circuit are: (i) Unsecured Creditors Comm. of
Debtor STN Enters., Inc. v. Noyes (In re STN Enters.), 779 F.2d 901 (2d Cir. 1985); (ii) Commodore Int'l,
Ltd. v. Gould (In re Commodore  Int'l, Ltd.), 262 F.3d 96 (2d Cir. 2001); and (iii) In re Housecraft Indus.
USA, Inc., 310 F.3d 64 (2d Cir. 2002). These seminal cases are referred to herein as "STN,"
"Commodore," and "Housecraft," respectively. The primary difference between STN on the one hand, and
Commodore and Housecraft on the other, is that standing is granted to a non-debtor under STN when the
debtor "unjustifiably refuses" to bring a cause of action on behalf of the estate. Standing may be
appropriate under Commodore and/or Housecraft when a debtor consents to or joins in the non-debtor's
request for standing.

[130]    In fact, given the landslide of votes in favor of the Plan at the equity level, the Equity Committee should be
deemed to have been given a mandate from its constituents to support the Plan.

- 115 -

3512096.2

(a)    The Equity Committee Never Had Absolute And Exclusive
Ownership Of The Additional Bank Claims.

199.    Documentary evidence plainly refutes the Equity Committee's assertion

that it has the sole and exclusive right to prosecute and control the Additional Bank Claims.   By

stipulation dated July 24, 2003 (the "**Committee Standing Stipulation**"),[131] several parties in

interest agreed, among other things, that:

> Notwithstanding anything set forth herein, to the extent the
> Committee's Standing Motion is granted:  (a) the Debtors shall
> retain the right to compromise and to settle the Lender Claims,
> whether pursuant to a plan of reorganization or otherwise; and (b)
> parties-in-interest shall retain the right to oppose such
> settlement(s), in each case as if this Stipulation and Order never
> existed and the Debtors had retained exclusive control over the
> Lender Claims.[132]

Committee Standing Stipulation ¶ 10.

200.    In light of the Committee Standing Stipulation, it is unclear how the

Equity Committee can assert that "neither the Debtors, the Creditors' Committee, nor the CVV

Trustees acting on their behalf can prosecute or _**settle**_ those claims."  Equity Committee

Objection, ¶ 3 (emphasis added).  In fact, the opposite is true. The Debtors explicitly retained the

right to compromise and/or settle the Lender Claims via a plan of reorganization or otherwise.

The right to settle a claim is a hallmark of ownership, and the retention of that right to settle by

the Debtors suggests that the Equity Committee's "ownership" of the Additional Bank Claims, if

---

[131]    See "Stipulation and Order Regarding (1) the Creditors' Committee's Motion for Leave to Prosecute
Claims and Causes of Action Against the Pre-petition Agents and Prepetition Secured lenders, (2) the
Equity Committee's Motion to Intervene in the Adversary Proceeding and (3) the Pre-petition Agents'
Responses in Opposition to the Motions of the Creditors' Committee and the Equity Committee and
Alternative Motions to Dismiss the Creditors' Committee's Complaint," dated July 29, 2003 (Docket No.
1925).

[132]    Pursuant to the Committee Standing Stipulation, "Lender Claims" encompassed all claims or causes of
action against the Banks, and therefore includes the Additional Bank Claims.

- 116 -

3512096.2

any, is anything but exclusive.[133]  Furthermore, even if the Equity Committee was deputized to prosecute the Additional Bank Claims, these claims have at all times remained property of the Debtors' Estates.

201.    To further support its position, the Equity Committee relies on Smart World Techs, LLC v. Juno Online Servs, Inc. (In re Smart World Techs., LLC), 423 F.3d 166 (2d Cir. 2005), in which the Second Circuit declined to permit an intervening party to "take ownership of the debtor's legal claims."  Id. at 182.  In reaching this conclusion, the Second Circuit quoted Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns. Corp.), 285 B.R. 848 (Bankr. S.D.N.Y. 2002) ("**Adelphia I**") for the proposition that "[i]n order to 'secure [ownership of the subject causes of action]' . . . creditors would have to meet the standard for derivative standing under STN."  Smart World, 423 F.3d at 182, quoting Adelphia I, 285 B.R. at 851.  Seizing on this holding, the Equity Committee has argued that because it was granted STN-type standing by this Court (as opposed to standing based on Housecraft or Commodore), it has "secured" ownership of the Additional Bank Claims.  This distinction, however, is based on a flawed citation contained within the Smart World opinion.  In fact, Adelphia I drew no such distinction among STN, Commodore, and Housecraft.  Adelphia I, 285 B.R. at 851 ("The Court further believes, however, that having standing to raise issues and to appear and be heard . . . does not equate to ownership of the causes of action in question; it takes an STN or Commodore/ Housecraft order to secure the latter.").

