Hearing Date: December 7, 2006 at 9:45 a.m.

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
J. Christopher Shore (JS-6031)
Gerard Uzzi (GU-2297)
Meghan McCurdy (MM-7887)

Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Thomas E Lauria (Admitted *Pro Hac Vice*)
Richard S. Kebrdle (Admitted *Pro Hac Vice*)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Adelphia Communications Corporation, <u>et al.</u>, | Case No. 02-41729 (REG) |
| | Jointly Administered |
| Debtors. | |

**THE AD HOC COMMITTEE OF ARAHOVA NOTEHOLDERS' (I) STATEMENT IN SUPPORT OF THE FIFTH AMENDED JOINT CHAPTER 11 PLAN FOR ADELPHIA COMMUNICATIONS CORPORATION AND CERTAIN OF ITS AFFILIATES AND (II) RESPONSE TO THE ACC BONDHOLDER GROUP'S OBJECTION THERETO**

TO:    THE HONORABLE ROBERT E. GERBER,
       UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Committee of Arahova Noteholders (the "Arahova Noteholders Committee"), as holders (or indenture trustee on behalf of, or investment advisors to, holders) of senior notes (the "Arahova Notes") issued by Debtor Arahova Communications, Inc. ("Arahova"), hereby submits this (i) statement in support of the Fifth Amended Joint Chapter 11

Plan of Reorganization (the "Plan") for Adelphia Communications Corporation and Certain of Its Affiliates ("ACC") and (ii) response to ACC Bondholder Group's Objection to Approval of the Global Settlement and Confirmation of the Plan, dated November 24, 2006, the Memorandum of Law in Support of the Objection, and the Addendum to the Memorandum (collectively, the "ACC Bondholder Group Objection"). In support of the foregoing, the Arahova Noteholders Committee respectfully represents as follows:

## STATEMENT

1. Although we are not a Proponent[1] of the Plan, the Arahova Noteholders Committee fully supports its prompt confirmation. The Arahova Noteholders Committee does not wish to burden the Court with a lengthy discourse on the benefits and advantages of the Plan from the perspective of holders of Arahova Notes and the shortcomings of the various objections to the confirmation of the Plan – we are confident that the Proponents will make their case. However, we believe that certain issues raised in the somewhat invective-filled submissions of the ACC Bondholders Group cannot go without response. We do so here in short order.

2. The purpose of the Confirmation Hearing is to determine whether the Plan satisfies section 1129 of the Bankruptcy Code, which requires, among other things, that the Global Settlement contained therein is reasonable. 11 U.S.C. § 1129(a)(3) ("The plan has been proposed in good faith and not by any means forbidden by law."); see also Protective Comm. for Indep. Stockholders of TMT Trailor Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (holding that "[a bankruptcy judge should] apprise[] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained,

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise"); Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (holding that when determining whether a settlement should be approved, the Bankruptcy Court should "canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness'"), cert. denied, 464 U.S. 822 (1983). Thus, the Court must determine whether the terms of the Global Settlement are reasonable under the circumstances.

3. Beyond simple issues of cost, burden and expense, a fundamental premise of this particular settlement was that the risks attendant to a continued trial would be overtaken by a settlement. As stated in the Second Amended and Restated Agreement Concerning Terms and Conditions of a Modified Chapter 11 Plan, the parties acknowledged that the "benefits and enhanced value to all stakeholders" that a settlement provides outweighs the "additional and material costs, undertakings and obligations" that would result from the continuation of the litigation in respect of the numerous inter-Debtor disputes in these chapter 11 case ("MIA Litigation"). The ACC Bondholder Committee, however, now seeks to litigate these inter-Debtor disputes in the context of the Confirmation Hearing and, thereby. subject the parties to the very material risks, known to the Court, that drove the settlement in the first instance. It is simply not appropriate to allow one group of creditors who are openly hostile to settlement, and who may have economic incentives to create chaos and uncertainty, to dictate what information is disclosed and when. This Court should exercise appropriate discretion to preserve the value of these chapter 11 estates.

