UNDER SEAL

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                                        )

In re:                                        )         Chapter 11

Adelphia Communications Corp., *et al.*,      )         Case No. 02-41729 (REG)

                         Debtors.     )         Jointly Administered
_____)

BENCH DECISION[1] ON MOTION TO
DESIGNATE VOTES OF CERTAIN CREDITORS
IN THE CLASS OF ACC SENIOR NOTES

APPEARANCES:
WEIL, GOTSHAL & MANGES LLP
Counsel for the ACC Bondholders Group
767 Fifth Avenue
New York, NY 10153
By:    Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
        Melanie Gray, Esq.
        Sylvia Ann Mayer, Esq.

STUTMAN, TREISTER & GLATT
Special Conflicts Counsel for the ACC Bondholders Group
1901 Avenue of the Stars, 12 Floor
Los Angeles, CA 90067
By:    Isaac M. Pachulski, Esq.
        Stephan M. Ray, Esq.

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
Counsel for W.R. Huff Asset Management Co., L.L.C.
One New York Plaza
New York, NY 10004-1980
By:    Bonnie Steingart, Esq.
        Gary Kaplan, Esq.

---

[1] I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where time does not permit more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have fewer citations and other footnotes, and have a more conversational tone.

UNDER SEAL

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB P.C. LLP
Counsel for the ACC II Committee
780 Third Avenue, 36th Floor
New York, NY 10017
By:     Dean A. Ziehl, Esq.

10100 Santa Monica Blvd., #1100
Los Angeles, CA 90067
By:     Richard Pachulski, Esq.
        Dean A. Ziehl, Esq.
        Jeremy V. Richards, Esq.

WHITE & CASE LLP
Counsel for the Ad Hoc Committee of Arahova Noteholders
1155 Avenue of the Americas
New York, NY 10036-2787
By:     J. Christopher Shore, Esq.
        Gerard Uzzi, Esq.

Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
By:     Thomas E. Lauria, Esq.
        Richard S. Kebrdle, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for the Official Committee of Unsecured Creditors
1633 Broadway
New York, NY 10019
By:     David M. Friedman, Esq.
        Adam L. Shiff, Esq.


BEFORE:     ROBERT E. GERBER
            UNITED STATES BANKRUPTCY JUDGE


In this contested matter in the chapter 11 cases of Adelphia Communications

Corporation and its subsidiaries (the "Debtors"), I have before me the motion of a group

of holders of ACC Senior Notes (the "ACC Bondholders Group") to designate[2] the votes

---

[2]   As discussed below, "designate" is a word of art in bankruptcy parlance, meaning, in essence, "disqualify."

in the class of ACC Senior Notes of three creditor groups that voted to support the Plan now before me for confirmation:[3]

> (1) the members of a "crossover committee" of holders of both ACC Senior Notes and notes of Arahova Communications Corp., an indirect ACC subsidiary (the "ACC II Committee");
> 
> (2) accounts maintained or managed by W.R. Huff Asset Management Co., some or all of which are likewise holders of notes of each of ACC and Arahova (referred to, for simplicity, simply as "Huff"); and
> 
> (3) those members of the Arahova Noteholders Committee who also hold ACC Senior Notes.

The three of them (the "Targeted Creditors"), joined by the Creditors Committee, oppose the motion, arguing, among other things, that even if the underlying factual contentions are true, there is no basis for disqualifying their votes.

