UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
In re                                                       :   Chapter 11
                                                            :
ADELPHIA COMMUNICATIONS CORP.,                              :   Case No. 02-41729 (REG)
et al.,                                                     :   Jointly Administered
                                                            :
              Debtors.                                      :
------------------------------------------------------------x


BENCH DECISION ON RIGAS SUB DEBT[1]


WILLKIE FARR & GALLAGHER LLP
Counsel for Debtors and Debtors in Possession
787 Seventh Avenue
New York, NY 10019-6099
By:   Shelly C. Chapman, Esq.
      Brian E. O'Connor, Esq.

HENNINGAN, BENNETT & DORMAN, LLP
Counsel for the ACC Senior Noteholders
245 Park Avenue, 39th Floor
New York, NY 10167
By:   A. Brent Truitt, Esq.

BROWN, RUDNICK, BERLACK, ISRAELS, LLP
Counsel for the Ad Hoc Trade Claims Committee
Seven Times Square
New York, NY 10036
By:   Steven D. Pohl, Esq.

---

[1] I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have fewer citations and other footnotes, and have a more conversational tone.

-1-

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for the Official Committee of Unsecured Creditors
1633 Broadway
New York, NY 10019
By: David M. Friedman, Esq.
 Adam L. Shiff, Esq.
 Howard W. Schub, Esq.

MORGENSTERN, JACOBS & BLUE LLC
Counsel for Official Committee of Equity Security Holders
885 Third Avenue
New York, NY 10022
By: Gregory A. Blue, Esq.
 Eric B. Fisher, Esq.
 Mark R. Jacobs, Esq.
 Andrew L. Buck, Esq.

SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
Counsel for U.S. Bank National Association, as Indenture Trustee in Respect of the Arahova Notes
30 Rockefeller Plaza, 24th Floor
New York, NY 10112
By: David J. McCarty, Esq.
 Daniel S. Brown, Esq.

SEWARD & KISSEL LLP
Counsel for Law Debenture Trust Company of New York, as ACC Senior Notes Trustee
One Battery Park Plaza
New York, NY 10004
By: Laurie A. Binder, Esq.
 Arlene R. Alves, Esq.

LOWENSTEIN SANDLER, P.C.
Counsel for Appaloosa Management
65 Livingston Avenue
Roseland, NJ 07068
By: Thomas E. Redburn, Jr., Esq.

WHITE & CASE LLP
Counsel for the Ad Hoc Committee of Arahova Noteholders
1155 Avenue of the Americas
New York, NY 10036-2787
By: J. Christopher Shore, Esq.
 Gerard Uzzi, Esq.

BEFORE:                             ROBERT E. GERBER
                                    UNITED STATES BANKRUPTCY JUDGE

For reasons to be set forth at greater length, if necessary, I rule that the Rigas Sub Debt was never validly issued, and was not (nor could it be) the subject of an allowed claim. Nor was it properly subject to subordination provisions that would make it subject to turnover to more senior debt. Hence the Rigas Sub Debt was properly cancelled under the Plan, and was not subject to a turnover to holders of ACC Senior Notes.

Facts

Familiarity with the background as to this controversy is assumed. The Plan[2] cancels $567 million in Sub Debt purportedly purchased by the Rigases that was later forfeited by the Rigases to the Government under the Debtors' court approved (and now fully affirmed) settlement with the DoJ. The Sub Debt class under the Plan covers bona fide third-party holders of Sub Debt, but expressly excludes the Rigas Sub Debt. There's no issue of fact, in my view, that the Rigases never paid cash, or any other consideration, for this Sub Debt. Their "payment" for the Rigas Sub Debt was documented solely by journal entries on the Debtors' books.

In January 2001 an initial subordinated debt indenture was issued, to cover future issuances of subordinated debt. It was dated "as of" January 23, 2001, but the parties agree that any back-dating that may have resulted from use of an "as of" date is not relevant to this controversy. What is relevant is that no notes were actually issued under this indenture, and it was in substance a master indenture to cover issuances of Sub Debt

---

[2]    *See* Plan § 11.4.

-3-

that would be issued contemporaneously with it or to follow. It has appropriately been referred to as a "Base Indenture."

