UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                          )
In re:                                    )        Chapter 11
                                          )
ADELPHIA COMMUNICATIONS CORP., *et al.*,  )
                                          )        Case No. 02-41729
              Debtors.                    )        (Jointly Administered)
_____)

DECISION ON LOCAL FRANCHISING AUTHORITY ISSUES[1]

APPEARANCES:

WILLKIE FARR & GALLAGHER
Counsel for Debtors and Debtors in Possession
787 Seventh Avenue
New York, New York 10019
By:    Roger Netzer, Esq.
       Rachel Strickland, Esq.
       Lisa Thompson, Esq.

COLE RAYWID & BRAVERMAN, LLP
Counsel for Debtors and Debtors in Possession
1919 Pennsylvania Avenue
Washington, D.C. 20006
By:    Robert Scott, Esq.
       Scott Thompson, Esq.
       Adam Caldwell, Esq.

HUNTON & WILLIAMS
Counsel for Martinsville, Virginia and Henry County, Virginia
200 Park Avenue
New York, New York 10166
By:    Peter Partee, Esq.
       Joseph Saltarelli, Esq.

---

[1]    This decision memorializes the principal rulings that the Court provided to the parties prior to the sale of the Debtors' assets to Time Warner and Comcast. Discussion of a third issue, as to which there were factual disputes and which has since become moot, has been omitted.

MILLER & VAN EATON
Counsel for Charlotte-Mecklenburg Office of Cable & Franchise Management
1155 Connecticut Ave., N.W.
Suite 1000
Washington, D.C. 20036
By:    Kenneth Brunetti, Esq.
        Nicholas Miller, Esq.
        William Malone, Esq.

CYNTHIA POLS, ESQ.
Counsel for Nash County, Pitt County, Whitakers, Red Oak, Middlesex, Spring Hope,
Dortches, Momeyer, Castilia and Bailey, North Carolina
1862 Mintwood Place N.W.
Washington, D.C. 20009

KREUCHER LAW FIRM, PLC
Counsel for El Centro, California
8315 Thendara Boulevard
Clarkston, Michigan 48348
By:    Jon D. Kreucher, Esq.

BEFORE:    ROBERT E. GERBER
            UNITED STATES BANKRUPTCY JUDGE


        In this contested matter in the jointly administered cases of Adelphia

Communications Corporation and its subsidiaries, the Court has before it the executory

contract assignment issues, under section 365 of the Code, associated with the Debtors'

contemplated transfer of their cable operations to affiliates of Comcast Corporation and

Time Warner Cable.  Though the Debtors have been able to consensually resolve the

section 365 issues with all but about 14 of the approximately 2,500 local franchising

authorities ("LFAs") that had issued franchises, issues with respect to the remaining 14

remain.[2]

---

[2]    With the consent of the parties, the Court has deferred the wholly factual issues associated with
        the cure of defaults under the franchise agreements (and compensation for past defaults), as
        required under sections 365(b)(1)(A) and (1)(B) of the Code.  It similarly has deferred its
        consideration of the ability of Time Warner to provide adequate assurances of future performance,
        as required under section 365(f)(2)(B).

In particular, the Court must decide two issues of first impression in this Circuit and District.  It must decide:

(1) whether the franchise agreements can be assigned—in each case in the face of provisions in the applicable cable ordinances which prohibit assignment without LFA consent—and in a statutory context in which executory contract provisions that prohibit, condition, or restrict assignment are generally unenforceable, under section 365(f) of the Bankruptcy Code, but with an exception, under section 365(c)(1) of the Code, where "applicable law" excuses an executory contract counterparty from accepting performance from another; and

(2) whether rights of first refusal in favor of certain LFAs—which would entitle them to buy the cable assets related to their franchises, are enforceable in light of the provisions of Code section 365(f).

As described more fully below, the Court concludes:

(1) Though the LFAs' rights of consent, under their franchise agreements or ordinances, will not, under Code section 365(c)(1) or otherwise, impair a debtor in possession's ability to *assume* them, many of the LFAs' rights to consent to *assignments* of their franchises are enforceable.  Rights to consent to the assignment of executory contracts (like franchises) plainly are provisions that "prohibit[], restrict[] or

---

The Court has informally advised the parties that subject to their rights to be heard (principally as against the possibility that the Court might have overlooked something), it will expect Adelphia and/or Time Warner to cure and provide compensation for past defaults—though with further argument as to how the Court should treat any past nonmonetary defaults that are now incapable of being cured.  But the nature and extent of any past defaults, and what it will take to cure them, will be addressed, if necessary, in future proceedings.

condition[]" assignment, which generally are unenforceable under section 365(f) of the Code. But many of the ordinances before the Court here satisfy the section 365(c)(1) "applicable law" exception to section 365(f) of the Code. Provisions in local ordinances can pass muster in instances, like some of those present here, where they are issued under delegations of authority from the state; do not have the purpose or effect of merely adjusting economic rights as between the LFA and the cable operator, or otherwise conferring upon the LFA an economic benefit (or the purpose or effect of impairing existing contractual arrangements); and, most importantly, are ordinances of general application enacted without reference to a particular franchise agreement, to implement valid police power regulatory concerns. (The Federal Cable Act, while it recognizes LFA regulatory concerns and the existence of consent rights on the part of many local franchising authorities, and declines to preempt in this respect, does not itself constitute such "applicable law.")[3]

(2) The rights of first refusal, triggered upon the proposed assignment of cable franchises, are unenforceable, at least in the first instance, under Bankruptcy Code section 365(f)(1). They "prohibit[],

---

[3]      Of course, in instances where a valid ordinance permitted an LFA to make its consent to assignment subject to conditions, neither assignor Adelphia nor assignee Time Warner would be obliged to satisfy them. Meeting any conditions for assignment might not be financially practicable or attractive. And while the Court would require compliance with *existing* contractual obligations as an element of section 365 cure obligations, it would have no role in requiring any new conditions for consent to be satisfied.

Thus, as a practical matter, the Court assumes that in such cases a negotiation will ensue, with each side recognizing that overreaching on its side might result in the other side deciding that a continuation of the relationship isn't worth it, with a resulting loss of the business on the one hand, or of the cable service, on the other.

restrict[] or condition[]" assignment to an unacceptable degree. However, as some of them arise from ordinances satisfying the standards described above (and not from contractual agreements), they are subject to the section 365(c)(1) exception to section 365(f)(1), and are enforceable. The rights of first refusal in the ordinances that do not pass muster under the standards described above (because they are for the LFAs' own economic gain) remain unenforceable.

The following are the Court's Findings of Fact and Conclusions of Law in connection with these determinations.

Facts

The Debtors comprise the fifth largest cable operator in the United States. The Cable Communications Policy Act of 1984 (the "Cable Act"), 47 U.S.C. § 541(d), contemplates that cable operators will enter into franchise agreements with municipalities in order to provide cable service in a given area. The Debtors have entered into such franchise agreements with over 2,500 LFAs (the "Franchise Agreements") pursuant to which the LFAs have granted the Debtors the right to build and operate cable systems within their geographical limits.

On April 25, 2005, the Debtors entered into asset purchase agreements (the "APAs") with Time Warner NY Cable LLC ("Time Warner") and Comcast Corporation ("Comcast" and, together with Time Warner, the "Buyers") that require the Debtors to transfer the Franchise Agreements to Time Warner or Comcast. On October 14, 2005, the Court entered an order to facilitate its consideration of the section 365 issues associated with the transfers. After the issues with respect to the overwhelming bulk of

the 2,500 LFAs were consensually resolved, the Court held an evidentiary hearing to address the objections of the remainder (the "Objecting LFAs"):

      (1)  El Centro, CA;

      (2)  Charlotte-Mecklenburg Office of Cable and Franchise Management ("Charlotte-Mecklenburg Franchise Office";)[4]

      (3)  Pitt County, NC;

      (4)  Nash County, NC;

      (5)  Whitakers, NC;

      (5)  Red Oak, NC;

      (7)  Middlesex, NC;

      (8)  Spring Hope, NC;

      (9)  Dortches, NC;

      (10)  Momeyer, NC;

      (11)  Castalia, NC;

      (12)  Bailey, NC;[5]

      (13)  Martinsville, VA;

      (14)  Henry County, VA.[6]

With the exception of Momeyer (one of the Nash-Pitt LFAs,)[7] each of the Objecting LFAs entered into a Franchise Agreement with one of the Debtors.[8]  In the

---

[4]    The Charlotte-Mecklenburg Franchise Office objected on behalf of Mecklenburg County and several municipalities within Mecklenburg County and Iredell County: Cornelius, Davidson, Huntersville, Mooresville and Troutman (the "Mecklenburg-Iredell Towns" and together with Mecklenburg County the "Charlotte-Mecklenburg LFAs.")

