UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Adelphia Communications Corp., *et al.*, | ) | Case No. 02-41729 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

_____)

DECISION AND ORDER ON MOTION FOR
APPROVAL OF SETTLEMENT AND PURCHASE
AGREEMENT WITH D&O INSURERS


APPEARANCES:

COVINGTON & BURLING LLP
Special Counsel for the Debtors and Debtors in Possession
1330 Avenue of the Americas
New York, NY 10019
By:    Alan Vinegrad, Esq.

One Front Street
San Francisco, CA 94111
By:    Donald W. Brown, Esq. (argued)

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for the Creditors' Committee
1633 Broadway
New York, NY  10019-6799
By:    Daniel Zinman, Esq.

DILWORTH PAXSON, LLP
Counsel for  Michael J. Rigas  and  James P. Rigas
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103-7595
By:    Lawrence G. McMichael, Esq. (argued)
       Peter C. Hughes, Esq.
       Christie M. Callahan, Esq.

HARRINGTON & MAHONEY
Counsel for Michael C. Mulcahey
1620 Statler Towers
Buffalo, NY  14202
By:     Mark J. Mahoney, Esq.

GOLENBOCK, EISEMAN, ASSOR, BELL & PESKOE, LLP
Counsel for Peter Venetis
437 Madison Avenue
New York, NY  10022
By:     Jeffrey T. Golenbock, Esq. (argued)

SQUIRE, SANDERS & DEMPSEY, LLP
Counsel for Erland Kailbourne
200 South Biscayne Boulevard
Suite 400
Miami, FL  33131
By:     Alvin B. Davis, Esq.

BAILEY CAVALIERI, LLC
Counsel for Associated Electric & Gas Insurance Company
10 West Broad Street, Suite 2100
Columbus, OH  43215
By:     Michael Goodstein, Esq.

FARRELL FRITZ, P.C.
Counsel for Associated Electric & Gas Insurance Company
1320 Reckson, Plaza
Uniondale, NY  11556
By:     Louis A. Scarcella, Esq.

HOGAN & HARTSON, LLP
Counsel for Federal Insurance Co.
555 Thirteenth Street, N.W.
Washington, DC  20004
By      Peter R. Bislo, Esq.
         Edward C. Crooke, Esq.

ROSS, DIXON & BELL, LLP
Counsel for Greenwich Insurance Co.
2001 K Street, N.W.
Washington, D.C.  20006
By:    Leslie S. Ahari, Esq.

BEFORE:    ROBERT E. GERBER
           UNITED STATES BANKRUPTCY JUDGE

In this contested matter[1] in a case under chapter 11 of the Bankruptcy Code, the

Debtors move, pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, for

approval of a settlement (the "Settlement") with the Insurers under their D&O Policies[2]

under which, *inter alia*, the Debtors would sell their interest in the Policies to the Insurers

for $32.5 million, with claims of others to policy proceeds (such as those of former

Adelphia officers and directors) attaching to the proceeds of the sale.  Certain of the

Rigases and others with whom they were associated[3] (the "Objectors") object to the

Settlement on a variety of grounds—but most significantly with respect to a proposed

channeling injunction which would prohibit the Objectors and other directors and officers

from proceeding directly against the Insurers to pursue claimed entitlements under the

policies.

A settlement with the Insurers that secures this $32.5 million, in exchange for a

give-up of further recoveries from the Insurers, is plainly in the interests of the Adelphia

estate.  And a section 363 sale of the Estate's interests in the policies and of their

proceeds—even if such may have adverse consequences for the Rigases or others—is

---

[1]    In light of the outcome of this decision, I do not have to decide whether the filing of an adversary
proceeding is required to achieve a desired channeling injunction where, as here, it is sought
outside of a reorganization plan, but where some or many of those to be enjoined are not
unknown.

[2]    Familiarity with prior proceedings is presumed.

[3]    Michael and James Rigas, Peter Venetis, and Michael Mulcahey.

not, in my view, prohibited under the law.  But I see the interests of the Estate and the

Objectors in the property to be sold somewhat different than either of the parties do, and

in light of the way I see it, the Estate may not want to invite the Objectors or others to lay

claim to parts of the Estate's proceeds.  And more importantly, I am not in a position to

issue the channeling injunction that is an element of the Settlement.

      I would see nothing wrong with a settlement that happened to give Adelphia a

head start in getting policy proceeds that might otherwise be claimed by the Objectors.

But at this stage of the Adelphia cases, with Adelphia having successfully reorganized

and with Adelphia having no more than a monetary interest in recovering losses and

expenses occasioned by the conduct of the Rigases and their confederates, I believe that I

should not interfere with proceedings before Judge Baylson in the related litigation now

pending in the Eastern District of Pennsylvania.  And aside from matters that might

inform the exercise of my discretion in areas where I have discretion, I believe that a

channeling injunction of the type requested here cannot be issued in light of current

Second Circuit authority, if it ever could have been.

