UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ADELPHIA COMMUNICATIONS CORP., *et al.*, | ) |  |
|  | ) | Case No. 02-41729 |
| Debtors. | ) | (Jointly Administered) |

_____

### DECISION ON DETERMINATION OF PURCHASE PRICE TO BE PAID BY THE MECKLENBURG-IREDELL CONSORTIUM FOR THE PORTION OF THE DEBTORS' CABLE SYSTEMS THAT SERVES THE CONSORTIUM COMMUNITIES

APPEARANCES:

MILLER & VAN EATON
Counsel for Charlotte-Mecklenburg Office of Cable & Franchise Management
1155 Connecticut Ave., N.W.
Suite 1000
Washington, D.C. 20036
By:     Kenneth Brunetti, Esq.
        Nicholas Miller, Esq.
        William Malone, Esq.

HOGAN & HARTSON L.L.P.
Counsel for Time Warner NY Cable LLC
555 13th St. N.W.
Washington, D.C. 20004
By:     Gardner Gillespie, Esq.
        Paul Werner, Esq.
        Jake Shields, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In this contested matter in the jointly administered cases of Adelphia

Communications Corporation and its subsidiaries (the "Debtors"), the Court has before it

the determination of the purchase price to be paid by the County of Mecklenburg, North

Carolina and the towns of Cornelius, Davidson, Huntersville, Mooresville, and Troutman,

all of which are governmental entities in the State of North Carolina (collectively, the

"Consortium), to exercise rights of first refusal to purchase the cable systems that serve

the Consortium communities (the "Consortium Systems"). The Consortium Systems

were included in a wide range of assets that Time Warner Cable and Comcast

Corporation offered to buy from the Debtors. As described more fully below, the Court

concludes that the Consortium must match Time Warner Cable's and Comcast's offer of

$3,810 per subscriber.

The following are the Court's Findings of Fact and Conclusions of Law in

connection with its determination.

### Facts

Until recently, the county and towns comprising the Consortium operated as local

franchising authorities ("LFAs") under state and federal law.[1] In North Carolina, cable

franchises were awarded by LFAs, not the state.[2] Pursuant to their authority under state

---

[1]     *See* Title VI of the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 (1984) *et seq.*
(establishing guidelines for the exercise of federal and state authority with respect to the regulation
of cable systems).

[2]     The recently repealed North Carolina General Statutes § 153A-137 authorized North Carolina
counties to grant a franchise to operate a cable television system. It provided:

> Consistent with the rules and regulations of the Federal
> Communications Commission, a county may by ordinance
> grant upon reasonable terms franchises for the operation of
> cable television systems within any portion of the county,
> exclusive of incorporated areas and make it unlawful to
> operate such a system without a franchise.

Similarly, the recently repealed North Carolina General Statutes § 160A-319 granted cities, towns
and villages the same authority. It provided:

> (a)     A city [defined in North Carolina General Statutes § 160A-1
> as including the terms "town and village"] shall have authority
> to grant upon reasonable terms franchises for the operation
> within the city of any of the enterprises listed in G.S. 160A-
> 311 [which list includes "cable television systems"] . . . .
> [C]able television franchises shall not be granted for a period
> of more than 20 years.

-2-

law, the members of the Consortium have passed substantially identical ordinances to

regulate cable communications in their jurisdictions (the "Cable Ordinances").[3]  The

LFAs also have entered into substantially identical franchise agreements (the "Franchise

Agreements") with Prestige Cable TV of North Carolina, Inc., an Adelphia subsidiary

("Prestige").[4]  The Franchise Agreements authorize Prestige to provide cable services

within the geographic areas governed by the Consortium.  The Franchise Agreements

specifically reference the Cable Ordinances, and state that the franchises were granted

under the "terms and conditions" contained in the ordinances.[5]

In particular, the sections within the Franchise Agreements concerning the

transfer or renewal of franchises incorporate by reference the Cable Ordinances,[6]

including the provision within the Cable Ordinances that provide the LFAs a right of first

refusal to purchase the cable system.   That provision reserves for the LFAs "the right of

---

Effective January 1, 2007, North Carolina General Statutes § 66-351 designates the Secretary of State the exclusive franchising authority in North Carolina.  After January 1, 2007, a county or city may not award or renew a franchise for cable service.

