**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**IN RE ADELPHIA COMMUNICATIONS CORP., et al.,**

                        **Debtors.**

---

**THE BANK OF NOVA SCOTIA and CITIBANK, N.A.,**

                        **Appellants,**

- against –

**ADELPHIA COMMUNICATIONS CORPORATION and THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,**

                        **Appellees.**

---

02-B-41729 (REG)

**06 Civ. 4983 (JGK)**

<u>**MEMORANDUM OPINION AND ORDER**</u>

**JOHN G. KOELTL, District Judge:**

     This is an appeal from the Decision and Order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") dated May 15, 2006 (the "Decision"). (Bankr. Docket No. 10853.) That decision disallowed claims for additional "grid interest" made by the administrative agents under six separate credit facilities (the "Initial Appellants"). The Initial Appellants filed a joint Notice of Appeal on May 24, 2006. On June 29, 2006, the Bankruptcy Court confirmed the Third Modified Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for the Century-TCI Debtors

and the Parnassos Debtors (as confirmed, the "JV Plan").[1]  On January 5, 2007, the Bankruptcy Court confirmed the First Modified Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation ("Adelphia") and Certain of its Affiliated Debtors (as confirmed, the "Affiliates Plan"). Following the confirmation of the Affiliates Plan, four of the six Initial Appellants have withdrawn their appeal.  The Appellants are the two remaining administrative agents, Bank of Nova Scotia ("BNS") as administrative agent for the lenders under the Parnassos Credit Agreement, and Citibank N.A. ("Citibank") as administrative agent for the lenders under the Century-TCI Credit Agreement.  There is jurisdiction to hear the appeal pursuant to 28 U.S.C. § 158(a)(1).[2]

---

[1] The Appellants have filed a motion pursuant to Rules 8006 and 8009 of the Federal Rules of Bankruptcy Procedure to supplement the record on appeal with the JV Plan.  The Appellees have not opposed this motion.  The JV Plan is relevant to the appeal and could not have been included in the Appellants' designation because the JV Plan was confirmed after the designation was filed.  Moreover, the Appellees will not suffer any prejudice as a result of the supplementation of the record.  Therefore, the Appellants motion to supplement the record on appeal is granted, and the Court will consider the JV Plan in its consideration of the appeal.

[2] The Appellees argue that this Court lacks jurisdiction to decide this appeal because the decision of the Bankruptcy Court was not "final" for the purposes of 28 U.S.C. § 158(a).  However, the Decision "finally dispose[d] of discrete issues within the larger case," because the Appellants' claim for additional grid interest is "an entire claim upon which relief may be granted." Shimer v. Fugazy Express, Inc. (In re Fugazy Express), 982 F.2d 769, 775-76 (2d Cir. 1992) (quotations marks and citation omitted).  The Appellees objected to the Appellants' claim for additional grid interest, and the Bankruptcy Court denied those claims. (Decision 26).  Subsequently, the Bankruptcy Court confirmed the JV Plan, pursuant to which the Appellants received distributions in complete satisfaction of their claims other than their claims for additional grid interest.  The JV Plan clearly contemplated the continuation of the appeal.  The JV Plan included the debtors' estimates of the Appellants' respective claims for additional grid interest and provided for the creation of a reserve if the decision of the Bankruptcy Court were

2

The central issue on this appeal is whether the Bankruptcy Court erred in finding that the Appellants were not entitled to additional "grid interest" and therefore that the Debtors did not have to create a reserve for claims for such interest. The Bankruptcy Court found that the claims for additional grid interest were without merit because the credit agreements did not provide for the recalculation of grid interest in the event of the delivery of false compliance certificates to the Administrative Agents and default interest was the Appellants' exclusive remedy under the credit agreements. The Bankruptcy Court also found that that claims for additional grid interest were not secured claims under 11 U.S.C. § 506(b), and that the Appellants were limited to restitutionary damages with respect to any tort remedies they might have, which would not include additional grid interst.

The Court has reviewed the Decision and the arguments of the parties to this appeal. The Decision is **vacated and remanded** for further proceedings consistent with this opinion.

---

reversed or vacated on appeal. (See JV Plan § 4.17(c)(ii), 4.22(c)(ii), Bell Affirmation, Ex. A.) Moreover, the existence of the separate adversary proceeding before Judge McKenna does not render the decision of the Bankruptcy Court non-final. The issues in that proceeding are separate from the distinct issue decided by the Bankruptcy Court, namely, whether the Appellants are entitled to additional grid interest under the credit agreements. In any event, even if the decision of the Bankruptcy Court was not a final order, the Court would grant leave to appeal pursuant to 28 U.S.C. § 158(a)(3) and Rule 8003(c) of the Federal Rules of Bankruptcy Procedure.

I.

