UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                :

In re                            :        Chapter 11
                                                :

ADELPHIA COMMUNICATIONS CORP.,    :        Case No. 02-41729 (REG)
*et al.*,                         :        Jointly Administered
                                                :

                 Debtors.            :
------------------------------------------------------------x

## DECISION AND ORDER ON ESTATE'S
## PAYMENT OF NON-FIDUCIARIES'
## PROFESSIONAL FEES

APPEARANCES:

**HENNIGAN, BENNETT & DORMAN LLP**
Counsel for the *Ad Hoc* Committee of ACC Senior Noteholders
865 South Figueroa Street, Suite 2900
Los Angeles, CA 90017
By:    Bruce Bennett, Esq. (argued)
       James O. Johnston, Esq.
       Joshua D. Morse, Esq.

245 Park Avenue, Suite 3962
New York, NY 10167
By:    A. Brent Truitt, Esq.

**WHITE & CASE LLP**
Counsel for the *Ad Hoc* Committee of Arahova
  Noteholders and Appaloosa Management L.P.
1155 Avenue of the Americas
New York, NY 10036-2787
By:    J. Christopher Shore, Esq. (argued)
       Gerard Uzzi, Esq.

Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
By:    Thomas E. Lauria, Esq.
       Richard S. Kebrdle, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Counsel for the FrontierVision *Ad Hoc* Committee
1177 Avenue of the Americas
New York, NY 10036
By:    Kenneth H. Eckstein, Esq.
       Jeffrey S. Trachtman, Esq. (argued)
       Amy D. Caton, Esq.

PACHULSKI STANG ZIEHL YOUNG
   JONES & WEINTRAUB LLP
Counsel for *Ad Hoc* Bondholders' Committee
   (a/k/a Committee II)
780 Third Avenue, 36th Floor
New York, NY 10017-2024
By:    Dean Ziehl, Esq. (argued)

10100 Santa Monica Blvd., #1100
Los Angeles, CA 90067
By:    Richard M. Pachulski, Esq.
       Jeremy V. Richards, Esq.

BROWN RUDNICK BERLACK ISRAELS LLP
Counsel to *Ad Hoc* Committee of Holdco Trade Claims
   and *Ad Hoc* Adelphia Trade Claims Committee
Seven Times Square
New York, NY 10036
By:    Edward S. Weisfelner, Esq.

LATHAM & WATKINS LLP
Counsel for the Olympus Parent Noteholders
885 Third Avenue, Suite 1000
New York, NY 10022-4834
By:    Robert J. Rosenberg, Esq.

Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606
By:    Peter P. Knight, Esq.

One Financial Center
Boston, MA 02111
By:    Steven D. Pohl, Esq.

SIDLEY AUSTIN LLP
Counsel for the Fort Myers Noteholders
787 Seventh Avenue
New York, NY 10019
By:     Lee S. Attanasio, Esq. (argued)

One South Dearborn Street
Chicago, IL 60603
By:     Larry J. Nyhan, Esq.

GOODWIN PROCTER LLP
Counsel for Highfields Capital Management
    and Tudor Investment Corporation
599 Lexington Avenue
New York, NY 10022
By:     Allan S. Brilliant, Esq.
          Gina Lynn Martin, Esq.
          Brian W. Harvey, Esq.

SCHULTE ROTH & ZABEL LLP
Counsel for OZ Management, L.L.C.
919 Third Avenue
New York, NY 10022
By:     Jeffrey S. Sabin, Esq.
          Adam C. Harris, Esq.

FRIED FRANK HARRIS SHRIVER & JACOBSON LLP
Counsel for W.R. Huff Asset Management Co., L.L.C.
One New York Plaza
New York, NY 10004-1980
By:     Bonnie Steingart, Esq.
          Gary Kaplan, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for the Official Committee of Unsecured Creditors
1633 Broadway
New York, NY  10019
By:     David M. Friedman, Esq. (argued)
          Adam L. Shiff, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
33 Whitehall Street, Suite 2100
New York, NY 10004
By:     Tracy Hope Davis, Esq.
          Alicia M. Leonard, Esq. (argued)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In this contested matter in the jointly administered chapter 11 cases of reorganized debtors Adelphia Communications Corporation and its subsidiaries, 14 *ad hoc* committees and individual creditors (collectively, the "**Applicants**")[1] seek reimbursement for their legal fees and other professional expenses (collectively, the "**Fees**") under a provision of the Debtors' now confirmed and effective Chapter 11 Plan.[2] The provision authorizes payment of the Applicants' Fees subject only to reasonableness, and without requiring the Applicants—all but one of whom are unsecured creditors, or *ad hoc* committees of such[3]—to make the traditional showing of "substantial contribution" to the case under section 503(b)(3)(D) of the Code. Very possibly responding to reservations the Court expressed in its decision on confirmation[4] as to the authority for

---

[1]     The Applicants seeking fees and expenses are the *Ad Hoc* Committee of ACC Senior Noteholders; the *Ad Hoc* Committee of Arahova Noteholders; the *Ad Hoc* Committee of FrontierVision Noteholders; the *Ad Hoc* Committee of Holdco Trade Claims; the *Ad Hoc* Adelphia Trade Claims Committee; the *Ad Hoc* Bondholders' Committee (a/k/a Committee II); the Olympus Parent Noteholders; the Ft. Myers Noteholders; Appaloosa Management; Highfields Capital Management; Tudor Investment Corporation; OZ Management; and W.R. Huff Asset Management.

        Another *Ad Hoc* Committee, the ACC Bondholders Group, filed a similar application but later withdrew it.

[2]     The Court was originally informed that the total fees requested by the Applicants—the overwhelming majority of whom were distressed debt investors who acquired their creditor status to make a profit—totaled $99 million. It later was informed that the fees were a somewhat lesser $88 million. Either is a huge figure.

[3]     Secured creditors typically have provisions in their loan documents providing for the payment of their legal fees, and section 506(b) of the Code authorizes the payment of such fees, to the extent reasonable, in instances where the creditor is oversecured—as most or all of the secured creditors in this case ultimately turned out to be. Though the Court understands the desire of the UST to have verified this, the single Applicant that consists of secured creditors, the Ft. Meyers Noteholders, has now made a satisfactory showing with respect to its oversecured status, and thus the Ft. Meyers Noteholders' entitlement to fees, which is otherwise uncontroversial, has been satisfactorily established.