---

[133]    In any event, even if STN-type standing carried with it the distinction advanced by the Equity Committee, the transfer of the Additional Bank Claims to the CVV would still be entirely permissible because, as set forth herein, any right to control the litigation granted to the Equity Committee was neither exclusive nor absolute.

- 117 -

3512096.2

(b)     Consent Of The Equity Committee Is Not Required
        To Transfer The Additional Bank Claims To The CVV.

202.    The Equity Committee also suggests that Additional Bank Claims cannot be transferred to the CVV without its consent.  This assertion is made without any supporting authority, and it ignores the collaborative basis on which the Equity Committee was granted derivative standing in the first place.  In Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns. Corp.), 330 B.R. 364 (Bankr. S.D.N.Y. 2005) ("**Adelphia II**"), the Bankruptcy Court acknowledged some uncertainty about the prospect for success for some of the Additional Bank Claims, and while suggesting that some of those claims "pushed the envelope," nevertheless granted derivative standing, in part, because of the collaborative nature of the endeavor with the Creditors Committee.  Adelphia II, 330 B.R. at 385.  As the Bankruptcy Court explained,

Thus, while some of the Equity Committee's claims will likely not survive 12(b)(6) motions, and while others — especially the RICO claims — will be at some substantial risk at the time of motions for summary judgment, some of the Equity Committee's claims have potential promise. Those in the latter two categories are at least colorable.

But while the ultimate prognosis may not be particularly optimistic for all but a few of the Equity Committee's claims, the "ultimate prognosis" is not the test, as the discussion above makes clear. And the Court necessarily must consider the fact that the Equity Committee does not propose asserting its supplemental claims in isolation, but rather as an adjunct to the claims the Creditors' Committee will assert. As the Equity Committee fairly observes, its motion does not present the Court with the more common cost-benefit analysis where the cost of an independent full-blown litigation must be analyzed. Here the Court must consider the incremental cost of permitting the Equity Committee to pursue the additional claims it wishes to assert. And here the incremental cost of prosecuting the Equity Committee's claims will be quite small — at least in the context of the claims already to be asserted by the Creditors' Committee, and the potential rewards of success on even one of the Equity Committee's claims.

- 118 -

3512096.2

Adelphia II, 330 B.R. at 385-86.

203.    Clearly, when the Equity Committee first sought the right to bring the

Additional Bank Claims, it leveraged that request against the fact that the Creditors Committee's

request for standing was likely to be granted.[134]   The Equity Committee assured the Bankruptcy

Court that the joint nature of the process would render their claims only incrementally more

costly to prosecute.  It would be utterly backwards if the Equity Committee — that would never

be able to make a case for derivative standing today,[135] and that was only able to make such a

case previously because of the positions of the Debtors and the Creditors Committee[136] — could

nevertheless veto the manner in which certain of the actions against the Banks will be

prosecuted.

           (c)    The Transfer Of The Additional Bank Claims To The CVV Will
                 Not Prejudice Any Party, And Will Promote The Efficient
                 Administration Of These Cases Post-Confirmation

204.    In addition to the dearth of legal authority to support their position, the

Equity Committee's attempt to retain sole and exclusive control over the Additional Bank

Claims is simply a bad idea, as it runs counter to the goal of efficient post-confirmation

---

[134]    The Bankruptcy Court characterized its decision to award derivative standing to the Creditors Committee as follows: "Upon the foregoing analysis, it is obvious to the Court — and not just true on balance — that the prosecution of the litigation by the Creditors' Committee here would be in the best interests of the estate. That determination is, to be blunt about it, an easy one." Id. at 384.

[135]    Under STN, the Equity Committee would have to show that the Debtors were refusing unjustifiably to prosecute the Additional Bank Claims, which they could not show, as those claims will now be prosecuted under the auspices of the CVV.  Under Commodore/Housecraft, following the Effective Date of the Plan, the Equity Committee would require the consent of the Debtors to prosecute the Additional Bank Claims, which it does not have.  See also n. 137, infra.