4. As we are all well aware, the MIA Litigation already has cost creditors of ACC hundreds of millions of dollars in accrued interest against the Debtors' estates (not to mention attorneys' fees and litigation costs), exposed ACC's estate to significant contingent liabilities,

3

potentially prejudiced CVV recoveries, and put all creditors at every level of the capital structure at risk of incurring the additional administrative costs associated with the continuation of these chapter 11 cases.  Cognizant of the rapidly-eroding value of the Debtors' estates and the lack of <u>any</u> viable exit strategy, throughout the course of the MIA Litigation, the Court repeatedly encouraged the parties to make their best efforts to settle the inter-Debtor disputes, recognizing that the matter was left entirely to the creditors to devise a way to get out of their own "jail cells."  We heeded the Court's suggestion, engaged in good faith settlement negotiations, and reached a resolution that we believe results in a recovery that is far less than that to which the holders of Arahova Notes are entitled, but which we cannot say is patently unreasonable, particularly when weighed against the risks and costs involved in continuing the MIA Litigation.  That settlement, brokered by creditors devoting their own time and effort (unpaid as of yet), now faces attack from a minority of ACC creditors who somehow feel free to personalize the debate, by accusing Arahova's representatives and ACC's various parties of various improprieties whenever they please to create the impression that Arahova is obtaining something completely inconsistent with a litigated result.

5.     Again, let us be clear, our firm belief was, and is, that we will prevail in the MIA Litigation.  Unlike the ACC Bondholders Group, however, we are neither willing to wait for years to achieve that result, nor litigate purely for litigation's sake, all the while exacting an unnecessary toll on the value of the Debtors' estates and personnel.  These chapter 11 cases need to be resolved now.  The 250 pages of the combined ACC Bondholders Group Objection, on the other hand, simply do not reflect an honest assessment of the risks and rewards of continuing the MIA Litigation.  We trust that the Proponents of the Plan will point out the myriad of relevant

4

information that the ACC Bondholders Group ignores in its analysis or simply misinterprets. It is not our intention to step into that fray.

6. The Arahova Noteholders Committee's decision not to "take the bait" and respond in kind to the ACC Bondholders Group Objection, however, should not be viewed as acquiescence or a concession to any of the positions taken by the ACC Bondholders Group, nor construed as an admission in any respect or lack of confidence in the positions we asserted in the MIA Litigation. Responding substantively to the ACC Bondholders Group's attempt to conduct the MIA Litigation during the Confirmation Hearing would run counter to the steps taken in good faith to ameliorate the declining value of the estates. At this late stage, we seek to act only in a manner that will enhance value, not destroy it.

7. Nevertheless, should the Court decline to confirm the Plan and if the MIA Litigation resumes, we are ready, willing, and able to pick up where the parties left off in March of 2006. We believe, however, that it should not come to that – the Plan, and the Global Settlement contained therein, should be approved and confirmed in all respects.

## **CONCLUSION**

Accordingly, for the reasons stated above, the Court should (i) approve the Plan; (ii) deny all objections to the Plan; and (iii) grant such other and further relief as the Court deems appropriate.

Dated: Miami, Florida
December 5, 2006

        WHITE & CASE LLP
        1155 Avenue of the Americas
        New York, NY 11036-2787
        (212) 819-8200

        J. Christopher Shore (JS-6031)
        Gerard Uzzi (GU-2297)
        Meghan McCurdy (MM-7887)

        By:  /s/ Gerard Uzzi

        Wachovia Financial Center
        200 South Biscayne Blvd., Suite 4900
        Miami, Florida 33131
        (305) 371-2700

        Thomas E Lauria (Admitted *Pro Hac Vice*)
        Richard S. Kebrdle (Admitted *Pro Hac Vice*)

        *Counsel for the Ad Hoc Committee*
        *of Arahova Noteholders*