The antagonists on both sides of the issue are predominantly or exclusively investors in distressed debt. And in this and now-withdrawn litigation going in the other direction—where similar efforts to designate were aimed at members of the ACC Bondholders Group—many expressed concerns as to the confidentiality of distressed debt trader investments, trading positions, and trading practices. At various times in these cases, I ruled that as a general matter, there is no absolute rule prohibiting discovery of distressed debt investors' debt trading activities, but that I'd limit discovery of these

---

[3] Familiarity with the events in this case, and defined terms used in the ongoing related litigation, is assumed.

activities to situations where such was sufficiently relevant.[4] Accordingly, I said I'd initiate consideration of the issues presented under this motion by demurrer—*i.e.*, by 12(b)(6) motions—with discovery (and, if necessary, an evidentiary hearing) to follow if such should be necessary.[5]

As described more fully below, motions to designate are within the discretion of the court. Here I conclude that even if all of the factual allegations asserted by the ACC Bondholders Committee were true, I would not disqualify the Targeted Creditors' votes. The ability to vote on a reorganization plan is one of the most sacred entitlements that a creditor has in a chapter 11 case. And in my view, it should not be denied except for highly egregious conduct—principally, seeking to advance interests apart from recovery under the Plan, or seeking to extract plan treatment that is not available for others in the same class.

While creditor tactics, activities or requests (or plan provisions that result from them) may be objectionable, the Code provides for other ways to address concerns that arise from such (such as upholding objections to confirmation), without the draconian

---

[4] I authorized discovery to a certain extent, upon a showing of possibly (but not plainly) improper activities, and said I'd authorize it to a greater extent if one side pressed claims based on those activities and the other side expressed a desire to show that essentially the same activities were engaged in by those on the attacking side.

[5] While Fed. R. Bankr. P. 9014, governing contested matters, does not by its terms include Fed. R. Bankr. P. 7012 (and hence Fed. R. Civ. P. 12(b)(6)) as rules that are automatically applicable in contested matters (in contrast, *e.g.*, to those providing for discovery and summary judgment), Rule 9014 provides that "[t]he court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply." Fed. R. Bankr. P. 9014(c). In the *Adelphia* cases and others, I've found demurrers to be a useful procedural mechanism to decide some kinds of contested matter disputes economically, saving litigation costs for the benefit of creditors and other stakeholders. There was no objection to this procedure, which was likewise used by the ACC Bondholders Group in its own 12(b)(6) opposition to a like designation motion targeting some of its members.

measure of denying one's franchise to vote.[6] And while I assume it to be true that creditors of different debtors in a multi-debtor chapter 11 case have interests contrary to each other (and that the different debtors themselves do as well), that is a fact of life in most, if not all, large chapter 11 cases.[7] If, under section 1126(e) (which now is silent on the matter) or otherwise, creditors who hold claims of multiple debtors are to be denied the right to vote all of their claims, in all of the debtors in which they hold debt—even assuming, once again, that the individual debtors have interests contrary to each other, and that the recoveries of one debtor come at the expense of another—that is a matter for Congress to decide.

Thus the motion is denied. Findings of Fact, Conclusions of Law and bases for the exercise of my discretion in this regard follow.

## Facts

For the purposes of this demurrer, the relevant facts are undisputed.[8]

*The Plan*

On October 17, 2006, I approved a supplement to the disclosure statement and authorized solicitation of votes on what is now the present Plan. A central feature of the Plan is the settlement of disputes relating to the intercompany relationships among the Debtors. Settling parties include Huff, the ACC II Committee, the Creditors' Committee,

---

[6] If it is any consolation to the movants here, I'd regard these same principles to be applicable if the now-withdrawn motion in the other direction had been pressed. Several aspects of the discussion that follows have been taken, in some cases nearly verbatim, from the brief filed by the ACC Bondholders Group in response to the attack that had been launched against some of its members.

[7] *See In re Adelphia Commc'ns Corp.,* 336 B.R. 610, 617, 644-653 (Bankr. S.D.N.Y.) (Gerber, J.) (the "*Arahova Motions Decision*") (discussing how prevalent inter-debtor issues are, and how they had been addressed in other cases), *aff'd* 342 B.R. 122 (S.D.N.Y. 2006) (Scheindlin, J.)