Sub Debt that was subject to the Base Indenture was issued in the traditional way to third-party investors, but the Sub Debt purportedly purchased by the Rigases was not issued under the public Sub Debt indentures, and was instead issued (or, more precisely, purportedly issued) under separate indentures.

On January 17, 2001, Highland 2000 (a Rigas Family Entity) entered into an agreement to purchase $167,376,000 face amount of 6% convertible subordinated notes (the "6% Notes"). The agreement required the Rigases to pay for the 6% Notes in "immediately available funds," but the Rigases paid no funds at all, immediately available or otherwise. ACC never received any cash or other value for the 6% Notes.

The Note for the 6% Notes purported to include the terms stated in a "form" Third Supplemental Indenture, which was attached to the Note. But the "form" Third Supplemental Indenture was not filled in or executed, and was not signed by ACC or the Indenture Trustee. The Note attempted to circumvent this requirement by providing:

> The intent of the Company and the Holder is that the Holder of this Note have all the rights and benefits *as though* it held this Note under the Indenture (i.e., as though the Note was issued under the Indenture) notwithstanding the fact that there is no Trustee or Executed Indenture.[3]

On April 19, 2001, Highland 2000 entered into another agreement, this time for the purported purchase of $400 million principal amount of 3.25% ACC subordinated notes (the "3.25% Notes"), requiring payment of $396,489,313. This agreement too required payment in immediately payable funds. It too purported to be issued under a

---

[3]   6% Subordinated Note ¶ 4 (emphasis added).

"form" supplemental indenture that was not filled in or executed, this time to a "form" Fourth Supplemental Indenture, and it was not signed by ACC or the Indenture Trustee. The Note for the 3.25% Notes dealt with the non-execution of the Fourth Supplemental Indenture in the same way as did the Note for the 6% Notes, executed about three months earlier.

On neither issue of Rigas Sub Debt were funds wired or otherwise transferred between ACC and the Rigases or any Rigas Family Entities.[4] The effect of the transaction was that proceeds of the purported sale of the Rigas Sub Debt to Adelphia were zero, and the increase to Adelphia's liquidity was zero.

Within just a few weeks after these chapter 11 cases were filed, Adelphia brought an action against the Rigases, claiming, among many other things, that the Rigases' purchase of the Sub Debt was fraudulent, that there was a failure of consideration for it, and seeking, among other things, imposition of a constructive trust over the Rigas Sub Debt. In substance, if not also explicitly, the Debtors objected to all of the Rigases' claims. In the course of that litigation, accountant Robert DiBella, who had been retained by Adelphia to help address the Rigas fraud, made at least two declarations, one for a TRO and one in support of a motion for partial summary judgment, and he was also deposed in connection with this controversy. Mr. DiBella's conclusions are not challenged in any way.

Under the Government settlement, the Rigases forfeited all of their securities to the Government, and the Government agreed to turn over those securities directly to Adelphia.

---

[4] DiBella Decl. ¶¶ 56 and 59, at 18.

Discussion

The January 23, 2001 Indenture, which is the "Base" or master indenture that covers both the 6% and 3.25% Notes, provides:

> any payment or distribution of assets of the Company of any kind or character … *to which the holders* or the Trustee *would be entitled* except for the provision of this Article 15, shall be paid … ratably according to the aggregate amounts remaining unpaid on account of the principal of or interest on and other amounts due on the Senior Debt.[5]

That requirement is not satisfied because, by reason of the failure of consideration and the Rigases' fraud, the "holders," i.e., Highland 2000 and/or any Rigas assignees, were not entitled to payment or distribution of assets, and thus there was nothing to turn over to senior debt.

Moreover, the Rigas Subordinated Notes were issued without the requisite authentication and executed supplemental indentures, and thus were without any governing subordination language. Sections 2.4 and 3.3 of the Base Indenture expressly required that any securities issued under the Base Indenture be authenticated by the Indenture Trustee—that they be certified as being "one of the Securities of the series designated therein referred to in the within-mentioned Indenture."[6] The Base Indenture continued that without that authentication:

> No security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose.[7]

---

[5]   Jan. 23, 2001 Indenture at § 15.3(b)(2) (emphasis added).