[5]    Whitakers, Red Oak, Middlesex, Spring Hope, Dortches, Momeyer, Castilia and Bailey (the "Nash Towns", and together with Nash County and Pitt County, the "Nash-Pitt LFAs") are all located in Nash County.

[6]    Martinsville is located within Henry County.

case of most of the Objecting LFAs, municipality approval of the franchise is incorporated in each Franchise Agreement.[9]  Additionally (and significantly), El Centro, Nash County, Mecklenburg County, the Mecklenburg-Iredell Towns and Henry County have enacted cable ordinances that address not just the Adelphia franchises, but cable franchises generally.[10]

Discussion

I.

Enforceability in Bankruptcy of LFAs' Rights to Consent to Franchise Assignment

A.  *Assumption as Precondition to Assignment*

Both sides agree that the franchise agreements in question are executory contracts. In order to assign an executory contract, a debtor in possession or trustee must assume it.[11]  A threshold issue is whether the franchise agreements can be *assumed* without the LFAs' consent, when they have contractual (and arguably statutory) rights to prohibit *assignment* without their consent.[12]

---

[7]    Momeyer was incorporated in 1991, and prior to its incorporation, was an unincorporated area of Nash County.  The Nash County franchise that formerly applied in Momeyer expired on June 1, 1999, and Adelphia has been operating in Momeyer since that date without a cable franchise.

[8]    To minimize repetition, the relevant provisions and dates of these Franchise Agreements are described more fully in the Discussion section below.

[9]    El Centro approved its franchise by separate ordinance.

[10]    To minimize repetition, the relevant provisions of these ordinances are described more fully in the Discussion section below.

[11]    Section 365(f)(2) of the Code provides, in relevant part:

> The trustee may assign an executory contract or unexpired lease of the debtor only if--
>
> > (A) the trustee assumes such contract or lease in accordance with the provisions of this section….

[12]    This issue arises, despite the obvious differences between assumption, on the one hand, and assignment, on the other, because of the wording of section 365(c)(1).  It provides, in relevant part:

As the Court advised the parties at the outset of oral argument, though the Objecting LFAs' ability to object to *assignment* of their franchise agreements without their consent presents a close issue, the law in this district, and by far the better view, is that where the assumption is to be effected by a debtor in possession (as contrasted to a trustee), the right to object to *assignment* does not by itself affect the right to *assume*.

That is the clear holding of the decisions of Judge Hardin of this Court in the *Footstar* cases, which this Court believes it should follow.[13]  The *Footstar* decisions also are consistent in outcome with the decisions of the First Circuit and the Fifth Circuit,[14] and the great majority of the lower courts,[15] which in this Court's view reach the proper result.  Cases to the contrary, including some Circuit Court decisions that apply a species

---

(c) The trustee may not *assume or* assign any executory contract … of the debtor, whether or not such contract … prohibits or restricts *assignment* of rights or delegation of duties, if--

  (1)(A) applicable law excuses [an executory contract counterparty] from accepting performance from … an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

  (B) such party does not consent to such assumption or assignment….

(emphasis added).  As a number of decisions have regarded trustees and debtors in possession as synonymous, a split has arisen in the cases as to whether prohibitions against *assignment* give rise to prohibition of *assumption* by a debtor in possession, even when no assignment is contemplated.

[13]   *See In re Footstar, Inc.,* 323 B.R. 566, 573-574 (Bankr. S.D.N.Y. 2005) ("*Footstar I*"), as reiterated in *In re Footstar, Inc.,* 337 B.R. 785, 788 (Bankr. S.D.N.Y. 2005) ("*Footstar II*").

This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error.  But to say that the *Footstar* decisions should be followed under that standard would be faint praise here.  In this Court's view, Judge Hardin's analysis in those decisions was plainly correct.

[14]   *Institute Pasteur v. Cambridge Biotech Corp.,* 104 F.3d 489 (1st Cir. 1997); *Summit Ins. & Dev. Corp. v. Leroux (In re Leroux),* 69 F.3d 608 (1st Cir. 1995); *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.),* 440 F.3d 238 (5th Cir. 2006).

[15]   *See Footstar I,* 323 B.R. at 569 n.2, citing the many lower court decisions.

of "plain meaning" analysis to section 365(c)(1),[16] are in this Court's view incorrectly

decided.  They give insufficient attention to other provisions of section 365,[17] link

concepts that have no relation to each other,[18] and yield results demonstrably at odds with

the purposes of the statute.

Thus, to the extent applicable law imposes restrictions on the ability to assign the

franchise agreements, it does not place restrictions on the ability to assume them.

B.    *Ability to Assign Notwithstanding Prohibition Against
Assignment Without Franchisor Consent*

The Debtors' ability to *assign* franchise agreements, where the franchises prohibit

assignment without franchisor consent, presents a much closer question.  Section 365(f)

of the Code addresses the assignment of executory contracts, and its subsection (f)(1),

which implements a general Congressional purpose to permit assignments, to maximize

recovery for creditors, sets forth a general rule authorizing the assignment of executory

contracts notwithstanding provisions in those contracts that prohibit, restrict or condition

assignment.  That is important, as Code section 365(f) implements a Congressional policy

determination that executory contracts are valuable assets of the estate, and that except in

those relatively rare cases where the realization of their value gives rise to material

---

[16]    *See Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*, 165 F.3d 747 (9th Cir. 1999); *RCI Tech Corp. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257 (4th Cir. 2004); *In re West Electronics*, 852 F.2d 79 (3d Cir. 1988).

[17]    By way of example, section 365(f), which lays out the requirements for assignment, makes the right to assign subject to section 365(c)(1) of the Code.  But an executory contract cannot be *assigned* if it is not first *assumed*.  If section 365(c)(1) made it impossible even to *assume* the contract to be assigned, there would be no reason for having a section 365(c)(1) exception in section 365(f).  Similarly, if section 365(c)(1) made it impossible for a debtor in possession to assume an unassignable contract, the purpose of including "or debtor in possession" in section 365(c)(1) would be difficult to explain.

[18]    There is no conceptual reason—especially after the Supreme Court's decision in *NLRB v. Bildisco*, 465 U.S. 513 (1984), making it clear that a debtor in possession is not a different entity than the prepetition debtor—why limits on the ability to assign should impair the rights of a debtor in possession to assume.  When a debtor in possession, as contrasted to a trustee, wishes to assume, the underlying needs and concerns to be protected have nothing to do with each other.

-9-

prejudice to the contract counterparty other than the loss of a prospective windfall, the

economic value in such contracts should go not to the contract counterparty, but rather to

the debtor's creditor community generally.

But as previously noted, section 365(f)(1) of the Code has an exception:

> *Except as provided in subsection (c) of this section*,
> notwithstanding a provision in an executory
> contract or unexpired lease of the debtor, or in
> applicable law, that prohibits, restricts, or
> conditions the assignment of such contract or lease,
> the trustee may assign such contract or lease under
> paragraph (2) of this subsection.[19]

Section 365(c)(1) provides, in relevant part:

> (c) The trustee may not assign any executory
> contract … of the debtor, whether or not such
> contract … prohibits or restricts assignment of
> rights or delegation of duties, if—
>
> > (1)(A) applicable law excuses [an
> > executory contract counterparty] from
> > accepting performance from or rendering
> > performance to an entity other than the
> > debtor or the debtor in possession, whether
> > or not such contract or lease prohibits or
> > restricts assignment of rights or delegation
> > of duties; and
> >
> > (B) such party does not consent to such
> > assumption or assignment….

The issue, then, is whether "applicable law" excuses the LFAs from accepting

performance from (or rendering performance to) a new franchisee—an entity other than

the debtor or debtor in possession.

What passes muster as "applicable law" is not defined or otherwise set forth in the

Code.  But the underlying concept is that a contract counterparty might be prejudiced if

---

[19]   11 U.S.C. § 365(f)(1) (emphasis added).  Section 365(f) is quoted in the pre-BAPCPA form that is
applicable to these chapter 11 cases.

contractual obligations were to be satisfied (or purportedly satisfied) by a person or entity

other than the one from whom the contract counterparty originally was expecting to

receive performance.  Thus, "personal services" contracts have long been held to

constitute such "applicable law," and understandably so, as the quality of performance

under such contracts could vary materially, depending on who is performing it.  But

many cases have held that the universe of law that can constitute "applicable law" that

can satisfy section 365(c)(1) is not limited to the law applicable to personal services

contracts.[20]  Thus the Court must here consider whether the LFAs' ordinances, or other

law related to the delivery of cable services to LFAs or their community residents,

constitute "applicable law" making the franchise agreements unassignable.[21]

There is some, but not much, caselaw on point.  Involving the most closely

similar facts, but a distinct legal issue, is the Eleventh Circuit's decision in *James

Cable*.[22]  It affirmed the decision of Chief Judge Hershner of the bankruptcy court, which

in turn had been affirmed by the district court, holding that a cable operator franchisee

---

[20]    *See, e.g., In re Braniff Airways, Inc.,* 700 F.2d 935, 943 (5th Cir. 1983) ("*Braniff*"); *In re Pioneer Ford Sales, Inc.,* 729 F.2d 27, 29 (1st Cir. 1984) (Breyer, J., then a Circuit Judge).