      Though I would readily approve a settlement with these monetary terms with the

understanding that the requested channeling injunction would not be issued, I cannot

unilaterally rewrite the Settlement, and it is up to the Settlement parties to determine

whether they would agree to it or a variant without that protection.  Accordingly, I am

denying approval of the Settlement on its existing terms.  This disapproval is without

prejudice to a request for a modified settlement that does not embody the requested

channeling injunction.  The following are my Findings of Fact and Conclusions of Law in

connection with this determination.

Findings of Fact

*A. The D&O Policies*

In 2001, Adelphia purchased three Directors and Officers Liability Insurance Policies (the "Policies"), each covering a period of December 31, 2000 though December 31, 2003:

(1) a D&O policy issued by Associated Electric & Gas Insurance Services, Ltd. ("AEGIS"), which provides a primary layer of coverage in the amount of $25 million;

(2) an excess policy providing coverage in excess of $25 million in primary coverage, issued by Federal Insurance Company, with coverage of up to $15 million; and

(3) another excess policy, issued by Greenwich Insurance Company, with coverage of up to an additional $10 million.

Thus, the Policies provide primary and excess coverage in the aggregate amount of $50 million.

The Policies cover:

(a) Adelphia's officers and directors for certain types of liabilities and associated defense costs if not indemnified by Adelphia;

(b) Adelphia itself, for sums paid to indemnify officers and directors for certain types of liabilities and associated defense costs; and

(c) Adelphia itself, for defense costs it incurs and for sums it becomes liable to pay as a result of securities claims against it.

The claims of directors and officers and Adelphia are paid on a "first come first serve"

basis.[4]

### B.  Actions against the Rigases

John Rigas and his sons Timothy, James and Michael Rigas (the "Rigases") are

former directors and officers of the parent Adelphia Communications Corporation and

most of its subsidiaries.  The Rigases (and Michael Mulcahey, a high-ranking employee

in Adelphia's accounting department) were arrested in connection with a criminal

complaint filed by the United States Attorney for the Southern District of New York

charging them with bank, securities and wire fraud.  John and Timothy Rigas were

convicted and Michael Rigas ultimately pled guilty to a lesser criminal charge.  Mulcahey

was acquitted of all criminal charges, and James Rigas and Venetis[5] were not charged

with any crimes—though like all of the other Objectors, they were named as defendants

in civil litigation.  All of the Objectors, in their capacities as former officers and directors

of Adelphia, have been sued in numerous class action suits and individual securities

actions.

On July 24, 2002, Adelphia itself commenced an adversary proceeding against the

Rigases, numerous entities owned or controlled by them, and former accounting

employees,[6] asserting numerous claims, most significantly for breach of fiduciary duty

and unjust enrichment.  In April 2005, Adelphia and the Rigases entered into a settlement

agreement under which the Rigases forfeited to Adelphia assets valued at approximately

---

[4]     These policies do not have a "priority of payments" endorsement, which provides that payments
on account of the defense costs of directors and officers come ahead of payments for
indemnification coverage and/or entity coverage.

[5]     Venetis, who is married to John Rigas's daughter Ellen Rigas Venetis, was a director.

[6]     *See Adelphia Communications Corp. v. Rigas, et al.*, Adv. Pro. No. 02-08051, in this Court.

$1.6 billion, and Adelphia covenanted not to sue or bring any claim against the Rigases and not to oppose payment of defense costs by the Insurers to the Rigases under the D&O Policies.

### C. Debtors' claims under the Policies

Adelphia has presented the Insurers with claims for more than $66 million under the Policies, including defense costs incurred by Adelphia and defense costs incurred by individual directors and officers that Adelphia paid pursuant to corporate indemnity obligations.  Also, pursuant to Adelphia's settlement with the DoJ and SEC, Adelphia has agreed to pay $715 million to the United States, which will be used to compensate victims of the Rigas fraud for losses.  Arguing that Rigas fraud excused them from paying under the policies, the Insurers denied coverage for any of the above-mentioned losses.

### D. Rescission Claims by the Insurers

On September 24, 2002, the Insurers commenced a lawsuit (the "Coverage Action") in the United States District Court for the Eastern District of Pennsylvania against certain directors and officers of Adelphia who received a notice of rescission.[7] The Coverage Action has been assigned to District Judge Michael Baylson.  While the Insurers did not initially name Adelphia itself as a defendant, they later sought relief from the stay in this Court to provide Adelphia with notice of rescission and to join it in the Coverage Action.[8]  The Insurers seek a declaration in the Coverage Action that the Policies are rescinded and void *ab initio* with respect to the individuals who received

---

[7]     *Associated Elec. & Gas Ins. Servs. v. Rigas, et al.*, No. 02-7444 (E.D. Pa.) (the "Coverage Action").