[3]     All the cable ordinances are entitled "Cable Communications Regulations," and are dated February 10, 2000.  *See* Mecklenburg Cable Communications Regulations (ECF #10935, Netzer Decl. Exh. 69); Cornelius Cable Communications Regulations; Davidson Cable Communications Regulations; Huntersville Cable Communications Regulations; Mooresville Cable Communications Regulations; Troutman Cable Communications Regulations.  The Cornelius, Davidson, Huntersville, Mooresville and Troutman ordinances were submitted to the Court in a statutory appendix to the LFAs' supplemental legal brief, dated June 9, 2006 (ECF #11184).

[4]     These six franchise agreements are practically identical and were all entered into with Prestige. *See* Mecklenburg County Franchise Agreement, dated April 4, 2000 (ECF #10935, Netzer Decl. Exh. 34); Troutman Franchise Agreement, dated April 6, 2000 (Netzer Decl. Exh. 35); Huntersville Franchise Agreement, dated March 20, 2000 (Netzer Decl. Exh. 36); Cornelius Franchise Agreement, undated, 2000 (Netzer Decl. Exh. 37); Mooresville Franchise Agreement, dated April 3, 2000 (Netzer Decl. Exh. 38); Davidson Franchise Agreement, undated, 2000 (Netzer Decl. Exh. 39).

[5]     Franchise Agreements, preamble.

[6]     The Franchise Agreements authorize Prestige to transfer the franchises "pursuant to the provisions of the [Cable] Ordinance and applicable state and federal laws."  *See, e.g.*, Mecklenburg County Franchise Agreement, § 6.1 (Transfer or Renewal of Franchise).

first purchase in any sale, transfer, lease, assignment or disposal of the system at a cost at least equal to a bona fide offer otherwise acceptable to the Grantee."[7]

On April 25, 2005, the Debtors entered into asset purchase agreements (the "APAs") with Time Warner NY Cable LLC ("Time Warner") and Comcast Corporation ("Comcast") for the sale of substantially all of the Debtors' assets.  The APAs required the Debtors to transfer the Franchise Agreements to Time Warner or Comcast.   The Consortium first filed an objection to the APAs before reaching a settlement agreement[8] that gave the Consortium the right to exercise its right of first refusal with respect to the sale of those assets covered by the Franchise Agreements.

Pursuant to the terms of the settlement agreement, the parties agreed that this Court would determine the dollar amount to be paid by a Consortium member in order to exercise its right of first refusal for a Consortium System.  That dollar amount will equal the price per subscriber set by this Court multiplied by the number of subscribers served by that Consortium System.[9]  Time Warner asserts that for the Consortium to exercise its right of first refusal, it must match the purchase price of $3,810 per subscriber that Time Warner claims was paid by Time Warner and Comcast to the Debtors in the APAs.  The

---

[7]     Cable Ordinances § 2.4.8.

[8]     The settlement agreement was dated July 28, 2006, and was approved by an order of this Court on August 16, 2006 (ECF #11817).

[9]     Although each of the individual members of the Consortium has an independent right of first refusal on its respective portion of the Consortium Systems and must make an individual determination on whether to exercise that right, the parties to the settlement agreement have agreed to make submissions as to an average cost per subscriber for the Consortium Systems as a whole.

Consortium argues that the price per subscriber was not clear in the APAs, and that the fair market value would more accurately represent the price to be paid.[10]

First, this Court will discuss rights of first refusal generally. Then, this Court will address whether Time Warner and Comcast made a "bona fide" offer. Finally, this Court will determine whether the Court should substitute a "fair value" price for the per subscriber price that was used by the seller and buyers under their agreement.

<u>Discussion</u>

<u>I.</u>

<u>Nature of Rights of First Refusal</u>

As stated above, the Consortium's Cable Ordinances contain provisions governing rights of first refusal that reserve "the right of first purchase in any sale, transfer, lease, assignment, or disposal of the system *at a cost at least equal to a bona fide offer otherwise acceptable to the Grantee*."[11] This Court recognized the enforceability of the Consortium's right of first refusal in its decision dated June 22, 2006.[12] By its terms, the Consortium's right of first refusal requires that the holder pay a purchase price "at least equal to a bona fide offer." The right of first refusal does not speak to paying market value; unless trumped by rules of law, the amount of "a bona fide offer" is controlling, and the holder is required to match the offer's price.