The following facts are undisputed unless otherwise noted. Prior to filing for bankruptcy on June 25, 2002 (the "Petition Date"), the Debtors entered into credit agreements with various bank lenders that established seven lending facilities. The Appellants are the Administrative Agents under two of these facilities, the Century-TCI Credit Agreement and the Parnassos Credit Agreement (collectively, the "Agreements"). As explained in the Decision of the Bankruptcy Court, the Agreements calculate the non-default rate of interest based on the sum of a floating "Base Rate" and an "Applicable Margin." (Parnassos Credit Agreement § III.2.1; Century-TCI Credit Agreement § 2.06.) The "Applicable Margin" is in turn determined by reference to a grid, where the "Applicable Margin" increases as a function of the borrower's "Leverage Ratio." (Parnassos Credit Agreement § I.1; Century-TCI Credit Agreement § 1.01.) Under the Agreements, the borrower is required to deliver to the Administrative Agent periodic compliance certificates reporting the borrower's "Leverage Ratio" along with related financial information. (Parnassos Credit Agreement § VII.1.1; Century-TCI Credit Agreement § 5.01.) The financial statements are to be prepared in compliance with GAAP and "present fairly in all material respects" the financial condition and results of operations of the borrower. (Parnassos Credit Agreement § 6.5;

Century-TCI Credit Agreement § 5.01.) The provision of inaccurate financial information in a Compliance Certificate constitutes an Event of Default under the Agreements. (Parnassos Credit Agreement § VIII.1.2; Century-TCI Credit Agreement § 7.01(a).)

Shortly after the Petition Date, and following extensive negotiation between the Debtors and the bank lenders, the Debtors obtained approval of Debtor In Possession ("DIP") financing from the Bankruptcy Court. The Final DIP Order provides the Appellants with a right to, among other things: (i) immediate payment of pre-petition accrued and unpaid interest; and (ii) current interest payments during the pendency of the bankruptcy at the non-default grid interest rates in effect as of the day immediately prior to the Petition Date. In exchange, the Appellants waived any right to receive default interest under the Agreements. (See Final DIP Order, Joint Exhibit ("JE") 111 at 20-21.)

The Administrative Agents timely filed proofs of claim, including claims for unpaid interest, and asserted claims for breach of contract, fraud, fraudulent inducement, fraudulent misrepresentation and negligent misrepresentation in connection with the Agreements. (JE-7 at 6; JE-13 at 4.) On July 8, 2004, John Rigas and Timothy Rigas, officers of Adelphia, were convicted of, among other crimes, bank fraud. The Appellants

subsequently filed amended proofs of claim more fully describing claims for additional interest payments to which they would have been entitled had they received true, complete and accurate information concerning the Debtors' financial performance (the "Additional Grid Interest claims"). (JE-6 at 10; JE-12 at 4.) The Debtors' objected to these claims. (Bankr. Docket No. 10667.) After additional briefing and oral argument, Judge Gerber issued an oral ruling on May 10, 2006 disallowing the Additional Grid Interest claims. On May 15, 2006, Judge Gerber issued the Decision that is the subject of this appeal.

II.

The Court reviews the Bankruptcy Court's conclusions of law de novo and its findings of fact for clear error. Citibank, N.A. v. Vebeliunas, 332 F.3d 85, 90 (2d Cir. 2003); In re Johns-Manville Corp., 340 B.R. 49, 58 (S.D.N.Y. 2006); see also Fed. R. Bankr. P. 8013. The parties have agreed that the language of the relevant agreements is unambiguous, and therefore the Bankruptcy Court's interpretation of the Agreements is subject to de novo review. Network Publishing Corp. v. Shapiro, 895 F.2d 97, 99 (2d Cir. 1990); see In re Calpine Corp., No. 07 Civ. 8493(JGK), 2007 WL 4326738, at *3 (S.D.N.Y. Nov. 21, 2007).

III.

The Appellants argue that they are not limited to default interest as a remedy upon an event of default and that the Bankruptcy Court erred in interpreting the Agreements to preclude the recovery of additional grid interest based on the fact that the Agreements did not contain a mechanism for a recomputation of Applicable Margin.  The main issues presented on appeal, therefore, are (1) whether the Appellants were entitled to grid interest based on the borrowers' actual financial condition, as opposed to the financial condition reported on false compliance certificates, and (2) whether under the terms of the Agreements the parties agreed that the Appellants would be limited to the remedy of default interest in the event that false compliance certificates were presented to the Administrative Agents.

> Under the Parnassos Credit Agreement:
>
> Following the sixth-month anniversary of the Effective Date, the Leverage Ratio used to compute the Applicable Margin shall be the Leverage Ratio set forth in the Compliance Certificate most recently delivered by the Borrower to the Administrative Agent . . . .