[4]     *See In re Adelphia Communications Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) (the "**Confirmation Decision**").

such payments in the absence of a substantial contribution showing,[5] the United States Trustee ("**UST**") has objected to the payment of the Fees on this basis.[6]

Though the wisdom of a statutory scheme that authorizes estates to absorb the legal fees, even "reasonable" ones, of entities advancing their own private interests without benefit to the estate is subject to fair policy debate,[7] the Court must determine this issue under the existing Code and caselaw.  The Court concludes, in this matter of first impression,[8] that under the Code and the caselaw (to the extent the latter exists), reasonable fees may be paid where, as here, the provision for fees is an element of a chapter 11 reorganization plan.  The Court does not today need to decide, and does not decide, whether a provision for payment of unsecured creditors' professional fees without satisfying section 503(b)(3)(D) would be appropriate under any other circumstances.

The Court further concludes, in another matter of first impression, that "reasonable" in the context of fees so awarded permits payment for fees (otherwise reasonable) that have been incurred solely to increase the applicant's personal recovery on a long position in claims against the estate (even without benefit to the estate), but does not permit payment for fees to advance interests unrelated to recovering on claims (such as short positions or competitive advantage), or for activities that go beyond normal

---

[5]    *See id.* at 269-71.

[6]    The Creditors' Committee, however, supported the applications, and the Equity Committee took no position on them.

[7]    *See* page 20  below.

[8]    The Applicants have identified a fair number of chapter 11 cases in which fees of the character here requested have been paid, principally by reference to orders which included provisions permitting the payment—though also, in one instance, by reference to Findings of Fact and Conclusions of Law that were published in the *Bankruptcy Reporter*.  *See* page 18-19 & n.38 below.  But there is no reported or unreported decision actually analyzing the issues in question.

advocacy or negotiation, that represent scorched earth tactics, or that are abusive, irresponsible, or destructive to the estate.

<u>Facts</u>

Familiarity with the history of this case—described, in this Court's *Confirmation Decision* as among the most contentious in bankruptcy history[9]—is presumed.  The Court here limits its discussion to those facts bearing directly on this controversy.

Prior to their June 2002 chapter 11 filings, the Debtors were the fifth largest operator of cable television systems in the United States.  After successfully stabilizing the company and maximizing value following the departure of the Rigases, the Debtors announced their intention to pursue a dual-track process to determine whether to emerge on a stand-alone plan or through a sale.  After a marketing process, they entered into definitive sale agreements in April 2005 to sell substantially all of their assets to the highest bidders, Time Warner Cable and Comcast, for a combination of cash and Time Warner Cable stock that this Court ultimately valued at $19.1 billion (the "**Sale**").

To their credit, the Debtors proposed to effect the Sale under a reorganization plan, as contrasted to section 363.  But the Sale documents required that the plan be implemented on or before a stated deadline.  Intercreditor feuding as creditors jockeyed to get incremental shares of the pie under the ultimate plan escalated to such a point that meeting the Sale documents' deadline would be difficult or impossible, jeopardizing the entire deal.

Responding to the frightful risk that the intercreditor feuding would crater the entire deal, risking the loss of $19.1 billion in Sale consideration (or, at the least, provide

---

[9]     *See Confirmation Decision*, 368 B.R. at 146.

Time Warner Cable and Comcast the ability to renegotiate the deal), the Debtors proposed that the sale be restructured as a 363 sale, getting the Sale proceeds into the estate with the creditors thereafter to fight over their shares of the proceeds.  But this, while understandable, did nothing to eliminate the intercreditor feuding, and reduced the downside to continuing it.  Though some were more litigious and aggressive than others, most of the Applicants were antagonists in the intercreditor disputes, as each tried to increase its incremental share of the pie.  The costs of their feuding were enormous.[10]

With no consensual resolution in sight, the Court granted a "Motion in Aid of Confirmation" (the "**MIA**"), filed by the Debtors to establish a framework to resolve the intercreditor disputes (the "**MIA Litigation**").  The MIA Litigation framework was divided into 6 phases to address specific creditor issues.  After about 3 months of the MIA Litigation, the Court approved a request by the Debtors to establish a mechanism by which a settlement might be achieved, and asked another judge of this Court to serve as a Monitor to aid in the negotiations.  After lengthy negotiations, the Applicants came to a settlement (the "**Global Settlement**"), including a plan support agreement, which would lead to revisions of the previously proposed plan, and ultimate confirmation of the Plan.

As part of the Global Settlement, the parties agreed that the Adelphia estate would bear the Applicants' fees, including those for litigating the MIA (which needed to be prosecuted in any event, to address the underlying interdebtor and intercreditor disputes, if they were not otherwise resolved), and, in addition, all of the other fees they incurred in the course of their fighting, negotiating an end to their fighting, and otherwise in participating in the case.

---

[10]     *See* n.2 *supra*.

In that connection, Section 6.2(d) of the Plan ("**Section 6.2(d)**"), implementing one of the elements of the Global Settlement, governed fee claims. It provided that the Applicants "shall receive reimbursements of their reasonable fees and expenses incurred in connection with the Chapter 11 Cases as Administrative Claims … [and] shall comply with any procedures required by the Bankruptcy Court in connection with seeking reimbursement…."[11]

Troubled by the notion that the estates should have to subsidize creditor efforts to augment their individual recoveries, and the possibility that innocent creditors would have to bear the costs of other creditors' fighting with each other and, in particular, shameful behavior in that regard, this Court stated in the *Confirmation Decision*:

> there is no basis in the Bankruptcy Code of which I'm now aware that authorizes fees of this character to be paid to creditors or their professionals without satisfying the requirements of the Code for fee awards—which include application to the Court and at least seemingly satisfying the requirements of section 503(b), and particularly sections 503(b)(3) and (4).[12]

However, this Court continued that it was willing to "keep an open mind" regarding the basis for awarding the requested fees.[13] It directed the Applicants to file fee applications "in the manner that fee applications are customarily submitted"[14] and, if they

---

[11]   *Id.*, § 6.2(d)(ii)(B). Section 6.2(d) further provided that

> [u]nless objected to … on the grounds that such fees are unreasonable within thirty (30) days of the receipt of detailed invoices from each party seeking reimbursement pursuant to section 6.2(d)(i), and except to the extent ordered by the Bankruptcy Court, claims for reimbursement of fees and expenses pursuant to section 6.2(d)(i) shall be deemed Allowed Claims.