[136]    The Equity Committee was able to rely on the Debtors' decision not to oppose their request for standing, as well as the fact that the Creditors Committee was prosecuting certain of the claims against the Banks in order to make their case for derivative standing.

- 119 -

3512096.2

administration of the Debtors' remaining assets.  Pursuant to the Plan, the Additional Bank

Claims will be transferred to the CVV, where:

> [s]ubject to the terms and provisions of the CVV Declaration, the
> CVV Trustees shall have the duty and authority to take all actions,
> including, but not limited to, the retention of professionals and the
> appointment of officers or other agents, deemed by the CVV
> Trustees to be necessary or appropriate (i) to protect, maintain,
> liquidate to Cash, and maximize the value of the transferred
> Causes of Action, whether by litigation, settlement or otherwise.

See Plan, § 9.4(a).

205.    Given that the CVV Trustees will have a fiduciary duty to maximize the

value of, among other things, the Additional Bank Claims, there can be no prejudice to any party

from the transfer proposed in the Plan.  Moreover, channeling the Estates' remaining causes of

action into a single litigation trust has the additional benefits of efficiency and may help to create

economies of scale with respect to the professionals retained by the CVV.[137]

206.    The Equity Committee does not have the legal authority to prevent the

transfer of the Additional Bank Claims to the CVV, nor would it be in the best interests of these

Estates for the Bankruptcy Court to permit them to do so.

ii.    The Equity Committee Cannot Retain The Benefits Of The ACC
Estate Without Sharing In Its Burdens.

207.    The Equity Committee has alleged that the Plan's proposed distribution of

proceeds from the CVV violates the absolute priority rule, because, among other reasons, a

---

[137]    The inefficiency and needless cost of permitting the Equity Committee to prosecute the Additional Bank
Claims separate and apart from the CVV, as well as the fact that no party will be prejudiced by permitting
the CVV to prosecute those claims, further buttresses the argument set forth above that if the Equity
Committee applied for standing to prosecute their claims today, such request would likely be denied.  See
n. 135, supra.  Similarly, the request for a separate "fiduciary" to prosecute claims for the Equity
Committee or ACC alone also fails, as requests for multiple fiduciaries for various creditor groups has been
consistently denied in these cases.  More importantly, though, taken to its logical conclusion, this argument
would require separate fiduciaries for each priority level of CVV Interests under the Plan.  Such an
arrangement would run completely counter to the goal of the CVV, i.e., the maximization of value of the
Designated Litigation.

3512096.2

number of the claims that would be transferred under the Plan to the CVV belong only to ACC.

Equity Committee Objection, ¶¶ 75-80.  Furthermore, the Equity Committee has suggested that

if successful litigation results in the recovery of damages for harm suffered by ACC, those

recoveries must be distributed only to satisfy ACC's creditors and then ACC's equity holders.

Equity Committee Objection, ¶¶ 81-86.

208.    First, any "gift" between the parties is authorized by virtue of the fact that

both Classes have accepted the Plan.  In other words, even if the Equity Committee is correct

that certain causes of action belong only to ACC, because all Classes of creditors and

shareholders of ACC have voted to accept the Plan, such Classes that accept the Plan may

nonetheless be deemed to have gifted such recoveries to creditors of non-ACC Estates in order to

achieve consensual implementation of the Plan and Global Settlement, and *vice versa*.

209.    Moreover, and in any case, the Equity Committee misconstrues the nature

of the Designated Litigation, and asserts without support that many of the causes of action that

make up the Designated Litigation are "owned" by the ACC Estate.  For example, assertions that

the action against Deloitte is solely for the benefit of ACC and its creditors ignores the

enterprise-wide nature of the ACC/JV Debtors' relationship with Deloitte & Touche, LLP

("**Deloitte**"), and incorrectly implies that only creditors of the ACC Estate were harmed by

Deloitte's alleged wrongful conduct.

210.    Beyond the ownership of these claims, however, the suggestion that only

creditors of ACC are entitled to recoveries from the Designated Litigation is curious in light of

the fact that the subsidiaries of ACC continue to be unable to file their separate SEC reports as a

result of the accounting practices that occurred while Deloitte served as auditor.