[8] The movants properly observe in their response that the submissions on the demurrers in many cases tried to argue facts, and sought to debate allegations that need to be taken as true on a demurrer. I've disregarded factual arguments of that character, and have taken the basic facts as alleged as true.

the ACC Settling Parties, the Arahova Noteholders Committee and certain other ad hoc committees of unsecured creditors. The Plan includes provisions for releases, exculpation and fee reimbursements for members of ad hoc committees and for individual creditors who signed onto the settlement and agreed to support the Plan, and for the same releases to go to any and all ACC Senior Noteholder creditors that support the Plan.[9] The Targeted Creditors voted all of their claims, including any ACC claims, in support of the Plan. The ACC Bondholders vehemently oppose the Plan and the underlying settlement and, thus, voted against the Plan.

*Inter-Creditor Dispute*

The principal inter-creditor dispute, and the one most relevant to the motion at hand, is a dispute between holders of ACC Senior Notes and the holders of Arahova Notes. Creditors of ACC Parent and of the Arahova Debtors have asserted positions that in nearly all respects would cause one group to benefit at the expense of the other—though under the settlement, ACC recoveries were augmented from debtors other than the Arahova debtors, to the end that ACC benefited without a corresponding detriment to Arahova. In nearly all respects, an increase in any recovery on the Arahova Notes results in a decrease in recovery on the ACC senior notes, and vice versa.

---

[9] The Plan may have an ambiguity as to whether a vote in favor of the Plan is enough or whether qualification for release rights is more limited. Particularly if the latter, this is a potential confirmation issue.

The Plan also has provisions at least seemingly awarding legal fees without court approval of the fees under section 503(b), or satisfaction of section 503(b)(3)(D)'s requirements for "substantial contribution," though they also provide that the parties seeking such fees "shall comply with any procedures required by the Bankruptcy Court in connection with seeking reimbursement" of such fees. *See* Plan § 6.2(d). The U.S. Trustee (who lacks the ACC Bondholder Group's axe to grind) has objected to this aspect of the Plan, and it too presents an issue on confirmation, or an issue as to whether I must impose supplemental procedures or requirements to comply with the Code.

Earlier in this case, the Arahova Noteholders filed numerous motions and engaged in related acts (together, the "Arahova Motions") seeking to thwart the judicial determination of interdebtor issues that the Debtors proposed and that I had approved; seeking relief which, if granted, would have been devastating to creditor recoveries in these cases (including, most significantly, a motion seeking the appointment of a chapter 11 trustee for the Arahova debtors, which would have been a breach of the Debtors' DIP financing facility and an event excusing Time-Warner and Comcast from closing on their purchase); and entering into an agreement to put their motions on hold pending the outcome of settlement negotiations. The ACC Bondholder Group asserts, and I take it as true for the purposes of this motion, that these were tactics on the Arahova Bondholders Group's part to improve its recovery. As the ACC Bondholders group appropriately notes,[10] I "sharply criticized" the Arahova Bondholders' tactics, and was "understandably dismayed" by them. In a lengthy decision in January 2006 addressing Arahova Debtors' motions, I stated:

> [T]he Court further decides these motions in light of the compelling inference that the motions were filed as part of a scorched earth litigation strategy that would provide the Arahova Debtors with little benefit that they do not already have (trumped, dramatically, by a resulting prejudice to the Arahova Debtors themselves, along with all of the other Debtors), and which would have the effect (and, the Court believes, the purpose) of imperiling the pending Time Warner/Comcast transaction and the Debtors' DIP financing in an effort to extract a greater distribution, sidestepping the Court-approved process for determining the Intercreditor Dispute issues on their respective merits.[11]

---

[10]   *See* Designation Motion ¶ 24.

[11]   *Adelphia*, 336 B.R. at 618-619.