[6]   *Id.* at § 2.4.

[7]   *Id.* at § 3.3.

-6-

Thus, even assuming that the Rigas Subordinated Notes remained outstanding, they did not trigger subordination rights.

In addition, under Sections 9.1 and 9.3 of the Base Indenture, any supplemental indentures had to be authorized and signed by the Indenture Trustee. Once again, even assuming that the Rigas Subordinated Notes remained outstanding, they didn't trigger subordination rights.

Here the "holder"—Highland 2000, a Rigas Family Entity—would not be entitled to payment, because of the failure of consideration, and because Adelphia objected to its claim. And the requirements for pay over to holders of ACC Senior Notes were not triggered for those reasons, and also because of the failures to satisfy matters as basic as assent by the Indenture Trustee, and authorization and certification by the Indenture Trustee. In the absence of that, no senior security "[was] entitled to any benefit under [the Base] Indenture" from the Rigas Sub Debt.

Under the facts here, I don't regard the deficiencies as technicalities. The documentation, or lack of it, was just another aspect of a Rigas fraudulent transaction that plainly lacked economic substance.

It is true, as the ACC Noteholders Committee argues, that the indentures for the Sub Debt preclude Adelphia from redeeming, purchasing, or otherwise acquiring any Sub Debt during an event of default, and it is at least reasonable to infer that one purpose of this was to protect holders of ACC Senior Notes. But that is irrelevant if the debt was never duly issued in the first place, if the debt was not subject to subordination, or if the claims arising from the debt were disallowed.[8]

---

[8] Under the Code and the Plan, an objection to allowance is sufficient to cause a claim to be disallowed until and unless the Court orders otherwise. Bankruptcy Code § 502(a); Plan § 11.5(a)

Similarly, it is true, as the ACC Noteholders committee argues, that the Rigas Subordinated Notes were not cancelled by Adelphia as part of the Restatement effort. But Adelphia's objection to payment of anything to the Rigases on the Rigas Sub Debt was unmistakable. And the ACC Senior Noteholders candidly and appropriately recognized that, simply arguing a different point.[9] I don't need to decide how I'd address this issue if the Rigases' claims were disallowed for reasons other than the initial failure of consideration or because they were void *ab initio*, for failure to satisfy the requirements for their issuance—e.g., if the Rigases had failed to return a preference, and their claims were thus disallowed under Bankruptcy Code section 502(d). Here the Rigases' claims were and/or would be disallowed for very basic reasons, for failure of consideration and for failure to satisfy conditions precedent to their issuance and to subordination.

Finally, what the ACC 10-K for the year ended December 31, 2003, filed on December 31, 2004, said is irrelevant. Just as in the MIA process, the Debtors' books

---

(treating disputed claims as not entitled to distribution until they are allowed). The Debtors objected to claims that were or might be filed by the Rigases early in these cases, and there is no basis for a conclusion that the claims ever would be allowed.

[9] As the argument went:

> THE COURT: I think, in substance, if not explicitly, when the Debtors… brought the action against the Rigases, they objected to all of the Rigas claims. … I think the unsecured creditor community is unanimous in the view that when they object to a claim it's disallowed, at least until the Court makes a contrary finding.
>
> So am I missing something or have all of the Rigases' claims against the Debtors, including their claims to get repaid on their Sub Debt, been disallowed?
>
> [COUNSEL FOR ACC SENIOR BONDHOLDERS]: I believe that they've been disallowed. I don't know the procedural posture, but my point is not that the Rigases' claims have been disallowed or have not been disallowed. It's that that disallowance doesn't affect third party's rights. … The Rigases' claims have been, or will be, finally disallowed.

and records are neither controlling nor presumptive, and the 10-K was issued so long after these cases were filed, and so long after the Rigases' misdeeds were known, that there is no basis for reliance, especially justifiable reliance, here.

## Conclusion

For all of these reasons I find that the Plan properly cancels the Rigas Subordinated Notes, and that holders of ACC Senior Notes aren't entitled to a pay over of amounts allocable to the Rigas Sub Debt.

Dated: New York, New York          *s/ Robert E. Gerber*
       January 3, 2007              United States Bankruptcy Judge