The Court believes it should follow those cases.  Thus, it holds, as a predicate for the analysis to follow, that while a personal services contract may be the epitome of the kind of contract as to which "applicable law" prohibits assignment without counterparty consent, the applicability of section 365(c)(1) is not limited to personal services contracts.

[21]    Thus, the Debtors inappropriately merge different concepts when they say, as part of their discussion of whether "applicable law" prohibits Time Warner and Comcast from performing the Debtors' obligations (Debtors' Omnibus Response at 8) that "[c]ourts have consistently held that franchise agreements are not subject to the section 365(c)(1) exception and are therefore assumable."  (*Id.* at 9).  Franchise agreements can be of many different types, and are often between private parties—as they are, for example, in connection with car and truck dealerships, beer distributorships, moving companies, and fast food restaurants.  With only one exception, (discussed below, see n.22), every one of the cases cited by the Debtors for the quoted proposition was a franchise agreement between private parties, and did not involve the extent to which an ordinance or statute limiting assignment was enforceable.

[22]    *City of Jamestown v. James Cable Partners (In re James Cable Partners, L.P.)*, 27 F.3d 534 (11th Cir. 1994) (*per curiam*) ("*James Cable-Circuit*").

could *assume* a cable franchise without franchising authority consent, notwithstanding a local cable ordinance requiring franchising authority consent to *assigning* it.[23]

But the Eleventh Circuit reached this result—which result, as this Court's discussion in Section I(A) above makes clear, this Court regards as plainly correct—under a rationale different, and perhaps more subject to question, than that used by the lower courts.  In the *James Cable* lower court proceedings, Judge Hershner of the bankruptcy court, and also the district court, had assumed that the ordinance was "applicable law,"[24] and used an analysis similar to this Court's analysis above—recognizing, as did Judge Hardin of this Court, that the Supreme Court's decision in *Bildisco*, decided 10 years before *James Cable*, had made it inappropriate to make distinctions between the "debtor" and "debtor in possession," and to deprive a debtor in possession of rights the debtor itself had.[25]  But the Eleventh Circuit decided the case and

---

[23]     The *James Cable* ordinance provided provided:

> The rights and privileges herein granted shall not be assignable nor transferable in any bankruptcy proceedings, trusteeship, receivership or by operation of any law, and in the event of such assignment or transfer, this grant shall terminate forthwith, nor shall said company sell, lease, assign or otherwise alienate this grant of any privilege hereunder without the prior approval of the Board of Mayor and Aldermen.

[24]     *See In re James Cable Partners, L.P.,* 148 B.R. 59, 60 (Bankr. M.D. Ga. 1992) ("*James Cable-Bankruptcy*") ("the Court notes that the 'applicable law' in question is section 12 of the City's ordinance"); *accord In re James Cable Partners, L.P.,* 154 B.R. 814, 815 (M.D. Ga. 1993) ("*James Cable-District*") (rejecting contention that "applicable law" would be limited to personal service contracts and holding that cable ordinance qualified:  "Consequently, the cable franchise contract at issue in this case is within the scope of § 365(c)").

[25]     *James Cable-Bankruptcy,* 148 B.R. at 62 ("Whether the term is 'debtor' or 'debtor in possession,' it is the same entity that existed before the filing of the bankruptcy petition that seeks to assume the franchise.").  The district court held similarly.  *See James Cable-District,* 154 B.R. at 815-16 ("A debtor in possession is a debtor's successor of interest and has acquired all of its rights and assets, including the rights under an executory contract.  Moreover, these rights are acquired without an assignment from the debtor to the debtor in possession.  Thus, as no real transfer occurs when a debtor in possession 'steps into the shoes' of the debtor, it makes no sense to prohibit the debtor in possession from "assuming" an executory contract from itself.").  Neither that concept, nor *Bildisco,* was mentioned in the Eleventh Circuit's decision.

affirmed them on a different basis, focusing instead on what constituted "applicable law."

And in this connection it held:

> This case involves a cable franchise in Jamestown, Tennessee. We thus look to Tennessee law as the "applicable law." Subsection (c), as applied in this case, therefore asks whether Tennessee law excuses the City from accepting performance under the cable franchise agreement from a third party-an entity other than James Cable.
>
> A general prohibition against assignment does not excuse the City from accepting performance from a third party within the meaning of § 365(c)(1). In order to be excused from accepting performance, the City would need to point to applicable law such as a Tennessee law that renders performance under the cable franchise agreement nondelegable.[26]

A fair reading of the foregoing compels the conclusion that the *James Cable-Circuit* court was thinking that law at the statewide level would pass muster as "applicable law," and that the local Jamestown ordinance would not. And the Debtors here understandably base arguments on that predicate.

But the *reason* why the Eleventh Circuit came to that view requires some consideration. The *James Cable-Circuit* court did not identify anything unique to legislation of statewide application that was relevant to its conclusion, or otherwise say why statewide law would qualify, and countywide or citywide law would not. Was the Eleventh Circuit therefore wrong in its conclusion that the City of Jamestown's ordinance did not constitute "applicable law"? Not necessarily, because as the Eleventh Circuit's discussion at the outset of its decision makes clear, the cable franchise agreement and the city ordinance appear there to have been merged into a single document (with the

---

[26]    *James Cable-Circuit,* 27 F.3d at 538.

ordinance being the contract, and vice-versa);[27] the franchise awarded by that single

document was an exclusive one;[28] and the ordinance was not of general application.  As

the Charlotte-Mecklenburg Franchise Office points out in one of its briefs here,[29] *James*

*Cable-Circuit* did not involve a separate statutory prohibition against assignment; the

franchise agreement was issued as an ordinance but there was no other statutory

prohibition.

That, in this Court's view, would make the *James Cable-Circuit* decision correct

in its reasoning as well as its outcome—which in this Court's view is correct in any

event.  If, as is sometimes the case (and was the case in *James Cable*), the cable

ordinance and the contract are a single document (and especially if they collectively

award an exclusive franchise), it is extraordinarily difficult, if not impossible, to regard

the ordinance as enacting legislation of general application, and thus as constituting

"applicable law."  The ordinance is little more than a glorified contract.  By contrast, if

the ordinance is a standalone document, regulating cable television (or other franchise)

matters in the community generally, there should be no reason, in this Court's view, why

countywide or citywide legislation should be entitled to any less respect than legislation

enacted on a statewide basis—assuming, of course, that the state has authorized localities

to enact legislation of that character.  When so authorized by their states, municipalities

have the right to legislate for their public welfare, and when they do, there is no reason

that their legislative enactments, if of general application, should be any less regarded as

"applicable law" than similar legislation applicable statewide.  Assuming an appropriate

---

[27]    *See id.* at 535.

[28]    *See id.*

[29]    Charlotte-Mecklenburg Supp. Br. at 19.

-14-

delegation of authority to legislate from state to county or municipality, there is no principled basis upon which this Court could find that legislation for the public welfare that is of statewide application would pass muster as "applicable law," but that countywide or local ordinances of general application within their domains would not.

This Court's conclusion is reinforced by other key decisions in the section 365(c)(1) area, though it appears that only the *James Cable* cases consider section 365(c)(1) issues as applied to cable television regulation. Relevant, in this Court's view, are the Fifth Circuit's discussion of the matter in the *Braniff* chapter 11 cases,[30] and bankruptcy court analysis that has wrestled with section 365(c)(1) concerns in other, non-personal service contract contexts.

In *Braniff*, the debtor airline wished to assign its "landing slots"—its contractual rights to land planes at airport gates—at Washington National Airport to a bidder for its assets. But the Washington Airport Act, part of the District of Columbia Code,[31] gave the control over those slots to the airport administrator, to lease as "he may deem proper"— in essence, granting the airport administrator the right to grant or deny consent to the assignment of the leased gates. Similarly, the FAA had promulgated regulations providing in substance that no one could engage in any commercial activity at Washington National Airport without the approval of the airport administrator. The Fifth Circuit held, in that context:

> Applicable law, therefore, provides that the FAA is to control the leasing of space at National Airport and that no person may operate at National Airport without its approval. Since PSA has not been approved to operate at National Airport, § 365(c)

---

[30]    *See* n.20 above.