[8]     The Insurers' renewed motion to lift the stay was continued with consent of the parties to an unspecified date.

notice of rescission, on the ground that the Policies were allegedly issued in reliance on

warranty statements, financial documents and SEC filings that were false and misleading

as a result of the Rigases' misconduct.  The Insurers also have refused to cover Adelphia

for payments made to indemnify any of the affected parties for their defense costs.  In the

alternative, the Insurers seek a declaration that the Policies do not provide coverage for

any lawsuits brought against the defendants, or certain of them, relating to the

mismanagement and "looting" of Adelphia, and that exclusions under the Policies are

binding.

   The Coverage Action, while still pending, has been put on hold by reason of this

Court's needs.  Proceedings in the Coverage Action to rescind the Policies as against

Adelphia itself have been stayed under section 362(a)'s automatic stay, and most other

proceedings in the Coverage Action, involving the rescission and other claims against the

Directors and Officers in the Coverage Action, have been stayed by section 105(a) relief I

granted by supplemental order.

   Upon a motion by the Rigases for partial summary judgment, Judge Baylson

ordered AEGIS to advance defense costs incurred by the Rigases and others pending a

determination of rescission or coverage.[9]  The Rigases and others subsequently have

sought and obtained additional advances, in $300,000 increments, which are to be repaid

to AEGIS if it is determined that its insurance policy is rescinded or otherwise does not

cover some or all of the advanced defense costs.  As of November 15, 2006, those

advances totaled almost $9 million[10]  After the Estate's motion for approval of the

Settlement was briefed and argued, James and Michael Rigas sought an order from this

---

[9]    *See Associated Elec. & Gas Ins. Servs., Ltd. v. Rigas*, 382 F.Supp.2d 685, 702.

[10]    More precisely, $8,994, 699 (*see* Motion at 3).

Court authorizing the advance of an additional $300,000 each, along with catch-up payments for other officers and directors.

*E.  The Settlement and Sale of Policies*

In November 2006, Adelphia entered into the Settlement with the D&O Insurers that is the subject of this motion.  The Settlement provides that Adelphia will sell the three Policies pursuant to section 363(b) of the Code back to the Insurers for $32.5 million—consisting of approximately $23.5 million in cash, to be deposited in an interest-bearing account, and an assignment of AEGIS's rights to recover the approximately $9.0 million advanced to date, to be delivered to a litigation trust.  The trustee of the litigation trust will assess and prosecute the rights to reimbursement of advancements, and will be authorized to retain counsel for submission of applications for compensation to this Court.  Proceeds paid into the interest bearing account will be released only upon further order of the Court.  The trustee's and legal fees and any other expenses shall be reimbursed from $500,000 reserved from the cash proceeds of this sale.

The Settlement and Purchase Agreement provides that the sale of the Policies to the Insurers is free and clear of all claims and interests in the Policies.  All such claims and interests shall instead attach to the proceeds of the sale, with the same validity and priority as they had in the Policies.  The Settlement and Purchase Agreement provides for a mutual release of claims between Adelphia and the Insurers.

Significantly, the Settlement is contingent on the entry by this Court of an order providing that no party can assert claims with respect to the Policies against the Insurers, and on the issuance of a channeling injunction prohibiting the prosecution of any such claims against the Insurers.

<u>Discussion</u>

Approval of the Debtors' motion requires consideration of the usual factors associated with a bankruptcy court's consideration of the desirability of a settlement, under Fed. R. Bankr. P. 9019 and related caselaw; consideration of the Debtors' use of section 363 as the means to effect the Settlement; and consideration of the propriety of issuance of the channeling injunction that would be issued in connection with the Settlement.  I see no problems with the first two aspects, but am not in a position to issue the channeling injunction, all for reasons described below.

<u>I.</u>

I discussed the standards applicable to approval of a settlement in earlier decisions in the *Adelphia* cases, most notably in my decisions on Adelphia's settlement with the SEC and DoJ,[11] and the global settlement underlying Adelphia's recently confirmed plan,[12] and need not discuss them at comparable length here.  As noted there and in many cases elsewhere, the legal standard for determining the propriety of a bankruptcy settlement is whether the settlement is in the "best interests of the estate."[13]  To determine that a settlement is in the best interests of the estate, the Supreme Court held in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*[14] that

---

[11]   *In re Adelphia Communications Corp.,* 327 B.R. 143 (Bankr.S.D.N.Y. 2005) (approving settlement in this Court), *adhered to on reconsideration,* 327 B.R. 175, *aff'd* 337 B.R. 475 (S.D.N.Y. 2006) (Kaplan, J.), *appeal dismissed,* No. 06-1417 (2d Cir. Dec. 26, 2006) and *aff'd on cross-appeal,* No. 06-1738 (2d Cir. Dec. 26, 2006) (the "*Adelphia DoJ/SEC Settlement Decision*").