Caselaw supports a contractual interpretation of the Consortium's right of first refusal as a right to match and nothing more. The United States District Court for the

---

[10]    The Consortium initially pegged the fair market value per subscriber at $2,433 per subscriber, but later increased that amount to $2,670 per subscriber. Consortium Reply Brief, filed August 29, 2006, at 3 (ECF #11889).

[11]    Cable Ordinances § 2.4.8 (emphasis added).

[12]    *In re Adelphia Communications Corp.*, -- BR --, 2007 WL 64128, at *90 (Bankr. S.D.N.Y. Jan. 11, 2007) ("Decision on Local Franchising Authority Issues").

Western District of Virginia recently issued a ruling regarding the attempt by the City of

Martinsville and the County of Henry, Virginia to exercise rights of first refusal related to

the Adelphia bankruptcy.[13]  The court held:

> "The cable ordinances do not grant the City and the
> County the right to pay a fair value for the Adelphia
> cable television assets, much less a value they
> believe to be fair.  The ordinances only provide
> Martinsville Cable with the *limited right to match*
> what Time Warner and Comcast have offered,
> which it utterly failed to do."[14]

Federal court decisions have supported the view of rights of first refusal as rights

to match.  In *Miller v. LeSea Broadcasting, Inc.*, the Seventh Circuit, speaking through

Judge Posner, observed, "All [that a right of first refusal] entitles the holder to do is

match an offer from a third party should the grantor of the option be minded to accept

that offer."[15]  The Third and Fifth Circuits, respectively, have expressed similar

understandings of rights of first refusal, distinguishing them from "a right to first

negotiation,"[16] and recognizing that "the owner of a property subject to a right of first

refusal remains master of the conditions under which he will relinquish his interest, as

long as those conditions are commercially reasonable, imposed in good faith, and not

specifically designed to defeat the preemptive rights."[17]

The matching requirement exists to ensure that the seller can alienate the

encumbered property at the time and price of its choosing, either to a third party or to the

---

[13]     *Martinsville Cable v. Time Warner NY Cable, LLC*, 445 F.Supp.2d 668  (W.D.Va. 2006).

[14]     *Id.* at 679 (emphasis added).

[15]     *Miller v. LeSea Broad., Inc.*, 87 F.3d 224, 226 (7th Cir. 1996).

[16]     *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 141 (3d Cir. 2001).

[17]     *W. Tex. Transmission, L.P. v. Enron Corp.*, 907 F.2d 1554, 1563 (5th Cir. 1990).

rights holder.[18]  This requirement recognizes that rights of first refusal do not endow the

rights holder with the authority "[t]o require [the third party] to offer a price that [the

rights holder] would consider low enough to exercise successfully its right[s]."[19]

Several state court opinions share the same understanding of rights of first refusal

as rights to match, not rights to pay the fair market value of the property that is subject to

the right of first refusal.  The Massachusetts Supreme Court has observed that holders of

rights of first refusal do not have the right to purchase the property at a fair market price

because that would effectively "contradict[ ] the practical application of the right of first

refusal."[20]  A right of first refusal means "that a third party, not the holder of the right,

will dictate the price, and the holder therefore runs the risk that the third party will agree

to a price that is above market value, or that is above what the holder is willing and able

to pay."[21]  Other state courts have refused to remand for determination of fair market

value when the third party offeror allocated a reasonable price to the property subject to

the right of first refusal.[22]

A right of first refusal entitles the holder to match any subsequent offers for the

property before the third party offeror can complete its transaction.  The transaction with

the third party offeror, not the market or the rights holder, dictates the terms and price of

the right to match.  Put plainly, the Consortium cannot second-guess Time Warner's

---

[18]     *See LeSea Broad.*, 87 F.3d at 226 (purchase rights are nothing more than the "option [to buy]
        when the grantor decides to sell on the terms offered by the third party").

[19]     *Uno Rests., Inc. v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 963 (Mass. 2004)

[20]     *Id.*

[21]     *Id.*

[22]     *Boyd & Mahoney v. Chevron U.S.A.*, 614 A.2d 1191, 1195 n.1 (Pa. Super. Ct. 1992); *Berry-
        Iverson Co. of North Dakota, Inc. v. Johnson*, 242 N.W.2d 126, 135 (N.D. 1976) (same).

offer, and as a general matter, any Consortium member wishing to acquire a franchise

pursuant to its right of first refusal must match the price.