(Parnassos Credit Agreement § I.1.)  "Compliance Certificate" under the Parnassos Credit Agreement is defined as "a certificate duly completed and executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit E hereto . . . ."  (Parnassos Credit Agreement § I.1; see also Parnassos

7

Credit Agreement § V.1.14.) The Parnassos Credit Agreement also contains a provision that the financial information of the borrower "furnished to the Administrative Agent and each Lender pursuant to Section 5.1.13 have been prepared in accordance with GAAP consistently applied, and present fairly the consolidated financial information of the Persons covered thereby," and a further representation that "no . . . factual information . . . furnished in connection with this Agreement or any other Loan Document by the Borrower or any other Obligor to any Credit Party will contain any untrue statement of a material fact . . . ." (Parnassos Credit Agreement §§ VI.5 and VI.18.)

Similarly, under the Century-TCI Credit Agreement:

> [a]t all times after the date six months following the Closing Date, if the Leverage Ratio as at the last day of any fiscal quarter of the Borrower shall fall within any of the ranges specified in the schedule below, then, subject to the delivery to the Administrative Agent of a certificate demonstrating such fact (which certificate shall accompany the financial statements for such fiscal quarter delivered under Section 5.01 on which the calculation of such Leverage Ratio is based) . . . the "Applicable Margin" shall be adjusted upwards or downwards, as the case may be . . . .

(Century-TCI Credit Agreement § 1.01). There is an affirmative covenant that the financial statements provided under Section 5.01 will be accompanied by appropriate opinions that they are prepared in accordance with GAAP and "fairly present the financial condition and results of operations" of the borrower. (Century-TCI Credit Agreement § 5.01; see also § 5.07.) There

is an additional covenant that "[a]ll written information furnished . . . by the Credit Parties to the Administrative Agent and the Lenders in connection with this Agreement . . . and the transactions contemplated hereby and thereby will be true, complete and accurate in every material respect . . . ." (Century-TCI Credit Agreement § 5.12.)

Interpreting the language of the Agreements de novo, in order to give the language of the Agreements full effect, the Court finds that under the Agreements the Appellants are entitled to grid interest based on the borrower's actual Leverage Ratio, not the Leverage Ratio reflected in a materially false document delivered to the Administrative Agents. This interpretation is supported by the inclusion of the words "duly completed" in the Parnassos Agreement and the requirement that the certificate provided under the Century-TCI Agreement "demonstrat[e]" the Leverage Ratio of the borrower as calculated based on accurate financial statements prepared in accordance with GAAP and that the "'Applicable Margin' shall be adjusted . . . ." It is further supported by the other warranties and covenants obligating the borrowers to maintain financial records in compliance with GAAP and to provide the bank lenders and the Administrative Agents with accurate financial information. Because the Appellants are entitled to grid interest based on the borrowers' actual Leverage Ratio, the absence of a provision

providing for a retroactive recalculation of the Applicable Margin in the event that inaccurate compliance certificates were delivered to the Administrative Agents does not preclude a finding that the Appellants are entitled to additional grid interest under the Agreements.

In any event, the parties do not dispute that the Appellants were entitled to accurate compliance certificates and that the delivery of fraudulent compliance certificates constitutes a breach of the Agreements. In the event that a false compliance certificate was delivered to the Administrative Agents, the Appellants would receive less interest than they would have received had accurate certificates been delivered. Therefore, the only issue that remains is a determination of the contractual remedies available to the Appellants under the Agreements in the event of such a breach.[3] Specifically, the parties dispute whether default interest is the exclusive remedy for the delivery of inaccurate compliance certificates, or

---

[3] To the extent the Decision of the Bankruptcy Court concluded that the Appellants were limited to tort remedies for restitutionary relief, the Court disagrees. The delivery of fraudulent compliance certificates plainly amounts to a breach of an express warranty under the Agreements, and the Appellants are therefore entitled to contract damages. See, e.g., Ostano Commerzanstalt v. Telewide Sys., Inc., 794 F.2d 763, 766 (2d Cir. 1986). The Appellants have made it clear that they are not alleging any tort claims, but rather are asserting contractual claims for breach of warranty, for which expectation damages are appropriate. See Ainger v. Michigan Gen. Corp., 476 F. Supp. 1209, 1233-34 (S.D.N.Y. 1979), aff'd, 632 F.2d 1025 (2d Cir. 1980). Because the Appellants have conceded that they are not seeking tort damages, the Court need not address the Appellees' arguments that such tort claims would be barred by the "economic loss rule" under New York law and the "gist of the action" doctrine under Pennsylvania law.

10

whether the Appellants are additionally entitled to expectancy damages, namely, the additional grid interest they would have been entitled to under the Agreements in the absence of the Debtors' breach.