[12]   *Confirmation Decision,* 368 B.R. at 270.

[13]   *Id.* at 270-71.

[14]   *Id.* at 271 n.316.

chose, to "make such arguments as they wish to support their contentions that they should be reviewed under standards other than those under sections 503(b)(3) and (b)(4)."[15]

The Applicants submitted their fee applications as directed. They were supported by the Creditors' Committee, which argued, among other things, that fee reimbursements of this character were permissible under the Code and not uncommon, and that the abuses as to which the Court was especially concerned could be addressed by the "reasonableness" requirement of Plan section 6.2.[16] The Applicants were opposed by the UST, who took a position very similar to that preliminarily voiced by this Court.

<u>Discussion</u>

To determine the entitlements here, the Court first has to determine whether the Bankruptcy Code permits fee reimbursement provisions of the type embodied in the Plan. If the Code does, subject to reasonableness (as the Applicants urge), the Court then needs to address how "reasonableness" applies to behavior of the sort this Court saw here.

<u>I.</u>

<u>Permissibility of Provisions of this Character</u>

As usual, the Court starts with textual analysis.[17] Several sections of the Code bear on this dispute.

---

[15]   *Id.* at 271.

[16]   *See*, *e.g.*, Cred. Comm. Br. at ¶ 15-17; Arg. Tr. at 14.

[17]   *See*, *e.g.*, *Alta Partners Holdings LDC v. Credit Suisse First Boston LLC (In re Global Crossing Ltd)*, 385 B.R. 5, 66 (Bankr. S.D.N.Y. 2008); *In re General Motors Corp.*, 407 B.R. 463, 486 (Bankr. S.D.N.Y. 2009) ("*GM-Sale*"), *appeal dismissed and aff'd*, 428 B.R. 43 (S.D.N.Y. 2010), and 430 B.R. 65 (S.D.N.Y. 2010); *In re DBSD North America, Inc.*, 419 B.R. 179, 205 (Bankr. S.D.N.Y. 2009); *In re Motors Liquidation Co.*, 2010 WL 3219506, *5 (Bankr. S.D.N.Y. Jul. 16, 2010) ("*GM-Asbestos Committee*").

The first is section 503(b) of the Code.  Sections 503(b)(3)(D) and 503(b)(4)

provide express authority for the payment of a nonfiduciary creditor or equity security

holder's fees.  Section 503(b) of the Code provides, in relevant part:

> (b) After notice and a hearing, there shall be
> allowed administrative expenses, other than claims
> allowed under section 502(f) of this title,
> including—
>
> …
>
> (3) the actual, necessary expenses, other
> than compensation and reimbursement
> specified in paragraph (4) of this subsection,
> incurred by—
>
> …
>
>> (D) a creditor, an indenture trustee,
>> an equity security holder, or a
>> committee representing creditors or
>> equity security holders other than a
>> committee appointed under section
>> 1102 of this title, in making a
>> substantial contribution in a case
>> under chapter 9 or 11 of this title…
>
> (4) reasonable compensation for
> professional services rendered by an
> attorney or an accountant of an entity whose
> expense is allowable under subparagraph
> (A), (B), (C), (D), or (E) of paragraph (3) of
> this subsection, based on the time, the
> nature, the extent, and the value of such
> services, and the cost of comparable services
> other than in a case under this title, and
> reimbursement for actual, necessary
> expenses incurred by such attorney or
> accountant….

These provisions are nonconsensual in nature.  By their terms, they do not require

the assent or agreement of the debtor, chapter 11 trustee, or any other party in the case to

qualify for payment; the applicant need only satisfy section 503(b) requirements.  There

are no other provisions of the Code that authorize payment of fees of this character as

expressly.  But importantly, section 503(b) does not provide, in words or substance, that

it is the *only* way by which fees of this character may be absorbed by an estate.[18]  Thus

the Court is free to look to other provisions of the Code that might also authorize a

payment.

Other provisions of the Code arguably do so.  Section 1129 sets forth the

requirements for a reorganization plan to be confirmed.  With an exception not relevant

here,[19] section 1129(a) provides, in relevant part, that:

> (a) The court shall confirm a plan only if all of the
> following requirements are met:
>
> …
>
> (4) Any payment made or to be made by the
> proponent, by the debtor, or by a person
> issuing securities or acquiring property
> under the plan, for services or for costs and
> expenses in or in connection with the case,
> or in connection with the plan and incident
> to the case, has been approved by, or is
> subject to the approval of, the court as
> reasonable….

---

[18]    That is so even though, from time to time, the Code does exactly that.  *See, e.g.*, section 503(c) of
the Code, which provides in substance that payments of the character that it covers can be made
only if its rigid requirements are satisfied.

The view that those subsections of section 503(b) are not exclusive is further bolstered, somewhat,
by the fact that the list of administrative expenses that may be paid under section 503(b) is
preceded by the word "including," which the Code expressly provides is "not limiting."
Bankruptcy Code section 102(3).  But there are nevertheless distinct limits on a court's ability to
authorize the payment of administrative expenses, or to elevate claims or expenses to
administrative expense priority.  *See, e.g., Howard Delivery Service, Inc. v. Zurich American Ins.
Co.*, 547 U.S. 651, 655 (2006) ("preferential treatment of a class of creditors is in order only when
clearly authorized by Congress").  Thus the Court is reluctant to place more than minimal reliance
on the "including" in section 503(b).

[19]    The exception is with respect to section 1129(a)(8), requiring acceptance by each impaired class,
which can be satisfied if the "cramdown" requirements of section 1129(b) have been satisfied.

Counsel for the Creditors' Committee, in support of the Applicants, argued that this provision supports the award of reasonable payments under a plan that are not subject to the "substantial contribution" requirement of section 503(b). Upon textual analysis, the Court agrees in part, but only in part. Section 1129(a) of the Code lists requirements that need be satisfied to secure confirmation—conditions for confirmation, if you will. Section 1129(a)(4) is one of those requirements. But like the other requirements for confirmation that appear in section 1129(a), section 1129(a)(4) is still no more than a requirement or condition. It does not provide for an affirmative grant of authority. It does not give permission to do anything.