3512096.2

211.    The Equity Committee's members cannot enjoy the allocation of burdens attendant to this approach while at the same time cry foul when they are also required to share in the benefits.[138]

       iii.    The Plan Does Not Violate The Absolute Priority Rule With Respect To The Distribution Mechanics Of The CVV.

212.    The Equity Committee has further asserted that an alleged *quid pro quo* contained within Sections 5.1(b)(h)(ii) and (i)(ii) of the Plan could deny distributions to holders of ACC Common Stock and ACC Preferred Stock otherwise entitled to such distributions on account of their place in the statutory line for payment.  This argument misconstrues the value of CVV Interests as well as the operation of those sections of the Plan.  Because the CVV Interests at issue will have only speculative value on the Effective Date,[139] and because a "carrot and stick" provision such as the one set forth in the Plan is wholly permissible, the Equity Committee's argument fails.[140]

213.    Unless there is a triple TKO in the litigations pursued by the CVV, it is beyond rational dispute that the holders of Equity Interests are out of the money.  As set forth on page 121 of the Second Disclosure Statement Supplement, it is extremely remote and unlikely that there will be sufficient litigation recoveries, if any, to provide <u>any</u> recoveries to holders of

---

[138]    Assuming *arguendo* that the Equity Committee were successful in lobbying for the creation of an ACC-only CVV (a determination that the Proponents would strongly oppose) the Equity Committee would still stand in line behind creditors of the Subsidiary Debtors for distributions from the Designated Litigation.  Pursuant to the Global Settlement, creditors of the Subsidiary Debtors have given up a portion of their primary recovery to the ACC Estates (which pursuant to the absolute priority rule, are used first to pay ACC's most senior creditors).  These give-ups must be re-paid to creditors of the Subsidiary Debtors from more speculative sources before any recoveries from the Designated Litigation could be distributed to equity.  Accordingly, even if the Equity Committee wins this argument, they stand in the same place in line for distributions.

[139]    <u>See</u> Second Disclosure Statement Supplement, at DSS2-71, DSS2-121.

[140]    Such objection has also been rendered moot by fact that holders of Equity Interests in the Debtors have voted overwhelmingly to support the Plan.

- 122 -

3512096.2

Series ESL Interests, Series ACC-4 Interests, Series ACC-5 Interests, Series ACC-6 Interests and

Series ACC-7 Interests.  Furthermore, ACC Senior Notes Claims, ACC Trade Claims and ACC

Other Unsecured Claims are not estimated to be paid in full under the Plan absent litigation

recovery.  See Second Disclosure Statement Supplement, at DSS2-121.  Indeed, as disclosed in

the Second Disclosure Statement Supplement, assuming that there are no Allowed Subsidiary

Debtor Existing Securities Laws Claims, holders of Equity Interests in the ACC Debtors should

not expect to receive any recovery on account of such interests unless there are net proceeds of at

least $6.5 billion on account of litigation prosecuted by the CVV (assuming all senior Classes

and Claims are paid in full as of January 31, 2007).  Id. [141]

214.    In light of the projected insolvency of ACC as of the anticipated Effective

Date of the Plan, the Bankruptcy Code does not require that any distribution be made to the

holders of Equity Interests in ACC.  See In re Guilford Telecasters, Inc., 128 B.R. 622, 627

(Bankr. M.D.N.C. 1991) ("The going concern value of the Debtor is far less than aggregate

allowed unsecured claims against the Debtor which exceed $ 9.6 million, and the Debtor, under a

reorganization value, is clearly insolvent.  The value of the shareholders' interests is zero and,

therefore, the plan need not provide for this class.  In view of the Debtors' insolvency and the

fact that no class of interests junior to shareholders is receiving property of the estate, the plan

does not discriminate unfairly and the treatment of shareholders is fair and equitable.") (citations

omitted).  Sections 5.1(h)(i) and (i)(i) of the Plan provide, respectively, that "ACC Preferred

---

[141]    Notably, the Equity Committee has never offered any contrary analysis to suggest that the Debtors'
projections are somehow flawed or otherwise inaccurate.  Accordingly, the Equity Committee's entire
objection ought to be read through a pragmatic lens which acknowledges that any distribution to holders of
Equity Interests on account of their CVV Interests is extremely unlikely.  Moreover, while the Equity
Committee does not suggest that the value of the Estates does warrant a recovery to equity holders, they do
propose substantially lengthening the "True-Up" period in the hope that value may dramatically improve in
the future.  See Equity Committee Objection, 104-106.  Nearly five years in chapter 11 is more than enough
time to have demonstrated that even more time is an unwarranted and forlorn hope.