I stated at the conclusion:

> The bringing of motions like these is not unethical, or sanctionable, but neither should it be encouraged, or rewarded. Motions that would bring on intolerable consequences for an estate should not be used as a tactic to augment a particular constituency's recovery.[12]

*Huff's Rule 2004 Discovery*

Huff sought and obtained Rule 2004 discovery to investigate the creation and dissemination of a letter sent by certain members of the ACC Noteholders Committee to the Board of Directors of ACC and to the Wall Street Journal on April 17, 2006. Huff sought discovery based on the premise that dissemination of the letter was an attempt to manipulate the market and an improper solicitation under section 1125(b) of the Code. The ACC Bondholders contend (and I must accept as true for the purposes of a demurrer) that this was not, in fact, Huff's true intent, and instead was an effort to improperly pressure ACC Noteholders.[13]

*Plan Agreement*

The ACC Bondholders then contend that only two days after I expressed an adverse reaction to alleged activities on the part of certain ACC Bondholders which were the subject of the now-withdrawn motion directed at them, and "in the midst of Huff's coercive tactics," two other holders of ACC Senior Notes agreed to a term sheet embodying a plan settlement, including a settlement of the interdebtor issues.[14] That term sheet, following further modifications, now serves as the basis for the Plan. "Among other egregious positions," the Plan included "thinly-veiled threats of litigation

---

[12] *Id.* at 677-678.

[13] *See* Designation Motion ¶ 27 and ¶ 30.

[14] *See* Designation Motion ¶ 31.

-8-

and continued discovery against ACC Senior Notes" who refused to join in the agreement, hire the counsel for the assenting ACC Bondholders, and vote to accept the proposed Plan, and provided broad release provisions for those who satisfied those conditions.[15]

## Discussion

### I.

Under well-settled principles, when considering a motion to dismiss, as made applicable under Fed. R. Bankr. P. 7012(b), a complaint's factual allegations are presumed true, and are construed in favor of the pleader.[16] "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[17] As the Supreme Court held in *Scheuer v. Rhodes*:

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.[18]

---

[15] *Id.*

[16] *See*, *e.g.*, *Luedke v. Delta Air Lines, Inc.*, 159 B.R. 385, 389 (S.D.N.Y. 1993) (Patterson, J.), cited in *In re Lois/USA, Inc.*, 264 B.R. 69, 89 (Bankr. S.D.N.Y. 2001).

[17] *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); accord *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 44 (2d Cir. 1997) (quoting *Conley*); *In re Granite Partners, L.P.*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997) (Bernstein, J.) (denying motion to dismiss complaint, noting dismissal would be proper only when the plaintiff would not be entitled to any type of relief, even if it prevailed on the merits of its factual allegations).

[18] *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

Dismissal should be granted only when the plaintiff's allegations, taken as true, along with any inferences that flow from them, are insufficient as a matter of law.[19]

The court is not, however, bound to accept as true legal conclusions or theories.[20] Similarly, mere conclusory allegations without factual support are insufficient to survive a motion to dismiss.[21] Rather, to withstand a motion to dismiss, there must be specific and detailed factual allegations to support the claim.[22] A court "will not accept as true pleading allegations that are contradicted by facts that can be judicially noticed or by other allegations or exhibits attached to or incorporated in the pleading."[23]

## II.

Section 1126(e) of the Bankruptcy Code provides:

> On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

Section 1126(e) is permissive in nature,[24] and a bankruptcy judge has discretion in designating votes.[25] The issue before me, then, is whether, assuming all of the ACC

---

[19] *See*, *e.g.*, *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993), cert. denied, 512 U.S. 1240 (1994) (applying the standard discussed above but nevertheless dismissing, where claims for relief were legally insufficient); *In re 80 Nassau Assocs.*, 169 B.R. 832, 841 (Bankr. S.D.N.Y. 1994) (Bernstein, J.) (granting motion to dismiss complaint for failure to allege a legally sufficient injury).

[20] *See In re Sunbeam Corp.*, 284 B.R. 355, 360 (Bankr. S.D.N.Y. 2002) (Gonzalez, J.).

[21] *See DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (citations omitted) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6).")

[22] *See Friedl v. City of New York*, 210 F.3d 79, 85-86 (2d Cir. 2000).

[23] 5A Wright & Miller, Federal Practice and Procedure, § 1363 (2d ed. 1990 & 2002 Supp.)