[31]    7 D.C. Code §§ 1101-1107.

-15-

> excuses the FAA from accepting performance from
> PSA. The district court therefore erred in
> authorizing Braniff to assign its rights under the
> lease.[32]

Also helpful, in this Court's view, is the analysis of section 365(c)(1) concerns in

general, and of *Braniff* in particular, in *Supernatural Foods*.[33]  As the *Supernatural Foods*

court explained (analyzing section 365(c)(1) issues in the context of a patent licensing

assignment:

> As shown in *Braniff,* a provision in the law
> generally applicable to all contracts with the United
> States regarding National airport which prohibited
> assignment without approval of the United States
> (or its regulatory agency charged with
> administration of the airport) was sufficient to
> defeat assignment under § 365(c)(1)(A).  In other
> words, the debtor's right to transfer its rights under a
> lease of space at an airport was restricted by a
> provision of *generally applicable law, which
> operated without reference to the particulars of the
> lease contract or the status of the lease itself.*  Such
> a restriction on transfer was of the kind
> contemplated by § 365(c)(1)(A), and therefore,
> excepted from the operation of § 365(f)(1).[34]

Though this Court would not necessarily agree with every aspect of the lengthy

68-page opinion in *Supernatural Foods*, this Court thinks the *Supernatural Foods* court

got it right when it focused on the distinction between rules of law of general

applicability (which should, as a general matter, pass muster under section 365(c)(1)),

and those which merely embody or make enforceable limitations on assignment that are

contained within a contract—which as a general matter should not pass muster, and

---

[32]     *Braniff*, 700 F.2d at 943.

[33]     268 B.R. 759.

[34]     *Id.* at 777.

should be voided under section 365(f).[35]  And this Court agrees with the *Supernatural Foods* court's conclusion:

> This Court concludes, therefore, that generally applicable laws which restrict or prohibit transfer of rights or duties under contracts (thereby excusing performance for the non-transferring party) *independent of any restriction contained within the contract itself*, are covered by the provisions of § 365(c)(1). Thus, such laws may be enforced against the bankruptcy trustee to prohibit or restrict the trustee's attempt to assume and assign such contracts. However, laws *for which operation of that law is dependent upon contractual provisions* prohibiting, restricting, or conditioning transfer are not excepted from § 365(f)(1) by § 365(c)(1), and are not enforceable against a trustee seeking to assume and assign a contract of the debtor.[36]

Thus this Court will enforce transfer restrictions in cable ordinances to the extent, but only the extent, to which the ordinances impose prohibitions or restrictions that are of general application, and that are independent of any restriction contained within the franchise agreement itself.[37]

---

[35]    *See id.* at 789 n.84 (referring to the legislative history, noting that section 365(c) would apply "only in the situation in which applicable law excuses the other party from performance ***independent of any restrictive language in the contract or lease itself***") (bold and italics by the *Supernatural Foods* court).

[36]    *Id.* at 792 (emphasis added).

[37]    Of course, the asserted "applicable law" arising from the ordinances here does not make the franchise agreements wholly unassignable; it merely makes them unassignable without local franchising authority consent.  But the Court does not regard that to be a meaningful distinction.  In essence, these ordinances state explicitly what the two subsections (A) and (B) of section 365(c)(1) say together.  Even in the classic personal services contract situation where applicable law makes that contract unassignable, the contract is not really unassignable; it is unassignable unless the contract counterparty consents to accepting performance from the assignee.  In several of the key cases holding non-personal services contracts to be likewise subject to section 365(c)(1), the contract was one that did not prohibit assignment in absolute terms, but rather made its assignment subject to counterparty consent or approval.  *See Pioneer Ford Sales,* 729 F.2d at 28 (Rhode Island statute provided that "no dealer . . . shall have the right to . . . assign the [automobile sales] franchise . . . without the consent of the manufacturer, except that such consent shall not be unreasonably withheld"); *Braniff,* 700 F.2d at 943 (D.C. Code provided that the airport administrator was "empowered to lease upon such terms as he may deem proper," and that no

-17-

But at least where the source of "applicable law" is an ordinance (as contrasted to federal legislation, or legislation of statewide application), this Court further believes that in order to constitute "applicable law" capable of enforcement, an ordinance must also satisfy certain threshold requirements, so as to retain the characteristics of the rule of law. Thus, to engage in the necessary totality of the relevant analysis, the Court believes it should examine, in the context of cable television ordinances prohibiting assignment, or requiring franchising authority consent to assignment, whether:

> — The state has authorized counties or municipalities to enact legislation in this area;

> — The ordinance has been enacted for the protection of the public or for other traditional police power purposes, as contrasted to the locality's own economic benefit;

> — The ordinance is of general application, and is not linked to a particular contractual relationship; and

> — The ordinance does not have the purpose or effect of merely adjusting economic rights as between the LFA and the cable operator, or otherwise conferring upon the LFA an economic advantage (or the purpose or effect of impairing existing contractual rights).

Focusing on the ordinances and statutory schemes of the particular states and localities involved here in light of the foregoing,[38] the Court finds that some of the

---

person could engage in commercial activity at the airport "without the approval of, and under terms and conditions prescribed by, the Airport Manager").

This Court thus believes that the fact that an ordinance might be more fine-tuned in its application would not make it less capable of enforcement under section 365(c)(1).

[38]    The Court assumes, without a sufficient basis to say one way or another, that cable television regulatory schemes across the United States are not necessarily uniform.  The Court focuses on the

ordinances here, entered into under the authority of state law that delegates authority to localities to issue ordinances of this character, having been enacted to protect the public, and being of general application, do pass muster as the requisite "applicable law." Others do not. The Court's analysis with respect to this follows.

### 1.  California LFA (El Centro, CA)

In California, cable franchises are awarded by local franchising authorities, and not the state. California Government Code § 53066 authorizes the legislative body of a city to issue a franchise or license for the construction and maintenance of a system to provide cable service. It provides:

> (a) Any city or county . . . in the State of California may, pursuant to such provisions as may be prescribed by its governing body, authorize by franchise or license the construction of a community antenna television system. In connection therewith, the governing body may prescribe such rules and regulations as it deems advisable to protect the individual subscribers to the services of such community antenna television system.

From the foregoing, the Court finds the requisite delegation of authority from the state to localities to enact ordinances in this area, and the requisite focus on the local public interest.

Pursuant to that authority, El Centro enacted two ordinances related to cable television, and entered into a franchise agreement with one of the Debtors. One of those ordinances merely "granted and approved" the franchise, which was embodied in a written franchise agreement dated March 6, 2002; it was not an ordinance of general

---

particular states and communities involved here. The principles that the Court regards as important here, when applied to the regulatory schemes in other states and communities, might or might not yield the same results.

application.  But the other, which had been entered into earlier, codified as Article X of

the El Centro Code ("Cable Communications Franchises"), dealt with cable franchises

generally.  It spoke in general terms, frequently referring to "franchises" in the plural.  It

even said explicitly that the Grantor City could at its option "grant one *or more*

franchises,"[39] and there is no indication that the ordinance was of anything less than

general application.  Article X provided, in part:

> There shall be no assignment of a franchise, in
> whole or in part, or any change in control of the
> grantee, without the prior express written approval
> of the grantor.

It went on to set forth procedural safeguards for grantor and grantee in connection with

any assignment or change of control (including a requirement that grantor not

unreasonably withhold its consent, and specifying matters that appropriately could be

considered) which this Court assumes will be binding on El Centro if its ordinance is not

held to be unenforceable.

A review of Article X of the El Centro Code makes it clear that it implements

classic regulatory concerns, and that it legislates for the public good and not for any

parochial economic gain.  The El Centro ordinance applies to any and all cable

companies doing business within its territory.  And it has significant regulatory and

consumer protection characteristics—the kinds of things that exemplify classic exercises

of the police power, for regulation of the public good—as compared and contrasted to

provisions that might have been woven into the ordinance for the LFA's own financial

advantage, or to feather its nest to advance parochial economic concerns.  Nor does

---

[39]      El Centro Code § 16-330(f).

Article X have either the effect (or, so far as the Court can see, the purpose) of impairing existing contractual rights. Indeed, El Centro has disclaimed any effort to do so.[40]

In short, the El Centro ordinance is the epitome of the type of ordinance of general application (also passing muster in terms of the Court's threshold concerns as to local franchising authorities being subject to the rule of law) whose restrictions on assignment are enforceable. The Court holds that the El Centro Ordinance constitutes "applicable law" within the meaning of section 365(c)(1), and the Court will not invalidate it.