[12]   *In re Adelphia Communications Corp.*, 2007 Westlaw ------, 2007 Bankr. LEXIS -------, Slip Opinion, No. 02-41729, ECF #12920 (Bankr. S.D.N.Y. Jan. 3, 2007) ("*Adelphia Confirmation Decision*").

[13]   *In re Purofied Down Prods. Corp.,* 150 B.R. 519, 523 (S.D.N.Y. 1993) (Leisure, J.) ("*Purofied Down Products*") (citations omitted).

[14]   390 U.S. 414 (1968).

-10-

the settlement must be "fair and equitable."[15]  Such a finding is to be based on "the

probabilities of ultimate success should the claim be litigated," and:

> an educated estimate of the complexity, expense,
> and likely duration of such litigation, the possible
> difficulties of collecting on any judgment which
> might be obtained, and all other factors relevant to a
> full and fair assessment of the wisdom of the
> proposed compromise.  Basic to this process in
> every instance, of course, is the need to compare the
> terms of the compromise with the likely rewards of
> litigation.[16]

Here getting this much money, in exchange for give-ups to the Insurers of the

Estate's ability to get more, plainly is in the best interests of the Adelphia Estate.  The

Estate has made substantial expenditures that are reimbursable under the Policies if the

Policies are not rescinded.  But the Estate is subject to a risk it will lose the right to that

reimbursement as a consequence of Rigas misconduct.  Though I can see advantages to

the Settlement from the Insurers' perspective as well, this is a very sensible settlement

from the perspective of the Estate.

## II.

The next issue is not as plainly one-sided, but here too the Estate has satisfied me

that it is on satisfactory statutory ground in invoking section 363 in selling its interests in

the policies and their proceeds to the Insurers for the Settlement amount.  But while

invocation of section 363(b) and section 363(m) is appropriate, I regard subsection 363(f)

as inapplicable.

---

[15]    *Id.* at 424.

[16]    *Id.* at 424-25. *See also Purofied Down Products, 150 B.R. at 523; Official Comm. of Unsecured
Creditors of Int'l Distrib. Ctrs., Inc. v. James Talcott, Inc. (In re Int'l Distrib. Ctrs., Inc.),*
103 B.R. 420, 422 (S.D.N.Y. 1989) (Conboy, J.) (determination as to whether proposed
compromise is fair and equitable requires exercise of informed, independent judgment by court).

Under Bankruptcy Code section 363(b), after notice and a hearing, an estate can sell estate property, such as its interests in the policies and their proceeds, other than in the ordinary course of business.  Then, section 363(f) of the Code provides, in relevant part:

> (f) The trustee may sell property under subsection (b) … of this section free and clear of any interest in such property of an entity other than the estate, only if--
>
>> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>>
>> (2) such entity consents;
>>
>> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>>
>> (4) such interest is in bona fide dispute; or
>>
>> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Then, section 363(m) provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

I believe that the Estate can invoke sections 363(b) and 363(m), if it wishes to, but see no occasion for invocation of section 363(f).

Strictly speaking, the Estate is selling its interests in both the policies and their proceeds. The policies are the property solely of the Adelphia Estate—or arguably, solely of the Adelphia Estate and Adelphia's former subsidiary Adelphia Business Solutions (often called ABIZ, and now called TelCove), which has voiced no objection to the sale. The Rigases do not have an ownership interest in the policies themselves; the Rigases have *contractual rights* under the policies, but that is a different issue. I agree with the Debtors' contention[17] that the Rigases and others with indemnification and defense costs rights under the policies are simply third party beneficiaries of the policies.

Consistent with the bulk of the caselaw,[18] my earlier decisions[19] and even the *Adelphia District Court Decision*,[20] I believe (disagreeing, in material part, with the Rigases' contention that while contractual rights under the policies are Estate property, the policies themselves are not[21]) that the policies *are* property of the Estate—because, *inter alia*, they provide coverage the Estate can use; the Estate is worth more with them than without them; and because the policies are something that someone may pay for. A sale incident to a settlement is still a sale even if the Insurers are in a unique position to

---

[17]    *See* Arg. Tr. 24.

[18]    *See, e.g., MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 837 F.2d 89, 92 (2d Cir. 1988), *cert. denied,* 488 U.S. 868 (1988) ("*Johns-Manville*"); *In re Louisiana World Exposition,* 832 F.2d 1391, 1399 (5th Cir. 1987); *Minoco Group of Cos., Ltd. v. First State Underwriters Agency of New England Reinsurance Corp. (In re The Minoco Group of Companies, Ltd.),* 799 F.2d 517, 519 (9th Cir. 1986); *A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.),* 788 F.2d 994, 1001 (4th Cir. 1986); *In re CyberMedica, Inc.,* 280 B.R. 12, 16-17 (Bankr. D.Mass. 2002).