## II.

### Bona Fide Offer

The Cable Ordinances require that the third party's offer be "bona fide."[23]  The

"bona fide" requirement ensures that there really is an offer to be matched, and, as

relevant here, prevents a third party offeror selecting an amount solely to defeat the right

of first refusal.  This concern is especially a matter of attention in package deals, like the

one here, where the property subject to the purchase right is included within a greater

package.  Courts recognize a risk in package deals that the purchase price may be unfairly

allocated or padded to defeat rights of first refusal.[24]

Here, the Consortium has made no allegation that Time Warner, Comcast and the

Debtors manipulated the price allocation to frustrate the Consortium's rights of first

refusal, or the price at which such rights might be exercised.  Nor has the Consortium

alleged or produced evidence of bad faith when Time Warner, Comcast and the Debtors

entered into the APAs.  Satish Adige, Time Warner's Senior Vice President of

---

[23]     Cable Ordinances § 2.4.8 (reserving "the right of first purchase in any sale, transfer, lease, assignment, or disposal of the system at a cost at least equal to a *bona fide offer* otherwise acceptable to the Grantee").

[24]     *See Pantry Pride Enterprises, Inc. v. Stop & Shop Companies, Inc.*, 806 F.2d 1227, 1231-32 (4th Cir. 1986) ("[W]e note that allocations of price to elements of a package may readily be manipulated *to defeat* contractual rights of first refusal.  It is easy to imagine an unreasonably inflated value assigned to the subject of any first-refusal option."); *see also Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 143 (3d Cir. 2001) ("…[the cited cases] establish the principle that we find controlling: allocations of price by interested parties to elements of a package may readily be manipulated to defeat contractual rights to substantially similar terms … . [There is a] … strong inherent potential for price padding [by interested parties]."); *Gyurkey v. Babler*, 651 P.2d 928, 932, 933 (Idaho 1982) ("If a seller were permitted to satisfy its obligation under a right of first refusal in the manner asserted by respondents here, even if done in good faith, not only would the preemptor be denied assurance that he was obtaining the same bargain on the lot as was the third party offeror, but the door would be opened to a myriad of unscrupulous endeavors designed to defeat preemptive rights of purchase by manipulation of lot prices within terms of a larger sale.").

investments, has submitted an affidavit stating that Time Warner, Comcast and the Debtors determined the "Per Subscriber Purchase Price" in April 2005 without consideration of any rights of first refusal, and without attempting to "value" any particular system being acquired.[25]  As stated in the declaration of Mr. Adige (and without contradiction or contrary evidence or argument), the purchase price was determined without any consideration given to any rights of first refusal.[26]

This Court previously made the determination that the parties entered into the APAs "without collusion, in good faith, and from arm's-length bargaining positions."[27] This Court further found that the resulting terms were "fair and reasonable," and the aggregate price "constitute[d] the highest and best offer."[28]  The Court determines that Time Warner and Comcast made a "bona fide" offer.

## III.

## The Certainty of the Time Warner/Comcast Offer

*A.  $3,810 Purchase Price Per Subscriber*

The APAs included "Purchase Price Per Subscriber" as a defined term, and set the amount at $3,810 per subscriber.  The Consortium argues that the APAs use the term "Purchase Price Per Subscriber" in a manner inapplicable to actual valuations to be used in the event of the exercise of a right of first refusal, and in a manner intended to serve as a penalty to the Debtors if they failed to deliver an adequate number of subscribers at

---

[25]    Adige Decl. at ¶¶ 3-5.

[26]    Both sides waived an evidentiary hearing, at which the parties would have rights of cross-examination.  The Court can and does make factual determinations based on affidavits, documents and deposition testimony.

[27]    *In re Adelphia Comm'cns Corp.*, Case No. 02-41729 (REG), slip op. at 9 (Bankr. S.D.N.Y. June 28, 2006) (ECF #11500) ("Sale Order").