The Agreements provided for default interest as a remedy for the delivery of inaccurate compliance certificates. (Parnassos Credit Agreement §§ III.2.2, VIII.1.2, VIII.3; Century-TCI Credit Agreement §§ 1.01 (Definition of "Post-Default Rate), 2.06(b), 7.01(a).) However, the Agreements do not indicate an intent that default interest was to be an exclusive remedy in the event of a breach. In the absence of such an expressed contrary intent, the Appellants are entitled to recover standard expectancy damages for the Appellees' breach of contract. See Palazzetti Import/Export, Inc. v. Morson, 2001 WL 1568317, at *9 (S.D.N.Y. Dec. 6, 2001) (citing In re Hale Desk Co., 97 F.2d 372, 373 (2d Cir. 1938) ("[W]hether the provision for damages in a contract should be treated as an exclusive remedy is to be determined by the intent of the parties as revealed in all the facts of the particular case").

In fact, the Agreements contain language that suggests that default interest was not intended to be an exclusive remedy. Under the Agreements the Appellants explicitly retained their right to pursue "damages, other monetary relief, injunctive relief or any other remedy at law or equity against the

11

Borrower, any Obligor or any Partner by reason of fraud, knowing or willful breach of representations and warranties, willful tortious acts or omissions, gross negligence or criminal acts." (Parnassos Credit Agreement X.13; Century-TCI Credit Agreement 10.15.) Furthermore, the Agreements contain "no-waiver" clauses such that the Appellants' exercise of their right to default interest could not be interpreted as a waiver of their right to pre-petition non-default interest at the appropriate rate. (See Parnassos Agreement X.1; Century-TCI Agreement 10.03.) The Appellees' do not point to any provision of the Agreements, other than the provisions providing for the remedy of default interest, that suggests that the parties intended to preclude remedies other than the collection of default interest.[4]

Therefore, the Court finds that default interest is not an exclusive remedy under the Agreements for the delivery of false compliance certificates. The Appellants are entitled to recover standard expectancy damages for the borrowers' breaches of their contractual obligation to report accurate Leverage Ratios in the compliance certificates delivered to the Administrative Agents.

---

[4] The Court notes that it would be an unreasonable result to allow the Debtors to avoid payment of pre-petition grid interest based on the borrowers' actual Leverage Ratio in the event that fraudulent compliance certificates were presented to the Administrative Agent, where the Debtors would owe pre-petition grid interest at that rate for other Events of Default that would not lead to a materially inaccurate representation of Applicable Margin, such as non-payment. The fact that the Appellees' proposed interpretation of the Agreements results in less interest being owed in the event of alleged fraud than in the event of non-payment lends additional support to the Court's interpretation.

Therefore, the Court finds that the Appellants' claim for additional grid interest is an allowable claim under Section 502(b).

The Bankruptcy Court also found that that claims for additional grid interest were not secured claims under 11 U.S.C. 506(b).[5]  However, this ruling followed directly from its finding that additional grid interest was not provided for under the relevant agreements.  The Decision stated that the Bankruptcy Court could not "agree that claims, and especially secured claims, can be defined so broadly as 'inherently encompassing' expectancy rights *not provided for in the agreements in question*." (Decision 19) (emphasis added).  Having found that the Appellants are entitled to additional grid interest under the Agreements, the Court finds that the Bankruptcy Court ruling that the claims were unavailable under Section 506(b) was also incorrect.

IV.

In the alternative, the Appellees argue that the Appellants have waived any rights they may have had to additional grid

---

[5] The pre-BAPCPA version of 11 U.S.C. § 506(b), which is applicable to this appeal, provides, in relevant part:
> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

interest and that they should be precluded from asserting such rights on the grounds of equitable and judicial estoppel based on the Appellants' conduct during the negotiation of the Final DIP Order, their representations to the Bankruptcy Court during the DIP hearings, and the language of the Final DIP Order.

The Bankruptcy Court expressly declined to rule on these arguments because it found that the Appellants were not entitled to additional grid interest. (See Decision 26.) Because the Bankruptcy Court is intimately familiar with the conduct of the parties and the proceedings associated with the DIP financing, the Court finds that the Bankruptcy Court is the proper court to address the arguments of waiver and estoppel in the first instance. Therefore, the Court will remand the case to the Bankruptcy Court to address the argument that the Appellants have waived their right to additional grid interest and that they should be equitably or judicially estopped from pursuing additional grid interest.

CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, they are either moot or without merit. Therefore, for the reasons stated above, the Decision and Order entered by the Bankruptcy Court on May 15, 2006 is **vacated and remanded** for further proceedings

consistent with this opinion. The Clerk is directed to close this case.

SO ORDERED.

Dated: New York, New York
August 21, 2008

_____
John G. Koeltl
United States District Judge