But the textual structure of section 1129(a)(4) supports the Creditors' Committee's arguments to this extent. It expressly *contemplates* that payments may be made in connection with a reorganization plan—presumably, consensually—by a debtor, plan proponent, issuer of securities, or acquiror of property. Section 1129(a)(4) then requires that any such payments must be approved by the court as reasonable, or that they be subject to such a review. To be sure, the needs and concerns to be addressed by a court when reviewing payments by parties as diverse as those named in 1129(a)(4) are likely to vary materially from case to case. But payments by the debtor, "for costs and expenses in or in connection with the case," or "in connection with the plan and incident to the case," are within that list. Thus the Code plainly contemplates that debtors will be making payments of that character for *something*.

That "something" might or might not be for individual creditors' legal fees. And if they were, they might or might not be for fees that would be capable of being requested, without any debtor assent, under section 503(b). But the language of section

-12-

1129(a)(4) at least permits the possibility that section 503(b) isn't the only source for
authority to pay legal fees under a plan.  If it were, there would be no need to impose the
reasonableness requirement twice.  Applying section 503(b) in accordance with its terms
would already have skinned the cat.[20]  Section 1129(a)(4) suggests, though it does not
compel the conclusion, that there might be other payments by the debtor, "for costs and
expenses in or in connection with the case," beyond those expressly permitted by section
503(b).

Thus the Court must consider the possibility that an award of fees of this character
could be appropriate as one of the myriad, and nearly infinite, types of provisions that can
go into a chapter 11 plan.  Subject to the requirements of the Code, reorganization plans
may distribute and allocate the value of debtors' estates by a broad array of means.
Section 1123(a) of the Code sets forth what a reorganization plan *must* contain, and
section 1123(b) of the Code sets forth what a reorganization plan *may* contain.  Section
1123(b) provides, in that latter respect, as relevant here:

> (b) Subject to subsection (a) of this section, a plan
> may—
>
> …
>
> (3) provide for—
>
> (A) the settlement or adjustment of
> any claim or interest belonging to the
> debtor or to the estate; or
>
> … and

---

[20]    Likewise, while it is possible that the section 1129(a)(4) language was intended to cover the fees
for retained professionals for estate fiduciaries, it is unlikely.  Fee requests by such professionals
already are subject to a reasonableness standard, under sections 330 and 328 of the Code.  Again
there would be no reason to impose a reasonableness requirement twice.

> (6) include any other appropriate provision
> not inconsistent with the applicable
> provisions of this title.

The parties will recall that this Court approved the Global Settlement, of which payment of the Fees was an element, finding the settlement to be one of those matters for which "a plan may…provide," under section 1123(b)(3).[21]  This Court did not then decide whether the payment of the Fees, since it was part of the settlement in the Plan, was likewise authorized under the settlement authority granted by section 1123(b)(3),[22] but textual analysis would tend to suggest the possibility that it could be so authorized, under Code language that is fairly broad in that respect.[23]

Then, as part of its textual analysis, the Court looks to the most potentially relevant provision of all.  Section 1123(b)(6) provides, as noted, that a plan "may" "include any other appropriate provision not inconsistent with the applicable provisions of this title."  The key words, with respect to "any other … provision" that may be included, are (1) "appropriate" and (2) "not inconsistent with the applicable provisions of this title."

---

[21]    *See Confirmation Decision*, 368 B.R. at 223-24 ("As noted above, section 1123(b)(3), which describes what a plan may contain, expressly includes settlements, and the Settlement that this Plan contains is one of its most important, and controversial features").

[22]    If reasonable; *see* section 1129(a)(4).

[23]    Obviously, settlements by their nature, are factually unique, with a broad array of potential terms. Settlements are not evaluated under a "business judgment" test; they must be in the best interests of the estate.  Whether the payment of such fees is in the best interests of the estate, or if the settlement as a whole is in the best interests of the estate notwithstanding a payment of fees provision, would at least seemingly turn on the particular facts as to the settlement, the underlying controversy, and the umbrella bankruptcy case.  In light of the remainder of its analysis, the Court does not need to decide whether a payment of fees could be authorized under section 1123(b)(3) (or Fed.R.Bankr.P. 9019) alone.

The latter of the two quoted provisions has easily been satisfied here.  As noted above,[24] section 503(b) does not provide that it is the *only* way by which individual creditors' fees may be absorbed by an estate.  Nor does any other provision of the Code prohibit their payment; while they may or may not be authorized, they are not forbidden. The issue then devolves into whether such a provision is "appropriate."

The word "appropriate" in this context is not defined in the Code, nor are standards articulated for that word's application.  While the sentence structure implies that there may be some circumstances where a bankruptcy court would regard a plan provision as inappropriate—and it is obvious that "appropriate" must mean *something*, beyond being not inconsistent with the provisions of the Code—it is too big a jump to infer that Congress intended to give bankruptcy judges the power to veto provisions in duly accepted plans based solely on their personal preferences.  On its face, section 1123(b)(6) permits a provision of this character, except to the extent that the "appropriate" requirement demands judicial scrutiny as to a provision's propriety for reasons other than inconsistency with the Code.[25]

After completing any necessary textual analysis—and especially where, as here, a significant word (here, "appropriate") is not judicially defined and is ambiguous—this Court's normal statutory interpretation approach would be to then turn to interpretative caselaw.[26]  But here the caselaw is thin, and insufficiently on point.  The parties' briefing

---

[24]    *See* page 11, *supra.*

[25]    For example, nonstatutory bankruptcy law (*i.e.*, caselaw) does, of course, sometimes place limits on the propriety of plan provisions even when those limits aren't expressly found in the Code.  *See* n.41 *infra* (discussing the caselaw limiting plans' third party release and exculpation provisions).