- 123 -

3512096.2

Stock Interests shall be cancelled and holders of ACC Preferred Stock Interests shall not be

entitled to any distribution," and "ACC Common Stock Interests shall be cancelled and holders

of ACC Common Stock Interests shall not be entitled to any distribution."  Plan, §§ 5.1(h)(i) and

(i)(i).  Accordingly, the Plan has provided holders of Equity Interests in ACC with their precise

legal entitlement.

215.    Though remote in the extreme, the mere possibility that the CVV could

realize much better than expected recoveries does not alter the above analysis.  Courts have held

that speculative recoveries from a litigation trust do not factor in to the various calculations that

must be made at the point in time at which a debtor seeks to confirm a plan.  For example, in

Thompson v. Ky. Lumber Co. (In re Kentucky Lumber Co.), 860 F.2d 674, 675 (6th Cir. 1988),

the Sixth Circuit refused to award postpetition interest to unsecured creditors upon a large post-

confirmation recovery by the debtor, even though, after all unsecured claims were paid in full, it

was "at least possible that some money [would] remain in excess of the unsecured creditors'

claims and hence be available to the debtor or its shareholders."[142]  In reaching this conclusion,

the Sixth Circuit reasoned that:

> When this plan was confirmed in July of 1983 it was in the best
> interests of creditors. The district court erred in interpreting section
> 726(a)(5) as mandating the payment of postpetition interest to
> unsecured creditors whenever after confirmation of the plan there
> should appear the possibility that the debtor may retain funds.

Id. at 678 (emphasis in original).[143]

---

[142]    See also In re Manchester Gas Storage, Inc., 309 B.R. 354, 383 (Bankr. N.D. Okla. 2004) (suggesting that "best interests of creditors test is applicable *at the time of confirmation*" . . . and not "years after confirmation") (emphasis in original).

[143]    Importantly, even if the prosecution of the Additional Bank Claims does produce the triple-TKO necessary for holders of Equity Interests to receive any distribution under the Plan, having now voted to accept the Plan, such holders will receive such distributions if they are recovered by the CVV.

- 124 -

3512096.2

216.    Though the Sixth Circuit applied its rationale to the best interests requirement, it is equally applicable in a case where, as here, a creditor seeks to hold a debtor to some future valuation standard in order to meet the confirmation requirements of section 1129.[144] As of the date on which the Debtors seek approval of the Plan, there are insufficient funds to pay holders of ACC Common Stock and ACC Preferred Stock anything on account of their Equity Interests.  Accordingly, the Debtors are not required to make any distribution to holders of ACC stock.

217.    Separate and apart from the treatment that the Debtors are required to afford to holders of ACC stock under the Plan, the Proponents have included a provision in the Plan that would provide an inducement for members of Classes ACC 8 and ACC 9 to vote in favor of the Plan.  Section 5.1(h)(i) of the Plan provides that:

> as part of the settlement and compromise embodied herein, if the holders of Allowed ACC Preferred Stock Interests vote in number sufficient to cause the ACC Preferred Stock Interests Class to accept the Plan and the ACC Existing Securities Laws Claims Class has voted to accept the Plan and if the ACC Senior Note Claims Class, ACC Trade Claims Class, ACC Other Unsecured Claims Class and ACC Subordinated Notes Claims Class accept the Plan, each holder of an Allowed ACC Preferred Stock Interest shall receive on the Initial Distribution Date and/or on a Subsequent Distribution Date thereafter in full satisfaction of such holder's Allowed ACC Preferred Stock Interest a Pro Rata Share of CVV Series ACC-6 Interests.

---

[144]    The Equity Committee is of course quite familiar with the case law cited herein, as it was the Equity Committee that brought these cases to the Bankruptcy Court's attention in April of 2006.  Seeking to insulate the recoveries of the CVV from the claims of structurally senior unsecured creditors for postpetition interest, counsel for the Equity Committee cited Kentucky Lumber and Manchester Gas for the proposition that post-confirmation recoveries by the CVV should not be considered in the context of a best interests analysis.  Of course, at the time, the Equity Committee sought to preserve those recoveries for its constituents.  Now the shoe is on the other foot, but the same rule must apply.  "[T]he value of potential uncertain future litigation recoveries," as counsel for the Equity Committee then characterized the claims that will reside with the CVV, are not properly before the Bankruptcy Court, and ought not be brought to bear on valuation questions that must necessarily be addressed now.  Apr. 24, 2006 Hr'g Tr. (G. Blue), at 59:22 – 59:23.