[24] "…the court *may* designate…." (emphasis added).

[25] *See Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 97 (3rd Cir. 1988) (Section 1126(e) "grants the bankruptcy court discretion to sanction any conduct that taints the voting process, whether it violates a specific provision or is in "'bad faith'").

Bondholders' contentions to be true, I should (or would) disqualify, by "designation," any of the Targeted Creditors' votes.

While 1126(e) does not define "bad faith," the courts have designated votes as having been cast in "bad faith" in the following instances:

> (1) if the claimant is using obstructive tactics and hold-up techniques to extract better treatment for its claim compared to the treatment afforded similarly situated claimholders in the same class; or
>
> (2) if the holder of the claim casts its vote for the ulterior purpose of securing some advantage to which it would not otherwise be entitled; or
>
> (3) when the motivation behind its vote is not consistent with a creditor's protection of its own self-interest.[26]

Some courts have held that some type of wrongdoing must be present to evidence bad faith.[27]

As the ACC Bondholders Group noted in its brief opposing an effort, in the other direction, to designate the votes of some of its members,[28] the burden on a party seeking to have a ballot disallowed is heavy.[29] When others were threatening to target members of the ACC Bondholders Group with a motion to designate in the other direction, I noted

---

[26] *See In re Kovalchick*, 175 B.R. 863, 875 (Bankr. E.D. Pa. 1994) (citations omitted); see also *Collier*, § 1126.06.

[27] *See In re Allegheny Int'l., Inc.*, 118 B.R. 282, 293 (Bankr. W.D. Pa. 1990) (Cosetti, C. J.) (holding that the court should designate the votes of only those creditors or interest holders who were engaged in wrongdoing).

[28] *See* ACC Bondholders Group's 12(b)(6) Motion to Dismiss "Motion … to Designate Votes of [certain ACC Bondholders]," ¶ 9.

[29] *See Kovalchick*, 175 B.R. at 875.

the severe implications of vote designation.[30]  A right to vote on a plan is a fundamental right of creditors under chapter 11.  Designation of a creditor's vote is a drastic remedy,[31] and, as a result, designation of votes is the exception, not the rule.[32]  The party seeking to have a ballot disallowed has a heavy burden of proof.[33]

In his decision in *Dune Deck Owners*, in this district, Chief Judge Bernstein canvassed the law in this area, and noted that the "badges" of the requisite bad faith include creditor votes designed to (1) assume control of the debtor; (2) put the debtor out of business or otherwise gain a competitive advantage; (3) destroy the debtor out of pure malice or (4) obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize.[34]  A moment earlier, he capsulized the standards that would satisfy the requisite bad faith as (i) where a claim holder attempts to extract or extort a personal advantage not available to other creditors in the class, or (ii) where a creditor acts in furtherance of an ulterior motive, unrelated to its claim or its interests as a creditor.[35]

Notably, a movant must demonstrate more than a mere selfish motive on behalf of a voting party in order for a court to designate that party's vote.[36]  "[W]hen the voting process is being used as a device with which to accomplish some ulterior purpose, out of

---

[30] *See* Hrg Tr. 75:13-20, Apr. 27, 2006 ("I have, indeed, said that I believe very strongly in creditor democracy, and that I believe that the designation of votes is a serious matter.").

[31] See *In re Peter Thompson Assocs, Inc.*, 155 B.R. 20, 23 (Bankr. D.N.H. 1993).

[32] *See In re Dune Deck Owners Corp.*, 175 B.R. 839, 844 (Bankr. S.D.N.Y. 1995) (Bernstein, C.J.).

[33] *Kovalchick*, 175 B.R. at 863.

[34] *See Dune Deck Owners,* 175 B.R. at 844-845.

[35] *Id.* at 844.