*2. North Carolina LFAs*

In North Carolina, cable franchises are awarded by local franchising authorities, not the state. North Carolina General Statutes § 153A-137 authorizes North Carolina counties to grant a franchise to operate a cable television system. It provides:

> Consistent with the rules and regulations of the Federal Communications Commission, a county may by ordinance grant upon reasonable terms franchises for the operation of cable television systems within any portion of the county, exclusive of incorporated areas and make it unlawful to operate such a system without a franchise.

North Carolina General Statutes § 160A-319 grants cities, towns and villages the same authority.[41]

---

[40] *See* Franchise Agreement § 1 (in event of conflict between franchise agreement and ordinance, franchise is controlling, and any change in ordinance after date of franchise will not be applicable to franchisee's rights or obligations under franchise)

[41] § 160A-319 provides:

> (a)    A city [defined in North Carolina General Statutes § 160A-1 as including the terms "town and village"] shall have authority to grant upon reasonable terms franchises for the operation within the city of any of the enterprises listed in G.S. 160A-311 [which list includes "cable television systems"] . . . . [C]able television franchises shall not be granted for a period of more than 20 years.

-21-

From the foregoing, the Court finds the requisite delegation of authority from the state to localities in this area.

*(a) Charlotte-Mecklenburg LFAs*

Pursuant to the state of North Carolina's delegation of authority to counties and towns, Mecklenburg County and the Mecklenburg-Iredell Towns enacted ordinances related to cable television, and each entered into separate franchise agreements with one of the Debtors.[42]  The cable ordinances (the "Mecklenburg-Iredell Cable Ordinances"), which are identical, and are all titled "Cable Communications Regulatory Ordinance", deal with cable franchises generally.  Like the El Centro ordinance, they speak in general terms, and there is no indication that they are of anything less than general application.[43]

The stated purpose of the Mecklenburg-Iredell Cable Ordinances is to serve "the public convenience, safety and general welfare . . . by establishing certain regulatory powers" in the area of cable television and communications systems.[44]  Section 2.4 of the ordinances deals with transfer and provides, in part:

> Any franchise granted hereunder cannot in any
> event be sold, transferred, leased, assigned or

---

[42]    These six franchise agreements are practically identical and were all entered into with Prestige Cable TV of N.C., Inc., an Adelphia subsidiary.  *See* Mecklenburg County Franchise Agreement, dated April 4, 2000 (Netzer Decl. Exh. 34); Troutman Franchise Agreement, dated April 6, 2000 (Netzer Decl. Exh. 35); Huntersville Franchise Agreement, dated March 20, 2000 (Netzer Decl. Exh. 36); Cornelius Franchise Agreement, Undated, 2000 (Netzer Decl. Exh. 37); Mooresville Franchise Agreement, dated April 3, 2000 (Netzer Decl. Exh. 38); Davidson Franchise Agreement, Undated, 2000 (Netzer Decl. Exh. 39).

[43]    *See* Mecklenburg Cable Communications Regulatory Ordinance, dated February 10, 2000 (Netzer Decl. Exh. 69); Troutman Cable Communications Regulatory Ordinance, dated February 10, 2000; Huntersville Cable Communications Regulatory Ordinance, dated February 10, 2000; Cornelius Cable Communications Regulatory Ordinance, dated February 10, 2000; Mooresville Cable Communications Regulatory Ordinance, dated February 10, 2000; Davidson Cable Communications Regulatory Ordinance, dated February 10, 2000.  The Troutman, Huntersville, Cornelius, Mooresville and Davidson ordinances were submitted to the Court in a Statutory Appendix to the Objecting LFAs' Supplemental Legal Brief dated June 9, 2006 (the "LFA Statutory Appendix").

[44]    Mecklenburg Cable Communications Regulatory Ordinance § 1.1.1.

> disposed of . . . without the prior consent of the
> Town ["County" in the case of Mecklenburg] and
> then, under such reasonable conditions as the Town
> [again, "County" in the case of Mecklenburg] may
> establish . . . .

The ordinances also set forth procedural safeguards for grantor and grantee in connection with any transfer or change of control (including a requirement that grantor not unreasonably withhold its consent, and specifying matters that appropriately could be considered in evaluating a transfer, such as the qualifications of the prospective transferee) which this Court assumes will be binding on Mecklenburg County and the Mecklenburg-Iredell Towns if their ordinances are not held to be unenforceable.

A review of the Mecklenburg-Iredell Cable Ordinances reveals that they, like the El Centro ordinance, implement classic regulatory concerns, and legislate for the public good and not for any parochial economic gain. The ordinances apply to any and all cable companies doing business within Mecklenburg County and the Mecklenburg-Iredell Towns. And like the El Centro ordinance, they have significant regulatory and consumer protection characteristics. Nor do they have the effect of impairing existing contractual rights. Indeed, the franchise agreements between Adelphia and Mecklenburg County and Adelphia and each of the Mecklenburg-Iredell Towns specifically reference the cable ordinances, and state that the franchises were granted under the "terms and conditions" contained in the ordinances.[45]

The Mecklenburg-Iredell Cable Ordinances are ordinances of general application whose restrictions on assignment are enforceable. The Court holds that the

---

[45]    *See, e.g.,* Mecklenburg County Franchise Agreement, p. 1.

Mecklenburg-Iredell Cable Ordinances constitute "applicable law" within the meaning of

section 365(c)(1), and the Court will not invalidate them.

> (b) *Nash-Pitt LFAs*

Also pursuant to North Carolina's delegation of authority to counties and towns,

Nash County enacted an ordinance related to cable television[46] (the "1993 Ordinance"),

and entered into a franchise agreement with a cable company that subsequently assigned

the agreement to the Debtors in 1996.[47]  The 1993 Ordinance is similar to the

Mecklenburg-Iredell cable ordinances.  In fact, the section governing transfer is

practically identical in form and substance.[48]  The stated purpose of the 1993 Ordinance

is to serve the "public convenience, safety and general welfare" by "establishing

regulatory powers" over the development of cable television and communications

systems.[49]  The ordinance deals with cable franchises generally, and like the

Mecklenburg-Iredell ordinances, it speaks in general terms, and there is no indication that

it is of anything less than general application.

The 1993 Ordinance is an ordinance of general application whose restrictions on

assignment are enforceable.  Like the Mecklenburg-Iredell and El Centro ordinances, the

---

[46]     Nash County Code, Ch. 10: "Cable Communications" (March 1, 1993).

[47]     *See* Nash County Franchise Agreement, dated June 2, 1986 (Exh. A to Nash County Contract
Objections); Debtors' Omnibus Response ¶ 20.  The Nash Towns, with the exception of Momeyer,
also entered into Franchise Agreements with the Debtors.  *See* Whitakers Franchise Agreement,
dated March 5, 1984 (Exh. A to Whitakers Contract Objections); Red Oak Franchise Agreement,
dated February 5, 2001 (Netzer Decl. Exh. 3); Middlesex Franchise Agreement, date unknown
(not submitted by the parties); Spring Hope Franchise Agreement, dated April 27, 1999 (Netzer
Decl. Exh. 76); Dortches Franchise Agreement, dated May 20, 1986 (Netzer Decl. Exh. 60);
Castalia Franchise Agreement, dated August 1, 2000 (Netzer Decl. Exh. 2); Bailey Franchise
Agreement, dated November 2, 1993 (Netzer Decl. Exh. 72).

[48]     *See* 1993 Ordinance § 10-38 (a) (no transfer without prior consent of franchise grantor); (d)
(requirement that grantor not unreasonably withhold consent to transfer, and specifying matters
that grantor may consider in determining whether to consent to a transfer).