[19]    *In re Adelphia Communications Corp.,* 285 B.R. 580, 590 (Bankr. S.D.N.Y. 2002) ("*Adelphia Initial D&O Decision*"), *rev'd* 298 B.R. 49 (S.D.N.Y. 2003) *("Adelphia District Court Decision"), on remand, In re Adelphia Communications Corp.,* 302 B.R. 439 (Bankr. S.D.N.Y. 2003) *("Adelphia Remand D&O Decision"); Adelphia Remand D&O Decision,* 302 B.R. at 442.

[20]    298 B.R. at 52-53.

[21]    *See* Arg. Tr. 73-74.

-13-

make the purchase, and even if there are no other bidders with the ability or motivation to do so.

The more significant and difficult issue results from the parallel claims of the Estate and others, including the Objectors, to policy proceeds. The Estate, the Objectors and others (such as independent directors) all have claims to policy proceeds, and the claims of all of them are their respective property. It is clear that the Estate *now* has an interest in policy proceeds, if it did not always have such.[22] Subject to any contractual defenses of the Insurers, Adelphia has an interest in the policy proceeds at least up to the covered losses Adelphia now has suffered—said to equal $66 million—for which Adelphia would be entitled to payment under the policies. And since that amount exceeds the amount remaining unpaid under the policies, it can fairly be said that Adelphia has an interest in the entirety of the policy proceeds remaining unpaid. The Rigases and other directors *also* have or may have interests in policy proceeds (likewise subject to any contractual defenses of the Insurers), which are in most respects separate in origin and rationale, but which are claims to the same "pot."

---

[22]     As set forth in my decisions in the *Adelphia Initial D&O Decision* and the *Adelphia Remand Decision*, I was and remain of the view that the Debtors always had such an interest. But in his decision in the *Adelphia District Court Decision*, a judge of the district court in this district did not agree with my view. And while the *Adelphia District Court Decision* has been criticized, *see* Douglas, "D & O Policy Proceeds Not Estate Property," 2 *Business Restructuring Review* 4, 8 (Oct. 2003), and Case Note, 49 *N.Y. L. Sch. L. Rev.* 1007, 1016 (2003), the *Adelphia District Court Decision*, reversing this Court in that regard, is of course binding in the *Adelphia* and *Adelphia Business Solutions* cases.

Under the district judge's rationale, the estate did not yet have an interest in the policy proceeds, and would only have such an interest at a later time. *See Adelphia District Court Decision*, 298 B.R. at 53 ("Here, as far as I can tell, Adelphia does not have a property interest in the proceeds of the insurance policies yet. Although the D & O policies reimburses each estate to the extent that the estate advances funds because of the indemnification obligations in the charter or by-laws, ... '[i]t has not been suggested that any of the Debtors has made any payments for which it would be entitled to indemnification coverage, or that any such payments are now contemplated.'") But even under the district judge's rationale, the Estate now has an interest in the policy proceeds. Events have transpired under which its heretofore contingent interest in policy proceeds has blossomed. The Estate has now made payments for which it is entitled to indemnification under the policies, subject to any contractual defenses the Insurers might have.

Under these circumstances, the pot of available proceeds from the Insurers, like the Policies themselves, is property in which the Estate has an interest, that the Estate can sell to anyone who will pay for it. That pot (or a subset of it) is property in which the Objectors also have an interest (albeit one at least presently of lesser size), and the Objectors (and others who may similarly have claims to it) could likewise at least theoretically sell their interests—though given the history of Rigas past conduct (and the fact that claims to proceeds remain subject to the Insurers' contractual defenses), any potential buyer of the Objectors' interests might well want to think twice before doing so.

But several things have become clear (as facts, mixed questions of fact and law, or legal conclusions, as the case may be) with respect to the proceeds pot, and the potential sale (by anyone) of claims to it. One is that the proceeds pot is not fixed in size. The size of the available proceeds pot has already decreased, as the Rigases and others have already depleted it, to the extent of about $9 million, by claims for defense costs. And the available proceeds pot would decrease in size further as future payments are made under the Policies, to satisfy the claims of the Estate, the Objectors, or others with claims to policy proceeds.

Another is, as the Rigases acknowledged (and argued as supporting points they wished to make) that Pennsylvania is a "first-come, first-serve[d] state."[23] That has the effect that persons or entities can make claim to policy proceeds without securing the permission of others, who might also have claims to policy proceeds, to do so. It also means (as the Rigases argued) that claims to policy proceeds are not joint, but are independent claims. But it also means that Adelphia can make claim for, and can settle

---

[23]    *See* Arg. Tr. 70.

-15-

its claims for, its entitlement under the Policies (which are no less entitled to payment than any Objectors' claims are), without the consent of the Objectors, even if that reduces policy proceeds remaining for the Objectors.