[28]    *Id.* at 7.

closing.[29]   In other words, the Consortium argues that the defined term "Purchase Price

Per Subscriber" is used *solely to calculate certain adjustments to the purchase price*.  The

term is defined in Section 1.1 of the APAs, and thereafter only appears in the adjustment

formula provisions of the APAs serving only the limited purpose of calculating

adjustments.[30]

        The Court fully recognizes that the fact that "Purchase Price Per Subscriber," as a

defined term of $3,810 per subscriber, is not by itself controlling.  Defined terms in an

agreement are interpreted in the context of the entire agreement.[31]  Thus, a separate

analysis of the offer is necessary to determine whether the defined "Purchase Price Per

Subscriber" is sufficiently indicative of the per subscriber price.  The Court concludes

that it is.

        Although Time Warner, Comcast and the Debtors did not individually value each

of the cable systems in the deal, Time Warner has provided sufficient evidence that Time

Warner and Comcast priced those systems as a whole on a basis that would yield a

$3,810 per subscriber cost.  The $3,810 per subscriber price was both the average per

subscriber price for the entire acquisition (based on the subscribers thought to be covered

under it), and the specific per subscriber adjustment price that Time Warner, Comcast

and the Debtors agreed would be applied equally to all subscribers.  The total purchase

---

[29]        Consortium Brief, filed August 18, 2006, at 20 (ECF #11840).

[30]        *Id.* at 23 n.16.

[31]        *William C. Atwater & Co., Inc. v. Panama R. Co.*, 159 N.E. 418, 419 (N.Y.C.A. 1927) ("Particular
words should be considered, not as if isolated from the context, but in the light of the obligation as
a whole and the intention of the parties as manifested thereby.  Form should not prevail over
substance, and a sensible meaning of words should be sought."); *Mars Associates, Inc. v. Health
and Mental Hygiene Facilities Improvement Corp.*, 47 A.D. 2d 5, 6 (N.Y.S.C.A.D. 3rd Dep't.
1975) ("…in construing the words of a contract, they must be given their ordinary meaning unless
the context requires a different construction.").

price – including the dollar amount of $9.154 billion in cash plus the anticipated value of the 16% stake of the Time Warner stock (valued at the time to be worth $4.96 billion) – divided by the total number of subscribers (3.704 million) amounted to approximately $3,810 per subscriber.

The Consortium argues that two inputs in the above equation – namely, the value of the 16% stake in Time Warner "to be issued" stock and the total number of subscribers[32] – were not certain.[33]  This Court agrees that the actual amount per subscriber could not be fully determined at the time the parties entered into the APAs because two important inputs that would determine the actual price per subscriber were not fixed in the APAs.  But this Court believes, and finds, that the $3,810 per subscriber was a reasonable and good faith effort to capture the per subscriber price at the time the seller and buyers entered into the APAs, and is reflective of the understanding of Time Warner, Comcast and the Debtors at the time.[34]

Moreover, Time Warner has established that the closing adjustments did not alter the $3,810 per subscriber purchase price offered by Time Warner and Comcast to the Debtors.  The closing adjustments included adjustments for net liabilities, capital

---

[32]     The total number of subscribers was not fixed because it was made subject to future adjustments, including the purchase-price-per-subscriber adjustment for subscriber shortfalls on the closing date.

[33]     Consortium Brief, filed August 18, 2006, at 22 (ECF #11840) ("While the purchase price and the number of subscribers both eventually will be ascertainable, neither was clearly a fixed number when the definition of 'purchase price per subscriber' was put in the APA and hence $3,810 cannot represent the actual purchase price per subscriber paid by [Time Warner].").

[34]     The Court recognizes that it is probable that not all cable systems included in the APAs' package deal would be of equal value.  It is at least theoretically possible that the Consortium Systems, if sold on an individual basis, would have sold for less per subscriber than other of the Debtors' cable systems might have sold for if they similarly had been sold individually.  But Time Warner, Comcast and the Debtors did not fix the price with that level of precision or in that manner.  For the Court now to substitute its own impressions of value where there was no attempt to manipulate the bid to affect the right of first refusal or the exercise price would be inappropriate.

expenditure and the total subscribers at closing. Each of these adjustments was made on

an overall – not a system-by-system – basis.[35] Because the number of subscribers fell by

the time of closing and was only partly compensated for by adjustment formulas, Time

Warner argues that the impact of the adjustments was to increase the amount actually

paid by Time Warner and Comcast at the Closing to an amount above the $3,810 per-

subscriber offer.[36] The Consortium does not refute this fact.