[26]    *See, e.g., GM Asbestos Committee*, 2010 WL 3219506 at *7 ("I then would look to the caselaw to see if there were any caselaw gloss on the words of the statute, or any basis for reading the Code in any way other than its plain meaning.").

did not identify any cases in which standards for interpretation of "appropriate" as used in section 1123(b)(6) were articulated, and this Court's independent review did not either. Rather, the caselaw on the whole has merely recognized the statutory requirement, and then determined whether the plan provision was appropriate or not.

The most significant example of this, and the caselaw that is most closely relevant (though still indecisive), is the Supreme Court's 1990 decision in *United States v. Energy Resources Co.*[27]  There the Supreme Court considered the propriety of a chapter 11 plan provision that required the payments on federal tax debts (to be stretched out over six years) to be applied first to trust fund taxes, before application to non-trust fund tax liabilities.[28]  Referring to the "appropriate" language now in section 1123(b)(6)[29] without extensive discussion (and also relying on section 105(a), and the "traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships"[30]), the Supreme Court found the plan provision acceptable, and, impliedly, "appropriate."  It ruled that the bankruptcy courts approving plans with those provisions had "not transgressed any limitation on their broad power."[31]  And it also provided, to a modest extent, some evidence of its thinking with respect to the "appropriate" requirement.  It said:

---

[27]    495 U.S. 545 (1990) ("***Energy Resources***").

[28]    Though the *Energy Resources* court explained the reason for the plan provision only by implication, *see id.* at 547, its rationale is obvious; members of senior management, referred to in tax parlance as "responsible individuals," would be personally liable for any unpaid trust fund taxes, and would want to be relieved of that obligation as soon as possible.  Conversely, the IRS would stand a better chance of getting repaid in the absence of this provision, because the debt that was not guaranteed would be paid off before the guaranteed debt.  *See id.* at 550.

[29]    At the time, it appeared as section 1123(b)(5).

[30]    495 U.S. at 549

[31]    *Id.* at 551.

> Even if consistent with the Code, however, a
> bankruptcy court order might be inappropriate if it
> conflicted with another law that should have been
> taken into consideration in the exercise of the
> court's discretion.[32]

Other than that, however, the *Energy Resources* court did not construe or address section

1123(b)(6) or any of its language, much less articulate any other standards for

determining whether or not a plan provision might be appropriate.

Other, but limited, guidance appears in a few post-*Energy Resource*s decision at

the bankruptcy court level.  In *In re Mercado*,[33] on an objection to confirmation of two

individual chapter 11 debtors' plan, the court considered the enforceability of a provision

in the plan that would enjoin the holder of a potentially nondischargeable claim from

executing on the judgment underlying the nondischargeable claim until a default under

the plan had occurred and a cure period had passed.  In a decision principally construing

section 1141(d) of the Code (which deals with the effects of confirmation), and without

also discussing section 1123(b)(6), the *Mercado* court observed:

> *Energy Resources,* therefore, stands for the
> following principles:  (1) the bankruptcy court has
> broad equitable power to resolve debtor/creditor
> matters; (2) its equitable power is limited by
> specific provisions in the Bankruptcy Code and
> other federal laws that should be considered before
> exercising this power; and (3) absent specific
> conflicts in the Bankruptcy Code and federal law, *a
> debtor has broad discretion to deal with its
> creditors through the plan process*, provided its
> actions are necessary for a successful
> reorganization, and the bankruptcy court has the
> equitable power to approve such plans.[34]

---

[32]     *Id.* at 550.

[33]     124 B.R. 799 (Bankr. C.D. Cal. 1991).

[34]     *Id.* at 802 (emphasis added).

Similarly, in *In re Shin*,[35] another individual chapter 11 case, the court observed that a chapter 11 plan could establish a procedure setting a deadline for tax authorities to file requests for payment of postpetition tax claims.  It stated that:

> Such a provision, if couched in reasonable terms, complies with 11 U.S.C. § 1123(b)(6) as an 'appropriate provision not inconsistent with the applicable provisions of this title,' and is necessary to facilitate administration of the plan, for example, by providing the necessary certainty as to when it is likely safe to make distributions to junior classes.[36]

The *Shin* court went on to say, however, that "it would be inappropriate" to provide that the procedure could cut off later pursuit of such tax claims from the debtor, if he had personal liability for them, unless they were entitled to be discharged under section 505(b) of the Code—as the provision would then be *inconsistent* with a provision of the Code, section 1141(d)(2).[37]

Finally, in one case, TWA's 1995 bankruptcy case, the court's Findings of Fact and Conclusions of Law on confirmation were reprinted in the *Bankruptcy Reporter*.[38] The findings stated:

> As permitted by section 1123(b)(6) of the Bankruptcy Code, the Plan includes other appropriate provisions not inconsistent with the applicable provisions of the Bankruptcy Code, including … (b) the provisions of Section 6.9 of the Plan governing the payment of the fees and expenses of the Old Indenture Trustees and Committees….[39]

---

[35]    306 B.R. 397 (Bankr. D.D.C. 2004).

[36]    *Id.* at 412.

[37]    *Id.* at 413.

[38]    *See In re Trans World Airlines, Inc.,* 185 B.R. 302, 313 (Bankr. E.D. Mo. 1995) ("*TWA*").

[39]    *Id.* at 313.

But *TWA* as there published was not an opinion, and had no statutory or caselaw analysis. The *TWA* Findings of Fact and Conclusions of Law cannot be regarded as different in any material respect from any of the orders that Applicants and the Creditors' Committee tendered, in which fees of this character were authorized, but without any legal discussion.[40]

Thus the caselaw is not particularly helpful, except insofar as it suggests that instances in which courts have found plan provisions to be inappropriate, or not "appropriate" within the meaning of section 1123(b)(6), have been very rare. And if there is a common thread in the cases, it is that the courts have historically not found a plan provision to be impermissible because it is not "appropriate" except where the plan provision, while not inconsistent with the provisions of "this title" (*i.e.*, the Bankruptcy Code), is violative of a statutory provision found *elsewhere* in the U.S.C. (*i.e.*, is violative of nonbankruptcy federal statutory law), or is violative of existing caselaw.[41]

Of course, it is at least possible that a strong public policy might make a plan provision not "appropriate." And the Court assumes, without deciding, that there could be plan provisions that a bankruptcy court might find to be inappropriate as a matter of public policy. But the Court believes that instances where there is such a strong public

---

[40]    That also is true of another case in which Findings of Fact and Conclusions of Law on confirmation of a plan authorizing such payments were published—though there just electronically, and without mentioning section 1123(b)(6). *See In re Entergy New Orleans, Inc.*, 2007 Bankr. LEXIS 1634, 2007 WL 1343804 (Bankr. E.D. La. May 7, 2007).