- 125 -

3512096.2

Plan, § 5.1(h)(i).[145]

218.    This "carrot and stick" provision, by which a creditor is offered an

inducement to vote on a plan of reorganization, is not inconsistent with any provision of the

Bankruptcy Code.  See In re Drexel Burnham Lambert Group, 138 B.R. 714, 717 (Bankr.

S.D.N.Y. 1992) ("Indeed, § 1129(a)(3) provides that the Court shall confirm a plan only if . . .

the plan is proposed in good faith and not by any means forbidden by law. We do not view the

carrot and the stick, factually presented in this case, as forbidden by the Code or any law we

know of").[146]  See also In re Zenith Elecs. Corp., 241 B.R. 92, 105 (Bankr. D. Del. 1999) ("There

is no prohibition in the Code against a Plan proponent offering different treatment to a class

depending on whether it votes to accept or reject the Plan.").  The Equity Committee's attempt at

distinguishing Drexel is hopeless, as the case is decidedly on point.  The Equity Committee's

summation of Drexel could easily be substituted for one describing this case:

---

[145]    Section 5.1(i)(i) of the Plan contains an analogous provision for ACC Common Stock Interests.  See Plan, §
5.1(i)(i).

[146]    The Equity Committee makes much of two cases from other jurisdictions that are inapplicable here.  In In
re MCorp Fin., Inc., 137 B.R. 219, 236 (Bankr. S.D. Tex. 1992), the Bankruptcy Court for the Southern
District of Texas rejected a plan provision that required an affirmative vote of one class of equity holders
before any of three classes of equity holders could participate in recoveries from a pending litigation (to the
extent funds were available after payment in full to unsecured creditors).  The factual predicates
underpinning the holding in MCorp. — i.e., the vote of one class impacting the recoveries of three, and the
Court's opinion that the litigation at issue was likely to result in value being available for distribution to
equity, id. at 235-36 — are missing here.  Moreover, even if MCorp. were on point factually, it has
nevertheless been considered and specifically rejected by a court in this district.  See Drexel Burnham, 138
B.R. at 717.

Likewise, in In re Allegheny Int'l., Inc., 118 B.R. 282, 304 (Bankr. W.D. Pa. 1990), the Bankruptcy Court
for the Western District of Pennsylvania rejected a plan provision which required equity holders to vote in
favor of the plan in order to receive a distribution in the form of warrants.  In Allegheny, however, the court
determined that, based on the valuation performed at confirmation, there would be some funds available for
distribution to the rejecting equity class.  Accordingly, the provision requiring equity holders to vote in favor of the
Plan in order to receive a distribution was problematic.  Moreover, Allegheny is devoid of any analysis to
support this holding, and shares the same deficiency as MCorp., which has been rejected by a court in this
district.  See Drexel Burnham, 138 B.R. at 717.

3512096.2

> In [Drexel] the proposed plan of reorganization sought to entice
> various groups of equity holders to vote in favor of the plan by
> offering those classes that voted in favor of the plan warrants to
> purchase shares of a newly-formed entity. By offering these
> warrants, senior creditors were effectively agreeing to dilute their
> recoveries in exchange for a consensual confirmation.  One class
> of equity holders rejected the plan, and argued against
> confirmation on the grounds that they had been unfairly
> discriminated against. The bankruptcy court found "no conceptual
> problem with senior interests offering to junior interests an
> inducement to consent to the Plan and waive whatever right they
> have." Id. at 717. Further, the court found that, although the equity
> class that had rejected the plan would receive no distributions
> under the plan, there was no violation of the absolute priority rule
> because that class of equity holders would receive exactly what
> their interests were worth: nothing.

Equity Committee Objection, ¶ 101.

219.    Just as in Drexel, the Plan offers a share in a newly-formed entity (here the

CVV, as opposed to the reorganized debtors) as an inducement to holders of Equity Interests to

vote on the Plan where they would otherwise be receiving no distribution.

220.    Accordingly, the Plan (a) provides holders of ACC Common Stock and

ACC Preferred Stock with all they are entitled to, and (b) contains a permissible inducement for

holders of ACC stock to vote in favor of the Plan.