[36] *See Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am.*, 118 F.3d 635, 639 (9th Cir. 1997); *In re Pine Hill Collieries Co.*, 46 F. Supp. 669, 671 (E.D. Pa. 1942) ("If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass muster."); *Dune Deck Owners*, 175 B.R. at 844 (same, quoting *Pine Hill Collieries*).

keeping with the purpose of the reorganization process itself, and only incidentally related to the creditor's status *qua* creditor," disqualification is appropriate.[37]

### III.

Though the ACC Bondholder Group's lengthy initial and responsive submissions, perhaps inevitably, articulate its arguments in slightly different ways, they nevertheless have two themes. First they assert that the Targeted Creditors extracted special consideration for themselves—releases, exculpation and fee awards—that was not awarded to other members of their voting classes who voted against the settlement (and used such as a coercive "carrot" to induce additional acceptances of the Plan), and, with respect to some of the Targeted Creditors, that they acted beyond the bounds of acceptable behavior in the process that led to the ultimate solicitation of the Plan. Second, they assert that the Targeted Creditors voted their ACC claims for ulterior purpose of benefiting their Arahova claims and the Arahova estate, and/or that holding claims of different debtors, which have conflicting interests as against each other, represents a kind of *per se* ulterior motive.

*A. Special Consideration*

The ACC Bondholders argue that the votes on the ACC claims of the Targeted Creditors should be designated because these creditors obtained special consideration in the form of releases, exculpation and reimbursement of fees expressly conditioned upon their acceptance of the settlement in the Plan, and used such as an enticement to others to support the Plan. Members of the same class who rejected the Plan did not secure those benefits.

---

[37] *In re Landing Assocs., Ltd.*, 157 B.R. 791, 807 (Bankr. W.D. Tex. 1993) (Leif Clark, J.).

These matters may support confirmation objections, but they are not matters of the type that warrant disqualification of the Targeted Creditors' votes. The factors identified above as badges of bad faith do not come even close to being applicable here. The Targeted Creditors did not seek to (1) assume control of the debtor; (2) put the debtor out of business or otherwise gain a competitive advantage; (3) destroy the debtor out of pure malice or (4) obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize. Taking the ACC Bondholders Group's allegations at face value, the Targeted Creditors whose behavior was challenged (*i.e.*, those other than the ACC II Committee) were overly aggressive, and/or stepped over the line, in taking action to benefit their economic interests in securing the confirmation of this Plan, and overreached, in particular, in benefiting themselves and using enticements to others to likewise support the Plan.

But to the extent complaints as to that conduct are justified, they can be addressed in the confirmation process. The disputed plan provisions will need to be examined, as part of the confirmation process, to evaluate their compliance with law, and to ascertain whether they are or are not appropriate benefits for those settle, and for those who choose to vote in favor of a chapter 11 plan. And depending on the particular provision concerned, various measures might have to be taken as part of the confirmation process if the contested plan provisions turn out to be objectionable.[38] But whether or not the disputed provisions pass muster at confirmation, they are in any event all variants of measures to advance one's interests in maximizing recoveries under a reorganization plan, which have consistently been held to be acceptable exercises of creditor power.

---

[38] Under the Plan, some might simply be inoperative if the Court otherwise ordered; others, if inappropriate, might require Plan provisions to modified. But these would be confirmation matters, not designation issues.

Proposing them is not the type of conduct that warrants vote designation, especially when it is fully disclosed under the Plan.

Likewise, I do not believe that the conduct alleged on the part of the Arahova Bondholders and Huff, even taking the allegations with respect to that conduct as true, warrants designation. Without question, at least some of it was overly aggressive and overreaching. But it was, once more, an effort to maximize recoveries as a creditor under a prospective plan.