[49]     1993 Ordinance § 10-1.

ordinance was enacted for the protection of the public, and not for Nash County's own

economic benefit.  The ordinance applies to any and all cable companies doing business

within Nash County.  And like the Mecklenburg-Iredell ordinances, it has significant

regulatory and consumer protection characteristics, and does not have the purpose or

effect of impairing existing contractual rights.[50]  In fact, the Debtors acknowledge that

when the Nash franchise was transferred to the Debtors in 1996, the Debtors agreed to

provide cable service to Nash County under the terms of the 1993 Ordinance.[51]

Two of the Nash Towns—Momeyer and Spring Hope—also enacted general

cable television ordinances.[52]  There is no need for the Court to address whether the

Spring Hope ordinance constitutes "applicable law" within the meaning of section

365(c)(1) because it does not contain any provisions requiring Spring Hope's consent to a

transfer of the franchise.  The Momeyer ordinance, which was passed in 2004, requires

the Town's prior consent to a transfer.  However, because Momeyer never had a

franchise agreement with the Debtors, the Court does not need to reach the issue of

---

[50]    Nash County adopted another cable regulatory ordinance in 2003 (the "2003 Ordinance") that
contained substantially similar transfer provisions as those in the 1993 Ordinance, but also
included new requirements that franchisees provide three additional public, educational and
government ("PEG") channels and upgrade Nash's cable system to "remain current with the state
of broadband technology."  2003 Ordinance §§ 10-137(b); 10-171(a).  The Debtors argue in their
Omnibus Response that the 2003 Ordinance is unenforceable because Nash County passed the
2003 Ordinance without good faith negotiations with franchisees, as required by the 1993
Ordinance, and because the 2003 Ordinance's new requirements unilaterally and materially altered
the terms of the Nash County Franchise Agreement, in violation of the Contract Clause of the U.S.
Constitution.  If the Court needed to reach them, these arguments might well have merit.  But
because the Nash County Franchise Agreement expired by its terms in 1999—a finding addressed
in greater detail in Section III, below—a holding that the 2003 Ordinance is unenforceable, by
reason of either the 1993 Ordinance's requirements or the Contract Clause, would be academic.

[51]    Debtors' Omnibus Response ¶ 20.

[52]    Spring Hope Cable Television Regulatory Ordinance, dated April 27, 1999 (LFA Statutory
Appendix); Momeyer Cable Television Standards Ordinance, dated April 5, 2004 (LFA Statutory
Appendix).

whether the Momeyer ordinance passes muster as "applicable law" under 365(c)(1) because there is no franchise transfer for Momeyer to give or deny consent to.

The Pitt County Franchise Agreement[53] and the Franchise Agreements for most of the Nash Towns contain provisions restricting transfer.[54]  However, the Court rejects the argument made by the Nash-Pitt LFAs that the *franchise agreements themselves* constitute applicable law under 365(c)(1).  Additionally, although Pitt County appears to have a cable ordinance that might be argued to constitute applicable law under 365(c)(1)—an ordinance that Pitt County cited in the portion of its reply brief dealing with cure issues[55]—Pitt County did not submit this ordinance to the Court and did not argue that this ordinance constitutes applicable law under 365(c)(1).

The Court holds that the Nash cable ordinance constitutes "applicable law" within the meaning of section 365(c)(1), and the Court will not invalidate it.  The Court further holds that the Nash-Pitt Franchise Agreements do not constitute applicable law within the meaning of 365(c)(1).

### 3. Virginia LFAs (Martinsville/ Henry County)

In Virginia, as in California and North Carolina, cable franchises are granted by local franchising authorities.  Virginia Code § 15.2-2108 authorizes localities to award a cable franchise to "no more than one cable television system," but permits the governing

---

[53]    Pitt County Franchise Agreement, dated September 17, 2001 (Netzer Decl. Exh. 77).

[54]    *See, e.g.,* Whitakers Franchise Agreement § XIII (franchise "shall not be assigned or transferred without the written approval of the City Council, which approval shall not be unreasonably withheld").  The Castalia and Red Oak Franchise Agreements do not contain restrictions on transfer.

[55]    *See* Nash-Pitt LFAs Reply Brief at ¶ 41.

body of a locality to grant additional licenses if, after a public hearing, it finds that the
public welfare will be enhanced by an additional franchise.[56]

From the foregoing, the Court finds the requisite delegation of authority from the
state of Virginia to localities to enact ordinances in this area, and the requisite focus on
the local public interest.

Pursuant to that authority, Martinsville and Henry County each enacted
ordinances related to cable television[57] and entered into franchise agreements with one of
the Debtors.[58]  The Martinsville and Henry County ordinances are practically identical
and contain identical provisions dealing with transfers.  Both ordinances require
municipality approval of any transfer, and state that approval "shall not be unreasonably
withheld."[59]  And both set forth procedural safeguards in connection with any proposed
transfer.

In part, but only in part, both ordinances appear to have been enacted for the
protection of the public and other traditional police power purposes (stated purposes of
the ordinances include regulating cable systems and serving the needs of the "citizens and
general public" of Martinsville and Henry County).[60]  And the ordinances do not appear
to have the purpose or effect of impairing Adelphia's existing contractual rights under the
Franchise Agreements.  But they contain rights of first refusal on franchise transfer that

---

[56]     Va. Code § 15.2-2108.

[57]     *See* Martinsville Cable Ordinance (Ordinance No. 98-4), dated February 24, 1998 (Collins Decl.
Exh. 2); Henry County Cable Ordinance, dated February 24, 1998 (Collins Decl. Exh. 4).

[58]     *See* Martinsville Franchise Agreement, dated February 24, 1998 (Collins Decl. Exh. 1); Henry
County Franchise Agreement, dated February 23, 1998 (Collins Decl. Exh. 3).

[59]     Martinsville Cable Ordinance § 5.2.3; Henry County Cable Ordinance § 5.2.3.

[60]     Martinsville Cable Ordinance, p. 1; Henry County Cable Ordinance, p. 1.

would make them unenforceable in cases (as the Court finds here) where the LFA wishes

to take over the cable system for its own private economic gain.

      Additionally, while both ordinances also appear to deal with cable franchises

generally—speaking in general terms, and referring to "franchises" in the plural and to

grants of franchises as being to "one or more companies"[61]—the cover page of the

Martinsville ordinance (titled "City of Martinsville, Virginia Ordinance No. 98-4") states

that "Ordinance No. 98-4" relates to the "provision of cable television service to the

City's residents by Adelphia Cable Communications."[62]  Thus it is clear from the face of

the ordinance that it was enacted to address Martinsville's particular contractual

relationship with Adelphia—not Martinsville's relationship with franchisees generally—

and is therefore not an ordinance of general application.

      Neither of the copies of the Henry County ordinance submitted to the Court by the

Debtors and Henry County contains such a cover page.  Nor does the Henry County

ordinance contain any other reference to Adelphia, or its subsidiaries, or any other

specific franchisee.  In the absence of such reference, and—as discussed above—in light

of the fact that the ordinance deals with cable franchises generally, the Court finds that

the Henry County ordinance is one of general application whose restrictions on

assignment would be enforceable except with respect to its right of first refusal, and any

denial of consent linked to that.[63]  The Court holds that, except with respect to the right

---

[61]      Martinsville Cable Ordinance, p. 1; Henry County Cable Ordinance, p. 1.

[62]      Martinsville Cable Ordinance, cover page.

[63]      If it were brought to the Court's attention that the Henry County ordinance also contained a page,
like the first page of the Martinsville ordinance, that specifically stated that the ordinance related
to the provision of cable services by Adelphia, or any other specifically named franchisee, the
Court would also find the Henry County ordinance not to be an ordinance of general application,
but rather inextricably linked to a particular contractual relationship.

of first refusal, the Henry County cable ordinance constitutes "applicable law" within the meaning of section 365(c)(1), and the Court will invalidate it only in part.[64]  The Court further holds that the Martinsville cable ordinance does not constitute "applicable law" within the meaning of section 365(c)(1).

* * *

In holding that many of the Objecting LFAs can enforce their ordinances to achieve legitimate police power ends, the Court notes what it does *not* hold.  It does not hold that these ordinances constitute valid "applicable law" because "franchising authority is a sovereign power," or because the authority to approve transfers is "encompassed in the authority to grant the franchises themselves."[65]  Incantations of this character are legally insignificant.  Sovereigns can abuse their power, and once they grant a franchise, they remain subject to the rule of law.  Several of the broad arguments advanced by the Objecting LFAs, if accepted, would permit a cable television local franchising authority (or, by very little in the way of extension, any governmental party to a contract) to advance its economic needs and concerns to the material detriment of its franchisee or contract counterparty, and allow it to use its legislative power to trump other important public policy.  It is only because, under the facts here, the Court is comfortable that many of the ordinances in question are being used to effectuate

---

[64]     This nuanced analysis gives Henry County the benefit of its ordinance to the extent that it has not overreached.  The Court will retain jurisdiction to ensure, if necessary, that any stated reliance by Henry County on legitimate regulatory concerns is not pretextual.

[65]     *See* LFA Supp. Br. at 3, 6.  The Court also has considerable skepticism as to the LFAs' contentions that the Court should regard their regulatory authority as the requisite "applicable law" based on the LFAs' undisputed power to "manage the public streets and roads" (LFA Supp. Br. at 2), when their desire to regulate the transfer of the cable franchise has nothing to do with obstructions of, or damage to, the community's roads, but involves very different regulatory needs and concerns.  But since under the facts here, there are bona fide regulatory concerns with respect to the delivery of cable television service to the community, the Court does not have to decide this question.