Thus there is no need or occasion for the Estate to invoke section 363(f)(4). The Estate's interests in neither the Policies nor the Policies' proceeds is in bona fide dispute, at least with the Objectors, whose "interest" the Estate proposes to attach to sale proceeds. The Objectors have no interest, disputed or otherwise, in the Estate's Policies, nor to the Estate's entitlement to policy proceeds, and have no claim to either of them. To the extent there are disputes, they are between the Estate and the Insurers, on the one hand, and the Objectors and the Insurers, on the other. The Objectors' entitlements, if any, to policy proceeds are not to the *Estate's* recovery of policy proceeds, but rather to whatever proceeds are available when any of the Objectors makes a request—even if that is only what is left after the Estate gets whatever policy proceeds to which the Estate is entitled.

Similarly, while the Objectors' claims to their own policy entitlements, if any, might be satisfied by cash—a matter relevant under Code section 363(f)(5)—their right to any cash would be from the *Insurers*, as a contractual entitlement, not from the property being sold, as a kind of *in rem* right, and would be independent of anything the Estate sought or received. Thus the "entity other than the estate" [24] (*i.e.*, an Objector) has no interest in the property of the estate being sold. Speaking of compelling the Objector "to accept a money satisfaction of such interest"[25] is not a meaningful concept in this context.

---

[24]    *See* Bankruptcy Code section 363(f).

[25]    *See* Bankruptcy Code section 363(f)(5).

Finally, if (as now is proposed) the Settlement were to limit the Objectors to recovery from a *corpus* less than the total remaining under the Policies, I do not believe that such a transaction would provide adequate protection to the Objectors and others with rights under the Policies.  Some of the Objectors might have debatable claims to payments under the Policies for anything beyond amounts Judge Baylson already authorized (not to mention beyond the discounted amount the Estate would get under the Settlement), but consideration of these and similar matters is a determination for Judge Baylson to make, and not this Court.

Accordingly, I will permit the Estate to sell whatever rights it has to the Insurers, under section 363 of the Code and not just Bankruptcy Rule 9019, but I will not authorize invocation of section 363(f).  Similarly, I will not limit the rights of the Objectors to prosecute claims against the Insurers under the 363(f) rationale that the Court has authorized a sale "free and clear" of Objector claims.

## III.

The motion also calls for this Court to issue a channeling injunction, prohibiting the Objectors from asserting claims against the Insurers for Objectors' entitlements (if any) under the Policies.  While I am fully sensitive to the importance of this request to the Insurers, the Estate, and to the underlying Settlement, I believe that I cannot issue such relief.

Although the channeling injunction proposed here is not to be issued pursuant to a reorganization plan, it shares many of the characteristics (and even more of the important ones) of the "third-party releases" and exculpation addressed by the Second Circuit in its

-17-

recent decision in *Metromedia*,[26] and my earlier rulings in the *Adelphia Confirmation Decision*.[27]  The proposed channeling injunction would, wherever applicable, proscribe litigation between two non-debtor entities, with respect to independent contractual rights they have against each other, and would in substance release the Insurers from further obligations to the Objectors and to other officers and directors after the Estate's sale of the Policies.

Channeling injunctions are permissible under some circumstances, and indeed perform an essential role in some cases—as, for example, mass tort cases, where a reorganization plan can be confirmed if, but only if, insurers who contribute to a trust or fund to satisfy the tort claims have the comfort that they will not thereafter be sued and asked to contribute even more.  And there is precedent supporting transactions *somewhat* similar to the one proposed here.  In *Johns–Manville*, the Second Circuit approved a settlement providing for the debtor to sell a tort claims policy that was property of the Johns Manville bankruptcy estate back to the insurer, free and clear of any claims, liens, encumbrances and interests, where it found that that the interests of any co-insureds under the policy were adequately protected.[28]  And in *Burns and Roe Enterprises*, Judge Gambardella of the District of New Jersey entered an order approving a settlement involving the sale of the debtors' interests in tort claims insurance policies that, with some exceptions, was free and clear of interests under section 363(f), and which was

---

[26]     *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),* 416 F.3d 136 (2d Cir. 2005) ("*Metromedia*").

[27]     *See Adelphia Confirmation Decision*, *supra* n.12, Slip Opinion at 217-218.

[28]     *See Johns-Manville*, 837 F.2d at 94.

-18-

accompanied by a channeling injunction prohibiting parties asserting claims to policy

proceeds from proceeding against the *Burns and Roe* insurers.[29]

But neither Johns Manville nor Burns and Roe involved a D&O policy, and more

fundamentally, each of *Johns-Manville* and *Burns and Roe* was an asbestos case,

attempting to deal with the unique problems present in mass torts cases—where it is often

desirable, if not essential, to tap insurance policies to help create trusts or funds to

provide a funding resource for the present and future tort claims that must be satisfied,

and where addressing issues of that character is an important, if not wholly dominant,

aspect of the bankruptcy case.[30]  The Policies here, while large in size and significant to

the Estate in helping satisfy its massive liabilities, are not nearly as important to the

Debtors' chapter 11 case as they were in *John-Manville* and *Burns and Roe*.