In fact, the actual value of the 16% stake in Time Warner "to be issued" stock

proved to be much greater than that originally anticipated in the APAs. In its decision

confirming the Debtors' plan of reorganization, this Court valued the 16% stake in Time

Warner stock as worth approximately $6.5 billion.[37] Again, as with the impact of the

closing adjustments, the result of the higher valuation of the 16% stake in Time Warner

"to be issued" stock was to increase the actual per subscriber amount that the Debtors

received to an amount greater than $3,810.[38]

## B. The Purchase Price Per Subscriber in a Package Deal

That the Consortium Systems were included as part of a package deal makes

determination of the certainty of the purchase price per subscriber more difficult because

this Court is charged with determining the appropriate price for exercising a right of first

---

[35]    For example, because there was a 21,157 subscriber shortfall at the time of the APAs' closing, the
subscriber adjustment resulted in an $80.6 million (21,157 times $3,810) reduction in the closing
amount paid by Time Warner and Comcast. But this adjustment neither affected Time Warner's
and Comcast's offer of $3,810 per subscriber nor reduced the amount actually paid by Time
Warner and Comcast to less than $3,810 per subscriber.

[36]    Responsive Brief of Time Warner, filed August 29, 2006, at 2 (ECF #11890). Mr. Adige
estimated the "actual" per subscriber amount to be $3,856 per subscriber. *See* Adige Supp. Decl.,
Exh. 3 at ¶ 9.

[37]    *See In re Adelphia Comm'cns Corp.*, --- B.R. ----, 2007 WL 866643, at *31 (Bankr. S.D.N.Y.
January 03, 2007) ("Confirmation Decision").

[38]    The exact amount of the increased valuation of the 16% stake in Time Warner "to be issued" stock
is not in the record of this dispute because the Court issued its decision on valuation after the
parties had submitted their briefs on this matter.

refusal to acquire assets that are part of a package deal but where neither the Debtors nor

Time Warner and Comcast established a separate price for the subject property.   The

APAs priced the subscribers in all acquired systems, including the Consortium Systems,

at a price of $3,810 per subscriber.

The Consortium argues that when assets subject to rights of first refusal are

bundled into a larger group of assets being sold, courts look past the average or allocated

percentage of the bundled price and instead determine the actual fair market value of the

assets subject to the rights of first refusal, based on valuation evidence presented by the

parties.[39]   The Consortium cites several cases in support of its proposition.[40]   The

Consortium proposed an initial fair market value price per subscriber of $2,433.[41]   In its

reply brief, the Consortium increased its asking price to increased to $2,670.[42]

Time Warner concedes that some courts have in certain specific circumstances

used the fair market value of the property as a proxy for the third-party offer.[43]   But Time

Warner argues that those cases must be distinguished from the present situation, where

---

[39]    Consortium Brief, filed August 18, 2006, at 8 (ECF #11840).

[40]    *See Shell Oil Co. v. Trailer & Truck Repair Co., Inc.*, 828 F.2d 205, 210 (3d Cir. 1987) (holding that, when determining the proper amount for a burdened property that was purchased in a package, "[o]nly two methods suggest themselves as arguably appropriate: (1) a determination of the fair market value of the … property [burdened by the right of first refusal] or (2) a determination of the portion of the … purchase price which, based on the percentage of the fair market value of the entire package represented by the … property [burdened by the right of first refusal], should be allocated to the … property [burdened by the right of first refusal]."); *Pantry Pride Enterprises, Inc. v. Stop & Shop Companies, Inc.*, 86 F.2d 1227, 1232 (4th Cir. 1986) (in bulk purchase case where using price that had been allocated for tax reasons to the property in question would result in an unduly low option exercise price with "windfall" effect, declining to regard allocated price as conclusive); *Wilber Lime Products, Inc. v. Ahrndt*, 673 N.W.2d 339, 343 (Wisc. Ct. App. 2003) (exercising a fair market value methodology and "recogniz[ing] the possibility that the acres being sold are not all of equal value").

[41]    Consortium Brief at 17.

[42]    Consortium Reply Brief, filed August 29, 2006, at 3 (ECF #11889) (explaining that the price increase was due to adjustments that Time Warner had provided).