[41]    A classic example of this is the very common practice of overly broad third party release and exculpation provisions, such as those that are impermissible under the Second Circuit's decision in *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),* 416 F.3d 136 (2d Cir. 2005), and that this Court found objectionable, on *Metromedia* grounds, in the *Confirmation Decision, see* 368 B.R. at 267, and its recent decision in *In re Chemtura Corp.* --- B.R. ----, 2010 Bankr. LEXIS 3773, *123, 2010 WL 4272727, *34 (Bankr. S.D.N.Y. Oct. 21, 2010). But because the modern practice is for plans to provide, with respect to provisions which may or may not be appropriate, that such provisions will apply or be enforceable only to the extent permissible under applicable law, plans typically do not violate section 1123(b)(6) for that reason.

policy, and where that policy isn't also reflected in caselaw, will be rare.  And the Court does not believe that it can or should find this fee provision to be inappropriate as a matter of public policy.

Counsel for the Creditors' Committee argued that the ability to pay objecting or settling parties facilitates fiduciaries' ability to settle or otherwise resolve controversies.[42] And this Court's experience tells it that the Creditors' Committee counsel was right in this regard.[43]  Addressing another concern this Court had,[44] Creditors' Committee counsel acknowledged that he'd been involved in lots of cases "where people come out of the woodwork and say things that we think are offensive and frivolous," but said that "[w]e don't agree to pay them."[45]  He said that "when the claims are really frivolous, they don't get paid."[46]

---

[42]     *See* Arg. Tr. 20-21, 47.

[43]     For instance, in *Global Crossing*, back in 2002, an objection to confirmation was withdrawn after this Court approved a settlement which included a provision authorizing payment of the objector's fees (though without then ruling on the propriety of the provision, which was not objected to by any party), after which confirmation proceeded on a substantially consensual basis.

[44]     As the Court asked in oral argument:

> [D]on't I also have to consider that establishing an environment in which people develop these expectations feed[s] on the very stuff that encourages terrorism, encourages frivolous claims, encourages holdups, because if wors[t] comes to wors[t], when you fold your tent, at least you're going to be back where you started from?

Arg. Tr. at 29 (reporter's transcription errors corrected).  *See also id.* at 33:

> But I'm unsure in my mind whether reasonableness is enough of a safety valve because the future debtors of the world, the future creditors' committees of the world, the future estate fiduciaries of the world are going to constantly be getting these objections by ad hoc committees and others who aren't satisfied with plans the way the bulk of the stakeholders in the case have developed them, and it's an invitation to more and more abuse.

[45]     *Id.* at 30.

[46]     *Id.*

On the other hand, it has been observed, correctly, that an estate's payment of the legal fees for constituencies litigating against each other materially increases the costs of the chapter 11 case.  As this Court noted in *Chemtura*, "[b]ankruptcy judges are painfully familiar with the litigousness of large bankruptcy cases, fueled in material part by the phenomenon (present especially with official committees, but also with *ad hoc* committees who look to estates for the payment of their fees) that those whose fees are paid by someone else have no incentive to keep costs under control, or to bring the litigousness to an end."[47]

Likewise (though this issue is different, and closer), reasonable people can differ over whether an estate's payment of individual creditors' fees—especially those of distressed debt investors who enter the chapter 11 process as a matter of choice to make a profit[48]—is sound policy.  The distressed debt investors provide useful liquidity for creditors left holding the bag who wish to cash out their claims—and this is no small thing.  But they also impose extraordinary burdens on the judicial system; distressed debt investors (and, though they are increasingly rare, more traditional creditors) in large chapter 11 cases don't pay for the costs and burdens to the bankruptcy system that their jockeying with each other entails.  And, of course, their efforts to make other creditors pay the fees for that jockeying make things worse.  For the creditors who are distressed debt investors (which is most of them), there also is the philosophical issue as to whether

---

[47]   --- B.R. ---, 2010 Bankr. LEXIS 3773 at *132-33, 2010 WL 4272727 at *36.

[48]   Counsel for one of the Applicants, who actually sought a "fee enhancement," also told the Court that payment for legal fees was an important issue, "[b]ecause holders of claims whether they be hedge funds or other sophisticated holders when they reach plan settlements typically include that as part of their economic take or what's going to be their piece of the pie as Your Honor has called it."  (Scheduling Conf. Tr. at 66).

they should simply pay the legal fees they incur as one of their costs of doing business, just as an airline pays for the fuel that it consumes.

Thus the wisdom of a policy permitting the payment of individual creditors' fees for advancing their own private interests, in the absence of a benefit to the estate, is subject to fair policy debate. Congress might conclude that in the absence of a benefit to the estate, reorganization plans shouldn't provide for the legal fees incurred by individual creditors to be borne by other creditors. But the right thing to do isn't so clear that it can be viewed as public policy—or, as a matter of importance, rise to the level of public policy at all.

Ultimately, after the textual analysis and caselaw discussion above, the Court believes that it must be wary of declaring a plan provision not "appropriate," and hence forbidden, in the absence of a violation of statutory or caselaw, a provision plainly contrary to public policy, or, perhaps, unusual circumstances or good reason that the Court cannot find here. Section 1123(b)(6), by its terms, is plainly a broad grant of authority. As previously noted, reorganization plans, after they get the requisite assent, may allocate and distribute the value of debtors' estates by a broad array of means. The various interests of maintaining the necessary flexibility for plan proponents and other parties in interest, maintaining predictability in the bankruptcy courts of this district and elsewhere, and avoiding judicial legislation all suggest a construction of section 1123(b)(6) under which judges act with restraint in declaring plan provisions not to be appropriate based on anything short of bankruptcy caselaw, nonbankruptcy statutory or case law, or clear public policy concerns.