VI.    MODIFICATION OF THE PLAN IS PERMISSIBLE
       UNDER SECTION 1127 OF THE BANKRUPTCY CODE

221.    As discussed above, the Creditors Committee is in ongoing Plan

discussions with representatives of the Non-Agent Lender Committee, which represents a

significant portion of the holders of Bank Claims in the Bank Syndicate Lenders Classes, that

may result in modifications being proposed to the Plan.  Moreover, an agreement over Plan

modifications already has been reached with BOFA, the Administrative Agent for the Century

Credit Agreement, resulting in BOFA earlier today submitting ballots to accept the Plan.  The

Proponents thus are in the process of documenting these changes, and also are making other non-

- 127 -

3512096.2

material and/or technical modifications to the Plan in response to certain of the objections filed

and comments received from certain parties.  The Proponents expect to file a modified version of

the Plan incorporating these changes and will request that the Bankruptcy Court approve the

modifications, pursuant and subject to the provisions of section 1127 of the Bankruptcy Code, at

the Confirmation Hearing.

222.    Section 1127(a) of the Bankruptcy Code provides that the proponent of a

plan may modify such plan at any time prior to confirmation, provided that such plan, as

modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  11

U.S.C. §1127(a).  Section 1127(c) of the Bankruptcy Code further provides that the proponent of

a plan modification comply with the disclosure requirements of section 1125 of the Bankruptcy

Code with respect to the plan, as modified.  11 U.S.C. § 1127(c).

223.    The legislative history to section 1127(c) of the Bankruptcy Code

indicates that Congress did not intend for section 1127 to necessarily mandate additional

disclosure.  See H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 411 (1977), reprinted in 1978

U.S.C.C.A.N. 5963, 6367 ("[o]f course, if the modification were sufficiently minor, the court

might determine that additional disclosure was not required under the circumstances.").

Similarly, Bankruptcy Rule 3019 provides that if the court finds, after hearing on notice[147] to the

trustee, any official committee appointed and any other entity designated by the court, that a

proposed modification does not adversely change the treatment of a creditor who has not

---

[147]    The hearing on proposed modifications may be conducted simultaneously with the confirmation hearing.
See Citicorp Acceptance Co., Inc., v. Ruti-Sweetwater (In re Ruti-Sweetwater), 57 B.R. 354, 358 (D. Utah
1985); Solar King, 90 B.R. at 823.  Indeed, notice received at such hearing may satisfy the notice provision.
Sweetwater, 57 B.R. at 358.

- 128 -

3512096.2

accepted the modification in writing, the modification shall be deemed accepted by all creditors

who have previously accepted the plan.  Fed. R. Bankr. Pro. 3019.

224.   Nearly all courts that have considered the issue have found that additional

disclosure is required only when and to the extent the plan proponent (a) intends to solicit votes

from previously dissenting creditors or (b) seeks approval of a modification that both *materially*

*and adversely* impacts parties who previously voted in favor of the plan.  A leading case

interpreting Rule 3019 is In re American Solar King Corp., 90 B.R. 808 (Bankr. W.D. Tex.

1988), decided by the Bankruptcy Court for the Western District of Texas.  That opinion set forth

the following test for determining whether a post-solicitation modification of a plan requires

additional disclosure:  "Further disclosure occurs only when and to the extent that the debtor

intends to solicit votes from previously dissenting creditors or when the modification *materially*

*and adversely* impacts parties who previously voted for the plan."  Id. at 823 (emphasis added).

See also Enron Corp. v. New Power Co. (In re New Power Co.), 438 F.3d 1113, 1117-18 (11th

Cir. 2006) ("[T]he bankruptcy court may deem a claim or interest holder's vote for or against a

plan as a corresponding vote in relation to a modified plan unless the modification *materially*

*and adversely* changes the way that claim or interest holder is treated"); Legend Radio Group,

Inc. v. Sutherland, 2000 U.S. App. LEXIS 6422 n.6 (4th Cir. 2000) (in defining "modification"

in appeal involving post-confirmation plan modification under section 1127(b), relying on

language in section 222 of former Bankruptcy Act, which engendered current Bankruptcy Rule

3019 and permitted pre-confirmation modification without resolicitation if modification "does

not *materially and adversely* affect the interests of creditors*"*);  In re Willow Creek Apts., No.