To be sure, a culture has developed in large chapter 11 cases in which many consider it acceptable, and indeed expected, to use the litigation process as a means to assert or follow through on threats, and to seek various kinds of relief, to secure "leverage" in efforts to increase recoveries. I don't like it. And I particularly don't like it when supposedly critical concerns then somehow turn out to be not so critical, and threatened or filed motions are put on hold or withdrawn pending "negotiation." But aside from saying, in precatory terms, that I don't like such tactics and that they are a good way to irritate the judge, I don't think that I can or should do anything about them on a motion of this character. In particular, I don't think I should disenfranchise creditors from their statutory voting rights based on my personal views as to the way they should behave. My views as to acceptable behavior in chapter 11 intercreditor disputes may be naïve, or they may be right on the money, but in either event I believe that where, as here, creditors are acting to maximize their recoveries, their overly aggressive conduct in the chapter 11 process is not a basis for disqualifying their votes.

Thus, assuming, as I do, that all of the allegations of the motion are true, they boil down to activities that, while distasteful and heavy handed, are sufficiently within

-15-

what the law permits, and sufficiently tied to maximize creditor recoveries, that I should not disenfranchise creditors from their statutory rights.

B.    *Ulterior motives*

The ACC Bondholders argue that the Court should designate the ACC votes of Targeted Creditors because they own both Arahova and ACC bonds; because by reason of the economics of the interdebtor issues, the Targeted Creditors stand more to gain by enhanced incremental recoveries at Arahova; and because their economic interests are oriented in favor of the Arahova estate. Thus, the ACC Bondholders allege and argue, Targeted Creditor votes in favor of the Plan in the ACC Senior Notes Class were driven by an ulterior motive—a desire to get a maximized recovery in another class, of another Debtor, under the Plan (that of the class of Arahova notes).

As discussed above, courts have found bad faith where the creditor has an "ulterior motive," such as to procure some collateral or competitive advantage that does not relate to its claim. But the kinds of motives that have so far been held to warrant vote designation have been to assume control of the debtor; to put the debtor out of business or otherwise gain a competitive advantage; to destroy the debtor out of pure malice, or to obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize.[39] None, so far as I'm aware or the parties' briefs have revealed, has been to maximize an economic recovery, or to hedge, by owning bonds of multiple debtors in a single multi-debtor chapter 11 case, or (as I think concerns would be analogous), to hold bonds in different, antagonistic, classes of a particular debtor in a single chapter 11 case.

---

[39] *See* page 12 above.

-16-

I assume, both because I have before me a demurrer and because I think the assumption is warranted, that there are inherent conflicts of interest between creditor classes in this case, whether within a single debtor or across multiple debtors, competing, in every practical sense, for maximized shares of the Debtors' limited pot of assets. So the issue, then, is whether I should find from that an ulterior motive sufficient to warrant the designation of votes of the Targeted Creditors because of their ownership of bonds in each of those classes.[40]

The ACC Bondholders do not cite, and I am not aware of, any case where a parent and a subsidiary debtors were treated as competitors for the purposes of section 1126(e). Inter-company debts and liabilities, which enhance recoveries of some creditors and dilute recoveries of others, are inherent in any multi-debtor bankruptcy. And conflicts between classes of a single debtor, which likewise involve competing claims on the part of those classes to what will usually be a pool of limited assets, will be present in many, if not most, chapter 11 cases as well, and while one can not then speak of "competitor" business entities, many like considerations apply. The statutory trigger for ordering vote designation is an absence of good faith, and I do not believe that holding (or acquiring) claims of different debtors in the same chapter 11 case fairly can be regarded as representing the kind of ulterior motive or "bad faith" that has heretofore been held to warrant vote designation. Thus I must rule that a creditor's ownership of claims in several debtor entities does not, by itself, amount to bad faith under 1126(e), and does not

---

[40] A related issue, which I do not need to address given my conclusions, is what, if I found a basis for designation here, I should do with respect to what I believe is many other creditors in the *Adelphia* cases, who hold bonds of several Debtors, or bonds at competing levels of priority (*e.g.*, senior and sub debt), of the same Debtor, albeit in situations where the interdebtor or intercreditor disputes were not as bitter.

-17-

afford a sufficient basis on which to disqualify votes of creditors who have voted to accept the plan.