-29-

legitimate regulatory concerns, for the benefit of the public in the LFAs' communities, that the Court finds them to constitute the requisite "applicable law" here. The Court emphasizes that it is *not* holding that a municipality can pass any ordinance it wants, to feather its nest in a manner unrelated to the public welfare of its community, and call it "applicable law" that will be respected in a bankruptcy case.

For the reasons set forth above, the Court cannot wholly accept the position of either side. While appropriately emphasizing the importance of section 365(f), the Debtors fail sufficiently to acknowledge the counterparty needs and concerns underlying section 365(c)—which, when applicable, will trump section 365(f). And the LFAs cannot claim that their ordinances constitute "applicable law" merely upon incantations of "sovereign grants," as if they are 21st Century kings. Their ordinances will be regarded as "applicable law" if, but only if, they constitute legislation of general applicability. If they represent no more than a mere approval of a franchise agreement, or a packaging of a contractual agreement within the ordinance, they will deserve no more deference under sections 365(c) and 365(f) than the contractual provisions themselves.

## II.

### Rights of First Refusal

Several of the Objecting LFAs assert rights of first refusal in connection with the proposed transfers. Mecklenburg County, the Mecklenburg-Iredell Towns, Martinsville and Henry County all base their rights of first refusal on the same cable ordinances discussed above in connection with the Objecting LFAs' rights to consent to franchise assignment. The Martinsville and Henry County cable ordinances provide in substance that if the Debtors decide to accept a bona fide offer to purchase their cable assets located in Martinsville or Henry County, those LFAs have the right to purchase the assets on

-30-

substantially the same terms and conditions set forth in that bona fide offer.[66]  The

Mecklenburg-Iredell cable ordinances contain provisions governing rights of first refusal

that are substantially similar, reserving "the right of first purchase in any sale, transfer,

lease, assignment, or disposal of the system at a cost at least equal to a bona fide offer

otherwise acceptable to the Grantee."[67]  The Court considers the enforceability of these

provisions next.

As previously noted, under section 365(f)(1) of the Bankruptcy Code (subject to

the section 365(c)(1) exception discussed above), a trustee or debtor in possession can

assign an executory contract notwithstanding a provision in that contract "that prohibits,

restricts, or conditions the assignment of such contract . . . ."  As a consequence, when a

debtor in possession wishes to assign an executory contract, any such provision is

unenforceable.[68]  Section 365(f) renders unenforceable not only provisions which

prohibit assignment *outright*, but also lease provisions that are so restrictive that they

constitute de facto anti-assignment provisions.[69]

Among the types of provisions that have been held to be unenforceable under

section 365(f) are rights of first refusal,[70] and for good reason.  They always "restrict"

---

[66]    *See* Martinsville Cable Ordinance § 5.1; Henry County Cable Ordinance § 5.1.

[67]    Mecklenburg County, Cornelius, Davidson, Huntersville, Troutman and Mooresville Cable
Ordinances § 2.4.8.

[68]    *See*, *e.g.*, *In re Rickel Home Centers*, 240 B.R. 826, 831 (D. Del. 1998) (Farnan, J., sitting as
bankruptcy court), *app. dismissed*, 209 F.3d 291 (3d Cir.), *cert. denied*, 531 U.S. 873, 121 S.Ct.
175, 148 L.Ed.2d 120 (2000).

[69]    *Id.*

[70]    *See In re Mr. Grocer, Inc.*, 77 B.R. 349, 355 (Bankr. D.N.H. 1987) (Yacos, J.) (discussed below);
*Ramco-Gershenson Properties, L.P. v. Service Merchandise Co., Inc. (In re Service Merchandise
Co.)*, 293 B.R. 169, 173(M.D. Tenn. 2003) ("*Service-Merchandise-District*"), *aff'g* 297 B.R. 675
(Bankr. M.D. Tenn. 2002) (Paine, C.J.) ("*Service Merchandise-Bankruptcy*"), affirming
bankruptcy court determination finding unenforceable landlord right to purchase leasehold after
reasonably withholding consent to assignment).

assignment—one of the three types of scenarios that result in invalidation under section

365(f). And in many (though not all) circumstances, rights of first refusal will do so in a

fashion that materially impairs the estate's ability to maximize value for its creditors

when it markets its assets, which often consist of (partly or entirely) executory

contracts.[71]

The seminal case invalidating rights of first refusal under section 365(f)(1) is *Mr.*

*Grocer*,[72] where Judge Yacos invalidated a landlord's right of first refusal in connection

with the proposed sale of a supermarket business, and the associated assignment of a

supermarket lease. He did so for multiple reasons, combining a plain meaning analysis

with an analysis of the practical effect of provisions of that character in chilling bidding

for estate assets. He noted, in that connection:

> It is hard to imagine any restriction or condition
> upon assignment of a lease more clearly within the
> legislative language than a lease provision which
> not only directly refers to assignment of the lease,
> but also further provides that any assignment is
> conditioned upon the landlord first having a right of
> first refusal to take the leasehold interest away from
> the prospective assignee.[73]

Judge Yacos also considered the chilling effect that first refusal rights have upon

obtaining bids. He distinguished the situation resulting from a right of first refusal from

the situation that all bankruptcy bidders for assets must face, being outbid:

---

[71]    In cases where the provision restricts assignment (as contrasted to cases, for example, where the
provision prohibits assignment, or conditions it on payment of a price), the Court does not apply a
*per se* test. A bankruptcy court retains discretion in determining whether a provision in an
executory contract hinders the possibility of assignment to a sufficient degree to render it
unenforceable. *See In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. 45, 50 (Bankr. M.D. N.C.
2003) (Carruthers, J.); *Hannaford Bros. Co. v. Ames Dep't Stores, Inc. (In re Ames Department
Stores, Inc.,* 316 B.R. 772, 794-95 (Bankr. S.D.N.Y. 2004) (Gerber, J.) ("*Hannaford*"); *In re The
IT Group, Inc.*, 302 B.R. 483, 487-489 (D. Del. 2003) (Farnan, J.) ("*IT Group*").

[72]    *See* n.70 above.

[73]    77 B.R. at 352.

> The landlord retorts that enforcing the right of first
> refusal here would not be essentially different than
> the common practice of taking "other bids" at
> bankruptcy sale hearings. The short answer to the
> landlord's contention in this regard is that it is *not*
> offering any "higher or better bid" possibility, but is
> simply insisting upon a contractual provision to take
> away the assignment *at the same price* bid by these
> prospective purchasers. Likewise, the landlord's
> argument that "this estate will not be hurt" because
> in no event will the estate get less than the bid price
> is essentially specious. That contention begs the
> question as to whether the eventual effect of
> enforcing first refusal rights would not discourage
> prospective purchasers and assignees from making
> the effort *to initially put a bid before the bankruptcy
> court to be matched*.[74]

While this Court does not suggest that these same considerations will necessarily

be the same in *every* right of first refusal case (and thus applies a "facts and

circumstances" test and does not here apply a *per se* rule), they will be applicable in

many right of first refusal cases, and this Court believes they are applicable here.  These

factors, and others, discussed below, all compel a conclusion in the Adelphia cases that

the rights of first refusal "thwart the fundamental policy of maximizing estate assets for

the benefit of all creditors,"[75] and thus are unenforceable.

This case fits in the mold of many cases under the Code where a multi-asset sale

is envisioned.  Here, as in those cases, each right of first refusal applies to a contract that

is one of *many* executory contracts to be assigned, and where the assets that are to be

conveyed as part of the sale go way beyond the single executory contract in question.

The Court believes that here, as in many chapter 11 cases with multi-asset auctions,

---

[74]    *Id.* at 353 (emphasis in original); *see also Service Merchandise-Bankruptcy*, n.70 above, 297 B.R.
at 680 (rejecting landlord contention that "the debtor's proposed assignment was without the
landlord's consent as is required by the lease terms, and therefore, [landlord] Ramco's option to
purchase has been triggered under the lease").

[75]    *Hannaford*, 316 B.R. at 796.

enforcing rights of first refusal with respect to a subset of those assets will be destructive

to maximizing value, and have a chilling effect on future bankruptcy auctions.