Additionally, the applicable law authorizing the approval of channeling

injunctions and third party releases has become increasingly restrictive, and now permits

such relief only under limited circumstances—most significantly, where they are critical

to the reorganization of the debtor.  In a decision—somewhat restrictive in itself—that

guided the bench and bar for most of the last 15 years, the Second Circuit declared that

"[i]in bankruptcy cases, a court may enjoin a creditor from suing a third party, *provided*

---

[29]     *See In re Burns and Roe Enterprises, Inc.*, Case No. 00-41610 (RG) (Bankr. D.N.J. Feb. 17, 2005), ¶¶ 8,9.  Unfortunately, those citing the *Burns and Roe* order, while submitting it in full, failed to comply with other aspects of the letter and spirit of my Case Management Order #3, dated July 26, 2004 (ECF #5622), ¶27—applicable to instances when orders (as contrasted to opinions) are submitted as authority—which requires essential background with respect to the order relied on.  In particular, they failed to advise me as to the extent to which relief granted in that order was opposed (and as to what matters), the extent to which the *Burns and Roe* court was asked to consider, and did substantively consider, the channeling injunction aspects of that order, and, as potentially quite relevant here, the circumstances and rationale with respect to carving "Excepted Insureds" out of the scope of the channeling injunction.

[30]     Indeed, the Code was amended in 1994 to address the particular concerns present in asbestos cases, establishing procedures modeled on those pioneered in *Johns-Manville*.  *Burns and Roe,* a post-amendments asbestos case, involved a settlement approved, and channeling injunction issued, in the context of the new legislation.

-19-

*the injunction plays an important part in the debtor's reorganization plan.*"[31]   And as

discussed at considerable length in the *Adelphia Confirmation Decision,*[32] the Second

Circuit in *Metromedia*[33] required the bankruptcy community in this Circuit to reconsider

the heretofore fairly common issuance of third-party releases—making it clear that such

releases are now proper "only in rare cases,"[34] under circumstances that may be

characterized as "unique."[35]

Here Adelphia has already reorganized and distributed the overwhelming bulk of

its value to its creditors.  While securing the consideration that is part of the proposed

Settlement will plainly benefit Adelphia creditors, completion of the Settlement is hardly

a "make or break" requirement for a successful reorganization.  I cannot make a finding

that the issuance of the requested channeling injunction is essential (or even important) to

a successful reorganization.  Subject to their work being undone on appeal, the Debtors,

Creditors' Committee and other Plan Proponents reorganized the Estate quite well

without it.[36]

---

[31]    *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),*
       960 F.2d 285, 293 (2d Cir. 1992) (emphasis added).

[32]    *See* Slip Opinion at 217-228.

[33]    *See* 416 F.3d at 142.

[34]    *Id.* at 241.

[35]    *Id.* at 242.

[36]    In this Decision, I have spoken of technically distinct concepts relating to channeling injunctions
       (variously issued before or upon reorganization plan confirmation), and third party releases and
       exculpation in reorganization plans.  But they share the common characteristic of providing,
       expressly or in substance, protection to nondebtors against claims by other nondebtors, when, in
       the absence of a release or injunction, the nondebtors could litigate and enforce any otherwise
       valid legal rights against each other.  The considerations are sufficiently similar to warrant reliance
       on the nondebtor release doctrine articulated in *Metromedia* and in the *Adelphia Confirmation
       Decision*, and for me to necessarily regard *Metromedia* as applicable in the present context as
       well.

       In contexts apart from settlements and requests to confirm a reorganization plan—often in much
       earlier stages—I and other bankruptcy judges have not infrequently issued injunctions, typically
       under section 105(a), to enjoin litigation against nondebtor third parties.  But injunctions of that

Finally, payment in full (or provision for payment in full) to affected creditors has

been another basis historically found to justify channeling injunctions.[37]  And if the *full*

amount of the remaining insurance proceeds had been used to provide a trust or fund

from which the Objectors might secure their recoveries, that might then justify a

channeling injunction prohibiting persons or entities from suing the Insurers to secure

more.  But here the fund has been decreased in size not just by the $9 million already

drawn upon, but also by the discount embodied in the Settlement deal—requiring persons

with claims under the policies to proceed against a fund further diminished size, to their

detriment, when they have independent rights against the Insurers for the full amount left.

Providing a fund of lesser size is inconsistent with the requirement that the alternate fund

provide adequate protection.