[43]    Responsive Brief of Time Warner, filed August 29, 2006, at 7 (ECF #11890).

-13-

the offeror and seller have set a good faith price.[44] The Court agrees. When, as here, the terms of the offer are clear, the Court believes that it should not rely on a fair market valuation of the property subject to the right of first refusal. The requirement to match the third party offer does not go away just because the encumbered property is sold as part of a packaged deal.[45] The seller is no less entitled to sell the encumbered property at the price of its choice when it sells the property as part of a package than when it sells the property as an individual entity.

The *Pantry Pride* case is worth consideration because both parties included multiple citations to it. *Pantry Pride* demonstrates the courts' dedication in package deal cases to determining the *actual price* offered by the third party for the encumbered property. Rather than blindly allowing the rights holder to exercise its purchase rights by paying fair market value for the lease subject to the first of first refusal – a price that the Fourth Circuit had no reason to believe would necessarily replicate the price agreed to in the deal – the *Pantry Pride* court used fair market value data for the limited purpose of determining how the parties would have allocated the overall purchase price of the store to the lease and the equipment had they realized a need to do so.[46] Consistent with what other courts have done, the Fourth Circuit used fair market data only as an aid in

---

[44]  *Id.* at 15-16.

[45]  *See Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 140 (3d Cir. 2001) (holding in a package deal case that "a right of first refusal . . . empowers [the rights holder] with a preferential right to repurchase [the property subject to the right of first refusal] on the same terms offered by a bona fide purchaser"); *Pantry Pride*, 806 F.2d at 1231 (holding in a package deal case that "[w]hat [the rights holder] did bargain for was the right to buy the leasehold at the price offered by a third party."); *Gyurkey v. Babler*, 651 P.2d 928, 932-33 (Idaho 1982) (holding in a package deal case that "[t]he preemptor . . . is [] entitled . . . to the benefit of the total bargain as it relate[d] to the burdened lot"); *see also USA Cable v. World Wrestling Fed'n Entm't, Inc.*, 766 A.2d 462, 466 (Del. 2000) (same).

[46]  *Pantry Pride*, 806 F.2d at 1231.

-14-

determining how the parties would have allocated the purchase price when that allocation was either unclear or somehow untrustworthy.

But here the parties themselves have made a reasonable allocation of the overall price to the property in question. Therefore, it is that allocation – not a fair market substitute for it – that must stand. *Pantry Pride* and the other cases cited by the Consortium involved situations where the seller had taken steps with the purpose or effect of frustrating the right of first refusal, or manipulating the purchase price, on one of several parcels of land sold as a package. Here, there is no evidence of either, and there is no need to rely on a fair market valuation to determine the purchase price. The price agreed to by the parties was clear in the offer, and that price was both a trustworthy and an accurate depiction of the agreement between the parties. Because the price was clear, the rights holder must match that price. That the encumbered property was sold as part of a package deal does not eliminate this requirement.

The price paid by Time Warner and Comcast apparently exceeded fair market value, but it was their right to pay greater than market value. The valuation expert for the Consortium conceded as much.[47] It makes no difference that the Consortium Systems might be worth more to Time Warner than to other potential buyers because of synergies and economies of scale that Time Warner could bring to bear. It appears that Time Warner was willing to pay more for the Consortium Systems than other potential offerors would have paid. But that is exactly why one could not simply rely on what the "fair

---

[47]    Douglas A. Dawson, a consultant from CCG Consulting, LLC whose valuation report was attached to the Consortium's brief, conceded in his fair market value analysis that "[the Consortium] property has more value to Time Warner than it would have for any other purchaser. The premium price that might be offered by Time Warner is not a price that any other buyer would be willing to offer." Dawson Report at 6.

-15-

market value" of the system might be to those other potential buyers.  It is the offer made

by Time Warner and Comcast that must be matched by the Consortium.  If the

Consortium does not consider the system to be worth $3810 per subscriber, or regard that

price as "fair and reasonable," then the Consortium need not exercise its right of first

refusal.

<u>Conclusion</u>

For the foregoing reasons, the Court holds that the Consortium must match Time

Warner's and Comcast's bona fide offer of $3,810 per subscriber.


Dated: New York, New York              _____*/s/  Robert E. Gerber*_____
      May 16, 2007                         United States Bankruptcy Judge