Accordingly, the Court rules that to the extent that the requested fees are reasonable, and the requirements of section 1129(a)(4) likewise are complied with, Section 6.2(d) of the Plan is permissible, and the Code permits the Applicants' reasonable fees to be recovered under that provision without showing compliance with sections 503(b)(3) or (4).

## II.

### Reasonableness

The Court then turns to the issue of reasonableness, considering it in the context that it must be considered here. That context, of course, is a determination by the Debtors, which Adelphia creditors and equity ratified by their plan acceptances, to pay the reasonable costs of nonfiduciary creditors trying to increase their personal recoveries on their claims—on long positions in bonds or other claims that they held.

In this context, it should be obvious that the fact that the fees were incurred to increase one's share of the pie, or some other private agenda, in the absence of more, is insufficient by itself to make a creditor group's fees unreasonable. Some traditional bankruptcy court concerns, like overworking a matter or running up excessive disbursements (the "**Economy Concerns**"), would apply in this reasonableness context as well.[49] But other concerns that normally would be important to a bankruptcy court, like benefit to the estate, would not matter here.[50] One would expect, to the contrary, that

---

[49]    Two Applicants, for a while, astoundingly sought a *premium* on their fees—also referred to as a "fee enhancement" (Scheduling Conf. Tr. at 65)—in their applications. All such requests were thereafter withdrawn, obviating the need for the Court to more extensively express its outrage with such requests. Whatever "reasonable" may or may not mean in this context, it does not include fee premiums for advancing one's own interests at the expense of other creditors.

[50]    Some of the activities undertaken by the Applicants (most obviously, the MIA Litigation), did indeed confer a benefit to the estate, since if they hadn't been performed in that fashion, they would have had to be performed in another way, or by additional fiduciaries. But finding that to

-23-

the Applicants would be looking out for no one other than themselves.  Subject to the

Economy Concerns, and the other concerns discussed below (the "**Behavioral**

**Concerns**"), there would be nothing wrong with that.

But while looking out for oneself, without more, would not make requested fees

in this context unreasonable, here there is something more, because behavior by some of

the Applicants in this case went beyond the bounds of ordinary negotiation and advocacy.

The Court saw conduct that was outrageous.  And Applicants engaging in it, at least

seemingly, now wish to be paid for it.

The paradigmatic example of outrageous conduct in this case is that of the

Arahova Bondholders, in taking efforts to bring this whole case down, by filing a motion

to appoint a chapter 11 trustee for Arahova—when that would result in a default under

the DIP financing facility and an event excusing Time Warner and Comcast from closing

on their purchase—and then putting the supposedly critical concerns that they claimed

occasioned their motion to be put on hold pending further plan negotiations.[51]  In its

January 2006 decision addressing the Arahova Bondholders' motions,[52] this Court stated:

> [T]he Court further decides these motions in light of
> the compelling inference that the motions were filed
> as part of a scorched earth litigation strategy that
> would provide the Arahova Debtors with little
> benefit that they do not already have (trumped,
> dramatically, by a resulting prejudice to the
> Arahova Debtors themselves, along with all of the
> other Debtors), and which would have the effect
> (and, the Court believes, the purpose) of imperiling
> the pending Time Warner/Comcast transaction and

---

be compensable is easy; the more difficult challenge is in determining what would or would not be
appropriate when the Applicant was advancing its own interests alone.

[51]   *See Confirmation Decision*, 368 B.R. at 159-61, describing this episode.

[52]   *In re Adelphia Communications Corp*., 336 B.R. 610, 618-19 (Bankr. S.D.N.Y. 2006) (the
"***Arahova Trustee Motion Decision***").

the Debtors' DIP financing in an effort to extract a
greater distribution, sidestepping the Court-
approved process for determining the Intercreditor
Dispute issues on their respective merits.[53]

This Court stated at the conclusion of the *Arahova Trustee Motion Decision*:

The bringing of motions like these is not unethical,
or sanctionable, but *neither should it be
encouraged, or rewarded*. Motions that would
bring on intolerable consequences for an estate
should not be used as a tactic to augment a
particular constituency's recovery.[54]

Such conduct by the Arahova Bondholders and their counsel cannot be rewarded in this

context, either. Conduct like this cannot be regarded as reasonable in any commonly

understood sense of that word.

While the Arahova Bondholders' behavior was the most egregious, it was not the

only example of offensive behavior by participants in these cases. Other examples

included:

- Shorting the Arahova bonds, and thereby making a financial bet on

  reduced recoveries by the Arahova bondholders, and on delay in the

  case;[55]

- Making threats to the Debtors' Board that its members' failures to propose

  a plan to that constituency's liking would be a breach of fiduciary duty;[56]

  and

---

[53]    *Id.* at 618-19.

[54]    *Id.* at 677-78 (emphasis added).

[55]    See *In re DBSD North America, Inc.,* 421 B.R. 133, 143 n.44 (Bankr. S.D.N.Y. 2009) (in a
decision on propriety of designating votes, describing the admitted short positions in the *Adelphia*
cases, and noting that if the motion in *Adelphia* to designate the votes of those with the short
positions hadn't been withdrawn (because the shorting parties' plan rejections wouldn't make a
difference), the designation motion would have been granted "in a heartbeat.").

- Planting documents and information with the *Wall Street Journal* and *Debtwire* to advance goals in plan negotiations, and, allegedly, to manipulate ongoing trading in the Debtors' bonds.[57]

In oral argument on this motion, counsel for the Creditors' Committee, who was the Applicants' principal advocate on this motion,[58] addressed concerns by the Court in this regard.  Apart from its concerns as to the statutory and caselaw basis for payments of this character (as to which the Court's concerns ultimately were satisfactorily addressed, as discussed in Part I above), the Court was extraordinarily troubled by the notion that other creditors should have to subsidize activities of the character just described, or that

---

[56]   *See Confirmation Decision*, 368 B.R. at 269 ("I fully understand the legitimate needs and concerns of parties to seek some protection from the continuing threats that creditors have launched against each other (and against the Debtors' Board and management) over the 4-1/2 years of these cases.").

That was outrageous not only in its own right, but also because claims for breach of fiduciary duty would belong to the estate, and not to any particular constituency.