94-11161C-11D, 1996 Bankr. LEXIS 1888 (Bankr. M.D.N.C. 1996).

3512096.2

225.     Although a materiality standard was explicit in the Bankruptcy Act and
the related bankruptcy rules and the materiality standard was omitted in the Bankruptcy Code
and Rule 3019, courts have concluded that no significance should attach to such omission.  This
position is supported by the legislative history of section 1127 of the Bankruptcy Code, which
states, "[A] creditor or stockholder who voted for or against a plan is deemed to have accepted or
rejected the modifying proposal.  But if the modification *materially and adversely* affects any of
their interests, they must be afforded an opportunity to change their vote…."  S. REP. NO. 95-
989, at 123 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5910 (emphasis added).

226.     The Solar King court aptly explained the practical rationale, "The goal
after all is consensual plans.  Every time a plan has to be re-solicited, the risk that consensus will
be lost is increased dramatically.  Requiring such a formalistic step in the face of a merely
technical negative impact heightens the risk of plan failure without satisfying any countervailing
public policy. . . . [Rule 3019] permits modifications that might technically have a negative
impact on claimants where the modifications are not substantial….  *Thus, if a modification does
not "materially" impact a claimant's treatment, the change is not adverse and the court may
deem that prior acceptances apply to the amended plan as well.*"  90 B.R. at 825-26.  In Solar
King, the debtors modified the plan to give stock to an equity holder who would have received
nothing under the original plan.  As a result of the modification, the total number of equity shares
would increase, causing a value-per-share dilution.  Although it was not possible to determine
exactly how much the modification would dilute the value of shares, the court estimated a
dilution of less than 1% and found this to be a dilution "so small that no previously assenting
creditor would be motivated to reconsider their vote because of it."  Id. at 824.  Therefore, the

- 130 -

3512096.2

existing disclosure statement was adequate and the plan as modified would be deemed accepted by all creditors and equity holders who had accepted the plan previously.

227.    The currently anticipated modifications to the Plan will not require any resolicitation of previously accepting creditors under section 1127 of the Bankruptcy Code, and the Proponents intend to request that the Bankruptcy Court approve such modifications at the Confirmation Hearing.

3512096.2

## CONCLUSION

After overcoming the pervasive fraud that forced the Debtors into chapter 11, and enduring more than four years of creditor infighting and legal maneuvering, the Debtors are poised to culminate the restructuring process and distribute to creditors the substantial value obtained from the successful consummation of the Sale Transaction.  The Global Settlement, the bedrock of the Plan, has garnered unprecedented support and will yield superior returns to all constituents in these cases.  The Plan complies with all applicable provisions of the Bankruptcy Code, including those provisions required in order to cram down the Rejecting Classes.  It does not discriminate unfairly and satisfies the "best interests of creditors" test.  Moreover, the post-Effective Date provisions, namely the releases and exculpations set forth in the Plan, are consistent with applicable law and essential to the Debtors' successful emergence from chapter 11.  Finally, and perhaps most importantly, the Plan is supported by a broad and weighty array of stakeholders spanning the full range of the Debtors' capital structure.

3512096.2

       The resolution of these cases in the manner proposed by the Plan and the Global Settlement will fully, fairly and finally resolve the Inter-Creditor Dispute.  With creditors' billions hanging in the balance, and the threat of erosion looming, it would be inconsistent with applicable law and sound policy to permit a few disgruntled combatants — desperate to land a hoped-for but illusory knock-out punch — to continue the brawl past the fifteenth round.  The overwhelming majority has spoken — the bell has rung.

Dated:  December 4, 2006
       New York, New York

                              WILLKIE FARR & GALLAGHER LLP
                              Attorneys for the Debtors and
                              Debtors in Possession

                              By:   /s/ Marc Abrams
                                   Marc Abrams (MA-0735)
                                 Paul V. Shalhoub (PS-2133)
                                 Rachel C. Strickland (RS-3787)

                              787 Seventh Avenue
                              New York, New York  10019
                              (212) 728-8000

                                   - and -

                              KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
                              Attorneys for the Official Committee
                              of Unsecured Creditors

                              By:   /s/ David Friedman
                                 David Friedman (DF-4278)
                                 Adam L. Shiff (AS-7571)

                              1633 Broadway
                              New York, New York 10019
                              (212) 506-1700