I come to that conclusion for two other reasons as well. First, as noted, the law has long upheld creditors' efforts to maximize their individual recoveries in their self-interest as creditors under a plan. While this is of course subject to the ulterior interest exception, holding long positions in bonds of various debtors is much more closely akin to ordinary recovery maximization strategies than it is to the efforts of a business competitor to drive the debtor out of business, or to harm it in other ways.[41]

And second, I note, with the assistance of Judge Bernstein's opinion in *Dune Deck Owners*, that Congress once considered a formulation of section 1126 that might support designation here, but that the alternate formulation did not find its way into the Bankruptcy Code.

As Judge Bernstein observed, the original Bankruptcy Code House Bill included a provision, denominated § 1126(e), that expressly authorized the Court to designate the vote of an "entity that has, *with respect to such class*, a conflict of interest that is of such a nature as would justify exclusion of such entity's claim or interest" from the amounts and number of claims or interests required for acceptance.[42] The present § 1126(e) was then codified as § 1126(f). The House drafters expressed an intention to ensure that a creditor who held conflicting claims in two classes could be excluded from voting in one—though not necessarily both—of those classes.[43] But the conflict of interest section,

---

[41] I don't need to decide, and don't now decide, the extent to which like considerations apply if the creditor's economic interest is enhanced by driving down the value of the estate as a whole, or by causing the entire reorganization—as contrasted to a particular plan proposal—to fail.

[42] *See Dune Deck Owners*, 175 B.R. at 845 n.13 (emphasis added).

[43] *Id.*, citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 411 (1977).

-18-

which was not included in the Senate bill, did not make it into the Code as enacted. Senator DeConcini expressed the view that Congress deemed the provision unnecessary because in its view, section 105 "constitutes a sufficient power in the court to designate exclusion of a creditor's claim on the basis of a conflict of interest."[44]

Since the time the Code was enacted, we have come to place great reliance on what statutes actually say (notwithstanding statements in legislative history that might lead to a contrary result), and I think I must find some significance in the fact that at one time, Congress considered a provision that would impose the requirement sought here, and that it did not enact it. In light of that, I'm reluctant to enact it by judicial fiat. And while I fully recognize that Senator DeConcini regarded section 105 as a means to achieve vote designation notwithstanding the absence of statutory language that would explicitly provide for it, recent section 105 jurisprudence has displayed a marked reluctance to use section 105 to achieve results that are not authorized under the Code or substantial caselaw precedent.[45]

In my view, imposing the disqualification rule sought here in the absence of a clearer statutory or caselaw foundation would be too much of a jump. Congress could, if it wished, declare that when creditors hold claims of multiple classes or debtors in multi-class or multi-debtor chapter 11 cases, they must choose the particular class or debtor with which they will wish to be allied. But it did not enact a provision that would have

---

[44]   *Id.*, citing 124 Cong.Rec. S17420 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini).

[45]   *See*, *e.g*., *In re Dairy Mart Convenience Stores, Inc.,* 351 F.3d 86, 92 (2d Cir. 2003) ("This Court has long recognized that Section 105(a) limits the bankruptcy court's equitable powers, which must and can only be exercised within the confines of the Bankruptcy Code. … It does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.") (internal quotations and citations omitted); *In re Aquatic Development Group, Inc.,* 352 F.3d 671, 680 (2d Cir. 2003) (Straub, J., concurring) (same).

done exactly that. I cannot now establish such requirements in the absence of a legislative direction, especially retroactively, when no court has previously so held, and creditors had no advance notice that such rules would be applied to take away their statutory right to vote. While I fully recognize that the Code gives me the power to designate for "bad faith," I do not believe that I should apply such an abstract standard in an unprecedented way in a matter of this importance.

### Conclusion

The motion of the ACC Bondholders to designate ACC votes of Huff, Arahova Noteholders Committee and ACC II Committee is denied.

Dated:  New York, New York                    *s/Robert E. Gerber*
        December 11, 2006                    United States Bankruptcy Judge