Developments in the disposition of assets in bankruptcy cases since *Mr. Grocer*

was decided have underscored Judge Yacos' prescience in terms of the chilling effects on

bidding. Those developments have given rise to mechanisms in many large and medium

size chapter 11 cases formalizing bidding procedures and establishing stalking horse

protection and required bidding increments, all to protect the first bidder from the

unfairness of being the first bidder in the fray and being outbid by those holding back—

an unfairness that is compounded when one of the competing bidders can win without

paying *anything* more. The *Mr. Grocer* decision was sensitive to the problem as far back

as 1992, and the developments since then have underscored the importance of

minimizing or eliminating factors that distort bidding, and, hence, impair the

maximization of estate value. Since 1992, bidding protection has become routine.

Then there is the matter of allocation of the applicable consideration, so as to

measure the price to be paid. The computation likely could be made, in this Court's

view, but as the complexity of the transaction increases (and this transaction is complex,

to say the least), the time and expense associated with making the allocation likewise

increases, to a point where it gets to be a material burden, as the Court believes would be

the case here.[76] The Court's concerns here mirror those articulated by the *Mr. Grocer*

court, in a less complex transaction:

---

[76] Here, for instance, the parties and the Court would be charged with the duty to allocate that
portion of the $17.6 billion to be paid by Time Warner and Comcast for the assets subject to the
rights of first refusal of Martinsville, Henry County, Mecklenburg County and the Mecklenburg-
Iredell Towns—a matter whose complexity would be aggravated by the use of certain cable assets
by multiple communities, some of whom have, and some of whom do not have, rights of first
refusal.

> Thus, the landlord's glib assertion that it will "pay the same price" if it exercises its right of first refusal leaves unanswered the practical question of *what is that price* and how many more hearings would be necessary to determine the matter even *after* the court completed its evidentiary hearing on the financial status of the prospective purchasers and entered its order approving assumption and assignment of the sublease on the basis of adequate assurance of future performance.
>
> To require prospective bidders to engage in such additional litigation, or to re-cast their offers in a form convenient to the landlord but perhaps undesirable to them for tax or other reasons, will simply add to the obstacles trustees and debtors face in getting competitive bidding for their assets.[77]

And then, it is the case here that assets are shared or used for the benefit of multiple contract counterparties. The exercise of a right of first refusal by one contract counterparty would affect other entities, some of whom would be prejudiced by the loss of assets needed to serve them, and would, at the least, require efforts to decouple the interlocking operations. This is one of the several problems affecting the desires of Martinsville, Henry County, and the Charlotte-Mecklenburg LFAs to enforce their rights of first refusal.[78] The cable systems serving them also serve subscribers in neighboring communities that, by contrast, have *agreed* to permit the assignment of their franchises to Time Warner and Comcast. The cable system that the Mecklenburg-Iredell communities wish to acquire has a single head end located in an Iredell community (Mooresville) that

---

[77] 77 B.R. at 353.

[78] Another matter involving Martinsville can be quickly disposed of. The Court rejects the notion, advanced by Martinsville that it is immune from section 365(f) analysis because its right of first refusal applies to the *assets* used by the cable system for the franchise, as contrasted to the franchise itself. *See* Martinsville Supplemental Reply at 5. The Court agrees with the Debtors that the "value, purpose and operation of the Franchise Agreements are inextricable from and dependent on the physical assets over which the LFAs seek to exercise rights of first refusal." Debtors' Supplemental Brief at 8. Indeed, both the purchase rights and the restriction on assignment are set out in the same section of the Martinsville cable ordinance.

serves approximately 20,000 subscribers in communities not represented by the

Charlotte-Mecklenburg Franchise Office, and if the Charlotte-Mecklenburg LFAs were to

exercise their rights of first refusal, Time Warner would lose the ability to serve those

subscribers.  A similar problem exists in Ridgeway, a community served by the same

cable system that serves Martinsville and Henry County.

While the Court believes that concerns articulated above (particularly with respect

to distorting bidding and impairing the ability to maximize value) will be applicable in

many, if not most, cases involving multi-asset sales, the Court does not suggest that those

concerns will be applicable in all of them.  Some cases have declined to invalidate rights

of first refusal.  But in this Court's view, they are distinguishable.

In *E-Z Serve*, individual bids were taken and accepted for the debtors' many

leaseholds, and the court focused on a particular right of first refusal, applicable to a

single lease that was the subject of a single assume-and-assign effort; at least as relevant

here, the case did not involve a right of first refusal to be enforced against a multi-asset

purchase.  The *E-Z Serve* court had made evidentiary findings that a landlord, the holder

of the right of first refusal, had participated in the auction of the debtor's property, and

had effectively outbid the otherwise-winning bidder.  The *E-Z Serve* court thus was in a

position to find that permitting exercise of the right of first refusal would not be a

detriment to the debtor's estate, and that there appeared to be no benefit to the estate of

allowing the sale to the winning bidder to proceed.[79]  Here the Court can make none of

those findings.

---

[79]        289 B.R. at 54.

Similarly, in *IT Group*, in a case acknowledged to present a "close legal question,"[80] two of the debtors were members of a limited liability company. The LLC had a provision in its operating agreement giving all of its members, including the nondebtor members, a right of first refusal to buy out the economic interest of a member proposing to sell its interest. The *IT Group* court affirmed a decision of the bankruptcy court that had found the right of first refusal to be enforceable. The district court was not persuaded that enforcing the right of first refusal in this case would hamper the Debtors' ability to assign the property, or foreclose the estate from realizing the full value of the Debtors' interest in the LLC.[81] And looking with a "facts and circumstances" type analysis of burdens associated with the value allocation needed to implement the right of first refusal, it noted that the bankruptcy court had not expressed concern over future hearings that might be needed to resolve the allocation issue.[82] Once more, this Court is not in a position, on the facts of this case, to make similar findings.

Thus, all of the LFAs' rights of first refusal constitute forbidden restraints upon assignment, which, at least in the first instance, are subject to invalidation under section 365(f). But the Court then must consider whether the rights of first refusal are saved by the section 365(c)(1) exception, as arising under "applicable law," since they are embodied not in the franchise agreements themselves, but in the LFAs' cable ordinances.

In the cases of Martinsville and Henry County, this is an easy determination. The Court finds, as a mixed question of fact and law, that their rights of first refusal must nevertheless fall, because a provision in an ordinance to be used for the municipality's

---

[80]     302 B.R. at 485 n.1.

[81]     *Id.* at 488.

[82]     *Id.*

-37-

private economic gain is fatal to the municipality's reliance on that provision as applicable law.[83]  Based on the evidence it saw and heard, the Court finds as a fact that Martinsville and Henry County wish to utilize their right of first refusal provisions for their own economic gain—to make cable television a new revenue source for the two LFAs.[84]

Mecklenburg County and the Mecklenburg-Iredell Towns likewise have right of first refusal provisions in their ordinances.  But their witness testified that:

> The right of first refusal was included in the Cable Ordinances because those of us involved in the 2000 cable franchise renewal, transfer and redrafting of the cable regulations wanted several key issues, one of which [was] the right of first refusal, to be applicable to all cable operators that were operating within the County and the Towns.  It was of particular importance because at the time (*i.e.* in 2000) the cable operators in the area had a track record for frequently transferring cable systems . . . . In addition, I and the County's consultant, based on our prior years of experience in the cable area, considered the right of first refusal to be a "standard" clause in any ordinance *to protect the interests of local governments in* controlling their rights-of-way and *protecting consumers*.[85]

This testimony, while arguably scripted and self-serving, was not impeached by cross-examination, and no evidence of a desire to exploit the ordinance for profit, as in the case of Martinsville, was introduced.  The Court has no basis for disbelieving or disregarding it.  Thus, although the Charlotte-Mecklenburg LFAs' rights of first refusal would be subject to invalidation under section 365(f)(1), they are saved by the provisions of section 365(c)(1), as their ordinance did not lose its character as "applicable law."

---

[83]    *See* Section I above.

[84]    *See* June 1 Hrg. Tr. at 20 (Cross Examination of Robert Collins, Martinsville City Manager).

[85]    Boris Decl. ¶ 25 (emphasis added; apparent typographical error corrected).

<u>Conclusion</u>

For the foregoing reasons, the Court holds that the cable ordinances of El Centro,

Mecklenburg County, the Mecklenburg-Iredell Towns, Nash County and Henry County,

insofar as they prohibit assignment of their respective cable franchises without LFA

consent, are enforceable.

The Court further holds that the rights of first refusal asserted by Martinsville and

Henry County are unenforceable, under section 365(f)(1) of the Bankruptcy Code, but

that the rights of first refusal asserted by Mecklenburg County and the Mecklenburg-

Iredell Towns are enforceable, under the section 365(c)(1) exception.

Dated:  New York, New York                          *Robert E. Gerber*
       June 22, 2006                          United States Bankruptcy Judge
       As edited and published,
       January 11, 2007