## IV.

Other contentions by the Objectors must be rejected, or are not yet ripe.  One such

contention is that the proposed Settlement represents a violation of provisions of the

settlement agreement between the Debtors and the Rigases, entered into in April 2005,

under which the Debtors agreed not to oppose payment of defense costs by the Insurers to

the Rigases under the Policies.  I agree that this agreement must be honored by the Estate,

but do not see a violation of that undertaking based on anything the Estate has done yet.

---

character historically have likewise been issued to facilitate reorganization, and have been limited
in scope and duration appropriate to achieve that end.  *See, e.g.*, *Adelphia Communications Corp.
v. The America Channel, LLC* (*In re Adelphia Communications Corp.*), 345 B.R. 69, 85-86
(Bankr. S.D.N.Y. 2006) (where I enjoined antitrust litigation in a federal district court that had
been commenced against Time Warner and Comcast to block the sale of Adelphia's business that
would be the underpinning of the Debtors' reorganization).  In the *Adelphia* case and elsewhere, I
have also issued injunctions staying third party litigation for a matter of months to permit debtor
personnel or their counsel to focus on matters important to reorganization efforts.  But injunctions
of that character at least normally were not permanent, and were limited in duration necessary to
achieve the debtors' reorganization needs.

[37]    *See Metromedia*, 416 F.3d at 142-143; *Class Five Nev. Claimants v. Dow Corning Corp. (In re
Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir. 2002).

And while measures by the Estate to secure payments under the Policies to which the Estate itself is entitled would at least seemingly not be violative of that undertaking either, it is sufficient to await any future action proposed by the Estate and then see whether or not it should be deemed to be violative of that obligation.

Similarly, the Objectors argue that the Settlement provides for the assignment of the Insurers' rights against the Rigases to the Debtors, and that any such assignment would be futile, as the Debtors and their assigns were precluded by the terms of the Adelphia-Rigas settlement agreement from suing the Rigases.  While I am inclined to agree that this agreement too must be honored by the Estate and its assigns (and do not now understand the basis for sidestepping this obligation), it is sufficient to await future events, and then determine whether or not the Debtors or their assigns have acted inconsistently with this obligation.

Finally, the Rigases, referring to Judge Baylson's earlier determination, argue that the motion "clearly violates an existing district court judgment regarding such proceeds."[38]  Whether or not the motion (or the relief sought under it) would do so would depend on whether I issued the *channeling injunction* (which I will not do), or whether the Estate thereafter were to use the settlement approval as a means to collaterally attack or circumvent Judge Baylson's rulings.  Ultimately such concerns are academic in light of my rulings today.  I doubt that I have the power—and in any event am not of the mind—to authorize the nullification of any ruling by Judge Baylson, either directly or indirectly.  By declining to issue the channeling injunction, I have gone at least a long way toward avoiding a collateral attack on Judge Baylson's ruling, or tying his hands

---

[38]    Rigas Obj. ¶2.

with respect to matters before him.  And if further matters with the potential of impinging

on Judge Baylson's jurisdiction come before this Court, I will likewise be sensitive to

such concerns.  But I must hasten to add that I do not understand Judge Baylson to have

ruled that the Rigases and other Objectors are the only ones to have the right to avail

themselves of policy proceeds, or to have a priority in making claims under the policies.

And the whole point of my earlier orders with respect to the stay was to protect the

Estate's legitimate interests in that regard.

V.

After the filing of the motion, the Rigases submitted for my approval an order

authorizing further relief from the stay and my earlier orders to authorize additional

draws of $300,000 each for Michael and James Rigas, along with catch-up payments to

former outside directors of the Debtors unaffiliated with the Rigases.  It is undisputed that

as of November 15, 2006, advancements under the policies to the Rigases and others

already have totaled nearly $9 million.[39]

At this point, and in light of this ruling, I believe that I should not be authorizing

further disbursements to Michael and James Rigas, and/or the others, without giving a

chance for the Estate to be heard, and to address, if and to the extent appropriate, this

ruling or other relevant considerations.  After considering the effect, if any, that any of

those matters might have on the Rigases' and others' requests, counsel for the Estate is to

consult with counsel for the Rigases and anyone else seeking further payments.  If there

is disagreement as to whether it is appropriate to grant further relief from the stay and my

earlier orders, and/or to authorize still more funding at the $300,000 per request level,

---

[39]     *See* Motion at 3 (advancements totaled $8,994,698.84).

counsel are to agree on an appropriate schedule for briefing (and, if necessary, evidence)

to the end that I can decide the matter.

Conclusion

The motion for approval of the Settlement is denied.  This determination is

without prejudice to a motion for approval of a modified settlement or transaction

consistent with this ruling.

SO ORDERED.

Dated: New York, New York                    _s/Robert E. Gerber_____
       March 6, 2007                              United States Bankruptcy Judge