[57]   *See In re Adelphia Communications Corp.*, 359 B.R. 54 (Bankr. S.D.N.Y. 2006) (the "**Designation Decision**"), describing this episode.  *See also* the *Confirmation Decision*, 368 B.R. at 167.   As the latter described:

> Unfortunately, members of the ACC Senior Notes Committee, holding the bulk (though not all) of the Senior Notes represented by that committee, declared the settlement "dead on arrival," and announced (both publicly and privately) their intent to reject any version of the April Plan embodying the settlement.
>
> They conveyed these views in a letter dated April 17, 2006 to the Adelphia Board, and the letter found its way to the Wall Street Journal, substantially simultaneously with the time (or perhaps before) it was received by at least some of the Board members to whom the letter to the Board was directed. On April 19, 2006, the Wall Street Journal ran an article discussing the intercreditor tensions, quoting portions of that letter.

[58]   Though it is presumably clear from the discussion above, the Court emphasizes that it was not the Creditors' Committee or its counsel whose activities raised the Behavioral Concerns; it was individual and *ad hoc* committee members of their constituency.  Indeed, the Creditors' Committee, on more than one occasion, was required to oppose or otherwise deal with the Behavioral Concerns—at substantial cost to the Debtors' estates.  The Court leaves for another day, with appropriate reservations of rights, the separate issue as to whether offending Applicants should be charged with the costs of the Debtors and Creditors' Committee to respond to the conduct raising the Behavioral Concerns.

-26-

the judicial system could countenance payment for behavior of that type.[59]  Creditors'

Committee counsel responded, in substance, that the Court could address concerns of this

character by the reasonableness requirement.  He emphasized said:

> In contrast, frankly, Your Honor, to other deals that
> have been approved in this district, nobody is
> seeking to evade judicial review on the basis of
> reasonableness …  — nothing in the plan, none of
> the parties.  And to the extent that Your Honor
> concludes that someone's conduct was offensive, I
> can't imagine that payment of fees on that would be
> reasonable.[60]

And he acknowledged that "Your Honor has every power to look at what people did on a

reasonableness basis.  And no one is seeking to evade judicial review."[61]

Coming back to the Court's concerns in this area, after making his statutory

construction points, and noting what had been done in other cases, counsel for the

Creditors' Committee capsulized his position:

> And I think Your Honor has the ability to, on the
> one hand, send a clear message that tactics that
> Your Honor views as being inappropriate are not
> reasonable and not subject to compensation, while
> at the same time doing what we think is the right
> thing and compensating the remainder.[62]

Ultimately, the Court is satisfied by this approach.  Consistent with the arguments

that Creditors' Committee counsel made, the Court determines that the reasonableness

---

[59]      *See, e.g.*, Arg. Tr. at 13-14:

> [D]oesn't giving people comfort that in the next case once
> more they're going to be able to recover these fees, give them
> the comfort that they can misbehave even more than they
> misbehaved in this case … [a]nd that they can be subsidized in
> their misbehavior?

[60]      *Id.* at 14.

[61]      *Id.* at 15.

[62]      *Id.* at 36.

standard can and must be used to disallow compensation for services subject to the

Behavioral Concerns.  And the Court agrees with counsel for one of the Applicants, who

had to live with others' abuses, when he said that "[r]easonableness has to be a potent

enough tool to deal with abuse, frivolous arguments, or any inappropriate behavior in this

courtroom by anyone seeking to be paid."[63]  The Court thinks that it indeed must send a

clear message that tactics of the type the Court described above—and the similar tactics

that might be used in the next case—"are not reasonable and not subject to

compensation."[64]  And the Court will not permit payment for any services related to the

activities that the Court described above, or otherwise raising issues as to the Behavioral

Concerns.

　　　　But subject to the usual adjustments necessary to address any applicable Economy

Concerns, the Court will, as Creditors' Committee counsel urged, permit "compensating

the remainder."[65]

<u>Conclusion</u>

　　　　The Court determines that under the Code and the caselaw, reasonable fees may

be paid where, as here, the provision for fees is an element of a chapter 11 reorganization

plan.  The Court further determines that the reasonableness requirement does not permit

payment for fees to advance interests unrelated to maximizing recovery on claims, for

---

[63]  　　*Id.* at 52.  The attorney continued, in comments with which the Court would also agree:

> Why?  Because taking frivolous positions, acting like a
> terrorist, is not only something ad hocs do, it's something that
> official committees sometimes do, it's something debtors
> sometimes do, it's something trustees sometimes do, and, yes,
> it's something even examiners sometimes do.

　　*Id.*

[64]  　　*Id.* at 36.

[65]  　　*Id.*

activities that go beyond normal advocacy or negotiation, or for activities that otherwise are abusive, irresponsible, or destructive to the estate.

The Court understands that any adjustments necessary to address Economy Concerns have already been determined as a consequence of the usual dialogue between Applicants and the UST.  Each of the Applicants is now to file with the Court (with copies to counsel for the Debtors, the Creditors' Committee, other Applicants, and the UST), a declaration stating in substance that the Applicant has not sought payment from the Estate for any activities raising issues as to any of the Behavioral Concerns or that related in any way to the Behavioral Concerns—or that the Applicant, prior to its submission of that declaration, has pruned from its application any request for compensation for such activities.[66]

If no objection has been lodged within 5 business days after the filing of a declaration of either type by any Applicant, the Debtors are authorized and directed to make payment[67] to that Applicant as soon as practicable.  If any Applicant is unable or unwilling to execute such a declaration (if, by way of example, it contends that the

---

[66]     The details as to any such pruning shall be provided to the counsel for the Debtors, the Creditors' Committee, the UST, and to any other Applicant that makes a request for such.

[67]     The amount to be paid is to be each Applicant's requested amount, or its requested amount net of any adjustments or pruning to address any Economy Concerns or Behavioral Concerns, as the case may be.  The Debtors, Creditors' Committee, UST and the Applicants are authorized and directed to engage in any necessary dialogue to fix the exact amounts, without Court intervention if possible.

conduct in question was in fact reasonable and/or compensable), or if any objection is timely lodged, the Court will schedule an evidentiary hearing on the matter.  In such event, the Debtors are to defer payment on the Application until the Court has ruled.

SO ORDERED.

Dated: New York, New York
      November **_18_**, 2010

        _**s/Robert E. Gerber**_
        United States Bankruptcy Judge